UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V. AND CB&I UK LIMITED,<br><br>Petitioners,<br><br>v.<br><br>REFINERÍA DE CARTAGENA S.A.S.,<br><br>Respondent. | Case No.: |

**PETITION TO VACATE ARBITRATION AWARD**

Petitioners Chicago Bridge & Iron Company N.V. ("CB&I NV") and CB&I UK Limited ("CB&I UK") (together, "Petitioners" and with nonparty CBI Colombiana, S.A., ("CBI Colombiana"), "CB&I"), by and through their undersigned attorneys, Holland & Knight, LLP, hereby petition this Court for an order and judgment vacating the final arbitration award, dated June 2, 2023 and noticed June 7, 2023 (the "Final Award") in the arbitration captioned *Refinería de Cartagena S.A. v. Chicago Bridge & Iron Company N.V. et al.*, International Court of Arbitration of the International Chamber of Commerce ("ICC"), Case No. 2147/RD (the "Arbitration") pursuant to the Inter-American Convention on International Commercial Arbitration, 9 U.S.C. §§ 301-07 (the "Panama Convention"), the United Nations Conventions on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-08 (the "New York Convention"), and the Federal Arbitration Act, 9 U.S.C. § 10 (the "FAA").

The Petition to Vacate is supported by the accompanying memorandum of law and Declaration of Stephen B. Shapiro, dated June 8, 2023 ("Shapiro Decl."), which contains true and correct copies of the Final Award, the operative contracts, and other documents relevant to this

application. As summarized below and more fully detailed in CB&I's accompanying memorandum of law, CB&I respectfully requests that the Court vacate the Final Award under 9 U.S.C. §§ 10(a)(3) and (4) on the basis that the arbitrators (i) deprived CB&I of fundamental due process and equality of arms during the Arbitration; (ii) exceeded the contractual powers conferred on them by the parties, and (iii) manifestly disregarded the law by refusing to enforce the terms of the parties' heavily negotiated agreement, and instead dispensing its own brand of industrial justice

In support of this Petition, CB&I respectfully states as follows:

## PARTIES

1. Petitioner CB&I N.V. is a company organized and existing under the laws of The Netherlands. It maintains its principle place of business at Prinses Beatrixlaan 35, 2595 AK, The Hague, The Netherlands. CB&I NV was a respondent in the Arbitration.

2. Petitioner CB&I UK is a limited liability company incorporated under the laws of the United Kingdom. It maintains its principal place of business at 2 New Square Bedfont Lakes Business Park, Feltham, Middlesex, United Kingdom, TWH14 8HA. CB&I UK was a respondent in the Arbitration.

3. Respondent Refinería de Cartagena S.A.S. ("Reficar") is a mixed capital company organized under Colombian law as a corporation and is owned by Ecopetrol S.A., the national oil company of the Republic of Colombia. Reficar is the owner of the Cartagena Refinery in Cartagena, Colombia (the "Refinery"), and was the claimant in the Arbitration. Upon information and belief, it maintains its principal place of business at Zona Industrial Mamonal Km. 10, Cartagena, Colombia.

4. Non-party CBI Colombiana is a *sociedad anónima* incorporated under the laws of Colombia. Upon information and belief, CBI Colombiana last maintained a principal place of

2

business at Cr 56 Km 2-10 Int 1 Mamonal, Cartagena, Bolívar Colombia.  CBI Colombiana was a respondent in the Arbitration, and was represented by the undersigned counsel (along with co-counsel) until September 15, 2020.  However, the *Superintendencia de Sociedades* ("SOC"), an agency of the Republic of Colombia (which, again, is the ultimate owner of Reficar), assumed control of CBI Colombiana and issued an *ex parte* order involuntary liquidating CBI Colombiana while the Arbitration was pending.  The SOC's *ex parte* order appointed a Colombian lawyer to serve as CBI Colombiana's "liquidator" and provided that individual with complete authority to control CBI Colombiana's affairs.  These SOC actions (i) were adverse to the interests of CBI UK and CBI N.V., (ii) created a situation where the Republic of Colombia controlled the claimant and one of the respondents in a USD $4 billion plus arbitration, and (iii) required counsel's withdrawal as counsel of record to CBI Colombiana in the Arbitration.  Accordingly, Petitioners' undersigned counsel does not purport to act on behalf of that entity.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. § 203 and 9 U.S.C. § 302 because the Petition seeks vacatur of an arbitral award pursuant to the Panama Convention and the New York Convention, as implemented by Chapters 2 and 3 of the FAA.

