# EXHIBIT 1 - Part 1

International Court of Arbitration of the
International Chamber of Commerce
Case No. 21747/RD/MK/PDP

Arbitration between

REFINERÍA DE CARTAGENA S.A.

(COLOMBIA)

*CLAIMANT*

and

1. CHICAGO BRIDGE & IRON COMPANY N.V.

(THE NETHERLANDS)

2. CB&I UK LTD.

(UNITED KINGDOM)

3. CBI COLOMBIANA S.A.

(COLOMBIA)

*RESPONDENTS*

## FINAL AWARD

The Arbitral Tribunal

Juan Fernández-Armesto (President)
Andrés Jana Linetzky (Co-arbitrator)
Sir Vivian A. Ramsey (Co-arbitrator)

Administrative Secretary
Deva Villanúa

Deputy Administrative Secretary
Adam Jankowski

June 2, 2023

ICC Case 21747 RD/MK/PDP
Final Award

# INDEX

| | |
|---|---|
| **INDEX** | **2** |
| **GLOSSARY** | **3** |
| **I.   PERSONS INVOLVED IN THE ARBITRATION** | **9** |
| **II.   PROCEDURAL HISTORY** | **17** |
| **III.  INTRODUCTION AND PENDING PROCEDURAL MATTERS** | **45** |
| **IV.  LAW APPLICABLE TO THE DISPUTE** | **52** |
| **V.   FACTS** | **60** |
| **VI.  RELIEF SOUGHT** | **68** |
| **VII. MERITS** | **101** |
| | |
| **VII.1.   Reficar's pre-contractual claims** | **102** |
| VII.1.1.   Facts | 102 |
| VII.1.2.   The Parties' positions | 136 |
| VII.1.3.   The Tribunal's decision | 142 |
| | |
| **VII.2.  Contractual claims** | **196** |
| VII.2.1.   Improper EPC costs | 196 |
| VII.2.2.   CB&I's Counterclaim | 288 |
| VII.2.3.   Improper delay | 314 |
| VII.2.4.   Work Completion costs | 348 |
| VII.2.5.   Procurement costs | 369 |
| VII.2.6.   Indemnification claims | 390 |
| | |
| **VII.3.  Claims outside the Tribunal's power** | **395** |
| **VIII.  QUANTUM** | **404** |
| | |
| **VIII.1.   Liability Cap** | **405** |
| | |
| **VIII.2.   Set-off and liquidation** | **439** |
| | |
| **VIII.3.   Interest** | **449** |
| **IX.  COSTS** | **454** |
| **X.   SUMMARY** | **462** |
| **XI.  DECISION** | **476** |

# GLOSSARY

| | |
|---|---|
| **54 Documents** | 54 email communications, charts and additional materials from the *Contraloría* Proceeding |
| **Administrative Costs** | Fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court |
| **Answer to the RfA and Counterclaim** | Respondents' Answer to the RfA, dated May 25, 2016 |
| **Anticipated/Forecast Labour Invoices** | Monthly advance payments for labour costs under the EPC Contract |
| **April 2010 Schedule** | Project Schedule prepared by CB&I, as updated in April 2010 |
| **B&O'B** | Baker & O'Brien |
| **Bargaining Agreement** | Collective Bargaining Agreement between USO and CB&I, dated September 23, 2013 |
| **Big West** | Big West oil refinery |
| **BL** | The Bill of Lading, a document necessary for the processing a freight shipment. |
| **Blended Requests for Relief** | Requests for Relief by the Parties as subsumed by the Tribunal |
| **BofD** | Board of Directors |
| **BPD** | Barrels per day |
| **BRNs** | Budget Revision Notices |
| **CCC** | Colombian Civil Code |
| **Certifications and Completions Procedure or CCProcedure** | Certifications and Completions Procedure for the Cartagena Refinery Expansion Project, last dated August 15, 2014 |
| **Citigroup** | Citigroup Global Markets Inc. |
| **Claimant or Reficar** | *Refinería de Cartagena S.A.* |
| **Claimant's Reply to Counterclaim** | Claimant's Reply to Counterclaim, dated June 27, 2016 |
| **Claimant's Request for Interim Measures** | Claimant's Request for Emergency Conservatory and Interim Measures, dated November 27, 2019 |
| **Claimant's Responsibility Events** | An event causing Excess Cost arising out of Reficar's instructions, fault or lack of diligence |
| **Claimant's Supplemental Response to Counterclaim** | Claimant's supplemental response to Respondents' Counterclaim, dated October 16, 2021 |
| **Claimant's Updated Statement of Claim Amounts** | Claimant's update of the amounts claimed in the Statement of Claim, dated March 12, 2021 |
| **CMT** | Construction Management Team |
| **Colombian Supreme Court** | Colombian Supreme Court of Justice |
| **Communication Interim Measures** | The interim measures ordered by the Tribunal on September 7, 2020 |
| ***Consorcio Ferrovial*** | *Consorcio Ferrovial SAINC v. Carbones del Cerrejón Limited* |
| **Contested Documents** | Documents contested by the Parties in connection with the *Contraloría* proceedings, filed up to the point of the Second Written Submissions |
| ***Contraloría*** | The Colombian *Contraloría General de la República* |
| ***Contraloría* File** | The case file pertaining to the *Contraloría* Proceeding |

ICC Case 21747 RD/MK/PDP
Final Award

| *Contraloría* Proceeding | The Ordinary Fiscal Liability Proceeding of the *Contraloría* against Respondents |
| Coordination Agreement | An agreement executed by Reficar, CB&I UK and CBI Colombiana, governed by New York law, providing for the coordination of obligations under the Onshore and Offshore Contracts and the resolution of any interpretation conflicts |
| Cost Control Commitments | CB&I's obligations under the Contract to control the Project costs by only submitting for reimbursement reasonable, proper costs incurred in accordance with the Contract, and by treating Reficar's resources as if their own |
| Court | The International Court of Arbitration of the ICC |
| CPHB | Claimant's first Post-Hearing Brief |
| CPHB2 | Claimant's second Post-Hearing Brief |
| CRWs | Cost-Reduction Workshops |
| Cut-Off Date | December 31, 2011 |
| CWS | Witness Statement of a fact witness for Claimant |
| Delay Change Order | Change Order 222 |
| Deviation Rules | Completions Procedure Agreed Deviation, dated July 7, 2014 |
| DOR Matrix | Division of Responsibility Matrix contained in Section 2 of the Procurement Execution Plan titled "CB&I Entities and Responsibilities" |
| DPS | Document Production Schedule(s) |
| DRA | The Dispute Resolution Agreement between the Parties |
| Draft Hearing Protocol or DHP | The text of the draft protocol for the Hearing, which had been proposed jointly by the Parties |
| *Edificio Centro de Comercio Internacional* | *Edificio Centro de Comercio Internacional v. INHISA S.A.* |
| EPC | Engineering, procurement and construction |
| EPC Agreement(s), EPC Contract(s) or simply Contract or Agreement | The six agreements between Reficar and CB&I, dated June 15, 2010 |
| ER | Expert Report |
| Excess Costs | The amounts of money CB&I invoiced to and collected from Reficar, in alleged breach of CB&I's Cost Control Commitments, which Reficar is now claiming back |
| Excluded Costs | Items, for which CB&I, notwithstanding its breach of the Cost Control Commitments, should not bear responsibility, because these Excess Costs were caused by factors outside its scope of control |
| Execution Masterplan | Cartagena Refinery Expansion Project Master Project Execution Plan |
| Exhaustive Defense to Counterclaim or Counterclaim Defense or EDOCC | Claimant's Exhaustive Defense to Respondents' Statement of Counterclaim, dated June 28, 2019 |
| Exhaustive Statement of Claim or ESOC | Claimant's Exhaustive Statement of Claim, dated March 16, 2018 |
| Exhaustive Statement of Counterclaim or ESOCC | Respondents' Exhaustive Statement of Counterclaim, dated March 16, 2018 |
| Exhaustive Statement of Defense to Claim or ESOD | Respondents' Exhaustive Statement of Defense to Claimant's Statement of Claim |

| February 2010 Estimate | CB&I's Revision 2 – Final Estimate Scope to the July 2009 Estimate, dated February 28, 2010 |
|---|---|
| FEED | Font End Engineering Design |
| FEL | Front End Loading |
| Final Award and Award | The current Final Award, dated June 2, 2023 |
| First and Second Alternative | The two alternative decisions adopted by the Tribunal in PO No. 2 |
| First Block | The first part of the Hearing period, eventually held from May 17 to June 4, 2021 |
| First Written Submissions | The Non-Exhaustive Statement of Claim and Statement of Counterclaim jointly |
| FMM | *Formulario de Movimiento de Mercancias*, a Colombia-specific certificate confirming that the goods had entered the Free Trade Zone. |
| Foster Wheeler | Foster Wheeler USA Corporation and Process Consultants, Inc. |
| FTZs | Free Trade Zones |
| Green Book | The IChemE Green Book for Reimbursable Contracts |
| ha | Hectare(s) |
| Heightened Diligence Obligation | Para. 3 of the Project Execution Plan, under which CB&I pledged to rigorously control cost and schedule, in a similar way to a lump sum contract, and to safeguard Reficar's resources as if their own |
| Hearing Protocol or HP | The finalized protocol of the Hearing |
| Hearing Summary Submission | Each Party's submission summarizing its respective position in preparation of the Hearing |
| ICC | The International Chamber of Commerce in Paris |
| ICC Rules | The Arbitration Rules of the ICC in force as from January 1, 2012 |
| Improper Delay Claim | Reficar's claim for damages caused by the delays in the Mechanical Completion of the Project |
| IPA | Independent Project Analysis Inc. |
| Jacobs | Jacobs Consultancy |
| Joint Exhibits | A number of joint exhibits of certain voluminous evidence submitted jointly by Claimant and Respondents |
| Joint Expert Reports | Joint expert reports submitted by the Parties pursuant to Communication A 66 |
| July 2009 Estimate | Estimate Basis Document "CB&I Scope" for the Cartagena Expansion Project Class II (+/-10%) Cost Estimate, dated July 31, 2009 |
| KBC | KBC Advanced Technologies |
| KG | Kenrich Group |
| Large Crane | The TC-36000 crane |
| Legal Costs | Reasonable legal costs incurred by each Party in the furtherance of the arbitration |
| Liability Cap | Limitations of the Contractor's liability under the EPC Contract |
| Liquidation Date | The date as of which the EPC Agreement is deemed to be liquidated |
| Liquidator | The Liquidator of CBI Colombiana |
| Liquidator's Response | The Liquidator's Response to a request of the Tribunal concerning several documents, dated November 11, 2020 |
| List of Demands | USO's formal list of 22 demands to CB&I |

| | |
|---|---|
| **LOI** | Letter of Intent |
| **LSTK** | Lump Sum Turn Key |
| **Mechanical Completion Date** | Date on which all Subsystems on the Project achieved Mechanical Completion |
| **McDermott** | McDermott International, Inc. |
| **MOA** | Memorandum of Agreement, entered into in February 2014 |
| **Monthly Forecasts** | An estimate of the total EPC costs that Reficar would incur until the finalization of the Project, and of the necessary schedule, submitted as a monthly forecast to be provided by CB&I to Reficar |
| **MRR** | The Material Receiving Report, a description of the goods and quantities |
| **New York Law** | The law of the State of New York |
| **Nexant** | Nexant Chem Systems Limited |
| **Non-Exhaustive Defense to Counterclaim or NEDOCC** | Claimant's Non-Exhaustive Defense to Respondents' Statement of Counterclaim, dated March 16, 2018 |
| **Non-Exhaustive Statement of Claim or NESOC** | Claimant's non-exhaustive Statement of Claim, dated April 28, 2017 |
| **Non-Exhaustive Statement of Defense or NESOD** | Respondents' non-exhaustive Statement of Defense to the Non-Exhaustive Statement of Claim, dated March 16, 2018 |
| **OCNs** | Other Country Nationals |
| **October 2010 Re-Baseline Schedule** | Project Schedule, as completed in October 2010 |
| **Offshore Contract** | One EPC Contract governed by New York law, for design, engineering, procurement and other work performed by CB&I UK primarily outside of Colombia |
| **Offshore Parent Guarantee** | A parent guarantee between Reficar and CB&I N.V., governed by New York law, for CB&I UK's obligations under the Offshore Agreement |
| **Onshore Contract** | One EPC Contract governed by Colombian law, for work (mainly construction) performed by CBI Colombiana in Colombia |
| **Onshore Parent Guarantee** | A parent guarantee between Reficar and CB&I N.V., governed by New York law, for CB&I Colombiana's obligations under the Onshore Agreement |
| **Oral Closings** | Session of closing oral arguments |
| **Parties** | Claimant and Respondents jointly |
| **Pathfinder** | Pathfinder LLC |
| **PCS** | Pre-Commissioning and Start-Up |
| **Performance LoC** | Performance Letter of Credit |
| **PFs** | Productivity Factors |
| **PIP** | Project Invoicing Procedure |
| **PO** | Procedural Order |
| *Política Salarial* | Procedure for the Implementation of the Salary Policy of Reficar S.A. Applicable to Employees of Contractors during the Construction of the Cartagena Refinery and Expansion Project |
| **Powell** | Powell Electrical Systems |
| **Pre-Contract Claim** | Reficar's claim that it was tricked by CB&I into changing the remuneration scheme of the contract, from lump sum to cost reimbursable |
| **Presentations** | The in-house attorney's presentations to Claimant's BofD |
| **Project or Refinery Project** | The Refinery modernization and expansion Project |

| Project Definition Contract | The contract for phases FEL-2 and FEL-3 (or the FEED), with the goal of developing the Project scope and schedule, and an LSTK price |
| --- | --- |
| Reasonable Cost Benchmark | A level of costs which represents a reasonable estimate on how much the project should have cost |
| RC or cost plus | Cost-reimbursable |
| Reficar Budget or Budget | The limited budget under which Reficar and Ecopetrol operated |
| Refinery | The Cartagena Refinery |
| Remaining Documents | The remaining documents from the *Contraloría* File, subject to a decision in PO No. 3 |
| Reply to the Non-Exhaustive Statement of Defense or Reply | Claimant's Reply to Respondents' Non-Exhaustive Statement of Defense, dated June 28, 2019 |
| Respondents' Reply to the Non-Exhaustive Statement of Defense to Counterclaim or Respondents' Reply on Counterclaim | Respondents' Reply to Claimant's Non-Exhaustive Defense to Counterclaim, dated June 28, 2019 |
| Representation Forecast | The December 2011/January 2012 Forecast |
| Representation Letter | CB&I's letter to Reficar, signed by its Project Director, Mr. Deidehban, in which CB&I reiterated the validity of the USD 3.971 billion cost Forecast, dated May 22, 2012 |
| Respondent 1 or CB&I N.V. | *Chicago Bridge and Iron Company N.V.* |
| Respondent 2 or CB&I UK | *CB&I UK Ltd.* |
| Respondent 3 or CBI Colombiana | *CBI Colombiana S.A.* |
| Respondents | Respondents 1-3 jointly |
| Respondents' Opposition to Claimant's Request for Interim Measures | Respondents' opposition statement to Claimant's Request for Interim Measures, dated December 16, 2019 |
| RfA | Claimant's Request for Arbitration, dated March 8, 2016 |
| ROM or Rough Order of Magnitude | Late adds, deletes and changes in the February 2010 Estimate |
| RPHB | Respondents' first Post-Hearing Brief |
| RPHB2 | Respondent's second Post-Hearing Brief |
| RWS | Witness statement of a fact witness for Respondents |
| Second Block | The second part of the Hearing period, eventually held from June 28 to July 16, 2021 |
| Schedule Control Commitments | CB&I's obligations under the EPC Contract to achieve Mechanical Completion by the Mechanical Completion Date and to use its best efforts in controlling the Project Schedule |
| SOFR | Secured Overnight Financing Rate |
| *Solicitud* | *Derecho de petición - solicitud de información y copias de documentos de proceso de responsabilidad fiscal* |
| Statement of Counterclaim | Respondents' Statement of Counterclaim, dated April 28, 2017 |
| *SDS* | The Colombian *Superintendencia de Sociedades* |
| Synergy Changes | The scope changes in the Project, precisely the deferral or deletion of certain units (mostly gasoline-producing upgrades) and the expansion of others, after Glencore's exit from the Project in May 2009 |

ICC Case 21747 RD/MK/PDP
Final Award

| | |
|---|---|
| ***Third Written Submissions*** | The Written Submissions made on June 28, 2019 jointly |
| **Total Contested Documents** | Contested Documents together with 29 additional documents objected to by Claimant on July 16, 2018 |
| **TofR** | The Terms of Reference, dated October 28, 2016 |
| **Tr.** | Hearing transcript (page:line format) |
| ***Tutela* Proceeding** | The public *acción de tutela* filed against the *Contraloría* by Foster Wheeler before the 26th Criminal Circuit of Bogotá |
| **Unpredictable Events** | An event which was not under Respondents' control |
| **USGC** | US Gulf Coast (1972) standard work hours |
| **USO** | *Unión Sindical Obrera de la Industria del Petróleo* |
| **Walkdown** | Inspection of a Unit or Subsystem |
| **Walkdown Notice** | Notice of Walkdown |
| **Work Completion Claim** | Reficar's claims in relation to the completion of the Works as well as the correction of defects |
| **WMC** | Watson Millican |
| **WNOC** | Written Notices of Change |

# I.  PERSONS INVOLVED IN THE ARBITRATION

**1.  THE PARTIES**

**1.1.  CLAIMANT**

1.  The Claimant is REFINERÍA DE CARTAGENA S.A., a Colombian company ["**Claimant**", "**Reficar**"] with principal place of business in Cartagena, Colombia, specialized in the refinement of crude oil and owner of the refinery that is subject to this dispute. Its registered office is:

Carretera a Pascaballos Km 12

Zona Industrial de Mamonal

Cartagena D.T. y C. (Bolívar)

Colombia

**Notices to be sent to**:

Carrera 14, No. 85 – 68, Oficina 606

Bogotá D.C., Colombia

2.  Claimant is represented in this arbitration by Mr. Mike Stenglein, Mr. Adam L. Gray and Mr. Matt Vandenberg from KING & SPALDING LLP[1]:

KING & SPALDING LLP

Mike Stenglein

Adam L. Gray

Matt Vandenberg

500 W. 2nd Street, Suite 1800

Austin, TX 78701

Prior to August 3, 2018 Claimant had also been represented by Mr. Daniel Posse of POSSE HERRERA & RUIZ but the law firm was replaced by SUESCÚN ABOGADOS and Santiago Martínez Méndez from GODOY CÓRDOBA on that date[2]. The latter ceased to represent Claimant as of September 10, 2018[3]. The latest update from Claimant no longer lists SUESCÚN ABOGADOS as one of its representatives[4].

**1.2.  RESPONDENTS**

---

[1] Communication C-235.
[2] Communication C-44.
[3] Communication C-49.
[4] Communication C-235.

3.    The Respondents in these proceedings are three companies. Respondents 1 to 3 will be jointly referred to as "**Respondents**".

### 1.2.1. RESPONDENT 1

4.    Respondent 1 is CHICAGO BRIDGE AND IRON COMPANY N.V. ["**Respondent 1**" or "**CB&I N.V.**"], a Dutch company with operative headquarters in Houston, Texas that was entrusted with building Reficar's refinery in Cartagena. It provides conceptual design, technology, engineering, procurement, fabrication, construction and commissioning services to customers in the energy, petrochemical and natural resources industries. On May 10, 2018 CB&I N.V. merged with McDermott International, Inc. ["**McDermott**"][5]. Its address for correspondence is[6]:

McDermott International Holdings B.V.

Prinses Beatrixlaan 35

2595AK, The Hague

Netherlands

### 1.2.2. RESPONDENT 2

5.    Respondent 2 is CB&I UK LTD. ["**Respondent 2**" or "**CB&I UK**"] a limited liability company existing and incorporated under the laws of the United Kingdom, 100%-wholly-owned subsidiary of Respondent 1, providing design, design-build, engineering, fabrication, procurement, construction and maintenance services for oil and gas, power, and allied industry projects in, among other places, South America. Its contact details[7] are as follows:

CB&I UK Limited

2 New Square Bedfont Lakes Business Park

Feltham, Middlesex

United Kingdom

### 1.2.3. RESPONDENT 3

6.    Respondent 3 is CBI COLOMBIANA S.A. ["**Respondent 3**" or "**CBI Colombiana**"], a legal entity of private law existing and incorporated under the laws of Colombia, 100%-wholly-owned subsidiary of Respondent 1, providing among other things, general contracting services such as constructing large projects. Its registered office and contact details[8] are as follows:

CBI Colombiana S.A.

Avenida 82 No. 10 – 62, Piso 6

---

[5] Ex. C-1865, p. 12 (pdf p. 14).
[6] Communication R-220.
[7] Communication R-220.
[8] Letter from the Liquidator dated November 11, 2020.

Bogotá, Colombia

7.    Prior to March 8, 2017, Respondents had also been represented by Mr. James L. Loftins and Timothy J. Tyler of VINSON & ELKINS, LLP but the law firm ceased to represent them on that date[9].

8.    On June 29, 2020, Respondents informed the Tribunal that the Colombian *Superintendencia de Sociedades* [the "*SDS*"] had ordered the judicial liquidation of CBI Colombiana[10]. According to Respondents, CBI Colombiana had not been notified about this action by the *SDS* and Respondents learned about it through Colombian media.

9.    On July 21, 2020, the *SDS* appointed Mr. Enrique Gómez Martínez as the Liquidator of CB Colombiana [the "**Liquidator**"][11].

10.   The Tribunal issued two letters to the Liquidator, after hearing the Parties and sending the respective drafts to them for comments, in which it invited him to inform the Tribunal whether he would participate in the arbitration proceedings on behalf of CBI Colombiana, and requested that he provide relevant documents to support his status as the Liquidator[12].

11.   On November 11, 2020, the Liquidator answered the Tribunal's letters, indicating that CBI Colombiana would "keep on participating in the referred procedures and maintains all the previous arguments, defenses and claims presented before the tribunal and henceforth adheres to all arguments, defenses, writs, requests and filings presented by [CB&I]", and that it "shall not appoint counsel for the proceedings"[13].

12.   On January 21, 2021, the Tribunal sent a third communication to the Liquidator, after sending a draft version to the other Parties for comments[14]. In this third letter, the Tribunal informed the Liquidator that, by stating in the Liquidator's Response that CBI Colombiana "adheres" to all past and future arguments, defenses, writs, requests and filings presented by CB&I, Respondent 3[15]:

-    Has consented to and ratified all past arguments, defenses, writs, requests, and filings presented by CB&I; and

-    Will adopt any future arguments, defenses, writs, requests, and filings presented by CB&I and, for this reason, CB&I will not be required to solicit or request CBI Colombiana's consent in advance.

---

[9] Communication R-21.
[10] Ex. R-0110.
[11] See *Auto* of July 21, 2020, *Expediente* 68.336, attached to the Liquidator's letter dated November 11, 2020. The Tribunal notes that according to the same *Auto*, the previous person appointed to serve as the Liquidator – Mr. Ricardo Echeverri López – did not accept his appointment.
[12] Arbitral Tribunal's letter to the Liquidator of October 11, 2020; Arbitral Tribunal's letter to the Liquidator of November 3, 2020.
[13] Letter from the Liquidator dated November 11, 2020.
[14] Third Letter to the Liquidator of January 21, 2021.
[15] Third Letter to the Liquidator of January 21, 2021, para. 4.

13. The Tribunal also requested the Liquidator to promptly inform the Tribunal if such understanding was incorrect. Additionally, the Tribunal also informed that all communications sent to CBI Colombiana would be addressed to the following emails[16]:

Attn: Mr. Enrique Gómez Martínez
(enriquegomez@zurekgomezabogados.com)

With copy to: Mr. Juan Gaitán
(juan.gaitan@zurekgomezabogados.com), and

Joaquín Londono
(joaquinlondono@zurekgomezabogados.com).

14. On March 28, 2023, the President received a letter from Mr. Camilo Alberto Guzmán Prieto, announcing his role as the new Liquidator of CBI Colombiana ["**New Liquidator**"], and attaching the power of attorney granted to Dr. Gustavo Adolfo Romero Torres ["**Legal Representative**"] for the purpose of representation of CBI Colombiana in the current proceedings[17]. The New Liquidator and the Legal Representative have provided the following addresses for notification:

Camilo Alberto Guzmán Prieto

CC 79205016

Calle 82 No. 19 A 14 Piso 3

Bogotá-Colombia
(depositariocguzman@gmail.com)

and

Dr. Gustavo Adolfo Romero Torres

(gustavoromero64@hotmail.com).

\* \* \*

15. Respondents 1 and 2 are represented in this arbitration[18] by Mr. Stephen B. Shapiro, Ms. Cheryl A. Feeley, Ms. Jessica L. Farmer, Ms. Anna P. Hayes, Mr. Enrique Gómez-Pinzón, Mr. Juan I. Casallas, Mr. Benjamin Wilson, Mr. Stosh M. Silivos, Mr. Jamie J. Hansen, from HOLLAND & KNIGHT LLP and Mr. Thomas F. Holt Jr., Mr. Christopher J. Valente, Mr. Mark E. Haddad, Mr. John C. Blessington, Ms. Lindsay S. Bishop, Mr. Richard F. Paciaroni, Ms. Martha J. Dawson and Mr. Matthew E. Smith from K&L GATES LLP, with notifications and communications to be made at:

---

[16] A 130; Arbitral Tribunal's letter to the Liquidator dated January 21, 2021.
[17] Communication A 176 with attachments.
[18] Holland & Knight LLP and K&L Gates LLP withdrew as counsel for CBI Colombiana on September 15, 2020.

Stephen B. Shapiro

Cheryl A. Feeley

Jessica L. Farmer

Anna P. Hayes

HOLLAND & KNIGHT LLP

800 17th Street, N.W., Suite 1100

Washington, DC 20006


Enrique Gómez Pinzón

Juan I. Casallas

HOLLAND & KNIGHT LLP

Carrera 7 # 71-21, Torre A, Piso 8

Bogotá DC, Colombia


Benjamin Wilson

HOLLAND & KNIGHT LLP

2929 Arch Street, Suite 800

Philadelphia, PA 19104


Stosh M. Silivos

HOLLAND & KNIGHT LLP

31 West 52nd Street, 12th Floor

New York, NY 10019


Jamie J. Hansen

HOLLAND & KNIGHT LLP

1801 California Street, Suite 5000

Denver, CO 80202


Thomas F. Holt Jr.

Christopher J. Valente

K&L GATES LLP

State Street Financial Center

One Lincoln Street

Boston, MA 02111

-and-

1601 K Street NW

Washington, DC 20006

Mark E. Haddad

John C. Blessington

Lindsay S. Bishop

K&L GATES LLP

State Street Financial Center

One Lincoln Street

Boston, MA 02111


Richard F. Paciaroni

K&L GATES LLP

K&L Gates Center

210 Sixth Avenue

Pittsburgh, PA 15222

-and-

Currency House, Tower 1, Level 4

Dubai Int'l Financial Centre, P.O. Box 506826

Dubai, United Arab Emirates


Martha J. Dawson

K&L GATES LLP

925 Fourth Avenue, Suite 2900

Seattle, WA 98104


Matthew E. Smith

ICC Case 21747 RD/MK/PDP
Final Award

K&L GATES LLP

One New Change London EC4M 9AF

England

\* \* \*

16.  Claimant and Respondents will be jointly referred to as the "**Parties**".

## 2.  THE ARBITRAL TRIBUNAL

17.  On July 18, 2016, the Secretary General of the International Court of Arbitration of the International Chamber of Commerce ["**Court**" of the "**ICC**"] confirmed Mr. Andrés Jana Linetzky as co-arbitrator upon the nomination by the Claimant, pursuant to Art. 13.2 of the Rules of Arbitration of the ICC in force as from January 1, 2012 [the "**ICC Rules**"].

18.  On July 18, 2016, the Secretary General of the Court confirmed Sir Vivian A. Ramsey as co-arbitrator upon the joint nomination of the Respondents, pursuant to Art. 13.2 of the ICC Rules.

19.  On August 19, 2016, the Secretary General of the Court confirmed Mr. Juan Fernández-Armesto as President of the Arbitral Tribunal upon the joint nomination of the co-arbitrators, pursuant to Art. 13.2 of the ICC Rules.

20.  The arbitrators stated that notifications and communications arising in the course of the arbitration should be made at:

Andrés Jana Linetzky
JANA & GIL DISPUTE RESOLUTION
Av. Andrés Bello 2711, Piso 9
Las Condes
Santiago 7550611, Chile
E-mail:  ajana@jg-disputes.com

Sir Vivian A. Ramsey
The Old Vicarage, School Lane
Swanley Village
Kent BR8 7PJ, United Kingdom
E-mail:  varamsey@aol.com

Juan Fernández-Armesto
ARMESTO & ASOCIADOS
General Pardiñas 102, 8° izda.
28006, Madrid, Spain
E-mail:  jfa@jfarmesto.com

## 3.  THE SECRETARIAT OF THE COURT

21.  The administration of this arbitration was granted to the Secretariat of the Court, initially in the persons of Rocío Digón and Marek Krasula  and finally in the person

ICC Case 21747 RD/MK/PDP
Final Award

of Paul Di Pietro, who acted as Counsel for the case management. All notifications and communications should be addressed at:

Paul Di Pietro
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE
SICANA, Inc.
140 East 45th Street, Suite 14C,
New York, NY 10017, USA
E-mail: ica9@iccwbo.org

## 4. THE ADMINISTRATIVE SECRETARY AND DEPUTY ADMINISTRATIVE SECRETARY

22.   On October 17, 2016, the Parties agreed to the appointment of Mrs. Deva Villanúa as Administrative Secretary[19]. On August 31, 2018, the Tribunal proposed to appoint Ms. Bianca McDonnell as Deputy Administrative Secretary which both Parties accepted[20]. Ms. McDonnell renounced on March 3, 2020[21]. On December 16, 2020, the Tribunal proposed to appoint Mr. Adam Jankowski as Deputy Administrative Secretary which both Parties agreed to. All notifications and communications should be addressed at:

Deva Villanúa
DEVARB
Príncipe de Vergara 109
28002 Madrid, Spain
E-mail: deva.villanua@devarbitration.com

Adam Jankowski
ARMESTO & ASOCIADOS
General Pardiñas 102, 8° izda.
28006 Madrid, Spain
E-mail: ajj@jfarmesto.com

---

[19] Communications C-13 and R-11.
[20] Communication A 44, Communications C-50 and R-59.
[21] Letter to the Parties of 3 March 2020.

## II. **PROCEDURAL HISTORY**

23. This arbitration first started in 2016. The anomalous duration of these arbitral proceedings is due to a multitude of procedural incidents and the extreme complexity of the case at hand.

24. The Tribunal has so far issued 156 communications containing decisions regarding procedural incidents and four Procedural Orders. The Parties have presented over twenty substantive submissions in total, and over 200 communications each.

25. It is impossible to summarise each submission, communication and decision in this chapter devoted to recapitulating the procedural history. The Tribunal, however, confirms that it has carefully analysed all submissions, communications and evidence submitted by the Parties and that all decisions are reasoned on the basis of such submissions.

### 1. ARBITRATION AGREEMENT

26. The present arbitration arises out of or in connection with the EPC Contract [the "**EPC Agreement(s)**", "**EPC Contract(s)**" or simply "**Contract**" or "**Agreement**"] for the expansion and modernisation of the Cartagena Refinery [the "**Refinery**"], entered into between Claimant and Respondents on June 15, 2010.

27. By Request for Arbitration dated March 8, 2016 ["**RfA**"], Reficar sought to initiate arbitration proceedings against Respondents, under Section 4 of the Dispute Resolution Agreement ["**DRA**"] between the Parties, which contains the following arbitration clause[22]:

> "4 Arbitration Agreement
>
> 4.1 Any Dispute not amicably resolved by the Parties pursuant to the terms of Clause 3 of this Agreement must be referred to and finally resolved by arbitration administered by the ICC and conducted under the ICC Rules as modified by this Agreement. The taking of evidence and the disclosure of documents shall be in accordance with the IBA Rules on the Taking of Evidence in International Commercial Arbitration (1 June 1999).
>
> 4.2 A Party wishing to refer a Dispute to arbitration shall file a Request as a Claimant in accordance with the ICC Rules, without designating an arbitrator.
>
> 4.3 Each Respondent shall file its Answer in accordance with the ICC Rules. If there are two or more Respondents they may agree to file a joint Answer.
>
> 4.4 The Arbitral Tribunal shall comprise three persons. The Claimant and the Respondent shall each be entitled to nominate one member (together, the "Nominated Arbitrators") of the Arbitral Tribunal to the ICC for appointment. If a Party fails to appoint its Nominated Arbitrator within 30 days of the date

---

[22] JX-007, pdf pp. 8-13.

of filing of the Answer by the Respondent, the missing Nominated Arbitrator shall be chosen by the ICC.

The third arbitrator (the "Independent Arbitrator") shall be chosen by the Nominated Arbitrators. If the Independent Arbitrator is not chosen by the Nominated Arbitrators within 30 days of the date of confirmation, by the ICC, of the appointment of the later of the two Nominated Arbitrators, the Independent Arbitrator shall be chosen by the ICC.

4.5 When appointing the Arbitral Tribunal, the Claimant and the Respondent (in respect of the Nominated Arbitrators) and the Nominated Arbitrators or the ICC Court (as applicable, in respect of the Independent Arbitrator), applying Articles 9(1) and 10(2) (or their replacements) of the ICC Rules where appropriate, shall be at liberty to appoint any person it or they regard, expressly taking into account the nature of the relevant Dispute or Disputes and the Project Agreements, as having suitable skills and experience to act as arbitrator in relation to the Dispute or (if relevant) the Disputes. The Independent Arbitrator shall be fully fluent in English and Spanish. In order to assist the Nominated Arbitrators or the ICC Court, as applicable, with the appointment of the Independent Arbitrator, the Claimant shall provide to the Secretariat (upon filing a Request pursuant to the ICC Rules) or the Nominated Arbitrators (upon confirmation by the ICC of their appointment), as applicable, a copy of this Agreement and the identity of any Parties added to or removed from this Agreement under Clause 6 together with a written request that the Independent Arbitrator, prior to signing a statement of independence pursuant to Article 7.2 of the ICC Rules, be required to consider the identities of the Parties listed in Appendix 2 and the changes, if any, thereto under Clause 6. The statement of independence shall be completed as if all Parties to this Agreement were parties to the Dispute(s) and the prospective Independent Arbitrator shall be made aware that he or she may, if appointed to determine a Dispute, be requested also to determine any other Dispute between any or all such Parties.

4.6 When considering the identity of the person to be appointed as the Independent Arbitrator in relation to a Dispute, the Nominated Arbitrators or the ICC Court, as applicable, shall take account of any representations any Party may make as to (i) whether or not there is, or is likely to be, any other Dispute which is related to the Dispute, and (ii) as to the subject-matter or nature of such actual or potential other Dispute.

4.7 If the Nominated Arbitrators and the Independent Arbitrator are of the opinion that there may be, prima facie, (i) one or more common issues of fact or law which may arise in determining the Dispute and any other Dispute, (ii) a risk of conflicting awards or legal obligations in resolving a Dispute and any other Dispute, or (iii) any other relationship between the Dispute and the other Dispute(s) which makes it appropriate to do so, then:

(a) If the Arbitral Tribunal for the Dispute and the other Dispute(s) are being appointed at the same time, the Nominated Arbitrators and the Independent Arbitrator shall conform a single Arbitral Tribunal for all the Disputes; and

(b) If the Arbitral Tribunal for the Dispute is being appointed when the Arbitral Tribunal for the other Dispute has already been appointed, the Parties will proceed as stated under section 4.15 in order to determine whether or not the same Arbitral Tribunal shall decide on the new Dispute(s).

4.8 If, in accordance with Clause 4.7, the members of the Arbitral Tribunal are the same persons as arbitrators as already form the Arbitral Tribunal for any other Dispute, the Arbitral Tribunal shall appoint as chairman the person who is acting or acted as chairman on the Arbitral Tribunal in that other Dispute.

4.9 The place and seat of arbitration shall be New York. The Arbitral Tribunal may, however, hold hearings, meetings, or sessions anywhere convenient and as agreed to by all Parties to the arbitration.

4.10 The language of the arbitral proceedings shall be English and Spanish, as appropriate.

4.11 The Parties acknowledge that, for the purposes of the arbitral proceedings, the Arbitral Tribunal will have the original version of the Project Agreements in the language in which they have been executed as binding agreements between the parties. In the event that there is a discrepancy between the original executed version and any translation of such executed version, the original executed version shall prevail.

4.12 The Arbitral Tribunal shall be governed by and shall apply the substantive law governing the Agreement under which the Dispute(s) arise. If the Dispute(s) refers to two (2) or more agreements with different applicable law, the Arbitral Tribunal shall apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement. The decision of the Arbitral Tribunal shall be final and binding to the fullest extent permitted by law. For the avoidance of doubt, the parties expressly exclude any and all rights to appeal, set aside or otherwise challenge any award by the arbitrators, insofar as such exclusion can be validly made under applicable law or international treaty.

4.13 The Arbitral Tribunal shall neither have nor exercise any power to act as amicable compositeur or ex aequo et bono, or to award special, indirect, consequential or punitive damages.

4.14 In addition to the authority conferred on the Arbitral Tribunal by the ICC Rules, the Arbitral Tribunal shall have the power to grant any provisional measures that it deems appropriate, including but not limited to provisional injunctive relief and/or specific performance, and any provisional measures ordered by the Arbitral Tribunal shall, to the extent permitted by applicable law, be deemed to be a final award on the subject matter of the measures and shall be enforceable as such.

4.15 Subject to Clause 4.17, if an Arbitral Tribunal has been appointed to hear both a Dispute and any other Dispute, at any time either:

(i) before Terms of Reference have been signed or approved in accordance with Articles 18.2 or 18.3 of the ICC Rules (whichever is applicable); or

(ii) after such signature or approval of the Terms of Reference if the Arbitral Tribunal receives the written agreement of all Parties which are parties to the arbitral proceedings of the Dispute (such agreement not to be unreasonably withheld),

the Arbitral Tribunal shall consolidate the arbitral proceedings of the Dispute and the arbitral proceedings of the other Dispute(s) into one set of arbitral proceedings on such procedural conditions as it may determine. The Parties confirm that one of the intentions and purposes of this Agreement is to provide a mechanism for the consolidation and determination of multiple Disputes between multiple Parties pursuant to multiple Project Agreements.

4.16 Subject to Clause 4.17, and whether or not it has been appointed to hear both a Dispute and any other Dispute and whether or not it has consolidated any Disputes pursuant to Clause 4.15, an Arbitral Tribunal shall have the following powers, to be exercised on or with such conditions as it may determine are appropriate in the circumstances:

(i) to direct that any hearings in the arbitral proceedings in relation to the Dispute take place concurrently with the arbitral proceedings of any other Dispute;

(ii) to allow, only upon the application of a Party, one or more third parties to be joined in the arbitral proceedings (and each Party hereby confirms that it consents to being so joined);

(iii) to direct that any documents served or disclosed and any evidence given in the arbitral proceedings of the Dispute be made available to the Parties which are involved in any other arbitral proceedings of any other Dispute; and

(iv) to make such other directions as may be considered by the Arbitral Tribunal to be necessary or expedient to ensure that the Dispute and any other Dispute are resolved justly, efficiently and consistently.

4.17 The Arbitral Tribunal may only exercise such powers in Clauses 4.15 and 4.16 if all parties to the relevant arbitral proceedings have been given a reasonable opportunity to make representations to the Arbitral Tribunal in relation to the exercise of such powers.

4.18 If there is more than one Dispute or more than two Parties are involved in any arbitral proceedings, the Arbitral Tribunal shall have all powers necessary to establish any supplementary procedural rules required or desirable in view of the multi-Dispute and/or multi-Party nature of the arbitral proceedings. Such powers shall include the ability to issue one or more Arbitration Awards during or at the conclusion of the arbitration as considered necessary or appropriate or expedient by the Arbitral Tribunal.

4.19 Each Party which is a party to any arbitral proceedings commenced under this Agreement hereby waives for itself, its assets and its revenues any and all

immunity from jurisdiction, investigation or enforcement that it may enjoy, whether pursuant to international agreements or the domestic laws of any such Party, and further waives any objection to arbitral proceedings being brought in accordance with the terms of this Agreement. If, in any jurisdiction in which arbitral or other proceedings are being taken against a Party, that Party has the power to claim for itself, its assets and its revenues any immunity from service or any immunity from jurisdiction, suit, judgment, execution, attachment or injunction (whether before judgment, in aid of execution or otherwise) or other legal process, including the defenses of "sovereign immunity" or "act of State", or if the court of its own motion grants such immunity to that Party or its assets, such Party hereby irrevocably waives such immunity to the fullest extent permitted by the law of that jurisdiction and consents generally to the giving of any relief or the issue of any process in connection with proceedings to uphold and enforce this Agreement and any Arbitration Award made pursuant to it, including, without limitation, the making, enforcement, or execution against any property whatsoever (irrespective of its use or intended use), of any Arbitration Award or any order or judgment which may be made or given in such proceedings.

4.20 A Party may seek to enforce an Arbitration Award in a court of law in accordance with the terms of this Agreement. The Parties undertake to implement without delay the provisions of any Arbitration Award.

4.21 Unless otherwise decided in the Arbitration Award, any Arbitration Award for the payment of money shall be paid in the currency or respective currencies for payment specified in the applicable Project Agreement or Project Agreements underlying the Dispute or Disputes and with interest accruing from the date of injury until payment, at the rate or respective rates of interest accruing on late payments under the applicable Project Agreement or Project Agreements underlying the Dispute or Disputes.

4.22 The Arbitral Tribunal shall be empowered to award all or a portion of the costs of the arbitration, and arbitration fees, to either Party. Any Party unsuccessfully resisting enforcement of any Arbitration Award must pay the enforcing Party's cost of those proceedings".

## 2.    SEAT OF THE ARBITRATION, LANGUAGE AND APPLICABLE LAW

28.    As per Section 4.9 of the DRA and the Parties' agreement[23], the seat of this arbitration is New York City, New York.

29.    The language of the arbitration is English and Spanish, as appropriate, pursuant to Section 4.10 of the DRA[24], para. 116 of the Terms of Reference and para. 2 of Procedural Order ["**PO**"] No. 5 – Annex V[25].

---

[23] Communication sent by King & Spalding to the Secretariat on 30 March 2016; Communication sent by Holland & Knight to the Secretariat on 1 April 2016; Communication of the Secretariat dated 4 April 2016.
[24] JX-007, p. 10; in communications C-14 and R-13, the Parties have confirmed their agreement to have the proceedings conducted in English and Spanish.
[25] TofR, para. 116 states: "The language of the arbitration shall be English and Spanish, as appropriate, pursuant to clause 4.10 of the DRA"; PO No. 1 – Annex V states: "The language of the arbitral proceedings shall be English and Spanish, as appropriate".

30.    In accordance with the above provisions, the **Final Award** [also referred to as the "**Award**"] is drafted in English, with a translation into Spanish by a translator of the Tribunal's choosing to follow once the English version of the Final Award is notified to the Parties[26].

31.    The law applicable to the dispute will be determined by the Tribunal in section IV *infra*.

### 3.    COMMENCEMENT OF THE ARBITRATION

32.    On March 8, 2016 Claimant filed its RfA.

33.    On March 25, 2016 the Secretariat was notified by Respondents that the RfA had not been served at the correct address. Upon discussion, the Parties agreed that the formal date of service of the RfA should be March 24, 2016[27]. Accordingly, Respondents were granted until April 25, 2016 to present their answer to the RfA[28].

34.    On April 15, 2016 Respondents requested an extension of the term for submitting the Answer to the RfA[29].

35.    The Secretariat extended the term until May 25, 2016 and on that date Respondents submitted the Answer to the RfA, with an accompanying counterclaim ["**Answer to RfA and Counterclaim**"][30].

36.    On June 27, 2016 Claimant submitted its reply to the counterclaim ["**Claimant's Reply to Counterclaim**"].

### 4.    APPOINTMENT OF ARBITRATORS

37.    On June 24, 2016 Claimant appointed Mr. Andrés Jana as co-arbitrator[31]. On that same date Respondents appointed Sir Vivian Ramsey as co-arbitrator[32]. On July 18, 2016, in accordance with Art. 13(2) of the ICC Rules, the Secretary General of the Court confirmed these nominations[33].

38.    On August 15, 2016 the co-arbitrators jointly nominated Mr. Juan Fernández-Armesto as president of the Tribunal. On August 19, 2016, in accordance with Art. 13(2) of the ICC Rules, the Secretary General of the Court confirmed Mr. Fernández-Armesto's appointment[34].

---

[26] See communications A 172, A 174, A 177-A 180.
[27] Communication sent by Holland & Knight to the Secretariat on March 25, 2016; Communication sent by King & Spalding to the Secretariat on March 30, 2016.
[28] Communication of the Secretariat dated March 30, 2016.
[29] Communication sent by Holland & Knight to the Secretariat on April 15, 2016.
[30] Communication R-4.
[31] Communication of King & Spalding dated June 24, 2016.
[32] Communication of Holland & Knight dated June 24, 2016.
[33] Communication of the Secretariat dated July 18, 2016.
[34] Communication of the Secretariat dated August 19, 2016.

ICC Case 21747 RD/MK/PDP
Final Award

5.    **TERMS OF REFERENCE, PROCEDURAL ORDER NO. 1 AND PROCEDURAL TIMETABLE**

39.    On August 31, 2016 the Arbitral Tribunal sent communication A 1 to the Parties, asking them to produce a summary of their positions for the purposes of the Terms of Reference ["**TofR**"][35], which they did on September 16, 2016.

40.    On October 4, 2016 the Tribunal issued communication A 4, inviting the Parties to submit their comments on the draft of the TofR. In response to this request, the Parties submitted several observations on October 7, 2016[36].

41.    On October 24, 2016, the Parties and the members of the Tribunal held a case management conference call to discuss the procedural measures to be adopted pursuant to Art. 22(2) of the ICC Rules.

42.    On October 28, 2016, the Parties and the members of the Tribunal signed the TofR electronically, which was transmitted to the Court at its session of December 15, 2016[37] in accordance with Art. 23(2) of the ICC Rules.

Procedural Order No. 1

43.    On that same date, the Tribunal sent a draft PO No. 1 to the Parties and invited them to provide their comments[38], which they did on November 16, 2016[39]. On November 29, 2016 the Tribunal issued PO No. 1 determining the conduct of the proceedings and annexing the Procedural Timetable[40].

44.    On April 25, 2017 the Tribunal amended PO No. 1 and issued PO No. 1 *Bis* to accommodate the Parties' agreement to submit certain exhibits jointly [the "**Joint Exhibits**"][41].

45.    On September 1, 2017 the Tribunal amended PO No. 1 for a second time and issued PO No. 1 *Ter*[42]. The Parties had jointly requested the Tribunal to extend their deadline for the submission of additional Joint Exhibits due to the volume and complexity of preparing them[43].

46.    The Tribunal again amended PO No. 1 on October 18, 2017 when it issued PO No. 1 *Quater*[44]. The Parties had again requested the amendment of PO No. 1 to have more time to prepare the Joint Exhibits[45].

---

[35] Communication A 1.
[36] Communications C-13 and R-11.
[37] Letter from the ICC dated December 15, 2016.
[38] Communication A 7.
[39] Communications C-16 and R-16. The Parties brought additional comments in communications C-17, C-18 and R-17.
[40] Letter from the Arbitral Tribunal dated November 29, 2016 transmitting PO No. 1 and annexes.
[41] Communication A 14.
[42] Communication A 21.
[43] Communications C-29 and R-34
[44] Communication A 23.
[45] See Communication R-38.

47.   On October 30, 2017 Claimant submitted on behalf of all Parties a set of Joint Exhibits relating to certain contractual agreements between the Parties which the Tribunal acknowledged the day after[46].

48.   On November 24, 2021 the Tribunal made a final amendment to PO No. 1 and issued PO No. 1 *Quinquies* incorporating the Parties' agreements on the submission of statements of costs[47].

## 6.   WRITTEN SUBMISSIONS AND DOCUMENT PRODUCTION

### A.   First Written Submissions

49.   On April 28, 2017 Claimant submitted the Non-Exhaustive Statement of Claim[48]. On that same day Respondents filed their Statement of Counterclaim[49].

### B.   Document Production

50.   On June 30, 2017 both Claimant and Respondents submitted their respective Document Production Schedules ["DPS"]: Claimant presented 144 requests for document production[50] and Respondents 114 such requests[51].

51.   Claimant annotated Respondents' DPS on July 17, 2017[52] and Respondents did the same to Claimant's DPS on July 21, 2017[53]. The DPS exercise was highly contentious and the Parties' arguments, including about the counterparty's cooperativeness, led the Tribunal to convene the Parties to a conference call, which was held on July 18, 2017[54].

52.   On August 8, 2017 the Tribunal issued its decisions on Document Production[55].

### C.   Second Written Submissions

53.   On March 16, 2018 the Parties filed their second round of submissions:

-   Claimant submitted its Exhaustive Statement of Claim [or "ESOC"] and its Non-Exhaustive Defense to the Counterclaim ["NEDOCC"];

-   Respondents submitted a Non-Exhaustive Defense to the Statement of Claim ["NESOD"] as well as an Exhaustive Statement of Counterclaim ["ESOCC"].

---

[46] See communications A 24 and C-30.
[47] Communication A 168.
[48] Communication C-20.
[49] Communication R-24.
[50] Communication C-25.
[51] Communication R-30.
[52] CB&I's DPS – Annotated by Reficar, dated July 17, 2017.
[53] Reficar's DPS – Annotated by CB&I, dated July 21, 2017.
[54] See communications A 17, A 18 and A 19.
[55] Communication A 20.

**D.    Third Written Submissions**

54.  On June 28, 2019 both Parties filed their third round of submissions:

-    Claimant submitted its Reply to Respondents' NESOD ["**Reply**"] as well as its Exhaustive Defense to Counterclaim ["**EDOCC**"];

-    Respondents submitted their Exhaustive Statement of Defense ["**ESOD**"] as well as a Reply to Claimant's Non-Exhaustive Statement of Defense to Counterclaim [the "**Respondents' Reply on Counterclaim**"].

55.  On September 9, 2019 Respondents submitted a communication in which they alleged that Claimant had violated PO No. 1 by improperly presenting new arguments and evidence in its Reply/EDOCC[56].

56.  After hearing both Parties[57], the Tribunal decided that:

-    Claimant's Reply could contain arguments and evidence which rebut Respondents' NESOD, and that Claimant's Third Written Submissions were *prima facie* compliant with PO No. 1;

-    Claimant's Third Written Submissions were *prima facie* responsive to Respondents' Second Written Submissions and needed not be amended;

-    Respondents' request that the Parties be ordered to meet and confer to discuss new arguments and all other requests for relief were now moot;

-    Both Parties had an exceptional and limited opportunity to submit certain additional arguments or to marshal certain additional evidence, under strict conditions and subject to approval by the Tribunal.

**E.    Supplemental Submissions**

57.  On January 10, 2020 the Tribunal granted several requests by the Parties[58] to file additional brief written submissions as well as supplemental witness statements and expert reports[59] after giving the Parties the opportunity to discuss the issue. The Tribunal decided:

-    To grant Claimant's request to file a written submission with a length of no more than 25 pages, two supplemental witness statements of no more than 10 pages, excluding attachments and exhibits, and a supplemental expert report from Deloitte with a length of no more than 25 pages excluding attachments and exhibits, by February 1, 2020;

-    To grant Respondents an extension to the date for notification of witnesses to be called until February 3, 2020 for those witnesses who had provided further evidence by February 1, 2020.

---

[56] Communication R-76.
[57] See communications R-81, C-73 and C-76.
[58] Communication A 85.
[59] Communications A 85, C84, C-88, R-88, and R-92.

58.  On October 16, 2020 Claimant submitted a supplemental response to Respondents' Counterclaim ["**Claimant's Supplemental Response to Counterclaim**"].

7.  *CONTRALORÍA PROCEEDING AND POS NO. 2 AND 3*

59.  Following Respondents' Second Written Submissions, the Tribunal became aware of the existence of an Ordinary Fiscal Liability Proceeding of the Colombian *Contraloría General de la República* [the "*Contraloría*"] against Respondents [the "*Contraloría* **Proceeding**"].

60.  On March 20, 2018 Claimant submitted a request for the Tribunal's assistance with regard to a document on which Respondents were seeking to rely in their Second Written Submissions, which, according to Claimant, had been inadvertently produced to Respondents during the document production exercise and contained information protected by attorney-client privilege[60].

61.  On March 21, 2018 Respondents sent a communication denying that the document was subject to privilege or confidentiality or had been inadvertently produced by Claimant; rather, Respondents stated that it had been sent to them by the Republic of Colombia through the *Contraloría* as evidence supporting the *Contraloría* Proceeding[61].

62.  On the same day the Tribunal requested that the Parties attempt to resolve the issue between them[62].

63.  On April 26, 2018 Claimant and Respondents jointly advised the Tribunal that they had been unable to reach an agreement on the issue of privilege attaching to the document and requested the opportunity to provide written submissions articulating their respective positions[63].

64.  In a separate communication of that same day, Claimant informed the Tribunal that it had notified Respondents of additional objections it had in relation to other documents tendered with Respondents' Second Written Submissions [together, the "**Contested Documents**"]. Claimant additionally requested that the Tribunal issue an interim measure preventing Respondents from disclosing confidential information whilst making submissions on the Contested Documents[64].

65.  Respondents immediately replied confirming that they would not reveal the substance of the Contested Documents in their submissions on the matter[65].

66.  On April 30, 2018, in light of Respondents' representation, the Tribunal declined to issue interim measures, but directed the Parties to treat the Contested Documents, *pro tem*, as subject to confidentiality and privilege[66].

---

[60] Communication C-33.
[61] Communication R-43.
[62] Communication A 34.
[63] Communications C-35 and R-48.
[64] Communication C-36.
[65] Communication R-49.
[66] Communication A 37.

67. On May 14, 2018 the Parties submitted their respective submissions regarding the Contested Documents[67].

68. On the same day, Respondents informed the Tribunal that Claimant had sent a letter to the *Contraloría* notifying it that Respondents had used documents obtained from the *Contraloría* Proceeding in this arbitration, which was subsequently reported in Colombian news[68]. Respondents requested that the Tribunal find Claimant to be in breach of its confidentiality obligation under the DRA[69].

69. On May 30, 2018 Claimant requested that the Tribunal reject Respondents' requests for relief, stating that it was obligated to report Respondents' allegedly wrongful use of confidential information from the *Contraloría* Proceeding under Colombian law[70]. Claimant further argued that as the Contested Documents were obtained through the *Contraloría* Proceeding, they were not covered by the confidentiality clause in Section 8 of the DRA[71].

70. On July 16, 2018 Claimant raised additional objections to 29 documents relied upon by Respondents, which are allegedly confidential and contain material protected by attorney-client privilege[72] [collectively with all documents objected to by Claimant, **"Total Contested Documents"**].

71. On July 23, 2018 Respondents submitted their response, opposing the exclusion of the 29 documents[73].

72. The Parties exchanged several additional submissions addressing Respondents' request and the use of the Total Contested Documents in these proceedings[74].

73. On August 22, 2018 the Tribunal issued PO No. 2, resolving the question of the admissibility of the Total Contested Documents in this arbitration[75]. PO No. 2 established that the Parties were allowed to use the Total Contested Documents in their submissions, on the assumption that the *Contraloría* would promptly release them to the public[76]. The Tribunal also found that Claimant had breached the confidentiality regime of this arbitration, but that no sanctions against Claimant were warranted[77].

74. On September 25, 2018 the Tribunal issued communication A 47, addressing clarifications raised by Claimant regarding certain aspects of PO No. 2.

---

[67] Communications C-37 and R-50.
[68] Communication R-51, para. 7, citing Exhibit 1.
[69] Communication R-51, para. 12.
[70] Communication C-38, pp. 3-4.
[71] Communication C-38, p. 4. Claimant states that the confidentiality clause of the DRA does not prevent Claimant from notifying the *Contraloría* about the use of documents that were obtained in the Fiscal Proceeding in this arbitration; further, Section 8.2. of the DRA specifically permits the disclosure of documents in good faith in accordance with the requirements of any applicable laws or any competent authority.
[72] Communication C-41.
[73] Communication R-53.
[74] Communications R-52, C-39, C-40, R-54, C-43, R-56 and C-45.
[75] See PO No. 2, para. 15.
[76] PO No. 2, paras. 155-156.
[77] PO No. 2, para. 164.

75. On November 19, 2018 the Tribunal decided that the deadline for submission of the Third Written Submissions would be delayed until January 31, 2019 to allow for the resolution of the dispute as to the Total Contested Documents[78].

76. On December 19, 2018 the Tribunal issued PO No. 3 resolving the issues related to the Total Contested Documents and the *Contraloría* Proceeding. The Tribunal decided, *inter alia*[79]:

- That documents obtained from the case file of the *Contraloría* Proceeding were admissible in this arbitration and the *reserva* attaching to such documents would be strictly protected by the arbitration's confidentiality regime;

- To authorize the Claimant to have access to the case file of the *Contraloría* Proceeding, obtained by virtue of its participation in a public *acción de tutela* filed against the *Contraloría* by Foster Wheeler USA Corporation and Process Consultants, Inc. ["**Foster Wheeler**"] before the 26th Criminal Circuit Judge in Bogotá;

- To protect the documents subject to attorney-client privilege pursuant to PO No. 2;

- To order the Parties to attempt to come to an agreement on any disputes that may arise regarding other documents that they consider are subject to attorney-client privilege, following the review of the case file of the *Contraloría* Proceeding.

77. On January 4, 2019 the Tribunal addressed a request by Claimant[80] to be granted leave by the Tribunal to submit a *derecho de petición - solicitud de información y copias de documentos de proceso de responsabilidad fiscal* [the "***Solicitud***"] to the *Contraloría* along with excerpts of PO No. 3, to which Respondents objected[81].

78. The Tribunal refused to make an order as a result of the correspondence of the Parties, noting that:

- The Parties were authorized to use documents obtained from the case file of the *Contraloría* Proceeding in the arbitration,

- It considered that the *Solicitud* was unnecessary for the purposes of the arbitration, and

- That it did not consider that Claimant needed to submit the *Solicitud* to use the documents in this confidential arbitration seated in New York.

---

[78] Communication A 50, p. 5.
[79] PO No. 3.
[80] Communications C-56 and C-57.
[81] Communications R-66 and A 54.

79. On January 17, 2019 the Tribunal granted Claimant's request[82] to provide the *Contraloría* with a copy of the decision portion of PO No. 3 after hearing both Parties on the matter[83].

Update to the *Contraloría* File

80. On January 22, 2021 the Tribunal affirmatively decided on the admissibility of a supplemental submission by CB&I containing documents from the *Contraloría* Proceedings[84] and delivered a clarification of its decision three days later[85].

81. On February 25, 2021 the Tribunal issued an affirmative decision concerning the admissibility of three of the abovementioned files, while at the same time ordering that only an abridged version be introduced into the record[86].

Further documents from the *Contraloría* File

82. On March 26, 2021 the Tribunal issued a decision concerning CB&I's request to present new evidence from the *Contraloría* File[87], comprising 54 email communications, charts and additional materials from the *Contraloría* Proceeding [the "**54 Documents**"] and five "Free Versions". The Tribunal decided to rule on the admissibility of both sets of documents after receiving Reficar's comments[88].

83. On April 15, 2021 the Tribunal admitted the 54 Documents into the case record[89] and permitted Reficar to submit counterevidence in order to protect the equality of arms[90]. On April 27, 2021 the Tribunal admitted into the case file the excerpts of the free version testimony statements provided by the witnesses in the arbitration and to reject the non-witness free version testimony[91].

8. **INTERIM MEASURES**

A 105

84. On June 29, 2020, in connection with the impending liquidation of CBI Colombiana, Respondents 1 and 2 requested interim measures which would protect their status in the arbitration and which would entitled them to receive notice prior to Reficar contacting the *SDS* (the entity which ordered the liquidation)[92].

85. On July 7, 2020 the Tribunal granted provisional interim measures and ordered[93]:

> "Claimant not to undertake any actions that could lead to the disruption of the *státus quo* in the current proceedings (including by undertaking

---

[82] Communication C-58.
[83] Communication A 57.
[84] Communication A 131.
[85] Communication A 132.
[86] Communications A 136.
[87] Communications A 148.
[88] A 148 paras. 28 and 33.
[89] Communication A 151, para. 27.
[90] A 151, para. 30.
[91] Communication A 154, para. 36.
[92] Communication R-110.
[93] Communication A 96.

communication and/or coordination with the [*SDS*]), without giving reasonable prior notice to the Tribunal and Respondents".

86.   The following day Claimant asked for a confirmation that the provisional interim measures did not affect its information duties vis-à-vis the *SDS* on matters which are not related to the arbitration[94]; the Tribunal provided such confirmation on the next day[95].

87.   On August 4, 2020 Respondents 1 and 2 reiterated their request for interim measures[96].

88.   On July 24, 2020 Claimant objected to Respondents' request for interim measures[97]; however, on August 11, 2020 Claimant agreed that a narrowed version of the interim measures could be ordered by the Tribunal[98].

89.   On September 2, 2020 the Tribunal and the Parties held a conference call in which the situation of CBI Colombiana, as well as the interim measures requested by Respondents 1 and 2, were discussed[99].

90.   On September 7, 2020 the Tribunal made its decision, ordering the replacement of the provisional interim measures with the following interim measures ["**Communication Interim Measures**"], taking effect immediately[100]:

> "The Tribunal instructs Claimant not to communicate or coordinate with the [*SDS*] or the liquidator of CBI Colombiana (or with members of his team), in relation to the liquidation of CBI Colombiana or the present arbitration proceedings, without giving reasonable prior notice to the Tribunal and Respondents".

91.   On September 30, 2020 the Tribunal and the Parties held another conference call in which the Communication Interim Measures were further discussed[101].

92.   On November 30, 2020 the Tribunal partially lifted the Communication Interim Measures from the date of dispatch of the letter to the Liquidator, which would confirm CBI Colombiana's participation in this arbitration[102].

93.   On January 21, 2021 the Tribunal clarified its decision A 123 and specified that the lifting of the Communication Interim Measures only applied to Claimant's communications with the Liquidator[103]. Thus, the Communication Interim Measures were modified as follows[104]:

---

[94] Communication C-120.
[95] Communication A 101.
[96] Communication R-115.
[97] Communication C-117.
[98] Communication C-122.
[99] Communications A 103 and A 104.
[100] Communication A 105, pp. 4-5.
[101] Communication A 107.
[102] Communication A 123.
[103] Communication A 130, para. 82.
[104] Communication A 130, para. 83.

> "The Tribunal instructs Claimant not to communicate or coordinate with the Superintendencia de Sociedades in relation to the present arbitration proceedings without giving reasonable prior notice to the Tribunal and Respondents".

### PO No. 4

94.   On November 27, 2019, Claimant filed a Request for Emergency Conservatory and Interim Measures[105] ["**Claimant's Request for Interim Measures**"] requesting certain interim measures to protect the alleged harm that could result from Respondents' difficult financial situation[106]; Respondents submitted an opposing statement on December 16, 2019[107] ["**Respondents' Opposition to Claimant's Request for Interim Measures**"].

95.   On January 22, 2020 the Tribunal issued PO No. 4:

-   Ordering Respondents to notify the Tribunal and Claimant in advance of any either significant corporate restructuring or alienation, transfer or sale of assets over the value of a certain threshold, but

-   Denying Claimant's requests to order Respondents to provide security and to maintain the *status quo* and to order Respondents to refrain from taking any measures that would aggravate the Parties' dispute as well as any other requests for relief[108].

96.   On March 22, 2021 the Tribunal issued a communication clarifying that PO No. 4 remained valid and binding upon the Parties and determining that the threshold for disclosure under PO No. 4, which had not been articulated in the first place, should be 5% of McDermott's assets[109].

### 9.   HEARING PREPARATIONS AND SUBMISSION OF NEW *CONTRALORÍA* EVIDENCE

97.   On March 1, 2021 Respondents submitted a communication to the Tribunal seeking leave to introduce three requests for dispositive pre-hearing relief[110] to which Claimant objected[111]. The Tribunal decided on the issue on April 1, 2021[112], denying CB&I the requested leave.

98.   On March 1, 2021 the Tribunal issued a decision regarding seven disputed instances concerning the text of the draft protocol for the Hearing ["**DHP**"][113] which had been proposed jointly by the Parties[114].

---

[105] Communication C-90.
[106] Ex. C-1865, pp. 87, 89-99.
[107] Communication R-98.
[108] PO No. 4, para. 74.
[109] Communication A 146.
[110] Communication R-165.
[111] Communication C-174.
[112] Communication A 149.
[113] Communications C-164 and R-163.
[114] Communication A 138.

ICC Case 21747 RD/MK/PDP
Final Award

99. On March 12, 2021 Claimant submitted an update regarding the amounts it claims in the arbitration[115].

100. On March 18, 2021 the Tribunal ordered a cut-off date of April 5, 2021 (six weeks before the scheduled Hearing) for the Parties to present any new procedural submissions of any type[116].

101. On March 22, 2021 the Tribunal circulated a communication to the Parties[117] containing the finalized Hearing Protocol ["**HP**"] reflecting the changes proposed by the Parties[118]. On the same day, the Parties informed the Tribunal that they had agreed on a set of principles for the organization of the second block of the Hearing as foreseen under paras. 81 and 82 of the HP[119].

102. In its communication A 150, issued on April 12, 2021 the Tribunal ruled on two requests submitted by the Parties:

- CBI's request to submit a video of the Refinery called "*Experiencia 360 – Refinería de Cartagena*"[120]: the Tribunal decided that this video was not necessary in light of the upcoming virtual Site Visit, but that CB&I could approach the Tribunal again if it felt that the video contained essential footage that had not been accessible during the virtual Site Visit.

- CBI's request for an order that the witnesses who provided their witness statements in the arbitration in English must also testify in English (rather than in Spanish, irrespective of their preferences) at the Hearing[121], which the Tribunal denied[122].

103. On April 30, 2021 each Party filed a submission with a summary of its respective case in preparation of the Hearing [the "**Hearing Summary Submission**"].

## 10.  HEARING AND SITE VISIT

104. Originally, the Hearing had been scheduled for one month between October 15, 2018 and November 15, 2018[123].

105. Due to several delays in the procedural calendar (originated in part by the document production), on April 18, 2018 the Parties suggested a new timetable for the Hearing. Therefore, the Hearing was postponed to April 15, 2019 to May 10, 2019[124] and the Site Visit was set for March 19 and 20, 2019.

106. In 2019 the scheduled period for the Hearing was shifted once more due to the volume and complexity of the arbitration proceeding. After negotiations and with

---

[115] Claimant's Updated Statement of Claim Amounts.
[116] Communication A 144.
[117] Communication A 145.
[118] Communications C-173 and R-170.
[119] Communications C-183 and R-179.
[120] Communication R-186.
[121] Communication R-187.
[122] Communication A 150.
[123] PO No. 1, Annex 1.
[124] See communications A 36, C-34 and R-45.

the agreement of the Parties, the Tribunal issued Annex I *Sexies* to PO No. 1 *Quater*, determining a split Hearing period from April 20 to May 1, 2020 [the "**First Block**"] and from May 12 to May 22, 2020 [the "**Second Block**"][125]. However, the Parties could not agree on whether additional hearing time would be needed, so the Tribunal reserved June 8 to June 19, 2020 *pro tem* and uttered that it would finally decide on whether to use additional hearing time at a later stage[126]. With the same amendment the scheduled Site Visit was shifted to December 9 and 10, 2019.

107. On November 25, 2019 the Tribunal sent a communication addressing the Parties' disagreement as to the appropriate length of the Hearing, deciding that four weeks would be sufficient time for the Parties to properly present their case at the Hearing[127].

108. On December 2, 2019 the Tribunal was forced to cancel the Site Visit due to an unexpected medical emergency affecting one of its members[128]. On December 4, 2019 the Tribunal, after consulting the Parties, decided to hold the Site Visit on June 9, 2020[129].

109. In early 2020 the COVID-19 pandemic hit the world and also affected the conduct of the arbitration, rendering an in-person Hearing in April/May 2020 unviable. On September 7, 2020 the Tribunal decided to hold the First Block virtually by videoconference.

110. On February 1, 2021 the Tribunal ordered a virtual Hearing in two Blocks in May-June and June-July 2021 and decided that the Site Visit would be held virtually at the beginning of the Hearing dates[130].

111. On April 29, 2021 the pre-Hearing conference was held virtually. Apart from general matters concerning the Hearing, the participants discussed Reficar's motion to cancel the Virtual Site Visit[131].

112. On May 1, 2021 weighing the high informational value of the Virtual Site Visit against the health hazards associated with recording it, the Tribunal decided for the Virtual Site Visit to proceed, but with the maximum precautions possible[132].

113. The Hearing was held virtually in the two Blocks. The First Block started on May 17, 2021 and ended one day earlier than envisaged on June 4, 2021 and the Second Block started on June 28, 2021 and ended on July 16, 2021.

## 11.  POST-HEARING PERIOD

---

[125] See communication A 67.
[126] See communication A 65.
[127] Communication A 78.
[128] Communication A 81.
[129] Communication A 82.
[130] Communication A 133.
[131] Communication A 155.
[132] Communication A 156.

114. On July 19, 2021 the Tribunal updated the Procedural Timetable to include the procedural steps that had to be taken after the Hearing[133]. The Tribunal prepared a list of questions for the Parties and circulated this list on July 30, 2021[134].

115. On October 22, 2021 the Parties submitted their first post-Hearing briefs [ "**CPHB**" and "**RPHB**"].

116. On November 10, 2021 the Parties submitted their second post-Hearing submissions ["**CPHB2**" and "**RPHB2**"].

117. On November 16, 2021 the Tribunal circulated a communication in which it confirmed and enumerated the general principles governing the sessions of closing oral arguments [the "**Oral Closings**"][135].

118. The Oral Closings were held virtually on November 18 and 19, 2021; the first day was dedicated to the Parties' closing presentations and the second day to a discussion on the submission of statements of costs by the Parties[136].

119. At the end of the Hearing Mr. Stenglein, Counsel for Claimant and Mr. Holt, Counsel for Respondents, both confirmed that there were no due process issues which they would like to raise[137].

120. On November 24, 2021 the Tribunal issued a communication to memorialize the agreements that had been reached during the Oral Closings among all participants[138]. Among other things, the Tribunal set deadlines for the Parties to submit their **Statements of Costs** and outlined how the Statements of Costs should be structured.

121. Claimant sent its Statement of Costs to the Tribunal on December 20, 2021, whereas Respondents 1 and 2 did so on February 11, 2022[139]. The Tribunal circulated the Parties' Statements of Costs to the counterparty on the following day[140].

## 12. SUMMARY OF THE SUBMISSIONS AND EVIDENCE

122. The Parties have filed the following main substantive submissions:

| Party(/ies) | Submission | Date |
|---|---|---|
| **Claimant** | Request for Arbitration | March 8, 2016 |
| | Claimant's Reply to Counterclaim | June 27, 2016 |
| | Non-Exhaustive Statement of Claim | April 28, 2017 |

---

[133] PO No. 1 *Quater* – Annex I *Decies.*
[134] Communication A 164.
[135] Communication A 166.
[136] See PO No. 1 *Quater* – Annex I *Decies* and PO No. 1 *Quater* – Annex I *Undecies.*
[137] See Tr. 7238:25–7239:13.
[138] Communication A 168.
[139] See Exhs. C-0232 and R-0077.
[140] Communication A 169.

ICC Case 21747 RD/MK/PDP
Final Award

| | Exhaustive Statement of Claim | March 16, 2018 |
|---|---|---|
| | Non-Exhaustive Defense to Counterclaim | March 16, 2018 |
| | Reply to Respondents' Non-Exhaustive Statement of Defense | June 28, 2019 |
| | Exhaustive Defense to Counterclaim | June 28, 2019 |
| | Request for Emergency Conservatory and Interim Measures | November 27, 2019 |
| | Supplemental Response to Respondents' Counterclaims | October 16, 2020 |
| | Updated Statement of Claim Amounts | March 12, 2021 |
| | Claimant's Hearing Summary Submission | April 30, 2021 |
| | First Post-Hearing Brief | October 22, 2021 |
| | Second Post-Hearing Brief | November 10, 2021 |
| | Claimant's Statement of Costs | December 20, 2021 (updated on February 22, 2022) |
| **Respondents** | Answer to RfA and Counterclaim | May 25, 2016 |
| | Statement of Counterclaim | April 27, 2017 |
| | Exhaustive Statement of Counterclaim | March 16, 2018 |
| | Non-Exhaustive Statement of Defense | March 16, 2018 |
| | Reply to the Non-Exhaustive Statement of Defense to Counterclaim | June 28, 2019 |
| | Exhaustive Statement of Defense | June 28, 2019 |
| | Opposition to Claimant's Request for Emergency Conservatory and Interim Measures | December 16, 2019 |
| | Respondents' Hearing Summary Submission | April 30, 2021 |
| | First Post-Hearing Brief | October 22, 2021 |
| | Second Post-Hearing Brief | November 10, 2021 |
| | Respondents 1 and 2's Statement of Costs | February 12, 2022 |

123. The Parties have jointly marshalled over 6000 numbered factual exhibits (a number of which are collective exhibits with hundreds of individual documents) and over 1500 legal exhibits into the record:

| Party | Factual exhibits | Legal authorities | Joint Exhibits |
|---|---|---|---|
| Claimant | C-0001 through C-1959 | CL-0001 through CL-0895 | JX-001 – JX 460, Joint Counterclaim Table, presented with Communication C-226/R-212 |
| Respondents | R-0001 through R-4145 | RL-0001 through RL-0807 | |

124. The Parties have also submitted chronologies of facts[141] and an agreed chronological index of exhibits[142].

125. There are multiple factual exhibits that are repeated on the record, brought by different Parties and sometimes even by the same Party multiple times. The fact that the Tribunal refers to a single exhibit does not imply that the Tribunal has failed to review all the versions of the exhibit brought into the record.

126. The Parties have jointly relied on the testimony of dozens of fact witnesses, who have signed a total of over a hundred witness statements:

| Claimant | Position |
|---|---|
| Javier Iván Alfonso García | Lawyer, specialized in labour law, employee of Reficar (post-2010) |
| Ramiro Arenas | Electronics Engineer, Instrument Control Engineer (2008-2014), Engineering Director (2014-Dec. 2015), Management, Control and Support Director (Dec. 2015-2017), employee of Reficar |
| Carlos Avellaneda | Head of the Technical Office in the JCS Consortium (May-Aug. 2012), Central Control Building of the Cartagena Refinery Construction Project Manager (Aug. 2012-2014) |
| Roberto Benavides | Chemical Engineer, employee of Reficar, Construction Superintendent Water Treatment and Sulfur Units (2012-2014), PCS Director (2015-2016) |
| Ernie Breaux | Former CB&I Employee, HSE Operations Manager (2010-2011 and 2013-2015) |
| Carlos Bustillo Lacayo | Technical Representative of Ecopetrol (Technical Manager/Technical Superintendent) (Oct 2006-2009), Former Vice-President of the Project to Expand the Cartagena Refinery (July 2009-July 2012), Advisor to Reficar Vice-President (Jul. 2012-Nov. 2013), Technical Project Manager for Massy (Oct. 2014) |
| Felipe Castilla Canales | Former Vice President of Finance and Administration, Reficar (Dec. 2007-Apr. 2009, Oct. 2009-Feb. 2012), Acting President of Reficar (Jun.-Sep. 2009) |
| Medardo Chinchilla | Procurement Professional, employee of Ecopetrol, later Reficar |
| Don Dilley | Material Manager (2008-late 2009), PMC Pipe Fabrication Material Manager (beginning 2010), former employee of Foster Wheeler |
| Belinda Fuentes | Project Manager for the Reficar project, former employee of Petrotiger (2010-2012) |
| John Gilchrist Bustamante | Chemical Engineer, Deputy Project Director for the expansion of the Cartagena Refinery (Mar. 2010-Jun. 2013), employee of Reficar |
| Nicolás González | Mechanical Engineer, Leader of the Invoicing Review Team, employee of Reficar |

---

[141] Claimant's Chronology dated March 20, 2017.
[142] See Joint Communication C-211 & R-201.

ICC Case 21747 RD/MK/PDP
Final Award

| Javier Gutiérrez Pemberthy | Former President of Ecopetrol and former Member of the Board of Directors of Reficar, 2007-2015 |
|---|---|
| Bryan Hartman | Senior Subcontracts Manager (Jan. 2014-Mar. 2017), Foster Wheeler |
| Carlos Herrera | Business Manager, Foster Wheeler |
| Ernest Houtz | Vice President & Project Director (2005-2009) and Technical Consultant (2009-2015), Glencore, later Reficar |
| Rafael León Gómez | Planning Analyst and Supply Chain Integral Performance Project Manager at Ecopetrol (2011-2015), Planning Manager and Operational Performance Manager at Reficar (since 2015) |
| Luis Malaver | Former Manager of the Internal Audit Department, Reficar (Oct. 2009-Aug. 2013) |
| Christian Mantilla | Civil Engineer, Project Controls Director of the FPJVC Team (Nov. 2009-Aug. 2015), Project Director (after Aug. 2015), employee of Foster Wheeler |
| Walter Marín | Independent Businessman with various companies specialized in electrical installations, industrial instrumentation and automatization and oversight, Project Director for CB&I for the BGC3 Contract (beginning Nov. 2013) |
| José Marrugo Roa | Economist and Business Administrator, Labour Relations Coordinator (2012) and Administrative Vice President (Sep. 2013-Dec. 2016), Reficar |
| Jon Moore | Former Procurement Director for the Reficar Project (beginning Mar. 2013) at Foster Wheeler |
| Alfonso Núñez Nieto | Director of Industrial Safety, Environmental and Occupational Health, and Process Safety (2009-2013), Construction Director Block A (Dec. 2013-2014), Director of Preparation and Commissioning of Industrial Service Unit Tanks (2014-Sep. 2015), Reficar |
| Jairo Peláez | Construction Director for the Reficar Project (Oct. 2014-Nov. 2015), Massy |
| Rafael Pittaluga | Mechanical Engineer, Director of Management Control and Support, Reficar (Oct. 2013-Nov. 2015) |
| Andrés Riera | Chemical Engineer, former Vice-President of the Project to Modernize and Expand Reficar (2012-2015), former Vice President for PCS (2015-2016) former Technical Manager (2016-2017) and Refining Advisor, Reficar, later Ecopetrol |
| Jorge Rodas | Costs Manager (2011-2018), Reficar |
| Roberto Romero | Finance Administrator Compliance for the Reficar Project (Oct. 2012-2014), Team Leader Offshore Invoice Review Team (2014-2017), Team Leader Onshore and Offshore Invoice Review Team (beginning July 2017), employee of Foster Wheeler |
| Paul Ruwe | Chemical Engineer, Group Manager, Jacobs Consultancy (beginning 2012) |
| Julio César Suárez | Civil Engineer, Deputy Manager of the Refinery Expansion Project (Oct. 2011-May 2012), Greenfield Construction Director (May 2012-Jan. 2015) Project Director for the Refinery Expansion Project (beginning Jan. 2015), Reficar |
| Enrique Torres | Chemical Engineer, former Engineering Director for the Refinery Expansion Project (2009-2014), Reficar |
| Sonia Urbina | Former Treasurer (2008-2012), former Senior Cost Control Professional (2012-2014) Senior Management Professional (beginning 2014), Reficar |

ICC Case 21747 RD/MK/PDP
Final Award

| Respondents | Position |
|---|---|
| Terry Anderson Baker | Project Material Manager & Materials Management Lead (2010-2012, 2013-2015), Expediting Lead (Feb. 2012), CB&I |
| Allen Barbre | Electrical Engineer, former Director of Engineering, Deputy Project Director for the Reficar Project and Manager of Project Engineering, CB&I |
| Robert J. Bridges | Former Construction Manager and Director of Construction for the Reficar Project (2010-2015), CB&I |
| Abel Campos | Project Security Manager (2009), CB&I |
| Cesar Canals | Global Vice President Business Development for Central, South America and the Caribbean (2006-2009), Product Executive for CB&I Storage Tank Solutions, CB&I |
| Philip Chapman | Former Lead Construction Coordinator Manager for the Reficar Project (March 2011), CB&I |
| Gary Davison | Project Engineering Manager (2009-Jun. 2010), CB&I |
| Masoud Deidehban | Former Project Director for the Reficar Project for CB&I UK and CBI Colombiana (Jan. 2009-Oct. 2015) |
| Kris Gachassin | Estimating Manager (2008-2010), CB&I |
| Steve J. Hartley | Construction Quality Manager (2008-2012), Project Quality Manager (2012-2015), CB&I |
| Stephen J. Kent | Commissioning and Completions Manager, CB&I (Oct. 2010-Sep. 2015) |
| Guillermo Lozada | Project Manager for the FCC Unit of the Reficar Project (2009-Jul. 2016), CB&I |
| Robert Matis | Former Project Finance Director for CB&I UK and CBI Colombiana for the Reficar Project (2012-Oct. 2015) |
| Todd Minnich | Civil Engineer and Economist, PMCS and Progress Lead & Quantity Surveying and Progress Reporting Lead (Sep. 2012-2015), CB&I |
| Francisco Ordonez | Planning and Scheduling Manager and Project Controls Director (Dec. 2013-early 2015), Project Controls Director (Early 2015-Jul. 2021), CB&I |
| Daniel G. Reeves | Subcontracts Manager for the Reficar Project, CB&I |
| Ernest Richardson | Subcontracts Director for the Reficar Project (2008-2014), CB&I |
| William Smith | Former Buyer and Project Procurement Manager for the Reficar Project, CB&I |
| Michelle L. Tipton | Former Purchasing Lead for the Reficar Project (2007-2012), CB&I |
| Antonio S. Yibirin | Former Project Controls – Cost Control Lead for the Reficar Project (May 2008-Sep. 2012), CB&I |
| Phillip Larsen | Former Senior Unit Manager for Unit 002 and former Senior Construction Manager for Block A in the Reficar Project (early 2010-Oct. 2013), CB&I |
| Daniel Ebeling | Former Completions Superintendent in Reficar's PCS Group (Feb. 2012-Oct. 2015), Foster Wheeler |
| Jann K. Elkins | Project Engineering Manage, supervising Inelectra (Dec. 2009), CB&I |
| Alfred Jones | Former Completions Area Superintendent for the Reficar Project (Apr. 2011), Foster Wheeler |

ICC Case 21747 RD/MK/PDP
Final Award

127. The Parties have jointly presented nearly 30 expert reports prepared by the following expert witnesses[143]:

| Claimant | Issue |
|---|---|
| Peter P. Bartlett, Charles J. Hirst, Alan W. Reynolds, Timothy D. Rooney (Baker & O'Brien) | Technical Issues |
| Joseph J. Egan | Lost Profits and Cost of Capital |
| W. Tom Thweatt, Stephen P. Warhoe, Robert J. Lane (Long International) | Management Issues, Delay and Cost Increases |
| Arturo Solarte Rodríguez | Colombian Law |
| José Roberto Herrera Vergara | Colombian Labour Law |
| Camilo Calderón Rivera | Fiscal Responsibility |
| J. Paul Campbell, Michael Hostettler, Steven Scott (Deloitte) | Invoices (Counterclaim) |
| **Respondents** | **Issue** |
| Jaime Alberto Arrubla-Paucar | Colombian Law |
| Carlos Ernesto Molina Monsalve | Colombian Labour Law |
| Donald Harvey | Delay and Productivity |
| C. David Millican, Nicholas D. Adams (WMC) | Engineering and Project Management |
| Christopher Hillier | Project and Construction Management |
| Scott D. Gray | Damages |
| Wiley R. Wright | Accounting and Invoicing |
| Mark Hackett | Quantum |
| Manuel A. Abdala | Quantum |

128. In addition, the following 11 Joint Expert Reports (some accompanied by voluminous addenda in Excel format) have been submitted by the Parties:

| Issue | Experts |
|---|---|
| Pre-Contract Issues | Baker & O'Brien (Reficar)<br>Watson Millican (CB&I) |
| Engineering | Baker & O'Brien (Reficar)<br>Watson Millican (CB&I) |
| Procurement | Baker & O'Brien (Reficar)<br>Watson Millican (CB&I) |
| Construction | Long International (Reficar)<br>GT Fairway (CB&I) |
| Delay/Schedule Analysis | Long International (Reficar)<br>Secreteriat (CB&I) |

---

[143] The expert witnesses of both sides have also submitted appendices, attachments and exhibits to their reports, but they will not all be listed for reasons of procedural efficiency.

ICC Case 21747 RD/MK/PDP
Final Award

| Quantum of Reficar's Claim | Long International (Reficar) |
| | Ankura (CB&I) |
| Lost Profits | Breakwater (Reficar) |
| | Compass Lexecon (CB&I) |
| Colombian General Law | Solarte (Reficar) |
| | Arrubla (CB&I) |
| Colombian Labour Law | Herrera (Reficar) |
| | Molina (CB&I) |
| Counterclaim Quantum | Deloitte (Reficar) |
| | Wright (CB&I)/Hackett (CB&I) |
| Colombian Fiscal Liability Law | Calderón (Reficar) |
| | Arrubla (CB&I) |

129. The following Hearing Transcripts are on record:

| TR. Pages | Day/Vol. | Date | Activities/Witness(es) |
| --- | --- | --- | --- |
| 1 - 84[144] | 1 | May 17, 2021 | Virtual Site Visit |
| 86 - 412 | 2 | May 18, 2021 | *Reficar's Opening Statement* |
| 414 - 710 | 3 | May 19, 2021 | *CB&I's Opening Statement* |
| 712 - 999 | 4 | May 20, 2021 | Masoud Deidehban |
| 1001 - 1269 | 5 | May 21, 2021 | Masoud Deidehban |
| 1271 - 1505 | 6 | May 22, 2021 | Masoud Deidehban |
| 1507 - 1731 | 7 | May 25, 2021 | Ernie Houtz |
| 1733 - 1928 | 8 | May 26, 2021 | Julio César Suárez |
| | | | Alfonso Nunez |
| 1930 - 2162 | 9 | May 27, 2021 | Alfonso Núñez Nieto |
| | | | Carlos Herrera |
| | | | Jorge Rodas |
| 2164 - 2425 | 10 | May 28, 2021 | Sonia Urbina |
| | | | Roberto Benavides |
| | | | John Gilchrist |
| 2427 - 2626 | 11 | May 29, 2021 | Enrique Torres |
| | | | Carlos Bustillo |
| 2628 - 2891 | 12 | June 1, 2021 | Kris Gachassin |
| | | | Gary Davison |
| 2893 - 3137 | 13 | June 2, 2021 | Abel Campos |
| | | | Phillip Larsen |
| 3139 - 3409 | 14 | June 3, 2021 | Philip Chapman |
| | | | Francisco Ordonez |
| 3411 - 3619 | 15 | June 4, 2021 | Antonio S. Yibirin |
| | | | Terry Anderson Baker |
| 3621 - 3850 | 16 | June 28, 2021 | *Second Block Opening Statement by Reficar* |
| | | | *Second Block Opening Statement by CB&I* |
| | | | Expert Discipline: Colombian Civil & Commercial Law |
| | | | Arturo Solarte for Reficar |
| 3852 - 4040 | 17 | June 29, 2021 | Jaime Arrubla for CB&I |
| | | | Joint Examination on Colombian Civil & Commercial Law Issues |

[144] The Tribunal notes that the page numbers do not exactly match – this is due to the transcripts for each day being followed by a varying number of pages with a glossary of terms and their appearance in the text.

ICC Case 21747 RD/MK/PDP
Final Award

| 4042 – 4282 | 18 | June 30, 2021 | Expert Discipline: Cost & Claim Quantum<br>Robert Lane for Reficar<br>Scott Gray, Mark Hackett, & Wiley Wright for CB&I |
| 4284 – 4539 | 19 | July 1, 2021 | Scott Gray, Mark Hackett, & Wiley Wright for CB&I<br>Joint Examination on Cost & Claim Quantum Issues |
| 4541 – 4786 | 20 | July 2, 2021 | Expert Discipline: Schedule & Delay<br>Stephen Warhoe for Reficar |
| 4788 – 5007 | 21 | July 3, 2021 | Donald Harvey for CB&I<br>Joint Examination on Schedule & Delay Issues |
| 5009 – 5228 | 22 | July 6, 2021 | Expert Discipline: Project Design / Definition & Engineering<br>Alan Reynolds, Peter Bartlett & Tim Rooney for Reficar |
| 5230 – 5490 | 23 | July 7, 2021 | David Millican & Nick Adams for CB&I<br>Joint Examination on Project Design / Definition & Engineering Issues |
| 5492 – 5694 | 24 | July 8, 2021 | Expert Discipline: Procurement<br>Tim Rooney for Reficar<br>David Millican for CB&I |
| 5696 – 5893 | 25 | July 9, 2021 | Joint Examination on Procurement Issues<br>Expert Discipline: Construction<br>Ted Brown for Reficar |
| 5895 – 6073 | 26 | July 10, 2021 | Chris Hillier for CB&I<br>Joint Examination on Construction Issues |
| 6075 – 6225 | 27 | July 12, 2021 | Expert Discipline: Colombian Labour Law<br>Jose Herrera for Reficar<br>Carlos Molina for CB&I<br>Joint Examination on Colombian Labour Law Issues |
| 6227 – 6356 | 28 | July 13, 2021 | Expert Discipline: Colombian Fiscal Responsibility Law<br>Camilo Calderon for Reficar<br>Jaime Arrubla for CB&I<br>Joint Examination on Colombian Fiscal Responsibility Law Issues |
| 6358 – 6612 | 29 | July 14, 2021 | Expert Discipline: Counterclaim Quantum<br>Wiley Wright & Mark Hackett for CB&I<br>Michael Hostettler, J. Paul Campbell, Steven Scott for Reficar<br>Joint Examination on Counterclaim Quantum Issues |
| 6614 – 6797 | 30 | July 15, 2021 | Expert Discipline: Lost Profits<br>Joseph Egan for Reficar<br>Manuel Abdala for CB&I |
| 6799 – 6932 | 31 | July 16, 2021 | Joint Examination on Lost Profits Issues |
| 6967-7201 | 32 | November 18, 2021 | Oral Closings Session, Day 1 |
| 7206-7241 | 33 | November 19, 2021 | Oral Closings Session, Day 2 |

130. The following Hearing Exhibits were presented:

| H-1 | Reficar Opening Presentation |
| H-2 | CB&I Opening Presentation |

ICC Case 21747 RD/MK/PDP
Final Award

| H-3 | Reficar's Counsel's Handwritten Calculations from M. Deidehban Examination |
| H-4 | Reficar's Counsel's Handwritten Calculations from M. Deidehban Examination |
| H-5 | Reficar's Counsel's Handwritten Calculations from M. Deidehban Examination |
| H-6 | Reficar's Counsel's Handwritten Calculations from M. Deidehban Examination |
| H-7 | Reficar's Counsel's Handwritten Calculations from M. Deidehban Examination |
| H-8 | [INTENTIONALLY OMITTED] |
| H-9 | Reficar's Counsel's Handwritten List from M. Deidehban Examination |
| H-10 | Virtual Site Visit (Video 1) |
| H-11 | Virtual Site Visit (Video 2) |
| H-12 | Summary of Pre-Recorded Virtual Site Visit (Final Guide to Videos), dated May 17, 2021 |
| H-13 | Reficar's Compilation of CB&I Monthly Report Data |
| H-14 | Reficar's Compilation of Photographs and Diagrams of the Project in the Record |
| H-15 | Reficar's Demonstrative Exhibit CD-002 |
| H-16 | English Translation of Ex. R-1758 (p.21) |
| H-17 | Reficar's Counsel's Handwritten Diagram |
| H-18 | Reficar Second Block Opening Presentation |
| H-19 | CB&I Second Block Opening Presentation |
| H-20 | Reficar's Expert Presentation on Colombian Civil Law |
| H-21 | CB&I's Expert Presentation on Colombian Civil Law |
| H-22 | Reficar Quantum Expert Presentation |
| H-23 | CB&I's Expert Presentation on Claim Quantum |
| H-24 | Reficar's Expert Presentation on Scheduling and Delay Analysis |
| H-25 | CB&I's Expert Presentation on Scheduling and Delay Analysis |
| H-26 | Reficar's Expert Presentation on Project Design and Definition & Engineering |
| H-27 | CB&I's Expert Presentation on Project Design and Definition & Engineering |
| H-28 | Reficar's Expert Presentation on Procurement |
| H-29 | CB&I's Expert Presentation on Procurement |
| H-30 | Reficar's Expert Presentation on Construction |
| H-31 | CB&I's Expert Presentation on Construction |
| H-32 | Reficar's Expert Presentation on Colombian Labor Law |
| H-33 | CB&I's Expert Presentation on Colombian Labor Law |
| H-34 | Reficar's Fiscal Liability Law Expert Presentation |
| H-35 | CB&I's Fiscal Liability Law Expert Presentation |
| H-36 | CB&I Counterclaim Expert Presentation |
| H-37 | Reficar's Counterclaim Expert Presentation |
| H-38 | Reficar's Expert Presentation on Lost Profits Damages |
| H-39 | CB&I's Expert Presentation on Lost Profits Damages |
| H-40 | Excerpt from KEATING ON CONSTRUCTION, 9th Edition |
| H-41 | Claimant's Closing Presentation |
| H-42 | Respondents' Closing Presentation |

131. For ease of reference, the Tribunal notes that CB&I has referred to the following individually-marked exhibits from the *Contraloría* casefile[145]:

| R-1853_0002 | Project Cost Risk Analysis Presentation, Attachment 11 to Reficar Board Meeting Minutes No. 029, dated 24 Nov 2008 |
| R-1853_0004 | Reficar Comité de Costos Meeting Minutes No. 04, dated 26 Oct 2011 |
| R-1853_0005 | Reficar Cost Control Memorandum |
| R-1853_0026 | Transcript of Testimony before Procuraduría of J. Rodas, dated 10 May 2016 |
| R-1853_0029 | Reficar Comité de Costos Meeting Minutes No. 07, dated 27 Jan 2012 |

---

[145] The *Contraloría* casefile is a voluminous folder; CB&I has referred to certain documents identified in that folder using the numbers listed by the Tribunal.

| R-1853_0032 | Reficar Board Meeting Minutes No. 107, dated 1 Mar 2013 |
| R-1853_0036 | Precommissioning Plan Presentation, Attachment 8 to Reficar Board Meeting Minutes No. 139, dated 14 May 2014 |
| R-1853_0037 | Project Management Presentation, Attachment 3 to Reficar Board Meeting Minutes No. 70, dated 20 Jun 2011 |
| R-1853_0038 | Email from C. Mantilla to N. Isaksson and others, dated 27 Nov 2012 |
| R-1853_0039 | Fiscal Liability Proceeding Before Contraloría General de la República, Process No. PRF-2017-00309_UCC-PRF-005-2017, Free Version Rendered by Christian Mantilla, Verbal, dated 7 Nov 2017 |
| R-1853_0040 | Monetary Recovery Presentation, Attachment 7 to Reficar Board Meeting Minutes No. 121, dated 11 Sept 2013 |
| R-1853_0048 | Foster Wheeler Minutes of Meeting, dated 28 Jul 2010 |
| R-1853_0049 | Email from C. Mantilla to R. Bramwell and others, dated 5 Apr 2013 |
| R-1853_0050 | Fiscal Liability Proceeding Before Contraloría General de la República, Process No. PRF-2017-00309_UCC-PRF-005-2017, Free Version Rendered by Christian Mantilla, dated 8 Feb 2018 |

13.  **ADVANCE ON COSTS**

132. The Court initially fixed the advance on costs at USD 650,000[146]. On July 5, 2018 the Court readjusted and increased the advance on costs to USD 2,055,000[147].

133. On April 29, 2021 the Court readjusted the advance on costs and increased in to USD 3,850,000[148].

134. Finally, on January 25, 2022 the Court increased the advance on costs to USD 5,400,000[149].

135. The Parties have contributed to the advance on costs in the following amounts[150]:

| Party | Amount paid |
|---|---|
| Claimant | USD 3,402,500 |
| Respondents | USD 1,997,500 |
| **Total** | **USD 5,400,000** |

136. Any amounts remaining in the case finances shall be reimbursed to the Parties pursuant to the Court's decision of May 5, 2023[151].

14.  **TIME PERIOD FOR THE ISSUANCE OF THE AWARD AND CLOSING OF THE PROCEEDINGS**

137. Originally, the ICC Court had fixed February 28, 2019 as the time limit for the Final Award[152]. The Court amended the deadline for rendering the Final Award on multiple occasions, on:

-    February 7, 2019, extended until August 31, 2020;

---

[146] Financial table of September 21, 2016.
[147] Secretariat's letter and Financial table of July 12, 2018.
[148] ICC communication of April 29, 2021.
[149] ICC communication of January 25, 2022.
[150] Financial table of May 5, 2023.
[151] Financial table of May 5, 2023.
[152] ICC communication of March 2, 2017.

- August 6, 2020, extended until December 30, 2020;

- December 3, 2020, extended until August 31, 2021;

- August 5, 2021, extended until October 29, 2021;

- October 7, 2021, extended until February 28, 2022;

- April 7, 2022, extended until November 30, 2022;

- November 3, 2022, extended until March 31, 2023;

- March 2, 2023, extended until May 31, 2023; and

- May 4, 2023, extended until August 31, 2023.

138. Therefore, this Final Award is rendered within the granted time limit.

139. On March 24, 2023, pursuant to pursuant to Art. 27 of the ICC Rules, the Tribunal declared the proceedings closed with respect to the matters to be decided in the Final Award.

140. On March 31, 2023 the Arbitral Tribunal submitted the draft Final Award to the Court, pursuant to Art. 33 of the ICC Rules. On May 5, 2023 the Court approved the draft Final Award[153].

---

[153] Communication from the ICC Secretariat dated May 5, 2023.

## III. INTRODUCTION AND PENDING PROCEDURAL MATTERS

### 1. OVERVIEW

141. The dispute before the Tribunal arises out of one of the biggest industrial projects in Latin America. The following paragraphs aim at providing a brief and simplified summary of the dispute, which should not be interpreted as a precise and exhaustive factual recollection.

142. Reficar owned an old refinery in Colombia and decided that it was time it underwent major improvements and modernisation. CB&I was the contractor in charge of the engineering, procurement and construction ["**EPC**"] project.

143. There is no dispute that the performance of the contract suffered around a two-year delay and the EPC costs amounted to USD 5.9 billion.

144. Reficar brings three major claims in this arbitration:

145. First, at the beginning the EPC project was conceived as a lump sum contract, but was later changed into a cost reimbursable one. Reficar argues that it was tricked by CB&I into that change [the "**Pre-Contract Claim**"] and asks for USD 4 billion in compensation for additional costs.

146. Alternatively, Reficar makes the argument that CB&I breached its contractual duties to only incur reasonable costs and claims either USD 1.77 billion for the breach or USD 1.59 billion for reimbursement of unreasonable costs.

147. Reficar also alleges that CB&I breached its duties with regard to controlling the Project Schedule.

148. CB&I, on the other hand:

149. First, denies ever having tricked Reficar into changing the remuneration scheme and argues that Reficar made the change at free will and after careful third-party advice.

150. Second, affirms that all costs incurred were reasonable and proper and that it diligently progressed with the Project and so, no contractual duties were infringed.

151. Finally, CB&I counterclaims that Reficar still owes it overdue invoices. Reficar says that none of the unpaid invoices are due.

152. Before analysing these claims, the Tribunal will address certain pending procedural issues.

### 2. PENDING PROCEDURAL MATTERS

153. There are three procedural matters that require a decision from the Tribunal: the evidentiary weight attributable to witnesses who failed to attend the Hearing (**2.1.**) negative inferences from deficient document production (**2.2.**) and the shifting of the burden of proof (**2.3.**).

**2.1.  EVIDENCE BY WITNESSES WHO FAILED TO APPEAR AT THE HEARING**

154.  Two of Reficar's witnesses, Messrs. Christian Mantilla and Andrés Riera, failed to appear at the Hearing.

155.  Mr. Mantilla is a civil engineer employed by Reficar's consultant, Foster Wheeler; he has acted as the vice-president of the Project, vice-president of pre-commissioning and start-up and advisor to Ecopetrol, Reficar's parent company[154]. Mr. Riera likewise served as the vice-president of the Project and vice-president of pre-commissioning and start-up; he later served as technical manager and refining advisor to Ecopetrol[155].

156.  Reficar announced the witnesses' unavailability on May 13, 2021 (*i.e.*, four days prior to the Hearing) for Mr. Mantilla[156] and on May 20, 2021 for Mr. Riera[157] (*i.e.*, four days into the Hearing). CB&I submitted its objections to both announcements on May 13[158] and May 21[159], 2021, respectively.

157.  Having heard the Parties at the Hearing regarding the witnesses' failure to appear, the Tribunal allowed the Parties to make written briefings on this issue in their post-hearing submissions and postponed its decision until the Award[160].

The Parties' positions

158.  Reficar argues that both witnesses' statements should be kept in the record with full evidential value. According to Reficar, Mr. Mantilla had been instructed by his employer, Foster Wheeler, to refrain from attending the Hearing in light of the then-recent order issued by the *Contraloria* attributing fiscal liability to Foster Wheeler and some of its employees (with the two witnesses being directly affected); this order in Reficar's view constituted exceptional circumstances, justifying the witness's last-minute failure to appear[161]. Mr. Riera could not attend the Hearing for the same underlying reason of having to manage the aftermath of the *Contraloria* order, meaning that his absence was also caused by exceptional circumstances and thus justified[162].

159.  CB&I requests that the Tribunal grant no evidentiary weight to the witness statements submitted by Messrs. Mantilla and Riera[163]. The reasons allegedly justifying the witnesses' last-minute failure to appear at the Hearing did not constitute exceptional circumstances and thus, the Tribunal should strike out the witness statements of Messrs. Mantilla and Riera, as well as any portions of expert reports submitted by Reficar which were based on information provided by these two witnesses[164]. CB&I also argues that it would be highly prejudiced if the

---

[154] Mantilla CWS; Mantilla CWS II; RPHB, para. 25.
[155] Riera CWS, RPHB, para. 25.
[156] Communication C-214.
[157] Communication C-220.
[158] Communication R-203.
[159] Communication R-209.
[160] Tr. 6902:11-6913:15; 6918:24-6923:7.
[161] Communication C-214.
[162] Communication C-220.
[163] RPHB, para. 24.
[164] RPHB, para. 35.

Tribunal accepted information from witnesses CB&I was unable to cross-examine[165].

Tribunal's decision

160. The Tribunal must decide whether it should strike from the record the witness statements of Messrs. Mantilla and Riera, as well as any portions of the expert reports submitted by Reficar which were based on information provided by these two witnesses.

161. In accordance with the Hearing Protocol agreed by the Parties and the Tribunal[166],

> "[t]he Tribunal shall not consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question fails to provide a legitimate reason for the Fact Witness's failure to appear".

162. The Tribunal must, then, decide, whether the failure to appear by Reficar's two witnesses was justified by "legitimate reasons".

163. Reficar avers that the Tribunal itself had previously considered the *Contraloria* proceedings to be an "exceptional circumstance" for the purposes of the current arbitration; thus, the new order issued by the *Contraloria* constituted a legitimate reason for the witnesses' failure to appear at the Hearing[167].

164. CB&I argues that the *Contraloria* proceedings had by the time of the Hearing been ongoing for years and the particular decision of the *Contraloria* invoked by Reficar's witnesses preceded the notification of their absence by two weeks' time[168]. And it would be highly prejudiced if the Tribunal accepts information from witnesses CB&I was unable to cross-examine[169].

165. The Tribunal finds that both Parties are partially correct.

166. On the one hand, Reficar is correct in arguing that the *Contraloria* proceedings have been recognised by the Tribunal as "exceptional circumstances"[170]; thus, upon the issuance of a new order by the *Contraloria*, that had a specific impact on the personal situation of the two witnesses, these witnesses indeed had a "legitimate reason" not to appear at the Hearing.

167. CB&I, on the other hand, is correct in arguing that its situation could be prejudiced by the fact that it has been unable to cross-examine two of Reficar's witnesses, whom it had specifically selected for these purposes.

168. As a result, the Tribunal will apply additional scrutiny to all the evidence in the case file based on the witness statements of Messrs. Mantilla and Riera and take account in assessing the weight given the fact that there was no opportunity for CB&I to cross-examine these witnesses. The Tribunal confirms, however, its prior decision

---

[165] RPHB, paras. 33-34.
[166] HP, dated March 22, 2021, para. 79(b).
[167] Communication C-214; communication C-220.
[168] RPHB, paras 29-31.
[169] RPHB, paras. 33-34.
[170] Communication A 151 at para. 22; communication A 136 at para. 23.

not to strike out these witness statements, or any portions of the expert reports submitted by Reficar, based on the information provided by these witnesses.

## 2.2. NEGATIVE INFERENCES FROM DEFICIENT DOCUMENT PRODUCTION

169. Claimant asks for the Tribunal to draw negative inferences from Respondents' failure to produce documents ordered by the Tribunal[171].

170. These pertain to documents that, according to Claimant, "should have existed in the ordinary course of business, but CB&I has refused to produce them"[172], including categories such as internal analyses, memoranda, reports, communications, data underlying CB&I's methods of calculating productivity, and the close-out report for the Project[173].

171. CB&I has, in its opinion, fully complied with the Tribunal's orders regarding document production[174]. CB&I avers that Reficar's request should be denied, because Reficar has failed to present a narrowly tailored request, to prove that CB&I effectively withheld any documents, and to argue that the standard for drawing adverse inferences has been met[175].

Tribunal's decision

172. Reficar brings a request under Art. 9.5 of the IBA Rules on the Taking of Evidence in International Arbitration, which provides that[176]:

> "[i]f a Party fails without satisfactory explanation to produce any Document requested in a Request to Produce to which it has not objected in due time or fails to produce any Document ordered to be produced by the Arbitral Tribunal, the Arbitral Tribunal may infer that such document would be adverse to the interests of that Party".

173. As regards the standard for drawing negative inferences from failures in document production, it is widely accepted that such inferences may only be drawn in exceptional circumstances[177].

174. Reficar only makes a generic request for a declaration "that these documents and the evidence contained therein would be adverse to the interests of CB&I"[178]. Consequently, Claimant has failed to establish a specific and narrow request of what inferences exactly it wishes the Tribunal to draw from CB&I's alleged failure to

---

[171] ESOC, paras. 528-538.
[172] ESOC, paras. 528.
[173] ESOC, paras. 535-536.
[174] ESOD, paras. 1601-1602, 1609.
[175] ESOD, paras. 1597-1600.
[176] CL-0734.
[177] RL-489, S. Greenberg and F. Lautenschlager, "Adverse Inferences in International Arbitral Practice", *ICC International Court of Arbitration Bulletin*, Vol. 22, number 2, (2011), p. 43 (pdf p. 1).
[178] ESOC, paras. 534-536. Reficar provides certain examples of documents that CB&I allegedly failed to produce but only provides arguments as to their existence and concludes each "example" with the same generic request that "the Tribunal should draw an adverse inference that such documents would be adverse to CB&I's interests".

produce documents, nor that there are exceptional circumstances which justify such an extreme measure.

175. There is also no evidence in the record suggesting that CB&I was in fact in possession of the requested documents, but willfully refused to produce them despite being ordered to do so by the Tribunal.

176. In the present case, the Tribunal rejects Claimant's request.

## 2.3. SHIFTING OF BURDEN OF PROOF

177. Reficar also requests that the Tribunal apply in the Award the "dynamic burden of proof" theory under Art. 167 of the Colombian General Code of Procedure and shift the burden of proof for a number of issues from Reficar to CB&I[179]: CB&I is the Party with superior or exclusive access to certain evidence, and it should thus be the Party having to meet the burden of proof[180].

178. CB&I avers that Reficar's request for shifting the burden of proof in this arbitration cannot be brought under a procedural rule provided for in Colombian law[181]. In any event, the conditions of the provision of Colombian law invoked by Reficar, such as the timeliness of the request and appealability, are not met[182].

Tribunal's decision

179. Reficar requests that the Tribunal apply in this Award Art. 167 of the Colombian General Code of Procedure to shift the burden of proof from Reficar to CB&I for several issues, for which, in Reficar's view, CB&I is the Party with superior or unique access to the underlying evidence.

180. CB&I asks the Tribunal to deny Reficar's request, as the underlying provision under Colombian law does not apply to this arbitration and, even if it did, Reficar's request is unacceptable: the Tribunal cannot shift the burden of proof in the Award as required by Reficar – such decision would have to be taken well in advance, but Reficar failed to request a prior decision.

181. The Tribunal sides with CB&I.

182. The relevant provision states as follows[183]:

---

[179] Reply, paras. 1005-1007.
[180] Reply, paras. 1008-1015.
[181] RPHB, para. 667.
[182] RPHB, para. 668-669.
[183] CL-0535; English translation:
"ARTICLE 167. BURDEN OF PROOF. It is incumbent on the parties to prove the factual basis of the rules enshrining the legal effect that they are pursuing.
However, depending on the characteristics of the case, the court may, sua sponte or at the request of a party, distribute, the burden of proof by ordering the production of evidence, during examination of the evidence or at any time during the procedure before it announces its decision, and demanding that a particular fact be proven by the party that is in a more favorable situation to provide the evidence or to clarify the disputed facts. A party will be considered best placed to prove a fact due its proximity to the evidence, because it has the evidence in its possession, due to special technical circumstances, because it played a direct role in

> *"ARTÍCULO 167. CARGA DE LA PRUEBA. Incumbe a las partes probar el supuesto de hecho de las normas que consagran el efecto jurídico que ellas persiguen.*
>
> *No obstante, según las particularidades del caso, el juez podrá, de oficio o a petición de parte, distribuir, la carga al decretar las pruebas, durante su práctica o en cualquier momento del proceso antes de fallar, exigiendo probar determinado hecho a la parte que se encuentre en una situación más favorable para aportar las evidencias o esclarecer los hechos controvertidos. La parte se considerará en mejor posición para probar en virtud de su cercanía con el material probatorio, por tener en su poder el objeto de prueba, por circunstancias técnicas especiales, por haber intervenido directamente en los hechos que dieron lugar al litigio, o por estado de indefensión o de incapacidad en la cual se encuentre la contraparte, entre otras circunstancias similares.*
>
> *Cuando el juez adopte esta decisión, que será susceptible de recurso, otorgará a la parte correspondiente el término necesario para aportar o solicitar la respectiva prueba, la cual se someterá a las reglas de contradicción previstas en este código [...]"* [Emphasis added].

183. Paragraph 1 of Art. 167 establishes the general principle that each party must prove the facts on which it relies to request the application of a certain legal norm. The application of this general principle is accepted by both Parties and will be applied by the Tribunal, with the *caveats* explained in subsequent sections.

184. Reficar requests that the Tribunal also apply the second paragraph of Art. 167, which grants the Colombian judge the possibility of shifting the burden of proof to the party which is in a more favourable situation to marshal the evidence. The option to make such a decision is restricted by several conditions: the decision must be subject to appeal and should be pronounced in the early stages of the proceeding, as the party burdened with the evidence must be given the opportunity to discharge its duty.

185. As an initial matter, it is doubtful whether para. 2 of Art. 167, which grants a power to Colombian judges (*"el juez podrá"*), can find application to arbitrators in an arbitration seated in New York. Be that as it may, Reficar's request does not meet the high threshold set forth by para. 2 of Art. 167:

    -    First, the request must be made early in the procedure, so that the party burdened with the duty has sufficient time to marshal the evidence – in the current proceeding, Reficar only made a request for the application of para. 2 of Art. 167 when it filed its Reply[184];

---

the events that gave rise to the dispute, or because the other party is denied due process or lacks capacity, among other similar circumstances.
When the court adopts this decision, which will be subject to appeal, it shall grant the corresponding party the time necessary to provide or request the evidence in question, which will be subject to the rules of rebuttal specified in this code".
[184] Reply, paras. 1005-1010.

- Second, Reficar has reiterated its request in its PHB[185], asking the Tribunal to apply para. 2 of Art. 167 in the Award; but the provision contains a clear prohibition of the shifting of the burden of proof at the stage of rendering the Award; instead, it must precede the Award (*en cualquier momento del proceso antes de fallar*);

- Third, the decision by the judge must be subject to appeal – this is impossible in an arbitration, reinforcing the finding that this rule is not to be applied in arbitral proceedings.

186. Thus, in this Award, the Tribunal will apply the ordinary rules governing the burden of proof under Colombian law.

---

[185] CPHB, paras. 143, 179, 526-527.

# IV. LAW APPLICABLE TO THE DISPUTE

187. Two major bodies of law find application to the current dispute: first, and foremost, the contract between the Parties (**1.**) and, second, generally applicable law of either of the two jurisdictions elected by the Parties – Colombian law or the law of the State of New York ["**New York Law**"] (**2.**).

188. The Tribunal will also analyse the law applicable to its power to grant indirect or consequential damages (**3.**).

## 1.    THE EPC CONTRACT

189. Reficar and the CB&I entities are bound by six agreements collectively known as the EPC Contracts.

190. Out of these six agreements (i) only two are, strictly speaking, EPC contracts, (ii) the rest are ancillary contracts.

191. (i) The engineering, construction and procurement contracts are:

- The "**Onshore Contract**" between Reficar and CB&I Colombiana, governed by Colombian law, for work (mainly construction) performed by CBI Colombiana in Colombia[186],

- The "**Offshore Contract**" between Reficar and CB&I UK, governed by New York law, for design, engineering, procurement and other work performed by CB&I UK primarily outside of Colombia[187].

192. (ii) The ancillary contracts are:

- A parent guarantee between Reficar and CB&I N.V., governed by New York law, for CB&I Colombiana's obligations under the Onshore Agreement [the "**Onshore Parent Guarantee**"][188],

- A parent guarantee between Reficar and CB&I N.V., governed by New York law, for CB&I UK's obligations under the Offshore Agreement [the "**Offshore Parent Guarantee**"][189],

- The "**Coordination Agreement**" executed by Reficar, CB&I UK and CBI Colombiana, governed by New York law, providing for the coordination of obligations under the Onshore and Offshore Contracts and the resolution of any interpretation conflicts[190],

---

[186] JX-002; JX-003; JX-006.
[187] JX-004; JX-005; JX-006.
[188] JX-008, pdf pp. 1-16.
[189] JX-008, pdf pp. 17-32.
[190] JX-007, pdf pp. 29-44.

- The DRA between Reficar and CB&I UK, CBI Colombiana, CB&I, N.V., governed by New York law and providing for the system of resolving any disputes between the Parties under the EPC Contracts[191].

## 2.   COLOMBIAN OR NEW YORK LAW

193.   The Parties were very much aware of the fact that the EPC work was governed by two distinct contracts – the Onshore and the Offshore Contracts – subject to different applicable laws – Colombian and New York law, respectively – and that discussions in that regard might arise in case of dispute. This is why Sections 4.1[192] and 4.2.2[193] of the Coordination Agreement provide that neither Party can excuse its liability alleging that the claim against it was brought under the wrong Contract:

> "4.1 Claims by the Owner
>
> Each Contractor undertakes not to contend, in connection with any Dispute (including any alternative dispute resolution process, arbitration or judicial proceeding) or otherwise, that it is not liable in respect of any Dispute made as aforesaid on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made.
>
> [...]
>
> 4.2.2 The Owner undertakes not to contend, in connection with any Dispute (including any alternative dispute resolution process, arbitration or judicial proceeding or otherwise, that it is not liable in respect of any Dispute made as aforesaid on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made".

194.   Since it was the Parties' intention that liability be enforced, even if claimed under the wrong Contract, it naturally follows that the same should result if the claim is brought under the wrong applicable law. Consequently, provided that liability exists under any of the Contracts and either under Colombian or New York law, such liability will be enforced, and the party liable has waived its right to argue that the dispute should properly have been brought under another Contract or another legal system.

195.   CB&I has raised as a defensive argument, that some of Reficar's claims should be dismissed, because they were pleaded under the wrong law. The Tribunal finds this argument non convincing and contrary to the Parties' express agreement.

196.   Notwithstanding the above, the Tribunal will now make an analysis of the applicable law for the three different claims brought by Reficar: pre-contract claims (**A.**), contract claims (**B.**), and the fiduciary liability claim (**C.**).

---

[191] JX-007, pdf pp. 3-27.
[192] JX-007, p. 34.
[193] JX-007, pp. 34-35.

**A.    Pre-contract claims**

197. The majority of the controversies as to the applicable law arise as regards Reficar's pre-contractual claims against CB&I.

Reficar's position

198. Reficar avers that the dual contract arrangement (Onshore and Offshore Contracts) was made for tax purposes rather than to create separate obligations and defenses under the distinct agreements[194]. The contractual origin of the claim is therefore, irrelevant.

199. But, if the pre-contractual claim was to be pinpointed to one of the Contracts, it would be the Onshore Contract, because the majority of misconduct and consequences for pre-contractual phase occurred in Colombia[195]. Hence, pre-contractual claims are governed by Colombian law.

200. Reficar additionally argues that the application solely of Colombian law is also in line with the Parties' approach during the Hearing, as only Colombian law experts were called[196], and is further reinforced by notions of fairness[197].

CB&I's position

201. CB&I agrees with Reficar that Onshore Contract-related pre-contractual claims are governed by Colombian law[198].

202. However, according to CB&I, for Offshore Contract-related pre-contractual claims, New York law applies due to the choice-of-law provisions in the EPC Agreements and pursuant to the ICC Rules' mandate for the Tribunal to apply the law chosen by the Parties[199].

203. CB&I argues that New York courts construe pre-contractual claims to be covered as also "arising out of" or "related to" the contract – thus New York law applies to Offshore Contract-related pre-contractual claims[200].

204. As a consequence, CB&I argues that Reficar either does not assert or has abandoned any claims in relation to the Offshore Agreement. Even if this is not the case, Reficar has failed to establish its case under New York law, which is required for any Offshore Contract claims[201].

Discussion

205. Reficar brings pre-contract claims based on CB&I's alleged breach of precontractual information duties. In Reficar's opinion, had it not been for CB&I's

---

[194] CPHB, para. 33.
[195] CPHB, paras. 28, 43; Reply, para. 15; ESOC, para. 549.
[196] CPHB, para. 29.
[197] CPHB, para. 29.
[198] RPHB, para. 11.
[199] RPHB, para. 10.
[200] RPHB, para. 10.
[201] RPHB, para. 68, fn. 141.

misleading information, it would have entered into the EPC Contracts under different pricing terms.

206. Reficar has concentrated its pre-contract claims under Colombian law. CB&I argues that this choice should lead to the dismissal of any pre-contract claims arising out of the Offshore Contract.

207. The Tribunal will, ultimately, reject Reficar's pre-contract claims, but not because of the choice of applicable law.

208. As a point of departure, the Tribunal recalls that its mandate, in accordance with Art. 21(1) of the ICC Rules, is to apply the law chosen by the Parties[202]:

> "Applicable Rules of Law
>
> 1 The parties shall be free to agree upon the rules of law to be applied by the arbitral tribunal to the merits of the dispute. In the absence of any such agreement, the arbitral tribunal shall apply the rules of law which it determines to be appropriate".

209. According to CB&I, this means that New York law applies to those pre-contract claims that relate to the Offshore Agreement, as provided for under Section 4.12 of the DRA:

> "4.12 The Arbitral Tribunal shall be governed by and shall apply the substantive law governing the Agreement under which the Dispute(s) arise. If the Dispute(s) refers to two (2) or more agreements with different applicable law, the Arbitral Tribunal shall apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement". [Emphasis added]

210. The Tribunal does not agree with CB&I.

211. Reficar's pre-contract claim refers to a breach of precontractual duties during the negotiation of the EPC Contract, generally speaking. Reficar has not singled out breaches which would specifically affect its consent to the Onshore or the Offshore Contract – Reficar refers to general misinformation on CB&I's side regarding the estimate of costs and work schedule involved in the Contract. Hence, the Tribunal cannot split the dispute and attribute a part of it "to the related agreement" – as envisaged in the DRA.

212. The Parties had also foreseen this situation when drafting the EPC Contract. The recitals of the DRA – the agreement specifically entered into to govern the process of dispute resolution, and which forms part of the EPC Contract in general – favour that only one law be applied[203]:

> "[t]he inter-related nature of the Project Agreements means that Disputes may arise under one Project Agreement which are related to Disputes which arise under one or more other Project Agreements, and it is in the interest of the

---

[202] RPHB, para. 10, citing to ICC Rules, Art. 21(1).
[203] JX-007, para. B, p. 4.

Parties that such related Disputes be resolved in a consistent manner".
[Emphasis added]

213. In this case, Reficar chose Colombian law – an option open to it, according to the DRA, which CB&I cannot question invoking Section 4.12 of the DRA, because the dispute affects both the Onshore and the Offshore Agreements and cannot be split.

214. But even if CB&I were right, and the pre-contract claim were divisible and partially attributable to each Contract (*quod non*), Section 4.1 of the Coordination Agreement would put an end to CB&I's argument, as it bars a party from bringing precisely the excuse CB&I is now pleading[204]:

> "4.1 Claims by the Owner
>
> Each Contractor undertakes not to contend, in connection with any Dispute (including any alternative dispute resolution process, arbitration or judicial proceeding) or otherwise, that it is not liable in respect of any Dispute made as aforesaid on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made".

215. In any event, the discussion above is purely academic, because ultimately, the Tribunal will dismiss these claims for lack of merit, irrespective of the legal system to be applied.

## B.   **Contract claims**

216. Reficar also brings a claim for contractual breaches based on the fact that CB&I allegedly charged for costs it was not contractually allowed to recover, which must be returned to Reficar; CB&I's failures also led Reficar to incur other additional costs on the Project.

217. As regards contractual liability, the legal framework is essentially confined to contractual provisions. The only area in which the discussion on Colombian or New York law becomes relevant concerns the interpretation of the liability cap provisions.

218. Both Parties agree that the contractual provision which could lead to the lifting of the liability cap in the current dispute is TC 8.1.1 (iii).

219. TC 8.1.1 (iii) in the Spanish version of both the Onshore and Offshore Contracts stipulates that the liability cap in the EPC Contract does not apply to[205]:

> "(iii) *responsabilidad derivada de cualquier fraude, Culpa Grave o Dolo, incurridos por el Contratista*",

which in the English version provides as follows[206]:

---

[204] JX-007, p. 34.
[205] JX-002, p. 51; JX-004, pp. 49-50.
[206] JX-002, pp. 180-181; JX-004, p. 166.

"(iii) liability arising from any fraud, Gross Negligence or Willful Misconduct committed by the Contractor".

220. In order to fully ascertain the meaning of the concepts enumerated as exceptions to the liability cap – *fraude*, *culpa grave*, *dolo* and fraud, gross negligence, willful misconduct – the Tribunal will undertake an analysis guided by the definitions section of both the Onshore and Offshore Contract.

221. The Onshore Contract provides that the terms "*Culpa Grave*"[207] and "*Dolo*"[208] have the meaning given to them under the Colombian Civil Code [the "**CCC**"]. The equivalent terms "Gross Negligence"[209] and "Willful Misconduct"[210], under the English version, refer to the same provisions under Colombian law.

222. "Willful Misconduct" is further described in the English version of the Offshore Contract as "an intentional act or omission that the relevant Person knew or should have known was wrongful"[211]. The equivalent term in Spanish is defined as "*Mala Conducta Intencional*" – a literal translation of "willful misconduct". The term is followed by "(Dolo)" in parentheses, which means that the Offshore Agreement equates willful misconduct and *dolo*[212].

223. The terms "*Culpa Grave*" and "Gross Negligence" are not defined in the Offshore Contract.

224. The above suggests that the Parties understood (i) *culpa grave* and gross negligence and (ii) *dolo* and willful misconduct to have equivalent meaning in the context of the performance of the Contract; (iii) the same is applicable to *fraude* and fraud.

225. The Tribunal further confirms that, as will be explained in section VIII.1 *infra*, *culpa grave* under Colombian law and gross negligence under New York law (the only relevant concepts to the discussion on contractual liability), are very similar concepts, so that any contractual performance which qualifies as the former under Colombian law would also meet the requirements for the latter under New York law.

226. The Tribunal will address these similarities, whenever necessary, in the respective sections on liability, where a detailed analysis and comparison of these legal concepts will be presented[213].

**C.    Fiduciary liability claim**

227. The final, alternative claim brought by Reficar in case the Tribunal dismisses the contract claims, is for an alleged breach of CB&I's fiduciary duties towards Reficar

---

[207] JX-002, p. 31.
[208] JX-002, p. 32.
[209] JX-002, p. 166.
[210] JX-002, p. 171.
[211] JX-004, p. 157.
[212] JX-004, p. 34.
[213] Even though these concepts are discussed in the context of contractual liability here, the Tribunal notes that the concept of *dolo* will also be key for assessing pre-contract liability. Thus, the respective analyses may be found as follows: for pre-contractual *dolo*, see Section VII.1.3.2; for *culpa grave*/gross negligence, see Section VIII.1.

under New York law. There is no discussion between the Parties as to the law under
which this claim has been pleaded.

228. In any event, the Tribunal will eventually find CB&I liable for contract breaches;
thus, the fiduciary claim must be considered moot to avoid Reficar obtaining double
recovery.

### 3. THE TRIBUNAL'S POWER TO GRANT INDIRECT OR CONSEQUENTIAL DAMAGES

229. Reficar's primary claims under the EPC Contract are twofold:

- That CB&I breached the Contracts by charging unreasonable and improper
costs for the Refinery, which Reficar never should have paid and which it
believes to be entitled to claw back.

- That CB&I was late in the delivery of the Refinery, entitling Reficar to claim
delay penalties and lost profits.

230. Reficar also brings an ancillary claim: the cost of capital.

231. There is no question that under the applicable law, these claims seem, *prima facie*,
available to Reficar as the aggrieved party. The question is whether the Parties
agreed to make them unavailable in this arbitration before this Tribunal.

232. CB&I says that Section 4.13 of the DRA carves out loss of profits and cost of capital
from the Tribunal's competence[214]:

> "The Arbitral Tribunal shall neither have nor exercise any power to act as
> *amicable compositeur* or *ex aequo et bono*, <u>or to award special, indirect,
> consequential or punitive damages</u>". [Emphasis added]

233. CB&I interprets "indirect or consequential damages" as encompassing claims for
lost profits and cost of capital[215]. Reficar argues that both its loss of profit and its
cost of capital claims are direct and fall outside of the scope of this provision[216].

234. Since the discussion revolves around the correct construction of certain terms
included in the DRA, the Tribunal must resort to New York law, as the applicable
law under that agreement[217]:

> "(…) <u>shall be governed by and construed in accordance with the laws of the
> State of New York</u> (…), whose state and federal courts shall have sole and
> exclusive jurisdiction over the enforcement or challenge to the enforcement
> of this Dispute Resolution Agreement" [Emphasis added].

235. The Tribunal also notes that New York is the seat of the arbitration, as per Section
4.9 of the DRA, and that questions regarding the Tribunal's scope of authority and

---

[214] JX-007, p. 11.
[215] RPHB, paras. 156-161.
[216] ESOC, para. 782, CPHB, paras. 444, 503, 507.
[217] JX-007, Section 14.

limitations thereto introduced by the Parties' agreement, should be adjudicated in accordance with the seat of arbitration; as indicated by Gary Born,

> "[…] issues concerning the arbitral tribunal's power and jurisdiction with respect to remedial authority are governed by the law of the arbitral seat […]"[218].

236. The Tribunal will address this issue in Section VII.3 *infra*.

---

[218] Born, G., International Commercial Arbitration, 2021, Kluwer Law International, section 23.04(D).

# V. **FACTS**

237. The facts underlying the present dispute are considerably complex. In this section the Tribunal offers an overview of the factual developments, to permit the reader an understanding of the subsequent discussion of the matters to be adjudicated.

238. A detailed analysis of the factual background pertinent to each of the claims and counterclaims presented by the Parties will be provided by the Tribunal in the relevant sections of the Award.

## 1.    DRAMATIS PERSONAE

### Claimant

239. Claimant is Refinería de Cartagena S.A., a mixed-capital company (*sociedad de economía mixta*) organized under Colombian law as a corporation (*sociedad anónima simplificada*) with its principal place of business in Cartagena, Colombia. It is also the owner of the Cartagena Refinery in Cartagena, Colombia and engages in the refinery of crude oil and the production of petrochemical products.

240. Reficar is a 100% wholly-owned subsidiary of Ecopetrol S.A., which is also a mixed-capital company (*sociedad de economía mixta*), organized under Colombian law (*sociedad anónima*). Ecopetrol is an oil and gas company, which is approximately 90% owned by the Republic of Colombia, and engages in exploration and production, transportation and logistics, refining, petrochemicals and biofuels. Ecopetrol is listed on the New York and Toronto Stock Exchanges.[219]

### Respondent 1

241. Respondent 1 is CB&I N.V., a limited liability company (*naamloze venootschap*) organized under the laws of The Netherlands and its main place of business in Houston, Texas. CB&I N.V.'s stock trades on the New York Stock Exchange under the ticker symbol "CBI". CB&I N.V. provides conceptual design, technology, engineering, procurement, fabrication, construction and commissioning services to customers in the energy, petrochemical and natural resources industries.

### Respondent 2

242. Respondent 2 is CB&I UK Ltd., a limited liability company existing under the laws of the United Kingdom and a 100% wholly-owned subsidiary of CB&I N.V. CB&I UK provides design, design-build, engineering, fabrication, procurement, construction and maintenance services for oil and gas, power, and allied industry projects in, among other places, South America.

### Respondent 3

243. Respondent 3 is CBI Colombiana S.A. is a limited liability company organized and existing under the laws of Colombia (*sociedad anónima*) and is a 100% wholly-owned subsidiary of CB&I N.V. CBI Colombiana provides, among other things,

---

[219] RfA, para. 7.

ICC Case 21747 RD/MK/PDP
Final Award

general contracting services such as constructing large projects. On September 15, 2020 counsel to CB&I UK and CB&I N.V. informed the Tribunal of a liquidation order concerning CBI Colombiana[220]. The last update on the status of CBI Colombiana was received by the Tribunal on November 11, 2020 in a letter from the Liquidator[221].

## 2.   PRE-CONTRACTUAL STAGE

244.   The Cartagena Refinery Modernization and Expansion Project [the "**Project**" or the "**Refinery Project**"] is one of the largest construction endeavours in the energy sector in the recent history of Colombia.

245.   Conceived as early as the beginning of the 2000s by the Refinery owner, the state-owned company Ecopetrol, the Project went through years of initial planning, followed by securing the co-operation of Glencore[222] and the creation of a special purpose vehicle, Reficar[223], the claimant in this arbitration[224].

246.   Due to the sheer size of the undertaking, the bulk of the Project was divided into two stages, each with a separate contract:

-   The initial agreement for process design and basic engineering [the "**Project Definition Contract**"], and

-   The main agreement for the engineering, procurement and construction of the Project, which would eventually be the EPC Agreement.

247.   One of the key aspects in deciding to whom to award the contracts was the willingness and ability of the contractor to undertake works under a lump sum turnkey ["**LSTK**"], rather than cost-reimbursable ["**RC**", also "**cost plus**"] basis[225]:

-   In an LSTK contract the contractor tenders a price for the completion of the scope of works – hence, the risk of cost overruns and delays lies with the contractor and not with the owner;

-   In a cost-reimbursable contract, the contractor bills the owner the costs incurred in the completion of the scope of works plus a margin – thus, the price and time risks rests with the owner and not with the contractor.

248.   Three international construction companies participated in the bidding procedure for the Project Definition Contract[226]; CB&I won, with its proposal being scored highest by Reficar's external consultant[227].

---

[220] See communications A 107 and R-124-R-126.
[221] Letter from the Liquidator dated November 11, 2020.
[222] Ex. R-0468; Houtz CWS, para. 15.
[223] The Tribunal notes that in some of its written submissions, Claimant uses the name Refinería de Cartagena S.A.S. instead of Refinería de Cartagena S.A.
[224] Ex. C-0024, p. 5; Ex. R-0473, p. 17; Houtz CWS, para. 16.
[225] See e.g., the Parties' respective arguments at CPHB, para. 62; RPHB, para. 84.
[226] Ex. C-0054, p. 8.
[227] Ex. C-0054, p. 12.

ICC Case 21747 RD/MK/PDP
Final Award

249. The Project would start under a cost-reimbursable basis in the Project Definition Contract, signed in November 2007[228]; this phase was later to be followed by a definitive EPC Agreement on an LSTK basis[229].

250. This initial assumption changed, however, with the evolution of market conditions.

251. In spring of 2008, CB&I's director of business development informally told Reficar's Mr. Houtz about CB&I's preference to move with the EPC Agreement on a cost plus basis.

252. Reficar undertook independent scrutiny of the risks and benefits of the two contracting models and instructed an external consultant to prepare a detailed comparison study, whose results stated that "a satisfactory LSTK arrangement may not be achievable"[230] and recommending the contract to be signed on a cost plus basis[231].

253. On the basis of the study, Reficar's Board of Directors ["**BofD**"] asked Reficar's management to formally approach CB&I about the possibility to switch the modality of the future EPC Agreement from LSTK to RC[232].

254. Reficar's BofD, however, kept pondering which contracting modality to use for the EPC Contract until November 2009, when the Letter of Intent ["**LOI**"], greenlighting the commencement of EPC activities by CB&I, was signed in anticipation of the EPC Agreement, explicitly on a cost-reimbursable basis[233].

255. Reficar now claims, in essence, that it was tricked by CBI into shifting to a pricing modality which placed the risk of cost overruns on Reficar[234].

256. Apart from the contracting modality, Reficar also requested that CB&I prepare two types of deliverables[235]:

-    cost estimates, and

-    a planned work schedule.

257. In January 2009 CB&I issued the Execution Masterplan, which required CB&I to prepare a cost estimate within a +/10% accuracy margin and a Level 3 work schedule[236].

258. The two cost estimates that played a key role in the pre-contract stage were the **July 2009 Estimate** and the **February 2010 Estimate**.

---

[228] Ex. R-0010 (Ex. C-0006). Apart from CB&I, Technip was also involved in the 2007 Project Definition Contract, even though it acceded through a separate agreement.
[229] Ex. R-0010, Schedule One, para. 1, p. 56.
[230] Ex. R-0487, p. 6.
[231] Ex. R-0487, pp. 7-8.
[232] Ex. C-0014, pp. 5-6.
[233] RFA Ex. 30.
[234] CPHB, paras. 62-72.
[235] See analysis of these deliverables in Section VII.1.3.1 *infra*.
[236] Ex. C-0024.

259. The July 2009 Estimate stated that it adhered to AACE Class II +/-10% accuracy[237] (the AACE is a leading association of cost engineers) and was presented to Reficar on August 3, 2009[238], at the amount of <u>USD 3.495 billion</u>[239].

260. The July 2009 Estimate was affected by further negotiations between the Parties and certain scope changes instructed by Reficar; thus, on February 28, 2010, CB&I produced its Revision 2 – Final Estimate Scope to the July 2009 Estimate[240] [known as the "**February 2010 Estimate**"][241].

261. As regards the work schedule, CB&I submitted a preliminary Level 3 Schedule on March 25, 2010[242], which Reficar rebutted as incomplete[243]. CB&I later delivered a modified version, called the **April 2010 Schedule**[244], which was not attached to the EPC Contract. Instead, the Parties agreed for CB&I to deliver the final Level 3 Schedule within 90 days after the execution of the EPC Contract; CB&I submitted such schedule as the **October 2010 Re-Baseline Schedule**[245].

## 3.    EPC CONTRACT

262. On November 10, 2009, Reficar and CB&I entered into the LOI[246], which contained the key commercial terms and interim provisions while the Parties negotiated in good faith towards the final RC based EPC Contract[247].

263. Finally, on June 15, 2010, Reficar and the CB&I entities entered into six agreements collectively known as the final EPC Agreement, which comprises the following documents:

-    The **Onshore Contract** between Reficar and CB&I Colombiana for work (mainly construction) performed by CBI Colombiana[248],

-    The **Offshore Contract** between Reficar and CB&I UK for design, engineering, procurement and other work performed by CB&I UK primarily outside of Colombia[249],

-    The Coordination Agreement executed by Reficar, CB&I UK and CB&I Colombiana[250],

---

[237] Exs. R-0033, p. 1; C-0748; C-0400, p. 2.
[238] Ex. R-0524.
[239] Ex. R-0524, p. 231.
[240] Ex. C-0041 (Ex. R-0546), p. 2.
[241] As a threshold matter, on the basis that the document is named "31 July 2009 Class [2] (+/-10%) Revision 2 – Final Estimate Scope February 28, 2010", the Tribunal shall refer to the document as the **February 2010 Estimate** taking into account that multiple documents in the record have revisions, and they are always referred to by the Parties under their original iteration's name.
[242] Ex. C-1741.
[243] Ex. C-0050.
[244] Ex. C-0051, p. 1.
[245] Ex. C-0058, pp. 15-21, 73.
[246] RFA Ex. 30.
[247] Ex. R-0047 (Ex. C-0037).
[248] JX-002; JX-003; JX-006.
[249] JX-004; JX-005; JX-006.
[250] JX-007, pdf pp. 29-44.

- The Dispute Resolution Agreement between Reficar and CB&I UK, CBI Colombiana, CB&I, N.V.[251],

- The Onshore Parent Guarantee[252],

- The Offshore Parent Guarantee[253].

264. The EPC Agreement is a set of voluminous documents; the key provisions for the purposes of the current dispute are twofold:

265. <u>First</u>, CB&I assumed certain **Cost Control Commitments**: it promised

- to rigorously control cost and schedule similar to a lump sum contract, and

- to safeguard Reficar's resources as if their own[254].

266. In addition, CB&I assumed the **Reasonable Cost Obligation**: to only incur costs which meet the criteria of being:[255]

- reasonable,

- properly incurred, and

- in accordance with the Contract.

267. <u>Second</u>, with regard to Schedule, CB&I undertook a twofold obligation ["**Schedule Control Commitments**"] to

- advance the Works to the point where the Project would be ready for pre-commissioning and start-up ["**PCS**"] by the date guaranteed in the Contract, and

- proceed with the Works regularly and diligently.

268. <u>Third</u>, CB&I's total aggregate liability to Reficar under or in connection with the EPC Contract would be limited to a total of USD 85.75 million, with explicit exceptions for liability arising from *fraude*, *culpa grave* or *dolo* under the Onshore Agreement and fraud, gross negligence or willful misconduct under the Offshore Agreement[256].

**4.    <u>CONTRACTUAL STAGE</u>**

269. After the signing of the EPC Agreement, CB&I continued to proceed with the Works without any signs of delays or excess costs during the latter half of 2010.

---

[251] JX-007, pdf pp. 3-27.
[252] JX-008, pdf pp. 1-16.
[253] JX-008, pdf pp. 17-32.
[254] Project Execution Plan, Exhibit 13 to the Onshore and Offshore EPC Contract, para. 3; JX-002, p. 654; JX-004, p. 628.
[255] Section IV, Appendix I to the EPC Contract, JX-003, p. 3; JX-005, p. 3.
[256] See TC 8.1.1 at JX-002, pp. 180-181; JX-004, p. 166.

270. To control costs in real time, CB&I was contractually bound to provide to Reficar monthly cost forecasts ["**Monthly Forecasts**"], an estimate of the total EPC costs that Reficar would incur until the finalization of the Project, and of the necessary schedule[257].

Representation Letter on costs and schedule by CB&I

271. Starting in 2011, the cost and schedule management of the Project began to display deficiencies:

- in February 2011 CB&I's Monthly Forecast suddenly indicated a delay in the **Mechanical Completion Date** from February to October 2013[258];

- three months later, the May 2011 Monthly Forecast recorded delays in all activities (apart from engineering)[259];

- the August 2011 Monthly Forecast showed a bleaker perspective: CB&I was now forecasting that the EPC costs would increase by USD 400 million to USD 3,641 million[260]; and

- The Monthly Forecast for November 2011 estimated EPC costs at USD 3.639 billion[261]; the number increased in December 2011 to USD 3.809 billion[262] and was revised in January 2012[263] to USD 3,971 million[264].

272. Note that in one year the Monthly Forecasts had increased more than USD 700 million (from USD 3.2 billion to almost USD 4 billion – a 22% increase).

273. As a result of these discrepancies, the Parties unsuccessfully tried to renegotiate the EPC Agreement[265].

274. As Reficar's frustration with the exploding cost forecast grew, it eventually informed CB&I that it would "take action outside the contract" if CB&I failed to prove it could bring the Project costs under control[266].

275. To appease Reficar, on May 22, 2012 CB&I issued a letter to Reficar, signed by its Project Director, Mr. Deidehban[267], in which CB&I reiterated the accuracy of the USD 3,971 million cost Forecast issued in December 2011 [the "**Representation Letter**"].

---

[257] See Project Controls Execution Plan, Annex 6 to Onshore and Offshore Agreements, para. 7.1; JX-002, p. 478; JX-004, p. 453.
[258] Ex. C-1864, p. 4.
[259] Ex. C-0067, p. 7.
[260] Ex. C-0069, p. 4.
[261] Ex. R-1851_057_00015, fourth tab, in yellow, "Project Summary".
[262] Ex. C-0222, p. 4; Ex. R-1851_057_00016, fourth tab, in yellow, "Project Summary".
[263] Ex. C-0088, p. 4.
[264] Ex. R-1851_057_00017, fourth tab, in yellow, "Project Summary".
[265] Ex. R-1480, p. 8; Ex. R-1476, p. 5.
[266] Ex. C-0089, p. 3: "It is critical to demonstrate control with the evolution of the project as, without this, there will be a need to take action outside the contract".
[267] Ex. R-1849_07396.

276. But Mr. Deidehban did not only repeat the validity of the Forecast; he also went one significant step further. Until then, CB&I had represented that its estimates were at best Class II +/-10%. Now, for the first time, CB&I formally represented to Reficar that this USD 3,971 million Forecast met <u>the highest accuracy requirements of the industry</u>: it complied with the requirements of a Class I +/-5% estimate[268].

<u>Ultimate costs on the Project</u>

277. Notwithstanding the Representation Letter, the Monthly Forecasts did not stop growing. By September 2012, the Monthly Forecast reached USD 4,221 million[269] and by October USD 5,467 million[270], an increase of USD 1,246 million (or 23%) in just one month. This prompted further alignment meetings, which led to CB&I slightly reducing the forecast to USD 5,371 million in December 2012[271].

278. By mid-2013 CB&I appeared to have stabilized the forecasted costs and schedule. But then, between July and September 2013, the Project suffered serious labour disruptions, which included work stoppages and a strike. In August there was an explosion in the FCC Unit[272], which also impacted on schedule.

279. Using the labour disruptions as its main excuse, CB&I once again increased its Monthly Forecast in February 2014, this time to USD 6.27 billion[273], a number which remained relatively stable until the end of the Project, with the final EPC cost projection from December 2015 being slightly reduced to USD 6,214 million[274].

280. Reficar ultimately paid to CB&I USD 5,908.2 million in EPC costs[275]. Additionally, in the present arbitration CB&I has filed a counterclaim for unpaid Project costs of USD 267.26 million[276]. If both amounts are added, the total Project costs paid by CB&I plus the amounts still under dispute reach up to <u>USD 6,175 million</u>. Reficar claims in this arbitration that nearly USD 2 billion were incurred by CB&I in breach of the Contract's Cost Control Commitments.

281. *Pro memoria*, in the May 2012 Representation Letter, delivered when construction had already been progressing for almost two years, CB&I submitted to Reficar a forecast of USD 3,971 million, representing that this figure met the Class I +/-5% requirements.

---

[268] Ex. R-1849_07396, pp. 2-3.
[269] Ex. C-0093, pp. 4, 39.
[270] Ex. C-0096, p. 13; the Tribunal notes that the same document offers different ranges for the reforecast at p. 17.
[271] Ex. C-0257, p. 4.
[272] Ex. C-0113.
[273] Ex. C-0110, p. 5.
[274] Ex. C-0056, tab "Project Summ Cost Report Only", Cell R62 ("TOTAL"); see also LI ER, para. 1180 and Table 9.4-17 therein; see also Attachment 9-02 to LI ER.
[275] CPHB, para. 1, citing to Long International ER, para. 1180 and Table 9.4-17.
[276] CPHB, para. 1, fn. 10. The Tribunal notes that CB&I does not quantify its counterclaim as a total number in USD but instead uses separate numbers for invoices due under the Onshore Contract, in Colombian pesos, and for those under the Offshore Contract, in USD.

Ultimate completion of Works

282. The EPC Contract stipulated that CB&I would complete the works by the guaranteed date of February 2013; it contains provisions for possible extensions of this deadline, but there is no agreement between the Parties as to their application in the current case.

283. Apart from the discussion on the extension of this deadline, the Parties also dispute when the Works were actually completed by CB&I; CB&I says this happened in February 2015[277] and Reficar says that it occurred when CB&I demobilised from the Project site in the fall of 2015[278]. The Parties likewise bring a number of arguments as to the reasons of the delay. Regardless of these arguments, however, it is clear that the Works were completed no earlier than <u>two years</u> after the date guaranteed by CB&I in the Contract.

284. It is finally undisputed that Reficar paid its other contractors for performing at least some of the completion and minor corrective Works that were initially in the scope of work of CB&I. The Parties dispute whether CB&I should reimburse Reficar for these costs as well.

285. There is no dispute between the Parties that Reficar now operates a state-of-the-art refinery.

\* \* \*

286. On the basis of the above facts, Reficar, in essence, brings pre-contractual claims.

---

[277] RPHB, paras. 172, 176.
[278] CPHB, paras. 134-135, citing to LI ER, para. 37.

ICC Case 21747 RD/MK/PDP
Final Award

# VI. RELIEF SOUGHT

287. In the following sections, the Arbitral Tribunal reproduces the Parties' requests for relief as described in the Terms of Reference (**1.**), main submissions (**2.**) and Post-Hearing Briefs (**3.**). Finally, the Tribunal will transform the Parties' requests for relief into blended requests for relief (**4.**).

## 1. TERMS OF REFERENCE

288. In the Terms of Reference, Reficar requested the Tribunal an award containing the following declarations or remedies[279]:

"a. A declaration that Reficar is entitled to reimbursement or restitution of all costs paid by Reficar which were unreasonably and improperly incurred by Respondents in connection with the work on the Project, and that Reficar is not obligated to pay to Respondents any additional such costs which it has not already paid.

b. A declaration that Respondents breached their fiduciary duties as well as the good-faith and other *deberes secundarios de conducta* to Reficar in connection with their work on the Project.

c. A declaration that Respondents committed fraud and/or *dolo* both in inducing Reficar to enter into the EPC Contract and in connection with their work on the Project.

d. A declaration that Respondents breached the EPC Contract by virtue of their fraud, *dolo*, gross negligence and/or willful misconduct.

e. A declaration that Respondents were negligent, grossly negligent, fraudulent, and/or acted *dolosamente* in preparing the estimates concerning the EPC Contract and in connection with their Work on the Project, both before and after execution of the EPC Contract, fully knowing or that they should have known that those estimates were inaccurate.

f. A declaration that Respondents were negligent, grossly negligent, fraudulent, and/or acted *dolosamente* in preparing the EPC Contract schedules and in connection with their work on the Project, both before and after execution of the EPC Contract, fully knowing or that they should have known that those schedules were inaccurate, including the baseline schedule provided to Reficar before execution of the EPC Contract.

g. A declaration that Respondents engaged in willful misconduct and/or *dolo* in preparing the estimates concerning the EPC Contract and in connection with their work on the Project.

---

[279] TofR, para. 37.

h. A declaration that Respondents engaged in willful misconduct and/or *dolo* in preparing the schedules concerning the EPC Contract and in connection with their work on the Project.

i. A declaration that Respondents were negligent, grossly negligent, fraudulent, and/or acted *dolosamente* in their failure to manage the labor force and that Respondents are responsible for costs arising out of the labor disruptions.

j. A declaration that, due to Respondents' conduct, Respondents cannot avail themselves of any limitation-of-liability provisions in any contract (including TC 8 of the EPC Contract) to limit Reficar's damages because they are unenforceable, abusive, inapplicable, and/or null and void.

k. A declaration that Respondents are fully responsible for any judgment or decision by Colombian courts or any other governmental entity against Reficar or its employees due to CBI's negligence, *dolo*, gross negligence, and/or willful misconduct with respect to Colombian public funds.

l. A declaration that Respondents shall indemnify Reficar for any payment or cost that any governmental entity may order under Colombian law due to CBI's negligence, *dolo*, gross negligence, and/or willful misconduct with respect to Colombian public funds.

m. A declaration that Respondents are fully responsible under their respective Project Agreements to Reficar – including, but not limited to, [CB&I N.V.]'s[280] obligations under the Performance Guarantees.

n. A declaration that Respondents are required to turn over and provide to Reficar all necessary documents for the completion and safe operation of the Refinery, including without limitation documents necessary to achieve contractual Mechanical Completion, QA/QC records, and subcontract records.

o. A declaration that the Letter of Credit issued pursuant to TC 75.3 of the EPC Agreement secures prior payments made by Reficar pursuant to the parties' Memorandum of Agreement and Project Invoicing Procedure and may be used to recover any such payments that are not justified and properly substantiated by CBI (by further declaration of the Tribunal).

p. An award of all actual damages, including additional Owner's costs and lost profits, of an amount of not less than USD 2 billion, based on the facts and legal grounds expressed herein and in any subsequent submissions. Reficar reserves the right to quantify at a later date the damages it has suffered, including lost profits.

q. An award of equitable relief based on the facts and legal grounds expressed herein and in any subsequent filings, including disgorgement of all revenues, fees, and profits.

---

[280] The TofR appears to contain a typographical mistake as it refers to "CBI NL". The Tribunal understands reference to be made to "CB&I N.V.".

r. An award of pre- and post-award interest at the applicable rates under applicable law until the effective payment of the award".

289. On the other hand, CB&I requested the Tribunal an award containing the following declarations or remedies[281]:

"a. A declaration that the Claimant's claims are dismissed in their entirety.

b. A declaration that the Claimant breached the applicable agreements.

c. A declaration that the Claimant abused its rights, acted in bad faith, and failed to comply with its duties under the Project Agreements and at law.

d. A declaration that the Claimant is liable for interference in the Respondents' contractual relationships with its subcontractors, laborers, employees, and banks, in breach of its duty of good faith to the Respondents, as well as at law.

e. A declaration that the Claimant has been unjustly enriched.

f. A declaration that the Respondents have no liability to the Claimant under any Performance Guarantee.

g. A declaration that the Advance Payment LC no longer secures money the Claimant paid to the Respondents in advance of the Respondents performing the obligations under the relevant agreements to which such money relates and the Claimant has no right to make a demand or draw upon the Advance Payment LC.

h. A declaration that Respondents satisfied Contractor's obligations and liabilities under the applicable agreements and the Claimant is liable to the Respondents for fraudulently drawing on the Performance LC.

i. A declaration that the Respondents are entitled to reimbursement for costs and expenses incurred in responding to the Colombian government investigations of the Claimant.

j. A declaration that the Claimant is obligated to pay all costs, expenses, fines or penalties that the Respondents incur in responding to Colombian government investigations of Ecopetrol, the Claimant, or their employees, agents, officers, shareholders, directors, or representatives.

k. A declaration that the Claimant is not entitled to recover sums paid under the Project Invoicing Procedures or the Memoranda of Understanding.

l. A declaration that the Respondents are entitled to the award of all actual damages, other sums, and/or set-offs based on the allegations in their Counterclaim.

---

[281] TofR, para. 106.

m. A declaration that the Respondents are entitled to be awarded their legal fees, expert fees, and costs of the Arbitration per the ICC Rules, the Project Agreements, and applicable law.

n. A declaration that the Tribunal's decision on any claim for an item of costs or any class of cost items that has been made or could have been made in this arbitration is final and binding for all purposes.

o. In the alternative, a declaration that the Project Agreements' economic balance has been unfairly affected to the Respondents' detriment and must be established by enforcing the Project Agreement or Project Agreements, as the case may be.

p. A declaration that the Respondents are entitled to be awarded pre- and post-judgment interest and all other interest payable under applicable law and/or the DRA".

## 2. MAIN SUBMISSIONS

290. In this section, the Arbitral Tribunal will reproduce the Parties' requests for relief for the Claim (**A.**) and the Counterclaim (**B.**).

## A. Claim

## a. Claimant's Request for Relief

291. In the Reply, Claimant requested the Arbitral Tribunal to issue an award containing the following declarations, relief or remedies[282]:

1. A declaration that the burden of proof on Reficar's affirmative claims is shifted in whole or in part to CB&I for the reasons set forth in Section VI(C)(1), *supra.*

2. A declaration that Reficar is entitled to reimbursement or restitution of all costs paid by Reficar which were unreasonably and improperly incurred by Respondents in connection with the Work on the Project, and that Reficar is not obligated to pay to Respondents any additional such costs which it has not already paid.

3. A declaration that Respondents committed *dolo incidental* and/or violated the duty to inform during negotiations over the EPC Agreement and/or otherwise failed to negotiate the EPC Agreement in good faith.

4. A declaration that Respondents violated the duty to inform under Colombian law with respect to the character and accuracy of Respondent's pre-contract estimates.

---

[282] Reply, para. 1021. The Tribunal notes that Reficar also filed an Updated Statement of Claim Amounts on March 12, 2021, but that this update only affected the numbers and not the character of the requests for relief.

5. A declaration that Respondents violated the duty to inform under Colombian law with respect to the character and accuracy of Respondent's pre-contract schedules.

6. A declaration that Respondents' violation of the duty to inform resulted in Reficar accepting contract terms in the EPC Agreement without full knowledge, which Reficar would not have accepted but for Respondents' failure to inform, and thus such terms shall not be applied to or enforced against Reficar, including but not limited to TC 8.1, TC 8.2.1, and TC 54.8.

7. A declaration that Respondents breached their good faith and fiduciary obligations to Reficar in connection with their Work on the Project.

8. A declaration that Respondents committed fraud, *dolo*, and/or willful misconduct in connection with their Work on the Project.

9. A declaration that Respondents committed gross negligence or *culpa grave* in connection with their Work on the Project.

10. A declaration that Respondents breached the EPC Agreement by virtue of their fraud, *dolo*, *culpa grave*, Gross Negligence and/or Willful Misconduct.

11. A declaration that Respondents were negligent, grossly negligent, fraudulent, and/or acted with *dolo* and/or *culpa grave* in preparing the estimates concerning the EPC Agreement and in connection with their Work on the Project, both before and after execution of the EPC Agreement, fully knowing or that they should have known that those estimates were inaccurate and unreliable.

12. A declaration that Respondents were negligent, grossly negligent, fraudulent, and/or acted with *dolo* and/or *culpa grave* in preparing the EPC Agreement schedules and in connection with their Work on the Project, both before and after execution of the EPC Agreement, fully knowing or that they should have known that those schedules were inaccurate or unreliable, including the baseline schedule provided to Reficar before execution of the EPC Agreement.

13. A declaration that Respondents engaged in gross negligence, *culpa grave*, *dolo*, fraud, and/or willful misconduct in preparing the estimates concerning the EPC Agreement and in connection with their Work on the Project.

14. A declaration that Respondents engaged in gross negligence, *culpa grave, dolo*, fraud, and/or willful misconduct in preparing the schedules concerning the EPC Agreement and in connection with their Work on the Project.

15. A declaration that Respondents not only committed willful misconduct, *dolo*, gross negligence, and/or *culpa grave* through violations of the EPC Agreement, but that the aggregate, extended duration of the harm Respondents caused also constituted willful misconduct, *dolo*, gross negligence, and/or *culpa grave*.

16. A declaration that, due to Respondents' conduct, Respondents cannot avail themselves of any limitation-of-liability provisions in any contract (including TC 8, TC 54, and TC 56 of the EPC Agreement) to limit Reficar's damages because they are unenforceable, inapplicable, and/or null and void.

17. A declaration that Respondents are not entitled to payment from Reficar for invoices that did not comply with the requirements of the EPC Agreement.

18. A declaration that Respondents must reimburse Reficar for payments that Reficar made under invoices that did not comply with the requirements of the EPC Agreement.

19. A declaration that Respondents must fully indemnify Reficar for any judgment or decision by Colombian courts or any other governmental entity against the Owner Group that was caused by CB&I's violation of any applicable laws, including violations that constitute fraud, negligence, *dolo*, gross negligence, *culpa grave*, and/or willful misconduct.

20. A declaration that Respondents shall indemnify Reficar for any payment or cost that any governmental entity may order against the Owner Group under Colombian law due to CB&I's violation of any applicable laws, including violations that constitute fraud, negligence, *dolo*, gross negligence, *culpa grave*, and/or willful misconduct with respect to Colombian public funds.

21. A declaration that Respondents are fully responsible under any Project Agreement—including, but not limited to, CB&I N.V.'s obligations under the Contractor Performance Guarantees.

22. An award of all actual damages, including additional Owner's costs, lost profits, and cost of capital, based on the facts and legal grounds expressed herein and in any previous or subsequent submissions.

23. An award of *daño emergente* for Improper EPC Costs of US$ 2,317.87 million resulting from Respondents' negotiation-phase misconduct, which is comprised of (i) US$ 364.53 million arising from CB&I's understatement of costs in its allegedly Class 2 +/- 10% estimate and (ii) US$ 1,953.34 million in configuration-of-the-contract damages.

24. In the alternative to Request 23, an award of damages/*daño emergente* for Improper EPC Costs of US$ 2,001.58 million resulting from (i) Respondents' breach of the EPC Agreement through gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo*; (ii) Respondents' breach of their fiduciary duties; and/or (iii) Respondents breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap due to Respondents' breach of the duty to inform during negotiations or for any other reason set forth herein.

25. In the alternative to Requests 23 and 24, an award of US$ 1,807.89 million for reimbursement of costs paid under the EPC Agreement that were not reasonably or properly incurred in accordance with the terms of the EPC Agreement.

26. An award of US$ 165.35 million for increased Owner's costs as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

27. An award of US$ 173.80 million for increased PCS costs as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

28. An award of US$ 569.11 million for cost of capital related to improper EPC costs, Owner's costs, and PCS costs as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

29. In the alternative to Request 28, an award of US$ 457.91 million for cost of capital related to unreasonable and improper costs and/or unsubstantiated payments requested in Requests 25 and 33.

30. An award of Reficar's *lucro cesante*/lost profits of US$ 862.59 million for lost product sales as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

31. An award of Reficar's *lucro cesante*/lost profits of US$ 397.05 million for cost of capital on lost profits as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

32. An award of Reficar's *lucro cesante*/lost profits of US$ 12.24 million for lost revenues on electricity sales as a result of (i) Respondents' negotiation-phase misconduct; (ii) Respondents' gross negligence, *culpa*

ICC Case 21747 RD/MK/PDP
Final Award

*grave*, willful misconduct, fraud, bad faith, or *dolo* in violation of the EPC Agreement; (iii) Respondents' breach of the EPC Agreement and the invalidity/inapplicability of the Liability Cap; and/or (iv) Respondents' breach of their fiduciary duties.

33. An award of US$ 137.25 million for payments that were made by Reficar pursuant to the MOA, PIP, or EPC Agreement but never subsequently substantiated by Respondents, or, if the Tribunal awards an amount request pursuant to Requests 23-25, an alternative award of US$ $74.72 million to avoid duplication.

34. An award of US$ 8.74 million resulting from Respondents' misconduct with respect to vendor back-charges.

35. An award of US$ 3.51 million related to Reficar's inability to collect these owed amounts from Aceral due to CB&I's breaches and failures.

36. An award of disgorgement of Respondents' profits and fees of at least US$ 225 million.

37. A declaration that Tribunal will draw an adverse inference in favor of Reficar with respect to documents that CB&I failed to produce or disclose in this arbitration, as more fully discussed in Section VI(C)(2) *supra*.

38. An award of equitable relief based on the facts and legal grounds expressed herein and in any subsequent filings.

39. An award of costs of the arbitration, including attorneys' fees.

40. An award of pre- and post-award interest, at the applicable rates under applicable law, until the effective date of payment of the award.

292. Reficar also requested the Tribunal to issue a declaration liquidating the EPC Agreement and establishing the appropriate EPC Agreement value[283].

**b.**    **Respondents' Request for Relief**

293. In its ESOD, Respondents' request for relief with regard to the Claim is as follows[284]:

[1] a. A declaration that Reficar is not entitled to any monetary damages or declaratory relief, including, but not limited to, the monetary damages and declaratory relief requested in Reficar's Request for Arbitration and Exhaustive Statement of Claim.

[2] b. An award to CB&I of monetary damages and other relief requested in its Answer to Request for Arbitration and Counterclaim, Non-Exhaustive

---

[283] Reply, para. 1022.
[284] ESOD, para. 1612. The Tribunal has numbered the different requests for relief for ease of reference in the following sections.

Statement of Counterclaim, Exhaustive Statement of Counterclaim, and Reply to the Non-Exhaustive Statement of Defense to Counterclaim.

[3] c. A declaration that Reficar's claims are dismissed in their entirety.

[4] d. A declaration that Reficar breached its duties under the EPC Contract.

[5] e. A declaration that CB&I has no liability to Reficar under any Performance Guarantee.

[6] f. A declaration that Reficar acted in bad faith and breached its duty of good faith by inducing CB&I to continue working on the Project by paying CB&I's invoices with the intent of breaching its contractual obligations and forcing CB&I to return billions of dollars when the work was completed.

[7] g. A declaration that Reficar abused its rights, acted in bad faith, and breached the duty of good faith by interfering with CB&I's desired means and methods, failing to properly plan and implement procurement activities, and making decisions that were not in the best interest of the Project.

[8] h. A declaration that Reficar is contractually liable to CB&I for abusing its rights and/or intentionally breaching its obligation to pay invoices to CB&I that are due and owing.

[9] i. A declaration that Reficar is contractually liable to CB&I for abusing its rights and/or intentionally breaching its obligation to approve valid subcontractor change orders.

[10] j. A declaration that Reficar is liable for tortious interference in CB&I's contractual relationships with its subcontractors, laborers, employees, and banks.

[11] k. A declaration that Reficar has been unjustly enriched.

[12] l. A declaration that the EPC Contract's Limitation of Liability provisions and other caps on liability or damages are enforceable under any applicable laws.

[13] m. A declaration that all waivers of damages in the EPC Contract are enforceable under any applicable laws.

[14] n. A declaration that Reficar finally approved payment of all amounts tendered to CB&I and Reficar waived its rights to claw back those payments under the EPC Contract and applicable law.

[15] o. A declaration that Reficar is not entitled to restitution in any form.

[16] p. A declaration that CB&I does not owe Reficar any defense or indemnity under the EPC Contract or applicable law.

[17] q. A declaration that Reficar owes CB&I such defense and indemnity as is required by the EPC Contract or applicable law.

[18] r. A declaration that Reficar's potential damages for late completion of the Work are capped by the Delay Liquidated Damages provisions in the EPC Contract.

[19] s. A declaration that Reficar cannot and shall not offset its prior payments to CB&I against sums that are due and owing to CB&I, and CB&I is not obligated to return any sums it received from Reficar for the Work.

[20] t. A declaration that CB&I has no liability under the Advance Payment LC.

[21] u. A declaration that Reficar fraudulently attempted to draw on the Advance Payment LC.

[22] v. A declaration that Reficar has no right to make a demand or draw upon the Advance Payment LC.

[23] w. A declaration that the Adavance Payment LC does not secure payments made by Reficar to CB&I under the MOA or PIP.

[24] x. A declaration that CB&I has no liability under the Performance LC.

[25] y. A declaration that Reficar is liable to CB&I for improperly drawing on the Performance LC.

[26] z. A declaration that the EPC Contract is a valid and binding agreement on the parties, is still in full force and effect, and Reficar must reimburse CB&I for all reasonable and proper costs it incurs until the EPC Contract is liquidated.

[27] aa. A declaration that all costs CB&I incurred in performing Work under the EPC Contract are reasonable and proper.

[28] bb. A declaration that CB&I adequately performed its obligations under the EPC Contract and is not liable for fraud, gross negligence, willful misconduct, *dolo*, *culpa grave*, or *fraude*.

[29] cc. A declaration that CB&I did not improperly or fraudulently induce Reficar to execute the EPC Contract.

[30] dd. A declaration that CB&I did not improperly or fraudulently induce Reficar to agree to fabricate pipe rack modules in the United States.

[31] ee. A declaration that Reficar maliciously withheld payments from CB&I, refused to sign change orders, and induced CB&I to continue working on the Project, without intending to honor its payment obligations.

[32] ff. A declaration that CB&I is entitled to reimbursement for costs and expenses incurred in responding to the Colombian government investigations of Reficar.

[33] gg. A declaration that Reficar is obligated to pay all costs, expenses, fines, or penalties that CB&I incurs in responding to the Colombian government investigations of Ecopetrol, Reficar, or their employees and representatives.

[34] hh. A declaration that CB&I is entitled to be awarded its legal fees, expert fees, and costs of this Arbitration.

[35] ii. A declaration that CB&I is entitled to be awarded pre- and post-judgment interest and all other interest payable under applicable law.

[36] jj. A declaration that CB&I is entitled to amounts necessary to compensate it for fluctuations in the exchange rate of the COP caused by Reficar's failure to timely pay amounts due and owing.

[37] kk. In the alternative, a declaration that the EPC Contract's economic balance has been unfairly impacted to CB&I's detriment and must be established by enforcing the EPC Contract.

## B.    Counterclaim

## a.    Respondents' Request for Relief

294.  Pursuant to para. 4162 of the Respondents' Reply on Counterclaim[285], Respondents' requests for relief with regard to the Counterclaim are as follows:

a. CB&I is entitled to monetary damages in the amount of approximately USD 37,886,998 and COP 503,241,225,913, inclusive of interest, for costs incurred in performance of the Work.

b. CB&I is entitled to monetary damages in the amount of USD 70 million, plus interest, as a result of Reficar's wrongful actions in connection with the Performance LC.

c. CB&I is entitled to its legal costs and expenses as a result of Reficar's wrongful actions in connection with Reficar's improper demands on the Performance LC and Advance Payment LC.

d. CB&I is entitled to pre- and post-judgment interest per TC 58.12 of the EPC Contract. In the case of U.S. dollars, interest shall be awarded at a rate of LIBOR plus 2%. In the case of Colombian pesos, interest shall be awarded at a rate of DTF plus 2%. Interest shall be compounded daily.

e. CB&I is entitled to amounts necessary to compensate it for fluctuations in the exchange rate of the COP caused by Reficar's failure to timely pay amounts due and owing.

f. CB&I is entitled to its attorneys' fees for this matter and all arbitration costs allowed by the ICC rules, including the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal, the

---

[285] Respondents' Reply on Counterclaim, para. 162.

costs of CB&I's own experts, translation costs and the reasonable legal and other costs incurred by CB&I for the arbitration.

g. CB&I is entitled to the following declaratory relief:

    i. A declaration that Reficar breached its obligations under the EPC Contract;

    ii. A declaration that Reficar acted in bad faith and breached its contractual and implied duties of good faith to CB&I;

    iii. A declaration that Reficar abused its rights to CB&I's detriment;

    iv. A declaration that CB&I does not owe Reficar any further monies;

    v. A declaration that Reficar cannot and shall not offset its prior payments to CB&I against sums that are due and owing to CB&I, and CB&I is not obligated to return any sums it received from Reficar for the Work;

    vi. A declaration that the Advance Payment LC does not secure payments made by Reficar to CB&I under the MOA or PIP;

    vii. A declaration that CB&I has no liability under the Advance Payment LC;

    viii. A declaration that Reficar has no right to make a demand or draw upon the Advance Payment LC;

    ix. A declaration that CB&I has satisfied its obligations and liabilities under the applicable agreements and, therefore, has no liability to Reficar under the Performance LC;

    x. A declaration that Reficar wrongfully drew on the Performance LC;

    xi. A declaration that Reficar is required to reimburse CB&I for any costs, including labor costs, that CB&I is currently obligated to pay, or may become obligated to pay in the future, under the EPC Contract or Colombian law;

    xii. A declaration that Reficar is obligated to pay all costs, expenses, fines, or penalties that the CB&I has incurred, or may incur in the future, in responding to Colombian government investigations; and

    xiii. A declaration that CB&I is entitled to be awarded pre- and post-judgment interest and all interest payable under applicable law.

h. CB&I is entitled to any other relief that the Arbitral Tribunal deems just and proper.

i. CB&I reserves its right to seek any and all additional relief to which it may be entitled.

j. CB&I hereby incorporates all claims for relief contained within its Exhaustive Statement of Defense.

**b.    Claimant's Request for Relief**

295.  In its ESODCC, Reficar requested the Tribunal to reject CB&I's requests for relief and to issue an award as follows[286]:

a. CB&I is not entitled to any further payments under the Onshore or Offshore Contracts;

b. CB&I should refund to Reficar US$ 137,253,916 in advance payments Reficar made to CB&I for invoices that did not qualify for reimbursement under the EPC Agreement, including payments made under the MOA and PIP;

c. CB&I is not entitled to any reimbursement, return of monies, damages, legal costs or fees in connection with Reficar's proper draw on the Performance LOC or proper attempt to draw on the Advance Payment LOC;

d. CB&I is not entitled to its attorneys' fees or arbitration costs in connection with its claims and is to pay Reficar's attorneys' fees and arbitration costs to the extent allowed by ICC rules;

e. CB&I's requests for declaratory relief are denied and Reficar is entitled to the following declaratory relief:

i. A declaration that CB&I breached its obligations under the EPC Agreement, including in particular its obligation to submit invoiced costs that were reasonably and properly incurred by CB&I in accordance with the EPC Agreement, and its obligation to provide information requested to facilitate Reficar's review of invoices;

ii. A declaration that Reficar properly offset invoice amounts that were due and owing by use of disputed invoices that were not due and owing because those invoices had been properly rejected;

iii. A declaration that payments Reficar made under the MOA and PIP qualify as advance payments under TC 75.3.1 and are not subject to the cap on liability in TC 8.1.1.

iv. A declaration that Reficar has the right to make a demand and draw on the Advance Payment LOC in an amount of up to US$ 95 million for the US$ 17,524,902.11 in forecast payments CB&I has retained, plus the total amount of disputed invoices paid under the MOA and PIP that did not comply with the reimbursement requirements of the EPC Agreement and Colombian fiscal responsibility laws;

v. A declaration that Reficar properly drew on the Performance LOC;

vi. A declaration that Reficar is entitled to pre- and post-judgment interest in connection with any amount Reficar paid to CB&I that did

---

[286] ESODCC, para. 376.

ICC Case 21747 RD/MK/PDP
Final Award

not comply with the reimbursement requirements of the EPC Agreement and Colombian fiscal responsibility laws;

vii. A declaration that CB&I is obligated to pay all costs, expenses, fines, or penalties that Reficar has incurred or may incur in the future in connection with any investigations or proceedings by the *Contraloría*, the Colombian government or any other governmental authority wherever located, that arise out of the events at issue in this arbitration.

## 3. POST-HEARING BRIEFS

296. Pursuant to the CPHB, Reficar asks the following with regard to its Claim[287]:

1. A declaration that the burden of proof rests with CB&I with respect to the issues set forth in paragraph 1016 of Reficar's Reply due to, among other reasons, the reasons set forth in paragraphs 1003-1015 of Reficar's Reply and paragraphs 136-144 of Claimant's First PHB.

2. A declaration that Tribunal will draw adverse inferences against CB&I as requested and for the reasons set forth at paragraphs 5, 528-538, 572, 577, 581, and 660 of Reficar's SOC and paragraphs 1017-1019 of Reficar's Reply.

3. A declaration that CB&I committed *dolo* incidental and/or violated the duty of good faith, including the duty to inform, during negotiations over the EPC Agreement (hereinafter, "Pre-contract Misconduct").

4. A declaration that CB&I committed Pre-Contract Misconduct with respect to its recommendation to switch the EPC Contract from a LSTK structure to a cost-reimbursable structure.

5. A declaration that CB&I committed Pre-Contract Misconduct with respect to the character and accuracy of CB&I's pre-contract estimates.

6. A declaration that CB&I committed Pre-Contract Misconduct with respect to the character and accuracy of CB&I's pre-contract schedules.

7. A declaration that CB&I's Pre-Contract Misconduct resulted in Reficar accepting contract terms in the EPC Agreement that it would not otherwise have accepted, and thus such terms shall not be applied to or enforced against Reficar, including but not limited to TC 8.1, TC 8.2.1, TC 54.8, TC 56, and any other limitations of liability in the EPC Contract (hereinafter, "Limitations of Liability").

8. A declaration that CB&I must reimburse Reficar for costs paid by Reficar to CB&I that were not reasonably and properly incurred in accordance with the EPC Agreement, and that such reimbursement is not limited by any Limitations of Liability (hereinafter, "Reimbursement Obligation").

---

[287] CPHB, para. 532.

9. A declaration that CB&I breached the EPC Agreement during the execution phase through gross negligence, culpa grave, wilful misconduct, fraud, bad faith, and/or *dolo* (hereinafter, "Contractual *Dolo*").

10. A declaration that, regardless of the existence of Contractual *Dolo*, Reficar is entitled to recover all damages arising from CB&I simple breach of the EPC Agreement during the execution phase because the Limitations of Liability are invalid/inapplicable due to CB&I's Pre-Contract Misconduct or for any other reason set forth in Reficar's briefing (hereinafter, "Inapplicability of Limitations of Liability").

11. A declaration that CB&I breached its good faith and fiduciary obligations to Reficar in connection with its Work on the Project (hereinafter, "Fiduciary Breach").

12. A declaration that CB&I not only committed wilful misconduct, *dolo*, gross negligence, and/or culpa grave through violations of the EPC Agreement, but that the aggregate, extended duration of the harm CB&I caused also constituted wilful misconduct, *dolo*, gross negligence, and/or *culpa grave.*

13. A declaration that CB&I is not entitled to payment from Reficar for invoices that did not comply with the requirements of the EPC Agreement.

14. A declaration that CB&I must reimburse Reficar for payments that Reficar made under invoices that did not comply with the requirements of the EPC Agreement.

15. A declaration that Reficar is not obligated to pay to CB&I any additional costs which it has not already paid.

16. A declaration that Reficar properly drew on the Performance Letter of Credit and is not obligated to return any of those funds.

17. A declaration that the Unsubstantiated Advance Payment Amount is in excess of US$ 95 million and that Reficar is entitled to draw on the full amount of the AP Letter of Credit.

18. A declaration that CB&I must fully indemnify Reficar for any judgment or decision by Colombian courts or any other governmental entity against the Owner Group that was caused by CB&I's violation of any applicable laws.

19. A declaration that CB&I is obligated to continue to indemnify and defend Reficar for and from claims pending in Colombian courts presented by workers hired by CB&I during the project.

20. A declaration that CB&I UK and CBI Colombiana are jointly and severally liable for all obligations declared and amounts awarded herein pursuant to the parties' Section 18 and other provisions of the Parties' Coordination Agreement as well as applicable law.

21. A declaration that CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded herein pursuant to the Parent Guarantee Agreements.

22. An award of all actual damages, including additional Owner's costs, lost profits, and cost of capital, based on the facts and legal grounds expressed in any of Claimant's submissions.

23. A specific award of US$ 363,550,178 for understated quantities and deliverables in the Final Full Estimate (Claim Category 1A) based on CB&I's Pre-contract Misconduct.

24. A specific award of US$ 361,026,237 for the understated productivity multiplier in the Final Full Estimate (Claim Category 1B) based on CB&I's Pre-contract Misconduct or, in the alternative, US$ 307,141,724 if the Tribunal decides to credit the final multiplier adjustment in CB&I's favour.

25. A specific award of US$ 102,392,722 for Engineering Productivity Failures (Claim Category 2) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

26. A specific award of US$ 30,737,257 for Steel Fabrication Failures (Claim Category 3) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

27. A specific award of US$ 103,445,504 for Pipe Spool Fabrication Failures (Claim Category 4) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

28. A specific award of US$ 4,400,000 for Substation Failures (Claim Category 5) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

29. A specific award of US$ 3,340,806 for Invensys Automation Failures (Claim Category 6) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

30. A specific award of US$ 48,814,969 for Labor Disruption Failures (Claim Category 7) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

31. A specific award of US$ 81,530,521 for Labor Strike Failures (Claim Category 8) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

32. In the alternative to Request 24 (Claim Category 1B), a specific award of US$ 284,335,307 for Non-Discrete Productivity Loss from CB&I Failures (Claim Category 9) based on (i) CB&I's Contractual *Dolo*, (ii) the

Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

33. A specific award of US$ 28,508,755 for Excessive Rework (Claim Category 10) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

34. A specific award of US$ 264,263,099 for Excessive CMT (Claim Category 11) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

35. In the alternative to the prior request, a specific award of US$ 268,503,387 for Excessive CMT (alternative Claim Category 11) based on CB&I's Reimbursement Obligation.

36. A specific award of US$ 69,906,599 for Excessive Scaffolding (Claim Category 12) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

37. In the alternative to the prior request, a specific award of US$ 61,128,009 for Excessive Scaffolding (alternative Claim Category 12) based on CB&I's Reimbursement Obligation.

38. A specific award of US$ 8,739,885 for Unresolved Back-charges (Claim Category 13) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

39. A specific award of US$ 20,062,560 for Island Park Productivity Failures (Claim Category 14) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

40. A specific award of US$ 42,683,951 for EPC Labor Escalation Due to CB&I Failures (Claim Category 15) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

41. A specific award of US$ 688,755,958 for EPC Prolongation Due to CB&I Failures (Claim Category 16) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

42. In the alternative to the prior request, a specific award of US$ 652,116,799 for EPC Prolongation Due to CB&I Failures (alternative Claim Category 16) based on CB&I's Reimbursement Obligation.

43. A specific award of US$ 165,345,825 for Owner's Delay Costs Due to CB&I Failures (Claim Category 17) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

44. A specific award of US$ 109,883,718 for PCS Delay Costs Due to CB&I Failures (Claim Category 18) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

45. A specific award of US$ 1,615,527 for PCS Completion of Outstanding and Incomplete Work (Claim Category 19) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

46. A specific award of US$ 8,692,212 for PCS Correction of Defective Work (Claim Category 20) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

47. A specific award of US$ 10,318,811 for PCS Specific Impacts on Contractors Due to CB&I Failures (Claim Category 21) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

48. A specific award of US$ 42,586,609 for PCS Labor Productivity Loss (Claim Category 22) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

49. A specific award of Cost of Capital (Claim Category 23) on the Improper Costs awarded above calculated based on the date of the Tribunal's award and Reficar's 8.6% WACC, or in the alternative, by applying the contractual interest rate for late payments of LIBOR + 2%. (Based on the calculations of Breakwater Forensics, those cost of capital amounts on Reficar's execution-phase damages as of 10-May-2019 were US$ 382,803,640 and US$ 220,009,151 for the two interest rate options.)

50. A specific award of US$ 809,813,402 for Loss Profits (Claim Category 24) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach, with an offset/credit of (US$22,926,290) due to the extended life of the Refinery.

51. A specific award of US$ 325,007,417 for Cost of Capital on Loss Profits (Claim Category 25) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

52. A specific award of $12,235,789 for Lost Revenue from Electricity Sales (Claim Category 26) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

53. A specific award of US$ 140,265,957 for Unsubstantiated Advance Payments (Claim Category 27) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, (iv) CB&I's Reimbursement Obligation, and/or (v) CB&I's failure to

substantiate invoices as required by the EPC Agreement, MOA, and PIP. However, to avoid duplication, this amount should be reduced by ratio of Improper EPC Costs awarded with respect to Requests 25 through 42 above in comparison to the total amounts paid directly to CB&I (US$ 3,967.38 million). For example, if the Tribunal awards US$ 1,590.08 million pursuant to the identified Requests, the US$ 140,265,957 amount should be reduced by 40.08% ($1,590.08/$3,967.38) to US$ 84.047 million.

54. A specific award of disgorgement of CB&I's profits and fees of at least US$ 225,000,000 (Claim Category 28) based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

55. In the alternative to Requests 43, 44, 50, 51, and 52 above (Delay Claim Categories Other than EPC Costs), a specific award of US$ 366,250,000 for Liquidated Damages for Delay based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.

56. In the alternative to Requests 25 through 42 above (Top-Down Claim Categories), an award of US$ 1,945.96 million in Improper EPC Costs as calculated in Long International's alternative Bottom-Up Methodology based on (i) CB&I's Contractual *Dolo*, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.

57. An award of equitable relief based on the facts and legal grounds expressed herein and in any prior filings.

58. An award of costs of the arbitration, including attorneys' fees.

59. An award of post-award interest, at the applicable rates under applicable law, until the effective date of payment of the award.

60. A declaration that the Tribunal has Liquidated the EPC Agreement and established the appropriate EPC Agreement value pursuant to its awards and declarations above.

61. Reficar also seeks any and all additional relief that the Tribunal may deem appropriate.

297. Pursuant to the RPHB, CB&I requests the Tribunal to issue an award containing the relief listed in the ESOD (para. 293 *supra*) under requests no. 1-9 and 11-37, in the Respondents' Reply on Counterclaim (para. 294 *supra*) and the following relief[288]:

a. An award of monetary damages of USD 146,964,022 under the Offshore Contract and COP 568,229,695,037 under the Onshore Contract;[1501]

---

[288] RPHB, para. 675.

b. A declaration that CB&I does not owe Reficar for invoices Reficar previously paid, but subsequently failed or refused to "approve";

c. A declaration that neither Party has asserted a liquidated claim for indemnity, and any claims for indemnity asserted in this Arbitration are premature and not ripe for resolution;

d. A declaration that Reficar shall return the sum it improperly drew on the Performance LC to CB&I UK and pay all of CB&I's legal costs and expenses associated with legal challenges to Reficar's demands on the Performance LC and Advance Payment LC;

e. A declaration that CB&I did not breach a pre-contractual duty to act in good faith and/or act with pre-contractual *dolo*;

f. A declaration that (i) CB&I UK has demanded payment of amounts owed jointly and severally to CB&I UK and CBI Colombiana in this Arbitration, and (ii) requiring Reficar to pay CB&I UK any amounts awarded in this Arbitration that are owned jointly and severally to CB&I UK and CBI Colombiana as required by article 1570 of the Colombian Civil Code; and

g. A declaration pursuant to article 1570 of the Colombian Civil Code that amounts owed to CBI Colombiana under the Onshore Contract can be set-off between Reficar and CB&I UK based on CB&I UK's status as a joint and several creditor with CBI Colombiana.

## 4. BLENDED REQUESTS FOR RELIEF

298. As acknowledged by the Parties, many of Claimant's requests overlap with those of Respondents'[289]; furthermore, as a consequence of the Tribunal's findings, a significant number of requests will become moot – these requests are not specifically mentioned in the table below, but will be adjudicated in Section X.6 *infra*.

299. Once duplicative and moot requests are excluded[290], the approximately 100 individual requests can be subsumed into the following 14 blended requests for relief ["**Blended Requests for Relief**"][291]:

| | Claimant's Relief | Submission | Respondents' Relief | Submission | Blended Request for Relief |
|---|---|---|---|---|---|
| 1. | *3. A declaration that CB&I committed dolo incidental and/or violated the duty of good faith, including the duty to inform, during negotiations over the EPC* | CPHB, para. 532 | *[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[29] cc. A declaration that CB&I did not improperly or* | RPHB, para. 675(1) (ESOD, para. 1612) | A declaration that CB&I committed pre-contract misconduct, breaching a pre-contractual duty to |

---

[289] Tr. 200:9; RPHB, para. 637.
[290] See section X.6 *infra*.
[291] The Tribunal will assume that, (i) if not mentioned in further requests for relief and (ii) not pleaded in the body of the Parties' main submissions, any other requests for relief have been waived by the Parties

| | | | |
|---|---|---|---|
| *Agreement (hereinafter, "Pre-contract Misconduct").* | *fraudulently induce Reficar to execute the EPC Contract.* | | **act in good faith and/or act with pre-contractual dolo and that CB&I is liable for damages.** |
| *4. A declaration that CB&I committed Pre-Contract Misconduct with respect to its recommendation to switch the EPC Contract from a LSTK structure to a cost-reimbursable structure.* | | | |
| *5. A declaration that CB&I committed Pre-Contract Misconduct with respect to the character and accuracy of CB&I's pre-contract estimates.* | *e. A declaration that CB&I did not breach a pre-contractual duty to act in good faith and/or act with pre-contractual dolo.* | RPHB, para. 675(3)(e) | |
| *6. A declaration that CB&I committed Pre-Contract Misconduct with respect to the character and accuracy of CB&I's pre-contract schedules.* | | | |
| *7. A declaration that CB&I's Pre-Contract Misconduct resulted in Reficar accepting contract terms in the EPC Agreement that it would not otherwise have accepted, and thus such terms shall not be applied to or enforced against Reficar, including but not limited to TC 8.1, TC 8.2.1, TC 54.8, TC 56, and any other limitations of liability in the EPC Contract (hereinafter, "Limitations of Liability").* | | | |
| *10. A declaration that, regardless of the existence of Contractual Dolo, Reficar is entitled to recover all damages arising from CB&I simple breach of the EPC Agreement during the execution phase because the Limitations of Liability are invalid/inapplicable due to CB&I's Pre-Contract Misconduct or for any other reason set forth in Reficar's briefing (hereinafter, "Inapplicability of Limitations of Liability").* | | | |
| *23. A specific award of US$ 363,550,178 for understated quantities and deliverables in the Final Full Estimate (Claim Category 1A) based on CB&I's Pre-contract Misconduct.* | | | |

ICC Case 21747 RD/MK/PDP
Final Award

| 2. | *22. An award of all actual damages, including additional Owner's costs, lost profits, and cost of capital, based on the facts and legal grounds expressed in any of Claimant's submissions.*<br><br>*44. A specific award of US$ 109,883,718 for PCS Delay Costs Due to CB&I Failures (Claim Category 18) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*47. A specific award of US$ 10,318,811 for PCS Specific Impacts on Contractors Due to CB&I Failures (Claim Category 21) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*48. A specific award of US$ 42,586,609 for PCS Labor Productivity Loss (Claim Category 22) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*50. A specific award of US$ 809,813,402 for Loss Profits (Claim Category 24) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach, with an offset/credit of (US$22,926,290) due to the extended life of the Refinery.*<br><br>*51. A specific award of US$ 325,007,417 for Cost of Capital on Loss Profits (Claim Category 25) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.* | CPHB, para. 532 | *[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[13] m. A declaration that all waivers of damages in the EPC Contract are enforceable under any applicable laws.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that the limitations in Section 4.13 of the DRA are enforceable.** |
| 3. | *8. A declaration that CB&I must reimburse Reficar for costs paid by Reficar to CB&I that were not reasonably and properly incurred in accordance with the EPC Agreement, and that such reimbursement is not limited by any Limitations of Liability* | CPHB, para. 532 | *[1] a. A declaration that Reficar is not entitled to any monetary damages or declaratory relief, including, but not limited to, the monetary damages and declaratory relief requested in Reficar's Request for Arbitration and* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that CB&I must reimburse Reficar USD 1,945.96 million for costs paid by Reficar to CB&I, in performing work,** |

ICC Case 21747 RD/MK/PDP
Final Award

| | | |
|---|---|---|
| *(hereinafter, "Reimbursement Obligation").*<br><br>*14. A declaration that CB&I must reimburse Reficar for payments that Reficar made under invoices that did not comply with the requirements of the EPC Agreement.*<br><br>*25. A specific award of US$ 102,392,722 for Engineering Productivity Failures (Claim Category 2) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*<br><br>*26. A specific award of US$ 30,737,257 for Steel Fabrication Failures (Claim Category 3) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*27. A specific award of US$ 103,445,504 for Pipe Spool Fabrication Failures (Claim Category 4) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*28. A specific award of US$ 4,400,000 for Substation Failures (Claim Category 5) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*29. A specific award of US$ 3,340,806 for Invensys Automation Failures (Claim Category 6) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*30. A specific award of US$ 48,814,969 for Labor Disruption Failures (Claim Category 7) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or* | *Exhaustive Statement of Claim.*<br><br>*[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[6] f. A declaration that Reficar acted in bad faith and breached its duty of good faith by inducing CB&I to continue working on the Project by paying CB&I's invoices with the intent of breaching its contractual obligations and forcing CB&I to return billions of dollars when the work was completed.*<br><br>*[7] g. A declaration that Reficar abused its rights, acted in bad faith, and breached the duty of good faith by interfering with CB&I's desired means and methods, failing to properly plan and implement procurement activities, and making decisions that were not in the best interest of the Project.*<br><br>*[9] i. A declaration that Reficar is contractually liable to CB&I for abusing its rights and/or intentionally breaching its obligation to approve valid subcontractor change orders.*<br><br>*[10] j. A declaration that Reficar is liable for tortious interference in CB&I's contractual relationships with its subcontractors, laborers, employees, and banks.*<br><br>*[14] n. A declaration that Reficar finally approved payment of all amounts tendered to CB&I and Reficar waived its rights to claw back those payments under the EPC Contract and applicable law.*<br><br>*[15] o. A declaration that Reficar is not entitled to restitution in any form.*<br><br>*[27] aa. A declaration that all costs CB&I incurred in performing Work under the EPC Contract are reasonable and proper.* | **that were not reasonably and properly incurred in accordance with the EPC Contract.** |

| | | | |
|---|---|---|---|
| *(iv) CB&I's Reimbursement Obligation.* | | *b. A declaration that CB&I does not owe Reficar for invoices Reficar previously paid, but subsequently failed or refused to "approve".* | RPHB, para. 675(3)(b) |
| *31. A specific award of US$ 81,530,521 for Labor Strike Failures (Claim Category 8) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.* | | | |
| *32. In the alternative to Request 24 (Claim Category 1B), a specific award of US$ 284,335,307 for Non-Discrete Productivity Loss from CB&I Failures (Claim Category 9) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.* | | | |
| *33. A specific award of US$ 28,508,755 for Excessive Rework (Claim Category 10) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.* | | | |
| *34. A specific award of US$ 264,263,099 for Excessive CMT (Claim Category 11) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.* | | | |
| *35. In the alternative to the prior request, a specific award of US$ 268,503,387 for Excessive CMT (alternative Claim Category 11) based on CB&I's Reimbursement Obligation.* | | | |
| *36. A specific award of US$ 69,906,599 for Excessive Scaffolding (Claim Category 12) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.* | | | |
| *37. In the alternative to the prior request, a specific award of US$ 61,128,009 for Excessive Scaffolding (alternative Claim Category 12) based on CB&I's Reimbursement Obligation.* | | | |

*38. A specific award of US$ 8,739,885 for Unresolved Back-charges (Claim Category 13) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*

*39. A specific award of US$ 20,062,560 for Island Park Productivity Failures (Claim Category 14) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*

*40. A specific award of US$ 42,683,951 for EPC Labor Escalation Due to CB&I Failures (Claim Category 15) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*

*41. A specific award of US$ 688,755,958 for EPC Prolongation Due to CB&I Failures (Claim Category 16) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*

*42. In the alternative to the prior request, a specific award of US$ 652,116,799 for EPC Prolongation Due to CB&I Failures (alternative Claim Category 16) based on CB&I's Reimbursement Obligation.*

*53. A specific award of US$ 140,265,957 for Unsubstantiated Advance Payments (Claim Category 27) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, (iv) CB&I's Reimbursement Obligation, and/or (v) CB&I's failure to substantiate invoices as required by the EPC Agreement, MOA, and PIP. However, to avoid duplication, this amount should be reduced by ratio of Improper EPC Costs awarded with respect to Requests 25 through 42 above in comparison to the total amounts paid directly to*

ICC Case 21747 RD/MK/PDP
Final Award

| | | | | |
|---|---|---|---|---|
| | *CB&I (US$ 3,967.38 million). For example, if the Tribunal awards US$ 1,590.08 million pursuant to the identified Requests, the US$ 140,265,957 amount should be reduced by 40.08% ($1,590.08/$3,967.38) to US$ 84.047 million.*<br><br>*56. In the alternative to Requests 25 through 42 above (Top-Down Claim Categories), an award of US$ 1,945.96 million in Improper EPC Costs as calculated in Long International's alternative Bottom-Up Methodology based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.* | | | |
| 4. | *43. A specific award of US$ 165,345,825 for Owner's Delay Costs Due to CB&I Failures (Claim Category 17) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*<br><br>*44. A specific award of US$ 109,883,718 for PCS Delay Costs Due to CB&I Failures (Claim Category 18) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*50. A specific award of US$ 809,813,402 for Loss Profits (Claim Category 24) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach, with an offset/credit of (US$22,926,290) due to the extended life of the Refinery.*<br><br>*51. A specific award of US$ 325,007,417 for Cost of Capital on Loss Profits (Claim Category 25) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*52. A specific award of $12,235,789 for Lost Revenue from Electricity Sales (Claim Category* | CPHB, para. 532 | *[1] a. A declaration that Reficar is not entitled to any monetary damages or declaratory relief, including, but not limited to, the monetary damages and declaratory relief requested in Reficar's Request for Arbitration and Exhaustive Statement of Claim.*<br><br>*[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[18] r. A declaration that Reficar's potential damages for late completion of the Work are capped by the Delay Liquidated Damages provisions in the EPC Contract.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that Reficar is owed USD 366.25 million for liquidated damages for delay.** |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | *26) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*55. In the alternative to Requests 43, 44, 50, 51, and 52 above (Delay Claim Categories Other than EPC Costs), a specific award of US$ 366,250,000 for Liquidated Damages for Delay based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.* |  |  |  |  |
| **5.** | *45. A specific award of US$ 1,615,527 for PCS Completion of Outstanding and Incomplete Work (Claim Category 19) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*46. A specific award of US$ 8,692,212 for PCS Correction of Defective Work (Claim Category 20) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*47. A specific award of US$ 10,318,811 for PCS Specific Impacts on Contractors Due to CB&I Failures (Claim Category 21) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.* | CPHB, para. 532 | *[1] a. A declaration that Reficar is not entitled to any monetary damages or declaratory relief, including, but not limited to, the monetary damages and declaratory relief requested in Reficar's Request for Arbitration and Exhaustive Statement of Claim.*<br><br>*[3] c. A declaration that Reficar's claims are dismissed in their entirety.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that Reficar is owed USD 20,626,550 for specific impacts on PCS contractors, including the completion of outstanding and incomplete work and the correction of defective work.** |
| **6.** | *13. A declaration that CB&I is not entitled to payment from Reficar for invoices that did not comply with the requirements of the EPC Agreement.*<br><br>*15. A declaration that Reficar is not obligated to pay to CB&I any additional costs which it has not already paid.* | CPHB, para. 532 | *[1] a. A declaration that Reficar is not entitled to any monetary damages or declaratory relief, including, but not limited to, the monetary damages and declaratory relief requested in Reficar's Request for Arbitration and Exhaustive Statement of Claim.*<br><br>*[4] d. A declaration that Reficar breached its duties under the EPC Contract.*<br><br>*[8] h. A declaration that Reficar is contractually liable* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that Reficar abused its rights and intentionally and/or maliciously breached its duties under the EPC Contract, and must reimburse CB&I for all reasonable and proper costs incurred until the EPC Contract is liquidated, in an amount of USD** |

| | | | | |
|---|---|---|---|---|
| | | | *to CB&I for abusing its rights and/or intentionally breaching its obligation to pay invoices to CB&I that are due and owing.*<br><br>*[11] k. A declaration that Reficar has been unjustly enriched.*<br><br>*[19] s. A declaration that Reficar cannot and shall not offset its prior payments to CB&I against sums that are due and owing to CB&I, and CB&I is not obligated to return any sums it received from Reficar for the Work.*<br><br>*[26] z. A declaration that the EPC Contract is a valid and binding agreement on the parties, is still in full force and effect, and Reficar must reimburse CB&I for all reasonable and proper costs it incurs until the EPC Contract is liquidated.*<br><br>*[31] ee. A declaration that Reficar maliciously withheld payments from CB&I, refused to sign change orders, and induced CB&I to continue working on the Project, without intending to honor its payment obligations.* | | **146,964,022 and COP 568,695,037.** |
| 7. | *16. A declaration that Reficar properly drew on the Performance Letter of Credit and is not obligated to return any of those funds.*<br><br>*17. A declaration that the Unsubstantiated Advance Payment Amount is in excess of US$ 95 million and that Reficar is entitled to draw on the full amount of the AP Letter of Credit.* | CPHB, para. 532 | *[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[4] d. A declaration that Reficar breached its duties under the EPC Contract.*<br><br>*[5] e. A declaration that CB&I has no liability to Reficar under any Performance Guarantee.*<br><br>*[20] t. A declaration that CB&I has no liability under the Advance Payment LC.*<br><br>*[21] u. A declaration that Reficar fraudulently attempted to draw on the Advance Payment LC.*<br><br>*[22] v. A declaration that Reficar has no right to make a demand or draw upon the Advance Payment LC.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that Reficar properly drew on the Performance LoC and that amounts already collected must be credited to CB&I in the settlement of accounts; a declaration that Reficar is entitled to fully draw on the Advance Payment LoC, and that amounts drawn reduce the total amount that CB&I is ordered to pay by this award.** |

| | | | | | |
|---|---|---|---|---|---|
| | | | *[23] w. A declaration that the Adavance Payment LC does not secure payments made by Reficar to CB&I under the MOA or PIP.* <br><br> *[24] x. A declaration that CB&I has no liability under the Performance LC.* <br><br> *[25] y. A declaration that Reficar is liable to CB&I for improperly drawing on the Performance LC.* | | |
| | | | *d. A declaration that Reficar shall return the sum it improperly drew on the Performance LC to CB&I UK and pay all of CB&I's legal costs and expenses associated with legal challenges to Reficar's demands on the Performance LC and Advance Payment LC.* | RPHB, para. 675(3)(d) | |

ICC Case 21747 RD/MK/PDP
Final Award

| 8. | 9. A declaration that CB&I breached the EPC Agreement during the execution phase through gross negligence, culpa grave, wilful misconduct, fraud, bad faith, and/or dolo (hereinafter, "Contractual Dolo"). 10. A declaration that, regardless of the existence of Contractual Dolo, Reficar is entitled to recover all damages arising from CB&I simple breach of the EPC Agreement during the execution phase because the Limitations of Liability are invalid/inapplicable due to CB&I's Pre-Contract Misconduct or for any other reason set forth in Reficar's briefing (hereinafter, "Inapplicability of Limitations of Liability"). 12. A declaration that CB&I not only committed wilful misconduct, dolo, gross negligence, and/or culpa grave through violations of the EPC Agreement, but that the aggregate, extended duration of the harm CB&I caused also constituted wilful misconduct, dolo, gross negligence, and/or culpa grave. | CPHB, para. 532 | [3] c. A declaration that Reficar's claims are dismissed in their entirety. [12] l. A declaration that the EPC Contract's Limitation of Liability provisions and other caps on liability or damages are enforceable under any applicable laws. [18] r. A declaration that Reficar's potential damages for late completion of the Work are capped by the Delay Liquidated Damages provisions in the EPC Contract. [28] bb. A declaration that CB&I adequately performed its obligations under the EPC Contract and is not liable for fraud, gross negligence, willful misconduct, dolo, culpa grave, or fraude. | RPHB, para. 675(1) (ESOD, para. 1612) | A declaration that Reficar properly drew on the Performance LoC and that amounts already collected must be credited to CB&I in the settlement of accounts; a declaration that Reficar is entitled to fully draw on the Advance Payment LoC, and that amounts drawn reduce the total amount that CB&I is ordered to pay by this award. A declaration that CB&I breached the EPC Contract during the execution phase through culpa grave or gross negligence and CB&I cannot avail itself of the limitation-of-liability provisions in the EPC Contract. |
| 9. | 18. A declaration that CB&I must fully indemnify Reficar for any judgment or decision by Colombian courts or any other governmental entity against the Owner Group that was caused by CB&I's violation of any applicable laws. 19. A declaration that CB&I is obligated to continue to indemnify and defend Reficar for and from claims pending in Colombian courts presented by workers hired by CB&I during the project. | CPHB, para. 532 | [3] c. A declaration that Reficar's claims are dismissed in their entirety. [16] p. A declaration that CB&I does not owe Reficar any defense or indemnity under the EPC Contract or applicable law. [17] q. A declaration that Reficar owes CB&I such defense and indemnity as is required by the EPC Contract or applicable law. [32] ff. A declaration that CB&I is entitled to reimbursement for costs and expenses incurred in responding to the Colombian government investigations of Reficar. [33] gg. A declaration that Reficar is obligated to pay all | RPHB, para. 675(1) (ESOD, para. 1612) | A declaration that each Party owes the other or its Group members defense and indemnity for any judgment or decision by Colombian courts or any other governmental authority. |

| | | | | | |
|---|---|---|---|---|---|
| | | | *costs, expenses, fines, or penalties that CB&I incurs in responding to the Colombian government investigations of Ecopetrol, Reficar, or their employees and representatives.* | | |
| | | | *c. A declaration that neither Party has asserted a liquidated claim for indemnity, and any claims for indemnity asserted in this Arbitration are premature and not ripe for resolution;* | RPHB, para. 675(3)(c) | |
| 10. | *20. A declaration that CB&I UK and CBI Colombiana are jointly and severally liable for all obligations declared and amounts awarded herein pursuant to the parties' Section 18 and other provisions of the Parties' Coordination Agreement as well as applicable law.*<br><br>*21.    A declaration that CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded herein pursuant to the Parent Guarantee Agreements.* | CPHB, para. 532 | *[3] c. A declaration that Reficar's claims are dismissed in their entirety.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A declaration that CB&I UK and CBI Colombiana are jointly and severally liable under any Project Agreement. A declaration that CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded pursuant to the Parent Guarantee.** |
| | | | *f. A declaration that (i) CB&I UK has demanded payment of amounts owed jointly and severally to CB&I UK and CBI Colombiana in this Arbitration, and (ii) requiring Reficar to pay CB&I UK any amounts awarded in this Arbitration that are owned jointly and severally to CB&I UK and CBI Colombiana as required by article 1570 of the Colombian Civil Code.* | RPHB, para. 675(3)(f) | |
| 11. | *60. A declaration that the Tribunal has Liquidated the EPC Agreement and established the appropriate EPC Agreement value pursuant to its awards and declarations above.* | CPHB, para. 532 | *[2] b. An award to CB&I of monetary damages and other relief requested in its Answer to Request for Arbitration and Counterclaim, Non-Exhaustive Statement of Counterclaim, Exhaustive Statement of Counterclaim, and Reply to the Non-Exhaustive Statement of Defense to Counterclaim.* | RPHB, para. 675(1) (ESOD, para. 1612) | **A payment order for the amounts awarded** |

ICC Case 21747 RD/MK/PDP
Final Award

| 12. | *15. A declaration that Reficar is not obligated to pay to CB&I any additional costs which it has not already paid.*<br><br>*43. A specific award of US$ 165,345,825 for Owner's Delay Costs Due to CB&I Failures (Claim Category 17) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*<br><br>*46. A specific award of US$ 8,692,212 for PCS Correction of Defective Work (Claim Category 20) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*47. A specific award of US$ 10,318,811 for PCS Specific Impacts on Contractors Due to CB&I Failures (Claim Category 21) based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, and/or (iii) CB&I's Fiduciary Breach.*<br><br>*56. In the alternative to Requests 25 through 42 above (Top-Down Claim Categories), an award of US$ 1,945.96 million in Improper EPC Costs as calculated in Long International's alternative Bottom-Up Methodology based on (i) CB&I's Contractual Dolo, (ii) the Inapplicability of the Limitations of Liability, (iii) CB&I's Fiduciary Breach, and/or (iv) CB&I's Reimbursement Obligation.*<br><br>*60. A declaration that the Tribunal has Liquidated the EPC Agreement and established the appropriate EPC Agreement value pursuant to its awards and declarations above.* | CPHB, para. 532 | *[2] b. An award to CB&I of monetary damages and other relief requested in its Answer to Request for Arbitration and Counterclaim, Non-Exhaustive Statement of Counterclaim, Exhaustive Statement of Counterclaim, and Reply to the Non-Exhaustive Statement of Defense to Counterclaim.*<br><br>*[26] z. A declaration that the EPC Contract is a valid and binding agreement on the parties, is still in full force and effect, and Reficar must reimburse CB&I for all reasonable and proper costs it incurs until the EPC Contract is liquidated.*<br><br>*g. A declaration pursuant to article 1570 of the Colombian Civil Code that amounts owed to CBI Colombiana under the Onshore Contract can be set-off between Reficar and CB&I UK based on CB&I UK's status as a joint and several creditor with CBI Colombiana.* | RPHB, para. 675(1) (ESOD, para. 1612)<br><br><br><br><br><br><br><br><br><br><br>RPHB, para. 675(3)(g) | **A declaration that the Tribunal has Liquidated the EPC Agreement and established the appropriate EPC Agreement value.** |
| 13. | *49. A specific award of Cost of Capital (Claim Category 23) on the Improper Costs awarded above calculated based on the date of the Tribunal's award and Reficar's 8.6% WACC, or in the alternative, by applying the contractual interest rate for late payments of LIBOR + 2%. (Based on the* | CPHB, para. 532 | *[3] c. A declaration that Reficar's claims are dismissed in their entirety.*<br><br>*[35] ii. A declaration that CB&I is entitled to be awarded pre- and post-judgment interest and all other interest payable under applicable law.* | RPHB, para. 675(1) (ESOD, para. 1612) | **An order for interest on the balance after liquidation and post-award interest until the date of payment of the award.** |

ICC Case 21747 RD/MK/PDP
Final Award

| | | | | | |
|---|---|---|---|---|---|
| | *calculations of Breakwater Forensics, those cost of capital amounts on Reficar's execution-phase damages as of 10-May-2019 were US$ 382,803,640 and US$ 220,009,151 for the two interest rate options).*<br><br>*59. An award of [pre[292] and] post-award interest, at the applicable rates under applicable law, until the effective date of payment of the award.* | | | | |
| **14.** | *58. An award of costs of the arbitration, including attorneys' fees.* | CPHB, para. 532 | *[34] hh. A declaration that CB&I is entitled to be awarded its legal fees, expert fees, and costs of this Arbitration.* | RPHB, para. 675(1) (ESOD, para. 1612) | **An award on costs.** |

---

[292] As requested in para. 37.r) of the Terms of Reference and pleaded in SOC, paras. 619, 810 and 813, and CPHB2, p. 25.

# VII.  <u>MERITS</u>

300. Claimant's first claim is for CB&I's pre-contractual liability, which it incurred through inducing Reficar to enter into a cost-reimbursable agreement with the limitations of liability and risk allocation through *dolo incidental*, or bad faith in contract negotiations (**VII.1.**).

301. Reficar and CB&I bring a number of contractual claims (**VII.2.**): first, Reficar requests relief for Improper EPC Costs (**VII.2.1.**), second, for Improper Delay (**VII.2.3.**), third, for Work Completion costs (**VII.2.4.**) and finally for Procurement costs (**VII.2.5.**). CB&I denies Reficar's claims and brings a counterclaim, mostly for unpaid invoices (**VII.2.2.**).

302. In addition, both Parties request from the Tribunal declaratory relief related to the indemnification obligations under the EPC Contract (**VII.2.6.**).

303. Finally, Reficar brings a number of claims that the Tribunal will reject as they fall outside the Tribunal's power (**VII.3.**).

## VII.1.**REFICAR'S PRE-CONTRACTUAL CLAIMS**

304. Reficar avers that it was induced by CB&I into changing the price structure of the EPC Contract from lump sum to cost reimbursable. Reficar makes CB&I pre-contractually liable for *dolo incidental* based on two premises:

  - Respondents' failure to abide by their good faith duty to inform and provide Reficar with relevant information that was crucial to its agreement to the terms of the 2010 EPC Contracts;

  - Reficar entered into the 2010 EPC Contracts on less beneficial terms due to CB&I's deception.

305. Reficar claims damages as a consequence of that deceit, because the contract turned out to be more onerous than what Reficar had been led to believe it would be.

306. CB&I, on the other hand, argues that its pre-contract actions constituted neither a breach of good faith nor *dolo incidental* (nor its equivalent under New York law).

307. The Tribunal will start by providing a summary of the facts (**VII.1.1**). Then, it will briefly summarize the Parties' positions (**VII.1.2**). Finally, it shall take a decision (**VII.1.3**).

## VII.1.1.    FACTS

308. The Refinery was originally designed and built in the 1950's for Intercol, an Esso affiliate, by the construction conglomerate Bechtel[293]. In the 1970's the Refinery was acquired by the Colombian State through the State-owned company Ecopetrol[294].

309. At that point in time, the Refinery was configured as a cracking refinery and was transforming low-sulfur crude oil of South American origin into propane, butane, motor gasoline, jet fuel, diesel, fuel oil and asphalt, for domestic production and export to other Latin American countries and the United States[295].

310. By the early 2000's Ecopetrol felt the need to expand the Refinery, turning it into a more efficient and profitable business, whilst at the same time addressing environmental concerns to meet new clean fuel regulations for gasoline and diesel.

311. For this purpose Ecopetrol, essentially, did three things:

  - First, it commissioned the engineering and construction company, Technip, to prepare a Master Development Plan (**i.**);

  - Second, it looked for an international strategic partner to invest in the modernised and enhanced Refinery (**ii.**);

---

[293] Ex. R-0459, p. 8.
[294] Ex. R-0459, p. 8, Houtz CWS, para. 12.
[295] Ex. R-0461, p. 6.

ICC Case 21747 RD/MK/PDP
Final Award

- Shortly thereafter, it began searching for a contractor (**iii.**).

312. (**i.**) The Master Development Plan, finalized by Technip in 2004[296], was based on a LSTK contract estimate of approx. USD 800 million[297]. Technip advised, at that point, that an LSTK contract would eliminate the risk of possible construction cost overruns[298].

313. (**ii.**) In 2005 Ecopetrol set up a tender to search for an investment partner[299]. Glencore won the bidding for a 51% ownership stake in the Refinery and, as a result, on October 3, 2006, Ecopetrol and Glencore signed the Framework Investment Agreement (*Acuerdo Marco de Inversión*) creating Reficar, the Claimant in the current arbitration[300].

314. Glencore, with a majority stake in Reficar, and the right to nominate three out of five of the company's BofD members[301], took the lead in the development of the plan for the expansion of the Refinery. The leading role of Glencore is reflected in how the Framework Investment Agreement also specifically entrusted Glencore with developing the financing strategy for the Refinery Project[302].

315. This situation would eventually change in May 2009, when Ecopetrol re-purchased Glencore's shares in Reficar[303] and assumed the management of the Project.

316. (**iii.**) In parallel to Reficar's constitution, a new tender was set up to search for the contractor.

317. By mid-2006, apart from CB&I, two other bidders submitted their proposals for the initial EPC contract – Technip (Italy) and Técnicas Reunidas (Spain)[304]. All of them made their proposals on the basis of an LSTK contract[305].

318. CB&I showed persistent interest in the bid. On April 18, 2007, Mr. Jeffrey Sipes, the director of business development for CB&I Americas, reached out to Glencore to "discuss […] the execution of the expansion on a firm price turnkey basis"[306].

319. Emphasizing the importance of the price modality, Reficar replied on the same day asking for a confirmation of whether CB&I would be willing to undertake the work

---

[296] Ex. R-0465; Ex. R-0462.
[297] Ex. R-0465, p. 6, identifies the number as approx. USD 792 million, while Ex. C-0907, p. 14 refers to USD 806 million (+/- 10%).
[298] Ex. R-0462, p. 7 "*El proceso de consecución de una firma para la ingeniería de detalle y la construcción, debe ser realizada por medio de un contrato "llave en mano" a fin de eliminar el riesgo de los posibles sobre costos en la construcción*".
[299] Ex. R-0468; Houtz CWS, para. 15.
[300] Ex. C-0024, p. 5; Ex. R-0473, p. 17; Houtz CWS, para. 16.
[301] Houtz CWS, para. 19; Ex. C-0908, Secton 7.03 of the AMI.
[302] Ex. C-0908, Section 5.04 of the AMI: "*El Accionista Adjudicatario [Glencore] podrá diseñar el mecanismo de financiación que, de acuerdo con las buenas prácticas financieras, sea más conveniente para la Sociedad y esta, en el seno de la Junta Directiva, aprobará dicha estructura de financiación*."
[303] Houtz CWS, para. 109; Ex. C-0939; Gutierrez CWS, para. 12.
[304] Ex. C-0054, p. 8.
[305] Ex. C-0388, p. 2: "The basic design documents developed in Phase II will be the basis of CBI's lump sum price". CB&I's presentation adhered to the premises of the bidding, which applied to all participants.
[306] Ex. R-0477, p. 4.

under a lump sum fixed price basis[307]. The following day, in his reply, Mr. Sipes stated as follows[308]:

> "To confirm, we remain interested and capable of executing the refinery expansion on a lump sum basis. […] CB&I is uniquely qualified to execute the expansion on an LSTK basis. We have relevant engineering experience on all the key process units, capability to perform the modular fabrication in house and experience with direct-hire construction in Colombia. We are one of the few (if any) companies that could adequately quantify and manage the risk and whose principal business model is lump sum turnkey contracting".
> [Emphasis added]

320. On October 10, 2007, CB&I issued a "Summary of [its] Proposal for Development of EPC Contract", in which it stated it had committed key project team resources to the project development effort and offered substantial cost savings for Reficar on the basis of an LSTK contract[309]. This document additionally promised that CB&I would "[m]aximize use of CBI direct hire construction force to maintain productivity"[310] and execute the "[m]ajority of Construction Activities" using "CBI employees at CBI's cost"[311].

321. In October 2007 Nexant Chem Systems Limited ["**Nexant**"] prepared an independent evaluation of the planned EPC agreement and the bids submitted by the three would-be contractors[312].

322. On the subject of the contracting strategy, Nexant unequivocally recommended a "'defined price' Lump Sum Turn Key (LSTK) contract" as the "optimum approach"[313]. This was reinforced by further findings that[314]:

- "The Project Sponsor and its shareholders have limited support resources to oversee the Project execution EPC and will require the closer approximation to a LSTK approach.

- The Project Sponsor and its shareholders do not have the resources to adopt high financial and technical risks and therefore need to negotiate an EPC Contract that can come closest to the optimum Project approach including moving the bid bases to a LSTK as soon as possible".

323. Regarding the bids, the Nexant report found that "[…] CB&I appears to propose the most feasible approach to the Project"[315]. Reficar's Mr. Houtz testified that

---

[307] Ex. R-0477, p. 3.
[308] Ex. R-0477, p. 2.
[309] Ex. C-0025.
[310] Ex. C0025, p. 1.
[311] Ex. C0025, p. 3.
[312] H-1, slide 24; Ex. C-0054 at p. 8 – although the date when Nexant was retained is not explicitly stated in the exhibit, Reficar's representation of "early 2007" during the Hearing was never contested by CB&I and is logical given the date of Nexant's report – October 2007.
[313] Ex. C-0054, p. 38.
[314] Ex. C-0054, p. 39.
[315] Ex. C-0054, p. 12.

CB&I's representations regarding the LSTK bid played an important role in its selection[316]:

> "During this timeframe, few contractors were interested in providing a LSTK bid for the Project, and CB&I's representations that it would pursue the Project on a LSTK basis was a material consideration to Reficar in selecting CB&I".

## 1. PROJECT DEFINITION PHASE

324. The Project Definition Phase, sets out the requirements for the project to achieve its goals under a defined scope[317]; the Project Definition Phase, or pre-project planning, may be broken down into separate Front End Loading ["**FEL**"] phases:

- FEL-1 (Concept Definition / Feasibility),

- FEL-2 (Process Design) and

- FEL-3 (Basic Engineering),

with the two latter being jointly referred to as Front End Engineering Design ["**FEED**"][318]. The FEL 1 through 3 phases are separated by so-called "gates"[319] – these gates require the project to pass through decision-making "stops" which ensure that the project is ready to advance to the subsequent phase[320].

325. The FEL-1 on the Project was handled by KBC Advanced Technologies ["**KBC**"], which delivered its FEL-1 report in December 2007[321]; the document constituted one of the bases for the FEL-2 and FEL-3 phases for which CB&I later became responsible[322]. CB&I was also involved in FEL-1 activities: it was contracted for early work supporting the definition of the facilities and coordinating supply of licensor technology[323].

326. As the work on FEL-1 was nearing completion, on November 6, 2007, Reficar and CB&I entered into the "**Project Definition Contract**"[324] for phases FEL-2 and FEL-3 (or the FEED), with the goal of developing the Project scope and schedule, and an LSTK price[325].

327. The Project Definition Contract specifically allowed Reficar to appoint Technip – who had already produced the Master Development Plan back in 2004 and who

---

[316] Houtz CWS, para. 88.
[317] B&O'B ER, Appendix C, para. 7.
[318] B&O'B Rebuttal ER, footnote 13 on p. 11.
[319] WMC ER, para. 226.
[320] WMC ER, para. 226.
[321] Ex. B-013.
[322] Ex. C-0910, p. 8; Ex. C-0390, p. 5.
[323] Ex. C-0391, p. 4.
[324] Ex. R-0010 (Ex. C-0006). Apart from CB&I, Technip was also involved in the 2007 Project Definition Contract, even though it acceded through a separate agreement.
[325] Ex. R-0010, p. 5.

ICC Case 21747 RD/MK/PDP
Final Award

provided the second highest evaluated bid – to carry out some of the FEED[326]; still, CB&I retained responsibility for this Project phase[327].

328.    The Project would start under a cost-reimbursable basis, followed by a definitive LSTK EPC contract[328]. Accordingly, in January 2008, when CB&I filed its first monthly progress report under the Project Definition Contract, it confirmed that while the FEL-2 and FEL-3 phases were paid on a cost reimbursable basis, there would be an eventual conversion to LSTK for the EPC phase[329]. Incidentally, the report acknowledged that the management of the budget and schedule during the cost reimbursable period would be the same as if the contract were an LSTK and there would be safeguarding of Reficar's resources as if they were CB&I's own[330].

> [This appears to be the first instance of this phrasing, which will be important in the Tribunal's analysis of CB&I's eventual contractual obligations.]

329.    CB&I employees ultimately spent over one million man-hours working on the Project Definition Contract[331].

## 2.    GENESIS OF THE SHIFT TO A COST REIMBURSABLE REMUNERATION SCHEME

330.    Simply put, the differences between an LSTK and a cost-reimbursable contract are the following:

-    In an LSTK contract the contractor tenders a price for the completion of the scope of works – hence, the risk of cost overruns and delays lies with the contractor and not with the owner;

-    In a cost plus contract, the contractor bills the owner the costs incurred in the completion of the scope of works plus a margin – thus, the price and time risks rests with the owner and not with the contractor.

### Change in CB&I's attitude

331.    The Refinery Project was not CB&I's first LSTK contract; in fact, as per its own representations, it had ample previous experience and it had just finalized two UK-based LSTK projects – alas with significant losses[332].

332.    In an airplane conversation in spring 2008 CB&I's Mr. Sipes told Reficar's Mr. Houtz that "CB&I wanted to avoid another LSTK contract" because "CB&I

---

[326] Ex. C-0006, p. 18 at Clause 10.27. and under 1.1, Definitions: "Basic Design Engineering Contractor" means Technip or such Other Contractor as may be appointed by RCSA and approved by Contractor whose approval will not be unreasonably withheld."
[327] Houtz CWS, paras. 54, 59; Figure 3 on p. 24 shows that CB&I was responsible for the Basic Design of almost half of the units, with Technip responsible for some – as subcontractor to CB&I – and MECOR and KBR responsible for one unit each. Technip acted as a sub-contractor to CB&I.
[328] Ex. R-0010, Schedule One, para. 1, p. 56.
[329] Ex. C-0390, p. 2.
[330] Ex. C-0390, p. 2.
[331] Ex. C-0009, p. 15.
[332] Ex. C-0011, pp. 3-4.

had recently lost money on a lump sum project in Ireland" and "contractors [were] leery to commit to LSTK contracting arrangements"[333].

333. In May 2008, CB&I informed Reficar that an LSTK price would have to account for escalation costs in a range between 10% and 40%, increasing the contract price from USD 3.5-4.8 billion to USD 4.3-5.5 billion[334]; reflecting the premium on LSTK contracting in times of highly volatile market conditions. CB&I requested a meeting to "discuss [...] the potential impact of escalation, continued scope growth and contracting strategy"[335].

334. Given its losses on the two UK-based LSTK projects, CB&I decided to reduce the number of LSTK contracts and move to cost-reimbursable ones. This step was explicitly announced by CB&I in an investor call on July 15, 2008[336]:

> "As we have discussed on numerous occasions, we are de-risking our portfolio by modifying our fixed price business model. During the past year, we have reduced CB&I's risk profile from 90%+ higher-risk projects to around 55%. [...] We are also targeting a portfolio mix of no more than 20 to 25% risk in work by the end of 2009".

335. While CB&I was changing its strategy to favour lower-risk RC contracts over LSTK ones, the volatile market conditions prompted Reficar to independently reassess whether to proceed with the EPC phase of the Project on an LSTK or RC basis.

## A.   Reficar's June Steering Committee

336. On June 10, 2008 Reficar's Steering Committee met to examine the different contracting strategies for the Project. In view of CB&I's reluctance and the price increase that an LSTK contract implied, in that meeting Reficar did not oppose the change in contract structure and made a presentation acknowledging that the LSTK strategy was no longer considered the optimal approach, because no projects of similar size were being conducted under LSTK, and RC contracts offered considerable savings[337]:

---

[333] Houtz CWS, para. 87, quoted in RPHB1, para. 77.
[334] Ex. R-0484, p. 2.
[335] Ex. R-0484.
[336] Ex. C-0011, p. 4.
[337] Ex. C-0928, p. 44. The Tribunal notes that the Agenda slide of the presentation, at p. 2, mentions that the relevant section of the presentation was made by "EH", which must mean Mr. Ernest Houtz, who at that point was an employee of Glencore; Mr. Houtz claims that the Steering Committee at the time was comprised mainly of Glencore representatives and that no members of Ecopetrol were on the Steering Committee as Ecopetrol had not yet re-purchased Glencore's shares in the Project, see Houtz CWS, para. 90.

**Change in EPC Strategy**

- We no longer consider LSTK strategy the optimal approach

  No projects of this size are being conducted under LSTK

  LSTK will prove unaffordable as contractor will charge 17.5% margin plus excessive contingencies over and above the expected price escalation

  We feel we could negotiate a much reduced mark-up while retaining completion schedule commitments and single point performance wraps on a cost-plus basis (say, 10% margin)

  The above combined would represent $500 mill in savings

  On that basis, the current strategy of soliciting competing bids from Technip and CBI would be redundant

### B.    Reficar's June BofD meeting

337.  Also in June 2008, Reficar's highest administrative body, the BofD met. The BofD had representatives of both shareholders at the time, Ecopetrol and Glencore. The discussion of an "[u]pdate of the revision of the contracting strategy of EPC" was put on the agenda[338], the chairman made a presentation and at the end no decision was taken, except to order management to study the issue in depth[339]:

> "*Después de discutir el tema, la Junta Directiva instruyó a la Sociedad estudiar con mayor profundidad el tema y presentar a los Directores los análisis y soporte[s] suficientes para efectos de poder tomar una decisión sobre la posibilidad de [...] modificar el tipo de contrato llave en mano o LSTK a un contrato "cost plus"*".

338.  Towards the end of the month, representatives of Reficar and CB&I exchanged emails apparently confirming that "current contractual arrangements will be changed to cost reimbursable"[340].

### C.    Retention of Pathfinder

339.  In order to make an informed decision on the change, and to comply with the instructions given by its BofD, Reficar retained Pathfinder LLC ["**Pathfinder**"], a respectable consultancy, to evaluate the alternative contracting strategies and review the cost estimate prepared by CB&I[341]. Pathfinder was specifically put on notice that Reficar was considering executing the Project on a cost plus basis[342].

---

[338] Ex. R-0489, p. 2 at. 2.5, pp. 3-4 at 5.

[339] Ex. R-0489, p. 4; translation at p. 16:
"After discussing the topic, the Board of Directors instructed the Company to study it more in depth and present the Directors with suficient analysis and support to be able to make a decision on the possibility of [...] modifying the type of turnkey or LSTK contract to a "cost plus" contract type".

[340] Ex. R-2067, p. 2; Canals RWS, para. 78.

[341] Ex. R-0488, p. 9; Ex. R-0487, p. 4.

[342] Ex. C-0012, p. 2: "Whereas the original plan was to obtain LSTK bids from both contractors, we are now considering executing the project on a cost plus basis, with CBI and Technip operating as a consortium during the execution of the rest of the basic design and the EPC phase."

340. On July 9, 2008, Pathfinder made an assessment of the Project in which it found that "a satisfactory LSTK arrangement may not be achievable"[343] as

> "project costs have typically been highest for Negotiated LS[TK] contracts" and that the best recommendation was for "reimbursable contracting arrangements, particularly when reinforced with effective Incentive Programs"[344].

341. Pathfinder likewise observed that, at that time, attempts by other market participants to start out contracts on an RC basis with a switch to LSTK modality for the EPC phase "have been largely unsuccessful"[345]. The consultant concluded that the option of using an RC contract for EPC "clearly appear[ed] to be the preferred Case!"[346] and provided the following graphic, showing the vast cost savings offered by the RC modality in the contemporaneous business climate[347]:



342. At the same time, Pathfinder identified numerous risks associated with the switch to an RC contract, including the assumption of risk for cost overruns[348], but still concluded that this strategy was the optimal one[349]. In order to mitigate the risks involved, Reficar would first need to revise the contracts already in place with CB&I and Technip and a suitable +/-10% accuracy Cost Estimate, among other items, would need to be in place[350].

### D. Reficar's July Steering Committee

343. The day after Pathfinder delivered its findings, on July 10, 2008 Reficar's Steering Committee met again and was given another presentation on the subject of contract modality[351]. The presentation stressed that CB&I did not support an LSTK

---

[343] Ex. R-0487, p. 6.
[344] Ex. R-0487, pp. 7-8.
[345] Ex. R-0487, p. 7.
[346] Ex. R-0487, pp. 9, 14.
[347] Ex. R-0487, p. 8.
[348] Ex. R-0487, p. 16.
[349] Ex. R-0487, p. 17.
[350] Ex. R-0487, p. 17.
[351] Ex. C-0930, p. 63; see also Ex. R-0455, p. 73.

contract[352] and that the market conditions had changed, leading to a possible additional cost of over USD 500 million[353]; furthermore, the cost margin in the reimbursable modality was forecasted to be 10% lower than that for an LSTK contract[354]. The Steering Committee urged the BofD to make a speedy decision[355] because "[it] need[ed] to obtain Board approval to immediately proceed with negotiations […] of a cost plus contract"[356].

**E.    Reficar's July BofD meeting**

344.  In view of Pathfinder's findings, and the July 10, 2008Steering Committee's request, on July 15, 2008 Reficar's BofD discussed again the strategy for the EPC Contract, on the basis of two presentations by the then President of Reficar, Mr. Richard Cohen, indicating

> *"Las diversas razones que encuentra la administración para determinar que se debe cambiar la estrategia de contratación a buscar un contrato cost-plus"*[357].

345.  Among others, he explained that worldwide projects were being changed from LSTK to cost plus pricing, in order to reduce costs; the anticipated surcharge for an LSTK option would amount to USD 500 million[358].

346.  On the basis of Mr. Cohen's explanations, the BofD took a cautious approach[359]:

-    It authorized management to meet and confer with CB&I and Technip to discuss a cost plus EPC contract option, but without assuming any commitment;

-    It instructed management to review with Pathfinder and with Linklaters (the law firm engaged by Reficar to advise on the contract negotiations) the strategy and negotiation position and to report back to the BofD.

347.  On July 15, 2008, *i.e.*, five days after the Steering Committee meeting and on the same day when Reficar's BofD instructed management to approach CB&I about a potential switch to RC, the investor call mentioned before (see para. 334 *supra*) took place, in which CB&I announced to investors a change in its strategy to limit exposure to LSTK contracts[360].

---

[352] Ex. C-0930, p. 75.
[353] Ex. C-0930, p. 72.
[354] Ex. C-0930, p. 75.
[355] Ex. C-0930, p. 75.
[356] Ex. C-0930, p. 80.
[357] Ex. C-0014, pp. 4-5, English translation at p. 15:
"The various reasons found by the administration for determining that the contracting strategy should change to seeking a cost-plus contract with a consortium made up of CB&I and Technip".
[358] Ex. C-0014, p. 5.
[359] Ex. C-0014, pp. 5-6.
[360] Ex. C-0011, p. 4.

348. Also in July 2008 CB&I provided Reficar's Dr. Cohen and Mr. Houtz with the iCHemE Green Book for Reimbursable Contracts [the "**Green Book**"], a reliable source of information on the general risk assumption under RC contracts[361].

## F.    Reficar's October BofD meeting

349. In October 2008 Reficar's BofD discussed a detailed comparison of the pros and cons of entering into an LSTK contract, on the basis of a 15-page presentation[362].

350. The recommendation by management was to proceed with a switch to a cost-reimbursable structure as it would "minimize the price and [...] maximize Reficar's negotiation flexibility [and] facilitate obtaining of financing under current market conditions", as opposed to maintaining an LSTK contract, under which "[t]he transfer of risk is imperfect and has a high asymmetric cost"[363]:

# Recomendación

- La transferencia de riesgo bajo un LSTK es imperfecta y tiene un costo asimétrico
  - Los riesgos asumidos por el contratista son limitados
  - Como el proyecto va a ser financiado, bajo un LSTK solo se transfiere el riesgo si los socios están dispuestos a abandonar el proyecto
- Estrategia RC minimizará el precio y maximizara flexibilidad de negociación de Reficar
- El esquema RC facilitará la obtención de financiación bajo las actuales condiciones de mercado
- Basado en lo anterior, Reficar solicita aprobación de la Junta para culminar las negociaciones del contrato EPC bajo un esquema RC dentro de las condiciones comerciales descritas a continuación
- Una reunión de junta directiva especial se agendará para aprobar el contrato una vez finalice la negociación

351. Notwithstanding the recommendation, the BofD again postponed a decision[364].

352. In November 2008 CB&I insisted on recommending Reficar to switch to an RC contract, emphasizing the "enormous potential" for cost savings that this change would entail for Reficar[365]:

> "There exists <u>an enormous potential for cost savings</u> due to the global economic crisis and its effect on currencies relative the U.S. Dollar and

---

[361] Tr.: 1618:8-1619:12.
[362] Ex. R-0502.
[363] Ex. R-0502, p. 14 (30 for English translation):
"Recommendation
The transfer of risk under an LSTK mode is imperfect and has a high asymmetric cost
- The risks assumed by the contractor are limited
- Since the project is going to be financed, under LSTK mode the risk is only transferred if the partners are willing to abandon the project
The RC strategy will minimize the price and will maximize Reficar's negotiation flexibility.
The RC scheme will facilitate the obtaining of financing under current market conditions
Based on the foregoing, Reficar requests approval from the Board to conclude the negotiations of the EPC contract under an RC scheme within the commercial conditions described as follows
A special meeting of the board of directors will be scheduled in order to approve the contract once negotiations have concluded".
[364] Ex. R-0456, p. 4.
[365] Ex. C-0020.

material pricing – <u>a savings that Reficar cannot fully realize in a lump sum
contract</u>" [Emphasis added].

## G.    <u>Reficar's November BofD meeting</u>

353.    Still unsure what to decide, Reficar's BofD met on November 24, 2008 and
pondered three documents recommending a switch to RC contracting – none of
which was prepared by CB&I[366]:

-    A report by Nexidea (**i.**);

-    A letter from Citigroup (**ii.**); and

-    A letter from Technip (**iii.**).

354.    (**i.**) Nexidea was a consultancy which had been engaged to independently quantify
the risk associated with Reficar entering into a cost-plus EPC contract[367]. Nexidea's
findings supported a switch to an RC contract:[368]

"Savings in Cost-Plus Contract Versus LSTK Contract – Based upon the
premise that (a) the historical cost model is accurate and (b) the EPC
contractor will seek to increase the negotiated fixed price of a LSTK contract
to limit the risk of a cost overrun to less than 5 percent of the cases, <u>Reficar
should expect to save nine (9) percent of the project cost by going with a cost-
plus contract</u>. The savings are potentially much greater considering the recent
economic changes and expected downturn in costs". [Emphasis added]

355.    (**ii.**) Attachment 10 to the BofD Meeting Minutes is a letter from one of Reficar's
lenders[369]: on November 16, 2008, the director of Citigroup Global Markets Inc.
["**Citigroup**"], wrote to Reficar stating that Citigroup could not recommend
whether an LSTK or RC basis for the contract would be a better approach for
Reficar[370]. He did state, however, that in the contemporaneous difficult market
conditions, lenders

"usually prefer projects that are conservatively structured, which would mean
having either a very strong LSTK EPC contract with appropriate additional
contingent equity commitments or completion guarantees from creditworthy
sponsors"[371].

356.    He also noted that

"very few similar downstream mega-projects have been financed on the basis
of a LSTK, possibly due to the high cost of obtaining a true turnkey "wrap"

---

[366] Ex. R-0476.
[367] Ex. R-1853_002, p. 3; see also Ex. R-0455, p. 79 (406 for English). Nexidea had previously been retained
by Glencore to prepare the estimated cost of upgrading the Refinery back in 2006 – see Ex. R-0461.
[368] Ex. R-1853_002, p. 7.
[369] Ex. R-0505.
[370] Ex. R-0505, p. 1.
[371] Ex. R-0505, p. 1.

and/or the difficulty of finding contractors which are truly willing and able to accept such a large potential liability"[372].

357. **(iii.)** The other contractor on the Project, Technip, was likewise against continuing with the Project on an LSTK basis[373]:

> "[a]s of today considering the present world financial turmoil, the possible market modifications during 2009 and the schedule of the Project, [Technip] consider that it would not be advisable on this date to proceed with an EPC lump sum turnkey solution".

358. Having received all this information, the BofD discussed the alternatives and again postponed any decision[374].

359. In late 2008/early 2009[375], Reficar hired Independent Project Analysis Inc. ["**IPA**"], a consulting firm specializing in the evaluation of risk for large-scale projects, to review the Project, which resulted in a March 2009 report, which confirmed that at that time, a decision on the contract modality had not yet been made[376].

**3.    GLENCORE'S EXIT**

360. As the global financial crisis deepened towards the end of 2008, directly affecting the certainty of the financing for the Project[377], Glencore advised Reficar to continue with all the activities for the basic engineering as planned, but suspend the EPC work on the Project until the requisite funding was secured[378]. Ecopetrol disagreed, insisting that Glencore continue with the Project as it had been agreed, and not suspend the EPC phase[379]. Reficar began to study the possibility of continuing without Glencore[380]. Glencore warned that while suspending the Project would lead to delays, it "saw **no alternative** in the economic environment"[381].

361. As anticipated, in May 2009, Ecopetrol exercised its pre-emptive right and re-purchased the 51% stake held by Glencore in Reficar for USD 549 million[382]. Ecopetrol, thus, became the only shareholder of Reficar, a company now fully owned and controlled by the Republic of Colombia.

**4.    REFICAR'S BUDGET APPROVAL AND THE LOI**

362. An important meeting by Ecopetrol's BofD took place on October 9, 2009, when the Project was officially green-lighted with a total budget set at USD 3.777 billion

---

[372] Ex. R-0505, p. 1.
[373] Ex. R-0503.
[374] Ex. R-0476, pp. 10-12.
[375] Ex. C-0316, p. 1.
[376] Ex. R-2994, p. 20.
[377] Ex. C-0936, p .1.
[378] Ex. R-1837, pp. 4-5.
[379] Ex. R-1837, p. 10.
[380] Ex. R-1837, p. 8.
[381] Ex. R-1837, p. 5.
[382] Ex. R-0024, p. 3; Ex. R-0038, p. 15.

ICC Case 21747 RD/MK/PDP
Final Award

+/- 10%[383] and Ecopetrol accepted to act as guarantor for the financing to be granted to its affiliate Reficar[384].

363. Reficar's BofD followed in the footsteps: on October 20, 2009, it approved the budget for the <u>EPC costs</u> of <u>USD 2.789 billion</u> +/- 10%[385]. The total budget reached USD 3.777 billion (the same number previously agreed by Ecopetrol's BofD), resulting from EPC costs plus escalation, contingency, owner costs and sunk costs[386]:

| COMPONENTE | MUSD$ |
|---|---|
| Ingeniería detallada | 350 |
| Procura | 1.426 |
| Construcción | 1.013 |
| **Total EPC** | **2.789** |
| Escalación | 117 |
| Contingencia | 167 |
| Costos del dueño | 367 |
| **Subtotal** | **651** |
| **Total por gastar** | **3.440** |
| Gastado (costos hundidos) | 337 |
| **COSTO TOTAL PROYECTO** | **3.777** |
| Nivel de Precisión del Estimado | ±10% |

The LOI

364. Ecopetrol's and Reficar's BofDs had thus approved the budget for the EPC Contract and for the Project, but the decision on the contract modality for the EPC contract was still outstanding.

365. Reficar's doubt finally ended on November 10, 2009, when it took the decision to contract on an RC basis, with CB&I acting as contractor[387]. On that date Reficar and CB&I entered into a LOI[388], which contained the key commercial terms and interim provisions while the Parties negotiated in good faith towards the final RC based EPC Contract[389].

366. Two weeks after signature of the LOI, in its meeting of November 24, 2009 Reficar's BofD was informed of and did not object to the LOI[390] – implying its agreement to a cost-reimbursable EPC Contract.

---

[383] Ex. R-1848, pp. 14, 17.
[384] Ex. R-1848, p. 17.
[385] Ex. R-3708, p. 10 in conjunction with Ex. R-1853_0054, p. 3.
[386] Ex. R-1853_0054, p. 3.
[387] RFA Ex. 30, p. 4: "The following agreed Key Commercial Principles will be used as the basis for preparation of a <u>Cost Reimbursable EPC Contract</u> for the Cartagena Refinery Expansion Project" [Emphasis added].
[388] RFA Ex. 30.
[389] Ex. R-0047 (Ex. C-0037).
[390] See Ex. R 1853 (Contraloría File)\Contraloría\CARPETA PRINCIPAL 1\Actas Directiva R1-77\Acta No. 48 (unnumbered), p. 3: "[*Felipe Castilla*] [*i*]*nformó que el 10 de noviembre se suscribió una carta de*

367. After the signing of the LOI, no more discussions may be found in the record of a possibility of going back to the LSTK contract pricing structure.

368. A week after entering into the LOI, CB&I announced that it had been awarded a USD 1.4 billion reimbursable EPC contract for the Refinery Project[391].

### Change to single contractor

369. An important part of the changes brought about by the November 2009 LOI, signed only with CB&I, was that from that moment on, the Project continued with CB&I as the only contractor on the Project. Technip, who had developed the July 2009 Estimate together with CB&I, was terminated by Reficar on December 28, 2009[392].

### Foster Wheeler

370. At around the same time, on November 19, 2009 Reficar hired Foster Wheeler Consultants Inc. [previously defined as "**Foster Wheeler**"] as Project Management Consultant[393]. Foster Wheeler was an old acquaintance of Ecopetrol's: it had already verified some of CB&I's estimates[394] and was involved in Ecopetrol's other refinery[395].

## 5.    CBI'S COST ESTIMATES

371. One of the main conditions for a successful CR contract is to have an accurate cost estimate prior to the signing. Such an estimate serves as the baseline for the decision to enter into the contract, and for the management of costs during execution.

372. In the previous section, the Tribunal has explained that in September/October 2009 the BofDs of Ecopetrol and Reficar approved their own budgets for the EPC contract of USD 2.789 billion +/-10% (the total Project was budgeted at USD 3.777 billion).

373. But Ecopetrol/Reficar was not the only party preparing budgets. CB&I did likewise. The EPC Contract which Reficar and CB&I would eventually enter into, included the concept of a **Final Full Estimate,** defined as an estimate which meets the Class II +/-10% accuracy requirements[396].

374. In anticipation of this contractual obligation, CB&I prepared a **July 2009 Estimate (C.)** and a **February 2010 Estimate Revision (D.),** preceded by numerous preliminary cost estimates (**B.**). Before analysing these Estimates, the Tribunal must address certain issues (**A.**).

---

*intención por parte de la Sociedad y aceptada por CBI* […] *Sobre este tema, igualmente se manifestó que los nuevos contratos se están estructurando como "reembolsables"* […]."
[391] Ex. C-1924, p. 5.
[392] Ex. R-0049, p. 1.
[393] Ex. R-0822; Ex. R-0534, p. 43. There was also a contract with Process Consultants Inc. Bogotá – Foster Wheeler's Colombian subsidiary and joint venture partner on the Project.
[394] Ex. R-0494, pp. 8-10; Ex. B-042, p. 29.
[395] Ex. C-0173; Ex. C-0398, p. 2.
[396] JX-002, p. 165; JX-004, p. 151.

## A.  Preliminary issues

375. There are three issues to be addressed[397]; the methodology used to elaborate the estimate (**a.**), the accuracy of the estimate (**b.**) and the productivity factor underlying the estimate (**c.**).

### a.  Methodology

376. A crucial element of any estimate by a constructor is the methodology that serves as its basis. Constructors typically prepare memoranda, for the benefit of the owner, explaining how they produce their cost estimates. CB&I did likewise: on January 30, 2009 it issued its Guidelines on Cost Estimate Classification System, with the purpose

> "[t]o provide the descriptions of the CB&I Cost Estimate System classes as provided by AACE International (American Association of Cost Engineers)"[398].

This means that CB&I had adopted the Cost Estimate Classification System provided by AACE International.

377. The AACE is a widely respected body in the domain of engineering, as acknowledged by CB&I[399]. It has developed a classification of cost estimates, whose Class number (1 through 5, or I – V in Roman numbers, which are used interchangeably) is based on the degree of project definition and the expected accuracy range. CB&I was to deliver an AACE Class II[400] estimate, meaning one based on a certain maturity of the engineering deliverables and with an accuracy level within a specified range[401].

### b.  Accuracy level

378. The second key element of the Final Full Estimate is its accuracy level. The Parties agreed that the Final Full Estimate to be prepared by CB&I must be within +/-10% accuracy. This understanding was not formalized in the EPC Contract, but rather in the draft **Execution Masterplan**[402] prepared by Reficar and its consultant and shared with CB&I on September 19, 2008[403]; in January 2009, CB&I issued the final version of the Execution Masterplan reiterating this assumption[404].

---

[397] The Tribunal notes that another requirement for the Final Full Estimate was that it would be at P80, meaning the risk of the estimate number exceeding the predicted costs was supposed to be limited to 20%. While Reficar mentions this requirement, it does not develop its argument on this characteristic of the estimate.

[398] Ex. C-0382, p. 2.

[399] Ex. C-0382, p. 2.

[400] The Tribunal notes that some of the evidence on file refers to "Class II" estimates (in Roman numerals); these are harmonized to reflect the convention of the Arabic numerals 1-5, rather than the Roman I-V, as used by the AACE. See ex. R-1985, p. 3.

[401] This range being between +5% to +20% and between -15% to -5%.

[402] The Tribunal notes that various Project plan documents were involved in the Project; for ease of reference; the current document is Ex. C-0024; other project plan documents will be referred to using different terminology.

[403] Ex. R-0641, p. 28.

[404] Ex. C-0024, pp 13-14, p. 35, p. 106.

379. CB&I's obligation to deliver an estimate with an accuracy of +/-10% is confirmed by numerous other sources:

- During the Hearing, both CB&I's lead estimator, Kris Gachassin[405] and CB&I's expert, David Millican[406], admitted that CB&I was aware that a Class 2 cost estimate within +/-10% accuracy was required for Reficar as a basis for its financing of the Project;

- The report by IPA, a consulting firm specializing in the evaluation of risk for large-scale projects, from March 2009, listed "a cost estimate accurate to within perhaps +/-10%" as one of the key products of the FEED phase[407];

- CB&I acknowledged in a Steering Committee meeting on May 19, 2009 that it would provide a +/-10% estimate[408].

**c.  Productivity factor**

380. Another relevant element of cost estimates is the productivity factor which underlies the calculations. The craft productivity multipliers determine how quickly work is expected to be performed. The ratio for the productivity multipliers is based on the US Gulf Coast work hours, *i.e.*, how long it would take the workers on-site in Cartagena to perform the same amount of work as workers on the US Gulf Coast[409].

381. The discussion on the appropriate craft productivity multipliers dates back to early 2007, when CB&I was trying to convince Reficar to enter into the Project Definition Contract. It was then that CB&I represented to Reficar that it had experience with direct-hire construction in Colombia[410].

382. The Parties now argue on who was responsible for estimating the productivity factors, which, in the course of the Project, turned out to have been understated.

**B.  Preliminary cost estimates**

383. The Tribunal will now briefly address these preliminary cost estimates, which were prepared by CB&I under the two contracting modalities, at a time when Reficar was pondering which of the two to choose.

**a.  LSTK pricing**

384. In May 2008 CB&I presented its first own cost estimate for the Project. With +23/-11.5% accuracy it estimated the cost of the Project at between USD 3.45 billion and USD 4.8 billion, with a reference point of USD 3.9 billion[411].

---

[405] Tr. 2646:15-2648:8.
[406] Tr. 5305:14-5306:7; Mr. Milican testified to Mr. Deidehban's words on this and agreed that the estimate was required to meet the AACE requirements.
[407] Ex. R-2994, p. 86.
[408] Ex. C-0173, p. 2.
[409] Ex. C-0041, p. 22, Hillier ER, Section B, at B6.2.
[410] Ex. R-0477, p. 2.
[411] Ex. R-0484, pp. 3-4.

385. One month thereafter CB&I together with Technip revised the May 2008 estimate to account for further Project scope reductions and other design parameter changes, leading to a +23/-11.5% accuracy estimate between USD 3.15 billion and USD 4.3 billion, with a lower reference value of USD 3.522 billion[412]. In an email of July 20, 2008, CB&I presented a preliminary cost estimate amounting to USD 3.518 billion[413]. By November 21, 2008, CB&I's last LSTK estimate, had increased to USD 4.561 billion[414].

386. Meanwhile, Reficar had retained Pathfinder to help control the estimating process. Pathfinder had even sent a team of four persons to CB&I Houston Office to become familiar with the work process[415]; ultimately, Pathfinder would provide a detailed analysis of the numbers and methodology of CB&I's November 2008 estimate, the first one prepared on the basis of RC pricing[416].

**b.    RC pricing**

387. This first RC cost estimate was provided on November 17, 2008, and was set at USD 3.654 billion (+/-15%)[417]. On December 12, 2008, CB&I issued a revised cost estimate which decreased the reference value from USD 3.654 billion to USD 3.421 billion, excluding escalation, contingency and owner's costs[418].

388. On January 7, 2009, Reficar requested meetings to reduce the Project budget because the conditions for obtaining financing were deteriorating[419]. These **"Value Engineering Meetings"** hosted by CB&I in Houston were held on January 12-20, 2009[420] and resulted in a set of changes to the Project agreed on March 10, 2009, which amounted to savings of USD 125 million[421].

389. A few days thereafter, on January 29, 2009, CB&I issued the Execution Masterplan; which addressed a key issue for the upcoming Final Full Estimate: the appropriate productivity factor for the construction should be a multiplier in the 1.6 to 1.7 range vs. US Gulf Coast standard[422]. This multiplier would be achieved by

> "increasing the rate of supervision for each crew and assuring the materials, drawings and tools needed to perform the work are available according to the plan"[423].

---

[412] Ex. R-0486, pp. 4-5.
[413] Ex. C-0017.
[414] Ex. C-0018, p. 2.
[415] Ex. R-0029, p. 5.
[416] Ex. R-0029.
[417] Ex. R-0028 p. 6; Respondents' Combined Chronology, p. 13; Ex. R-0029, p. 8.
[418] Ex. C-0395.
[419] Ex. R-0020.
[420] Ex. R-0513.
[421] Ex. R-0514, p. 2.
[422] Ex. C-0024, p. 18.
[423] Ex. C-0024, p. 46.

390.  In March 2009, Reficar's consultant IPA delivered a report in which it analysed the CB&I November 2008 cost estimate[424]. IPA also made a presentation in which it accepted average productivity in Colombia as 1.7 the US Golf Coast rate[425].

391.  On April 6, 2009, CB&I issued Revision 2 of the Project Execution Strategy, which foresaw a total cost of USD 3.4 billion[426].

## C.  The July 2009 Estimate

392.  CB&I had, by mid-2009, presented a total of five preliminary cost estimates and was intimately familiar with the Project, as it was responsible for the vast majority of the FEED work. These estimating exercises, however, still did not meet the Class II AACE +/-10% accuracy requirements, which was required of the Final Full Estimate.

393.  The first estimate, which (at least, at face value) mentioned being Class II AACE +/-10% accuracy, was provided on July 31, 2009. CB&I and Technip completed the July 2009 Estimate, which came to USD 3.495 billion[427], was labelled "Class 2 (+/-10%)"[428], and covered the EPC Contract, without owner's costs, escalation and contingency[429]. CB&I presented the Estimate to Reficar on August 3, 2009[430] together with a breakdown of the methodology behind the calculations[431] and a slip of the estimate on a unit-by-unit basis[432].

394.  The July 2009 Estimate contains a blended productivity factor of 1.86 for greenfield work (the parts of the Project that were to be newly built), with brownfield work (modernization work done on already existing parts of the Refinery) being given 15% to 50% mark-ups[433].

      [The Parties now dispute whether this estimate actually met the required standards of a Class 2 with +/-10% accuracy. Reficar argues that the July 2009 Estimate was not and could not have met the requirements of an AACE Class 2 +/10% estimate, while CB&I avers that the Estimate was in fact compliant with those requirements].

Review by Foster Wheeler and Cost Reduction Workshops

395.  CB&I's July 2009 Estimate was too high for Reficar, who was looking for a significantly reduced cost. Reficar instructed Foster Wheeler to review CB&I's July

---

[424] Ex. R-2994, pp. 31-40.
[425] Ex. R-3662, p. 85.
[426] Ex.  C-0396, p. 4; R-0618.The Tribunal notes minor discrepancies between the two documents despite them being the same revision of the document but these discrepancies do not have an impact on the analysis.
[427] Ex. R-0524, p. 231.
[428] Exs. R-0033, p. 1; C-0748; C-0400, p. 2.
[429] Ex. R-0033, p. 6.
[430] Ex. R-0524.
[431] Ex. R-0033.
[432] Ex. R-0525.
[433] Ex. R-0033, para. 8.1 at p. 19.

2009 Estimate, which Foster Wheeler did on August 14, 2009, reducing CB&I's calculation by USD 0.25 billion to USD 3.229 billion[434].

396. Furthermore, Reficar invited CB&I to participate in a series of Cost-Reduction Workshops ["**CRWs**"], with the aim of identifying potential changes to the scope, and other improvements that would reduce the cost, such as changes in the assumed productivity multipliers[435]. The Parties met on August 5, 2009, and in the meeting Reficar stated that it was looking at potential cost savings opportunities to "tighten the number" and "get the numbers down to a manageable level"[436].

397. At one of the meetings, discussions arose as to possible reductions in the productivity multipliers (*i.e.*, assuming an increased productivity of Colombian workers); CB&I, however, noted that this assumption was overly optimistic, and Foster Wheeler concurred that the productivity in Colombia was not very good[437].

398. The CRWs continued through the rest of August and then September.

Synergy Changes

399. Additionally, upon Glencore's exit from the Project in May 2009, Ecopetrol began looking into other scope changes which would allow for an optimization of synergies with:

- Ecopetrol's other refinery in Colombia[438], which was also undergoing major changes[439], and

- A company owned by Ecopetrol, which was the main producer of polypropylene in Colombia[440].

400. The potential synergies were finally narrowed down to the deferral or deletion of certain units (mostly gasoline-producing upgrades) and the expansion of others [the "**Synergy Changes**"; the Parties frequently refer to the main aspect of the Synergy Changes as "Case 1.3.7"][441].

401. The Synergy Changes evolved between July 2009 and June 2010. The evolution, with a certain degree of simplification to avoid technical details, can be categorized as follows[442]:

- The base case from July 2009: low investment deferral scope[443];

---

[434] Ex. B-042, p. 29.
[435] Chinchilla CWS, paras. 16-23.
[436] Ex. C-0401, p. 1.
[437] Ex. R-0545, p. 2.
[438] Ex. C-0399, p. 2; Ex. R-0515, p. 14.
[439] Ex. C-0398, p. 3; Ex. C-0173, p. 2.
[440] Ex. R-0516, p. 189; Ex. R-0549, p. 12.
[441] Ex. C-0399, p. 46; Ex. R-0518, p. 4; Ex. C-0398, p. 3.
[442] WMC ER, paras. 447-459.
[443] Ex. B-041 does not mention the turboexpander, which implies that at that point it was supposed to be deleted.

- The October 2009 case: base case plus Maximum Propylene[444];

- The January 2010 case: base case plus Maximum Propylene plus Full Burn FCC[445]; and

- The June 2010 case: base case plus Maximum Propylene plus Full Burn FCC plus FCC Power Recovery[446].

July 2009 Estimate, Revision 1

402. On September 3, 2009, as a result of the CRWs, CB&I presented Revision 1 to the July 2009 Estimate, which identified USD 235 million in potential savings related to the CRWs[447]. The estimated EPC costs were now USD 2.899 billion[448]. But, upon further studies, on September 24, 2009 the estimate was lifted to a total EPC cost value of USD 2.989 billion[449].

Budget approval by Reficar

403. *Pro memoria*: in October 2009, the BofDs of Ecopetrol and Reficar approved the budget for the EPC Contract in an amount of USD 3.777 billion, with USD 2.789 billion[450] for EPC costs only (excluding Owner's costs, escalation, contingency and sunk costs). This fell USD 200 million short of the July 2009 Estimate, Revision 1 prepared by the contractor at the end of September 2009, with EPC costs at USD 2.989 billion[451].

404. There is no information in the file explaining how Reficar intended to achieve this necessary USD 200 million cost reduction.

**D.    The February 2010 Estimate**

405. In the meantime, the final design of the Project was being developed. On December 15, 2009, CB&I finally reported that FEED was now 100% complete[452], permitting the preparation of the final estimate.

> [However, further design changes were later introduced by Reficar to certain units on the Project as part of the ongoing Synergy Changes; meaning that the accuracy of estimations for those units would not be at possible at the agreed level.]

406. On February 28, 2010, CB&I produced its Revision 2 – Final Estimate Scope to the July 2009 Estimate[453] [the "**February 2010 Estimate**"][454]. This estimate was made,

---

[444] WMC ER, paras. 453-456.
[445] WMC ER, para. 457.
[446] WMC ER, paras. 458-463.
[447] Ex. C-0032, p. 64.
[448] Ex. C-0032, p. 52.
[449] Ex. R-3444, p. 3, Houtz CWS, para. 122.
[450] Ex. R-1848, pp. 14, 17; Ex. R-3708, p. 10 in conjunction with Ex. R-1853_0054, p. 3.
[451] Ex. R-3444, p. 3.
[452] Ex. C-0009, p. 15 (Ex. R-0555).
[453] Ex. C-0041 (Ex. R-0546), p. 2.
[454] As a threshold matter, on the basis that the document is named "31 July 2009 Class [2] (+/-10%) Revision 2 – Final Estimate Scope February 28, 2010", the Tribunal shall refer to the document as the **February**

for the first time, without the participation of Technip. It forecast that the EPC Contract would cost <u>USD 3.150 billion</u>[455], including escalation and contingency[456] – this is a major difference from the previous estimates, which did not account for escalation or contingency costs.

407. The February 2010 Estimate constitutes a revision of the July 2009 Estimate, and incorporates the following changes[457]:

- late adds, deletes and changes, which were explicitly labelled as **ROM** or **Rough Order of Magnitude**

  [According to the AACE Guidelines from 2005, Order of Magnitude estimates typically mean an accuracy range of -30/+50%[458] although different ranges are acceptable; CB&I used a +/-50% range as ROM on the Project[459].];

- reductions identified in the CRWs;

- modifications caused by the Synergy Changes[460];

408. The Estimate states explicitly that it is based on the scope of work of the July 2009 Estimate and that it remained the same except for the changes listed above[461].

409. The February 2010 Estimate Revision uses a 1.66 productivity multiplier for a majority of the works to be performed in the greenfield area of the Project[462]. The brownfield work was given a 15% to 50% mark-up to account for the interruptions[463].

  [Reficar argues that the February 2010 Estimate, increased by USD 115 million addition due to the Synergy Changes, was later incorporated into the EPC Agreement as the "Final Full Estimate", as Appendix IV to Section III[464]; however, CB&I disputes this and the Contract received by the Tribunal is empty in the section where the Final Full Estimate should be situated[465].]

---

**2010 Estimate** taking into account that multiple documents in the record have revisions, and they are always referred to by the Parties under their original iteration's name.
[455] Ex. C-0041, p. 50.
[456] Ex. C-0041, p. 9.
[457] Ex. C-0041, pp. 7-8.
[458] Ex. R-1985, pp. 4 [ANSI Standard Reference].
[459] Tr. 2656:6-19.
[460] The scope was defined as "No NHT/CCR, Full FCC Scope less Turbo Expander, Install Butamer and Alkylation Units, No Benzout Unit, Associated reductions in utility and supports systems - No redesign"; see Ex. C-0041, p. 8. This implies that the Synergy Changes were incorporated as of their initial, July 2009 case.
[461] Ex. C-0041, p. 8.
[462] Ex. C-0041, p. 22.
[463] Ex. C-0041, pp. 22-23.
[464] JX-002, p. 165; JX-004, p. 151. This was also the nomenclature used when referring to the February 2010 Estimate during the Hearing.
[465] See JX-006; Appendix 3 ends at p. 609 and immediately after, at p. 610, Appendix 5 begins.

A cost reduction and a cost increase

410. On April 8, 2010, Reficar wrote to CB&I stating that the February 2010 Estimate resulted in total costs that exceeded the approved October 2009 budget by some USD 77 million:

- in accordance with the budget, the EPC Contract was expected to cost USD 2.789 billion, plus escalation of USD 117 million and contingency of USD 167 million (total USD 3.073 billion);

- while the February 2010 Estimate was USD 3.150 billion

and asked for an appropriate reduction[466]. CB&I responded on April 26, 2010, offering an explanation of the differences in numbers[467].

411. Eventually Reficar's budget for the EPC Agreements was increased to USD 3.106 billion[468], with the difference coming down from USD 76 million to USD 46 million.

412. But this was not the end of the story: over the months of March and April 2010, CB&I issued a number of Budget Revision Notices ["**BRNs**"] caused by Synergy Changes and certain other design changes, which modified the final design, and in turn increased the final estimate by USD 115 million to USD 3.221 billion[469].

CB&I's confirmation

413. On April 30, 2010, Reficar again reached out to CB&I, with a number of questions about the February 2010 Estimate, including its accuracy and the productivity factor used[470]. In an email from May 5, 2010, CB&I:

- Confirmed that the accuracy level of the February 2010 Estimate was +/- 10%[471],

- Confirmed that it had included in the February 2010 Estimate the scope of work of the Synergy Changes "limited to the July 31st 2009 basis with the deletion of the turbo expander"[472],

- Affirmed that the productivity factor used in the July 2009 Estimate was accurate, but the reduction in the multiplier resulted from cost-savings exercises performed by Reficar, and this reduction led to craft productivity being identified as one of the

---

[466] Ex. C-0042, p. 2.
[467] Ex. C-0031, p. 4.
[468] Ex. R-0605 p. 12.
[469] Ex. C-0043.
[470] Ex. C-0314, p. 3.
[471] Ex. R-0027, p. 4 (Ex. C-315).
[472] Ex. R-0027, p. 2.

ICC Case 21747 RD/MK/PDP
Final Award

"largest risk areas associated with the cost reduction efforts and <u>was based on feedback from Reficar / ECOPETROL's work history is the most optimistic outcome in regards to productivity</u>"[473] [Emphasis added].

[Reficar argues that the February 2010 Estimate did not meet the AACE Class 2 +/-10% requirements and CB&I agrees, but avers that the Estimate was never represented as compliant with such requirements.]

## 6. CBI'S WORK SCHEDULE

414. Cost estimates and work schedule were the two main issues discussed before the signature of the EPC Contract. So far, this Award has focused on cost estimates but will now turn to the work schedule.

415. The detail and accuracy of a work schedule is measured against standards and definitions provided, again, by the AACE, which are categorised by levels.

Level 3

416. A Level 3 Schedule represents individual work tasks, which summarize project activities and deliverables with enough detail to manage work at the foreman level[474]. A Level 3 Schedule was intended to be resource-loaded, *i.e.*, linked to the data underlying the Final Full Estimate for the Project[475].

417. Reficar made it clear to CB&I from as early as the Project Definition Contract of 2007 that a Level 3 Resource Loaded Schedule would be key to Reficar's decision on proceeding with the final EPC agreement: the Project Execution Plan mentioned a "Level 3 Resource Loaded Schedule"[476] and a Level 3 Schedule was also part of the Tender Deliverables[477].

418. CB&I accepted this requirement and on April 22, 2008, when it issued an Execution Plan for Basic Engineering and Definition Phase, it stated that it would provide a Level 3 Schedule during the Basic Engineering Phase as part of the EPC Execution Plan[478].

419. The importance of the Level 3 Resource Loaded Schedule was reiterated in the final version of the Execution Masterplan issued by CB&I, which mentioned that[479]:

"The CBI/ Technip and KBR schedulers will prepare a Level 3 CPM schedule for Reimbursable Phase Engineering of the Project, with the full participation and buy-in of all internal projects. CBI will be responsible to

---

[473] Ex. R-0027, p. 5 (Ex. C-0315).
[474] Ex. C-0384 at p. 62 (source p. 61).
[475] See e.g. Dr. Warhoe's explanation at Tr. 4759:11-17: "And then, taking the resources, the manpower and the quantities, and inserting those in the schedule to resource load, what's referred to as resource loading the schedule, which would show all parties what the planning was in terms of manpower from week to week, month to month, and also quantities; see also Mr. Deidehban's agreement with such definition at Tr. 923:1-7.
[476] Ex. R-0010, Schedule 3, para. 4.0 C.1, p. 89.
[477] Ex. R-0010, Schedule 3, para. 5.0 B.1, p. 89.
[478] Ex. C-0391, p. 14.
[479] Ex. C-0024, p. 115.

prepare a fully integrated Level 3 EPC schedule as part of its Reimbursable Phase Engineering deliverables. This schedule will define and work load detail engineering's design activities".

The April 2010 Schedule

420. On March 3, 2010, Reficar notified CB&I that it was in breach of its obligation to provide a Level 3 Schedule[480].

421. Soon thereafter, on March 25, 2010, CB&I delivered a preliminary Level 3 Schedule[481], which Reficar rebutted as incomplete[482]. But CB&I assuaged Reficar saying that its comments to the Level 3 Schedule had "either been incorporated or [did] not have an impact on the mechanical completion date"[483]. Reficar did not ask for further clarifications.

422. This modified schedule, called the April 2010 Schedule, set February 28, 2013 as the guaranteed mechanical completion date and was the last work schedule exchanged before the signature of the EPC Contract. The Parties agreed that the final Schedule would not be attached to the EPC Contract[484]; instead CB&I assumed the obligation to deliver a finalized Level 3 Schedule to Reficar within 90 days after the execution[485].

423. CB&I complied with its undertaking and the definitive baseline is referred to as the October 2010 Re-Baseline Schedule[486] and was delivered after the EPC Contract had been signed. Importantly, the October 2010 Re-Baseline Schedule also set the guaranteed completion date for February 28, 2013[487].

> [Reficar argues that the April 2010 Schedule was not a Class 3 Resource Loaded Schedule and CB&I avers that it was fully compliant with such requirements and that, in any event, this schedule was not relevant for the Reficar's decision to enter into the EPC Agreement.]

## 7. EXECUTION OF THE EPC CONTRACT

424. After intense negotiations[488] following the signing of the LOI, on May 10, 2010 the Parties agreed on the principal terms of the EPC contract in a Baseline Agreement and Negotiated Terms and Conditions[489].

425. On May 25, 2010, Reficar's BofD met to discuss whether to authorize the EPC Contract. Management presented an internal document, which acknowledged that the final estimate for the EPC Contract was the addition of two elements:

---

[480] Ex. C-0409.
[481] Ex. C-1741.
[482] Ex. C-0050.
[483] Ex. C-0051, p. 1.
[484] Ex. C-0057, p. 12.
[485] JX-002, pp. 469-471; JX-004, pp. 444-446 (Project Controls Exécution Plan, Section 6.5.3).
[486] Ex. C-0058, pp. 15-21, 73.
[487] Ex. C-0058, p. 73.
[488] See Exs. R-0569, R-0573, R-0574, R-0575.
[489] JX-001.

- USD 3.106 billion, an amount different from the February 2010 Estimate by some USD 44 million, plus

- USD 115 million, resulting from the BRN's issued by CB&I after the February 2010 Estimate, to include new Synergy Changes requested by Reficar, giving a total of <u>USD 3.221 billion</u>.[490]

426. The BofD granted its formal approval for Reficar to enter into the EPC Agreement[491]:

> "[La] *Junta Directiva* [...] *autorizó de manera unánime al representante legal de la sociedad a suscribir los contratos de ingeniería, procura y construcción para el proyecto de ampliación y modernización de la refinería de Cartagena, con las compañías CB&I UK Limited y CBI Colombiana S.A. según corresponda, al igual que todos los documentos relacionados o que se deriven de dichos contratos, <u>teniendo en cuenta como cifra máxima de negociación para el referido presupuesto estimado del proyecto la suma de US$3.221 millones</u>*". [Emphasis added]

427. On June 1, 2010, CB&I issued Revision 3 to the Project Execution Plan, which contained a statement that, in due course of the Tribunal's analysis, will become very relevant for these proceedings:

> "even though a reimbursable contract, <u>CB&I project management will rigorously control cost and schedule similar to a lump sum contract, safeguarding Reficar resources as if their own</u>"[492]. [Emphasis added]

428. This was the latest Project Execution Plan version at the moment of the signing of the EPC Agreement. This Plan was eventually incorporated into the EPC Contracts, as an Annex both to the Onshore and to the Offshore Agreements and thus CB&I's commitment to rigorously control costs and to safeguard Reficar's resources became a contractual undertaking.

<u>Execution</u>

429. Two weeks later, on June 15, 2010, Reficar and the CB&I entities entered into six agreements collectively known as the final EPC Contracts. These agreements are as follows:

- The Onshore Contract between Reficar and CB&I Colombiana for work (mainly construction) performed by CBI Colombiana[493],

---

[490] Ex. R-0605, p. 12.
[491] Ex. C-0044, p. 4 translation into English at p. 12:
"[t]he Board the Board of Directors [...] authorized the Company's legal representative to sign the engineering, procurement and construction contracts for the Cartagena Refinery expansion and modernization project with the companies CB&I UK Limited and CBI Colombiana S.A. as appropriate, together with all documents related to or arising from said contracts, taking as a maximum negotiating figure for the said estimated budget of the project the sum of USD 3,221 m".
[492] Ex. C-0055, p. 4.
[493] JX-002; JX-003; JX-006.

- The Offshore Contract between Reficar and CB&I UK for design, engineering, procurement and other work performed by CB&I UK primarily outside of Colombia[494],

- The Coordination Agreement executed by Reficar, CB&I UK and CB&I Colombiana[495],

- The Dispute Resolution Agreement between Reficar and CB&I UK, CBI Colombiana, CB&I, N.V.[496],

- The Onshore Parent Guarantee[497],

- The Offshore Parent Guarantee[498].

430. The EPC Contract is a very long, detailed and complex agreement. But for present purposes, the relevant provision are the scope of work (**A.**), compensation owed to the Contractor (**B.**), Final Full Estimate (**C.**), Cost Control Commitments (**D.**), Work Schedule (**E.**) and the limitation of Contractor's liability (**F.**).

## A.    Scope of work

431. The purpose of the EPC Contract was for CB&I to modernize and expand the Cartagena Refinery[499], using as a basis the initial engineering prepared under the Project Definition Contract, and proceeding onto the detailed engineering, procurement and construction stage of the Project.

432. Thus, the scope of the work under the EPC Contract is for CB&I to

"engineer, procure, construct, up to Mechanical Completion of the Plant in Cartagena, Colombia. Additionally, to support pre-commissioning, commissioning, start-up and performance test, activities to lead by [Reficar]"[500].

## B.    Compensation

433. The EPC Agreement, as it is cost-reimbursable, does not set a Contract Price[501]; instead, TC 58.1.1 states that such price shall be constituted by the total amount payable[502]:

"58.1.1 […] As a result of the cost-reimbursable nature of this Agreement, this Agreement is of an indeterminate value […] The actual value of this Agreement, as at the date of Liquidation, shall be determined by adding together the value of all amounts which the Contractor has been paid, or is

---

[494] JX-004; JX-005; JX-006.
[495] JX-007, pdf pp. 29-44.
[496] JX-007, pdf pp. 3-27.
[497] JX-008, pdf pp. 1-16.
[498] JX-008, pdf pp. 17-32.
[499] See Ex. R-0010, pp. 2, 5.
[500] JX-006, p. 9.
[501] Section I Agreement, TC 3 "Compensation"; JX-002, p. 15; JX-004, p. 15.
[502] JX-002, p. 235; JX-004, pp. 211-212.

> entitled to be paid, in each case in accordance with Section IV Appendix II."
> [Emphasis added]

434. The compensation to be achieved by CB&I was not based on any percentage, as is frequent in other EPC contracts. Instead, payments to CB&I were set using three major mechanisms:

- reimbursement of reasonable and proper costs undertaken in accordance with the Contract on the basis of monthly invoices (**a.**);

- a Contractor's Fixed Fee of a total of USD 175.75 million (**b.**);

- and potential bonuses (**c.**);

- CB&I also had other means of achieving profits (**d.**).

**a.**    **Reimbursement for specific costs**

435. CB&I would be reimbursed for the costs undertaken on a cost reimbursable basis in the execution of the EPC Agreement. These payments would not constitute a source of profit for CB&I under TC 58.1.1, but rather, they were to cover CB&I's expenses on the Project, given its cost-reimbursable nature[503]:

> "58.1.1 In consideration of the performance by the Contractor of the Work under this Agreement, subject to the provisions of this TC58, the Contractor shall be entitled (i) to invoice and receive the Contractor's Fixed Fee, and (ii) to invoice and receive the amounts incurred with respect to its reimbursable costs, in each case in accordance with Section IV Appendix II". [Emphasis added]

436. The costs to be reimbursed were strictly limited pursuant to the provisions under Section I of the Onshore and Offshore Agreements

> "Only costs which are incurred by the Contractor in accordance with this Agreement in carrying out the Work shall be paid by the Owner"[504]. [Emphasis added]

and Appendix I on Contrator's Fixed Fee, Rates and Management Fee under Section IV on Pricing of the Onshore[505] and Offshore[506] Agreements:

> "In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis […] and the amount payable shall be the Contract Price. Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner". [Emphasis added]

---

[503] JX-002, p. 235; JX-004, pp. 211-212.
[504] Section I Agreement, TC 3 "Compensation"; JX-002, p. 15; JX-004, p. 15.
[505] JX-003, p. 3.
[506] JX-005, p. 3.

**b.**    **CB&I's fixed fee**

437.  CB&I was to earn a fee at an amount not subject to fluctuations[507] pursuant to TC 58.1.1[508]:

> "58.1.1 In consideration of the performance by the Contractor of the Work under this Agreement, subject to the provisions of this TC58, the Contractor shall be entitled (i) to invoice and receive the Contractor's Fixed Fee [...]". [Emphasis added]

and Section IV of the Onshore Agreement[509]:

> "2.1 The Contractor's Fixed Fee is the sum of one hundred and four million Dollars (US$104,000,000) and ten million, two hundred and thirty seven thousand five hundred Dollars (US$10,237,500), the two amounts when combined represent the Contractor's profit and compensation for the performance of the Work".

and the corresponding provisions of Section IV of the Offshore Agreement[510]:

> "2.1 The Contractor's Fixed Fee is the sum of fifty six million Dollars (US$56,000,000) and five million, five hundred and twelve thousand five hundred Dollars (US$5,512,500), the two amounts when combined represent the Contractor's profit and compensation for the performance of the Work."

438.  Thus, CB&I's fixed fee under both Contracts was set at a total of USD 175.75 million, which was to be paid in instalments as the Project progressed. This money would constitute CB&I's revenue, in contrast to the reimbursable costs, which did not allow CB&I to make profits.

**c.**    **Potential bonuses**

439.  CB&I was entitled to additional payments on a bonus basis if it managed to achieve certain parameters during the performance of the Contract. The payment of all bonuses would only be made after CB&I complied with and discharged all of its obligations[511] under the Contract[512].

Cost bonuses

440.  The cost bonuses allowed CB&I to earn up to three additional fees, provided that

-    the actual Project costs were lower than

---

[507] Apart from slight annual adjustments for inflation as per TC 58.1.2.
[508] TC 58, JX-002, p. 235; JX-004, pp. 211-212.
[509] JX-003, p. 3.
[510] JX-005, p. 3.
[511] Other than defect warranty obligations.
[512] TC 58.13.11, JX-002, p. 239; JX-004, p. 215.

ICC Case 21747 RD/MK/PDP
Final Award

- USD 3.221 billion – a quantity defined in the Contract as "Bonus Target Costs", which corresponds to the budget approved by Reficar's BofD when it approved the Project[513].

441. The cost bonuses can be broken down to three categories:

- A fixed fee of USD 15.75 million if CB&I achieved Mechanical Completion below the Bonus Target Cost[514];

- 30% of the difference between the Bonus Target Cost and the actual costs incurred on the Project (*i.e.*, 30% of the Project cost "savings")[515];

- A Management Fee, to which CB&I was entitled under certain circumstances if it did not qualify for either of the two previous bonus categories[516].

HSE Bonus

442. CB&I was also entitled to a Health and Security bonus if it reached targets for Project security, *i.e.*, a low number of accidents and no fatalities[517].

443. The Cost Bonus and HSE Bonus were together capped at a joint value of USD 29.25 million and could not exceed that limit[518].

Early Completion Date bonus

444. The next category of bonuses was linked to an early completion of the works. CB&I was entitled to the Share-in Time Bonus if it achieved Mechanical Completion of all the Units by the Early Completion Date and the Start-Up of the Refinery was achieved within four months of the Early Completion Date[519].

Project Contingency bonus

445. The final category of bonuses that CB&I could obtain was linked to the Project contingency. CB&I was entitled to 6% of any potential savings in the Project Contingency Budget[520].

**d.    Additional sources of revenue**

446. CB&I was entitled to additional sources of profit, which were not specifically identified in the EPC Agreement.

447. The change orders for extra work on the Project entitled CB&I to a percentage of the value as profit for CB&I – an ordinary arrangement that allows a margin for the contractor for any additional work. According to the information discussed at the

---

[513] TC 1.1; JX-002, p. 160, JX-004, p. 146.
[514] JX-003, JX-005 p. 4, para. 3.2.1.
[515] TC 58.13.1; JX-002, p. 237; JX-002, p. 213.
[516] TC 58.13.4; JX-002, pp. 237-238; JX-004, p. 214.
[517] TC 58.13.6, TC 58.13.8, TC 58.13.9; JX-002, p. 238; JX-004, p. 215.
[518] JX-003, p. 4; JX-005, p. 4: para. 3, "Contractor Bonus".
[519] TC 58.13.5; JX-002, p. 238; JX-004, pp. 214-215.
[520] TC 58.13.10; JX-002, pp. 238-239; JX-004, p. 215.

Hearing, the Parties agreed under TC 63[521] that CB&I would be entitled to a 6.8% markup on all change orders for extra work[522].

448. CB&I avers that it gained some extra USD 10.5 million through Reficar-accepted change orders[523].

449. Finally, CB&I has acknowledged that, at least potentially, it was possible for it to gain additional profits through rate arbitrage, *i.e.*, by remunerating its Project employees less than the hourly rate charged to Reficar for the services provided by such employees[524].

## C.   Final Full Estimate

450. The EPC Agreement contains a definition of Final Full Estimate as

> "the estimate which is set out in Appendix IV to Section III, which amends the detailed Class 2 cost estimate (on a +/- 10% basis) which was delivered by the Contractor and Technip to the Owner on 31 July 2009 [*i.e.*, the July 2009 Estimate]"[525].

## a.   Definition

451. Both the Onshore and the Offshore Agreements declare that the Final Full Estimate is attached as Appendix IV under Section III[526]. Appendix IV in the case record is, in fact, blank[527]. No document is contained therein.

---

[521] JX-002, p. 243; JX-004, p. 220:
TC63 – Extra Work
63.1 "Extra Work" is defined as work not identified in Section III Appendix I of this Agreement. The Owner may, at any time, without notice to the Contractor's sureties, if any, request in writing the Contractor to perform Extra Work. Following receipt from the Owner of the scope, drawings or specifications of the Extra Work, the Contractor shall submit, in writing, a proposal for accomplishing the Extra Work, including costs and start and completion dates.
63.2 The Contractor shall substantiate any costs and fees to the Owner. Following agreement between the Parties on the terms under which the Extra Work will be performed, the Extra Work will be added to the Work by a Change Order.
63.3 In the event of an emergency which the Owner determines endangers life or property, the Owner may verbally order the Contractor to perform any Extra Work required by reason of such emergency. The Contractor shall commence and complete the Extra Work as directed by the Owner. Such orders will be confirmed promptly in writing by the Owner and may be accompanied by drawings, specifications or data as necessary to show the extent of such Extra Work. Compensation in the event of emergency work shall be agreed to in accordance with the provisions for Extra Work.
63.4 Any Extra Work by the Contractor not incurred in accordance with this TC63, will not be paid by the Owner.
63.5 Notwithstanding any other provision of this Agreement, no claim by the Contractor for an adjustment hereunder will be allowed if asserted after Final Completion.
[522] Tr. 1491:1-11.; 1499:16-25; Tr. 3765:1-2. No contractual provision setting the mark up at 6.8% is to be found.
[523] ESOD, fn. 14, p. 16; CB&I simultaneously argues that Reficar rejected most of such extra work WNOCs, see RPHB, para. 479.
[524] Tr. 1501:10-16; also see Breaux CWS, para. 55.
[525] JX-002, p. 165; JX-004, p. 151.
[526] JX-002, p. 14; JX-004, p. 14.
[527] See JX-006; Appendix 3 ends at p. 609 and immediately after, at p. 610, Appendix 5 begins.

452. Reficar avers that the Final Full Estimate coincides with the February 2010 Estimate[528].

453. But this is a simplification: the Project kept evolving between February 2010 (issuance of the February 2010 Estimate) and June 2010 (signing of the EPC Contract). The February 2010 Estimate was closed on 28 February, but the design was not frozen on that date. The changes were reflected in several separate BRNs], which increased the final estimate by USD 115 million[529]. These BRNs, although not referred to in name anywhere in the Contracts, must be deemed part of the Contract-relevant Final Full Estimate.

454. This is corroborated by Mr. Deidehban's testimony, who said that the number of USD 115 million for the BRNs was a provisional amount that "went into the contract"[530].

455. CB&I's most recent stance appears to accept that either the February 2010 Estimate or that estimate together with the BRNs may indeed be referred to as the "Final Full Estimate"[531].

456. Reficar also appears to have contemporaneously considered the USD 115 million BRNs as part of the Final Full Estimate[532]. Additionally, Reficar's damages expert seems to include the BRNs as part of the Final Full Estimate[533].

457. To sum up, the EPC Contract term of "Final Full Estimate", which constituted Appendix IV to Section III of the Contract is, in fact, the February 2010 Estimate as modified by the spring 2009 BRNs submitted by CB&I. This means that the Final Full Estimate was set at a value of USD 3.150 billion[534] + USD 115 million[535], i.e., a total of USD 3.265 billion.

**b.    Contractual relevance**

458. What is the contractual relevance of the Final Full Estimate defined in the EPC Agreements?

459. The relevance is very minor.

460. The Offshore Agreement does not make any further use of the definition.

---

[528] See Joint Exhibit Index, fn. 1 at pdf p. 3; CPHB, para. 92.
[529] Ex. C-0043.
[530] Tr. 964:5-17.
[531] RPHB2, para. 25: "The evidence shows that Reficar neither relied on the Estimate Revision or its accuracy level, nor believed the Final Full Estimate value was a guarantee or representation of the cost of the Work".
[532] Ex. C-0050, p. 3: "[t]he following information must be ready: [...] (iii) Final Full Estimate [...] and incorporation of any change order (Budget Revision Notices) with April 30, 2010 as cut-off date."
[533] LI ER, para. 1136.
[534] Ex. C-0041, p. 50.
[535] Ex. C-0043.

461. The Onshore Agreement only refers to the Final Full Estimate in TC 44.1.1, which provides that if the labour rates or the productivity factors used in the Final Full Estimate are changed, the Contractor is entitled to additional compensation[536].

462. Surprisingly, the Contractor does not make any representation with regard to the Final Full Estimate, nor does it assume any obligation or undertaking in relation thereto.

463. If there is one provision, which intuitively, should refer to the Final Full Estimate, it should be CB&I's cost bonus target; but, tellingly it does not do so and, instead, provides a fixed value of USD 3.221 billion, which equates with the budget approved by Reficar's BofD (a figure which is close to, but different from that of the Final Full Estimate, which adjusted by the March and April 2010 BRNs, totalled USD 3.265 billion[537])[538].

**D.    Cost Control Commitments**

464. The EPC Agreement contains two provisions which are meant to keep the costs under control [previously defined as the "**Cost Control Commitments**"]:

465. First, Section IV of the Onshore[539] and Offshore[540] Agreements includes an Appendix I in which CB&I agreed as follows:

> "In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis […] and the amount payable shall be the Contract Price. Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner". [Emphasis added]

466. CB&I, consequently, undertook to only charge costs to Reficar if they met a triple requirement: The costs must be

- reasonable,

- properly incurred, and

- in accordance with the Contract.

467. Second, under para. 3 of the Project Execution Plan, which, as Exhibit 13 forms an integral part of the Onshore[541] and Offshore[542] Agreements, CB&I undertook to rigorously control cost and schedule similar to a lump sum contract, and to safeguard Reficar's resources as if their own:

---

[536] JX-002, pp. 215-216.
[537] USD 3150 million + USD 115 million = USD 3265 million.
[538] JX-002, TC 1.1, Definitions, p. 160 ; JX-004, TC 1.1, Definitions, p. 146.
[539] JX-003, p. 3.
[540] JX-005, p. 3.
[541] JX-002, p. 654.
[542] JX-004, p. 628.

> "Even though a reimbursable contract <u>CB&I project management will
> rigorously control cost and schedule similar to a lump sum contract
> safeguarding Reficar resources as if their own</u>". [Emphasis added]

468. The Cost Control Commitments will play a fundamental role in the Tribunal's
decision regarding both CB&I's pre-contractual and contractual liability.

### E.  <u>Work Schedule</u>

469. The EPC Agreement defines "Schedule" as a level 3 schedule produced by the
Contractor and approved by the Owner:

> "'Schedule' means a level 3 schedule for performance of the Work produced
> by the Contractor and approved by the Owner, as the same may be amended
> from time to time in accordance with the terms of this Agreement"[543].

470. No Schedule was attached to the Agreement. The understanding of the Parties was
that the Level 3 Work Schedule would be delivered by CB&I within 90 days from
signing of the EPC Contracts. This was reflected in the Project Controls Execution
Plan, which was attached as Annex 6 to the Onshore and Offshore Agreement:

> "[t]he detail working Schedule will be developed within the Project WBS and
> will be presented in bar chart format within 90 days of contract award"[544].

471. CB&I complied with this obligation[545] and eventually delivered the October 2010
Re-Baseline Schedule[546], which reconfirmed that the Guaranteed Completion Date
to achieve Mechanical Completion was February 28, 2013[547].

472. Under TC 51, CB&I undertook to perform the works in accordance with the
Schedule. In situations of delay, Reficar was entitled to give a written notice to
CB&I, to which CB&I would have had to respond with reasonable efforts to
mitigate the delay. CB&I also undertook to provide Reficar with regular progress
updates and forecasts as the Project progressed. CB&I finally agreed to cooperate
with any third party contractors in a joint effort to comply with the schedule.

473. The contractual relevance of the Guaranteed Completion Date comes into play in
the calculation of the Delay Liquidated Damages under TC 54.8[548]:

> "54.8.1 Subject to TC54.8.1A, <u>if the Contractor fails to achieve Mechanical
> Completion of all of the Units by the Guaranteed Completion Date</u>, the
> Contractor shall be <u>liable to pay Delay Liquidated Damages</u> for each Day from
> the Day immediately following the Guaranteed Completion Date up to and
> including the date Mechanical Completion of all of the Units is achieved, at
> the following <u>rates per Day</u>:

---

[543] JX-002, p. 170 ; JX-004, p. 155.
[544] Project Controls Execution Plan, Section 6.5.3; JX-002, pp. 469-471; JX-004, pp. 444-446.
[545] CB&I presented the October 2010 Re-Baseline Schedule in December 2010, which is over the 90-day
limit; however, Reficar does not allege any breaches by CB&I in connection with this date of delivery.
[546] Ex. C-0058, pp. 15-21, 73.
[547] Ex. C-0058, p. 73.
[548] JX-002, p. 226; JX-004, p. 203.

(i) at the rate of two hundred and sixty two thousand five hundred Dollars (US$262,500) per Day for the first 60 (sixty) Days of such delay; and then

(ii) at the rate of five hundred thousand Dollars (US$500,000) per Day for each Day of such delay thereafter; provided that the aggregate amount payable pursuant to this clause (ii) shall not exceed thirty million Dollars (US$30,000,000)" [Emphasis added].

474. Another relevant date for the EPC Agreement was the Early Completion Date, which served as the basis for potential bonuses for CB&I if it finalized the works ahead of schedule[549] – alas, the provision did not come into play given the delays on the Project.

**F.    Liability cap**

475. The liability cap in the Contract limits CB&I's total aggregate liability to Reficar under or in connection with the EPC Contract to USD 70 million under TC 8.1[550]:

"8.1.1 The total aggregate liability of the Contractor to the Owner under or in connection with this Agreement (which includes, but is not limited to, (a) liability for Contractor default, (b) liability for Defects, (c) Delay Liquidated Damages payable under TC54.8 (other than those payable under TC54.8.1(i)), (d) Performance Liquidated Damages payable under TC56.2 and subject to the amount set forth in TC56.3.1, and (e) the Contractor's obligations to reperform any services or make good any deficient Work under TC71), will not exceed seventy million Dollars (US$70,000,000.00) [...]" [Emphasis added].

476. The USD 70 million cap could rise by a further USD 15.75 million, to a total of USD 85.75 million, if delay from the Guaranteed Completion Date accrued for 60 days, pursuant to TC 54.8.1(i):

"54.8 Delay Liquidated Damages

54.8.1 Subject to TC54.8.1A, if the Contractor fails to achieve Mechanical Completion of all of the Units by the Guaranteed Completion Date, the Contractor shall be liable to pay Delay Liquidated Damages for each Day from the Day immediately following the Guaranteed Completion Date up to and including the date Mechanical Completion of all of the Units is achieved, at the following rates per Day:

(i) at the rate of two hundred and sixty two thousand five hundred Dollars (US$262,500) per Day for the first 60 (sixty) Days of such delay [...]

54.8.2 Any amount payable pursuant to TC54.8.1(i) shall not count towards the Contractor's aggregate limit on liability set out in TC8.1.1" [Emphasis added].

477. CB&I's liability is thus contractually limited to a total of USD 85.75 million.

---

[549] JX-002, p. 164; JX-004, p. 150; see also "Share-In Time Bonus", JX-002, p. 170; JX-004, p. 156.
[550] JX-002, pp. 180-181; JX-004, p. 166.

ICC Case 21747 RD/MK/PDP
Final Award

478. The liability cap would, however, not find application to six categories of liability specified under TC 8.1:

> "8.1.1 The total aggregate liability of the Contractor to the Owner under or in connection with this Agreement will not exceed seventy million Dollars (US$70,000,000.00) provided that the <u>following liabilities</u> (whether agreed or determined pursuant to TC46) <u>shall not be taken into account</u> in assessing whether the total aggregate liability (or any liability sub cap referred to in TC15.1.2, 54.8.3, 56.3.1 or 71.17) has been reached:
>
> (i) liability under any <u>indemnity under this Agreement</u>;
>
> (ii) liability for any <u>insurance deductibles</u> to be paid by the Contractor hereunder;
>
> (iii) liability arising from any <u>fraud, Gross Negligence or Willful Misconduct</u> committed by the Contractor;
>
> (iv) liability arising for a failure by the Contractor to comply with TC14.1 [failure to apply local law];
>
> (v) liability for any <u>default interest</u> which accrues due to the late payment by the Contractor of any amount provided for under this Agreement; and
>
> (vi) any amounts paid to the Owner under the <u>Advance Payment Letter of Credit</u> or any repayment made to the Owner of any advance payment made by the Owner to the Contractor".

479. Out of the scenarios above, the only relevant one in the current case concerns roman number (iii), *i.e.*, liability arising from fraud, gross negligence or willful misconduct. The Tribunal will analyse whether this provision finds application in subsequent sections of the Award.

## VII.1.2.    THE PARTIES' POSITIONS

### 1.    REFICAR'S POSITION

480. Reficar argues that CB&I:

- induced it to agree to risk-shifting provisions under the cost-reimbursable modality of the EPC Agreement and its liability cap (**A.**);

- through a series of misrepresentations or omissions (**B.**) that amounts to a showing of *dolo incidental*;

- Reficar was in a position where it placed legitimate trust in CB&I (**C.**); and

- it could not have been expected to be aware of CB&I's deceptions (**D.**).

136

## A.    Inducement to switch from LSTK to RC Contract

481. Reficar avers that its original preference, as stipulated under the Project Definition Contract from 2007, was to obtain an LSTK contract. This is precisely why it engaged with CB&I[551].

482. Even though CB&I initially represented it would sign an LSTK contract with Reficar, upon experiencing losses on other projects CB&I decided to switch its practice to RC contracts to try to avoid further losses – at Reficar's expense[552].

483. According to Reficar, CB&I induced Reficar into signing an RC contract by emphasizing the considerable savings to be gained through changing the contracting modality – the RC estimate was almost a billion dollars lower than the LSTK one[553]. If not for CB&I's repeated representations of cost savings, the promise to deliver a Class 2 +/-10% AACE Estimate and a Level 3 Schedule, Reficar would not have agreed to the RC modality[554].

484. And when Reficar continued insisting on an LSTK estimate, in October 2009, Mr. Deidehban threatened Reficar with "drastic" changes if Reficar insisted on a LSTK estimate, which further induced Reficar to agree to the change in the contracting modality[555].

## B.    The misrepresentations

485. Reficar points to three essential misrepresentations made by CB&I: the Estimates did not adhere to Class 2 +/-10% AACE standards (**a.**), the Estimates were based on insufficient productivity multipliers (**b.**), and a deficient schedule was provided (**c.**).

## a.    No Class 2 +/-10% AACE standards Estimates

486. According to Reficar, no CB&I estimate could meet the AACE standards, because the classification system adopted by CB&I did not adhere to the requirements of the AACE; thus, the Estimates were not compliant with what had been agreed about their parameters[556].

487. The Estimates did not meet a +/-10% level accuracy either:

488. As regards the July 2009 Estimate, the deficiencies in the engineering and, especially, the lack of discipline drawings, made it impossible to reach a +/-10% accuracy[557].

489. In relation to the February 2010 Estimate, Reficar argues that CB&I knowingly presented false information about the alleged accuracy: it explicitly represented that said Estimate had a +/-10% level of accuracy, when it knew this to be incorrect –

---

[551] CPHB, para. 62.
[552] CPHB, paras. 39-42, 63-66, 71-72.
[553] CPHB, paras. 67-68, 70.
[554] CPHB, paras. 70, 72.
[555] CPHB, para. 69.
[556] CPHB, para. 82. CPHB, paras. 93-94.
[557] CPHB, paras. 80-81.

and in this arbitration CB&I has acknowledged that it was aware that the February 2010 Estimate did not have a +/-10% accuracy[558].

**b.    Insufficient productivity multipliers underlying the Estimates**

490.    CB&I knowingly used an insufficient productivity multiplier to artificially undervalue the estimate[559].

491.    CB&I had internal knowledge that 3.0 was what the productivity multiplier should have been, as opposed to 1.86 (and 1.66), which were unilaterally decided by CB&I (or agreed to it)[560], with a deceitful purpose of lowering the estimate value[561].

**c.    Deficient Schedule**

492.    Despite multiple promises to provide a Level 3 Schedule[562], prior to the execution of the EPC Agreement, CB&I knowingly submitted a document which, in fact, only adhered to the requirements of a Level 2 Schedule[563].

**C.    Reficar legitimately relied on CB&I's representations**

493.    Reficar argues that it placed trust in CB&I as a renowned expert in engineering and construction – this meant that CB&I had superior knowledge of the refinery-construction business and was in a better position to know whether the Estimates and Schedule were accurate[564].

494.    Reficar avers that its BofD relied on the Final Full Estimate and Level 3 Schedule when making its decision to approve the EPC Agreement[565]. This is clear from the multitude of prior Project documents CB&I was aware of, that emphasized the importance of CB&I's deliverables[566].

495.    Even though the February 2010 Estimate had ROM numbers in it, Reficar argues that it could still have been a Class 2 +/-10% Estimate[567]. And the overstatement of the level of detail of the February 2010 Estimate, legitimately led Reficar to believe in the Estimate's accuracy[568].

496.    Reficar maintains that, had its BofD been aware of the inaccuracy of the July 2009 and February 2010 Estimates and the Level 3 Schedule, it would never have signed the EPC Agreement on a cost-reimbursable basis, with the risk allocation that is prescribed under the Contract[569].

---

[558] RPHB, paras. 101-102.
[559] CPHB, paras. 83-85.
[560] CPHB, paras. 104-107.
[561] CPHB, paras. 106-107.
[562] CPHB, para. 113.
[563] CPHB, para. 115.
[564] ESOC, paras. 2, 544, 762.
[565] CPHB, paras. 108, 114.
[566] CPHB, paras. 73-77, 112.
[567] CPHB, para. 96.
[568] CPHB, para. 97.
[569] CPHB, paras. 108-111, 114; Reply, para. 127.

**D.**    **Reficar could not have been aware of CB&I's deception**

497.    First, Reficar denies that, because of its professional position, it could not be deceived. Reficar submits that it is not a professional in the areas of engineering, procurement and construction that should have realised the misrepresentation[570], it is only a professional in the operation of refineries; thus, CB&I cannot shift the burden of obtaining correct information on Reficar[571].

498.    Second, since Reficar had placed legitimate trust in CB&I due to the representations it had made, Reficar had, under Colombian law, a decreased duty to self-inform[572].

499.    Reficar met that duty by having multiple advisors; but these advisors were not tasked with re-doing CB&I's work and did not have access to source data to warn Reficar of CB&I's deceit[573].

500.    Third, there is no "duty to verify the information" as a corollary to the duty to inform, to the contrary of what CB&I's expert stated at the Hearing without offering proof other than this being his opinion[574].

**2.**    **CB&I's POSITION**

501.    CB&I argues that it did not act with *dolo incidental* because:

-    it did not induce Reficar into signing the RC EPC Contract (**A.**);

-    it fully informed Reficar of the accuracy of its deliverables (**B.**) and, in any event,

-    Reficar could not have been deceived as a professional because it was under the duty to self-inform, and in fact it was fully informed by its advisors (**C.**); and also

-    Reficar did not rely on the July 2009 Estimate, the February 2010 Estimate Revision, or the Level 3 Baseline Schedule when making the decision to enter into the EPC Agreement (**D.**).

502.    Finally, CB&I also avers that Reficar could not have suffered any damages under a *dolo incidental* scenario, because it simply paid the true cost of the Refinery (**E.**).

**A.**    **CB&I did not induce Reficar to sign the RC EPC Contract**

503.    According to CB&I, it was Reficar that approached it regarding the change in the contracting modality of the EPC agreement – not the other way around[575]; this alone would disprove the inducement theory.

---

[570] CPHB2, pdf pp. 10-11 (line item 5 on p. 10).
[571] CPHB, paras. 51-52, 57; Reply, paras. 65, 72.
[572] CPHB, paras. 53-55.
[573] CPHB, para. 110.
[574] CPHB, para. 47, citing to Tr. 3903:8-3904:3; 3909:1-20.
[575] RPHB, para. 84.

504. As regards the risks in the switch from an LSTK to an RC EPC contract, CB&I avers that Reficar was fully informed on the issue and risks by its external advisors, independently of CB&I[576]. Additionally, CB&I tried to educate Reficar on the risk assumption by sharing the iChemE Green Book for Reimbursable Contracts with its representatives[577].

**B.    CB&I's did not make any misrepresentations**

505. CB&I provided compliant estimates (**a.**), which did not require a Level 3 Schedule (**c.**). Additionally, Reficar was informed of the realistic productivity factors and forced them downwards (**b.**).

**a.    Properly represented estimates**

506. The July 2009 Estimate was indeed a Class 2 estimate (**i.**) with +/-10% accuracy as represented (**ii.**)[578].

507. (i) The methodology used to arrive at the July 2009 Estimate did not strictly adhere to the AACE guidance but instead CB&I applied its own methodology, memorialized in the Estimate Plan, which called for deliverables which were greater in number and required more advanced maturity than those required by AACE[579].

508. In fact, Reficar's expert criticized CB&I's methodology at arriving at the Class 2 Estimate of July 2009, but itself used a flawed methodology, and failed to apply it correctly[580].

509. (ii) Foster Wheeler's independent estimate commissioned by Reficar was within USD 250 million of the July 2009 Estimate, further corroborating its accuracy at that point in time[581].

February 2010 Estimate

510. CB&I acknowledges that the February 2010 Revision to the July 2009 Estimate was not Class 2 +/-10%, neither was it intended to be; but Reficar knew this[582] and its own representatives explicitly referred to the February 2010 Estimate as a "reference document" only[583].

---

[576] RPHB, paras. 74-76.
[577] RPHB, para. 80, citing to Tr. 1618:8-22.
[578] RPHB, para. 124.
[579] RPHB, para. 125-126.
[580] RPHB, para. 127, citing to Tr. 5137:10-22, 5145:21-5146:1; WMC ER, paras. 1098, 1106.
[581] RPHB, para.124, citing to Ex. B-042, p. 29 (Foster Wheeler estimate from August 14, 2009 at USD 3.229 billion).
[582] RPHB, paras. 129-133.
[583] RPHB, para. 98.

**b.**    **Reficar was aware of the more realistic productivity factors**

511.    Before releasing the July 2009 and February 2010 Estimates, CB&I had informed Reficar that 3.0 should in fact have been the correct multiplier[584].

512.    Reficar was well informed of CB&I's data as it had its employees actively involved in the preparation of the estimate documents, and Foster Wheeler had calculated the productivity factor at 2.65 rather than the 1.66 in the February 2010 estimate[585].

513.    The 1.66 productivity factor of the February 2010 estimate was a consequence of Reficar's aggressive pressure for the reduction in the productivity multipliers[586], as Reficar has conceded[587].

**c.**    **No Level 3 Schedule was required**

514.    According to CB&I, a Level 3 Schedule was not required prior to the EPC Agreement[588]. Reficar reviewed and approved the Level 3 April 2010 Schedule (that CB&I submitted regardless), which renders all of Reficar's arguments moot[589].

515.    The Project Controls Execution Plan, which forms part of the EPC Contract, overwrote the Execution Masterplan and only foresaw a level 3 detailed working schedule 90 days after the contract award[590] and CB&I delivered the appropriate Level 3 Schedule, which was accepted by Reficar[591].

**C.**    **Reficar was well advised and could not have been deceived**

516.    Reficar (and Ecopetrol), as a sophisticated party ("professional") supported by a cadre of experts, engineers, consultants, and lawyers, could never be deceived by any purported statement CB&I made or omitted during the negotiation of the EPC Contract[592].

517.    Furthermore, CB&I advised Reficar on the risks of cost-reimbursable contracts by providing Reficar's representatives with the iChemE Green Book for Reimbursable Contracts[593]. In any event, Reficar was bound by the duty of diligence, or to self-inform, which rendered any putative deceptions by CB&I impossible[594].

518.    Reficar discharged the duty to self-inform hiring a number of external advisors, which gave Reficar full knowledge of the business risks it entered into[595]. Based on that information, Reficar freely agreed to changing the contracting strategy to a

---

[584] RPHB2, para. 20-21.
[585] RPHB2, para. 23.
[586] RPHB2, para. 22.
[587] RPHB, paras. 103, 122.
[588] RPHB, para. 144.
[589] RPHB, para. 142.
[590] RPHB, paras. 141-142; citing to JX-002, p. 469, Section 6.5.3 ; JX-004, p. 444, Section 6.5.3.
[591] ESOD, para. 240,
[592] RPHB, para. 74, citing to *Glencore* RL-640.
[593] RPHB, para. 80.
[594] ESOD, paras. 1550-1553.
[595] RPHB, paras. 82,89.

cost-reimbursable contract[596]; in fact, it was Reficar who approached CB&I with the idea for an RC EPC Contract[597].

**D.   No reliance on the Estimates or April 2010 Schedule**

519.   Reficar did not rely on either the July 2009 or the February 2010 Estimates, or the April 2010 Schedule[598].

520.   Reficar's BofD approved a Project budget of USD 3.777 billion, signed the LOI and directed EPC work to proceed in the fall of 2009 – months before Reficar received the February 2010 Estimate or the April 2010 Schedule[599].

**E.   No damage attached to the change in the remuneration scheme**

521.   CB&I argues that Reficar entered into an RC EPC Contract which established that only reasonable and proper expenses would be reimbursable[600]. And that is exactly what happened: Reficar paid the true cost of the Refinery[601]. Hence, there would be no damage attached to having entered the RC EPC Contract, even assuming but not conceding, that there had been misrepresentations on CB&I's side[602].

522.   But even if some damage had arisen, Reficar has not proven that it was caused by any pre-contractual breaches: in fact, the damages sought by Reficar are extra costs incurred on the Project and loss of profit due to delay – almost the same damages as the ones sought in its contractual claims[603].

## VII.1.3.   THE TRIBUNAL'S DECISION

523.   Claimant's case regarding pre-contractual liability is based on the allegation that CB&I acted with *dolo incidental* under Art. 1515 II of the CCC and breached the more general obligation to negotiate in good faith enshrined in Art. 863 of the Commercial Code. Reficar admits that, absent CB&I's deception and misrepresentation, it would indeed have entered into the EPC Contract, but it would have agreed to the Contract on other terms and conditions:

-       it would have rejected the RC methodology touted by CB&I and instead would have insisted on the LSTK methodology originally envisaged and

-       it would not have agreed to the cap to CB&I's contractual liability as it stands.

524.   Reficar is not claiming annulment of the EPC Contract, but rather compensation for the damage suffered as a consequence of CB&I's devious conduct.

525.   Respondents deny any responsibility. They say that they did not engage in any deception nor misrepresentation, and that Reficar agreed to the switch from an

---

[596] RPHB, para. 76, 86-88.
[597] RPHB, para. 84.
[598] RPHB, paras. 25-26, 137-138, 141, 144-145.
[599] RPHB, para. 96, RPHB2, para. 18.
[600] RPHB, para. 151.
[601] RPHB, para. 152.
[602] RPHB, para. 152.
[603] RPHB2, para. 28; RPHB, para. 147.

LSTK to an RC methodology at its own request, with full knowledge of the facts and properly advised by external experts.

526. The Tribunal will dismiss Claimant's claim by:

- first reviewing CB&I's pre-contract deliverables, *i.e.*, the July 2009 Estimate, the subsequent February 2010 Estimate and the April 2010 Schedule (**1.**),

- then establishing whether CB&I acted with *dolo incidental* (**2.** and **4.**), or

- whether it breached its pre-contractual duty to inform derived from good faith (**3.**)

## 1. ANALYSIS OF CB&I'S PRE-CONTRACT DELIVERABLES

527. In the course of the negotiations of the EPC Contracts CB&I prepared numerous estimates: by mid-2009 it had presented a total of five preliminary estimates, which then were followed by the July 2009 Estimate, which was revised twice, the second revision constituting the February 2010 Estimate.

528. CB&I also prepared and delivered to Reficar, before the execution of the EPC Contracts, various time schedules, including the so-called April 2010 Schedule, which set February 28, 2013 as the guaranteed Mechanical Completion Date and was the last work schedule exchanged before signature.

529. Claimant says that the July 2009 and February 2010 Estimates and the April 2010 schedule prepared by CB&I contained material and intentional misrepresentations – a claim which CB&I denies.

* * *

530. To adjudicate this question, the Tribunal will analyse each of the three deliverables separately (**1.2**, **1.3** and **1.4**), but before doing that, it will devote a separate section to the craft productivity factors ["**PFs**"] used in the Estimates (**1.1**).

## 1.1. THE PFs USED IN THE ESTIMATES

531. A key component of the July 2009 and February 2010 Estimates were the craft productivity factors used in these documents. These factors describe how efficiently craft workers (*i.e.*, skilled and qualified construction workers[604]) are able to perform their construction tasks; selecting higher or lower PFs has a profound impact on the estimation of the time, and by extension the costs, which the construction works will require. The higher the PFs, the lower the productivity in Cartagena, the more conservative the prediction and the higher the resulting cost estimate.

> *Pro memoria*: in accordance with common practice in the refinery construction business, the PFs used in the Estimates were based on the US Gulf Coast (1972) standard work hours ["**USGC**"], *i.e.*, the factor indicates how long it would take a worker on-site in Cartagena to perform the same task

---

[604] See e.g., TC 44.1; also ESOD, para. 698.

as a worker on the US Gulf Coast[605]. A PF of 2 signals that a Cartagena worker will need twice as many hours as a worker in the USGC to perform the same activity.

532. The July 2009 Estimate used a PF of 1.86 for greenfield work, with brownfield work being given 15% to 50% mark-ups to account for the interruptions caused by the on-going refinery operations[606]. The February 2010 Estimate reduced the PF for greenfield work to 1.66 (*i.e.*, it assumed a higher productivity than in 2009)[607], but retained the brownfield[608] mark-ups of between 15% to 50%[609].

533. Once construction of the Project finalized, and the true costs were established, it turned out that the PFs used in the Estimates were excessively optimistic (especially the 1.66 PF in the February 2010 Estimate, which overestimated the productivity in Cartagena by a factor of two). The Parties now discuss who should assume responsibility for setting the very low PFs in the July 2009 and February 2010 Estimates.

## A. Reficar's position

534. Reficar argues that CB&I knowingly used underestimated craft PFs in the July 2009 and February 2010 Estimates.

535. First, Reficar argues that during the Hearing, CB&I's construction expert acknowledged that even though the average estimated craft PFs were set at 1.86 and 1.66 in July 2009 and February 2010, respectively, CB&I internally knew that the value should have been set at around 3.0, but failed to disclose this to Reficar[610].

536. Second, Reficar avers that the July 2009 PFs could not have been affected by any interference by Reficar and were deliberately undervalued on CB&I's own accord[611]. These multipliers were consistent with CB&I's representation in the Execution Masterplan, stating that productivity between 1.5 and 1.7 was achievable[612].

537. Third, as regards the multipliers used in the February 2010 Estimate, Reficar avers that CB&I agreed to them and therefore cannot claim that the multipliers were directed by Reficar[613].

## B. CB&I's position

538. CB&I argues that the July 2009 Estimate craft PFs were lowered due to Reficar's insistence – but were still reasonable; the only unreasonable ones were those in the February 2010 Estimate, but they were imposed by Reficar.

---

[605] Ex. C-0041, p. 22.
[606] Ex. R-0033, para. 8.1 at p. 19.
[607] Ex. C-0041, p. 22.
[608] Brownfield is the industry name used for existing facilities on a project.
[609] Ex. C-0041, pp. 22-23.
[610] CPHB, paras. 83-89.
[611] CPHB, para. 84.
[612] CPHB, para. 104.
[613] CPHB, para. 104.

539. First, CB&I argues that the July 2009 multipliers were aggressive, but reasonable given its local experience and the local surveys it performed in 2008[614]. The 1.86 PF was established on the basis of surveys conducted in 2008 and of the experience obtained by CB&I's from its other South American projects, located in Chile and Peru[615]; and the 15% to 50% mark-ups for the brownfield work brought the real PFs to between 2.14 and 2.79[616].

540. Second, CB&I argues that Reficar tried to contemporaneously control the estimated productivity multipliers, which means that CB&I cannot be held accountable for them being undervalued[617] This is especially the case with the February 2010 Estimate multipliers, which Reficar now agrees it imposed on CB&I[618].

541. Third, CB&I avers that it never "agreed" to the lowered PFs and made multiple caveats as to their understated nature[619].

## C.    Discussion

542. The determination of PFs is not an objective science. It is more in the nature of a "rule of thumb", a prediction based on previous experience and conditioned by the specific characteristics of the project. Multiple exogenous factors, which are difficult to quantify in advance (availability of skilled craft workers, configuration of the work site, vagaries of local weather, attitude of trade unions, local labour regulation…) are capable of provoking significant difference between the productivity, which was planned and expected, and that which is actually achieved.

543. The determination of which is the correct PF to be applied to estimate the cost of a specific refinery project, located in a certain country, is thus a highly subjective endeavour, in which the experience of the estimator plays an important role. This is proven by the wide range of PFs (from 1.6 to 2.65) which different experts proposed during the development of the Cartagena Project:

-    First, it was CB&I who, at a very early stage of the relationship with Reficar, in August 2008, for the first time mentioned the possibility of achieving very aggressive productivity PFs, in the 1.6-1.7 range[620]. CB&I invoked its "unique expertise and experience", which would allow it to obtain improved PFs when compared with competitors[621]:

     "CB&I is uniquely qualified to execute the expansion on an LSTK basis. We have relevant engineering experience on all the key process units, capability to perform the modular fabrication in house and experience with direct-hire construction in Colombia. We are one of the few (if any) companies that could adequately quantify and manage the risk and whose principal business model is lump sum turnkey contracting". [Emphasis added]

---

[614] ESOD, para. 136; also fn. 243 at p. 72.
[615] ESOD, para. 136; also fn. 243 at p. 72.
[616] RPHB2, para. 22.
[617] RPHB2, para. 22, footnote 68.
[618] RPHB, paras. 122, 135 (bullet point no. 4), 193-194 ; RPHB2, para. 22.
[619] RPHB, paras. 193-195.
[620] Ex. R-0029, p. 10.
[621] Ex. R-0477, p. 2.

- In the second half of 2008 CB&I conducted local studies and on the basis of contemporaneous projects in Chile and Peru, it came to the conclusion that the PF's would have to be increased to a range of 2.0-2.2.[622].

- When in September 2008 Pathfinder, acting on behalf of Reficar, prepared the draft Execution Masterplan, it still used the 1.5-1.7 PFs, originally touted by CB&I[623]. The final version of the Execution Masterplan, which was issued by CB&I in January 29, 2009, retained the same range of PFs[624].

- In March 2009 IPA, an expert retained by Reficar, prepared a presentation, which again used an average productivity in Colombia of 1.7[625].

- When Foster Wheeler reviewed the Synergy Changes proposed by Reficar and their impact on the Estimates, it assumed a higher multiplier of 2.65[626].

- CB&I, in its internal discussions, may have, at some point, used a multiplier as high as 3.0. CB&I's construction expert, Mr. Hillier, stated during his deposition that CB&I's employees had told him that a productivity of 3.0 might have been closer to reality[627]; he also confirmed that in his expert opinion a multiplier of 3.0 would have been appropriate[628].

- A Jacobs Consultancy ["**Jacobs**"] report from July 2012 prepared for Ecopetrol suggested that in Jacobs's experience, the proper PF for the Project was in the range of 2.2-2.25[629].

544. <u>Finally</u>, the actual productivity on the Project appears to have been in the range between 3.02 and 3.25[630].

\* \* \*

545. <u>Summing up</u>, the PF used in the July 2009 Estimate (1.86 for greenfield work between 2.14 and 2.79 for brownfield) was already an optimistic prediction, on the lower end of the range of PFs. The February 2010 Estimate reduced the greenfield PF to 1.66 – the last Estimate thus used the lowest PF within the range. The actual PFs on the Project hovered above 3.0. The result was that the productivity of craft in Cartagena was undervalued by a factor of two.

---

[622] Ex. R-0029, p. 10.
[623] Ex. R-0641, p. 33, 80.
[624] Ex. C-0024, pp. 18, 46.
[625] Ex. R-3662, p. 85.
[626] Ex. C-1273-REF0000142170, p. 20.
[627] Tr.: 6006:19-25.
[628] Tr.: 5979:11-18.
[629] Ex. R-0803, p. 8.
[630] Tr.: 5796:15-21: "[…] As part of his discussion on this topic, [Mr. Hillier] notes that he calculated the actual multiplier on the project and found it was 3.02". Reficar's expert, LI, instead of providing a Project craft productivity multiplier says that "cumulative site productivity ended up at about 0.51, compared to the planned Project productivity of 1.0", see LI ER, para. 767. Extrapolating this number from the February 2010 Estimate's PF of 1.66 gives a PF of 3.25, which is relatively close to 3.02.

a. **Responsibility for undervalued multipliers**

546. How could this happen?

547. Did CB&I *sua sponte* introduce the low PFs in the Estimates, or did it act at the request and with full knowledge of Reficar?

    July 2009 Estimate

548. The first PF mentioned is a range of 1.5-1.7[631] recorded in the Execution Masterplan, which was prepared in draft form by Pathfinder (Reficar's consultant advisor)[632]. This number probably came from CB&I, but Reficar must have played a part in its calculation, because the Masterplan says that Reficar would provide to CB&I information[633]:

    > "needed to quantify their risk such as Local Labour Studies, government contacts, insights on local labour [...] as may be available through REFICAR representatives' experience/knowledge". [Emphasis added]

549. CB&I warned Reficar that the PFs used in the draft Execution Masterplan were too optimistic and that a 2.0-2.2 range (a figure based on contemporaneous works in Chile and Peru) would be more appropriate – a fact proven by Pathfinder's subsequent report, which expressly refers to these warnings[634]. Despite CB&I's clear indications, the final Execution Masterplan left the PFs as they were and so, they remained at 1.5-1.7[635].

550. The evidence thus shows that the PFs in the Execution Masterplan originated from a draft prepared by an advisor of Reficar, were based on information provided by Reficar (or on its behalf) and that CB&I unsuccessfully tried to increase these PFs[636].

551. In the subsequent July 2009 Estimate, prepared by CB&I, the PFs were somewhat higher than in the Execution Masterplan – 1.86 for the greenfield work. There is no explanation in the file showing how this figure, slightly above the range consented by Reficar in the Execution Masterplan, was arrived at. The most likely explanation is that CB&I, who had warned that the PFs were undervalued, insisted on a moderate increase.

552. There is no contemporaneous evidence showing that Reficar disagreed either with the PFs in the Execution Masterplan or in the July 2009 Estimate.

    February 2010 Estimate

553. The July 2009 Estimate was not decisive for Reficar's decision to enter into the EPC Contract. The Contract was executed 11 months thereafter, and during this

---

[631] Ex. R-0641, p. 33, 80.
[632] See CPHB, para. 74: "Specifically, in September 2008, Pathfinder, a Reficar consultant, created a Master Project Execution Plan ("MPEP") [*i.e.*, the Execution Masterplan]".
[633] Ex. R-0641, p. 227.
[634] Ex. R-0029, p. 10.
[635] Ex. C-0024, pp. 18, 46.
[636] See evidence referenced in the two preceding paragraphs.

ICC Case 21747 RD/MK/PDP
Final Award

time CB&I prepared and delivered two revisions of the July 2009 Estimate, the last being the February 2010 Estimate, which used a PF of 1.66.

554. There is clear evidence that the decision to reduce the PFs from 1.86 to 1.66 originated from Reficar, and was resisted by CB&I.

555. The key piece of evidence is the February 2010 Estimate itself, which contains a chart that confronts the July 2009 PFs in the left column (which, blended, amounted to 1.86), with the February 2010 PFs (which, blended, amounted to 1.66), and underlines that these latter figures are "Client Directed", *i.e.*, imposed by Reficar[637]:

| Div | Craft | PF 31Jul09 | PF Client Directed |
|---|---|---|---|
| 02 | Civil/Earthwork | 1.66 | 1.46 |
| 02 | Demolition Crewed Hours | 1.66 | 1.46 |
| 03 | Concrete | 1.66 | 1.40 |
| 04 | Architectural | 1.77 | 1.77 |
| 05 | Structural | 1.77 | 1.57 |
| 07 | Insul/Refract/Fireproof | 1.77 | 1.77 |
| 09 | Coatings | 1.73 | 1.73 |
| 11 | Major Equipment | 1.88 | 1.65 |
| 12 | Plate Structures | 1.88 | 1.68 |
| 15 | Piping | 2.17 | 1.93 |
| 16 | Electrical | 1.80 | 1.68 |
| 17 | Instrumentation | 1.81 | 1.29 |
| 18 | Start-up/Comm | 1.95 | 1.95 |
| 20 | Prorateables | 1.00 | 1.00 |

556. There is further evidence:

557. In January 2010 CB&I sent a mark-up of the draft EPC Contract to Reficar, stating that the PFs were imposed by Reficar and that CB&I had on several occasions warned that these numbers were low[638]. Reficar was not only aware of CB&I's warnings but agreed to CB&I's proposal not to include in the Contract any provision making CB&I liable for any discrepancies between the estimated and actual PFs on the Project.[639]

558. In a letter dated April 30, 2010 Reficar denied having imposed the February 2010 Estimate PFs[640]. In a responsive letter dated May 5, 2010 (*i.e.*, before execution of the EPC Contract) CB&I reiterated that the reduced February 2010 PFs resulted from cost-savings exercises performed by Reficar and were based on the most optimistic outcome and rates experienced by Ecopetrol rather than the average ones. The Contractor added that the undervalued PFs was one of the largest risk areas in the Project[641].

559. Being aware of CB&I's position, and with full knowledge that the PFs in the February 2010 Estimate were highly optimistic and represented a risk for the

---

[637] Ex. C-0041, p. 22.
[638] Ex. R-0568, p. 5.
[639] Ex. R-0569, p. 371, under row "44.1.1".
[640] Ex. C-0314, p. 3.
[641] Ex. C-0315, p. 5.

successful completion of the Project, Reficar still decided to execute the EPC Contract.

560. The fact that it was Reficar who requested the very low 1.66 PF in the February 2010 Estimate is also accepted by Long International, Reficar's expert[642]:

> "Reficar, based on its own experience in the Colombian market, requested CB&I to utilize more aggressive productivity factors and unit workhours, which resulted in a lower estimate of EPC costs".

561. For this reason, in its damage calculations Long International gives CB&I credit for the difference between the productivity factor used in the July 2009 Estimate and the one in the February 2010 Estimate.

562. <u>Summing up</u>, the evidence shows that a wide range of PFs were used during the pre-contractual stage, and that estimates as high as 3.0 were discussed; the Tribunal, however, is convinced that Reficar:

- Requested that the (reduced) 1.66 PF be introduced in the February 2010 Estimate;

- Must have been aware that this figure was undervalued or at least overly optimistic, and

- Knew that the reduction represented a substantial risk factor for the successful completion of the Project within the cost Estimate.

**b.   Reficar's counterarguments**

563. Reficar's response is that the 1.66 PF was not imposed but simply proposed by Reficar, and that CB&I agreed to its use[643]. Reficar also points to Mr. Houtz's witness statement, which confirms that between the July 2009 Estimate and its February 2010 Revision, "Reficar proposed and CB&I ultimately agreed to certain higher [risk] productivity factors"[644].

564. The Tribunal disagrees.

565. There is no contemporaneous evidence that CB&I acquiesced with Reficar's proposed PFs.

566. To the contrary. There is clear evidence that CB&I disagreed with the 1.66 PF:

- the February 2010 Estimate itself labels the productivity factor as "Client Directed"[645];

- CB&I also stated in January 2010, as it was negotiating the draft EPC Contract, that the PFs were imposed by Reficar and that it had warned Reficar on several occasions that these numbers were low – for this reason, CB&I

---

[642] LI ER, para. 1129-1131; LI Rebuttal ER, paras. 511-512.
[643] CPHB, para. 104.
[644] Houtz CWS, paras. 119-120.
[645] Ex. C-0041, p. 22.

would not agree to Reficar's contract proposal that "Productivity rate should be at CBI's risk" [646]; and

- CB&I's letter dated 5 May 2010 (one month before execution of the EPC Contracts) explicitly says that the PF used was based on feedback from Reficar, that it assumed the most optimistic outcome and that it represented one of the largest risk areas in the Project[647].

567. There is a second counterargument. As can be seen from the calculations of its own expert mentioned above, Reficar seems to accept that CB&I is not responsible for the difference between the PF of 1.86 (used in the July 2009 Estimate) and 1.66 (used in the February 2010 Estimate), but still maintains that CB&I should be responsible for the difference between 1.86 and the much higher actual PF achieved in the Project.

568. The Tribunal disagrees.

569. Although CB&I accepted that the 1.86 PF in the July 2009 Estimate was achievable, Reficar, a Colombian entity with experience in the Colombian labour market, also accepted that PF as realistic, notwithstanding the warnings by CB&I and its own advisors. Moreover, it directed a further reduction of such PF and ultimately accepted a specific provision in the EPC Contract (TC 44.1.1), in which CB&I warned of and declined responsibility for the risk that the actual PFs would surpass those in the Final Full Estimate (1.66).

## 1.2. THE JULY 2009 ESTIMATE

570. CB&I presented the July 2009 Estimate to Reficar at a value of USD 3.495 billion, excluding escalation and contingency[648], together with an Estimate Basis Document, which contained a breakdown of the methodology behind CB&I's calculations[649], and a separate document with a break-down of the numbers on a unit-by-unit basis[650].

571. The Estimate Basis Document confirms that the estimate meets the Class 2 +/- 10% accuracy[651]:

> "the July 31st EPC Estimate in accordance with the EPC Estimate Plan for the July 31st 2009, Class II (+/- 10%) Cost Estimate".

## A.    Reficar's position

572. Reficar says that the July 2009 Estimate clearly represented that it complied with AACE Class 2 +/-10% requirements. And just months before, in January, CB&I

---

[646] Ex. R-0568, p. 5.
[647] Ex. C-0315, p. 5.
[648] Ex. R-0524.
[649] Ex. R-0033.
[650] Ex. R-0525.
[651] Ex. R-0033, p. 7.

had made a presentation stating that it had "adopted the Cost Estimate Classification System provided by AACE"[652].

573. However, this representation turned out to be false:

574. First, the estimate was based on insufficient engineering progress[653]. Reficar's expert, Baker & O'Brien ["**B&OB**"] found that when the July 2009 Estimate was prepared, CB&I's engineering had only reached 21-27% of completeness[654], while the AACE requires a Class 2 +/-10% estimate to be based on engineering progress at approximately 55%[655].

575. Second, the engineering deliverables were not in compliance with the AACE requirements[656].

**B.    CB&I's position**

576. CB&I avers that the July 2009 Estimate was in fact a Class 2 +/-10% estimate.

577. First, according to CB&I's expert, Watson Millican ["**WMC**"], the methodology chosen by Claimant's expert to evaluate whether the Estimate was a Class 2, *i.e.*, the percentage of completion of engineering, is flawed[657]. In any event, the percentage of engineering progress calculated by B&OB is undervalued, as it does not take into account the work performed by the other contractors[658].

578. Second, CB&I says that the July 2009 Estimate was not its sole responsibility, as it involved inputs from other contractors for nearly half the estimating scope[659].

579. Third, CB&I argues that the July 2009 Estimate was prepared in compliance with the agreed Estimate Plan, which only incorporated AACE guidelines as regards the numbering of classes, but established its own requirements for each of the classes, which differed from those of AACE[660].

580. Fourth, CB&I avers that the accuracy of the July 2009 Estimate is confirmed by the independent estimate commissioned by Reficar and prepared by Foster Wheeler in August 2009, which was within USD 250 million of the July 2009 Estimate[661].

**C.    Discussion**

581. In this discussion, the Tribunal sides with Claimant.

582. CB&I makes a preliminary argument: it says that it only adopted the numbering convention of the AACE (*i.e.*, 1, 2, 3, 4 and 5), but not its substance. This averment,

---

[652] CPHB, para. 82.
[653] CPHB, para. 80.
[654] B&O'B ER, para. 275.
[655] B&O'B ER, para. 275, Appendix E, paras. 28, 71, 78.
[656] CPHB, paras. 80-81.
[657] WMC ER, para. 1097.
[658] WMC ER, para. 1098.
[659] RPHB, para. 124.
[660] RPHB, para. 125.
[661] RPHB, para. 124, citing to Ex. B-042, p. 29; Tr. 1668:2-21.

however, is contradicted by its own "Guidelines on Cost Estimate Classification System", delivered to Reficar to explain to the Owner how the Constructor prepared its cost estimates. Para. 4.1. of these Guidelines specifically states[662]:

> "CB&I has adopted the Cost Estimate Classification System provided by AACE International (American Association of Cost Engineers)".

583. The AACE System includes not only five classes of estimates, but also very specific requirements for each of them. When a constructor says that it has "adopted the Cost Estimate Classification System provided by AACE", it is representing that the substantive requirements, which estimates have to fulfil to qualify for a certain class, are indeed met – otherwise, the reference to the classification system would be meaningless.

584. The Tribunal now turns to whether the July 2009 Estimate was or was not a AACE Class 2 +/-10% Estimate. The Tribunal finds that it was not, the reason being that the engineering deliverables prepared by CB&I were insufficient to meet the AACE requirements.

585. As a point of departure, the nomenclature used by the AACE for the maturity of deliverables comprises various levels of readiness[663]:

- a blank space means that progress has not started,

- an "S", standing for "started", means that work has begun but is limited to sketches, rough outlines or similar levels of early completion,

- a "P", standing for "preliminary" means that work on the deliverable is advanced. Contrary to ordinary meaning, preliminary in this context implies that development may be near completion except for final reviews and approvals. Thus, there is a considerable difference between "P" and "S", despite their semantic proximity,

- a "C", standing for "complete" means that the deliverable has been reviewed an approved as appropriate.

586. One of the categories of engineering deliverables are the discipline drawings, required to calculate the quantities and materials to be engineered, procured and installed[664]. According to B&OB, Claimant's expert, CB&I's progress in preparing these discipline drawings only met the status of "started" (which would correspond to a Class 3 estimate), rather than the status of "preliminary", as required by a Class 2 estimate[665].

---

[662] Ex. C-0382, p. 2.
[663] WMC ER, para. 1057.
[664] Tr. 5027:5-7.
[665] B&O'B ER, Appendix E, paras. 87, 90.

ICC Case 21747 RD/MK/PDP
Final Award

587. WMC, Respondents' expert, disagrees with B&OB's findings. But WMC has prepared a chart with the maturity of the engineering deliverables, which in fact supports B&OB's position[666]:

**Table 7.1 - Project Estimate Input Deliverables**

| Item | CB&I Inputs | TPTI Inputs | |
|---|---|---|---|
| | **FEED Phase Deliverables** | **AACE Recommended Practice 18R-97** | **Overall or Unit Specific** |
| | **Engineering Deliverables** | | |
| 1 | Process Flow Diagrams (PFDs) | x | C | Unit |
| 2 | Process and Instrumentation Drawings (P&IDs) | x | C | Unit |
| 3 | Utility Flow Diagrams (UFDs) | x | C | Unit |
| 4 | Electrical One-Line Diagrams | x | C | Unit |
| 5 | Plot Plans | x | C | Unit |
| 6 | Equipment Lists - Process/Mechanical | x | C | Unit |
| 7 | Equipment Lists - Electrical | x | C | Unit |
| 8 | Instrument List | x | C | Unit |
| 9 | Major Equipment Data Sheets | x | C | Unit |
| 10 | Standards and Specifications | x | C | Overall |
| 11 | Standard Detail Drawings | x | | Overall |
| 12 | Hazardous Area Classifications | x | | Unit |
| 13 | General Equipment Arrangement Drawings | | C | Unit |
| 14 | Block Flow Diagrams | | C | Overall |
| 15 | Heat and Material Balance | | C | Unit |
| 16 | Spare Parts Listing | | P | Overall |
| 17 | Mechanical Discipline Drawings | | P | Overall / Unit |
| 18 | Electrical Discipline Drawings | | P | Overall / Unit |
| 19 | Instrument/Control System Discipline Drawings | | P | Overall / Unit |
| 20 | Civil/Structural/Site Discipline Drawings | | P | Overall / Unit |

588. The table shows the AACE requirements in the middle column, and in the left column, whether CB&I had or not complied with them (an "x" showing that compliance had been achieved, a blank that it had not).

589. In accordance with the findings summarized in the table, when CB&I prepared its July 2009 Estimate, its engineering was not sufficiently advanced for eight items (numbered 13 through 20). These include mechanical, electrical, instrument/control and civil/structural discipline drawings (items 17 through 20).

590. Apart from discipline drawings, the AACE Maturity Matrix also required a preliminary status of spare parts listings[667], which is missing in the above table under line number 16. By WMC's own count, the engineering was also lacking items 13-15, *i.e.*, general equipment arrangement drawings, block flow diagrams and heat and material balance.

591. Mr. Millican of WMC tried to argue at the Hearing, that the progress for discipline drawings did not need an "X", as the progress was implicitly accounted for under line 11, "Standard Detail Drawings"[668]. The Tribunal, however, is not convinced: if these items really were part of a previous line item, then they would not have been listed separately in the table. Additionally, this would still not account for the other lines that were missing sufficient progress, *i.e.*, 13-15.

592. WMC's own analysis shows that the July 2009 Estimate failed to include certain deliverables at the level required by the AACE: as a result, the Tribunal finds that the July 2009 Estimate was not AACE Class 2 as it purported to be.

---

[666] WMC ER, p. 376 (source p. 369), Table 7.1.
[667] B&O'B ER, Appendix E, para. 86, Figure 12.
[668] Tr. 5317 :3-16.

CB&I's counterarguments

593. CB&I makes two counterarguments regarding the character of the July 2009 Estimate, namely that it cannot take responsibility for the entirety of the Estimate as it was a joint work product of multiple contractors (**i.**) and that the accuracy of the Estimate was confirmed by a separate estimate prepared by Foster Wheeler (**ii.**):

594. (**i.**) As regards the involvement of other contractors in the estimating process, CB&I cannot avoid responsibility. It was CB&I that had prepared the five prior estimates and was obliged to provide the July 2009 Estimate under the Project Definition Contract and the Execution Masterplan.

595. (**ii.**) CB&I, however, is correct in one aspect: Foster Wheeler, the expert hired by Reficar back in 2009, reviewed CB&I's July 2009 Estimate and decided that the budget could be adjusted downwards by some USD 0.25 billion[669]. The Tribunal agrees that this shows that, with the available information, an expert came to a conclusion, regarding the cost of the Project, similar to that of CB&I – but this does not mean that Foster Wheeler in any way endorsed that the July 2009 Estimate met the contractual requirements of accuracy and AACE-required parameters.

596. For the reasons above, the Tribunal dismisses CB&I's counterarguments.

\* \* \*

597. <u>In sum</u>, based on the information on record, the Tribunal finds that the July 2009 Estimate did not adhere to the AACE Class 2 +/-10% accuracy level, because the engineering deliverables were not at the level required by AACE[670].

598. That said, the last deliverable presented by CB&I before Reficar's decision to execute the EPC Contract was not the July 2009 Estimate, but the February 2010 Estimate, which, together with certain BRNs, corresponded to the Final Full Estimate. This February 2010 Estimate will be analysed in the subsequent section.

**1.3.  THE FEBRUARY 2010 ESTIMATE**

599. The Tribunal has already established that the July 2009 Estimate did not meet the Class 2 +/-10% accuracy level. The next question to address is whether the February 2010 Estimate did so.

**A.  Reficar's position**

600. <u>First</u>, Reficar argues that the cover page of the February 2010 Estimate and cover correspondence refers to it as a Class 2[671]. In fact, it was rather a Class 3 or 4 estimate and CB&I should have disclosed it, but never did so[672]. Specifically, CB&I

---

[669] Ex. B-042, p. 29.
[670] The Tribunal need not enter into Reficar's fragmentary argumentation on the P80 character of the July 2009 Estimate raised at the Hearing at Tr. 5028:17-20 but not addressed in detail in Reficar's written submissions. Any putative finding would not change the Tribunal's decision on the accuracy of the Estimate.
[671] CPHB, para. 96.
[672] CPHB, paras. 93-94.

included no clarification, highlighting that the USD 500 million in cost reductions were ROM values and did not meet the +/-10% accuracy requirement[673].

601. Reficar finds support in Mr. Gachassin's testimony at the Hearing, who, when asked whether CB&I even informed Reficar about the non-conformity of the February 2010 Estimate with Class 2 requirements, replied "I can't point you to a specific location"[674].

602. Second, Reficar avers that it was not in a position to find on its own that the Estimate did not fulfil Class 2 +/-10% requirements.

603. Third, Reficar avers that on April 30, 2010, it reached out to CB&I to specifically enquire about the accuracy of the February 2010 Estimate Revision[675] and that the Contractor answered on May 5, 2010 with a deliberately ambiguous message[676].

**B.    CB&I's position**

604. First, CB&I acknowledges that the February 2010 Estimate was not a Class 2 estimate[677], but avers that it was never represented as such[678], and that Reficar was well aware of this fact[679].

605. Second, Reficar had intimate knowledge of the February 2010 Estimate, as it reviewed it in depth, advised by Foster Wheeler[680].

606. Third, Reficar knew of the ROM values in the February 2010 Estimate, because it directed the Cost Reduction Workshops [previously defined as "**CRWs**"] and proposed the Synergy Changes resulting in the ROM values[681]. Moreover, CB&I sent a letter to Reficar on April 26, 2010, which specifically explains that certain items in the February 2010 Estimate were ROM figures[682].

**C.    Discussion**

**a.    Development of the Project between July 2009 and February 2010**

607. After CB&I had delivered the July 2009 Estimate, the Project suffered significant changes:

- Reficar carried out various CRWs, which resulted in significant modifications that reduced the overall cost of the Project;

---

[673] CPHB, paras. 96-97.
[674] CPHB, para. 95, citing to Tr. 2746:11-2747:12.
[675] CPHB, para. 99, citing to Ex. C-0314, p. 3.
[676] CPHB, paras. 100-101.
[677] ESOD, para. 232.
[678] RPHB, para. 98.
[679] ESOD para. 231, NESOD, para. 182.
[680] RPHB, para. 137, citing to Gachassin RWS, para. 145.
[681] RPHB, para. 129.
[682] RPHB2, para. 25, citing to Ex. R-0360, p. 1.

-      Reficar also identified certain Synergy Changes, which required that the
       Project be amended, to increase the complementarity of the new refinery with
       other plants belonging to the Ecopetrol group.

CRWs

608.   The CRWs led to a first cost reduction, which was reflected in the initial September
       Revision[683] of the July 2009 Estimate[684]. But the CRWs continued thereafter[685]. By
       the time of the February 2010 Estimate, these savings were calculated at some
       USD 501 million in total[686].

609.   The changes in the Project which were to produce these cost savings were initially
       conceived as ROM (+/-50%) values, and required considerable work and time to be
       incorporated at a +/-10% accuracy level. By February 2010 CB&I was incapable of
       performing this task, and the February 2010 Estimate incorporates the changes
       identified in the CRWs using ROM values.

Synergy changes

610.   Synergy Changes became one of Reficar's priorities in the second half of 2009,
       after Glencore had left the Project[687]. In a July 14, 2009 letter Reficar identified a
       first set of Synergy Changes and asked CB&I to include them in the July 2009
       Estimate[688]. CB&I was, however, unable to do so in the two weeks left before the
       delivery July 2009 Estimate; thus, the July 2009 Estimate contains a separate
       section with ROM values for "Late Adds / Deletes / Changes" (and these values are
       not incorporated into the Estimate)[689].

611.   Reficar says that CB&I had ample time to incorporate the Synergy Changes into
       the February 2010 Estimate, because discussion had started in July 2009[690], and by
       October Reficar had authorized CB&I to proceed with the required engineering[691].

612.   Reficar's averment is a simplification of what really happened. Reficar's orders to
       change the design did not happen at once, but rather, in successive stages[692]:

-      in July 2009 only the base case was adopted[693];

-      in October 2009 the maximum propylene case was added[694]; and

---

[683] The Tribunal notes that the September 3, 2009 Revision to the July 2009 Estimate is called Rev. 1 and
the September 24, 2009 Revision is called Rev. 2. However, since the February 2010 Estimate is also called
Rev. 2, the Tribunal understands that the September 24, 2009 Revision was an improved iteration of
Revision 1, rather than a separate Revision 2. See Exs. C-0032, C-0033, C-0041.
[684] Ex. C-0032, p. 52.
[685] Ex. C-0033, p. 3.
[686] Ex. C-0031, p. 3.
[687] Ex. C-0398, p. 1; Ex. C-0173, p. 2.
[688] Ex. C-0399.
[689] Ex. R-0033, p. 21.
[690] ESOC, para. 226.
[691] Ex. C-0035.
[692] WMC ER, paras. 447-459.
[693] WMC ER, para. 452.
[694] WMC ER, paras. 453-456.

ICC Case 21747 RD/MK/PDP
Final Award

- in January 2010 the full burn FCC change was ordered[695].

613. These dates show that the last Synergy Changes were adopted barely a month before the February 2010 Estimate. The Tribunal finds that the tight time schedule again justifies that CB&I was unable to develop the new cost estimations, including the Synergy Changes, at a +/-10% accuracy level. Since the affected units accounted for 20% of the Project[696], the Synergy Changes had a significant impact on the accuracy of the February 2010 Estimate.

**b.  Misleading elements in the February 2010 Estimate**

614. When CB&I issued its February 2010 Estimate it reiterated on the title page that the estimate was "Class 2 +/-10%"[697]:



**CARTAGENA REFINERY EXPANSION PROJECT**

CB&I Project # 42-160000

**31 July 2009
Class II (+/- 10) Cost Estimate**

**Revision 2 – Final Estimate Scope**

**FEBRUARY 28, 2010**

**Copy Presented to: Masoud Deidehban**



615. Notwithstanding what the title page appears to say, both Reficar and CB&I now acknowledge that this statement was not accurate and that the Estimate did not meet the Class 2 +/-10% threshold, (*inter alia*) because

- cost reductions of USD 501 million were estimated as ROM values, rather than as +/-10% estimations[698] (this impacted on some 20% of the total estimate value) and because

- the Synergy Changes were only partially incorporated[699].

616. Not only the title page is misleading. The lack of clarity is compounded by the content of the February 2010 Estimate itself.

---

[695] WMC ER, para. 457.
[696] Reply, para. 319, citing to B&OB ER, para. 207.
[697] Ex. C-0041, p. 2.
[698] Ex. C-0031.
[699] *See* Section VII.1.3.1.3 *supra*.

617. Clause 10 of the Estimate Basis Document acknowledges that "Late adds/Deletes/Changes" are established on the "basis of ROM Estimate", which is defined as "the most accurate methods possible", and then adds that "the costs noted on the Log have been incorporated into the EPC Estimate Costs". The log is attached as Annex 7, which consists in a long list of adds/deletes/changes, with a relatively modest monetary impact: USD 8.7 million.

618. Annex 7 thus provided the false impression that the only ROM figure incorporated into the 2010 Estimate amounted to USD 8.7 million. But this figure only includes the additional, very late adds/deletes/changes that arose when the July 2009 Estimate was being finalized and were not included in the Estimate[700].

619. CB&I could have resolved the mishap, when Reficar sent a letter dated 30 April, requesting clarification of 16 issues[701]. In Issue 12 Reficar voiced the doubt whether the February 2010 Estimate was indeed Class 2 +/-10%:

> "Based on the comments provided, we cannot confirm that this estimate meets the requirements of a +/-10% estimate"[702].

620. CB&I avoided confronting the question and rather gave a deliberately ambiguous answer, appearing to confirm the +/- 10% certainty, but at the same time sharing responsibility with Reficar:

> "CB&I would like to kindly remind Reficar that the planning and review of the EPC Estimate was a <u>joint process between Reficar and CB&I</u>-TPIT Consortium. The review and implementation of the estimate plan, procurement plan and many other key factors that <u>supported the +/-10% estimate</u> were <u>approached by all Parties as a team</u>"[703][Emphasis added].

c. **CB&I's defense**

621. The above facts do not shed positive light on CB&I's pre-contractual behaviour. CB&I, however, submits an important argument in defense of its conduct: it says that Reficar was perfectly aware that the design changes it requested after the July 2009 Estimate, to reduce costs and increase synergies, had been introduced at ROM level – making the Class 2 status illusory. There is evidence which supports Respondent's defense:

622. <u>First</u>, Reficar reviewed the February 2010 Estimate in detail, with the help of its advisor, Foster Wheeler. This is proven by the fact that on April 30 it sent a letter to CB&I[704], requesting information with a high level of detail, suggesting that it had a good understanding of the document.

623. <u>Second</u> and more importantly, there is documentary evidence that, after delivery of the February 2010 Estimate but before execution of the EPC Agreement, CB&I did convey to Reficar in its letter of April 26, signed by Mr. Deidehban the correct

---

[700] Ex. R-0033, p. 21.
[701] Ex. C-0314.
[702] Ex. C-0314, p. 3.
[703] Ex. R-0027, p. 4.
[704] Ex. C-0314.

information regarding the inclusion of ROM figures in the February 2010 Estimate[705].

624. The Contractor explicitly informed Reficar that the ROM estimates included in the 2010 Estimate were very substantial: they reached USD 671 million, composed of

- USD 501 million cost reductions, plus

- USD 170 million from Synergy Changes.

625. With this information an experienced entrepreneur in the oil business such as Reficar, with the professional advice of Foster Wheeler, must have been able to assume that, notwithstanding the designation included in the title page, the February 2010 Estimate could not meet the Class 2 +/-10% status.

* * *

626. In sum, the Tribunal finds that the February 2010 Estimate did not meet the Class 2 +/-10% requirement, notwithstanding the indication on its cover page. Reficar's design changes resulted in the inclusion of ROM figures which amounted to USD 671 million, composed of USD 501 million cost reductions identified in the CRWs and USD 170 million resulting from Synergy Changes requested by the Owner – making a Class 2 +/-10% category unachievable.

627. The available evidence shows that CB&I informed Reficar of this fact, and Reficar, who was advised by Foster Wheeler and who carefully reviewed the Estimate, must have been aware that ROM values in these amounts implied that the Estimate could not and did not meet the Class 2 +/-10% threshold.

628. That said, CB&I's conduct is not without blame. It should have eliminated the reference to Class 2 +/-10% from the cover page, and Mr. Deidehbah's letter, answering a direct question from Reficar, could and should have been less ambiguous.

## 1.4.  THE APRIL 2010 SCHEDULE

629. Reficar claims that CB&I also deceived it as to the April 2010 Schedule, which was supposed to be Level 3 and resource-loaded, and which in fact did not meet these criteria.

630. Reficar argues that CB&I was required to provide a Level 3 resource-loaded schedule prior to the execution of the EPC Agreement[706]. According to Reficar, the April 2010 Schedule did not meet this requirement; in fact, it was only Level 2 and the resource-loading "bore no relation to CB&I's plan for the Work"[707].

631. CB&I says that Reficar's arguments on the Level 3 Schedule are based on the false premise that CB&I was obliged to prepare such schedule prior to the EPC

---

[705] Ex. R-0360, p. 1.
[706] CPHB, para. 112.
[707] CPHB, para. 115, citing to LI ER, Appendix 6E; CPHB2, pdf p. 11 at comments to para. 145.

Agreement – which it was not[708]. Regardless of the above, the April 2010 Baseline Schedule was a resource-loaded level 3 Schedule, as verified by CB&I's expert, Mr. Harvey[709].

632. The record shows that, from the outset of its relationship with CB&I, Reficar insisted that the Contractor eventually delivered a Level 3 resource-loaded schedule. The 2007 Project Definition Contract already included a Level 3 resource-loaded schedule among CB&I's key deliverables[710]. This was later reiterated in the 2008 FEED Execution Plan[711]. The Level 3 resource-loaded schedule was finally explicitly required under the 2009 Execution Masterplan, issued by CB&I[712].

633. The Execution Masterplan preceded the EPC Contract by some 18 months and during that time the parties discussed at length the schedule of the forthcoming works. These discussions intensified in the spring of 2010, in the lead-up to the execution of the EPC Agreements.

## A.  <u>Reficar accepted the April 2010 Schedule</u>

634. On March 3, 2010, Reficar notified CB&I that it was in breach of its obligation to provide a Level 3 Schedule (which according to the letter should have been delivered by February 26, 2010)[713].

635. A week later, during a weekly meeting with CB&I, Reficar reiterated that it had not yet received the Level 3 Schedule[714]. Reficar stressed that the February 2010 Estimate was deficient until it was synchronized with the Level 3 Schedule[715]. CB&I responded that it needed two more weeks to deliver the Schedule[716].

636. Following up on its promise, on March 25, 2010, CB&I delivered a preliminary Level 3 Schedule[717]. However, Reficar rejected it as incomplete on April 8, 2010 and submitted a number of comments[718]. Ultimately, CB&I submitted the so-called **April 2010 Schedule** (although the effective date of delivery seems to have been May 19, 2010[719]).

637. There is no evidence that Reficar voiced dissatisfaction with the document it had received. On the contrary, Reficar's agreement to this schedule was memorialized in CB&I's Monthly Project Report No. 7 of June 2010, which states that

---

[708] RPHB, para. 141.
[709] RPHB, para. 145; Secretariat ER, paras. 5.2.17-5.2.20; 5.2.46-5.2.51.
[710] Ex. R-0010, Schedule 3, para. 4.0 C.1, p. 89; Ex. R-0010, Schedule 3, para. 5.0 B.1, p. 89.
[711] Ex. C-0391, p. 14.
[712] Ex. C-0024, p. 115.
[713] Ex. C-0409.
[714] Ex. C-0410, p. 1.
[715] Ex. C-0410, p. 2.
[716] Ex. C-0410, pp. 1-2.
[717] Ex. C-1741.
[718] Ex. C-0050.
[719] Ex. C-0052.

> "[t]he EPC Level 3 Schedule was baselined and the Guaranteed Mechanical Completion Date of February, 28th 2013 was agreed upon by CB&I and Reficar"[720].

## B.  Agreement on the Mechanical Completion Date

638. An important issue during the discussions leading to the April 2010 Schedule was the definition of the date of finalization of the construction activity, with specified deliverables, contractually referred to as the Mechanical Completion Date. The same calendar date is also defined in the Contract as the Guaranteed Completion Date. The importance of this Date is reflected in the EPC Contract, under which it serves as the basis for the calculation of Delay Liquidated Damages[721] and the accrual of performance bonuses to the benefit of CB&I[722].

639. Prior to the April 2010 Schedule, CB&I had proposed May 21, 2013 as the Mechanical Completion Date[723]. However, Reficar pushed for an acceleration of this date, as visible in an April 8, 2010 letter[724]:

> "[F]or REFICAR is not acceptable to have May 21, 2013 as the mechanical completion date, as currently shown in the schedule received by us."

640. In the end, the Parties reached an agreement, establishing February 28, 2013 as the Mechanical Completion Date (and also the Guaranteed Completion Date)[725], as shown in the April 2010 Schedule, delivered on May 19, 2010. It is not clear when this agreement was reached exactly, but it must have happened within the April 8 and May 19 window. The EPC Agreement was signed only a month later, on June 15, 2010. This did not leave sufficient time for CB&I to prepare a final, Level 3 resource-loaded schedule, which could be annexed to the EPC Contract. Hence, the solution agreed upon by the Parties was

- To reflect the Mechanical[726] and Guaranteed Completion Date[727] of February 28, 2013 in the EPC Contract,

- And to insert CB&I's undertaking to deliver the Schedule, with the agreed upon Mechanical Completion Date, within 90 days of the execution of the EPC Agreement[728]:

> "[t]he detail working Schedule will be developed within the Project WBS and will be presented in bar chart format within 90 days of contract award".

---

[720] Ex. C-0057, p. 12.
[721] JX-002, p. 226; JX-004, p. 203.
[722] JX-002, p. 164; JX-004, p. 150; see also "Share-In Time Bonus", JX-002, p. 170; JX-004, p. 156. These bonuses were based on the Early Completion Date, which in turn was set for a time prior to the Mechanical Completion Date.
[723] Ex. R-3183, p. 1.
[724] Ex. C-0050, p. 2.
[725] Ex. C-0058, p. 73.
[726] JX-002, p. 654; JX-004, p. 628; the Mechanical Completion for only the FCC Unit was April 30, 2013.
[727] JX-002, p. 166 ; JX-004, p. 152 ; Ex. C-0058, p. 73.
[728] JX-002, pp. 469-471 ; JX-004, pp. 444-446 (PCEP, section 6.5.3).

### C.    No deception

641.    Reficar does not argue that CB&I breached its obligation to deliver the final Schedule, or that the final Schedule was defective. Reficar also does not argue that the April 2010 Schedule should have formed part of the EPC Agreements. Reficar's position is more nuanced: it says that it was deceived by the April 2010 Schedule.

642.    The evidence does not support Claimant's averment:

643.    First, for Reficar the most significant element of the April 2010 Schedule was the Mechanical Completion Date, as to which Reficar does not claim that it was deceived[729].

644.    Second, while it had rejected earlier, less accurate drafts, Reficar did not object to the April 2010 Schedule when it received it.

645.    CB&I has provided the following description of a Level 3 resource-loaded schedule [730], which in turn coincides with the AACE guidelines invoked by Reficar[731]:

> "Generally speaking, there are four levels of project schedules that one might see on a project the size and complexity of the Reficar project [...]. A Level 3 schedule would show work activities at the sub-area level by discipline". [Emphasis added]

646.    Thus, for a schedule to be Level 3, it needs to show work activities at the sub-area level by discipline. In this case, the Level 3 Schedule was also to be resource-loaded, i.e., be linked to the data underlying the Final Full Estimate for the Project[732].

647.    The Tribunal agrees with Reficar that the April 2010 Schedule was not fully compliant with Level 3 resource-loading requirements.

648.    That said, Reficar could have rejected CB&I's proposal, and postpone signature of the EPC Contracts until a fully compliant Level 3 Schedule had been delivered. But Reficar decided not to go this route: it preferred to agree to a firm Mechanical Completion Date (February 28, 2013), to waive the requirement that CB&I deliver a fully compliant Level 3 resource-loaded Schedule before executing the EPC Agreements, to substitute it by a commitment by CB&I to deliver the fully compliant Level 3 Schedule within 90 days and to immediately move the Project into the construction phase.

649.    Thus, apparently, though not a Level 3, the April 2010 Schedule was good enough for Reficar at that time. This was confirmed at the Hearing by Reficar's expert,

---

[729] Ex. C-0058, p. 73.
[730] ESOD, p. 108, footnote 411.
[731] Ex. C-0384 at p. 62 (source p. 61).
[732] CPHB, para. 112, referencing Mr. Deidehban's agreement with such definition at Tr. 923:1-7.

Mr. Warhoe[733] and in the Long International Report[734]; there is also evidence that Foster Wheeler accepted the April 2010 Schedule[735].

650. Third, in the EPC Contract Reficar agreed to extend CB&I's time to prepare and deliver a Level 3 Schedule until 90 days after the signature of the Contract. Reficar is thus precluded from arguing that CBI breached the obligation, established in the Execution Masterplan, to deliver a Level 3 resource-loaded schedule prior to the EPC Agreement[736].

651. On the basis of the above, the Tribunal finds that while a Level 3 resource-loaded schedule was indeed very important to Reficar in the initial stages of the Project, Reficar's outlook changed in the face of the approaching date of EPC Contract execution:

-   Reficar agreed to postpone a detailed and complete schedule until after the Contract execution; thus, Reficar's consent did not rely on the April 2010 Schedule;

-   Reficar accepted the April 2010 Schedule with a Mechanical Completion Date that adhered to its expectations.

\* \* \*

652. In sum, Reficar has argued that CB&I, purposefully provided incorrect (i) PFs, (ii) July 2019 and (iii) February 2010 Estimates and (iv) April 2010 Schedule.

653. The Tribunal, however, has found that:

-   (i) it was Reficar who had full knowledge of and requested the use of unrealistic PF;

-   (ii) the July 2009 Estimate did not adhere to the AACE Class 2 +/-10% accuracy level, but was not decisive on Reficar's decision to execute an RC contract;

-   (iii) the February 2010 Estimate was not a AACE Class 2 +/- 10% accuracy level, but Reficar was aware of it when it decided to execute an RC contract;

-   (iv) the April 2010 Schedule was not a Level 3 Schedule, but was acceptable to Reficar and, in any event, it was not decisive on Reficar's decision to execute an RC contract.

654. Having found the above, the Tribunal must now determine whether CB&I's pre-contractual conduct, when it provided the above information, constitutes *dolo incidental*, as Reficar avers.

---

[733] Tr. 4611:17-4612:12.
[734] LI ER, para. 440.
[735] See *e.g.*, Ex. R-0810, pp. 4, 11, where Foster Wheeler discusses the April 2010 Schedule with May updates as the baseline.
[736] RPHB, paras. 141, 144.

## 2.    DOLO INCIDENTAL

655.    Claimant's main case regarding pre-contractual liability is based on the allegation that CB&I acted with *dolo incidental*: Reficar says that by using deception and misrepresentation CB&I induced it to switch the EPC Contract from an LSTK to an RC methodology and to agree to a liability cap. Reficar admits that, absent CB&I's improper conduct, it would indeed have entered into the EPC Contract, but it would have agreed to the Contract on other terms and conditions.

656.    Reficar is not claiming annulment of the EPC Contract, but rather compensation for the damage suffered as a consequence of CB&I's allegedly devious conduct, under the specific rules governing *dolo incidental* in Art. 1515 II of the CCC.

657.    Reficar says that it was misled by CB&I into believing that the PFs were accurate, the two Estimates complied with previously agreed AACE Class 2 +/-10% requirements and that the April 2010 Schedule was Level 3 and resource-loaded; based on this information, Reficar agreed to switch to an RC EPC Contract; had its BofD been aware of the inaccuracy of the Final Full Estimate and the Level 3 Schedule, it would not have signed the EPC Agreement on a cost-reimbursable basis, with the risk allocation that is prescribed under the Contract, nor to a liability cap[737].

658.    Reficar offers the witness statements of:

-    The former president of Reficar's BofD, Mr. Javier Gutiérrez[738]:

    "If I had known the estimate was false, I would never have approved the signing of the EPC Contract under the conditions that it was signed";

    "I would not have approved the risk-shifting terms of the EPC Contract, such as the cost-reimbursable structure or the liability cap in TC 8.1",

-    Carlos Bustillo – former vice-president of the Project[739]:

    "CB&I's representations regarding its experience, its "Class 2" cost estimate [...], the benefit of a cost reimbursable approach, and the limited impact of [the Synergy Changes] were all necessary to Reficar's authorization for the Project",

-    and Felipe Castilla – former vice-president of finance and administration[740]:

    "Reficar only agreed to any type of limitation because CB&I provided what they represented as a Class [2] +/-10% estimate [...] for the Project".

Overview

659.    The Tribunal will establish that an accurate cost Estimate was indeed highly important to Reficar. In fact, it was so relevant, that Reficar became deeply involved

---

[737] CPHB, paras. 108-111, 114; Reply, para. 127.
[738] Gutierrez CWS, para. 45; Gutierrez CWS II, para. 15.
[739] Bustillo CWS, para. 49.
[740] Castilla CWS, para. 28.

in the estimating process, and undertook so many efforts in independently assessing its own budget, which differed from CB&I's Final Cost estimate, that it was unlikely that Reficar could be deceived by CB&I.

660. When the signing of the EPC Contract approached in early 2010, the Project suffered significant scope changes, introduced at Reficar's behest, in an effort to reduce costs and to increase synergies. This implied, as Reficar must have known, that the Final Full Estimate would not reach +/-10% accuracy, and that its contractual relevance became minimal: the EPC Contract ultimately does not include any representation nor any guarantee by CB&I regarding the accuracy of the Final Full Estimate.

661. Given Reficar's involvement in the preparation of the Estimates, its responsibility for the late scope changes and its ultimate limited reliance on the Final Full Estimate, considering the Final Full Estimate in its entirety, it is impossible for Reficar to claim that it was deceived by CB&I.

662. The same applies to the April 2010 Schedule, which was not attached to the EPC Contract nor guaranteed by CB&I; instead, Reficar granted CB&I 90 days after the execution of the Contract to provide a proper Level 3 resource-loaded schedule – and there is no allegation that CB&I failed to comply with its obligation.

663. Summing up, the Arbitral Tribunal is convinced that, when Reficar took the decision to change from an LSTK to an RC Contract, it did not act under the inducement of *dolo incidental.* To substantiate this conclusion, the Tribunal will first summarize Colombian law applicable to *dolo incidental* (**2.1.**), then establish that Reficar was not tricked by CB&I into switching to an RC Contract (**2.2.**), and that in any case Reficar has failed to prove the causality of its *dolo incidental* claim (**2.3.**) and that the RC EPC Contract it agreed to offered no less beneficial contractual terms to Reficar (**2.4.**). Finally, the Tribunal will reach its conclusion (**2.5.**).

## 2.1.  APPLICABLE LAW

664. *Dolo* is a polysemic concept, which is used to qualify conduct in a variety of situations, in civil, administrative and criminal law.

665. *Dolo* is the conduct, adopted during the negotiation or the performance of a contract, where one party is aware and accepts that such conduct will result in the detriment of the counter-party. In this civil context, the Colombian Civil Code [previously defined as the "**CCC**"] provides the following definition of *dolo* in the final sentence of Art. 63[741]:

> "*Artículo 63.*
>
> […]

---

[741] CL-0013.

*El dolo consiste en la intención positiva de inferir injuria a la persona o propiedad de otro*"[742].

666. A contracting party can commit *dolo* both before entering into a contract, and after having done so:

- In a pre-contractual scenario, while the contract is being negotiated, *dolo* refers to the conduct which deliberately induces the other party's consent through machinations, artifices, false statements, insidious words or even omissions; it is this type of *dolo* which will be analysed in this section.

- In a contractual scenario, once the contract has been signed and while it is being executed, *dolo* describes a party's willful contractual breach or serious disrespect for contractual obligations – this contractual *dolo* will become relevant *infra* when assessing the contractual breaches claims.

Pre-contractual *dolo*

667. Pre-contractual *dolo*, which occurs before the execution of a contract, while negotiations between the parties are ongoing, is regulated in Art. 1515 of the CCC:

"*Artículo 1515. DOLO.*

*El dolo no vicia el consentimiento sino cuando es obra de una de las partes, y cuando además aparece claramente que sin él no hubiera contratado.*

*En los demás casos el dolo da lugar solamente a la acción de perjuicios contra la persona o personas que lo han fraguado o que se han aprovechado de él; contra las primeras por el total valor de los perjuicios y contra las segundas hasta concurrencia del provecho que han reportado del dolo*"[743].

668. The CCC does not provide a definition of this type of pre-contractual *dolo*. It simply states that:

- this type of conduct, deployed during the negotiation of a contract vitiates the consent of the counter-party, if were it not for the existence of *dolo* the counterparty would not have entered into the contract; this type of dolo is normally referred to as *dolo causal*, *principal* or *determinante* (because it causes the nullity of the contract);

---

[742] English translation from RL-317:
"Article 63.: […]
Fraud consists of the willful intention to inflict injury upon an individual or the property of another".
[743] Translation taken from RL-387:
"Article 1515. Deceit [*dolo*] does not vitiate the consent when it is on behalf of one of the parties, and also when it is clear that without it, there would be no contract.
In other cases, a defect [*dolo*] only gives rise to the action of damages against the person or persons who have forged it, or who have taken advantage of it; against the former for the total value of the damages, and against the latter up to the profit obtained from the defect they reported".

ICC Case 21747 RD/MK/PDP
Final Award

- while in all other cases, the validity of the contract is not affected, but the aggrieved party is entitled to damages; this is the so-called *dolo incidental* (because it gives rise to an incident in the contract's life).

669. The CCC does not give a precise definition of what type of conduct, performed before the contract is executed, gives rise to pre-contractual *dolo*. Guillermo and Eduardo Ospina Fernández, respected authors quoted by both Reficar's and CB&I's experts[744], reflect the unanimous understanding of what constitutes pre-contractual *dolo* in Colombian civil law[745]:

> "*[C]ualquier maquinación, trampa, artificio o astucia encaminados a sorprender a la víctima y a provocar su adhesión, bien sea sobre el acto en general, bien sea sobre ciertas condiciones de él; consiste, pues, en crear en la mente de una persona, mediante procedimientos condenados por la buena fe, un móvil o razón para consentir, móvil o razón que en realidad no existe, que es ilusorio y pernicioso*"[746] [Emphasis added].

670. *Dolo*, in a pre-contractual phase, is thus

- the trickery, deception, machination or misrepresentation employed by one party,

- with the aim of convincing a counter-party to enter into a contract with it on certain terms and conditions,

- something to which the counterparty, absent the devious conduct, would not have agreed to (*dolo causal*), or would have agreed to on different terms and conditions (*dolo incidental*)[747].

671. *Dolo* may take the form of false representations, but it may also appear by omission, this is, by concealing the truth – this latter *dolo* is referred to as negative *dolo*[748] or *reticencia dolosa*[749].

672. The consequences of a party deceiving the counter-party to enter into a contract on certain terms and conditions, are radically different, depending on whether the conduct qualifies as *dolo causal*[750] or as *dolo incidental*:

- If the counter-party can prove that, absent the trickery, deception, machination or misrepresentation, it would never have entered into the contract, the *dolo* is *causal* and vitiates the consent, the basic requirement for

---

[744] RL-455; CL-081.
[745] CL-081, p. 4 (source page 202), para. 232.
[746] Translation from RL-455, p. 18:
"[a]ny kind of contrivance, trap, ploy or trick intended to surprise the victim and win their trust, whether this relates to the general act in general, or certain conditions of it; it consists, therefore, of creating in the mind of a person, through methods considered not to be in good faith, a motive or reason to consent, which in reality does not exist, which is illusory and harmful".
[747] "*Astucia o engaño para sorprender el consentimiento de la víctima*". CL-039, p. 6 (source page 796).
[748] ESOC, para. 552, citing to Solarte ER I, para. 131.
[749] CL-041, p. 11.
[750] Also referred to as *dolo principal*. See e.g. JER 8 on Colombian law, issue 28.

the existence of a binding agreement, which is free will, falls away, and the counter-party can claim annulment of the contract plus damages[751];

- In the other situations in which the conduct of one party that, although not decisively influencing the affected party's consent to enter into the contract, induces the other party to accept terms more onerous that it would have accepted, the *dolo* is *incidental*, and the only remedy available to the counter-party is to claim damages against the devious party (including third parties who have benefitted); the damages are calculated by comparing an as-is situation (the terms and conditions of the contract actually executed), with a but-for situation (the terms and conditions which the counter-party would have accepted, absent the other party's devious conduct).

673. <u>Summing up</u>: *dolo* will become *dolo incidental* when the victim's consent to enter into the agreement was not vitiated, but wrongfully influenced as regards the terms and conditions of the contract: the victim would have entered into the contract in any event, with or without unlawful inducement (hence, no *dolo causal*), but it would have agreed to better conditions than those accepted by means of the trickery[752]. The consequence of *dolo incidental* is that the contract is valid, but the victim is entitled to damages (determined as the difference between the conditions it actually agreed and the conditions it would have agreed absent *dolo*).

<u>A textbook example</u>

674. A handbook example of a trickery which may lead to *dolo causal* or to *dolo incidental* is that of the sale of the horse Pegasus.

> Flavius wishes to buy a horse and Ticius shows him Pegasus, stating that Pegasus has won the latest Roman derby. Convinced of the horse's strength and speed, Flavius buys Pegasus for 200 denarii. Alas, once the purchase is made, Flavius finds out that Pegasus never won any derby and, in fact is a rather weak and slow horse. If Flavius had bought Pegasus with the intention to use it as a racing horse, Flavius's consent would have been vitiated by Ticius's malicious representations regarding Pegasus's features, and there would be *dolo causal* voiding the contract. Had, however, Flavius intended Pegasus to be a surprise addition for his farm, to entertain his granddaughters, he would have acquired Pegasus anyway, because, despite its weaknesses, it still is a beautiful horse, but would have paid only 125 denarii, the market price for a regular horse – the extra cost incurred was a consequence of the *dolo incidental*, the contract is not voided (but rather confirmed) and the difference between both prices can be recovered by way of damages.

675. In the present arbitration, the Tribunal will only scrutinize whether CB&I acted with *dolo incidental*, as Reficar argues that, absent CB&I's devious conduct, it would have agreed to the EPC Agreement but under different terms; Claimant does not contend that the negotiation and execution of the EPC Agreement were tainted by *dolo causal*, and that it would never have entered into an EPC Agreement, had it not been for CB&I's *dolo*.

---

[751] See RL-387; CCC, Art. 1515, in full in para. [667] *supra*.
[752] See JER 8 on Colombian law, issues 34-35.

## 2.2. NO EVIDENCE OF DEVIOUS CONDUCT

676. *Dolo incidental* can thus be summarized as:

    - the trickery, deception, machination, misrepresentation or omission deliberately employed by one party,

    - with the aim of convincing a counter-party to enter into a contract on certain terms and conditions,

    something to which the counterparty, absent the devious conduct, would have agreed but on different terms and conditions.

677. Reficar says that CB&I's devious conduct induced it to change the EPC Contract from an LSTK to an RC methodology and to agree to a liability cap.

678. Reficar argues that it was not aware of the flaws in the July 2009 and February 2010 Estimates and April 2010 Schedule because it had placed its legitimate trust in CB&I as the expert in engineering and construction[753]. Reficar avers that it only operates refineries, which allowed it to fully rely on CB&I's engineering and construction expertise[754]. According to Reficar, CB&I had superior knowledge of the refinery-construction business and was in a better position to know whether the Estimates and Schedule were accurate[755].

679. As an initial point, the Tribunal agrees with Reficar when it argues that, unlike CB&I, it is not an expert in engineering and construction of refineries. Thus, CB&I was the expert in the relationship and CB&I would have a heightened duty to properly inform Reficar and to provide it with accurate deliverables.

680. That said, Reficar is a highly experienced operator of refineries:

    - it was Reficar who developed cost saving and synergy improving measures; it was Reficar who ordered CB&I to introduce multiple last-minute changes to the design of key units on the Project; the capability of Reficar's team of in-house engineers is undisputed;

    - the record also shows that Reficar employed its own group of estimators, employees who were physically inserted in CB&I's Houston offices;

    - finally, Reficar retained multiple specialized external advisors, including Pathfinder, IPA and Foster Wheeler, who reviewed the Estimates at multiple stages and prepared various reports and recommendations on the estimating process, including a control calculation for the July 2009 Estimate[756].

681. These factors act as countervailing factors, off-setting CB&I's heightened duty as a constructor.

---

[753] CPHB, paras. 110-111, 114; Reply, para. 67.
[754] CPHB, paras. 51-52, 57; Reply, paras. 65, 72.
[755] ESOC, paras. 2, 544, 762.
[756] Ex. B-042, p. 29.

682. In the present case, even taking into consideration CB&I's heightened duty of candour as a professional constructor, the Tribunal finds that Reficar has failed to prove that it was deceived by CB&I to change the EPC Contract from an LSTK to an RC methodology and to agree to a liability cap:

- it was Reficar who initiated the negotiations for the contracting change (**A.**), and

- Reficar was fully advised on the subject by a multitude of objective sources (**B.**).

683. Furthermore, Reficar could also not have been deceived by CB&I's deliverables, because Reficar

- entered into the EPC Agreement on the basis of its internal budget and not the Estimates (**C.**);

- directed the PFs underlying the Estimates (**D.**);

- was intimately involved in the preparation of the Estimates (**E.**);

- directed last minute scope changes that made accurate estimations impossible (**F.**);

- did not consider the Final Full Estimate to be a source of substantive obligations under the EPC Contract (**G.**); and

- did not rely on the April 2010 Schedule in its decision on the EPC Agreement (**H.**).

## A.    <u>Reficar initiated the negotiations to switch from LSTK to RC</u>

684. The first formal approach to explore a potential switch from LSTK to RC was taken *motu proprio* by Reficar in July 2008, based on truthful information provided at the time by CB&I and confirmed by Claimant's experts.

685. In May 2008, CB&I informed Reficar that an LSTK price would have to include a premium of between 10% and 40%, thereby increasing the contract price from USD 3.5-4.8 billion to USD 4.3-5.5 billion[757]; the premium had become necessary due to highly volatile market conditions (2008 was the year when the financial crisis exploded). The information provided by CB&I was correct – there is no evidence in the file proving otherwise. CB&I's representative offered to meet with Reficar

> "to discuss CBI's consensus regarding the potential impact of escalation, continued scope growth and contracting strategy on this estimate"[758].

686. Reficar's Mr. Houtz has stated that he had an informal conversation with CB&I's Mr. Sipes on a flight in the spring of 2008, in which the latter disclosed that

---

[757] Ex. R-0484, p. 2.
[758] Ex. R-0484, p. 1.

"CB&I wanted Reficar to agree to a cost-reimbursable contract, and that by doing so, Reficar would save considerable money"[759].

687. In June 2008, Reficar's Steering Committee met to examine the different contracting strategies for the Project. In view of the price increase that an LSTK contract implied, the Steering Committee concluded that the LSTK strategy was no longer the optimal approach, with RC contracts offering considerable savings by comparison[760].

688. Also in June 2008, Reficar's highest administrative body, the BofD met. The BofD had representatives of both shareholders at the time, *i.e.*, Ecopetrol and Glencore. The discussion of an "[u]pdate of the revision of the contracting strategy of EPC" was put on the agenda[761], Reficar's President, Dr. Richard Cohen, made a presentation and at the end no decision was taken, except to order management to study the issue in depth[762].

689. To make an informed decision on the change, and to comply with the instructions given by its BofD, Reficar retained Pathfinder, a respectable consultancy, to evaluate the alternative contracting strategies[763].

690. On July 9, 2008, Pathfinder made an assessment of the Project in which it found that "a satisfactory LSTK arrangement may not be achievable"[764] and

"that the best recommendation was for reimbursable contracting arrangements, particularly when reinforced with effective Incentive Programs"[765].

The consultant concluded that the option of immediately shifting to an EPC Reimbursable Cost Contract "clearly appear[ed] to be the preferred Case!"[766].

691. The following day, Reficar's Steering Committee met again and was given another presentation on the subject of contract modality[767]. The presentation stressed that CB&I did not support an LSTK basis[768] and that the market conditions had changed, leading to possible additional costs of over USD 500 million in LSTK[769]; furthermore, the cost margin in the LSTK modality was forecasted to be 10% higher

[759] Houtz CWS, paras. 87-88.
[760] Ex. C-0928, p. 44. The Tribunal notes that the Agenda slide of the presentation, at p.2, mentions that the relevant section of the presentation was made by "EH", which must mean Mr. Ernest Houtz, who at that point was an employee of Glencore; Mr. Houtz claims that the Steering Committee at the time was comprised mainly of Glencore representatives and that no members of Ecopetrol were on the Steering Committee as Ecopetrol had not yet re-purchased Glencore's shares in the Project, see Houtz CWS, para. 90.
[761] Ex. R-0489, p. 2 at. 2.5, pp. 3-4 at 5.
[762] Ex. R-0489, p. 4.
[763] Ex. C-0012, p. 2: "Whereas the original plan was to obtain LSTK bids from both contractors, we are now considering executing the project on a cost plus basis, with CBI and Technip operating as a consortium during the execution of the rest of the basic design and the EPC phase."
[764] Ex. R-0487, p. 6.
[765] Ex. R-0487, pp. 7-8.
[766] Ex. R-0487, pp. 9, 14.
[767] Ex. C-0930, p. 63; see also Ex. R-0455, p. 73.
[768] Ex. C-0930, p. 75.
[769] Ex. C-0930, p. 72.

than that for a reimbursable cost contract[770]. The Steering Committee urged the BofD to make a speedy decision[771].

692.  In view of the Steering Committee's request, on July 15, 2008 Reficar's BofD again discussed the strategy for the EPC Contract, on the basis of a presentation by Dr. Cohen[772]. He explained that the anticipated surcharge for an LSTK option would amount to USD 500 million[773]. The BofD[774] authorized management to meet and confer with CB&I to discuss a cost plus EPC contract option.

693.  This was the first official approach by either of the Parties to commence negotiations on a possible change of the contracting strategy.

694.  The facts show that the decision to start a negotiation with CB&I, which would after almost two years lead to the signing of the RC EPC Agreement, was initiated by Reficar, with strong support of its own President, on the basis of truthful information provided by CB&I, and confirmed by an independent expert, retained by Reficar to make an informed decision. The underlying reasoning was that in volatile market conditions, an LSTK required a very substantial premium, and that a properly negotiated RC contract could result in considerable cost savings.

\* \* \*

695.  <u>On the basis of the above</u>, the Tribunal finds that Reficar was not deceived by CB&I to switch to RC contracting, as it was Reficar who took the initiative to commence negotiations to change the contract modality, based on objectively true information, confirmed by Reficar's own expert, that, at that highly volatile time, RC contracting offered considerable cost reductions to the Project.

## B.   <u>Multiple sources of information</u>

696.  Reficar relied on many sources to form its opinion on the appropriateness of the change in the contracting modality; CB&I was only one of those sources. Other sources of Reficar's knowledge included:

-   the other major contractor on the Project, Technip, who made it clear it was reluctant to proceed with an LSTK EPC Contract[775];

-   the external consultant Pathfinder, who provided a study proving the superiority of the cost-plus option at the time[776];

---

[770] Ex. C-0930, p. 75.
[771] Ex. C-0930, p. 75.
[772] Ex. R-0492.
[773] Ex. C-0014, p. 5; Ex. R-0492, p. 6.
[774] Ex. C-0014, pp. 5-6.
[775] Ex. R-0503.
[776] Ex. R-0487, pp. 8-9, 14, 17. Reficar has conceded that "in light of its independent diligence through Pathfinder, Reficar was not necessarily opposed to a cost-reimbursable contract-in theory", see ESOC, para. 573.

ICC Case 21747 RD/MK/PDP
Final Award

- Citigroup, Reficar's lender, who commented on how an RC approach was more usual for similar megaprojects[777]; and

- a study by Nexidea, an external consultant, stating that Reficar could expect 9% in Project cost savings if it switched to an RC contract[778].

697. Furthermore, CB&I provided to Reficar the iChemE Green Book for Reimbursable Contracts, an objectively reliable source of information on the risk assumption under RC contracts in general[779], which would later be used to draft the EPC term sheet[780]. CB&I tried to inform Reficar objectively about the risks and rewards in cost-reimbursable contracts. Had it wanted to conceal the risks connected to the contracting switch, it would have only spoken of the alleged advantages, without giving an exhaustive and objective source of information on the subject.

698. Furthermore, during the drafting process, Reficar was assisted by the international law firm Linklaters, who as specialized professionals must have made Reficar aware of the differences between an LSTK and an RC contract[781]. Having been assisted by a professional law firm, Reficar cannot claim ignorance of the different risks which both contracting modalities implied.

699. The fact that Reficar was a highly shophisticated party advised by qualified experts has a second consequence: Claimant contends that it was entitled to place legitimate trust in Respondents' representations, and that this decreased its duty to self-inform. This is not so: it is true that under Colombian law legitimate trust in the counterparty's representation may be a factor which reduces the duty to self-inform. But this principle is not aplicable to Reficar, a sophisticated party advised by multiple qualified experts. The principle only applies to the trust placed by unexperienced parties.

\* \* \*

700. <u>In sum</u>, Reficar was sufficiently briefed on the advantages and risks of a switch from LSTK to RC contracting to make a fully informed decision. In reaching the decision to switch, Reficar was advised by various independent advisors; CB&I also provided it with objectively true information. Thus, Reficar could not have been deceived by CB&I and induced to enter into the RC EPC Contract.

## C.    <u>Own budget</u>

701. In the run-up to the signing of the LOI, Ecopetrol[782] and Reficar's[783] BofDs approved a total Project budget of USD 3.777 billion +/- 10%[784]. The total budget of USD 3.777 billion was broken down to account for EPC Costs at USD 2.789

---

[777] Ex. R-0505.
[778] Ex. R-1853_002, p. 7.
[779] Tr.: 1618:8-1619:12.
[780] Ex. R-0563, p. 2.
[781] See e.g., Ex. R-0567.
[782] Ex. R-1848, pp. 14, 17.
[783] Ex. R-3708, p. 10 in conjunction with Ex. R-1853_0054, p. 3.
[784] Ex. R-1853_0054, p. 3.

ICC Case 21747 RD/MK/PDP
Final Award

billion, escalation at USD 117 million, contingency at USD 167 million, owner costs at USD 367 million and sunk costs at USD 337 million[785].

702. It is unclear how Reficar's and Ecopetrol's BofDs set the estimated EPC costs in their budget, because the value of USD 2.789 billion is:

- USD 200 million lower than the last Estimate prepared by the contractor on September 24, 2009, with EPC costs at USD 2.989 billion[786];

- USD 110 million lower than the previous September 3, 2009 estimate revision, with EPC costs at USD 2.899 billion[787].

- USD 706 million lower than the July 2009 Estimate, with EPC costs at USD 3.495 billion[788]

703. The disparity in numbers seems to suggest that Reficar also relied on its own means of determining the appropriate Project budget.

704. After approving the internal budget, Reficar's goal was for the Project costs to remain within the limit, without regard to any estimates that CB&I would release afterwards. When Reficar received the February 2010 Estimate, it wrote to CB&I and asked for a reduction of USD 44 million, to align the value with Reficar's internal budget[789]:

> "We would appreciate your deeply review and adjust to your Cost Estimate (Revision 2) to ensure that your final figures are consistent with those agreed and approved by our Board of Directors as expected limits".

705. On April 26, 2010, Mr. Deidehban sent a clarification[790], but Reficar did not take it into account. Instead, the May 25, 2010 Reficar BofD which approved the EPC Contract[791], accepted a total budget for the Project[792] of USD 3.221 billion (comprising USD 3.106 billion plus USD 115 million for the spring 2010 BRNs):

> "Una vez discutido lo anterior, la Junta Directiva solicitó que se definiera el alcance y el monto de las órdenes de cambio requeridas a la mayor brevedad. Adicionalmente, autorizó de manera unánime al representante legal de la sociedad a suscribir los contratos de ingeniería, procura y construcción para el proyecto de ampliación y modernización de la refinería de Cartagena, con las compañías CB&I UK Limited y CBI Colombiana S.A. según corresponda, al igual que todos los documentos relacionados o que se deriven de dichos contratos, teniendo en cuenta como cifra máxima de negociación para el

---

[785] Ex. R-3708, p. 10 in conjunction with Ex. R-1853_0054, p. 3.
[786] Ex. R-3444, p. 3.
[787] Ex. C-0032, p. 52.
[788] Ex. R-0524, p. 231.
[789] Ex. C-0042, p. 2.
[790] Ex. C-0031.
[791] Ex. C-0044.
[792] Ex. R-0605, p. 12.

referido presupuesto estimado del proyecto la suma de US$3.221 millones"[793]
[Emphasis added].

706. *Pro memoria*: the February 2010 Estimate, adjusted for the spring 2010 BRNs, amounted to USD 3.265 billion.

707. The discrepancy of some USD 44 million is the same which CB&I had pointed out over a month prior. There is no information in the record explaining this divergence. Thus, it appears that Reficar disregarded CB&I's explanation, as well as the February 2010 Estimate number, and used its internal numbers to approve the EPC Agreement.

708. The Tribunal is convinced that the Project costs were important for Reficar's decision to enter into the RC EPC Contract. However, there is no evidence from Reficar's BofD Meeting which would prove that the basis for their decision was solely the February 2010 Estimate.

**D.   PFs were imposed by Reficar**

709. *Pro memoria*, the Tribunal has already established that the PFs used in the July 2009 Estimate (1.86 for greenfield work, and between 2.14 and 2.79 for brownfield) was already an optimistic prediction. The February 2010 Estimate reduced the greenfield PF to 1.66. The result was that the productivity of craft in Cartagena was undervalued by a factor of two.

710. The Tribunal has also found that there is clear evidence that the decision to reduce the PFs from 1.86 to 1.66 originated from Reficar, and was resisted by CB&I – see section VII.1.3.1.1 *supra*. The key piece of evidence is the February 2010 Estimate itself, which explicitly acknowledges in a chart that the PFs used are "client directed"[794]. Another important element is CB&I's letter dated May 5, 2010 (*i.e.*, before execution of the EPC Contract) stressing that the reduction of the PFs resulted from cost-savings exercises performed by Reficar and were based on the most optimistic outcome and rates experienced by Ecopetrol. The Contractor added that the undervalued PFs was one of the largest risk areas in the Project[795].

711. Being aware of CB&I's position, and with full knowledge that the PFs in the February 2010 Estimate were optimistic and represented a risk for the successful completion of the Project, Reficar still decided to execute the EPC Contract. Reficar could not and was not deceived by the undervalued PFs used in the Estimates.

---

[793] Ex. C-0044, p. 4; translation into English at p. 12:
"Once the foregoing had been discussed, the Board of Directors requested that the scope and amount of the change orders be defined as soon as possible. In addition, it unanimously authorized the Company's legal representative to sign the engineering, procurement and construction contracts for the Cartagena Refinery expansion and modernization project with the companies CB&I UK Limited and CBI Colombiana S.A. as appropriate, together with all documents related to or arising from said contracts, taking as a maximum negotiating figure for the said estimated budget of the project the sum of USD 3.221 m" [Emphasis added].
[794] Ex. C-0041, p. 22.
[795] Ex. C-0315, p. 5.

ICC Case 21747 RD/MK/PDP
Final Award

## E.    Continuous participation and own review

712. Reficar was not a passive Owner who simply orders a refinery expansion and modernization project. On the contrary, Reficar actively participated in CB&I's cost estimating process, employed its own means to establish its own budget, and pressed CB&I to reduce its Estimates so that they would adhere with Reficar's internal cost predictions.

713. The transparency of CB&I's estimating process was acknowledged by Reficar's Chief Financial Officer in a letter sent to two Reficar estimators shortly before the issuance of the July 2009 Estimate[796]:

**From:** Fred Bendle
**Sent:** Wednesday, July 01, 2009 3:15 PM
**To:** Daniel Morgan; jim.bellow@reficar.com.co
**Subject:** report

Gentlemen

According to the Estimate plan the estimate should now be in the stage of "management review"
I assume therefore that it is complete - at least as a draft

As it has been a transparent process - are you aware of the amount of the estimate?
even if that is an amount subject to deciding on final "allowances" etc??

You will remember that your principle objective has always been to be able to form an opinion by 31 July, when the estimate is presented, on whether the estimate is correct, or too high, or too low? Or more probably - in which areas it is high, and in which it is low.

We have discussed several times that your opinion needs to be supported by evidence of the work you have carried out and a final Report, with back up documents.
Dan and I spoke at length about the approach that I favour. It was

714. These estimators had been hired as early as January 2009[797] as Reficar employees and their primary mission was to review the July 2009 Estimate; to comply with this task they had been placed full-time at CB&I's Houston office[798]. Through them Reficar was fully informed of the development of and progress in CBI's estimating process.

715. Shortly after the July 2009 Estimate was issued, on August 13, 2009 Reficar announced to CB&I that three further Reficar employees would be joining CB&I's Houston office to participate in the cost reduction efforts[799]. The record also shows that two other Reficar/Foster Wheeler estimators were still placed at CB&I's Houston office as of June 2010[800].

716. In addition to having its own estimating team, embedded in CB&I's Houston office, Reficar employed additional means to assess the reasonable costs for the Project:

---

[796] Ex. R-3038, p. 1; Emphasis added. These were Daniel Morgan and Jim Bellow.
[797] B&OB Rebuttal ER, para. 180.
[798] Tr. 1659:20-1660:3.
[799] Ex. R-0543: these were Hugo Barrios, Medardo Chinchilla and Ezequiel Acosta.
[800] Ex. R-0532, rows 131 and 151. These were Ana Paula Gayon and Yobelis Rossi.

-    CB&I gave Reficar access to iDocs, the in-house platform where all the inputs, backup, calculations and documents related to the estimate development were stored[801];

-    Additionally, Reficar had CB&I's cost estimates audited by external advisors: in September 2008, Pathfinder reported on CB&I's early cost estimates[802]; shortly thereafter, in November 2008, the same consultant provided a comprehensive memorandum on CB&I's November 2008 estimate[803]; further insight on the same estimate, together with some alternative calculations, was provided by IPA in March 2009[804];

-    Foster Wheeler developed and delivered its own, independent estimate of total Project costs (which was reasonably close to CBI's July 2009 Estimate)[805];

-    Reficar also performed, together with Foster Wheeler, a contemporaneous review of the February 2010 Estimate[806].

717.  Reficar avers that it and Foster Wheeler only conducted a high-level review of CB&I's deliverables and did not verify their falsehoods[807].

718.  The record, however, proves that Reficar conducted a careful review of the work prepared by CB&I and was capable of raising detailed remarks and requests for additional data; Reficar's letter of March 19, 2010 did so with regard to the February 2010 Estimate[808]. A detailed review of CB&I's estimating work was also provided by Pathfinder in a report from late 2008 and by Foster Wheeler in the control calculations for the July 2009 Estimate.

719.  Finally, Reficar's own witnesses agree that the work on the Estimates was approached jointly; for example, Mr. Chinchilla states that[809]:

> "Later, CB&I's Estimates Manager, Kris Gachassin, sent us a photo of the work that we did during the Savings Cost Workshop, which showed a table that we prepared together and that documented how the decisions made at the meeting had been reviewed and discussed collaboratively and in the presence of all participants, from both CB&I and Reficar, including me" [Emphasis added].

* * *

720.  In sum, it seems unlikely that Reficar could have been deceived or misinformed by CB&I regarding the July 2009 or February 2010 Estimates, as Reficar extensively

---

[801] Ex. C-1036; Tr. 2706:9-13 (Mr. Deidehban); Tr. 1533:23-1535:6 (Mr. Houtz conceding that Reficar was provided unfettered access to the underlying documents of the estimate).
[802] Ex. R-0494, pp. 8-10.
[803] Ex. R-0029.
[804] Ex. R-2994, pp. 16-40.
[805] Ex. B-042, p. 29.
[806] ESOC, paras. 58-59.
[807] ESOC, para. 58.
[808] Ex. R-0032, p. 1.
[809] Chinchilla CWS, para. 18.

and transparently participated in their preparation, and engaged outside advisors to verify CB&I's calculations.

## F.    Scope changes: design continued

721.  After CB&I had delivered the July 2009 Estimate, at the request of Reficar the Project suffered significant changes, to reduce costs and to increase synergies. The February 2010 Estimate incorporates the changes identified in the CRWs and the Synergy Changes using ROM values.

722.  After delivery of the February 2010 Estimate but before execution of the EPC Agreement, in its letter of April 26, 2010 CB&I informed Reficar that the ROM estimates included in the 2010 Estimate were substantial: they reached USD 671 million, composed of

-    USD 501 million cost reductions plus

-    USD 170 million from Synergy Changes.

723.  Having received this information, Reficar decided to execute the EPC Contract, in full knowledge that the Final Full Estimate contained USD 671 million in ROM figures, caused by late changes included at its request to reduce costs and increase synergies. Reficar cannot shift to CB&I the responsibility for these inaccuracies in the Final Full Estimate – the last-minute scope changes were requested by Reficar and CB&I transparently disclosed the affected amounts.

\* \* \*

724.  In light of the above, the Tribunal finds that Reficar, when it decided to enter into the EPC Contract, was aware of the shortcomings of the February 2010 Estimate, and cannot claim to have been deceived or misinformed by CB&I due to these shortcomings.

## G.    Limited relevance of the Final Full Estimate

725.  The EPC Agreements do not refer either to the July 2009 Estimate nor to the February 2010 Estimate. The Agreements use a different terminology, that of Final Full Estimate, defined as

> "the estimate which is set out in Appendix IV to Section III, which amends the detailed Class 2 cost estimate (on a +/- 10% basis) which was delivered by the Contractor and Technip to the Owner on 31 July 2009 [*i.e.*, the July 2009 Estimate]"[810].

726.  The Tribunal has already established (in section VII.1.1.7.C. *supra*) that the Final Full Estimate coincides with the February 2010 Estimate, modified by the spring 2009 BRNs submitted by CB&I. This means that the Final Full Estimate was set at

---

[810] JX-002, p. 165; JX-004, p. 151.

a value of USD 3.150 billion[811] + USD 115 million[812], *i.e.*, a total of <u>USD 3.265 billion</u>.

727. What was the contractual relevance of the Final Full Estimate?

728. The November 2009 LOI between CB&I and Reficar had provided for a "Control Budget" that would be attached to the final EPC Contract and which could only be modified through change orders[813]. This Control Budget played a role similar to the Bonus Target Cost in the EPC Contract, as it constituted the benchmark for CB&I's performance that could allow it to earn bonus compensation[814].

729. As the EPC Contract signing date in June 2010 was approaching, the importance to Reficar of the Final Full Estimate waned. Reficar must have become aware that the late design changes it was requesting, which were still not finalized, provoked an unintended consequence: that the February 2010 Estimate, even adjusted for the BRNs, failed to be a fully reliable prediction for the entirety of Project costs. This in turn made the Final Full Estimate (the sum of the February 2010 Estimate plus the BRNs), which was defined in and attached to the EPC Agreements, lose relevance:

- The Offshore Agreement does not make any further use of the definition of Final Full Estimate; while

- The Onshore Agreement only refers to the Final Full Estimate in TC 44.1.1, which provides that if the labour rates or the productivity factors used in the Final Full Estimate are changed, the Contractor is entitled to additional compensation[815].

730. The limited relevance of the Final Full Estimate is reinforced by the absence of any representation by CB&I with regard to its accuracy or development; CB&I also does not assume in the Contract any obligation or undertaking in relation thereto.

731. The irrelevance of the Final Full Estimate for the Contract goes even further: one provision that might have referred to it was CB&I's Bonus Target Cost; tellingly, the Contract does not use the figure of the Final Full Estimate (USD 3.265 billion[816]), and instead provides an alternative value of USD 3.221 billion, which derives from the budget approved by Reficar's BofD[817]. In simple words, to establish the Bonus Target Cost for CB&I, Reficar decided to use its own budget, as approved by its BofD, and not the figure established in CB&I's Final Full Estimate. This proves that despite all of Reficar's present arguments, at the relevant time it placed limited reliance on the Final Full Estimate.

---

[811] Ex. C-0041, p. 50.
[812] Ex. C-0043.
[813] Ex. C-0037, pp. 9.
[814] Ex. C-0037, pp. 9-13.
[815] JX-002, pp. 215-216.
[816] USD 3150 million + USD 115 million = USD 3265 million.
[817] JX-002, TC 1.1, Definitions, p. 160; JX-004, TC 1.1, Definitions, p. 146.

732. The restricted importance of the Final Full Estimate was conceded by Reficar's own President, Dr. Cabrales, who stated in a letter from September 2011 that the Final Full Estimate was

> "merely a reference document. It was used at the outset of the Project primarily to determine bonus threshold and the likely full estimate value of the EPC"[818].

733. This finding is determinative, as Reficar's case of *dolo incidental* is built around the notion that the falsehoods in the Final Full Estimate induced it to enter into the RC EPC Agreement – a premise disproven by the evidence.

## H.  No reliance on the April 2010 Schedule

734. CB&I submitted the so-called April 2010 Schedule[819] approximately a month before the execution of the EPC Contract. There is no evidence that Reficar voiced dissatisfaction with the document it had received. The April 2010 Schedule showed February 28, 2013 as the Mechanical Completion Date[820] – an arrangement with which Reficar agreed.

735. The Mechanical Completion Date became a defined term in the EPC Contract, with meaningful consequences for CB&I in form of penalties in case it failed to meet the deadline[821]. The EPC Contract did not, however, attach a schedule. Instead, the Parties had agreed that CB&I would provide a Level 3 resource-loaded schedule within 90 days of Contract award[822].

736. While a Level 3 resource-loaded schedule may indeed have been important to Reficar in the initial stages of the Project, its outlook changed in the face of the approaching date of EPC Contract execution. Reficar accepted the April 2010 Schedule with a Mechanical Completion Date that adhered to its expectations and agreed to postpone a detailed and complete Level 3 schedule until after EPC Contract execution.

737. That Reficar's BofD only relied on the Mechanical Completion Date and not the April 2010 Schedule is corroborated by the BofD's discussion when it authorized the EPC Agreement. The presentation under the part of "schedule" first refers to the Mechanical Completion Date, then to the Early Completion Date, which served as the basis for potential bonuses for CB&I, and finally mentions that CB&I had delivered an updated level 3 schedule. The Mechanical Completion Date and the Early Completion Date are both in bold, while the Level 3 schedule is not even specified as being resource-loaded, proving that this was not a key component for the decision of Reficar's BofD[823]:

---

[818] Ex. C-0432, p. 2.
[819] Ex. C-0052.
[820] Ex. C-0057, p. 12.
[821] TC 54.8, JX-002, p. 226; JX-004, p. 203.
[822] Project Controls Execution Plan for Engineering, Procurement and Construction, Annex 6, Section 6.5.3; JX-002, pp. 469-471; JX-004, pp. 444-446.
[823] Ex. R-0605, p. 12; translation from p. 87:
"Schedule: It was agreed that the date for Mechanical completion would be **February 28, 2013** and the Early Completion Date remains **November 30, 2012**. CB&I delivered the updated Level 3 last May 17."

•Schedule: Se acordó fecha de terminación Mecánica **febrero 28 de 2013** y el Early Completion Date se mantiene en **noviembre 30 de 2012**. CB&I entregó el pasado 17 de mayo el nivel 3 actualizado.

738. There is no evidence that Reficar was deceived by the April 2010 Schedule, which reflected an agreed upon Mechanical Completion Date. The April 2010 Schedule did not fulfil all of the Level 3 and resource-loading criteria, but Reficar clearly did not base its decision to enter into the EPC Agreement on the basis of this deliverable, and accepted an undertaking by CB&I that the final Schedule would be delivered within 90 days of Contract execution.

\* \* \*

739. <u>In summary</u>, the Tribunal has found no evidence that CB&I provided Reficar misinformation with the purpose of deceiving it into entering the RC EPC Contract:

- It was Reficar who, concerned about the volatile market conditions, took the initiative to change the EPC Contract from LSTK to RC;

- Reficar was aware that the February 2010 provided by CB&I was not an AACE Class 2 +/-10% estimate; similarly, it knew that the April 2010 Schedule was not a proper Level 3 resource-loaded schedule;

- Reficar did not rely on the Final Full Estimate when it consented to the RC EPC Contract, but on its own budget; similarly, it did not rely on the April 2010 Schedule, but chose to set a Mechanical Completion Date and obtain the Level 3 resource-loaded schedule after the execution of the contract.

740. The Tribunal has also found that Reficar took an informed decision to change to an RC EPC Contract, based on the information and advice obtained from various sources; and that CB&I's input was not accepted *per se*, but was subjected to a careful review by expert advisors engaged by Reficar.

## 2.3. LACK OF CAUSALITY

741. Reficar argues that, had it not been for the CB&I's deceit regarding cost and schedule, it would not have agreed on an RC EPC Contract, or at least not on the liability caps. Even if it is accepted, *arguendo*, that Reficar had been deceived by CB&I's conduct, *dolo incidental* requires that the aggrieved party prove the alternative scenario which would have occurred, absent the deceit. In this case, Reficar has failed to meet this test:

742. <u>First</u>, in the normal *dolo incidental* situation, the aggrieved party is tricked to pay an excessive price – and the alternative scenario is that, absent the deceit, it would have paid a lower price (and the price difference equates with the damage).

743. In the present case, Reficar alleges that it was tricked to enter into an RC Contract, instead of an LSTK Contract; the alternative scenario is, thus, a modality of Contract which would have attracted a very substantial remuneration premium of between 10% and 40%, due to the then present volatile market conditions. But, as CB&I correctly pointed out, Reficar is not claiming damages for the cost difference between the LSTK and the RC pricing modalities, but rather reimbursement of

unreasonably and improperly incurred costs (and loss of profit) under the RC EPC Contract it actually signed. There is thus an inconsistency between the delinquency which Reficar is imputing against CB&I (*dolo incidental*) and the remedy sought in this procedure (cost reimbursement and lost profits).

744. Reficar says that it has paid an excessive price for the Project; but the price increase has not been caused by CB&I's pre-contractual conduct, but allegedly by CB&I's post-contractual behaviour: the Constructor has charged a price much higher than anticipated (whether in compliance or in breach of the EPC Contract is a question which will be addressed in the next section). There is, thus, no causal link between CB&I's alleged *dolo incidental* and the damage which Claimant says it has suffered.

745. Second, the Tribunal is also not convinced that, absent the deceit, Reficar would have rejected that CB&I's overall liability under the EPC contract be capped to a certain amount. Liability caps are a common provision, in all kinds of construction contracts (including RC and LSTK contracts); in fact, the Project Definition Contract[824], the LOI[825] as well as the initial versions discussed during the negotiations of the final text of the EPC Agreement[826] contained provisions limiting the Contractor's liability.

746. Reficar has not proven that the liability cap was specifically incorporated into the contract because of its RC nature or that it would have rejected the inclusion of a liability cap had it been properly informed of the risks of RC contracting. In any event, Reficar's argument fails because it was advised by a professional law firm, Linklaters[827].

\* \* \*

747. In sum, the Tribunal finds that Reficar has failed to provide a convincing counter-factual scenario for its *dolo incidental* claim, that would allow the Tribunal to establish the consequences of CB&I having deceived Reficar into entering into the RC EPC Contract and that would allow for a proper calculation of potential damages.

## 2.4. NO LESS BENEFICIAL CONTRACTUAL TERMS

748. The Tribunal has already determined that Reficar was well advised on the risks associated with an RC EPC Contract vs an LSTK EPC Contract. The two principal risks relate to cost overruns and conflict of interest:

---

[824] See Ex. C-006, Section 26 "Limitations of Liability" at pp. 42-44.
[825] Ex. C-0037, p. 5: "Aggregate Liability – The Aggregate cap on liability is $USD 70MM […]".
[826] See *e.g.*, Ex. R-0568, p. 5 "Reficar's Position (25/01/10)" at item 7 "Remedies" states: "No waiver of remedies established in Colombian law, subject to the liability caps. To the extent that resolution (rescission) or specific performance is required, this will only be up to the limits of liability set out in the EPC"; Ex. R-0569, "TC8 - Limitations of Liability 8.1 Limitation of Contractor's Liability" and similar wording under Ex. R-0570 at pdf p. 37.
[827] See e.g., Ex. R-0567.

-    If an RC project incurs cost overruns, these have to be assumed by the Owner in their entirety, and

-    The Constructor, who is being kept fully indemnified by the Owner, has little interest in minimizing and controlling costs.

749. Reficar, well advised by its experienced legal counsel, understood these risks and in the EPC Agreement included two provisions which shielded it from those pitfalls:

750. First, Section IV on Pricing of the Onshore[828] and Offshore[829] Agreements includes Appendix I (on Contractor's Fixed Fee, Rates and Management Fee) which reads as follows:

> "In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis […] and the amount payable shall be the Contract Price. Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner" [Emphasis added].

751. This provision creates a triple condition, to give rise to Reficar's obligation to reimburse a cost incurred by CB&I. Reimbursable costs must:

-    Be reasonable,

-    Have been properly incurred in accordance with the Contract, and

-    Have been incurred in carrying out the Project.

752. Second, para. 3 of the Project Execution Plan, which, as Annex 13, forms an integral part of the Contracts, reads as follows[830]:

> "Even though a reimbursable contract CB&I project management will rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own". [Emphasis added]

753. Under this provision CB&I accepted a double undertaking:

-    To rigorously control cost and schedule, applying the same standards as in an LSTK agreement, and

-    To safeguard Reficar's resources as if their own.

754. These two provisions have been referred to jointly as the "**Cost Control Commitments**". These contractual safeguards protected Reficar from unreasonable costs and delay and from CB&I's improper conduct due to conflict of interest.

---

[828] JX-003, p. 3.
[829] JX-005, p. 3.
[830] JX-002, p. 654; JX-004, p. 628.

Reficar willingly accepted the RC structure, knowing that these protections were in place.

755. <u>Thus</u>, the second prong of the *dolo incidental* claim is also not met: Reficar has not proven that by agreeing to the RC EPC Contract it accepted contractual terms that were less beneficial than those which it would have agreed to in an LSTK EPC Contract.

## 2.5. CONCLUSION

756. <u>In sum</u>, the Tribunal finds that there is no evidence that CB&I acted with *dolo incidental* in the pre-contract stage. CB&I did not deceive Reficar into signing the RC EPC Agreement:

- Because Reficar was fully and independently informed of the risks and benefits of such contractual arrangements,

- Because it had knowledge of deficiencies in CB&I's pre-contract deliverables, some of which were caused chiefly by its own late decision to introduce changes to the Project, and

- Because it did not fully and exclusively rely on these deliverables in its decision to enter into the EPC Agreement.

757. Reficar has also failed to establish a convincing counter-factual scenario, a crucial element of a *dolo incidental* claim.

758. That said, CB&I's conduct is not without blame.

759. The February 2010 Estimate did not meet the Class 2 +/-10% requirement, notwithstanding the indication on its cover page. CB&I should have eliminated the reference to Class 2 +/-10% from the cover page, and Mr. Deidehban's letter, answering a direct question from Reficar, could and should have been less ambiguous.

760. But later on, CB&I did inform Reficar that the design changes that it had requested resulted in the inclusion of ROM figures which amounted to USD 671 million (USD 501 million cost reductions identified in the CRWs and USD 170 million resulting from Synergy Changes). Reficar, who carefully reviewed the Estimate with its own team of estimators and with the support of its external advisors, must have been aware that ROM values in these amounts implied that the Estimate could not meet the Class 2 +/-10% threshold.

761. Hence, CB&I's conduct did not amount to deceit and was incapable of resulting in *dolo incidental*.

## 3.    NO BREACH OF DUTY TO ACT IN GOOD FAITH

762. As a second argument, Reficar argues that CB&I violated its good faith duties in the negotiation of the EPC Contract, by failing to provide Reficar full and correct information and by other specific conduct[831]. CB&I denies the claim[832].

## 3.1. APPLICABLE LAW

763. The duty to inform during negotiations under Colombian law derives from a more general obligation of good faith. Provisions regulating this duty may be found in general under Art. 83 of the Colombian Constitution[833] and in the more detailed context of the pre-contractual period, under Art. 863 of the Colombian Commercial Code[834]:

> "*Artículo 863. BUENA FE EN EL PERIODO PRECONTRACTUAL.*
>
> *Las partes deberán proceder de buena fue exenta de culpa en el período precontractual, so pena de indemnizar los perjuicios que se causen*"[835].

764. This general requirement of acting in good faith gives rise to more detailed secondary duties; both experts on Colombian law agree that such duties include

- the duty to inform,

- the duty of loyalty and

- the duty of care,

which apply during the pre-contractual stage and during the performance of the contract even if not specifically spelled out therein[836].

765. Reficar's precontract claim focuses on one of these secondary good faith obligations: the duty to fully inform the counterparty during negotiations.

766. Reficar argues[837] and CB&I does not contest[838] that:

- the information provided must be clear (understandable), transparent (complete and precise) and timely (in advance allowing for informed decision)[839]; information does not meet the required standard if it is misleading, relative, out of date, obscure or deliberately insufficient[840];

- the information must be relevant;

---

[831] CPHB, para. 60 and references therein.
[832] RPHB, paras. 70-71; ESOD, paras. 1424-1426.
[833] CL-001.
[834] CL-020.
[835] Translation taken from RL-404:
"Art. 863.- The parties shall proceed in good faith exempt from guilt during the pre-contractual period, under penalty to compensate the damage caused".
[836] Solarte I, paras. 193-200; Arrubla I, paras. 86-91.
[837] CPHB, para. 46; Reply, para. 59.
[838] RPHB, para. 70.
[839] CPHB, para. 46, citing to Solarte II, para. 166.
[840] CPHB, para. 46.

- the information should be in possession (or should have been in possession of) of the revealing party; and

- the information should not already be in possession of the receiving party.

767. <u>Summing up</u>, Art. 863 of the Colombian Commercial Code regulates the period of negotiations leading to the execution of a contract; the rule requires that, during this period both parties must act in good faith, and such obligation includes the duty to provide to the counter-party

- clear and transparent information,

- which is relevant for the contract execution, and

- to which the counter-party does not have access.

If a party fails to comply with this standard of disclosure or in some other way acts in bad faith during the negotiations, the validity of the executed contract is not impaired, but the aggrieved counter-party is entitled to be compensated for the damage suffered.

## 3.2. DISCUSSION

768. CB&I delivered numerous pieces of information to Reficar during their pre-contract negotiations, including several estimates, schedules and aclaratory letters. The Tribunal has already established that Reficar was not deceived by this information and that CB&I did not act with *dolo incidental* when it provided the deliverables. The discussion now centers on a different issue: Colombian law requires that during contract negotiations both parties must, under their general act in good faith duty, provide to the other party relevant information to which the counter-party does not have access; such information must be clear, complete and precise.

769. The duty to act in good faith and provide information is not absolute and depends on the specific characteristics of each of the parties.

770. In this case, CB&I is an international construction firm, with extensive professional experience in the construction of refineries. CB&I had superior knowledge of the refinery-construction business and was placed in a better position to know whether the Estimates and Schedule were accurate[841]. This would militate for a heightened or reinforced duty of candour.

771. But this conclusion must be weighed against the fact that Reficar is a highly experienced operator of refineries, with an extensive and qualified team of in-house engineers and analysts, capable of developing sophisticated cost saving and synergy improving alternatives. The record also shows that Reficar had its own group of estimators, who were physically inserted in CB&I's Houston offices to help in the estimating effort and verify CB&I's work. Finally, Reficar was supported by a cadre of outside experts, engineers, consultants, and lawyers.

---

[841] ESOC, paras. 2, 544, 762.

772. The Tribunal will address certain instances in which Reficar alleges that CB&I acted with bad faith in the pre-contractual stage. The Tribunal will refer to:

- CB&I's change in its business strategy (**A.**),

- the alleged threats by CB&I (**B.**),

- CB&I's announcement in February 2010 that it had been awarded the Contract (**C.**),

- the introduction of TC 44.1.1 into the EPC Contract (**D.**),

- the Class 2 +/-10% requirement of the February 2010 Estimate (**E.**), and

- finally, the allegedly deficient Schedule (**F.**).

**A.     Change in CB&I's business strategy**

773. Reficar argues that CB&I took a general business decision to change its strategy and to "de-risk" its construction portfolio, by phasing out LSTK contracts and moving to RC contracts[842]. According to Reficar, this internal change was not communicated to Reficar and constituted a breach of good faith[843].

774. The Tribunal disagrees with Reficar.

775. <u>First</u>, it appears that CB&I did let Reficar know about this change in strategy – Mr. Houtz, a Reficar employee, reports that CB&I's Mr. Sipes informed him of this fact on a flight in the spring of 2008[844].

776. <u>Second</u>, CB&I was a listed company, and had a duty to inform the financial markets of any relevant change in its business strategies. On July 15, 2008 CB&I publicly announced its new strategy in an investor call[845]:

> "As we have discussed on numerous occasions, we are de-risking our portfolio by modifying our fixed price business model. During the past year, we have reduced CB&I's risk profile from 90%+ higher-risk projects to around 55%. […] We are also targeting a portfolio mix of no more than 20 to 25% risk in work by the end of 2009".

777. There is no evidence that CB&I in bad faith tried to hide this information from Reficar.

**B.     Alleged threats by CB&I**

778. Reficar brings another instance of alleged bad faith by CB&I to the Tribunal's attention:

---

[842] CPHB, paras. 63-64.
[843] CPHB, paras. 71-72.
[844] Houtz CWS, paras. 87-88.
[845] Ex. C-0011, p. 4.

779. According to Reficar, in October 2009, Mr. Deidehban threatened Reficar with "drastic" changes, if Reficar continued to request an LSTK estimate, and the threat further induced Reficar to agree to the change in the contracting modality[846].

780. Mr. Deidehban's conduct does not breach the duty of good faith: CB&I had been working under the impression that the decision to switch to RC had been made as early as June 2008[847] and preparing a new LSTK estimate would have required considerable additional resources, which were not budgeted for – according to CB&I, by that point, the FEED budget had been exhausted[848]. Therefore, the "drastic" changes mentioned by Mr. Deidehban were not exaggerated and would actually have been needed, if Reficar had insisted on CB&I preparing a new LSTK estimate – which it did not.

## C.    Contract award announcement

781. Reficar also argues that CB&I prematurely announced in an investor earnings call from February 2010 that it had been awarded the EPC Contract in November 2009, half a year prior to the actual signing of the EPC Contract – according to Reficar, this proved a source of motivation for CB&I to be awarded the EPC Contract no matter what, even if it meant deceiving Reficar[849].

782. The Tribunal disagrees with Reficar. The investor call announcement referred to the November 2009 LOI, the preliminary agreement signed between Reficar and CB&I and labelled it as a contract. This was partially justified because the LOI's full name is actually "Letter of Intent and Authorization to Proceed with the EPC work [...]"[850] [Emphasis added]. Since the LOI allowed CB&I to proceed with EPC work, it did permit CB&I to commence the EPC work, even though the LOI itself stated that it did not oblige the Parties to ultimately enter into the EPC Contract[851], as correctly indicated by Reficar[852].

783. That CB&I's officers were announcing the award of the LOI rather than the EPC Agreement is reinforced by the numbers given by CB&I's officials: USD 1.5 billion (stated by the CEO)[853] and USD 1.4 billion (as stated by the COO)[854], rather than the USD 3 billion contemplated for the Project[855].

* * *

784. Therefore, the Tribunal does not see any breach of good faith duties in CB&I's investor call announcements.

---

[846] CPHB, para. 69, referring to Ex. C-0022, p. 1.
[847] Ex. R-2067, p. 2; Canals RWS, para. 78.
[848] ESOD, para. 144, referencing Exs. R-0017, R-0550 and R-0551.
[849] CPHB, paras. 117-119, citing to Ex. C-1924, pp. 3-4.
[850] Ex. C-0037, p. 1.
[851] Ex. C-0037, p. 3.
[852] CPHB, para. 118.
[853] Ex. C-1924, p.3; CEO stands for Chief Executive Officer.
[854] Ex. C-1924, p. 4; COO stands for Chief Operating Officer.
[855] The September 2009 Revisions to the July 2009 Estimate foresaw EPC Costs at USD 2.899 and USD 2.989 billion, respectively, and the February 2010 Estimate – at USD 3.150 billon.

**D.**  **Introduction of TC 44.1.1**

785. According to Reficar, CB&I in bad faith[856] inserted a contract provision in the EPC Agreement, TC 44.1.1, which intended to shield CB&I from financial fallout of lower-than-expected productivity, of which CB&I was fully aware[857].

786. TC 44.1.1 reads as follows:

> "44.1.1 Skilled and Qualified Craftsmen
>
> [...]
>
> Should the actual productivity values be different than those set out in the Final Full Estimate, the Contractor shall be entitled to change in those productivity values with the Written Approval of the Owner".

787. The clause foresees the possibility that actual PFs are higher than those used in the Final Full Estimate, due to the craftsmen in Cartagena reaching a productivity lower than that expected. In such case, CB&I is entitled to change the PFs in its estimates, provided that it obtains the previous authorization of Reficar.

788. The Offshore Agreement, as it does not cover local construction work, does not contain an analogous provision.

789. Far from showing bad faith, TC 44.1.1 reinforces CB&I's argument that it repeatedly tried to warn Reficar that the PFs in the February 2010 Estimate and, consequently, in the Final Full Estimate were overly aggressive. The existence of the clause simply shows that CB&I foresaw the possibility that higher PFs would result necessary, and that, if this happened and Reficar agreed, the new PFs would be used in future estimates. Reficar agreed to this.

790. The Tribunal does not see any element of bad faith.

**E.**  **The Class 2 +/-10% requirement of the February 2010 Estimate**

791. The Tribunal has already established that the July 2009 Estimate did not adhere to the AACE Class 2 +/-10% accuracy level, because the engineering deliverables were not at the level required by AACE[858]. But the more relevant deliverable for Reficar's decision to enter into the EPC Contract was not the July 2009 Estimate, but the February 2010 Estimate, which corresponded to the Final Full Estimate. The February 2010 Estimate also failed to meet the Class 2 +/-10% requirement, notwithstanding the indication on its cover page to the contrary, but for a different reason: Reficar's design changes had resulted in the inclusion of ROM figures which amounted to USD 671 million, composed of USD 501 million cost

---

[856] CPHB, para. 90.
[857] CPHB, para. 89.
[858] The Tribunal need not enter into Reficar's fragmentary argumentation on the P80 character of the July 2009 Estimate raised at the Hearing at Tr. 5028:17-20 but not addressed in detail in Reficar's written submissions. Any putative finding would not change the Tribunal's decision on the accuracy of the Estimate.

reductions identified in the CRWs and USD 170 million resulting from Synergy Changes – making a Class 2 +/-10% category illusory.

792. The Tribunal has already established that CB&I's conduct with regard to the February 2010 Estimate was not without blame:

- CB&I should have eliminated the reference to Class 2 +/-10% from the cover page, and

- Mr. Deidehban's letter, answering a direct question from Reficar, could have been less ambiguous and should have candidly disclosed that the February 2010 Estimate was not Class 2 +/-10%[859].

793. But the Tribunal has already established that CB&I's conduct did not amount to deceit and was incapable of resulting in *dolo incidental,* because CB&I, before the execution of the EPC Contract, properly disclosed to Reficar that the design changes that it had requested had resulted in the inclusion of ROM figures (see Section VII.1.3.2.2.F *supra*).

794. The question which the Tribunal must now address is whether CB&I's conduct, although not reaching the level of irregularity necessary for *dolo incidental*, could still qualify as a breach of the general duty of good faith. Did the general principle of good faith require that CB&I candidly disclose to Reficar that the February 2010 Estimate, contrary to its cover page, did not meet the Class 2 +/-10% requirements?

795. The Tribunal, not without some hesitation, decides in CB&I's favour. In finding that CB&I did not breach its duty to inform derived from good faith, the Tribunal finds the following arguments compelling:

796. First, it is a general principle of Colombian civil law, that bad faith cannot be presumed and must be properly proven; the general presumption is that parties act in good faith. This principle is enshrined both in

- the CCC, under Art. 769:

    "*ARTÍCULO 769. PRESUNCIÓN DE BUENA FE. La buena fe se presume, excepto en los casos en que la ley establece la presunción contraria.*

    *En todos los otros, la mala fe deberá probarse*"[860]

and

- the Commercial Code, under Art. 835:

    "*ARTÍCULO 835. PRESUNCIÓN DE BUENA FE. Se presumirá la buena fe, aún la exenta de culpa. Quien alegue la mala fe o la culpa de una persona,*

---

[859] See Section VII.1.3.1.3.C.b. *supra*.

[860] RL-401; translation into English at p. 3:
"ARTICLE 769. PRESUMPTION OF GOOD FAITH. Good faith is presumed, except in cases whereby the law presumed otherwise.
In all other cases, bad faith must be proven".

> *o afirme que ésta conoció o debió conocer determinado hecho, deberá probarlo*"[861].

797. Thus, the burden of proof for alleged bad faith behavior by CB&I lies with Reficar. Reficar has failed to discharge the burden to prove its case.

798. <u>Second</u>, the Estimates' failure to meet the Class 2 +/-10% standard was not CB&I's fault. The fundamental reason for the 2010 February Estimate's deficiency was Reficar's very late decisions to introduce significant design changes which, due to time constraints, CB&I was only capable of inserting at ROM levels. To make matters worse, after initially giving a green light to redesign the Synergy Changes-affected units, a month later Reficar told CB&I to stop the re-design of these units[862]. It also appears from the case record that Reficar instructed CB&I not to proceed with re-doing basic design but instead to move straight to detailed engineering[863] – a procedure which required additional time.

799. <u>Third</u>, <u>before the EPC Contract was executed</u> CB&I made up for the inaccuracies in the title of the Estimates and properly informed Reficar that the February 2010 Estimate included USD 671 million in ROM figures[864]. Reficar, an experienced and well advised refinery operator, confronted with this information, could have taken the decision to postpone execution of the EPC Contract until CB&I had managed to convert the USD 671 million ROM figure into a Class 2 +/-10% amount. It chose not to do so, and instead it decided to accelerate the execution of the Contract, based on its own estimated budget, and trigger the commencement of the construction.

800. <u>Finally</u>, Mr. Deidehban's conduct, although not to be commended, did not amount to a falsehood – more to an opaque ambiguity.

801. Reficar had sent a letter dated 30 April, requesting 16 items of clarification[865]. In Item 12 Reficar voiced the doubt whether the February 2010 Estimate was indeed Class 2 +/-10%:

> "Based on the comments provided, we cannot confirm that this estimate meets the requirements of a +/-10% estimate"[866].

802. Mr. Deidehban gave a somewhat ambiguous answer, appearing to confirm the +/-10% certainty, but sharing responsibility over the accuracy with Reficar:

> "CB&I would like to kindly remind Reficar that the planning and review of the EPC Estimate was a joint process between Reficar and CB&I-TPIT Consortium. The review and implementation of the estimate plan,

---

[861] RL-403; translation into English at p. 3:
"ARTICLE 835. PRESUMPTION OF GOOD FAITH. Good faith is presumed, even that exempt from guilt. He who alleges bad faith or blames a person, or affirms that they knew about or should have known a certain fact must prove so".
[862] Ex. R-0552, p. 1; Tr. 1586:10-15.
[863] Ex. B-052, p. 2; the speaker was Mr. Deidehban.
[864] See Section VII.1.3.2.2.F. *supra*.
[865] Ex. C-0314.
[866] Ex. C-0314, p. 3.

procurement plan and many other key factors that supported the +/-10% estimate were <u>approached by all Parties as a team</u>"[867] [Emphasis added].

803. Reficar could have asked for a clarification – there is no evidence in the record that it did, and thus the ambiguity was not properly cleared.

* * *

804. All in all, the Tribunal finds that, although CB&I's, and especially Mr. Deidehban's conduct are not without blame, the standard under Colombian law for a finding of bad faith is high, and that CB&I's conduct did not trespass the level of propriety which would provoke a breach of the good faith duties of Art. 863 of the Colombian Commercial Code.

## F.    <u>Deficient Schedule</u>

805. Reficar claims that CB&I also acted in bad faith regarding the April 2010 Schedule, by not disclosing that it was in fact a Level 2 Schedule and that the resource-loading was done at an insufficient level[868].

806. It is true that the April 2010 Schedule did not fulfil all of the Level 3 and resource-loading criteria. But the Tribunal has already established that there was no deceit, because Reficar accepted CB&I's offer, and the EPC Contract provided that the final Schedule be delivered within 90 days of execution, provided that the Mechanical Completion date remained the same.

807. The existence of an agreement between CB&I and Reficar with regard to the delivery of the final Schedule with a delay of 90 days, and CB&I's subsequent compliance with the terms of the agreement, also excludes any possibility of considering CB&I's conduct as bad faith.

808. <u>As a result</u>, the Tribunal finds that there is no evidence that CB&I breached its good faith duties as regards the April 2010 Schedule.

## 3.3.    <span style="font-variant:small-caps">Conclusion</span>

809. Art. 863 of the Colombian Commercial Code requires that during the period of negotiations both parties must act in good faith, and provide to the counter-party

-    clear and transparent information,

-    which is relevant for the contract execution, and

-    to which the counter-party does not have access.

If a party fails to comply with this standard of disclosure or in some other way acts in bad faith during the negotiations, the aggrieved counter-party is entitled to be compensated for the damage suffered.

---

[867] Ex. R-0027, p. 4.
[868] CPHB, paras. 114-115.

810. Reficar alleges that CB&I acted with bad faith in the pre-contractual stage when it decided to change its business strategy, when it threatened drastic changes if Reficar required another LSTK estimate, when it prematurely announced the awarding of the EPC Contract, when it insisted in introducing TC 44.1.1 into the EPC Contract, when it failed to candidly disclose that the February 2010 Estimate was Class 2 +/- 10% and finally when it submitted a deficient Schedule.

811. The Tribunal has analysed these situations and has found for CB&I: Reficar has been unable to prove CB&I's pre-contractual misconduct. In one instance, the Tribunal has come to this conclusion not without hesitations: CB&I has failed to candidly disclose to Reficar that the February 2010 Estimate in fact did not meet the Class 2 +/-10%. CB&I's, and specially Mr. Deidehban's conduct in this respect are not to be commended, but, in the Tribunal's considered opinion, such conduct is not the expression of bad faith and does not give rise to a breach of the good faith duties of Art. 863 of the Colombian Commercial Code.

**4.** **IRRELEVANCE OF THE DOCTRINA DE LA RESPONSABILIDAD EN LA CONFIGURACIÓN DEL CONTRATO**

812. Reficar has also invoked the *doctrina de la responsabilidad en la configuración del contrato*, which Reficar defines as follows[869]:

> "When a breach of the duty to inform causes the other party to agree to certain terms of a contract to which that party otherwise would not have agreed, those terms will not be enforced against the aggrieved party".

813. Reficar's legal expert, Judge Solarte, does not refer to a *doctrina de la responsabilidad en la configuración del contrato*, but simply to a "*daño en la configuración del contrato*", which he describes with these words[870]:

> "*[E]l daño en la configuración del contrato se presenta cuando el <u>deber de información</u> ha sido vulnerado por una de las partes durante la etapa de negociación del contrato, y esta conducta ocasiona que la otra parte manifieste <u>su consentimiento respecto de condiciones contractuales que no hubiera aceptado de haber sabido que la información no era veraz o completa</u>*" [Emphasis added].

814. According to Judge Solarte, the *daño en la configuración del contrato* arises whenever there is a breach of the pre-contracual duty to inform, which leads the aggrieved party to agree on less beneficial terms then it would have, had it been properly informed. In support of his theory, Judge Solarte quotes a book by Prof. Rengifo, who also refers extensively to the "*daño en la configuración del contrato*", which derives, as he explains, when the counterparty has acted with *dolo incidental*[871].

---

[869] CPHB, para. 128.
[870] Solarte ER II, para. 137.
[871] Mauricio Rengifo: "*La formación del contrato*", p. 290; CL 490; the daños can also occur in some other circumstances, which are irrelevant for this discussion.

815. In his opinion, Judge Solarte further explains how damages should be calculated in these situations:

> "*En los supuestos de daño en la configuración del contrato el monto de la reparación [...] corresponderá al valor que surja de realizar una <u>comparación entre el contenido del contrato efectivamente celebrado y el que hubiera existido</u> si la víctima hubiese tenido una información veraz y oportuna [...]*"[872] [Emphasis added].

816. Judge Solarte's opinion could not be clearer: the doctrine of "*daños en la configuración del contrato*" leads to a remedy of damages, to be calculated by comparing an "as is" scenario (the contract as signed) and a "but for" scenario (the contract that would have been agreed had there been full information). His opinion echos the Tribunal's findings regarding the calculation of damages in situations where one party has acted with *dolo incidental* – see section 2 above.

817. Reficar's opinion is different: it submits that in the present case the doctrine would lead to the inapplicability of certain provisions in the EPC Agreement, such as the liability caps. Reficar argues that if there is *responsabilidad y daño en la configuración del contrato*, the disadvantageous terms of the contract may be deemed inapplicable, and the contract may be thus "reconfigured" by the Tribunal to recreate what it would have been, had the victim party been fully informed.

818. This is a clear misunderstanding of Judge Solarte's and Prof. Rengifo's opinions: both simply stated that if there is a breach of the duty to inform, or if one party acts with *dolo incidental* during the negotiations, leading the other party to accept terms and conditions which it otherwise would not have accepted, the aggrieved party is entitled to damages. But neither Judge Solarte nor Prof. Rengifo state what Reficar avers: that the remedy is the inapplicability of the terms and conditions which the aggrieved party, had it had full information, would not have accepted.

<u>Case law</u>

819. The few cases invoked by Claimant confirm the Tribunal's position; in these procedures, the adjudicators decided that, if a party had breached its duty to inform, the appropriate remedy was damages (as the Commercial Code and Civil Code provide), but not partial nullity of the offending terms and conditions:

820. Claimant's expert refers to an order given in 2012 by the Colombian *Consejo de Estado* (Council of State) in the *Endesa* case[873], in which the dispute focused on the selling party failing to disclose in the pre-contractual negotiations certain liabilities of the enterprise which was the object of the sale[874]. The Council of State found that[875]:

> "*[E]xistiendo el deber de informar sobre la existencia de ese pasivo y habiéndose omitido brindar la información respectiva, es claro que se*

---

[872] Solarte ER II para. 140.
[873] Solarte ER II, para. 139.
[874] CL-818.
[875] CL-818, p. 20.

> *incumplió con ese deber precontractual y por ende surge el deber de reparar*
> *el daño que se hubiere ocasionado con la reticencia*".

821. The Council of State found that there had been a breach of the obligation to inform, but the remedy enforced was not a change in the provisions of the contract – instead, the Council awarded damages as if it were a case of breach of the duty to inform or a *dolo incidental* case[876].

822. The other case referred to by Reficar in detail concerns the arbitration of *Concesionaria Vial de Los Andes S.A. v. Instituto Nacional de Vías*, in which the concessionaire agreed to assume the risk that work quantities exceeded 30% of the projected amounts, and where the pre-contractual studies contained significant errors.

823. The tribunal found that this risk provision would not have been agreed to by the claimant had it been fully and properly informed[877]:

> "*Así las cosas, el tribunal considera que no puede argumentarse que el*
> *concesionario estaba obligado a asumir el riesgo de diferencia en cantidades*
> *de obra por encima del 30%, pues esta propuesta se formuló sobre la base de*
> *una información errada, que, de haberse conocido, hubiera determinado que*
> *dicha propuesta no se realizara o por lo menos, hubiera sido planteada a*
> *sabiendas*".

824. However, the tribunal did not purport to apply the *configuración del contrato* doctrine (in fact, there is no reference whatsoever to this concept in the award). Neither did it order the inapplicability of certain provisions – the tribunal simply awarded damages[878].

825. <u>Summing up</u>, the Tribunal dismisses Reficar's argument that if there is *responsabilidad y daño en la configuración del contrato*, the disadvantageous terms of the contract may be deemed inapplicable, and the contract may be "reconfigured" by the tribunal to recreate what it would have been, had the victim been fully informed. Reficar's position is based on a misunderstanding of Judge Solarte's and Prof. Rengifo's opinions, and finds otherwise no support in Colombian case law.

---

[876] CL-818, p. 22.
[877] CL-375, p. 44.
[878] CL-375, pp. 144-145.

## VII.2. CONTRACTUAL CLAIMS

826. Reficar's contractual claims are four-pronged: first, for improper EPC costs incurred in breach of the Contract provisions on controlling costs (**VII.2.1.**), second, for improper delay costs (**VII.2.3.**), third, for work completion costs (**VII.2.4.**) and finally, for procurement costs (**VII.2.5.**). CB&I denies these claims and brings a counterclaim, mostly for unpaid invoices (**VII.2.2.**).

827. Finally, both Parties also request the Tribunal declaratory relief related to the indemnification obligations under the EPC Contract (**VII.2.6.**).

### VII.2.1.    IMPROPER EPC COSTS

828. Claimant claims, in essence, that CB&I breached the Cost Control Commitments[879] and made Reficar incur unreasonable and improper costs. The existence of these unjustified cost overruns is allegedly confirmed by the sheer size of the difference between the real costs and the cost projections that CB&I provided to Reficar.

829. CB&I retorts by denying that cost overruns could have occurred at all, because of the cost-reimbursable nature of the Contract, because of the Reficar-accepted increases to the Project budget and finally because of Reficar's acceptance of costs through payment of invoices, after their extensive review. In addition, if *arguendo* there were any cost overruns, all of them would have arisen due to Reficar's, and not CB&I's, fault.

830. The Tribunal will first briefly describe the relevant facts (**1.**), then summarize the Parties' positions (**2.**) and finally enter into a discussion (**3.**).

### 1.    FACTS

831. As discussed under Section VII.1.1.7 , the EPC Agreement was signed on June 15, 2010[880]. The EPC Contract is a cost-reimbursable agreement between the Parties pursuant to TC 58.1 "Contract Price". Section IV of the Contract specifies which costs were reimbursable[881] and para. 3 of the Project Execution Plan introduces CB&I's heightened standard of care in incurring costs[882].

832. While the EPC Agreement specifically states under TC 58.1 that it is of indeterminate value[883], it does set a Bonus Target Cost at USD 3.221 billon[884] – CB&I would obtain an extra remuneration if it were capable of keeping costs below this limit[885].

---

[879] See Section VII.1.1.7.D above.
[880] See e.g., JX-002, p. 13.
[881] JX-003, p. 3; JX-005, p. 3.
[882] JX-002, p. 654; JX-004, p. 628.
[883] JX-002, p. 235; JX-004, pp. 211-212.
[884] TC 1.1; JX-002, p. 160, JX-004, p. 146.
[885] See analysis at Section VII.1.1.7.B.c.

ICC Case 21747 RD/MK/PDP
Final Award

### A. Monthly Forecasts and the Reficar Budgets

833. To control costs in real time, CB&I was contractually bound to provide to Reficar monthly cost forecasts [previously defined as the "**Monthly Forecasts**"], an estimate of the total EPC costs that Reficar would incur until the finalization of the Project, and of the necessary schedule[886].

834. The Monthly Forecasts were important, because Reficar and Ecopetrol operated under a limited budget [the "**Reficar Budget**" or simply the "**Budget**"]. The Budget had an internal purpose: to control that the overall Project was running as planned, and to ensure that Reficar had sufficient funds for the payments due.

835. The initial Budget had been approved in October 2009 and amounted to USD 3.777 billion[887]. It included not only the EPC costs payable to CB&I, but all other Project-related costs, including sunk costs, owner's costs and Pre-Commissioning and Start-Up ["**PCS**"] costs, which were not included in the Monthly Forecasts prepared by CB&I. Any increase in the Budget had to be approved by the BofD of Reficar and of Ecopetrol, to guarantee that the additional funding was available.

836. In May 2011 Reficar's BofD[888] approved an increase in the Budget to USD 3.994 billion, to account for the Synergy Changes[889]. In total Reficar increased the Budget five times; in its final iteration it amounted to USD 8.016 billion[890].

837. The Budget is an internal Reficar document – there is no reference thereto in any of the Contracts.

### B. CB&I increases its Monthly Forecasts

838. The initial months after signing the EPC Contract showed steady progress and little to no change in the Monthly Forecasts prepared by CB&I, with an increase of only USD 1 million by December 2010[891].

839. Starting in 2011, however, the Project began to run into delays: in February 2011 CB&I's Monthly Forecast suddenly indicated a delay in the Mechanical Completion Date from February to October 2013[892]. Three months later, the May 2011 Monthly Forecast showed delays in all activities (apart from engineering)[893].

840. The delay allegations will be addressed separately by the Tribunal (see Section VII.2.3 *infra*), but the fact that CB&I was running behind schedule was relevant to the Project costs and Reficar's Budget.

---

[886] See Project Controls Execution Plan, Annex 6 to Onshore and Offshore Agreements, para. 7.1; JX-002, p. 478; JX-004, p. 453.
[887] Ex. R-1848, pp. 14, 17; Ex. R-3708, p. 10 in conjunction with Ex. R-1853_0054, p. 3.
[888] The Tribunal notes that each increase in the control budget was later also approved by Ecopetrol's BofD.
[889] Ex. R-4139, p. 1.
[890] Gutierrez CWS, para. 73, as reflected by Ex. R-4139, p. 1.
[891] LI ER, Attachment 6H-01 (CB&I Actual & Forecast Costs), line "Total Project".
[892] Ex. C-1864, p. 4.
[893] Ex. C-0067, p. 7.

Impact on costs

841. The impact of the delay was not initially reflected in the Monthly Forecasts: in CB&I's January 2011 Monthly Forecast the EPC costs only increased from 3.221 billion to USD 3.251 billion[894]; a mere addition of USD 30 million half a year into the Project. Six months thereafter, the August 2011 Monthly Forecast showed a bleaker perspective: CB&I was now forecasting that the EPC costs would reach USD 3.641 billion[895], a substantial increase of some USD 400 million. The situation worsened in the fall and winter of 2011. The Monthly Forecast for November 2011 showed EPC costs at USD 3.639 billion[896]; the number increased in December 2011 to USD 3.809 billion[897] and was revised in January 2012[898] to USD 3,971 million[899].

842. Note that in one year the Monthly Forecasts had increased more than USD 700 million (from USD 3.2 billion to almost USD 4 billion – a 22% increase).

## C.   **Reficar's reaction**

843. Alerted by its consultant Foster Wheeler, Reficar became worried that CB&I might be engaging in practices of profit maximization at its expense[900]. The matter was extensively discussed at the January 2012 Steering Committee, held with the participation of Reficar, Ecopetrol, CB&I and Foster Wheeler[901]. CB&I assuaged Reficar's fears and averred that, notwithstanding the increase, the Project costs were under control[902].

844. As a solution to the exploding cost predictions, Reficar proposed to CB&I to renegotiate the EPC Contract, offering to increase the Bonus Target Cost to USD 3.7 billion[903] and to introduce a system of penalties and benefits that would increase CB&I's interest in controlling Project costs[904]. CB&I's counterproposal accepted the modification of the Bonus Target Cost to USD 3.7 billion, but limited possible penalties against CB&I for cost overruns to USD 30 million[905]. Reficar's BofD rejected CB&I's offer[906].

---

[894] LI ER, Attachment 6H-01 (CB&I Actual & Forecast Costs), line "Total Project".
[895] Ex. C-0069, p. 4.
[896] Ex. R-1851_057_00015, fourth tab, in yellow, "Project Summary".
[897] Ex. C-0222, p. 4; Ex. R-1851_057_00016, fourth tab, in yellow, "Project Summary".
[898] Ex. C-0088, p. 4.
[899] Ex. R-1851_057_00017, fourth tab, in yellow, "Project Summary".
[900] Reficar BofD Meeting Minutes of January 24, 2012, Annex 1, "Punto No. 1 - Informe de Foster Wheeler.pptx", p. 8 [under group Ex. 1853; see path: 1853\Contraloria\CARPETA PRINCIPAL 1\Actas Junta Diretiva Reficar 078 a 131CD_Fl 14\Acta No. 79 - Reunión Ordinaria - 24 de enero de 2012].
[901] Ex. C-0089.
[902] Ex. C-0089, p. 4.
[903] Excluding contingencies, see Ex. R-1476, p. 5.
[904] Ex. R-1476, p. 5.
[905] Ex. R-1480, p. 8.
[906] Ex. R-1480, p. 8.

Threat of unilateral termination

845. In parallel to its efforts to renegotiate the Contracts, Reficar threatened CB&I with the possibility of termination – a right to which Reficar was entitled in accordance with the terms of the Agreements and which reinforced its bargaining position[907].

846. The 2007 Project Definition Contract had limited Reficar's right to unilateral termination: in such case CB&I was entitled to receive a fee of USD 50 million, as compensation for the use by Reficar of CB&I's license[908]. But when the Parties negotiated the EPC Agreement, CB&I's right to this fee was explicitly removed[909]; as a result, the EPC Contract grants Reficar the right to unilaterally terminate the relationship with CB&I at convenience, even without any fault on CB&I's part[910], and on terms beneficial to Reficar: termination of the EPC Agreement for convenience does not entitle CB&I to any severance fee and CB&I explicitly waived any claims against Reficar and Ecopetrol for this reason[911].

**D.    CB&I's Representation Letter**

847. To assuage Reficar's fears, on May 22, 2012 CB&I sent a letter to Reficar, signed by its Project Director, Mr. Deidehban[912], in which CB&I reiterated the validity of the USD 3.971 billion cost Forecast [previously defined as the "**Representation Letter**"].

848. But Mr. Deidehban did not only repeat the validity of the Forecast, but he also then went one significant step further. Until now, CB&I had represented that its estimates were at best Class II +/-10%. Now for the first time CB&I formally represented to Reficar that this USD 3,971 million Forecast met the highest requirements of the industry: it complied with the requirements of a Class I +/-5% estimate.

**E.    The Monthly Forecasts continue increasing**

849. Notwithstanding the Representation Letter, the Monthly Forecasts did not stop growing. By September 2012, the Monthly Forecast reached USD 4.221 billion[913] and by October USD 5.467 billion[914], an increase of USD 1.246 billion (or 23%) in just one month. This prompted further alignment meetings, which led to CB&I slightly reducing the forecast to USD 5.371 billion in December 2012[915].

850. As regards the delay in the schedule, in early 2013 as an attempt to stabilize the relations between the Parties, Reficar offered to grant CB&I a 184-day time

---

[907] Ex. C-0089, p. 3: "It is critical to demonstrate control with the evolution of the project as, without this, there will be a need to take action outside the contract".
[908] Ex. C-0006, p. 16.
[909] JX-007, p. 46.; also see JX-002, p. 199; JX-004, p. 184.
[910] JX-002, p. 243; JX-004, p. 220.
[911] JX-002, p. 245; JX-004, p. 222.
[912] Ex. R-1849_07396.
[913] Ex. C-0093, pp. 4, 39.
[914] Ex. C-0096, p. 13; the Tribunal notes that the same document offers different ranges for the reforecast at p. 17.
[915] Ex. C-0257, p. 4.

extension to the Guaranteed Completion Date[916]. Mr. Deidehban, however, rejected this proposal, as it "d[id] not sufficiently reflect the agreements reached during our recent schedule and cost alignment discussions"[917] and added, regarding costs, that:

> "Whether the schedule is extended to August 31, 2013, August 22, 2014 or any other date, CB&I is entitled to be compensated for extended performance costs associated with that time extension"[918].

851. By mid-2013 CB&I appeared to have stabilized the forecasted costs and schedule. But then, between July and September 2013, the Project suffered serious labour disruptions, which included work stoppages and a strike. In August there was an explosion in the FCC Unit[919], which impacted on schedule.

852. Using the labour disruptions as its main reason, CB&I once again increased its Monthly Forecast in February 2014, this time to USD 6.27 billion[920], a number which remained relatively stable until the end of the Project, with the final EPC cost projection from December 2015 being slightly reduced to USD 6.214 billion[921].

## F.   Actual cost of the Project

853. Reficar ultimately paid to CB&I USD 5,908.2 million in EPC costs[922]. Additionally, in the present arbitration CB&I has filed a counterclaim for unpaid Project costs of USD 267.26 million[923]. If both amounts are added, the total Project costs paid by CB&I plus the amounts still under dispute reach up to USD 6,175 million[924].

854. *Pro memoria:*

- A few months before signing of the Agreements, CB&I had delivered to Reficar its final February 2010 Estimate, a Class II +/- 10% work product, which forecasted that the EPC Contract costs would not exceed USD 3.150 billion[925];

- the Bonus Target Cost agreed upon in the June 2010 Agreement was USD 3.221 billion[926];

- in the May 2012 Representation Letter, delivered when construction had already been progressing for almost two years, CB&I submitted to Reficar a

---

[916] Ex. C-0101, p. 1.
[917] Ex. C-0102, p. 1.
[918] Ex. C-0102, p. 2.
[919] Ex. C-0113.
[920] Ex. C-0110, p. 5.
[921] Ex. C-0056, tab "Project Summ Cost Report Only", Cell R62 ("TOTAL"); see also LI ER, para. 1180 and Table 9.4-17 therein; see also Attachment 9-02 to LI ER.
[922] CPHB, para. 1, citing to Long International ER, para. 1180 and Table 9.4-17.
[923] CPHB, para. 1, fn. 10. The Tribunal notes that CB&I does not quantify its counterclaim as a total number in USD but instead uses separate numbers for invoices due under the Onshore Contract, in Colombian pesos, and for those under the Offshore Contract, in USD.
[924] 5,908.2+267.26=6175.46
[925] Ex. C-0041, p. 50.
[926] TC 1.1; JX-002, p. 160, JX-004, p. 146.

ICC Case 21747 RD/MK/PDP
Final Award

forecast of <u>USD 3.971 billion</u>, representing that this figure met the Class I +/-5% requirements;

- the final cost of the Project reached <u>USD 6.175 billion</u> (of which Reficar has already paid USD 5,908.2 million and USD 267 million is to be adjudicated in the counterclaim).

## 2.   THE PARTIES' POSITIONS

855. The case put forward by Claimant is rather simple: acting with contractual *dolo* or gross negligence, CB&I mismanaged the Project and breached the Cost Control Commitments; as a result, the Project suffered cost overruns, which Claimant has paid, and which Claimant is now seeking to claw back.

856. Reficar does not dispute that the Contract is a cost-reimbursable agreement, but emphasizes that the general principle was modified by the more detailed Cost Control Commitments, which imposed on CB&I the duty to only charge for reasonable and proper costs incurred in accordance with the Contract, and to rigorously control costs – something which CB&I failed to do[927].

857. The EPC Contract clearly states that payments made by Reficar do not constitute a waiver of claims and that Reficar may seek to claw back any costs improperly paid[928]; this shows that there could be cost overruns and that Reficar is entitled to claim them back if unreasonable or improper.

<u>Respondents</u>

858. Respondents defend themselves arguing that, conceptually, in a cost-reimbursable EPC Contract there can be no overrun costs, and that the Cost Control Commitments do not change this[929].

859. Pursuant to TC 58.1, the EPC Contract is of indeterminate value, which further reinforces its claims that the Owner is bound to reimburse all costs incurred by the Constructor[930].

860. In any event, Reficar is barred from clawing back any costs, because by paying Reficar reinforced CB&I's expectations as to the finality of all covered costs[931]. In addition, Reficar employed an extensive cost review system, which confirmed the contractual compliance of all approved costs[932]. Reficar contemporaneously had full knowledge of the Project costs, and accepted them as reasonable every time it increased its Budget[933].

---

[927] CPHB, paras. 192-196; 199-200.
[928] CPHB, paras. 421-425.
[929] RPHB, para. 654; RPHB2, para. 10; H-19, p. 6.
[930] RPHB2, para. 10; RPHB, paras. 111, 153, 586, 629.
[931] RPHB, para. 553.
[932] RPHB2, paras. 4-6, RPHB, paras. 36-46, 60-66.
[933] RPHB, paras. 47-55.

861. Regardless of the above, CB&I always fully complied with the contractual requirements for costs and only invoiced reasonable and proper costs incurred in accordance with the Contract[934].

## 3.    DISCUSSION

862. The Tribunal will address Reficar's claims for unreasonable EPC cost overruns in the following sequence:

- First, the Tribunal will analyse CB&I's duties pursuant to the Cost Control Commitments (**3.1.**);

- Then, it will verify whether CB&I breached the Cost Control Commitments, as claimed by Reficar (**3.2.**);

- As the next step, the Tribunal will quantify the amount of excess costs paid as a consequence of the breaches of the Cost Control Commitments, which Reficar is now entitled to claw back, and in so doing, the Tribunal will address CB&I's defenses that certain categories of costs are Excluded Costs for which it should bear no responsibility (**3.3.**).

## 3.1.    COST CONTROL COMMITMENTS

863. The June 2010 EPC Contract is a voluminous document. The general structure of the EPC Contracts has already been addressed at Section VII.1.1.7[935]. Its nature is that of a cost-reimbursable engineering, construction and procurement contract[936].

864. It is in the very nature of a cost-reimbursable contract that the interests of the owner and constructor are not aligned: since the risk of increased costs or additional delays lies with the owner, the constructor has little incentive to minimize them. To offset the misalignment, CB&I accepted the Cost Control Commitments, which created incentives for the Contractor to be interested in minimizing time and risk: if CB&I failed to treat Reficar's resources as if its own, if it did not rigorously control cost and schedule, or if it incurred unreasonable or improper costs, then it forfeited its right to be reimbursed by Reficar and faced liability for breach of its contractual duties.

865. CB&I accepted these additional obligations, because it wanted to encourage Reficar to change its mind, abandoning its original idea of awarding the construction of the Refinery on a lump sum basis and accepting, instead, a cost-reimbursable structure.

866. CB&I's Cost Control Commitments have two prongs:

---

[934] RPHB, para. 575, citing to H-23, p. 34, which in turn cites to Ex. R- 2219_D and Ex. R-2220_D, adding to a total of COP 68 billion and USD 20 million that CB&I incurred but never invoiced to Reficar; also ESOD, para. 1281.

[935] See discussion of the EPC Contracts in the Pre-Contractual Liability section of the Award.

[936] As prescribed under TC 58 "Contract Price" and Section IV "Pricing" of the Onshore and Offshore Agreements; a similar provision may also be found under TC 3 of Section I "Compensation" of the EPC Contracts. The Tribunal notes that Section I is denoted as "Draft May 8, 2010" in exhibits JX-002 and JX-004 received from the Parties.

ICC Case 21747 RD/MK/PDP
Final Award

- CB&I's **"Heightened Diligence Obligation"**, under which CB&I pledged to rigorously control cost and schedule, in a similar way to a lump sum contract, and to safeguard Reficar's resources as if their own.

- CB&I's **"Reasonable Cost Obligation"**, under which CB&I agreed only to claim reimbursement for costs that were incurred:

  o reasonably,

  o properly, and

  o in accordance with the Contract.

867. The Tribunal will dedicate a separate section to each of the Cost Control Commitments (**3.1.1.** and **3.1.2.**) and then it will address the practical consequences of such provisions (**3.1.3.**).

### 3.1.1. THE HEIGHTENED DILIGENCE OBLIGATION

868. The Heightened Diligence Obligation is to be found in para. 3 of the Project Execution Plan[937]:

> "Even though a reimbursable contract CB&I project management will <u>rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own</u>". [Emphasis added]

869. The cost reimbursable EPC Contract puts CB&I in a position like that of a mandatary (*mandatario*) in a mandate contract (*contrato de mandato*)[938]: CB&I performs works, and engages others to perform work, for the benefit of the mandator (*mandante*, in this case, Reficar), in consideration of which it is paid a commission (here, a margin on the costs). Mandataries and contractors in cost reimbursable contracts face a similar challenge, because the interests of the mandator (owner) and those of the mandatary (contractor) are not aligned: the mandator/owner wishes to pay a small price for the goods or services engaged, but the higher the price, the bigger the mandatary/contractor's remuneration.

870. The CCC provides certain rules, in an effort to reduce the inherent conflict of interest between mandatary and mandator. Under these rules, a mandatary incurs responsibility vis-à-vis the mandator, if it fails to perform the work entrusted with the "*diligencia y cuidado que los hombres emplean ordinariamente en sus <u>negocios propios</u>*"[939]. Thus, the CCC requires the mandatary to defend the interest of the mandator with the same standard of care as if the assets at risk were his/her own.

871. The Contract follows the same approach; this is the reason why the Heightened Diligence Obligations requires CB&I "to safeguard Reficar's resources as if their

---

[937] JX-002, p. 654; JX-004, p. 628.
[938] CCC, *TITULO XXVIII. "DEL MANDATO"*. The Tribunal acknowledges that under TC 5.1 "No Partnership, Agency or Employment Relationship", CB&I is explicitly not an agent under the Contract, nor could it be: CB&I has no authority to bind Reficar into relationships with third parties. This does not mean, however, that the relationship between the Parties did not include fiduciary elements characteristic of the contract of mandate.
[939] Art. 2155 in relation to Art. 63 CCC, emphasis added.

own" – echoing the wording used by the CCC to establish the level of responsibility of the mandatary vis-à-vis the mandator. CB&I agreed that its contractual role would not be that of a mere contractor, without any fiduciary duty vis-à-vis Reficar and without any limitation in the exercise of its contractual rights; instead, CB&I accepted to become a contractor *cum* mandatary, with the obligation to construct the Project and the right to be reimbursed by the Owner, but subject to a fiduciary obligation that all costs decisions taken must safeguard Reficar's resources as if its own.

Respondents' defenses

872. Of the two limbs of the Cost Control Commitments, Respondents focus their defense on the Heightened Diligence Obligation, arguing that they should not be bound by it:

873. First, Respondents say that the Heightened Diligence Obligation is located within the Project Execution Plan, formally an Annex to the Agreements, and not in the main body of the Agreements. The Tribunal notes, however, that the binding, contractual nature of the Project Execution Plan is acknowledged in the very EPC Contract:

> "This Agreement includes […] the following documents and sections (the "Contract Documents"), which are attached hereto, their respective schedules, exhibits, forms, annexes and appendices, and all subsequent amendments and variations to such documents and sections, and the term "Agreement" in all such documents and sections will be construed accordingly:
>
> Section II Terms and Conditions
>
> […]
>
> Exhibit 13 – Project Execution Plan".

874. Second, CB&I argues that the nature of the EPC Contract is that of a cost-reimbursable contract of indeterminate value, and a "single sentence" referring to a lump sum contract cannot change this[940]. If the Tribunal finds that it needs to solve this contradiction, it should do so giving preference to the cost-reimbursable nature of the Contract, because according to TC 23, provisions made in the main body trump those contained in the Annexes[941].

875. The Tribunal does not agree.

876. There is no dispute that the nature of the EPC Contract is that of a cost reimbursable agreement, and that the essence of the Contract is that the Owner must reimburse the Contractor for the expenses incurred in the furtherance of the Project. And it is also undeniable that the EPC Contract includes the Cost Control Commitments, which form part of Section IV of the Onshore and Offshore Agreements and of the Project Execution Plan.

---

[940] RPHB, para. 654; RPHB2, para. 10; H-19, p. 6.
[941] TC 23.3; JX-002, p. 198; JX-004, p. 183.

877. The Tribunal sees, however, no "conflict between any of the terms of the various documents", which could give rise to the application of TC 23. There is no conflict between the nature of the EPC Contract as an indeterminate value, cost-reimbursable agreement under TC 58, and the Heightened Diligence Obligation, which itself explicitly acknowledges the peaceful coexistence between both terms ("[e]ven though a reimbursable contract [...]"[942]):

   - As a cost reimbursable contract, Reficar did not know the exact value of the contract and undertook the obligation to pay costs incurred by CB&I, as opposed to paying a fixed lump sum;

   - The Heightened Diligence Obligation does not turn the Contract into a lump sum; it merely imposes a fiduciary duty of care on CB&I when incurring those reimbursable costs.

878. Third, CB&I argues that the Heightened Diligence Obligation only implies that CB&I would be using "cost control tools" applied in lump sum contracts[943], but does not otherwise impose additional substantive duties to CB&I[944].

879. The Tribunal strongly disagrees.

880. The Heightened Diligence Obligation is a contractual source of substantive obligations; it is in the very nature of any contractual provision to create substantive obligations, as acknowledged by the CCC[945]. Hence, Parties are free to contract as they wish, as long as they remain within the limits of the applicable law. No suggestion was made that the Heightened Diligence Obligation lies outside those limits; in fact, CB&I's own expert, Mr. Hackett, acknowledged that the Heightened Diligence Obligation is not an unusual clause in EPC contracts[946] and Prof. Solarte, Reficar's Colombian law expert, testified that the Heightened Diligence Obligation conformed with Colombian law[947].

881. The Tribunal further notes that this qualified standard of care is not unknown to Colombian Law: it is commonly found in *intuitu personae* contracts, where one party relies on the specific skills of the other party and special trust is placed on the performance of those competences – as Reficar placed legitimate trust on CB&I in its performance of contractual and legal duties.

---

[942] JX-002, p. 654; JX-004, p. 628.
[943] Tr. 1121:18-1122:10; RPHB2, para. 10; RPHB, para. 654.
[944] RPHB2, para. 10; RPHB, para. 654.
[945] CL-361; RL-473; Art. 1602 of the CCC:
"*ARTICULO 1602. <LOS CONTRATOS SON LEY PARA LAS PARTES>. Todo contrato legalmente celebrado es una ley para los contratantes, y no puede ser invalidado sino por su consentimiento mutuo o por causas legales.*"; English:
Article 1602. Any Contract legally entered into is a law for the contracting parties, and cannot be invalidated except by mutual consent or by legal cause".
[946] Tr. 4508:6-4509:22.
[947] Tr. 4016:23-25.

### 3.1.2. THE REASONABLE COST OBLIGATION

882. The precise wording of the Reasonable Cost Obligation is to be found in Section IV (on Pricing) of the Onshore[948] and Offshore[949] Agreements, which has an Appendix I (on Contractor's Fixed Fee, Rates and Management Fee):

> "In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis […] and the amount payable shall be the Contract Price. <u>Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner</u>" [Emphasis added].

883. Pursuant to the Reasonable Cost Obligation, CB&I undertook only to charge costs to Reficar, provided that they met the triple set of requirements of being reasonable, proper and incurred in accordance with the Contract.

884. CB&I's position is that all invoiced costs were reasonable and proper. According to CB&I, all invoiced costs were actually incurred to build the Refinery; the money was mostly paid to third parties and not to CB&I or its shareholders and Reficar does not even claim that CB&I diverted or misused the money received[950]. Furthermore, anytime CB&I found that some costs did not meet the reasonableness requirement, they were simply not submitted to Reficar for reimbursement[951]. In this situation, in which Reficar has obtained a world-class Refinery, it should not be allowed to now claim back costs which unarguably went towards its construction[952].

885. The Tribunal is not persuaded.

886. It is undisputed that Reficar now owns a world-class Refinery and that all costs submitted for reimbursement arose out of its construction; the discussion turns around the amount of costs – whether all of them were reasonable and proper and complied with the Contract. CB&I claims that all Project-related costs are, by their own nature, reimbursable, but this statement is contradicted by CB&I's own admission that it did in fact incur certain unreasonable or improper costs, which it chose to not submit for reimbursement[953]. The question is thus, whether there were further costs, which were also not reasonable and proper and should not have been submitted for reimbursement, yet they were – this is, precisely, Claimant's case.

### 3.1.3. CONSEQUENCES

887. For the purposes of this arbitration, the most salient practical consequences of the Cost Control Commitments are the following:

---

[948] JX-003, p. 3.
[949] JX-005, p. 3.
[950] Tr. 3728:10-25.
[951] RPHB, para. 575, citing to H-23, p. 34, which in turn cites to Ex. R- 2219_D and Ex. R-2220_D, adding to a total of COP 68 billion and USD 20 million that CB&I incurred but never invoiced to Reficar.
[952] Tr. 3729:1-15.
[953] RPHB, para. 575, citing to H-23, p. 34, which in turn cites to Ex. R- 2219_D and Ex. R-2220_D, adding to a total of COP 68 billion and USD 20 million that CB&I incurred but never invoiced to Reficar.

## A. **CB&I's obligation of thrift**

888. Under the Reasonable Cost Obligation CB&I undertook to execute the contract thriftily and to control the costs of the Project, by using the same methods, practices and techniques which CB&I would have applied had the risk of cost increases fallen on its shoulders.

889. It is not an absolute obligation of result (*obligación de resultado*), but an obligation of best efforts (*obligación de medios*). It guarantees that CB&I will try to reduce to the extent possible costs incurred (which under the cost reimbursable principle must be assumed by Reficar), applying the same diligence it would have used, had the additional cost been borne by itself.

## B. **CB&I's obligation of truthfulness**

890. The Heightened Diligence Obligation created a fiduciary duty of CB&I vis-à-vis Reficar and imposed a reinforced standard of good faith upon Reficar. CB&I became Reficar's *quasi*-mandatary[954] in the execution of the Contract, entitling Reficar to assume that the forecasts, estimates or schedules delivered, the representations made, or any other information provided by CB&I were truthful, and candidly represented the Contractor's actual belief.

## C. **Reficar's right to claw back**

891. The Parties have discussed whether Reficar has a right to claw back payments of invoices made to CB&I, if it subsequently became aware that the Contractor had breached its Cost Control Commitments, with regard to the cost items reflected in such invoices.

892. The Tribunal will elaborate on this right in the following paragraphs:

893. The EPC Contract (in Section IV "Pricing", Appendix I "Contractors [*sic*] Fixed Fee, Rates and Management Fee") contains detailed provisions on invoicing and review (**a.**) and claw back of reimbursable costs incurred by CB&I (**b.**).

## a. **Invoicing and review**

894. The initial step in the process consists in CB&I submitting an invoice, Reficar reviewing the invoice and, if found correct, paying it. Para. 6.1 "Payment of Reimbursable Costs" of Appendix 1 to Section IV provides the details[955]:

- CB&I should submit invoices on a monthly basis;

- certain categories of costs should be submitted under separate invoices;

- format and content of the invoices were to be agreed between the Parties;

---

[954] With the qualifications mentioned under fn. 938 above.
[955] JX-003, pp.11-12; JX-005, pp. 9-11; paras. 6.1.1-6.1.4.

- Reficar should review, approve and pay CB&I's invoices within 10 business days of receipt (20 business days in case of reimbursable costs);

- CB&I had a duty to cooperate and to expeditiously provide all information required to facilitate Reficar's review of the invoices.

895. Reficar was then entitled to reject any invoice it found non-compliant with the Contract. Para. 6.1.4 of Appendix I to Section IV stipulates that whenever an invoice

> "cannot be agreed in full, the Owner will notify the Contractor of the value of the undisputed and agreed portion of that invoice, provide a detailed explanation of the discrepancy and request a credit note from the Contractor in respect of the full amount of that invoice"[956].

896. In other words: when CB&I submitted an invoice, Reficar was entitled to review it, and then could accept it in part or in total, or it could reject it providing a "detailed explanation".

**b.    Claw back**

897. The Contract extensively and minutely establishes the consequences of Reficar's failure to identify defects during the review process and of Reficar's payment of invoices which had been improperly submitted by CB&I.

898. TC 4 and TC 58.9 are the relevant provisions.

899. TC 4 provides that Reficar's failure to properly review and the acceptance or payment of any invoices does not release CB&I from any of its obligations[957]:

> "Failure of the Owner to insist upon strict performance of any terms or conditions of this Agreement, or failure or delay to exercise any rights or remedies provided herein or by applicable Laws, or failure to properly notify the Contractor in the event of breach, or the acceptance of or payment for any goods or services under this Agreement, or the review or failure to review designs or make inspections, or a failure by the Owner to discover any instances of non-compliance with this Agreement during any such review or inspection, shall not release the Contractor from any of the warranties or obligations of this Agreement and shall not be deemed a waiver of any right of the Owner to insist upon strict performance under this Agreement [...]" [Emphasis added].

900. TC 58.9 states, in a similar vein, that[958]:

> "58.9 No payment of any invoice, whether in whole or in part, shall at any time constitute approval or acceptance of the Work, or be considered to be a waiver, by the Owner of any of the requirements of this Agreement" [Emphasis added].

---

[956] JX-003, p. 12; JX-005, pp. 10-11.
[957] JX-002, p. 175; JX-004, pp. 160-161.
[958] JX-002, p. 236; JX-004, p. 212.

901. The Contract could not be clearer: failure to review an invoice, acceptance of an invoice and even payment of an invoice does not release CB&I from any of its obligations and cannot be considered as a waiver by Reficar of any of the rights agreed upon in the Contract – including CB&I's Cost Control Commitments.

902. CB&I's expert, Mr. Hackett, confirmed at the Hearing that any "unreasonable amount should be disallowable and <u>returned to Reficar</u>"[959] [Emphasis added].

<u>CB&I's counter-arguments</u>

903. CB&I says that Claimant, once it paid an invoice submitted by Reficar, forfeited its right to claw back the amount paid. It provides various arguments to support its position, which the Tribunal finds unpersuasive:

904. <u>First</u>, CB&I maintains that given the extensive review process of invoices on the Project (carried out by Foster Wheeler and Reficar itself), whenever Reficar paid an invoice, it confirmed that the costs were fully compliant with the requirements of the EPC Contracts, including reasonableness and propriety[960]. CB&I also avers that the reasonableness of the costs was assessed contemporaneously by Reficar[961]:

   - during the monthly meetings with CB&I in which the Parties discussed costs incurred in the prior month and cost forecasts for the following month[962],

   - when it participated in and analysed the comprehensive cost forecasts prepared by CB&I at various stages of the Project[963], and

   - when Reficar's cost control department provided analyses and approvals for costs incurred on the Project[964].

905. CB&I also avers that under the stringent Colombian fiscal liability laws, which require compliance under threat of personal liability, Reficar employees would not have authorized any payments without first ensuring the costs' compliance with the Contract, including reasonableness and propriety[965].

906. The Tribunal finds that these arguments fail, because they are directly contradicted by the wording of the EPC Contract. Under TC 58.9 payment of any invoice does not "constitute approval or acceptance of the Work" nor can it be "considered to be

---

[959] Tr. 4419:6-23:
"[Q] Based on the EPC contract, if a cost is shown -- a specific cost amount is shown to be unreasonable, that cost, the unreasonable amount should be disallowable and returned to Reficar; correct?
A. [MR. HACKETT] Yes, just that the element of the overall invoice, not the entirety of the invoice, but that, then, has to be accompanied by an explanation of the bit which is not being allowed.
Q. Whatever the cost is that is determined to be unreasonable, this is the unreasonable bucket, whatever it is, that is the amount that is disallowable and returnable to Reficar; yes?
A. [MR. HACKETT] Yes, just the unreasonable element, not the entirety of the bucket from which it's drawn."
[960] RPHB, para. 553.
[961] Ankura ER, para. 40.
[962] Deidehban WS, Section. XI.B.
[963] Deidehban WS, Section. XI.B; Yibirin WS, paras. 90-92, 110-116.
[964] Ex. R-0819, pp. 16-34.
[965] H-19, p. 26.

a waiver, by the Owner of any of the requirements of this Agreement". *In claris non fit interpretatio.*

907. As regards the scope of Foster Wheeler's review of the invoices, this is an issue which the Parties have extensively discussed: CB&I submits that Foster Wheeler verified whether the costs were fully compliant with the EPC Contracts, including for reasonableness and propriety, before submitting them to Reficar for reimbursement[966], while Reficar holds that Foster Wheeler only checked the formalities[967].

908. The discussion really is moot because the extent of Foster Wheeler's review is contractually irrelevant. The wording of TCs 4 and 58.9 does not leave space for doubt: even if it is accepted *arguendo* that Foster Wheeler did review the materiality of the invoices, such procedure would not prevent Reficar from requesting a claw back if CB&I had breached its Cost Control Commitments.

909. That said, the Tribunal tends to agree with Reficar. The better view seems to be that Foster Wheeler intensively reviewed the formalities of the invoices, but not the compliance with the Cost Control Commitments. Mr. Herrera, a Foster Wheeler employee in charge of the invoice review procedure[968], who actually conducted the review, and is therefore the most convincing authority regarding the scope of work performed by Foster Wheeler, denied – without leaving any doubt – having checked the reasonableness of the costs submitted to review. He testified that he had not reviewed "the materiality of it, whether it was cheap or expensive, efficient or inefficient"[969], or whether given sums were "necessary to do the job or [were] excessive to do the job"[970].

910. Second, CB&I invokes TC 59, an EPC Contract provision which allows the Owner to examine and audit any costs within three years after Final Completion and to appoint an accounting firm to resolve disputes regarding overpayments[971].

911. The Tribunal finds that the fact that Reficar decided not to avail itself of this special procedure cannot be held against it. The procedure under TC 59 is only one of the avenues open to Reficar among which it was entitled to choose – an alternative being the initiation of this arbitration procedure under Section 4 of the DRA[972].

912. Third, CB&I argues that Reficar verified Project costs for reasonableness whenever it increased the Budget: the complex pre-approval process[973], followed by an ongoing on-site work review system[974], an elaborate technical and substantive ex-post review[975] and further scrutiny by Reficar's cost controls department and cost committee ensured compliance of all costs with Project requirements; the cost

---

[966] RPHB2, paras. 4-6, RPHB, paras. 36-37.
[967] CPHB2, response to RPHB, paras. 61-63 at pdf pp. 8-9; CPHB2, response to RPHB, para. 587 at pdf p. 25; CPHB, paras. 446-448, 459-460.
[968] Tr. 1998:2-11; 2069:20; 2070:3; 2072:3-7; 2075:16-25.
[969] Tr. 2089:24-2090:13.
[970] Tr. 2090:15-2091:2.
[971] RPHB, para. 555, referencing TC 59.
[972] JX-007, pp. 8-13.
[973] RPHB, para. 39-41.
[974] RPHB, para. 44.
[975] RPHB, para. 42-43.

controls department specifically vetted the costs for reasonableness[976]. In addition, the approval of the Budget constituted a commitment by Reficar that it was going to reimburse CB&I[977]. According to CB&I, Reficar never gave a warning that the increases to the Budget were provisional and that they did not constitute an acceptance of the costs as fully compliant with the Contract[978].

913. The Tribunal is also not convinced. The Budgets were not instruments foreseen under the EPC Contract. These were internal Reficar and Ecopetrol resolutions, adopted by their BofDs to guarantee the availability of funding; Reficar's internal rules prohibited it from making any payment to CB&I if such disbursement had not been previously authorized by its BofD. Approval of the Budgets did not mean that Reficar accepted the increases in costs as reasonable and proper. CB&I's averment to the contrary is fully unsupported and it is contradicted by the text of TC 4 and TC 58.9.

914. Fourth, CB&I finally invokes two New York law doctrines that would bar Reficar's recovery of paid invoices: that of unclean hands[979] (i.) and that of voluntary payments[980] (ii.).

915. (i.) Under the doctrine of clean hands, a party is estopped from submitting an equitable claim of restitution, where that party has committed some unconscionable act, directly related to the subject matter in litigation and has injured the counterparty[981].

916. (ii.) The doctrine of voluntary payments bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or material mistake of fact or law[982].

917. The Tribunal finds the invoked doctrines to be inapposite:

- (i.) The New York court rulings invoked by CB&I apply the unclean hands doctrine to bar equitable relief: in its improper EPC costs claim Reficar is not bringing a claim for equitable relief, but rather for breach of the Cost Control Commitments under the EPC Contract; nor is there evidence of bad faith on Reficar's side – Reficar has the right to pay and to later question compliance of the Cost Control Commitments.

- (ii.) The second doctrine equally finds no application – while in different circumstances, the voluntary payments of a party might estop it from later bringing claims for such payments, in the present case the Parties agreed under the EPC Contract that no payments by Reficar should constitute a waiver or acceptance of contractual rights[983].

---

[976] RPHB, paras. 45-46.
[977] Tr. 3762:18-20.
[978] Tr. 3761:13-18.
[979] ESOD, paras. 1380-1386.
[980] ESOD, paras. 1387-1389.
[981] RL-302, p. 2.
[982] RL-293, p. 2.
[983] TC 4, TC 58.9, analysed under paras. 899 and 900 *supra*.

\* \* \*

918. In light of the above, the Tribunal confirms that, pursuant to TC 4 and TC 58.9, Reficar is entitled to claw back any amounts paid to CB&I, which arose out of a breach by CB&I of its Cost Control Commitments.

## 3.2. CB&I'S BREACH OF THE COST CONTROL COMMITMENTS

919. The EPC Agreement is not a standard cost-reimbursable construction contract, but rather an agreement where the Contractor accepted to comply with certain Cost Control Commitments:

- CB&I undertook to safeguard Reficar's resources as if its own,

- to rigorously control cost and schedule as if this were a lump sum contract,

- and only to claim reimbursement for costs reasonably and properly incurred in accordance with the Contract.

920. The Tribunal has so far found that the Cost Control Commitments are applicable and that neither Reficar's payment of invoices, nor the adoption of increases to the internal Budget by Reficar's BofD, nor their review by Reficar and/or Foster Wheeler, nor any other argumentation presented by CB&I, relieve Respondents from compliance with these obligations.

921. The Cost Control Commitments have two prongs: the Heightened Diligence Obligation (3.2.1.) and the Reasonable and Proper Costs Obligation (3.2.2.); Reficar says that CB&I breached both. Reficar's EPC cost overrun claim is based on the allegation that, during the execution of the Project, CB&I invoiced to and collected from Reficar significant amounts of money, in breach of CB&I's Cost Control Commitments; as a consequence of this breach, Reficar is entitled to claw back these costs ["**Excess Costs**"][984] (**3.3.**).

## 3.2.1. CB&I'S BREACH OF ITS HEIGHTENED DILIGENCE OBLIGATION

922. Reficar maintains that CB&I breached its Heightened Diligence Obligation by failing to control costs in the EPC Contract, and to apply the same standard of diligence as if it were its own lump sum construction contract[985].

923. The Tribunal concurs.

924. Under the Heightened Diligence Obligation CB&I undertook to "rigorously control cost and schedule", as if the cost-reimbursable EPC Contract were a lump sum contract, and to do so "safeguarding Reficar resources as if their own".

925. The Tribunal has already determined in the preceding Section that the Heightened Diligence Obligation is a contractual source of substantive obligations: by assuming this obligation, CB&I agreed that its contractual role would not be that of a mere contractor, but rather that of a contractor *cum* mandatary; it accepted to execute the

---

[984] See analysis at Section VII.2.1.3.1.3.C.b *supra*.
[985] CPHB, paras. 195-200.

contract thriftily and to make its best efforts to control costs, by using the same methods, practices and techniques which CB&I would have applied had the risk of cost increases fallen on its shoulders.

926. During the pre-contractual phase, Reficar and CB&I extensively discussed the possibility of structuring the EPC Contract on a lump sum basis – Reficar's initial preference. During these negotiations, CB&I submitted to Reficar a precise calculation of how much the Project would cost under a lump sum approach. In a letter dated November 21, 2008[986] CB&I gave a lump sum price indication of <u>USD 4.561 billion</u> – a USD 907 million surcharge above the total projected costs of USD 3.654 billion.

927. The actual costs which CB&I has incurred, and which it has charged to Reficar, amount to some USD 5.9 billion.

928. In other words: by accepting the cost reimbursable structure touted by CB&I, Reficar ended up paying USD 1.3 billion <u>more</u> than what it would have paid, if it had accepted CB&I's November 2008 quote for a lump sum structure (which already included a conservative USD 907 million surcharge, to protect the contractor against risks).

<u>How could this happen</u>?

929. The Tribunal is convinced that, if Reficar had insisted and CB&I had accepted a lump sum structure, the costs of the Project would <u>not</u> have spiralled out of control. Had this been a lump sum contract, in which CB&I bore the risk of Excess Costs, CB&I would for certain have adopted "rigorous measures" to limit the cost increases and avoid incurring a USD 1.3 billion loss. The time window to diligently react existed: the increase in estimated costs did not occur from one day to the other, but over a protracted period of two years[987]. There is ample evidence that Reficar repeatedly raised with CB&I the issue of

- the cost increases[988], and

- CB&I incurring costs in breach of the Cost Control Commitments[989].

---

[986] Ex. C-0018.
[987] See Facts Section above at VII.2.1.1.
[988] See *e.g.*, Ex. C-0089, item 11.0; Rx. C-0094, Ex. C-0095; Ex. C-0097; Ex. C-0104.
[989] See *e.g.*, Ex. C-0104, p. 1 "p. 19: "[…] CBI's serious deficiencies in engineering […] continues [sic] to cause unreasonable and not properly incurred costs"; Ex. C-0296, p. 1 "It is very alarming for Reficar to read the referenced letter from CBI which suggests to us that CBI fails to understand once again the need to control costs in this Project and to manage Reficar's budget within reason and responsibility. As we have repeatedly noted, the mere fact that a cost has been spent by CBI, does not automatically mean that Reficar is required to reimburse it to CBI, for only those costs that have been reasonably and properly incurred are subject to reimbursement by Reficar"; Ex. C-0105, p. 3: "All of CBI's cost estimates, including, but not limited to, the Final Full Estimate, and all of its schedules, from the baseline to the present day, are completely and utterly meaningless, for CBI believes that it can spend whatever it likes and take however long it desires, and Reficar can do nothing other than pay. CBI's position is utterly wrong and grossly misguided, for Reficar is not obligated to pay for costs that are unreasonably or not properly incurred".

930. But there is no counterevidence that CB&I, in response to these requests, adopted meaningful measures to effectively control costs – as it was bound to do under the Heightened Diligence Obligation.

931. What the evidence shows is that CB&I adopted a cavalier attitude towards the increases of costs. This attitude is best reflected in a quote from the examination of Mr. Deidehban, CB&I's highest officer on the Project. Asked by opposing counsel if he agreed that the standard for submitting costs to Reficar "is not just because you incurred costs, that means they are reimbursable", he answered

"If I incurred costs associated with the work, they are reimbursable"[990].

932. The answer may be good enough in a plain vanilla reimbursable contract, in which the contractor is entitled to recover any cost associated with his work, without any limitation. In the present EPC Contract, where the Owner insisted on Cost Control Commitments to give up its preferred solution of a lump sum structure, and where the Contractor undertook to "rigorously control cost and schedule", as if this were a lump sum contract, "safeguarding Reficar resources as if their own", the attitude is indicative of a breach of the Heightened Diligence Obligation.

933. Weighing the evidence marshalled, the Tribunal concludes that the only plausible cause for the enormous surcharge which the construction incurred can only be one: that CB&I breached its Heightened Diligence Obligation by not rigorously controlling costs as it was a lump sum.

934. This conclusion is reinforced by the following arguments:

935. First, pursuant to the provisions on remuneration in the EPC Contract, CB&I was initially entitled to earn USD 175.75 million[991]. However, the graph below, which is a slide from CB&I's Project Manager Review presentation at the end of the Project[992], retrospectively shows that CB&I's actual expected gross profits were initially limited to USD 135 million but , with the passage of time, CB&I obtained additional returns, eventually arriving at USD 210 million, with an expectation of a total gross profit of USD 225 million. Thus, CB&I predicted, in view of how the Project was developing, that it would make an additional profit of USD 90 million, or over 50% more than agreed with Reficar:

---

[990] Tr 1127:17 1127:18.
[991] See discussion under Pre-Contractual Liability Section VII.1.1.7.B.
[992] Ex. C-1329, p. 36. The version used by the Tribunal is the one presented by Claimant in CPHB, para. 18.



936. The increase in the profit is explained by CB&I's Mr. Ernest Breaux as follows[993]:

> "[…] In my numerous discussions with CB&I construction block managers and supervisors, their attitude was that since the Project was under a cost reimbursable contract structure, efficiency was not a priority for them. Indeed, the view of CB&I was that the longer the job went on, the more money CB&I would make. The workers understood – as I understood – there was as a mark-up on the hourly rate charged to Reficar for our time and that CB&I made money on each employee on the Project, including my time". [Emphasis added]

> [The Tribunal will enter into a detailed discussion of CB&I's profit-motive in the Section on the applicability of the liability cap].

937. Second, the drastic growth in EPC Costs, projected at USD 3.971 billion, by almost 50% to some USD 5.9 billion[994], is likewise indicative of CB&I's lack of adherence to the Heightened Diligence Obligation, absent scope changes, catastrophically unpredictable events or Reficar's improper interferences.

938. Further below, the Tribunal will analyse these two defenses that could exculpate CB&I[995], and will find that neither unpredictable events nor Reficar's negligence can explain the total explosion in EPC costs.

---

[993] Breaux CWS, para. 55.
[994] The Tribunal does not include the amounts subject to the Counterclaim in the current analysis.
[995] See discussion under Section 3.3 *infra*.

939. <u>Third</u>, as reflected by the dramatic increase in costs, CB&I also expended exponentially more engineering man-hours than initially planned: the number doubled from 2 million at the beginning of the Project to 4 million[996]; a difference that cannot be explained even when accounting for all scope changes. All three of the Parties' experts agree that CB&I billed for 1-1.3 million engineering man-hours that were "unreconciled or unjustified"[997].

940. <u>Finally</u>, the EPC Contract set the Guaranteed Mechanical Completion Date for February 2013[998]. The Parties agree that the actual Mechanical Completion did not occur prior to February 2015[999], meaning that there was a delay of at least two years[1000].

### 3.2.2. CB&I'S BREACH OF THE REASONABLE COST OBLIGATION

941. Reficar says that CB&I has also breached its Reasonable Cost Obligation, by charging to Reficar costs which were unreasonable, improper or not due under the EPC Contract[1001].

942. The Tribunal has already found that CB&I *prima facie* breached its Heightened Diligence Obligation. That breach is intertwined with the breach of the Reasonable Cost Obligation: a failure to apply the required diligence in the control of costs will always result in unreasonable and improper costs being incurred.

> To give a (very) simplified <u>example</u>: assume that in a lump sum contract being performed in South America, CB&I pays its U.S. engineers USD 100 per hour, while the equivalent rates charged to Reficar for the same work are USD 300 per hour; in such case Reficar can argue that CB&I has breached both Cost Control Commitments,
>
> - because it is not rigorously controlling resources as it would in its own lump sum contract (breach of the Heightened Diligence Obligation) and
>
> - because CB&I is claiming unreasonable and improper costs (breach of the Reasonable Cost Obligation).
>
> In this situation, Reficar is entitled to withhold payment of the invoice or, if the payment has already been made, to claw back from CB&I the difference of USD 200 per hour.

943. In the above, highly simplified example, determination that CB&I has breached its Cost Control Commitments is straightforward, because there is a ready benchmark: the cost incurred by CB&I in a lump sum contract with equivalent characteristics.

944. In actual facts, Claimant's case is much more complex: Reficar says that it has paid some USD 5.9 billion in EPC costs for a Refinery, and that within that payment the

---

[996] Compare: Ex. C-0154, pdf p. 30 and Ex. C-0155, pdf p. 99.
[997] H-027, p. 107; see discussion under Section VII.2.1.3.3.3.A [Engineering].
[998] TC 1, Definitions; JX-002, p. 166; JX-004, p. 152.
[999] CB&I argues that it achieved Mechanical Completion on or before February 2015, see RPHB, para. 172; Reficar argues that Mechanical Completion was only in November 2015, see CPHB, para. 134.
[1000] Responsibility for delay will be addressed in detail in the delay analysis under Section VII.2.3 *infra*.
[1001] CPHB, paras. 195-200.

unreasonable and improper costs amount to approximately USD 1.773 billion[1002], reflected in a myriad of individual invoices.

945. How can the Tribunal determine whether CB&I has charged undue amounts to Reficar, in breach of the Cost Control Commitments, and if it has, how can these amounts be quantified?

946. The answer to these two questions is, in this highly idiosyncratic case, inherently intertwined: any costs determined to be unreasonable will constitute proof of liability for the breach of both Cost Control Commitments and, at the same time, will reflect the amounts to be reimbursed.

947. Reficar proposes the following approach: in a first step the Tribunal should determine the reasonable costs for the Project, using a Modified Total Cost approach; and in a second step it should find that any costs paid in excess of that amount constitute undue costs, incurred in breach of the Cost Control Commitments.

948. CB&I takes issue with Reficar's methodological proposal, but in the next Section the Tribunal will side with Reficar [**A.**], and, within the Modified Total Cost approach, will choose the Bottom-Up methodology [**B.**]. This methodology is based on the use of a "**Reasonable Cost Benchmark**" as an estimation of the reasonable costs, and the Tribunal will have to decide, in view of the evidence before it, which is the best suited Reasonable Cost Benchmark [**C.**].

### A.   The Modified Total Cost approach

949. To determine which of the costs incurred in the construction of the Project were unreasonable, improper or excessive, Reficar proposes two methodologies[1003] – the Top-Down (i.) and the Bottom-Up (ii.), jointly defined by CB&I's experts as the "Modified Total Cost" approach[1004]. CB&I's experts reject these methodologies and suggest using a third alternative: an invoice-by-invoice analysis (iii.).

950. (i) The <u>Top-Down</u> methodology breaks down Reficar's actual payments into categories of improper EPC costs[1005], arriving at a total number of improper EPC costs paid by Reficar[1006]. The proper costs paid by Reficar are equal to the difference between the actual and improper costs[1007].

951. The Top-Down methodology requires a precise quantification of each single category of costs, to avoid double-counting.

---

[1002] Communication C-175, pdf pp. 9, 11, 15.
[1003] LI ER, para. 254; communication C-175, pdf pp. 5-6.
[1004] ESOD, paras. 1511-1512. CB&I argues that both Reficar's Top-Down and Bottom-Up approaches in fact employ the Total Modified Cost methodology; this is the case at least for the majority of the Top-Down claims and the entirety of the Bottom-Up claim, see Ankura ER, Sections II.E and II.F and Hackett ER, Section 7.2.
[1005] "E.g., poor labour productivity, rework/corrective work, labour disruptions, labour strike, excessive vendor charges, prolonged project schedule, and excessive construction indirect costs" – see LI ER, para. 263.
[1006] LI ER, paras. 263-270.
[1007] LI ER, para. 269.

952. (ii) The other methodology proposed by Reficar is the <u>Bottom-Up</u>, which compares the actual EPC costs with an appropriate baseline – a level of costs which represents a reasonable estimate on how much the project should have cost [the "**Reasonable Cost Benchmark**"][1008].

953. The difference between actual EPC costs and the Reasonable Cost Benchmark are the "Excess Costs" caused by CB&I's breach of its Cost Control Commitments, for which CB&I bears responsibility.

954. CB&I's experts reject the Modified Total Cost approach (be it in Reficar's Top-Down or Bottom-Up variety), arguing that it is an imprecise and unreliable[1009] estimation, skewed towards the owner, as it assumes that the owner's conduct was perfect and did not cause even a single dollar of cost increase, while the constructor is made responsible for every problem, impact and cost increase in the project[1010].

955. Nonetheless, CB&I's experts acknowledge the use of the Modified Total Cost approach in the industry, especially in situations in which the contractor in a lump sum contract claims to have suffered losses because of cost overruns[1011]. To avoid overstated claims, the application of the Modified Total Cost approach must conform to stringent requirements, such as the contractor proving[1012]:

-       That no other means are possible to establish the cost overruns;

-       All events contributing to the cost overruns (and loss) must be compensable;

-       The contractor did not contribute to the increased costs;

-       The bid or estimate was reasonable; and

-       The (estimated) actual costs must be reasonable.

956. For these reasons, the experts say that this approach should only be employed "as a last resort" in the "'rare case' where other, more appropriate and precise methodologies are not available"[1013].

957. (iii) CB&I's experts would favour the use of a more precise and reliable method: the <u>invoice-by-invoice analysis</u> of the reasonableness of the costs, which is precisely the methodology used by CB&I's experts to calculate the damages in CB&I's Counterclaim[1014].

---

[1008] LI ER, paras. 255-262.

[1009] ESOD, paras. 1511, 1516.

[1010] Ankura ER; para. 271.

[1011] ESOD, para. 1512. Ankura, para. 50.

[1012] ESOD, para. 1514.

[1013] ESOD, para. 1513, citing to A*ndron Const. Corp. v. Dormitory Auth. of State of New York, 51 Misc. 3d 1217(A), 38 N.Y.S.3d 830, (N.Y. Sup., Albany Cnty., 2016), Servidone Constr. Corp. v. United States, 931 F.2d 860, 861– 62 (Fed. Cir. 1991) and Geolar, Inc. v. Gilbert/Commonwealth Inc. of Michigan, 874 P.2d 937, 944 (Alaska 1994).*

[1014] Ankura ER, paras. 324-329, JER, item 111, pp. 177-182. The Tribunal notes that this statement is an oversimplification: the invoice-by-invoice analysis was actually carried out on samples of invoices, not on the totality of them.

The Tribunal's analysis

958. The Tribunal acknowledges that the Modified Total Cost approach is inherently less accurate than other methods of calculating cost overruns, especially when compared with a scrutiny of the reasonableness of each individual invoice.

959. But in the present claim, exceptionally complicated and voluminous, where the total number of invoices issued nears 20,000[1015], the invoice-by-invoice methodology suggested by CB&I does not constitute a feasible alternative. The solution proposed by CB&I's experts would require that the Parties and the Tribunal analyse and review, from a substantive point of view, the totality of invoices – a herculean task, from which, most tellingly, CB&I and its numerous experts have shied away: Respondents themselves have not provided the Tribunal with an alternative analysis of Reficar's claims, based on the review of the totality of invoices (or on any other methodology).

960. The Tribunal, thus, believes that this case warrants the use of "last resort" overrun cost determination approaches, such as the Modified Total Cost approach, which Respondents' experts accept, provided that certain requirements are met.

961. The requirements set out in para. 955 *supra* are narrated from the perspective of a contractor, who claims overrun costs; the situation is similar to the present case, in which the owner claims a right to claw back overrun costs, but not identical – hence not all requirements can be extrapolated:

- No other means are possible to establish the cost overruns: given the staggering number of invoices, it would be impracticable for Reficar to prove its actual losses directly, by individually assessing the unreasonableness of each of the nearly 20,000 invoices;

- All claimed amounts must be compensable: the Tribunal will make sure that Reficar only claws back overrun costs incurred as a consequence of breaches of Cost Control Commitments;

- Reficar did not contribute to the increased costs: the Tribunal will not compensate Reficar for overrun costs caused by Reficar's own instructions or its fault;

- The cost estimate was reasonable: this requirement prevents a contractor from presenting an artificially low cost estimate and later claiming the difference in actual costs – in the same vein, the Tribunal will carefully select the cost estimate against which the reasonableness of costs is measured, to ensure that it is neither artificially low, nor unduly inflated as will be seen in section c. below;

- The (estimated) actual costs must be reasonable: this requirement avoids that the Modified Total Cost approach be used to claim disproportionate amounts – the estimated actual costs must, therefore be within a reasonable range; in this case, however, the actual costs need not be estimated, because there is

---

[1015] CPHB, para. 423 and Reply, para. 208, citing to Ex. C-1078.

certainty of how much Reficar paid; the Modified Total Cost approach is not used to estimate the actual costs, but to establish the portion of actual costs which is reasonable – there is, thus, no risk that Reficar abuses the imperfections of the Modified Total Cost for its own benefit: it cannot claim more than it actually paid.

**B.    Top-Down or Bottom-up?**

962.  The next step is to decide which of the two approaches is the optimal one in the circumstances of the current arbitration.

963.  In the present case, the Top-Down methodology is fraught with risk of double-counting – certain categories of costs may be (and indeed are) encompassed by others, as is shown by the fact that Reficar lists multiple heads of claims of allegedly improper costs, but does not quantify all of them, *e.g.* for materials management, contract administration or change management[1016].

964.  To avoid this risk, the Tribunal prefers the Bottom-Up approach. Under this methodology, the Excess Costs caused by CB&I's breach of its Cost Control Commitments, for which CB&I bears responsibility, are calculated as the difference between

-    a Reasonable Cost Benchmark, properly established and then properly adjusted taking into consideration CB&I's defenses, and

-    the actual EPC costs paid to CB&I.

**C.    Alternatives for a Reasonable Cost Benchmark**

965.  As a first step, the Bottom-Up approach requires the establishment of a Reasonable Cost Benchmark.

966.  Each Party has suggested the use of a different Reasonable Cost Benchmark:

-    CB&I favours the use of two cost studies performed by Ecopetrol[1017] (**a.**)

-    Reficar proposes the use of the Bonus Target Cost with certain adjustments (**b.**).

967.  The Tribunal will ultimately discard both suggested benchmarks and opt for a third benchmark, which satisfies the requirements a Reasonable Cost Benchmark should meet (**c.**)

**a.    Benchmarking Studies**

968.  In 2013 Ecopetrol commissioned Mr. Pittaluga, who had started working for Reficar's consulting firm IPA and then moved to Ecopetrol, to prepare a Benchmarking Study, comparing the costs of the Cartagena Project with 25 similar

---

[1016] Communication C-175.
[1017] The Tribunal notes that CB&I also uses the internal Reficar and Ecopetrol Budgets as an alternative Reasonable Cost Benchmark, but the Budgets were of no relevance to CB&I under the EPC Contract, see Section VII.2.1.1.A.

refinery projects around the globe[1018]. The results of this study were reiterated in a 2014 edition, which compared a total of 31 projects[1019].

969. The methodology consisted in weighing the actual or expected cost of refinery projects in various countries, which had been recently finalized or which were expected to be finalized up to 2019, by various factors, including capacity and complexity – the Cartagena Refinery being the second most complex project in the population. The 2013 Study comes to the conclusion that "*Reficar a pesar de tener un alto grado de complejidad, su costo no está entre los mayores*" and that "*no se observa un sobrecosto*"[1020].

970. The Study then applies a similar methodology to a population of projects increased to 32. The conclusions are similar: "*no se observa sobrecosto*"[1021] and, given the complexity of the Cartagena Project, its expected costs, using international benchmarking, should be a figure in excess of USD 9 billion[1022].

971. CB&I refers to these studies to support that no Excess Costs were observed on the Project[1023] and that Ecopetrol could, in fact, have expected to incur USD 1.2 billion more on the Project than it actually did[1024]. CB&I's opinion is buttressed by its expert, Mr. Gray[1025]. CB&I remarks that, during his interrogation before the *Contraloría*, the author of the studies confirmed that they were prepared with the highest possible degree of accuracy[1026].

972. The Tribunal begs to differ.

973. The Benchmarking Studies are in fact two short power points, prepared by Mr. Pittaluga, an employee of Ecopetrol. The power points are on their very face of extremely low quality. The reliability of the data used and of the methodology applied is very doubtful:

   - The comparator projects have varying termination deadlines: some had already been finished, others were expected to be completed by 2019; and this, of course, impacts the real costs of each project;

   - The data were extracted by Mr. Pittaluga from the internet, because he no longer had access to the verified information in the database of his previous employer; in a Witness Statement Mr. Pittaluga also acknowledged that he did not include certain costs[1027] and that he was unable to verify the accuracy of the data[1028];

---

[1018] Ex. R-0915, p. 2 (English at p. 16).
[1019] Ex. R-1423, p. 205.
[1020] Ex. R-0915, pp. 9-10 (pp. 23-24 for English: "Despite having a high degree of complexity, Reficar's cost is not among the highest"; "There is no excess cost observed").
[1021] Ex. R-1917, p. 14 (English at p. 31).
[1022] Ex. R-1917, p. 11 (English at p. 28).
[1023] Ex. R-0915, p. 10 (p. 24 for English).
[1024] RPHB, para. 57, citing to Ex. R-1917, p. 14 (English at p. 31).
[1025] Ankura ER, para. 361, see also JER 6 on Claimed Costs & Quantum, Issue no. 116.
[1026] RPHB, para. 61, citing to Ex. R-3664, pp. 20 and 22.
[1027] Pittaluga CWS, para. 24, when speaking of Outside Battery Limit costs.
[1028] Pittaluga CWS, paras. 23-24.

- The analysis is not based on the actual costs of the comparator projects, but these costs are weighed by a complexity factor; the higher the complexity, the higher the justifiable cost; the Cartagena Project is considered as the second (in the 2014 Study, the fourth) most complex Project – the weighing by complexity introduces a subjective factor and helps to justify the higher costs incurred in Cartagena.

974. Unsurprisingly, the 2014 Study commences with the following *caveat*:

> "*Se aclara que el presente análisis NO CONSTITUYE UN ESTUDIO QUE VALIDE O APRUEBE LA GESTIÓN DE CBI O CUALQUIERA OTRO CONTRATISTA*" [Capitals in the original][1029]

975. All in all, the Tribunal does not attach evidentiary weight to the Benchmarking Studies. These look like internal papers, hastily prepared by Ecopetrol from open sources, applying a suspect methodology, as an in-house justification for the decisions adopted by its management. The studies in no way prove or disprove whether CB&I complied with its contractual obligations: the Tribunal's mission is to scrutinize the costs of the Project in accordance with the requirements of the Contract – not to compare these costs, weighed by the complexity of the project, with those of other refinery construction projects, which were under construction in the first two decades of the century.

976. The Tribunal also notes that another benchmarking study, prepared by the Jacobs consultancy in August 2013, recognized that such studies are inherently difficult and offer findings of low accuracy[1030].

> "Jacobs commissioned a study comparing the Refinery to a similar South American refinery. Jacobs concluded that the Project costs could surpass those of the comparative refinery, noting that <u>benchmarking in general was 'difficult since differences in site conditions and scope have a large influence on the cost'</u> and that <u>the benchmarking was suitable only for "an order of magnitude comparison"</u> [Emphasis added, citation omitted].

977. The Tribunal thus finds that the Benchmarking Studies are not an appropriate standard to establish the reasonableness of costs incurred on the Project.

**b.    The Bonus Target Cost**

978. Reficar's proposal is to use the Bonus Target Cost from the EPC Contract adjusted by applying the following factors[1031]:

- difference between the productivity factors[1032],

---

[1029] Ex. R-1917, p. 2 (English at p. 19: "Note that this analysis DOES NOT CONSTITUTE A STUDY THAT VALIDATES OR APPROVES THE MANAGEMENT OF CB&I OR ANY OTHER CONTRACTOR")
[1030] ESOD, para. 1183, citing to Ex. R-1488, p. 131.
[1031] A more detailed breakdown of the cost adjustments may be found at Table 2 in Communication C-175, at p. 5.
[1032] LI ER, para. 256.

- the increase in material and equipment quantities[1033],

- scope changes and additional services[1034], and

- increases in costs due to justifiable delay[1035].

979. Ankura, CB&I's expert, calls the Bonus Target Cost "an arbitrary budget amount"[1036], because when the EPC Contract was signed, the scope of work had not been completely defined[1037]. Ankura adds that other contemporaneous oil and gas projects, especially in Latin America, were plagued by cost overruns[1038], reinforcing the conclusion that a value established when the Contract was signed cannot represent a reliable Reasonable Cost Benchmark. Ankura's findings are confirmed by CB&I's other expert, Mr. Hackett[1039].

980. The Tribunal shares the criticism by CB&I's experts. The Bonus Target Cost, a quantity established when the EPC Contract was signed, is not an adequate parameter:

- The Bonus Target Cost was based on the February 2010 Estimate, a projection which did not even meet the requirements of AACE Class 2 +/- 10% accuracy;

- It was quantified at the beginning of the Project, when many variables and cost factors remained difficult to gauge (for example, the second round of BRNs was only submitted half a year thereafter and the implications of the Synergy Changes were just partially quantified[1040]).

981. The Tribunal consequently shares CB&I's position that the Bonus Target Cost cannot be reliably used as a Reasonable Cost Benchmark.

c.  **The Representation Forecast**

982. The Tribunal has so far accepted Claimant's case that the Bottom-Up methodology is suitable to establish the breach of the Reasonable Cost Obligation; thus, a Reasonable Cost Benchmark must be set. The Tribunal does not share CB&I's proposal to use the Benchmarking Studies, nor Reficar's to resort to the Bonus Target Cost. The Tribunal further notes that each of these proposals is located at the end of the cost range: Claimant suggests using one of its early (low) budget estimates, while Respondents favour the figure shown in some studies which is even bigger than the actual costs incurred in the Project.

983. In the Tribunal's opinion, taking into consideration some of the criticisms put forward by CB&I, the ideal Reasonable Cost Benchmark against which the

---

[1033] LI ER, para. 257.
[1034] LI ER, para. 258.
[1035] LI ER, para. 259.
[1036] Ankura ER, para. 33.
[1037] Ankura ER, paras. 135-141; WMC ER, Sections 3.4.2-3.4.3.
[1038] Ankura ER, paras. 294-302.
[1039] Hackett ER, Sections 4.5 and 7-2.-7.3.
[1040] Ex. C-0046; Ex. C-0047, p. 9.

reasonableness and propriety of costs incurred by CB&I should be measured, must meet a number of requirements:

- It should be an estimation prepared by CB&I, and delivered to Reficar;

- It should have been prepared not at the initial stages of the Project, when there were still unknown risks, but rather at a stage of construction where the Constructor already had full knowledge of the real circumstances affecting the Project;

- It should meet the requirements at least of a Class 2, +/-10% AACE and, preferably, of a Class 1, +/- 5% AACE estimate[1041]; and

- Both Parties should have accepted it as a reliable cost projection.

984. There is a cost estimation in the record – the Representation Forecast – which meets all Reasonable Cost Benchmark requirements: the December 2011/January 2012 Monthly Forecast, which estimates that EPC costs will amount to Class I +/-5% USD 3,971 million.

985. By the fall of 2011, a year and a half into the execution of the EPC Contract, Reficar was highly dissatisfied with CB&I's progress – at that point, the Project was suffering from severe delays and CB&I was reassessing the cost of the Project[1042]: the Monthly Forecast for November 2011 estimated EPC costs at USD 3,639 million[1043]; the number increased in December 2011 to *circa* USD 3,809 million[1044] and was revised in January 2012[1045] to USD 3,971 million[1046].

986. Reficar became very worried by CB&I's sudden increases in forecasted costs. Foster Wheeler warned Reficar's January 2012 BofD that CB&I was engaging in practices of profit maximization at Reficar's expense and advised to renegotiate the EPC Agreement[1047].

987. And so the issue was brought up in the January 2012 Steering Committee, held with the participation of Reficar, Ecopetrol, CB&I and Foster Wheeler. During the

---

[1041] The only material difference between the AACE's Class 2 and Class 1 estimate is that the former has an accuracy range of -5 to -15%/+15 to 20%, and the latter a range of -3% to-10%/+3% to +15%; see Ex. B-001, p. 3. However, during the Hearing, it was confirmed that what was understood under the Project was that Class 2 meant +/-10% accuracy, and Class 1 meant +/-5% accuracy. See *e.g.*, Tr. 1302:15-21; Tr. 2414:22-2415:7; Tr. 2656:21-25; Tr. 3660:3-6.

[1042] Ex. C-0070, pp. 5-6 "Pedro Rosales highlighted that it is unacceptable that project delays are increasing without actions and results […]. Pedro Rosales wished to avoid being distracted by individual specifics. The main message was that any steps that are taken to avoid negative events, in the end, do not have results. […] The resulting action is for CB&I to generate a project recovery plan, supported by challenging execution strategies, focused on completion on the 28 Feb 2013, and to table this for communication to the team as a matter of urgency"; see also Ex. C-0086, pp. 2-3; Ex. C-0087, p. 4.
to the team as a matter of urgency."

[1043] Ex. R-1851_057_00015, fourth tab, in yellow, "Project Summary".

[1044] Ex. C-0222, p. 4; Ex. R-1851_057_00016, fourth tab, in yellow, "Project Summary".

[1045] Ex. C-0088, p. 4.

[1046] Ex. R-1851_057_00017, fourth tab, in yellow, "Project Summary".

[1047] Reficar BofD Meeting Minutes of January 24, 2012, Annex 1, "Punto No. 1 - Informe de Foster Wheeler.pptx", p. 8 [under group Ex. 1853; see path: 1853\Contraloria\CARPETA PRINCIPAL 1\Actas Junta Diretiva Reficar 078 a 131CD_Fl 14\Acta No. 79 - Reunión Ordinaria - 24 de enero de 2012].

meeting, Mr. Rosales, the vice president of Ecopetrol[1048], transmitted to CB&I the political relevance of the Project, Reficar's lack of satisfaction with CB&I's performance and a veiled threat of terminating the relationship[1049]:

> "Pedro Rosales highlighted that these [sic] was a high level of interest within the government on the progress of the project. It is critical to demonstrate control with the evolution of the projects as, without this, there will be a need to take action outside the contract. Once agreement on targets are reached, these cannot be changed, otherwise there will be high pressure for Reficar to take action [...] Commitment from CB&I to the plans [to reduce costs] is critical" [Emphasis added].

988. Since Reficar had the contractual right to unilaterally terminate the Contract under highly beneficial terms[1050], Mr. Rosales's threat must have sounded real to CB&I: its Project Director, Mr. Deidehban, defended himself as best as he could, averring that the Project was under control, and deflected Mr. Rosales's worries by undertaking to perform a detailed review of costs[1051].

989. To comply with this objective, the Parties held a number of cost alignment workshops in February 2012[1052], with the goal of reducing the January 2012 monthly forecast number to USD 3.7 billion, a figure acceptable to Reficar[1053].

990. By the end of February 2012, after the conclusion of the alignment workshops, Reficar wrote to CB&I, stating that the forecasts contained errors, lacked proper backing and were based on inaccurate forecasting methods[1054]; for example, line-items without any support added up to almost USD 751 million[1055]. As a result, Reficar requested that CB&I re-issue the December/January reports before issuing the February 2012 report[1056].

991. CB&I, however, did not agree, and kept showing in its monthly forecasts the same figure used for December 2011 and January 2012: USD 3,971 million[1057], and only referred to USD 3.7 billion as "Reficar Target"[1058] – this, no doubt, must have caused tensions with Reficar.

992. To assuage Reficar's worries and to provide further support to the December 2011/January 2012 Forecast, on May 22, 2012 CB&I sent the a letter to Reficar,

---

[1048] Tr. 2312:19-25.
[1049] Ex. C-0089, pp. 3-4.
[1050] JX-002, p. 243; JX-004, p. 220.
[1051] Ex. C-0089, p. 4.
[1052] Ex. R-1849_07396, pp. 7-28.
[1053] Ex. C-0090, p. 28. The slide contains a typo: the Cost Forecast February 2010 was in fact for February 2012.
[1054] Ex. R-1849_12447, p .1.
[1055] Ex. R-1849_12447, p .1.
[1056] Ex. R-1849_12447, p. 3.
[1057] Even though the amount of USD 3.971 billion comes from the December 2011 Revision 1 and the January 2012 cost forecast, the Parties refer to this number as the February 2012 Forecast based on its appearance as such in later Project documents. See e.g. Ex. R-1383, p. 13. The Tribunal has opted to refer to the number as the December 2011/January 2012 Forecast, as this is more accurate and also reflects Mr. Deidehban's representations in the May Letter.
[1058] Ex. C-0096, p. 13, column number 3: "CB&I Forecast (A) of 3,971,000,000" vs "Reficar Target (B) of 3,700,000,000".

signed by CB&I's Project Director, Mr. Deidehban[1059] [previously defined as the "**Representation Letter**"].

993. The Representation Letter's starting point was to reiterate that CB&I's reporting met all requirements under the Agreement. But then he added – *sua sponte* – a specific representation that the December 2011 and January 2012 forecasts of USD 3,971 million were not only correct[1060], but that they were so accurate that they even complied with the highest requirements of a Class I +/-5% estimate.

994. The precise words which CB&I used to convey this representation are these:

> "CB&I cost and schedule forecasts are within the range established by a class I estimate (either cost or time)"[1061];

and

> "The Cost Forecast of 3,971 MM issued in the December Revision 1 and January 2012 reports is both <u>properly reported</u> and <u>within the definition of a Class I estimate</u> as defined by the various national and international professional societies and associations"[1062]. [Emphasis added]

995. It is noteworthy that CB&I, spontaneously, vouched that these estimates were so precise that they actually met the higher threshold of Class I (so far, all estimates had been reported as Class II at best).

996. For good measure, Mr. Deidehban added:

> "It is CB&I's responsibility to provide Reficar with the most probable forecast based not only on the information available at the moment, but also on the <u>best practices for cost control</u> which have been established throughout the EPC industry. <u>The revised Cost Forecast of $ 3,971 MM includes such practices</u>". [Emphasis added]

997. CB&I has tried to minimize the relevance of the Representation Letter:

998. <u>First</u>, it argues that "CB&I's letter referred to certain elements within the forecast as meeting estimate definitions"[1063]. But the very wording of the Representation Letter belies Respondents' argument: it does not refer to certain "elements", but states in unfettered terms that the cost forecast meets the definition of Class I as defined by professional bodies.

999. <u>Second,</u> CB&I discusses the impact of a list with 14 exceptions attached to the Representation Letter[1064].

---

[1059] Ex. R-1849_07396.
[1060] TC 1 Definitions; JX-002, p. 165; JX-004, p. 151: ""Final Full Estimate" means the estimate which is set out in Appendix IV to Section III, which amends the detailed Class 2 cost estimate (on a +/- 10% basis) which was delivered by the Contractor and Technip to the Owner on 31 July 2009". [Emphasis added]
[1061] Ex. R-1849_07396, p. 2.
[1062] Ex. R-1849_07396, p. 3.
[1063] RPHB2, para. 8.
[1064] RPHB2, paras. 8-9, citing to Ex. R-1849_07396, p. 6.

1000. In fact, the list with 14 items does not appear for the first time attached to the Representation Letter. CB&I had previously discussed this list with Reficar, and Reficar had already expressed worries about its potential impact[1065]. In an Executive Review Meeting (in which the Parties were trying to reduce the USD 3,971 million figure to USD 3.7 billion) CB&I had reassured Reficar that these exclusions were not included in the Representation Forecast, precisely because CB&I did not anticipate incurring costs for these categories[1066].

> 10.0    The cost forecast of $3.7bn was reviewed and noted that certain exclusions apply. CB&I confirmed that they do not anticipate incurring costs for these exclusions and therefore are not in the forecast. Reficar clarified that there is no provision for fuel for construction in Owners Costs.

[The quote refers to the USD 3.7 billion number, because that was the level the Parties were trying to achieve[1067]. It also applies to the USD 3,971 million represented by Mr. Deidehban, as the exclusions were identical[1068].]

1001. By making these statements, CB&I represented to Reficar that:

- It only foresaw 14 possible exceptions to the Representation Forecast; and

- It did not anticipate incurring costs regarding those exceptions.

\* \* \*

1002. Why did Mr. Deidehban, at this stage of the construction, commit CB&I to such high and unprecedented standard?

1003. The record does not provide a clear answer, but the Tribunal feels that Reficar's threats to terminate the Contract with CB&I, and to entrust construction to an alternative constructor, was the compelling and decisive factor.

1004. And, at least initially, CB&I's strategy seems to have been successful, because Reficar, upon receiving the assurances contained in the Representation Letter, desisted from the idea of terminating the Contract, and decided to continue with the Project in CB&I's hands. But CB&I's promise soon evaporated and costs started to exceed the thresholds of the USD 3.971 Representation Forecast. The tensions between Owner and Contractor resurfaced – eventually leading to the present arbitration.

---

[1065] Ex. R-1903, p. 8, showing that the same list was discussed in February 2012 – the only difference in the slides is that the list discussed in February 2012 contained a typo and stated that "This Alignment is as of December 2012", while in fact it was December 2011, as correctly stated in the slide attached to the Representation Forecast.
[1066] Ex. C-0827, p. 3 (point 10).
[1067] Ex. R-1849_07396, p. 3: "It should be understood that the forecasted Target Cost at Completion (TCC) of $3.700 MM, was ultimately set as a Target that excludes Owner's costs, remaining contingency and allowances against existing PO commitments".
[1068] Compare: Ex. R-1903, p. 8 and Ex. R-1849_07396, p. 6.

1005. Reficar submits that it was entitled to place, and that it actually placed, special trust on CB&I's Representation Letter and the USD 3,971 million Representation Forecast[1069] and the Tribunal sees good reasons to believe that it was actually so.

1006. Hence, in the Tribunal's *prima facie* opinion, this <u>USD 3,971 million</u> Forecast does constitute a Reasonable Cost Benchmark, as it fulfils the Tribunal's criteria:

1007. <u>First</u>, the Reasonable Cost Benchmark is an estimate prepared by CB&I and then delivered and reviewed by Reficar.

1008. <u>Second</u>, the Reasonable Cost Estimate was prepared well into the EPC phase of the Project, at a time when CB&I had actual experience in the Cartagena location, was aware of the idiosyncrasies affecting Reficar as a public company, was knowledgeable of the actual productivity of labour in the location and the scope of the Project was (almost) finalized.

1009. <u>Third</u>, CB&I specifically represented in the Representation Letter to Reficar that the Reasonable Cost Estimate boasted an accuracy of Class I +/-5%[1070].

1010. <u>Fourth</u>, it was accepted by both Parties as a reliable cost projection: CB&I was prepared to vouch that this projection met the stringent requirements of being a Class I +/-5% estimate, and Reficar shelved its plans of terminating the Contract with CB&I and of entrusting completion of the Project to a different constructor.

### 3.3. QUANTIFICATION OF REFICAR'S CLAW BACK

1011. The general principle in a cost-reimbursable construction contract is that the risk that the project results in higher costs than anticipated is assumed by the owner. But the Tribunal has already found that, in the EPC Contract the above general principle is more nuanced: because CB&I, to assuage Reficar's reluctance to give up the initially agreed lump sum structure, was willing to assume stringent Cost Control Commitments in favour of the Owner:

- Under its Reasonable Cost Obligation, CB&I agreed only to claim reimbursement for costs that were incurred reasonably, properly, and in accordance with the Contract; and

- Under its Heightened Diligence Obligation CB&I pledged to rigorously control cost and schedule similar to a lump sum contract, and to safeguard Reficar's resources as if its own.

1012. Reficar says that it has paid USD 5,908.2 million in EPC costs for the Refinery, and within that payment there were significant unreasonable and improper costs, which CB&I incurred in breach of its Cost Control Commitments[1071]. Reficar's main claim is that CB&I repay these monies.

---

[1069] CPHB, paras. 11-13, 25, 197; see also paras. 53-56, 110, 194 about the relationship of special trust between the Parties and Reficar's legitimate trust on CB&I's representations.
[1070] Tr. 1234:6-15.
[1071] Communication C-175, pdf pp. 9, 11, 15.

Excess Costs

1013. The Tribunal has already decided that in the present case the only viable methodology to determine whether CB&I has indeed breached its Cost Control Commitments, and to establish the precise amount of the Excess Costs charged to Reficar, is the so-called Bottom-Up approach. Under this methodology, the Excess Costs are calculated as the difference between:

- the actual EPC costs paid by Reficar to CB&I: it is undisputed that Reficar ultimately paid to CB&I USD <u>5,908.2 million in EPC costs</u>[1072] (additionally, there is a counterclaim of USD 267.26 million[1073], which the Tribunal will analyse separately, to ascertain whether these are properly incurred costs); and

- a Reasonable Cost Benchmark, which meets the criteria defined by the Tribunal in the preceding Sections and amounts to <u>USD 3,971 million</u>[1074].

1014. Thus, Excess Costs amount to <u>USD 1.937.2 million</u>.

Excluded Costs

1015. CB&I has argued, as a defense against that *prima facie* quantification, that some of those Excess Costs were not caused by a breach of its Cost Control Commitments, and thus Reficar should not be entitled to claw them back[1075]. The Tribunal accepts the premise that, within those Excess Costs, there may indeed be certain items, for which CB&I, notwithstanding its breach of the Cost Control Commitments, should not bear responsibility, because these Excess Costs were caused by factors outside its scope of control ["**Excluded Costs**"].

1016. Following CB&I's line of argumentation, to qualify as an Excluded Cost, any Excess Cost item must meet the following two requirements:

1017. <u>First</u>, the item must <u>not</u> have been foreseeable as of December 31, 2011[1076] [the "**Cut-Off Date**"], *i.e.*, the date as of which CB&I represented to Reficar that the USD 3,971 million Representation Forecast constituted a Class I estimate; for this reason, the Representation Forecast must be deemed to include all costs, which CB&I could foresee with the information available as of the Cut-Off Date. Had CB&I been concerned at that time that there were future costs, that escaped its scope

---

[1072] Ex. C-1181; CPHB, para. 1, citing to Long International ER, para. 1180 and Table 9.4-17.

[1073] CPHB, para. 1, fn. 10. The Tribunal notes that CB&I does not quantify its counterclaim as a total number in USD but instead uses separate numbers for invoices due under the Onshore Contract, in Colombian pesos, and for those under the Offshore Contract, in USD.

[1074] The Tribunal notes that the Representation Forecast had an accuracy margin of +/-5%. Because this margin of error in the cost estimation could go both upwards and downwards, the Tribunal accepts the figure of USD 3,971 million, with no adjustment, as the Reasonable Cost Benchmark.

[1075] See *e.g.*, Section V of the ESOD, with multiple arguments about Reficar and Ecopetrol's interferences in the Project.

[1076] The Tribunal notes that there is no day for which the Representation Forecast was made specifically, but on the basis of the fact that it was given as of the month of December, it is safe to assume that the final day of that month should constitute the Cut-Off Date.

of control, it should have disclaimed responsibility at that time; but it did not[1077], and so it assumed liability for all foreseeable Excess Costs.

1018. Second, the Excess Cost must have arisen as a consequence of factors outside CB&I's control, such as:

- events which were unforeseeable ["**Unpredictable Events**"] (**3.3.1.**); or

- scope changes (**3.3.2.**), or

- Reficar's own fault or lack of diligence ["**Claimant's Responsibility Events**"] (**3.3.3.**).

Burden of proof

1019. Before delving into these issues, the Tribunal must briefly address the burden of proof. Throughout its pleadings, CB&I avers that Reficar, as the claimant, bears the burden of proof regarding any Excess Costs to be borne by CB&I[1078].

1020. The Tribunal concurs. It is a general principle of law, that the burden of proof rests with the party submitting a claim. In Colombian law this universal principle is enshrined in Art. 1757 of the CCC[1079]:

> ""*ARTICULO 1757. PERSONA CON LA CARGA DE LA PRUEBA. Incumbe probar las obligaciones o su extinción al que alega aquéllas o ésta*".

1021. Under this rule, each party is required to prove the facts upon which the legal consequences sought by such party are based.

1022. In the present case, Reficar has already met its burden of proof under Art. 1757 of the CCC: it has proven, at least *prima facie*, its claim that Respondents' breach of their Cost Control Commitments has resulted in Excess Costs of USD 1,937.2 million, and that these Excess Costs must be borne by CB&I.

1023. Respondents now raise certain defenses, arguing that the Excess Costs were not caused by their negligence, but that they were caused by Reficar's conduct or as the result of Unpredictable Events, for which they bear no responsibility. Under Art. 1757 of the CCC, the burden of proving these defenses lies with Respondents.

1024. An additional argument may be made.

1025. Under the Heightened Diligence Obligation [described in Section 3.1.1 *supra*] CB&I undertook to "rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own". The wording of this Obligation is analogous to the standard of care which Colombian law imposes on

---

[1077] CB&I excluded certain items from the Representation Forecast, but ultimately acknowledged that they would not have a significant impact on costs. See para. 1001 *supra*.
[1078] See e.g., RPHB, paras. 293, 325, 394.
[1079] Art. 1757 of the CCC; English translation by the Tribunal:
"ARTICLE 1757. THE PERSON WITH THE BURDEN OF PROOF. The burden of proving the obligations or their extinction lies with the party alleging such obligations or extinction".

the mandatary in the contract of mandate (*contrato de mandato*)[1080]. Under the CCC a mandatary incurs responsibility vis-à-vis the mandator, if he fails to perform the measure entrusted to him with the "*diligencia y cuidado que los hombres emplean ordinariamente en sus negocios propios*"[1081]. Similarly, the Reasonable Cost Obligation requires CB&I to carry out the contract diligently, minimizing the costs of the Project.

1026. In these situations, where a contractual debtor is required to act with specific diligence, Art. 1604 of the CCC establishes a special rule as regards the burden of proof[1082]:

> "*ARTICULO 1604. <RESPONSABILIDAD DEL DEUDOR>.*
>
> [...] *La prueba de la diligencia o cuidado incumbe al que ha debido emplearlo; la prueba del caso fortuito al que lo alega*". [Emphasis added]

1027. Under Art. 1604 CCC, when a person is bound to act diligently, the burden of proving that this threshold has been met, falls upon the shoulders of such person. Thus, negligence is presumed, unless the person who should have used diligence or care proves otherwise. As explained by Prof. Castro de Cifuentes[1083],

> "*Es decir, en principio se presume su culpa, admitiéndose evidentemente la prueba en contrario para desvirtuar tal presunción*".

### 3.3.1. UNPREDICTABLE EVENTS

1028. As a first defense, CB&I says that certain Excess Costs were, at least in part, caused by Unpredictable Events which occurred after the Cut-Off Date, for which CB&I cannot be made responsible. Since the present EPC Contract is a cost reimbursable agreement, the Excess Costs caused by such Unpredictable Events should constitute Excluded Costs, which Reficar is not authorised to claw-back.

1029. Respondents refer to five types of Unpredictable Events, which allegedly comply with this requirement. The Tribunal will analyse them in turn.

### A. Extreme weather events

1030. CBI invokes extreme weather events in the years 2010, 2011 and 2012 both in Cartagena and in Island Park (where modularization was performed)[1084] (**i.**);

---

[1080] Titulo XXVIII "DEL MANDATO"; Arts. 2142 to 2199 of the CCC.
[1081] Art. 2155 in relation to Art. 63 CCC, emphasis added.
[1082] CL-709; English translation:
"ARTICLE 1604. DEBTOR'S LIABILITY.
[...] The burden of proof of diligence or care lies with the party who should have used it; proving an Act of God is the burden of the party who alleges it.
All of which, however, is without prejudice to the special provisions of the laws, and to the express provisions of the parties".
[1083] CL-711, p. 8 (source p. 179); English translation:
"In other words, their fault is presumed in principle, obviously admitting evidence to the contrary to disprove the presumption".
[1084] ESOD, paras. 739-746

additionally, CB&I says that Reficar provided faulty information, which made it impossible for CB&I to properly prepare for these events (**ii.**)[1085].

1031. (i) CB&I acknowledges that from August 2010 through late 2011 (*i.e.*, before the Cut-Off Date) there was very heavy rainfall in Cartagena[1086].

1032. The Tribunal finds that, by the Cut-Off Date, CB&I must have been aware of the inclement weather conditions on the site, and consequently, when CB&I issued its +/-5% Class I Representation Forecast, the impact of the inclement weather must have been taken into consideration.

1033. That said, in mid-2012 (after the Cut-Off Date) there was again a spell of heavy rainfall, and to set-off the Excess Cost caused, CB&I submitted a Change Order for a total value of USD 23 million[1087] (albeit a year and a half later, on January 23, 2014). Although inclement weather was the norm in Cartagena, the Tribunal is willing to give credit to CB&I for this amount, because the meteorology in 2012 seems to have been worse than what CB&I could expect from its experience.

1034. (ii) With respect to the allegedly faulty rely-upon information regarding water drainage, this issue was discovered by CB&I in 2010, well before the Cut-Off Date[1088]. Hence, this issue cannot qualify as contributing to an Unpredictable Event.

**B.    Underground obstructions and contamination**

1035. CB&I argues that its work was impacted by the discovery of underground obstructions and contamination, for which Reficar was responsible under the EPC Contract[1089].

1036. Reficar acknowledges its responsibility for some of the underground obstructions and soil contamination, which were discovered prior to the Cut-Off Date[1090], worth USD 4 million[1091], but it denies responsibility for others[1092]; regardless of who was

---

[1085] ESOD, paras. 747-749.
[1086] ESOD, paras. 740-745.
[1087] Ex. R-1079, pp. 1-7, 15-16.
[1088] Ex. R-1077.
[1089] ESOD, para. 729, citing to TC 1.1, TC 20.12 and JX-6, Appendix II (Owner Responsibilities), at 5.
[1090] JX-245, p. 2. The supporting documents include a letter from Reficar from September 29, 2011. Additionally, CB&I has presented another letter from Reficar on the same subject, dated 29 December 2011, Ex. R-1516.
[1091] JX-245, p. 1.
[1092] Reficar accepted COs 112, 279, 222 and 238, Ex. B-038;
Reficar did not accept:
Change Order 131 for USD 0.9 million – this concerned existing underground conduit interferences first filed under WNOC 394 in November 2011;
Change Order 169 for USD 30 k – this Change Order specifies that the impact occurred between November and December 2011;
Change Order 208 for USD 140 k – the impacts appear to precede the Cut-Off Date, as the underlying WNOC 436 states that "This Change is reflected in the January, 2012 Forecast".
Total = 0.9+0.03+0.14= 1.07 million
Reficar also did not accept:
Change Order 132 for USD 6.9 million – this concerned the same reasons as the accepted CO 275 and should thus be disregarded.

ultimately responsible, these obstructions and contamination were discovered prior to the Cut-Off Date and thus cannot lead to Excluded Costs.

1037. There are, however, two instances of discoveries of obstructions after the Cut-Off Date, which caused USD 0.1 million in Excess Costs[1093]. The Tribunal has looked into the record and thinks that Reficar withheld approval for these Change Orders arbitrarily[1094]. Thus, USD 0.1 million constitute Excluded Costs.

## C.    **Accidents**

1038. CB&I lists an additional set of events involving fires and gas leaks, which the Tribunal accepts as Unpredictable Events that happened after the Cut-Off Date:

-    The explosion at the FCC unit on August 30, 2013, quantified by CB&I at USD 4.3 million[1095];

-    More fires, all of which occurred past the Cut-Off Date, with a total value of an additional USD 0.4 million[1096].

1039. The Tribunal will credit CB&I these USD 4.7 million, in total[1097].

1040. There are two additional events - the toppling of a crane[1098] and the bursting of a water tank[1099] – which the Tribunal also finds are Unpredictable Events. Both occurred after the Cut-Off Date and Reficar, in fact, accepted all related costs in the

---

[1093] Change Order 314 for USD 60 k – this Change Order appears to have arisen from a discovery of the need to change route location for the Heavy Crane, which only occurred in 2014.
Change Order 254 for USD 70 k – this Change Order is for the re-routing, relocation of existing stormwater line and manhole in design area 21; it appears to originate at a time after the Cut-Off Date; the underlying WNOC states that "The cost of this additional work is not included in the January 2012 Project Cost Forecast".
Total = 0.06+0.07=0.13 million.
[1094] Reficar only refused to approve Change Order 254 because it took issue with the added fee, but not with the principal amounts due; however, it rejected payment in total, see Ex. R-1849_14221, p. 4.
Reficar should have accepted Change Order 314 as it was connected with the reverberations of Reficar's decisions regarding the Large Crane, as discussed in the Section VII.2.1.3.3.3.B on Construction, *infra*.
[1095] See Reply, para. 738, confirming that the Change Order for that amount was rejected by Reficar and that Reficar's expert, Long International, credited this amount to CB&I in its damages model. See Ex. C-1731 for the underlying WNOC.
[1096] Fires – USD 0.38 million, based on events in April 2013, rejected by Reficar, see Ex. R-1085; thus Excluded Cost.
Gas Leaks –USD 29 k, based on events in June and October 2012, rejected by Reficar, Ex. R-1089; thus Excluded Cost; USD 32k, based on events from October 2013, rejected by Reficar, Ex. R-1091.
Total: 0.38+0.029+0.032=0.441.
[1097] Total of: 4.3+0.4=4.7 million.
[1098] Ex. R-0966 (confirmation of acceptance in Reply, para. 738). This amount will only be added in the subsequent subsection under Approved Change Orders.
[1099] Fire Water pipe break – USD 0.1 million, accepted by Reficar, see Ex. R-1083; thus accounted for under Approved Change Orders;
Fires – USD 0.38 million, based on events in April 2013, rejected by Reficar, see Ex. R-1085; thus Excluded Cost.
Gas Leaks –USD 29 k, based on events in June and October 2012, rejected by Reficar, Ex. R-1089; thus Excluded Cost; USD 32k, based on events from October 2013, rejected by Reficar, Ex. R-1091.
Total: 0.38+0.029+0.032=0.441.

corresponding Change Orders, as will be seen in Section 3.3.2 *infra*. No further credit to Excluded Costs is thus warranted.

## D. <u>MECOR deletion</u>

1041. MECOR was another contractor on the Project and was supervised and paid directly by Reficar, without any involvement from CB&I[1100]. Initially, CB&I planned to use MECOR's petcoke conveyor pipe rack and structure for electrical routing, utility piping and as support for a molten sulphur transfer line[1101]. But, as part of a cost-cutting effort, at the end of January 2012 Reficar deleted the coke conveyor from MECOR's scope of work[1102] – and this deletion had an ancillary effect for CB&I: it made the use of the pipe rack as a support for CB&I's lines impossible.

1042. The Tribunal accepts that MECOR's departure was unforeseeable at the Cut-Off Date.

1043. As to its impact on costs, <u>USD 12.6 million</u> are recorded in the evidence[1103]. In fact, it seems that, Reficar initially accepted these additional costs[1104] but for some reasons, the Parties did not reach a final agreement reflected in formal documentation[1105].

1044. This event thus represented an additional cost of <u>USD 12.6 million</u> of Excluded Costs[1106].

## E. <u>Refinery target capacity</u>

1045. CB&I brings up the capacity "uncertainty" on the Project, with the target capacity for the Refinery changing from 150,000 barrels per day ["**BPD**"] to 190,000 BPD, back to 150,000 BPD to finally end with 165,000 BPD[1107]. CB&I says that this uncertainty and lack of foreseeability required additional engineering manhours and had severe knock-on effects on the downstream process units, utilities sections and offsite systems on the Project[1108].

---

[1100] WMC ER, para. 765.
[1101] WMC ER, para. 765.
[1102] Ex. C-0440, p. 1; WMC ER, para. 766.
[1103] Reficar argues that the MECOR change amounted to USD 12 million at CPHB, para. 318. In the Reply at para. 367, it states that the MECOR-related WNOCs amounted to approximately USD 10.7 million. The costs were estimated under WNOC 468 at USD 11.4 million, see Ex. R-0765. In an abundance of caution, the Tribunal also includes the amount of USD 0.4 million under WNOC 477, see Ex. R-0767. Both numbers account for contingency, unlike Reficar's calculations, see Reply, fn. 692 at pdf p. 188. The Tribunal additionally accounts for WNOC 706 for USD 0.8 million invoked by CB&I's expert, WMC, at WMC ER, para. 776, due to further design changes to accommodate for the change in the pipe racks' location. The total is thus USD 11.4+0.4+0.8= 12.6 million. The Tribunal acknowledges the existence of WNOC 441, Rev. 2 for another USD 0.4 million; however, it is not accounted for here to avoid double counting as this WNOC was ultimately agreed by the Parties under CO 101, see Ex. B-038 and WMC ER, para. 779.
[1104] Ex. R-0764.
[1105] In fact, the WNOC log under Ex. C-0224, points out that for WNOC 468 for "Removal of MECOR Petcoke Pipe Conveyor", the column for Reficar Review Status states "Rejected CO". The same "Rejected CO" text may be found under the columns "NOC Status" and "CO Status".
[1106] Since this value arose from a lack of an approved Change Order, it is already included in the analysis under Subsection [a].
[1107] RPHB, para. 312, citing to WMC ER, Section 6.2.
[1108] WMC ER, paras. 373-375.

1046. CB&I's arguments on fluctuating Project capacity have no bearing on the adjustments to the Representation Forecast, because the capacity was finally fixed at 165,000 BPD in December 2010[1109], a year prior to the Cut-Off Date. Thus, any foreseeable costs on this account were or should have been reflected in the Representation Forecast.

## F.    Conclusion

1047. In sum, the Tribunal recognizes <u>USD 40.4 million</u>[1110] as Excluded Costs due to the result of Unpredictable Events.

### 3.3.2. SCOPE CHANGES

1048. Respondents have drawn the Tribunal's attention to the fact that the scope of the works changed during the performance of the Project, thus leading to higher costs, which should be excluded.

1049. Indeed, under TC 62 "Changes" either the Owner or the Contractor can initiate a process to increase or reduce the scope of work[1111]. And these scope changes, as per Section III, Appendix 2 of the EPC Contract[1112], would be included as Owner's costs.

1050. There is, thus, no doubt that additional costs arising out of scope changes should be borne by Reficar, but the really relevant issue here is whether scope changes occurred after the Cut-Off Date; the Tribunal will conclude that, for the largest part, scope changes pre-dated the Cut-Off Date and cannot, thus, be Excluded Costs (**A.**). The Tribunal will then analyse post Cut-Off Date scope changes and arrive at a figure of Excluded Costs (**B.**).

## A.    Pre Cut-Off Date

1051. CB&I refers to seven areas of work affected by scope changes, which should account of USD 1.478 million cost overruns. The Tribunal will analyse them and come to the conclusion that most of those scope changes happened before the Cut-Off Date:

### a.    Synergy changes

1052. The Synergy Changes were Reficar-requested design changes with the goal to increase the synergy between the Cartagena Refinery and another refinery owned

---

[1109] WMC ER, para. 372; see also Figure 6.1 at pdf p. 152.
[1110] Total of: USD 23 million for inclement weather, USD 0.1 million for underground obstructions and contamination, the total of USD 4.7 million for unsafe and dangerous conditions and USD 12.6 million for MECOR deletion.
[1111] TC 62 – Changes, JX-002, pp. 241-243; JX-004, pp. 218-219.
[1112] JX-006, p. 587:
"5. Owners [sic] Costs
Listed below are some specific items that should be included as Owner's Costs for the overall project expenditure.
•   Scope Changes"

by Ecopetrol; the main goal was to increase the production of propylene but the knock-on effects impacted a variety of Project units[1113].

1053. The Tribunal finds that the impacts of the Synergy Changes had been quantified and accepted in the 2010 and 2011 BRNs for a total value of USD 225 million[1114] and no additional increase has arisen after the Cut-Off Date.

**b.    Flare system**

1054. The flare system is an emergency mechanism which collects and burns hydrocarbon materials whenever there is a danger of explosion in a refinery[1115]. CB&I says Reficar changed the design multiple times between January 2009 and November 2014[1116] and requested CB&I to perform related risk analyses[1117].

1055. The flare system was still in flux as of December 2011, when CB&I submitted a cost approval for a study on potential disastrous situations and their mitigation by the flare system[1118] – but this was still within the Cut-Off Date. There is reference to a later (minor) scope changes in an amount of USD 3.6 million[1119], which will be taken into consideration in the next section dealing with post Cut-Off Date scope changes.

**c.    Recycled alkylation unit**

1056. Reficar bought an alkylation unit from another failed refinery project at a discount and asked CB&I to use it in replacement for a unit it had initially planned to build from scratch[1120]; but Reficar was late in transferring necessary design information to CB&I[1121] and extensive engineering work was necessary to adapt the unit to the Project[1122].

1057. The impacts of the purchase were captured mostly in 2010, with the exception of a purchase of new pumps for USD 0.5 million[1123], which will be taken into consideration by the Tribunal in the next section dealing with post Cut-Off Date scope changes.

**d.    Raw and Waste Water Treatment Plant**

1058. Similarly, CB&I says that Reficar is responsible for the cost overruns in the engineering for the Raw and Waste Water Treatment Plant – through choosing an unqualified subcontractor despite CB&I's warnings[1124], delaying the provision of

---

[1113] ESOD, para. 278. The details of the changes are explained in ESOD, paras. 279-307 and are not disputed by Reficar when it comes to the objective description of their scope.
[1114] Ex. C-0046; Ex. C-0047.
[1115] WMC ER, paras. 797-798.
[1116] ESOD, paras. 400-414.
[1117] ESOD, paras. 410-412.
[1118] Exs. R-2757 and R-0751.
[1119] Ex. R-2759.
[1120] ESOD, paras. 312-314.
[1121] ESOD, paras. 318-321.
[1122] ESOD, paras. 322-329.
[1123] JX-116.
[1124] ESOD, para. 362, citing to Ex. R-0735. The Tribunal notes that this letter does not state that the contractor was not qualified, as claimed by CB&I.

necessary documents[1125] and ultimately reverting to the original execution strategy through reassigning the engineering to CB&I[1126].

1059. The majority of the Waste Water Treatment Plant scope change controversies ended in the fall of 2010[1127]. CB&I's further assertion of Reficar's persistent interference with CB&I's detailed design through mid-2012 is not substantiated by any references[1128] and regardless, CB&I should have already accounted for any further interferences by the Cut-Off Date, given the knowledge of its relationship with Reficar.

**e.     Tanks and Spheres**

1060. The changes to the Tanks and Spheres are one of the scope change invoked by CB&I in its submissions as a source of Project disruptions[1129].

1061. The Tanks and Spheres on the Project changed mostly due to the Synergy Changes, with some reverberations still in 2010[1130]. Likewise, the procurement delays imputed to Reficar by CB&I happened in 2010-2011[1131], with CB&I communicating them in January 2011[1132]. Finally, the allegedly insufficient inspections performed by Reficar occurred up until 2010, with CB&I communicating the need for repairs as early as January 2011[1133]. The majority of the required tank modification scope of work packages were released by October 2011[1134]. All this occurred prior to the Cut-Off Date.

1062. While further inspections kept revealing additional issues through 2014[1135], CB&I acknowledges that Reficar decided to self-perform a significant portion of the repair work rather than assigning it to CB&I[1136]. There is, however, evidence of one scope change affecting one of the subcontractors working on Tanks and Spheres, which amounts to USD 10.3 million[1137], that will be analysed in the post Cut-Off Date section.

**f.     Other scope changes**

1063. There were two additional scope changes on the Project discussed in detail by CB&I: the construction and improvements to the Central Control Building[1138] and

---

[1125] ESOD, paras. 361-364.
[1126] ESOD, para. 365.
[1127] ESOD, para. 365, citing to Exs. R-0739, R-732.
[1128] Last sentence of ESOD, para. 365.
[1129] ESOD, paras. 341-360.
[1130] ESOD, para. 341.
[1131] ESOD, paras. 342-350.
[1132] Ex. R-0201, p. 2.
[1133] Ex. R-2244.
[1134] ESOD, para. 359, citing to Exs. R-2244, R-2245, R-2716, R-2717, R-2714, R-2715, R-2712, R-2713, R-2710, R-2711. The only remaining modification scope of work package was dated February 7, 2012 – which CB&I could have predicted by the cut-off date; see Ex. R-2709.
[1135] ESOD, para. 358, citing to Ex. R-2679.
[1136] ESOD, para. 359.
[1137] It is dated July 6, 2015, see Change Order 491, Ex. B-038.
[1138] ESOD, paras. 366-384; and the resulting JX-34.

CB&I being tasked with the Gas Facility works[1139]; however, since both occurred past the Cut-Off Date, they will only be addressed in the subsequent section.

\* \* \*

1064. <u>In conclusion</u>, CB&I claims that around USD 1.5 billion cost overruns were caused by scope changes, for which it should not be held responsible and would have to compute as Excluded Costs.

1065. The Tribunal has analysed each area of scope changes and come to the conclusion that most of such scope changes occurred prior to the Cut-Off Date and thus, were or should have been included in the Representation Forecast, and cannot qualify as Excluded Costs.

1066. There is further evidence of this conclusion, to be found in CB&I's Project Director, Mr. Deidehban's testimony at the Hearing, where he acknowledged that, by the time the Representation Forecast was prepared, all the major scope changes on the Project (apart from MECOR deletion) had already been accounted for[1140].

1067. The Tribunal will analyse the evidence regarding post Cut-Off Date scope changes in the next section.

**B.    Post Cut-Off Date**

1068. As mentioned before, the introduction of scope changes was a process which benefited from detailed guidance in the Change Management Plan referenced by the EPC Contract[1141], including the need to maintain an updated change management log[1142]. Scope changes would typically start with a Written Notices of Change detailing the additional work to be performed and corresponding cost ["**WNOC**"][1143] which, after several steps of approvals by Reficar would evolve into a Change Order, which would again require Reficar's approval.

1069. The Tribunal will analyse all specific scope changes mentioned by CB&I – those that were approved by Reficar in a Change Order (**a.**), as well as those that were not (**b.**).

**a.    Approved Change Orders**

1070. After the Cut-Off Date CB&I filed, and Reficar accepted, a number of Change Orders for the additional work performed. CB&I must be given credit for these

---

[1139] ESOD, paras. 428-434; and the resulting JX-263; JX-413.

[1140] Tr. 1234:16-1235:15; Tr. 1297:8-13, on the basis of H-9.

[1141] Ex. R-2928; the Change Management Plan is referenced under Annex I Coordination Procedure, see JX-002, p. 292; JX-004, p. 267; Annex 13 Project Execution Plan, see JX-002, p. 653, 662; JX-004, p. 627.

[1142] JX-002, pp. 479-480; JX-004, pp. 454-455.

[1143] (W)NOCs preceded Change Orders in the change management system on the Project. CB&I was entitled to file a potential notice of change, which if approved by Reficar, would later be developed into a (W)NOC, which again, if approved, would be developed into a further specified Change Order. At this point, Reficar was also given the power to either approve or reject the Change Order. Thus, both categories reflect Project changes well. Reficar was also entitled to initiate the change process but in the Project history, it was CB&I that filed the vast majority of WNOCs and Change Orders. See e.g., B&OB ER, Section 6 "Change Management".

accepted Change Orders, as this further work is deemed to have been instructed by Reficar (or otherwise acquiesced by Reficar) and, pursuant to the Contract, it is part of the Owner's cost.

1071. The Tribunal has reviewed the change management log[1144] and has, on the basis of the final cost report submitted by CB&I on the Project[1145], found USD 129.1 million worth Change Orders approved by Reficar after the Cut-Off Date[1146] – the first Change Order issued past this deadline was CO 41, dated January 12, 2012[1147].

1072. Furthermore, there is a number of WNOCs and certain Change Orders, which were submitted by CB&I, as a consequence of further work performed after the Cut-Off Date, where CB&I now claims that Reficar arbitrarily withheld their authorization with the consequence that CB&I should be credited for their amounts and which will be analysed in the following section[1148].

**b.    Rejected Change Orders and WNOCs**

1073. A total of 1004 WNOCs were filed during the Project[1149]: a vast majority, 70%, were accepted by Reficar[1150].

1074. Out of the remaining 30% of the rejected WNOCs, CB&I only discussed in detail a limited number. The Tribunal will analyse them in the forthcoming sections of the Award, and should be considered Excluded Costs in connection with the following WNOCs and Change Orders:

- **Change Order 247** with a value of USD 12.7 million for the adding of the Large Crane to the work scope[1151] – analysed in Section **3.3.3.B** on Construction;

---

[1144] The Tribunal uses Ex. C-0024 as the basis for its analysis even though LI has proposed a different log with its adjustments. In the Tribunal's view, even if Ex. C-0024 contains minor errors, as claimed by LI, this document is still more objective as a source of information for the changes on the Project than would have been the document modified by LI.

[1145] Ex. C-0056, tab "Contract Value", sum of all Change Orders past January 1, 2012.

[1146] The Tribunal notes that this number includes the Change Orders for the Central Control Building and Gas Facility; see JX-34, JX-263 and JX-413.

[1147] CO 41, Ex. B-038.

[1148] In some cases, Reficar also granted its approval for WNOCs which were never transformed into Change Orders – but this was only the case when both Parties agreed that the scope change did not have any impact on the forecasted costs, as they would be covered by the separate pool of contingency funds – which under the Representation Forecast constituted USD 141.4 million, see Ex. R-1851_057_00017, tab "Project Summary". Hence, the approved WNOCs that were not transformed into Change Orders will not form part of the Tribunal's analysis.

[1149] Ex. C-0224, tab "NOC LOG".

[1150] Based on the green coloured cells; the Tribunal has discounted WNOC 468 for MECOR which in fact ended up with a rejected CO, as found under the previous subsection. There were 699 accepted WNOCs according to the WNOC log.

[1151] WNOC 715, Ex. B-038.

- **Change Order 285**, with a value of USD 9.9 million for equipment to properly manage the storage areas[1152] – analysed in Section **3.3.3.D** on Materials Management; and

- **WNOC 831** for labour disruption-related costs, with an adjusted value of USD 171 million – analysed in Section **3.3.3.F** on Labour Disruptions.

1075. The Tribunal could end its analysis here, focusing only on the WNOCs and Change Orders discussed in detail by the Parties. Nevertheless, the Tribunal is inclined to enter into further analysis, given that, although the rejected WNOCs by Reficar only represent 30% of the total of WNOCs, they still amount to a significant USD 1,150 million[1153].

1076. According to Respondents, CB&I was entitled to costs adjustments arising out of Change Orders; Respondents aver that Reficar rejected WNOCs that reflected the additional costs based on changes to the Project's scope[1154]; nevertheless, neither CB&I nor its expert have gone through the trouble of analysing all the rejected WNOCs individually. To ensure that CB&I's position is not prejudiced, and that all post-Cut-Off Date scope changes are accounted for (as required in the Bottom-Up approach), the Tribunal will look at those rejected WNOCs that meet the threshold of USD 5 million – this will account for 92%[1155] of the totality of rejected WNOCs[1156]. The Tribunal considers this to be representative enough to ensure that CB&I's position is not prejudiced.

1077. In performing this analysis, the Tribunal will grant CB&I credit for a total of <u>USD 118.4 million</u>[1157] as a result of recognizing the following rejected WNOCs and Change Orders as Excluded Costs[1158]:

- **WNOCs 934** (Rev 1 from November 2014)[1159], **1010** (August 2015)[1160] and **963** (January 2015)[1161] for the purchase of materials for Reficar – Reficar rejected these WNOCs because they included the 6.8% fixed fee supplement that CB&I was entitled to whenever it performed extra work; the Tribunal tends to agree with Reficar that the purchase of materials is an ordinary task in the Contract and CB&I should not be entitled to receive a supplement for it; however, rejecting the entire WNOCs for this reason prejudices CB&I as it effectively made the purchase of the underlying materials; for this reason,

---

[1152] Change Order 285, Ex. B-038; See ESOC, para. 301: "In all, Reficar provided nearly US$ 10 million for equipment and labour for CB&I to locate and handle the materials and equipment stored in the laydown areas".

[1153] The Tribunal notes that the extensive case record may include partial submissions on other unaddressed WNOCs but the Tribunal's limitations have compelled it to focus on the Parties' written pleadings in the arbitration.

[1154] ESOD, paras. 1238-1246, with examples for individual WNOCs at ESOD, paras. 1247-1249.

[1155] 996.7 million (sum of rejected WNOCs above USD 5 million)/1085.7 million (sum of all rejected WNOCs)= 0.918.

[1156] *Pro memoria*, the Tribunal is only taking into account post-Cut-Off-Date WNOCs in its calculations.

[1157] Total = 93.9+8.7+5.4+0.1+10.3

[1158] This category is different from the preceding one because the Parties have not argued about these Change Orders or WNOCs in detail in their main submissions; although they may be found in the WNOC log, Ex. C-0224.

[1159] WNOC 934, Ex. B-038.

[1160] WNOC 1010, Ex. B-038.

[1161] WNOC 963, Ex. B-038.

the Tribunal considers that the value of these WNOCs minus the fee supplement should be considered Excess Costs: that is, <u>USD 93.9 million</u> for WNOC 934, <u>USD 8.7 million</u> for WNOC 1010 and <u>USD 5.4 million</u> for WNOC 963[1162];

- **WNOC 943** (October 2014)[1163] for the extension of warranties of purchase orders of critical equipment – Reficar rejected this WNOC because its amount was never expended by CB&I: in 2014, Reficar requested that CB&I reach out to the **Vendors** (third-party suppliers for the Project who were not CB&I's subcontractors) to try and extend the warranties for equipment, which were expiring due to Project delays; however, upon receiving the estimates of the costs, Reficar directed CB&I to cease its work, with Reficar employees taking over the process; the Tribunal thus grants CB&I the amount of <u>USD 0.1 million</u> pursuant to the calculation by Reficar's expert, B&OB, for the work CB&I performed in negotiating with the Vendors following Reficar's instructions[1164], but not for the rest of the WNOC, as the money was never expended as Reficar rightfully claims;

- **WNOC 1024** (July 2015) for Change Orders of the modifications made to a contract with a subcontractor working on the Tanks and Spheres[1165] for USD <u>10.3 million</u>. The analysis of WNOCs provided by Reficar's expert, B&OB does not include this particular WNOC; given that Reficar has raised no specific defense against excluding this amount, the Tribunal is inclined to grant these costs to CB&I as Excluded Costs.

1078. In turn, the Tribunal will not credit CB&I for the following remaining rejected Change Orders and WNOCs with a value exceeding USD 5 million[1166]:

- **Change Orders 360**[1167] and **362**[1168], for a total value of USD 27 million[1169], analysed under Section 3.3.3.B on construction;

- **WNOC 888** for Additional Security Services employed as a result of the labour disruptions, submitted in March 2015 for 5.3 million[1170]; the Tribunal will devote a whole section to the impact on of labour disruptions on Excess Costs and come to the conclusion that they cannot constitute Excluded Costs,

---

[1162] These numbers are simply taken from the WNOC sheets, at the level which does not include CB&I's mark-up fee.
[1163] WNOC 943, Ex. B-038.
[1164] B&OB ER, para. 840.
[1165] WNOC 1024, Ex. B-038.
[1166] The analysis only concerns post-Cut-Off Date WNOCs and Change Orders and thus does not extend to the following:
  - Change Order 518 on "131 and 143 Changes 28-Feb-10 Budget to March 2011" for USD 16.6 million, which eponymously preceded the Cut-Off Date, see Change Order 518, Ex. B-038; and
  - WNOC 357 for "Change Design of Unit 002 Piling from August Cast-in-Place to Helical Piling" as it was submitted in October 2011; see WNOC 357, Ex. B-038.
[1167] Change Order 360, Ex. B-038.
[1168] Change Order 362, Ex. B-038.
[1169] The Tribunal has added the value of Change Order 361 to the calculation as all three pertained to the same factual scenario. A detailed analysis may be found under Section VII.2.1.3.3.3.D on materials management.
[1170] WNOC 888, Rev 1, Ex. B-038.

except for a very limited category of costs – there is, thus, no need to analyse this particular WNOC.

- **WNOC 833**[1171] for "Force Majeure Due to Abnormal Weather Conditions" has been added by the Tribunal under the preceding section 3.3.1.A on extreme weather events and will not be granted here to avoid double-counting; and

- **WNOC 802** for labour disruption-related costs, analysed under Section 3.3.3.F.

## C.    <u>Conclusion</u>

1079. The Tribunal has looked into the scope changes as a source of cost overruns, for which according to the Contract, Reficar assumed liability. The Tribunal has found evidence that most of the scope changes occurred prior to the Cut-Off Date and thus, cannot be computed as Excluded Costs.

1080. As for those residual costs related to scope changes happening after the Cut-Off Date, the Tribunal has acknowledged USD 129.1 million in accepted Change Orders – these must be considered Excluded Costs. And of the remaining non-accepted WNOCs and Change Orders, after an analysis of those covering 95% of the value, the Tribunal has decided that USD 118.4 million be part of the Excluded Costs;

1081. In sum, <u>USD 247.5 million</u> of scope changes constitute Excluded Costs.

### 3.3.3. CLAIMANT'S RESPONSIBILITY EVENTS

1082. Respondents submit that some Excess Costs were caused by situations in which Reficar acted with fault or negligence. The situations cover a very wide category of events, and will be analysed by the Tribunal in the succeeding Sections [**A. – H.**].

## A.    <u>Engineering</u>

1083. CB&I did the engineering of the Project by itself – it was not subcontracted. CB&I had two off-shore engineering centres, apart from having a team on-site, and had hundreds of engineers working on the Project. Payment of invoices for that work flowed directly and entirely to CB&I[1172].

1084. The payment for engineering was based on the billed number of engineering man-hours, of which two types were charged:

- Off-Site engineering, with the hours charged by CB&I's engineers in Houston and Cairo, and

---

[1171] WNOC 833, Ex. B-038.
[1172] Tr. 1116:18-24:
"Q. Okay. And payments to CB&I for engineering stayed with CB&I; right?
A. Payments to engineering?
Q. Yeah, payments for engineering.
A. Yeah, yeah, we paid our 24 personnel, that's correct".

242