6.  The Final Award falls under both Conventions because it is an "arbitral award arising out of a legal relationship," which is considered "commercial" and "not entirely between citizens of the United States."  9 U.S.C. § 202; *see also* 9 U.S.C. § 302.

7.  Pursuant to 9 U.S.C. § 305, when the requirements for application of both the Panama Convention and New York Convention are met, the New York Convention applies unless (i) a "majority of the parties to the arbitration agreement are citizens of a State or States that have

ratified or acceded to the [Panama] Convention" and are members of the Organization of American States, or (ii) "otherwise expressly agreed." Here, at Section 7.3 of their Dispute Resolution Agreement (the "DRA"), the parties agreed that that the Final Award should be enforced "in accordance with the [Panama Convention] and, where not in conflict, the [New York Convention]."

8. The Arbitration was seated, and the Final Award was rendered, in New York, New York.

9. Venue is proper in this Court under 9 U.S.C. § 204 because the parties designated New York, New York as the seat of the arbitration at Section 4.9 of the DRA and Paragraph 113 of the Terms of Reference. *See also* 9 U.S.C. § 302. Venue is also proper in this Court under 9 U.S.C. § 204 and 9 U.S.C. § 1391(b)(3) because Reficar is subject to this Court's personal jurisdiction with respect to this action.

10. This Court has personal jurisdiction over Reficar because Reficar (i) agreed to arbitrate in New York and subsequently participated in the Arbitration, which was seated in New York; and (ii) consented to the personal jurisdiction of this Court.

## FACTUAL BACKGROUND

### A. The Project Agreements Set Dispute Resolution Parameters

11. On June 15, 2010, CB&I and Reficar entered into engineering, procurement, and construction contracts (the "EPC Contract") to upgrade and expand Reficar's oil refinery in Cartagena, Colombia (the "Project"). The EPC Contract, included an Offshore Agreement, an Onshore Agreement, and a Coordination Agreement.

12. Generally, the Offshore Agreement covered work performed on the Project outside of Colombia and is governed by New York law; the Onshore Agreement covered work performed

4

on the Project in Colombia and is governed by Colombia law; and the Coordination Agreement, governed by New York law, specified how the Parties' obligations under these agreements interrelated.

13. Simultaneous with the EPC Contract, the parties entered into the DRA.

14. The DRA memorialized procedures to resolve "any dispute, controversy or claim which arises out of or is related to any one or more Project Agreements."[1]

15. At Section 4.1 of the DRA, the parties agreed that "[a]ny dispute not amicably resolved by the Parties . . . must be referred to and finally resolved by arbitration administered by the ICC and conducted under the ICC Rules as modified by this Agreement."[2]

16. The parties further agreed, at Sections 4.9 of the DRA, that "the place and seat of arbitration shall be New York."

**B.  Reficar Initiates Arbitration and CB&I Asserts Counterclaims**

17. On March 8, 2016, Reficar initiated the Arbitration by filing a Request for Arbitration with the ICC. CB&I answered the Request for Arbitration, denying liability, and filed a counterclaim (the "Counterclaim") on May 25, 2016.

18. In accordance with the parties' agreement, the ICC constituted a tribunal (the "Tribunal"). Specifically, on July 18, 2016, the Secretary General of the ICC confirmed Andrés Jana Linetzky and Sir Vivian A. Ramsey as co-arbitrators, upon the respective nominations of Reficar and CB&I; and, on August 19, 2016, the Secretary General of the ICC confirmed Juan Fernández-Armesto as president of the Tribunal, on the joint nomination of the co-arbitrators.

---

[1]   The DRA defines "Project Agreements" to include *inter alia* the Offshore Agreement, Onshore Agreement, Coordination Agreement, and DRA. DRA at § 1.1 and Appendix 1.
[2]   The DRA clarifies, however, that New York state and federal courts "shall have sole and exclusive jurisdiction over the enforcement or challenge to enforcement of this Dispute Resolution Agreement," which is governed by New York law.

19. The parties and the Tribunal subsequently memorialized Terms of Reference for the Arbitration on October 28, 2016. The Terms of Reference set forth the parties' respective claims and counterclaims and acknowledged New York City as the seat and place of arbitration.

20. Over the next several years, the parties submitted briefing and exchanged witness statements, expert reports, and exhibits in support of their respective claims, counterclaims, and defenses.

21. The Tribunal held a virtual merits hearing (the "Hearing"), commencing on May 17, 2021.

22. The parties submitted two rounds of post-trial briefing and then presented closing statements in November 2021.

    C.    **The Tribunal Issues the Final Award**

23. The ICC noticed the Tribunal's June 2, 2023 Award to the parties on June 7, 2023.

24. The Tribunal rejected Reficar's arguments that CB&I fraudulently induced it to enter into the cost-reimbursable EPC Contract, finding that Reficar initiated the decision to proceed with the contract structure based on advice from Linklaters and multiple respected consultants.

25. Yet, the Tribunal nonetheless (i) adopted a "last resort" and "rare" damages methodology that identifies a fixed cost that does not appear in the EPC Contract and orders CB&I's repayment of $845.4 million in costs that CB&I had incurred in performing the work (*see generally* Final Award, ¶¶ 855-871, 918, 947-48, 952, 963); (ii) ruled that cost overruns and delays on the Project amounted to *res ipsa loquitur* evidence of gross negligence, thereby invalidating the EPC Contract's limitations of liability and awarding Reficar $152.75 in delay liquidated damages (*see generally id*. ¶¶ 1723-25, 2219); (iii) found that CB&I failed to correct defects for which it

owes Reficar $10.3 million for Project close-out impacts (*see generally id.* ¶¶ 1817, 1821, 1832-34); and (iv) concluded that CBI Colombiana, CB&I UK, and CB&I N.V. are jointly and severally liable to Reficar for the full damages award (*see generally id.* at ¶ 2302-14).

26. It is these findings—rooted in due process violations, prejudicial procedural measures, and irrational positions that defy the plain language of the parties' contract—that require vacatur of the Award.

## GROUNDS FOR VACATUR OF THE FINAL AWARD

### A. The Tribunal Employed Procedures That Were Fundamentally Unfair to CB&I

27. *First*, the Tribunal violated CB&I's due process rights when it failed to preclude affirmative testimony from Reficar witnesses who refused to appear for cross-examination.

28. As explained below, the Tribunal's compressed virtual hearing schedule permitted CB&I to designate only a fraction of Reficar's witnesses for cross-examination. The parties thus negotiated protocols for the selection and disclosure of fact witnesses for cross-examination, with strict consequences if a party failed to produce a duly-noticed witness. Specifically, the parties agreed that "[t]he Tribunal shall not consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question fails to provide a legitimate reason for the Fact Witnesses's [sic] failure to appear." Hearing Protocol, ¶ 79(b). If, and only if, the proffering party provided a "legitimate reason" for a witness's failure to appear could the Tribunal then evaluate the "weight" that should be accorded to the witness statement. *Id.*

29. Consistent with the parties' protocol, CB&I designated Christian Mantilla (a senior Project representative employed by Reficar's Project Management Consultant, Foster Wheeler) and Andrés Riera (Reficar's Vice President on the Project) for cross-examination.

7

30. CB&I chose to use its limited cross-examination opportunities for Messrs. Mantilla and Riera—to the exclusion of other key Reficar witnesses—because each gave extensive witness statements on key Project topics. Messrs. Mantilla's and Riera's high-level roles on the Project, and Reficar's and its experts' extensive reliance on Mantilla's and Riera's witness statements (Reficar and its experts cited their witness statements hundreds of times in their written submissions), made their testimony key to Reficar's claims.

31. Just <u>three weeks</u> before the Hearing commenced, however, another instrumentality of the Republic of Colombia (the "*Contraloría*") attempted to circumvent and unduly influence the Arbitration process by ordering CB&I and certain witnesses in the Arbitration to pay Colombia approximately USD $800 million in damages in connection with the Project. This improper, politically-motivated *Contraloría* proceeding—premised on effectively the same issues as the Arbitration—had been pending for years, but the decision was timed to disrupt CB&I's case preparations and intimidate potential witnesses. Reficar then seized on that decision to avoid having these two key witnesses cross-examined.

32. Specifically, just <u>four days</u> prior to the start of the Hearing, Reficar informed the Tribunal and CB&I that Mr. Mantilla refused to appear in light of "the recent issuance by the *Contraloría* of an order in which [Foster Wheeler] along with . . . others was determined to be fiscally responsible for events related to the Reficar Project." Notably, (i) Mr. Mantilla's voluntarily witness statement in support of Reficar's Claim was filed <u>after</u> the *Contraloría* named his employer, Foster Wheeler, as a defendant in that proceeding; and (ii) other Foster Wheeler witnesses and witnesses who, unlike Mr. Mantilla, were personally at risk in the *Contraloría* proceeding, all appeared during the Hearing.

33. Similarly, on May 20, 2021, <u>the fourth day of the Hearing</u>, Reficar informed the Tribunal and CB&I that Mr. Riera, too, would not appear.  For Mr. Riera, Mr. Reficar blamed "demands placed on his time in relation with the *Contraloría's* recent issuance of an order." Reficar failed to account for the suddenness of his unavailability (the *Contraloría* decision had been issued nearly a month earlier) or explain how the unidentified "demands" were so onerous so as to prevent a limited, two-hour, virtual examination—particularly where Mr. Riera found the time to draft a 61-page witness statement in the midst of the *Contraloría* proceedings.

34. Reficar deprived CB&I of the opportunity to confront Mantilla and Riera with contemporaneous evidence (including Project records) and their statements provided in related Colombian proceedings that wholly contradicted testimony they offered in the Arbitration on key aspects of Reficar's claims.

35. Despite the obvious prejudice to CB&I, the Tribunal declined to strike the witness statements of Messrs. Mantilla and Riera.

36. Reficar's strategic, belated disclosures deprived CB&I from calling other Reficar witnesses.  Moreover, the Tribunal's refusal to afford CB&I contemporaneous relief left open the possibility that it would grant weight to testimony offered by Mantilla and Riera, requiring CB&I to exhaust other witness examination to attempt to cover topics it intended to cover with those witnesses.

37. CBI's fears were realized with the issuance of the Award—the Tribunal founded material aspects of its Award on Mantilla's and Riera's witness statements even though CB&I never had the opportunity to test the witnesses' reliability and credibility consistent with fundamental principles of due process.  For this reason too, the Final Award must be vacated.

38. *Second*, the Tribunal deprived CB&I of an adequate opportunity to present its case by failing to enforce important procedural directives.

39. Reficar's Request for Arbitration contained no support for the amount of damages sought, and offered no explanation of the causation on which Reficar's claim was based. Instead, Reficar vaguely stated that it sought "damages, additional Owner's costs, and lost profits in an amount of not less than US$2 billion caused by CB&I's pre-contract misrepresentations and misrepresentations during the Project, resulting in unreasonable and improper costs and Project execution failures."

40. From the outset, CB&I requested that the Tribunal address Reficar's failure to set forth its claim with the details necessary to enable CB&I to respond. The Tribunal failed to timely require Reficar to do so, and permitted Reficar's late disclosures of key arguments, evidence, and damages sought, severely prejudicing CB&I and denying CB&I the opportunity to respond.

41. Under Procedural Order No. 1, the parties were required to disclose their causation and damages theories in a "non-exhaustive" iteration of their Statement of Claim/Counterclaim. The purpose of this disclosure requirement was to afford the parties sufficient opportunity to marshal evidence to contest these theories in their defensive submissions.

42. Procedural Order No. 1 contemplated that the parties then would use their respective "exhaustive" submissions (submitted at the same time as the counterparty's "non-exhaustive" defensive statement) to supplement the previously-submitted Statements of Claim/Counterclaim with <u>all</u> evidence in support, and the counterparty would, in turn, marshal counter-evidence in their respective exhaustive defensive submissions.

43. Procedural Order No. 1 also granted each party a reply to the counterparty's non-exhaustive defensive statement (to be submitted at the same time as the parties' exhaustive

defensive submissions), but it was explicit that "no new argument shall be presented, and no new evidence shall be attached" to the replies except if required to rebut arguments and evidence submitted in the submission to which it was replying.  In other words, Reficar's reply submission could only respond to CB&I's opposition points; it could not proffer new evidence in support of its claims for the first time on reply (and vice-versa).  Here again, the purpose was to ensure equality of arms in ensuring that no party was deprived of an opportunity to contest evidence or introduce counterargument.

44. The Tribunal refused to hold Reficar to the mandates of PO No. 1.

45. Reficar's non-exhaustive statement of claim failed to disclose Reficar's damages sought or any causative nexus between those damages and the substantive claims being asserted, as required by PO No. 1.  Instead, Reficar's April 28, 2017 memorial was noncommittal, expressing Reficar's general desire "to recover any and all damages and costs to which it is entitled under applicable law."

46. Indeed, not until its exhaustive statement of claim—<u>two years</u> after its Request for Arbitration—did Reficar disclose <u>any</u> detail on its claimed damages, and, at that point, it more than doubled its claimed amount from "not less than US$2 billion" to approximately $4.5 billion.

47. Thereafter, over <u>three years</u> into the Arbitration, Reficar submitted new evidence and new argument in its Reply to CB&I's non-exhaustive defensive statement, compounding the already serious prejudice that CB&I had suffered.  Over CB&I's objection, the Tribunal admitted all of Reficar's eleventh-hour submissions, permitting CB&I to respond to only a fraction of the new evidence and argument.  Material parts of the Award turn on this intentionally-delayed evidence-by-ambush.

48. The Tribunal's failure to enforce these procedural directives deprived CB&I of fundamental fairness in the development and presentation of evidence and argument and prejudiced CB&I's ability to test the merits of Reficar's Claim, requiring vacatur of the Final Award.

49. *Third*, the Tribunal imposed arbitrary time limits on the Hearing that neither conformed to the complexity and value of the Arbitration nor permitted CB&I to reasonably present evidence supporting its case.

50. When the Tribunal issued Procedural Order No. 1 in 2016, before any evidence had been marshalled, it set a one-month block for the Hearing with a week in reserve.

51. But, after an exhaustive, multi-year arbitral process, CB&I repeatedly stressed that good cause existed to enlarge the Hearing schedule to account for the complexity of issues, the "bet-the-company" stakes of Reficar's Claim for USD $ 4.5 billion in damages, and the breadth of an evidentiary record that included more than 80 fact and expert witnesses, 15,000 pages of written testimony, and hundreds of thousands of pages of exhibits.

52. The Tribunal itself acknowledged that this Arbitration was the "largest and one of the most complex construction disputes in the world."

53. At a minimum, due process mandated that CB&I be permitted to confront key Reficar witnesses whose testimony had already been already accepted into the evidentiary record.

54. Yet, the Tribunal denied CB&I's request for an enlarged Hearing schedule and instead ordered a compressed, virtual Hearing that failed to afford CB&I a meaningful opportunity to present its defense and Counterclaim.

55. Among other things, the Tribunal's arbitrarily-imposed time restrictions (i) forced CB&I to forego cross-examination of over two-thirds of Reficar's fact witnesses, and (ii) allowed

CB&I an average of just 71 minutes to cross-examine each of Reficar's 14 experts on over 7,000 pages of opinions (roughly 8 seconds per page of opinion) and hundreds of thousands of pages of purported "support" for such opinions embodied in appendices.  This too requires vacatur of the Final Award.

### B.     The Tribunal Exceeded Its Contractual Powers

56.     *First*, the Tribunal exceeded its powers in ignoring the parties' choice-of-law directives and acting as *amiable compositeur*.

57.     As noted, there are choice-of-law provisions in both the Offshore Contract and the Onshore Contract:  New York law governs the Offshore Contract "and any matter relating thereto" and Colombia law governs the Onshore Contract "and any matter relating thereto."  EPC Contract, (Offshore and Onshore) at TC 82.1.

58.     The DRA (which also contains a New York choice-of-law provision) expressly requires the Tribunal to apply the substantive law governing the agreement to which the relevant dispute (or portion thereof) relates:

> The Arbitral Tribunal shall be governed by and shall apply the substantive law governing the Agreement under which the Dispute(s) arise. If the Dispute(s) refers to two (2) or more agreements with different applicable law, the Arbitral Tribunal shall apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement.

DRA at § 4.12; *see also* Terms of Reference at p. 10.

59.     Indeed, in its Request for Arbitration, Reficar acknowledged that the DRA required the Tribunal to "apply the law of New York to that part of the Dispute that relates to the Offshore Contract and Colombian law to that part of the Dispute that relates to the Onshore Contract." Reficar RFA, ¶ 24.

13

60. Nevertheless, Reficar intentionally styled its claims without regard to the law that governed the agreement to which it claims related. Through extensive briefing and Hearing argument, CB&I repeatedly highlighted this fundamental problem in Reficar's liability and causation theories and related damages calculations. In response, Reficar repeatedly admitted that it had not associated its claims (or components thereof) with any particular contract or its governing law.

61. Yet, in the Award, the Tribunal nonetheless adopted material aspects of Reficar's flawed analyses and imposed damages against CB&I without itself assessing the agreement under which the claims arose and, in turn, applying the operative controlling law.

62. By accepting Reficar's arguments without attempting to link liability or damages to a specific contract or controlling legal authority the Tribunal failed to "apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement."

63. The parties further agreed, at Section 4.13, that the Tribunal shall neither have nor exercise any power to act "*amciable* [sic] *compositeur or ex aequo et bono*." DRA at § 4.12. The Tribunal nonetheless acted as *amiable compositeur* by creating its own "law" against which to adjudicate breaches of contract and awarding damages based on its creation of "obligations" that do not exist in the EPC Agreement.

64. *Second*, the Tribunal exceeded its powers in ordering a fully virtual merits hearing over CB&I's objection.

65. At Section 4.9 of the DRA, the parties expressly agreed that arbitral hearings would be held in New York, unless all parties agreed otherwise: "The place and seat of the arbitration shall be in New York. The Tribunal may, however, hold hearings, meetings, or sessions anywhere convenient and as agreed to by all Parties to the arbitration." DRA, § 4.9.

66. The Tribunal itself recognized that Section 4.9 contemplates <u>physical, in-person</u> hearings in New York, explaining that "[t]he DRA uses the expression 'anywhere', an adverb of place which clarifies that the rule can only refer to physical meetings." A-105, ¶ 59; *see also id.* ("[T]here is a preference for such physical meetings to be held in New York, but . . . a physical meeting can also be held 'anywhere convenient', provided there is consent of all Parties.").

67. The Tribunal nonetheless concluded that, because Section 4.9 does not explicitly address "hearings by video conference," no party consent was required for the Tribunal to impose this fundamental procedural change. But by expressly specifying a geographic "place" for the arbitration and requiring that all parties consent to move the hearing "anywhere" else, the parties' necessarily excluded holding a hearing by other means or at any other location absent party agreement.

68. While Section 4.9 of the DRA is itself dispositive, the governing ICC Rules also required an in person hearing.

69. The parties agreed that the arbitration would be conducted in accordance with the 2012 ICC Rules (i.e., the ICC Rules in force at the time CB&I filed its Request for Arbitration), as modified by the DRA. DRA at §§ 1.1, 4.1.

70. Under Article 25 of those rules, an "in person" hearing is required upon any parties' request: "After studying the written submissions of the parties and all documents relied upon, the arbitral tribunal shall hear the parties together <u>in person</u> if any of them so requests." 2012 ICC Rules, Art. 25(2) (emphasis added). CB&I so requested.

71. The Tribunal nevertheless unilaterally directed the parties to move forward with a virtual hearing in contravention of the DRA and the 2012 ICC Rules. That decision, too, requires vacatur of the resulting Final Award.

15

    **C.**    **The Tribunal Manifestly Disregarded the Law By Refusing to Enforce the Terms of the Parties' Agreement**

72. The Tribunal also manifestly disregarded the law by refusing to enforce the terms of the parties' written and heavily negotiated agreement, instead dispensing its own brand of industrial justice.

73. *First*, the Tribunal converted what is explicitly stated to be a "cost-reimbursable" contract into a guaranteed fixed-price agreement.

74. After rewriting the contract, the Tribunal ordered CB&I to return $854.4 million that had been rigorously reviewed, approved and paid by Reficar and its construction management consultant.

75. *Second*, Tribunal ignored the parties' agreement express agreement to limit CB&I's total aggregate liability at $70 million, with an additional $15.75 million for delay liquidated damages if the $70 million total aggregate limitation of liability was reached.

76. Remarkably, the Tribunal justified this decision by applying the *res ipsa loquitur* standard in finding that amount of the cost overrun and length of delay constituted gross negligence under New York law and *culpa grave* under Colombian law.  Gross negligence has rarely been found in construction disputes, and never based on *res ipsa loquitur* due to cost overruns and delays.

77. For all these reasons, the Award must be vacated.

### **RELIEF**

WHEREFORE, pursuant to 9 U.S.C. §§ 9, 302, and 207, Petitioner respectfully requests:

1) An Order enjoining enforcement of the Award while this Petition to Vacate is pending;

2) A Judgment vacating the Award; and

3) Any and all further relief that the Court deems just and proper.

Dated: June 8, 2023

                              Respectfully submitted,

                              CHICAGO BRIDGE & IRON COMPANY N.V.
                              and CB&I UK LIMITED,

                              By their attorneys,

                              */s/ Cheryl A. Feeley*
                              Stephen B. Shapiro
                              Cheryl A. Feeley
                              HOLLAND & KNIGHT LLP
                              800 17th Street, N.W., Suite 1100
                              Washington, DC 20006
                              202.955.3000
                              stephen.shapiro@hklaw.com
                              cheryl.feeley@hklaw.com

                              Stosh M. Silivos
                              HOLLAND & KNIGHT LLP
                              31 West 52nd Street
                              New York, NY 10019
                              212.513.3200
                              stosh.silivos@hklaw.com

                              Benjamin R. Wilson
                              HOLLAND & KNIGHT LLP
                              2929 Arch Street, Suite 800
                              Philadelphia, PA 19104
                              215.252.9571
                              benjamin.wilson@hklaw.com

                              *Attorneys for Petitioners*