ICC Case 21747 RD/MK/PDP
Final Award

- On-Site engineering, performed in Cartagena.

1085. CB&I incurred a total of 4.14 million man-hours in engineering. The experts for both Parties agree that this number can be broken down in three categories:

- the budgeted hours under the October 2010 Baseline (*pro memoria*, this was the first Project schedule under the EPC Contract, see discussion at Section VII.1.1.6 under pre-contractual liability, *supra*);

- additional impacts from the Change Orders and WNOCs, and

- unreconciled or unjustified hours.

1086. Respondents note that the numbers for all three categories put forward by the Parties' experts are very similar; this can be observed in the three columns on the right of the following graph[1173] (the first column will be discussed separately):



**Home Office Engineering Work Hour Reconciliation**

1087. The experts agree that unjustified engineering man-hours are in the region of 1.06 million (Long International) to 1.31 million (B&OB); this translated in an increase of the totality of engineering costs from USD 547 million (in the Representation Forecast) to real engineering costs of USD 659 million[1174]; implying an Excess Costs of USD 110 million (20% more).

1088. CB&I claims that it is not to be held responsible for these Excess Costs, for a whole array of reasons – none of which is convincing, in the Tribunal's opinion:

1089. First, once the impact of WNOCs and Change Orders is computed (orange tranche), all three experts agree that the overall engineering productivity achieved by CB&I

---

[1173] H-027, p. 107.
[1174] Ex. C-0056, tab "Project Sum Cost Report Only", Cell R70.

was around 70% of forecast[1175]. According to CB&I's expert, a factor of 0.7 is a reasonable productivity range under the circumstances CB&I worked under[1176]. Reficar's experts disagree and argue that the factor of 0.7 reflects CB&I's poor engineering productivity[1177].

1090. The Tribunal tends to side with Reficar: an engineering productivity of 1.0 means that the engineers would work at a 100% of their productivity potential. Here, however, they were working at 70% only – it seems reasonable to assume that the productivity decrease is imputable to CB&I itself, who was in charge of its own engineers.

1091. That said, the cost impact of engineering working only at a 0.7 productivity was already known by CB&I at the time the Representation Forecast was presented, and thus, CB&I is deemed to have included this impact in the forecasted USD 547 million engineering costs.

1092. Second, CB&I relies on Eng. Torres' testimony to support that Reficar accepted a higher number of man-hours (1.5 million) as justified hours (grey tranche[1178]): hence, CB&I argues that Reficar itself has admitted that all the allegedly unjustified man-hours should be considered as Excluded Costs[1179].

1093. During the Hearing, Eng. Torres explicitly stated that he was not certain of his recollection[1180]:

> "[…] I don't remember the exact figures but, yes, those would be the numbers".

1094. For this reason, the Tribunal does not award probative value to Eng. Torres's Hearing testimony.

1095. Third, CB&I refers to a number of costs which allegedly arose because of Reficar's own doing. The Tribunal will dismiss this claim, because, even if accepting *arguendo* that they were caused by Reficar, the events leading to the Excess Costs occurred prior to the Cut-Off Date and, thus, were or should have been included in the Representation Forecast:

- Reficar's instruction to proceed with detailed engineering prior to the finalization of basic engineering, which was taken two years before the Cut-Off Date[1181].

---

[1175] In the case of engineering productivity, the experts reference the relative, and not absolute, productivity factor on the Project. Thus, while the analysis of craft labour PFs benchmarks the Project productivity against that of US Gulf Coast workers, the analysis of engineering PFs uses the forecasted productivity as the target – or 1.0, or 100%, with the actual PFs benchmarked against that, *i.e.*, a PF of 0.7 means 70% of the planned productivity.
[1176] H-027, p. 106.
[1177] B&OB ER, paras. 603-607; LI ER, para. 1187.
[1178] Far left column in the image at para. 1086 *supra*.
[1179] RPHB, para. 303.
[1180] Tr. 2530:22-25.
[1181] RPHB, paras. 313, 319-324; ESOD, paras. 260-307.

ICC Case 21747 RD/MK/PDP
Final Award

- Unsatisfactory hand-over of deliverables by Technip (a contractor which initially worked on the Project FEED together with CB&I), upon Reficar's termination of its contract: it occurred in early 2010[1182].

- Reficar's insistence to use a local Colombian engineering company instead of CB&I's Cairo engineering office[1183], only to change one and a half years later to Cairo, upon realisation of the bad performance of the Colombian engineering company: the contract with the local company was terminated in January 2012[1184], just a month after the Cut-Off Date and four months before the Representation Letter – hence, the cost impact of having used the Colombian sub-contractor must have been properly reflected in the Representation Forecast.

- Multiple revisions to the engineering drawings[1185]: these must have occurred mainly before the Cut-Off Date because at that time the engineering was well advanced.

1096. Fourth, CB&I brings two additional arguments, which do not support the position it tries to defend:

1097. (i) CB&I says that Reficar's team was continuously involved in CB&I's engineering offices, but never complained that CB&I acted with gross negligence in the engineering activity – as Mr. Houtz, Reficar's chief engineer, acknowledged. Reficar would now be estopped from clawing back engineering Excess Costs[1186].

1098. The Tribunal disagrees:

- there is no support for the proposition that an alleged failure to complain in time amounts to a waiver of the right to claw back Excess Costs, moreover, to the contrary,

- there is ample contemporaneous evidence of Reficar filing complaints regarding CB&I's engineering work[1187].

1099. (ii) CB&I says that Reficar[1188] and Ecopetrol representatives[1189] have flaunted the Refinery as a major success story.

1100. The Tribunal remains unconvinced:

---

[1182] ESOD, paras. 308-311.
[1183] ESOD, para. 338.
[1184] ESOD, para. 340, citing to Ex. R-0709.
[1185] RPHB, para. 305; ESOD, paras. 256-259, 458-460.
[1186] RPHB, paras. 298-301.
[1187] See e.g. delays in issuing piping isometrics (Ex. C-0169, p. 3), the high revision rate of drawings (Ex. C-0104, p. 6), CB&I releasing engineering drawings prematurely (Ex. C-104, p. 10) and delays in engineering progress (Gilchrist CWS, para. 31; Ex. C-0794, Ex. C-0795; Ex. C-0172).
[1188] RPHB, para. 294, citing to Mr. Arenas, Ex. R-2642, pdf pp. 64-65; Mr. Houtz Hearing testimony at Tr. 1528:13-21.
[1189] RPHB, para. 294, citing to Mr. Bayón, Ecopetrol CEO, Ex. R- -1798, pdf p. 7; Ecopetrol BofD MoM, Ex. R-0449, p. 13.

- the task of the Tribunal is not to pass judgment on the quality of the Refinery construction, but to decide whether its construction involved Excess Costs for which CB&I should be held responsible; and

- the praise invoked by CB&I must be read in context: Mr. Arenas was testifying to the *Procuraduría,* with his personal liability at stake; and Mr. Houtz did say at the Hearing that he was proud of the Project configuration, and that the margin the Refinery produces is impressive, but he immediately added "[b]ut I view the project as a failure"[1190].

1101. Fifth, CB&I argues that Reficar's 2012 decision to demobilize CB&I's Houston engineering Home Office and to move CB&I's engineers on-site led to additional inefficiencies, which translated in engineering cost overruns[1191].

1102. The Tribunal notes that Reficar's decision was taken in December 2012[1192], upon CB&I's assurance that engineering was "essentially complete"[1193]. But the record shows that, even after that point, CB&I kept charging Reficar engineering man-hours, including for Home Office[1194].

1103. The Tribunal has already established that one of the consequences of the introduction of the Cost Control Commitments is that certain fiduciary duties arise on CB&I's side. And that Reficar is entitled to rely and place special value on CB&I's representations regarding costs.

1104. This is one of such situations: CB&I made a representation that engineering work was essentially complete and Reficar was entitled to act accordingly and assume that little cost could arise from an almost finished activity; hence, if additional costs arose, it is for CB&I to accept responsibility.

1105. In light of the above, the Tribunal concludes that none of the engineering-related cost overruns should be considered Excluded Costs.

## B.    Construction

1106. Construction was the major component of the EPC Contract. It is the area with the highest cost overruns – the final cost was USD 3.126 billion[1195], while the Representation Forecast only foresaw construction costs of USD 1.406 billion[1196]. This means that construction experienced Excess Costs of USD 1.720 billion – 120% of CB&I's +/-5% accuracy Representation Forecast!

1107. Construction – in a wider sense – encompasses a number of specific Excess Cost sources, such as modularisation, materials management, craft labour productivity and labour disruptions, which will be looked into separately [**C. – F.**]. In this section, the Tribunal will only analyse CB&I's general position that all construction

---

[1190] Tr. 1528:2-21.
[1191] ESOD, paras. 450-457.
[1192] Davison RWS, para. 161, citing to Ex. R-0799, p. 3.
[1193] Ex. C-0162, p .1.
[1194] Comparison of Ex. R-1855_080, p. 41 and Ex. R-1855_133, p. 99.
[1195] Ex. C-0056, tab "Project Summ Cost Report Only", tab "Construction Services".
[1196] Ex. R-1851_057_00017, tab "Project Summary".

Excess Costs were in fact Excluded Costs, for which it should assume no responsibility.

**a.    Control over workforce levels**

1108. CB&I argues that it cannot be held responsible for any cost overruns arising from the suboptimal allocation and management of workforce on the Project, since it was Reficar who controlled whom CB&I could hire[1197]. Respondents add that Reficar continuously delayed or denied CB&I's formal requests to hire additional craft workers without legitimate cause[1198]. This led to slower than expected construction progress.

1109. The Tribunal disagrees with CB&I.

1110. TC 44.1.3(iii) regulates the hiring of craft workers[1199]:

> "If during the course of the Work the Contractor determines that the number of craftsmen or other workers available is insufficient to perform the Work in accordance with the terms of this Agreement, then the Contractor shall, with the prior written approval of the Owner, perform any actions required to obtain additional craftsmen and other workers".

1111. The contractual rule is straightforward: the Contractor must establish the number of craftsmen which, in its professional opinion, are required to carry out the construction in accordance with the EPC Contract, and if at any time the workforce proves to be insufficient, the Contractor is obliged to find and employ additional craftsmen, subject to the prior written approval of the Owner.

1112. The requirement that Reficar approve the additional cost is logical, because this being a cost reimbursement structure, Reficar was legitimately entitled to limit hires to the numbers necessary for the works to be performed; otherwise, the Contractor might over-hire construction workers and recklessly charge the cost overruns to the Owner. On the other side, good faith requires that Reficar not withhold the authorization, when the Contractor reasonably requested an increase.

1113. The following graph shows the actual number of craftsmen employed in the construction of the Refinery[1200]:

---

[1197] RPHB, para. 404.
[1198] RPHB, paras. 409-412.
[1199] JX-002, p. 216, JX-004, pp. 194-195.
[1200] Unnumbered graph at the end of para. 326 of CPHB; Column AE from Ex. H-013.

ICC Case 21747 RD/MK/PDP
Final Award



1114. The original execution plan foresaw a peak labour requirement of 5,410 craftsmen[1201]. In fact, between February 2012 and June 2015 the actual number of craftsmen employed was consistently above this estimate, reaching its highest number of 14,000 in August 2013 and 2014 – this almost triples the estimated peak labour requirement. *Res ipsa loquitur*: the facts prove that Reficar indulged the tripling of the work force; this runs at odds with CB&I's suggestions that Reficar unjustifiably restricted the number of necessary work force.

1115. CB&I's arguments as to allegedly insufficient workforce are also refuted by a contemporaneous report by Reficar's consultant, Bechtel, who in August 2013 opined that hiring more personnel "does not help; it compounds the problem" because the infrastructure is not designed to handle large influxes in the workforce[1202].

1116. CB&I's arguments, rather than supporting Reficar's responsibility for the Excess Costs caused due to an insufficient workforce, tend to prove the opposite: that CB&I's inefficiencies led to the hiring of huge, unmanageable workforce, which in turn led to Excess Costs in breach of the Cost Control Commitments.

**b.    Interferences with CB&I Staff**

1117. According to CB&I, Reficar also negatively interfered in the hiring of CB&I's own personnel, mainly the Construction Management Team ["**CMT**"][1203].

1118. The Tribunal once again disagrees with CB&I.

---

[1201] Bechtel confirmed that this capacity was at the 5000-6000 worker level, see Ex. C-0281, pp. 30-31.

[1202] Ex. C-0281, p. 31: "The original execution plans and schedules showed peak direct manpower at the 5,000 - 6,000 worker level. When projects get in trouble and statt dramatically increasing manpower, we usually see weaknesses and failures in the ability of the infrastructure to support the higher work force. Bussing, parking, construction equipment, tools, consumables, scaffold, sanitation, are all impacted".

[1203] Under ESOD, para. 693, CB&I defines Project staff as:

"(1) home office staff, including Engineering, Procurement Services, Project Controls, Project Management, and other support personnel; and

(2) field/site staff working at the site, including expatriates, local workers, and other country nationals ("OCNs"), but excluding craft labor staff".

1119. As with craft workers, Reficar was also entitled under the EPC Contract to accept or reject additional hires for CB&I's own staff[1204]:

> 44.11 The Owner shall approve the Contractor's organizational chart, all positions therein and the staff that will provide professional services.

1120. CB&I argues that Reficar abused this prerogative and arbitrarily delayed, and sometimes withheld, approval for CB&I's additional staff hires: for example, in 2012 Reficar refused to approve 24 out of 45 allegedly urgent applications[1205].

1121. Reficar has provided ample reasons for these refusals[1206], including missing requested information and submission for hire of candidates with no relevant work experience; hence, the evidence does not point to Reficar acting arbitrarily.

c.   **Control over Other Country National hires**

1122. Another staffing issue refers to the availability of skilled local workers: according to CB&I, the local pool was severely limited, with the consequence that the Project was experiencing inefficiencies in construction[1207]. CB&I undertook best efforts to train local workers[1208], but this could not replace experienced craft[1209]; a preferred solution to this issue would have been hiring Other Country Nationals ["**OCNs**"] with sufficient qualifications[1210].

1123. CB&I says that Reficar reduced the cap for OCN hires to merely 3-5%[1211], even though Colombian law placed the limit at 10%[1212] – this resulted in Excess Costs due to low efficiency of the poorly qualified workers.

1124. The Tribunal again is unconvinced for a number of reasons:

1125. First, the need to engage local craft labour was an issue anticipated by the Parties long before the Contract was executed; in fact, CB&I's representations as to its experience and access to pools of skilled local labour were one of the key reasons why CB&I was granted the EPC Contract:

- back in 2007, CB&I represented that it would "maximize use of CBI direct hire construction force to maintain productivity"[1213];

- also in 2007, CB&I made another representation about its experience with local labour[1214]:

---

[1204] TC 44.11; JX-002, p. 219; JX-004, p. 196.
[1205] ESOD, paras. 695-696.
[1206] Reply, paras. 681-682, citing to Exs. R-1001, C-1681-C-1683.
[1207] ESOD, paras. 699-700.
[1208] RPHB, para. 412, citing to Ex. R-3431 and Ex. R-0459, p. 20.
[1209] ESOD, para. 702.
[1210] RPHB, paras. 405-406.
[1211] ESOD, para. 704.
[1212] Molina ER, Section 7 "Proportions of Colombian and foreign workers", citing to Art. 74 of the Comprehensive Labour Code. Professor Molina then explains that this requirement was repealed in 2010; Hillier ER, Section B, para. B3.4.2.
[1213] Ex. C-0025, p. 1.
[1214] Ex. R-0477, p. 2.

ICC Case 21747 RD/MK/PDP
Final Award

"CB&I is uniquely qualified to execute the expansion on an LSTK basis. We have relevant engineering experience on all the key process units, capability to perform the modular fabrication in house and experience with direct-hire construction in Colombia. We are one of the few (if any) companies that could adequately quantify and manage the risk and whose principal business model is lump sum turnkey contracting" [Emphasis added].

- in 2008 CB&I reiterated its position about it having more than sufficient direct hire capabilities[1215].

1126. In 2011, half a year into the EPC Contract, CB&I yet again reassured Reficar, this time in the Construction Execution Plan, that it had conducted surveys and confirmed the adequacy of the local workforce, thus ensuring Reficar that any craft availability issue was under control[1216].

1127. Because CB&I made these representations, there should be no causal link between the hiring of local forces and supposed inefficiencies.

1128. Second, the record shows that, during the periods of more intense construction work (mid July 2013 through January 2015[1217]) the OCN workforce was within the 10% limit established by Colombian law[1218], and that the numbers only decreased to the 3-5% level claimed by CB&I for the last half year of work -- presumably because the type of work did not require the presence of high skilled OCN:



---

[1215] Ex. C-0071, p. 20.
[1216] Ex. C-0245, p. 5.
[1217] The Tribunal notes that CB&I makes arguments about the period between May 2011 and March 2012 (see ESOD, para. 704, citing to Exs. R-2795-R-2797, Ex. R-909), but these occurred as construction work was only beginning and the relevant period is reflected in the Tribunal's analysis.
[1218] Ex. H-030, p. 22.

1129. In fact, contrary to CB&I's position, in the crucial month of August 2013, *i.e.*, at the peak hire time, a consultant discouraged Reficar from hiring further OCNs precisely because CB&I was driving up costs with its excessive OCN hires[1219]:

> "The CB&I non manual staff, especially Western expats, appears much larger than expected with less reliance on local or Third Country Nationals (TCN) and Field Non Manuals (FNM) than expected, driving up potential cost".

1130. In sum, any Excess Costs caused by an alleged shortage of OCNs were neither unpredictable nor attributable to Reficar; hence, none of them are Excluded Costs.

**d.    Site access**

1131. Respondents argue that Reficar and Ecopetrol interfered with CB&I's construction activities by creating impediments to workers' access to the construction site[1220].

1132. CB&I offers anecdotal examples of when its employees could not obtain access to the work site due to:

-    Ecopetrol equipment blocking physical access to the work site[1221];

-    inability to obtain or delay in obtaining the necessary permits issued by Reficar or Ecopetrol[1222], and

-    the same access permits being withheld by the labor union leaders[1223].

1133. The Tribunal observes that the majority of the communications cited by CB&I about site access predate the Cut-Off Date[1224]; consequently, the idiosyncrasies of the access requirements to enter the Cartagena Refinery must have been taken into consideration when CB&I issued its Class I Representation Forecast; and thus, cannot be considered Excluded Costs.

**e.    Scaffolding**

1134. Scaffolding forms a crucial part of all construction works and, because the work site comprised many areas that were frequently congested, scaffolding was particularly important on the Cartagena Project[1225]. Scaffolding for the Project was supposed to be rented out by granting a subcontract on a total estimated price basis, which included the costs of rental and labour for installing and removing scaffolding; but some of the scaffolding was handled directly by CB&I[1226].

---

[1219] Ex. C-0281, p. 6.
[1220] ESOD, paras. 756-762.
[1221] ESOD, para. 757, citing to Ex. R-1092.
[1222] ESOD, paras. 758-760.
[1223] ESOD; paras. 762.
[1224] Ex. R-2393, Ex. R-2386, Ex. R-2381.
[1225] ESOD, para. 765.
[1226] ESOD, para. 767, citing to Ex. R-1095, pp. 2-4.

1135. The Representation Forecast foresaw a total cost for scaffolding of USD 46.8 million[1227] (up from an original budget of USD 23.9 million), while the final costs reached USD 162.8 million, a 247% increase[1228]. The number of scaffolding hours also multiplied: from an original budget of 2 million man-hours to 8.8 million at the end of the Project[1229].

The Parties' positions

1136. CB&I accepts that the cost and man-hours of scaffolding multiplied, but says that these increases were caused by Reficar's faults and negligence[1230].

1137. Reficar sees things differently; it says that CB&I's failures are to blame:

-    CB&I would erect scaffolding in anticipation of future work, and thus continue incurring wasteful costs for rental[1231], or would install scaffolding with disregard for newly installed fireproofing and other installations[1232].

-    Finally, when CB&I demobilized, it left scaffolding in disarray and Reficar needed to pay its own subcontractors to remove the scaffolding rented out by CB&I[1233].

The Tribunal's analysis

1138. The Tribunal will now analyse and reject CB&I's individual arguments allegedly showing Reficar's fault and negligence. According to CB&I:

1139. First, Reficar incurred multiple delays in approving additional scaffolding, despite its clear necessity for the works[1234]; for example, in mid-2012, this delay was as long as over two months for scaffolding for the FCC Unit[1235].

1140. In fact, the delay in approving additional scaffolding for the FCC Unit was limited to only three weeks, in accordance with a contemporaneous letter from CB&I[1236]. Reficar avers that this three-week delay is not overly significant and was justifiable because by mid-2012, CB&I had already built a reputation for trying to incur extravagant costs which triggered the need to perform detailed reviews whenever CB&I requested additional resources. Reficar's position is understandable.

1141. Second, according to CB&I, Ecopetrol (which was in control of the existent Refinery in the brownfield) gave CB&I a directive to immediately dismantle

---

[1227] See Ex. R-1851_057_00017, tab "Construction"; sum of scaffolding categories under "Proratable" – USD 28.9 million + "Scaffolding Rental" under "Site Construction Equipment" – USD 16.2 million + "Scaffolding and ladders for FCC" – USD 1.7 million; total = 46.8 million.
[1228] ESOC, para. 358, citing to Ex. C-0294 compiled from Ex. C-0056.
[1229] Unnumbered graph from ESOC, top of pdf p. 218, based on Ex. C-0261, p. 106 and Ex. C-0155, p. 98.
[1230] ESOD, paras. 562, 765-773, 885, 888.
[1231] ESOC, para. 355, citing to Suarez CWS, paras. 216-217; Houtz CWS, paras. 256-258; LI ER, paras. 185, 191, 365, 707.
[1232] ESOC, para. 356.
[1233] ESOC, para. 357, citing to Suarez CWS, para. 212; Ex. C-0660; Ex. C-0661.
[1234] ESOD, paras. 562, 771.
[1235] ESOD, para. 769, citing to Ex. R-1106.
[1236] Ex. R-0965, p. 1. "[…] the bids were sent to Reficar on September 4, 2012. […] Finally, on September 25, 2012, CB&I received Reficar's approval for the rental of the scaffolding".

scaffolding after their initial need disappeared, which led to constant dismantling and re-erection of scaffolding[1237].

1142. The Tribunal disagrees. The alleged directive by Ecopetrol is only described in a letter from CB&I to Reficar, dated August 1, 2011, in which CB&I avers that Ecopetrol had given instructions that scaffolding for "each test" be erected and "disassembled immediate after the testing is done"[1238]: there is no proof that the directive applied to other types of scaffolding. In any event, the evidence on which CB&I relies stems from August 2011 and consequently any additional scaffolding costs must have been included in the Representation Forecast.

1143. Third, CB&I argues that Reficar used the scaffolding subcontractor for Reficar's own construction works in the brownfield[1239].

1144. The argument is a *non sequitur*: there is no reason why the use of the scaffolding subcontractor for Reficar's own constructions should lead to any Excess Costs – and CB&I has failed to marshal any evidence to the contrary.

1145. Fourth, CB&I argues that Reficar's chosen local Vendor for ladders and platforms failed to deliver on time, making the installation of scaffolding on dressing vessels and towers more costly[1240].

1146. Regardless of whether CB&I's allegations are true, they do not seem to have been the real cause for Excess Costs. CB&I actually acknowledged its responsibility for the additional costs for the scaffolding for dressing vessels and towers[1241]:

> "To mitigate [a vendor]'s delays, CB&I proceeded to set the towers that began to arrive without 'dressing' them with ladders and platforms. Once [the vendor] delivered the missing components, significant amounts of scaffolding were needed to dress already erected towers" [Emphasis added].

1147. Fifth, according to CB&I, Reficar limited scaffolding quantities and reduced the duration of scaffolding resources required by CB&I[1242]. For this allegation, apart from *ex post facto* letters with CB&I's grievances sent to Reficar[1243], CB&I also points to the actual requests it filed for Reficar to approve additional funds required for the subcontractor to cover the required extra materials and work[1244] and an Excel file with a list of pending requests for changes to subcontracts purporting to show the lack of Reficar's approval[1245].

1148. The Tribunal notes that the evidence in support of CB&I's allegation is limited to a relatively small-time window: 2015, the final year of the Project. By that point, Reficar had already expended significantly higher resources on scaffolding than had been forecasted and was fully aware that it needed to rein in CB&I's overspending

---

[1237] ESOD, para. 769, citing to Ex. R-1106.
[1238] Ex. R-1106, p. 1.
[1239] ESOD, para. 770, citing to Ex. R-1096.
[1240] ESOD, para. 772.
[1241] ESOD, para. 772.
[1242] ESOD, para. 771.
[1243] Ex. R-1100; Ex. R-1101; Ex. R-0916.
[1244] Ex. R-1102, pp. 2-4.
[1245] Ex. R-1103.

ICC Case 21747 RD/MK/PDP
Final Award

practices. The request for additional funding itself states "[a]ll funds for scaffolding in the current Subcontract Scope of Work cost have been depleted"[1246].

<u>Conclusion</u>

1149. All in all, the Tribunal finds that CB&I's argument, even if found relevant, would only explain a little fraction of the overrun costs. But in this area, the final costs skyrocketed continuously. And there is confirmation in the record, from as early as February 2013, that proves CB&I's knowledge that the scaffolding practices on the Project were "unacceptable"[1247]:

> "With regard to Reficar's observations on scaffolding practices in Unit 101, CB&I agrees that this practice of installing scaffolding with disregard for the newly installed fireproofing and other installations is unacceptable" [Emphasis added].

1150. <u>Summing up</u>, a careful review of the evidence supports Reficar's hypothesis that CB&I was negligently maintaining unused scaffolding on the Project at a high cost, and that this practice resulted in Excess Costs. That said, the Tribunal will take into consideration the prolongation costs incurred in scaffolding in section H. *infra.*

**f.   Cranes**

1151. Over the course of the Project, CB&I entered into 11 crane rental and support services subcontracts[1248]. Reficar's expert, Long International, has quantified an overrun of 175% in the subcontractor category of "Heavy Lift and Construction Equipment", with an increase from the originally budgeted USD 73.8 million to a final cost of USD 202.8 million[1249].

1152. <u>In general</u>, CB&I argues that it complied with good industry practices in its cranes management[1250]. Reficar, replies that CB&I had a very low crane utilization rate[1251] and that the cranes rented out by CB&I were improper models for the works[1252].

1153. Reficar has proffered evidence that between April 2011 and April 2013, CB&I had 140 cranes on site, but only half as many operators[1253]. The Tribunal is convinced that this fact must have generated tremendous costs for the Project, and the Tribunal has already established (see Subsections (**a.** and **b.** *supra*)) that CB&I was the party responsible for ensuring sufficient workers on the Project.

---

[1246] Ex. R-1102, p. 3.
[1247] Ex. C-0293. The Tribunal notes that the letter ends with a caveat that nothing in it should be considered an admission or waiver; however, if this reservation were to be enforced, then the Tribunal would not be able to scrutinize any letters by either Party, as both were supported by professional lawyers, who ensured the inclusion of such preservation of rights text.
[1248] ESOD, para. 776.
[1249] LI ER, Table 6.15-1 at pdf p. 238; the category contains multiple other services apart from just cranes rental.
[1250] ESOD, para. 775.
[1251] ESOC, paras. 359-360.
[1252] ESOC, paras. 361-362.
[1253] Ex. C-0296, p. 3; Houtz CWS, paras. 259-262.

1154. The finding is reinforced by an audit performed by Foster Wheeler from January to February 2012, which found that CB&I was only using 18% of the cranes it had subcontracted[1254], providing another plausible explanation for the significant Excess Costs in cranes management.

1155. There is a second argument: the Excess Costs of cranes subcontractors had already become an issue as early as April 2011 and Reficar had expressed its concerns about the proper management of cranes[1255]. This alone is sufficient evidence to find against CB&I on this issue.

1156. These general arguments are in themselves sufficient to dismiss CB&I's claim. That said, the Tribunal will enter into a detailed analysis of each event which, allegedly, caused the Excess Costs, to marshal further support for its general conclusion:

**(i). Events foreseeable at Cut-Off Date**

1157. CB&I blames Reficar for a number of inefficiencies with cranes that led to cost overruns, but which the Tribunal finds were all foreseeable as of the Cut-Off Date:

- CB&I requested design drawings for the heavy haul road to ensure the cranes could use it and Reficar took a long time to deliver these drawings, after repeated requests, in May 2011[1256].

- CB&I avers that it informed Reficar as early as October 2011 about the shortage of qualified crane operators[1257].

- Likewise, Reficar caused disruptions through diverting cranes to support the Owner's work scope; this first occurred in November 2011[1258].

**(ii). Later events**

1158. The Tribunal will address CB&I's arguments that these Excess Costs, incurred after the Cut-Off Date, were the result of Reficar's negligence[1259]:

1159. First, according to CB&I, Reficar delayed approval to retain additional cranes[1260].

1160. The delay in itself is not indicative of negligence. Here, not only has CB&I failed to prove existence of negligence, but there is evidence that Reficar's delay in taking decisions is justifiable.

1161. CB&I acknowledges that it was its own decision to contract for a large number of cranes in advance to avoid the risk of their later unavailability and allowing for

---

[1254] Ex. C-0297, p. 14.
[1255] Ex. C-0295.
[1256] ESOD, para. 779, citing to Ex. R-1114.
[1257] ESOD, para. 786, citing to Ex. R-1017.
[1258] ESOD, para. 783, citing to Ex. R-1122.
[1259] There is one additional argument, regarding the impact of labour unrest (ESOD, para. 785.). Reficar's scope of responsibility for labour issues will be addressed specifically in Section VII.2.1.3.3.3.F *infra*. And also one relating to the payment of subcontractors (ESOD, para. 781, citing to Ex. R-1121), which will be analysed in Section VII.2.1.3.3.3.B.g *infra* dealing with subcontracts.
[1260] ESOD; para. 781, citing to Ex. R-1116; Ex. R-1117; Ex. R-1118; Ex. R-1119 and Ex. R-1120.

"contingency in large capacity crane utilization"[1261]. In other words, CB&I preferred to incur potentially unnecessary costs to mitigate hypothetical future delay.

1162. Thus, the Tribunal finds that it was reasonable for Reficar to have taken its time to determine whether the costs were actually necessary.

1163. Second, Reficar would also be responsible for the cost overruns connected with the TC-36000 ["**Large Crane**"], which required special handling and preparation[1262] and in which Reficar is said to have interfered through delaying the pad installation[1263], failing to remove physical impediments to the Crane's transport[1264] and failing to provide critical information[1265]; in the end, Reficar agreed that the use of the Large Crane amounted to a success[1266].

1164. The Tribunal agrees with CB&I and, in fact, so did Reficar when it approved WNOC 604 for USD 1.3 million[1267]. CB&I submitted another Change Order for the Large Crane in June 2014[1268], which was rejected by Reficar.

1165. Since Reficar acknowledged this responsibility, and has not presented evidence supporting its decision to refuse to approve the subsequent Change Order, the Tribunal finds (as was anticipated under Section 3.3.2.B on post Cut-Off Date scope changes) that the related costs of USD 12.7 million must be considered Excluded Costs.

1166. Third, CB&I submits that Reficar was allegedly responsible for delayed deliveries of equipment from Vendors[1269].

1167. The Tribunal is only partially convinced by this argument. CB&I points to a letter from July 2012, stating that "extended durations of some cranes on site was caused by the unforeseen delays in delivery of equipment and structural steel from Vendors"[1270], with a nearly identical text in a subsequent letter from June 2013[1271]:

"Additionally, the extended durations of some cranes was caused delays [sic] in delivery of equipment and structural steel from Reficar vendors".

1168. The Tribunal opines that, while there appear to have been delays in delivering equipment from Vendors, these delays could not have been material:

---

[1261] ESOD, paras. 777-776.
[1262] ESOD, paras. 792-796.
[1263] ESOD, paras. 797-800.
[1264] ESOD, para. 801.
[1265] ESOD, paras. 802-803.
[1266] ESOD, paras. 805-806, citing to Ex. R-2810; Ex. R-2812; Ex. R-1896_00062.
[1267] Ex. C-0224, change title "Work Associated with Set up of HL Deep South Crane TC-36000". The change was accepted by both Parties as a design change (*i.e.*, not additional work) and so no additional costs are considered Excluded Costs.
[1268] Change Order 247, Ex. B-038; The Tribunal notes that there is no risk of double-counting as the Change Order specifically states at p. 2 that this Change Oder includes the full value of WNOC 604.
[1269] ESOD, para. 782, citing to Ex. R-963, Ex. R-964.
[1270] Ex. R-0963, p. 1.
[1271] Ex. R-0964, p. 2.

- It is to be expected that in its communications CB&I should have mentioned the effects of these delays; instead, both letters proffered by CB&I only mention the Vendor delays as a side-note;

- The use of the word "additionally" before explaining this cause, indicates that there were more important delay causes; and

- No WNOC exceeding USD 5 million was filed on this account – as the Tribunal has already pointed out, the approximately 209 post Cut-Off Date rejected WNOCs below USD 5 million had an aggregate value of only USD 89 million; hence, in average their amount was USD 0.4 million.

**g.    Subcontract management**

1169. During the Project, CB&I administered over 270 subcontracts, signed in its own name with third parties that would perform work that was inside of CB&I's own scope under the EPC Contract[1272].

1170. CB&I was the entity who would enter into contracts with the subcontractors and the moneys for the subcontractors' work passed from Reficar, through CB&I, to the subcontractors.

1171. Unlike for Vendors, with whom the contracts were signed either directly by Reficar or by CB&I in Reficar's name, CB&I had a direct contractual relationship with the subcontractors:

> [...] 26.1.5 Subject to TC57, all Lower Tier Subcontracts will be entered into by the Contractor in its own name.

1172. TC 26.1[1273], as confirmed by TC 5.4[1274], specifically made CB&I responsible for the subcontractors' performance and TC 26.4.1 made CB&I explicitly liable for managing the subcontractors[1275].

1173. CB&I's obligations in managing the subcontractors were also further detailed in the Subcontract Plan, with an initial version attached to the EPC Contract[1276], later updated in March 2012[1277]. Pursuant to the task matrix therein, CB&I was engaged in managing the process of subcontractor selection, with a few steps requiring participation from Reficar. One of the tasks for Reficar under the matrix was to review and approve the "Recommendation for Award", the step preceding contract award, for each subcontract[1278]; meaning that in effect, CB&I could never award works to a subcontractor that Reficar would not accept.

---

[1272] RPHB, para. 422; ESOD, para. 807.
[1273] JX-002, pp. 201-202; JX-004, p. 185.
[1274] JX-002, p. 178; JX-004, pp. 163-164.
[1275] JX-002, p. 204; JX-004, p. 187.
[1276] JX-002, JX-004, Annex 8 – Lower Tier Subcontracts T&C and Plan.
[1277] LI ER, para. 789, citing to Ex. C-0658.
[1278] Ex. C-0658, p. 13.

ICC Case 21747 RD/MK/PDP
Final Award

1174. It is with keeping in mind the obligations above that the Tribunal will analyse CB&I's arguments as to the Excess Costs constituting Excluded Costs in the areas of subcontractors selection (**i.**) and subcontractors administration (**ii.**).

1175. As regards the amounts in question, Reficar's expert identifies the entirety of subcontractor (construction and indirect construction support services) Excess Costs at USD 451.5 million[1279]. CB&I's expert, Mr. Hillier, provides a thorough report on CB&I's management of subcontractors[1280], with detailed appendices containing the history of changes made to the contracts with each major subcontractor[1281]; however, he does not offer any number that he believes would constitute Excess Costs.

**(i). Subcontractor selection**

1176. CB&I complains that Reficar, misguided by its cost-saving goals, selected local subcontractors that offered the cheapest services but who ultimately ended up underperforming, despite CB&I's recommendations to award these contracts to more expensive but also more reliable bidders[1282].

1177. The Tribunal is not convinced, on the basis of the task matrix of the Subcontract Plan in the EPC Contract[1283]:

| Step Requiring Approval | CB&I Subcontracts Admin. | CB&I Subcontracts Manager | CB&I Eng / Construction Manager | CB&I Project Controls Manager | CB&I Legal | CB&I Project Director | Owner |
|---|---|---|---|---|---|---|---|
| Prequalification of Subcontractor(s) | I | A | R | - | - | R | P/R |

1178. The matrix states that CB&I subcontracts administrators would initiate the selection process, CB&I's subcontracts manager would approve the selected subcontractors and CB&I's engineering and construction manager, as well as CB&I's project director, would review the pre-qualification of subcontractors[1284]. Under the task matrix, Reficar's participation in the review of the pre-qualification of subcontractors is incidental, compared to CB&I's.

1179. With this level of engagement from CB&I, and the fact that CB&I would be entering into contracts with the subcontractors, Reficar's participation and review roles must have been limited in scope.

1180. Additionally, according to the Contract, all pre-qualified subcontractors should be equally capable to perform the work, as confirmed by the Subcontract Plan[1285]:

> "All companies that pass each portion of the prequalification assessment will become CB&I-approved subcontractors".

---

[1279] LI ER, para. 796, based on LI ER, Table 6.15-1 at pdf p. 238.
[1280] Hillier ER, Section G.
[1281] Hillier ER, Attachments G3.3.1-3.3.2 and G.4.4.1-G.4.14.2.
[1282] ESOD, paras. 833-835.
[1283] JX-002, p. 541; JX-004, p. 516.
[1284] Ex. C-0658, p. 13; I = initiate; R = review; A = approve; P = participate.
[1285] Ex. C-0658, p. 8.

1181. The purpose of the procedure was precisely to establish a number of bidders that fulfilled the requirements, and to then award the contract to the lowest qualified bidder[1286]:

> "Subcontract Administrators [...] will carry out CB&I's procedures for: (i) the prequalification of interested subcontractors; (ii) the management of the competitively bid "Invitation to Tender" [...] process; (iii) the negotiation and award of subcontracts to 'best-value' qualified subcontractors that offer the highest technical skill at the lowest price; and (iv) the administration of the subcontracted work" [Emphasis added].

1182. Had CB&I properly performed its vetting duties, then all pre-qualified (technically and commercially)[1287] bidders should have been equally able to perform the work, and Reficar was entitled – amongst those – to award the contract to the lowest bidder.

1183. In fact, the Subcontract Plan gave Reficar approval power precisely to reconcile the conflicting interests between the Owner and the main Contractor, and CB&I has no right to complain about Reficar's reasonable decisions, taken on the basis of data provided by CB&I as a result of its bidder qualification exercises.

1184. CB&I does not contest that its practice was to qualify a number of subcontractors and then to only recommend those at the higher end of the cost range, because they allegedly offered superior services[1288] – in fact, CB&I is therefore admitting that it did not conform with the Cost Control Commitments: if there are multiple bidders fulfilling the requisite criteria, the reasonable selection criterion is price.

1185. The only explanation is that CB&I must have pre-qualified some bidders, knowing that they failed to fully comply with the requirements.

1186. CB&I's complaint about Reficar favouring local bidders is also misguided, given that Contract gives priority to local subcontractors over regional and then national ones, in that order (with no priority for foreign bidders):

> "26.1.10 As far as possible, the Contractor shall, when procuring all Lower Tier Subcontracts, Purchase Offers and contracts, give preference first to local suppliers, secondly to regional suppliers, and lastly to national (Colombian) suppliers"

1187. Thus, CB&I's arguments about any Excess Costs arising from Reficar's allegedly poor selection of subcontractors are rejected.

### (ii). Subcontract administration

1188. As regards subcontract administration, CB&I argues that all Excess Costs in this area are Excluded Costs because:

---

[1286] Ex. C-0658, pp. 3-4.
[1287] CB&I explains its exclusive role in qualifying the bidders at ESOD, para. 815.
[1288] ESOD, paras. 833-835.

1189. <u>First</u>, through its decision to overlap basic and detailed engineering, Reficar caused the need to enter into subcontracts based on a unit rate pricing structure (since the required amounts of materials were unknown due to the unfinished engineering); as a result, the materials and subcontractors' services were severely underestimated – when the engineering was completed, it turned out that many more materials and much more services from subcontractors were required; all those costs were Excluded Costs as they resulted from Reficar's decisions[1289].

1190. The Tribunal disagrees with CB&I on the first point.

1191. By the Cut-Off Date at the end of 2011, CB&I was fully aware of the impacts of Project strategy decisions made two years prior; likewise, engineering should have been sufficiently advanced by that point to properly estimate the required quantities and work.

1192. <u>Second</u>, Reficar retained control in the area of subcontract administration and through the power to approve the scope of work, budget and changes, Reficar made short-term costs-cutting decisions that led to cost overruns[1290].

1193. The Tribunal also disagrees with CB&I on the second point.

1194. The EPC Contract makes CB&I fully responsible for the subcontractors' work.

1195. TC 26.1 not only tasked CB&I with managing the subcontractors but also specifically placed on it the responsibility for the subcontractors' performance[1291]:

> "26.1.2 As part of the Work, the Contractor shall identify, assess, recommend (all in accordance with the Project Procurement Plan attached as Exhibit 7) and <u>manage all Lower Tier Subcontractors</u>, and <u>shall be responsible for their Work and for their proper performance of any and all obligations</u> set out in the Lower Tier Subcontracts (including, without limitation, compliance with applicable free trade zone regulations and obligations, and labour obligations)" [Emphasis added]

1196. TC 26.4.1 confirms that CB&I was responsible for managing the subcontractors[1292]:

> "26.4.1 <u>The Contractor shall act as the Owner's representative in Managing Third Party contractors</u>, Vendors and the Freight Forwarder, and the Owner shall notify such Third Party contractor(s), Vendor(s) and the Freight Forwarder of the Contractor's authorization to Manage them for and on behalf of the Owner. Provided that the Contractor has complied with its obligations to Manage, the Contractor shall have no responsibility for compliance by Third Party contractors, Vendors or the Freight Forwarder with the provisions of such Third Party contracts or Purchase Offers entered into by the Owner".

---

[1289] ESOD, paras. 811, 825-830.
[1290] ESOD, paras. 810, 822-823, 832, 840-845, 856-857.
[1291] JX-002, pp. 201-202; JX-004, p. 185.
[1292] JX-002, p. 204; JX-004, p. 187.

with the term broad understanding of the obligation of "managing" explained under TC 26.4.3[1293]:

> "26.4.3 For the purposes of this TC26.4, "Managing" shall mean planning, directing, coordinating and actively administering the relevant Person by taking those steps in the Contractor's power which are capable of achieving the desired results under the relevant contract, which a prudent, diligent and reasonable engineering, procurement and construction company, which is properly qualified and competent in performing services of a similar nature, would take with the aim of achieving such results (short of entering into a formal dispute resolution procedure with that Person), and "Manage" and 'Management' shall be construed accordingly. The Owner shall cooperate in a timely manner with the Contractor to enable the Contractor to perform its Management obligations".

1197. TC 5.4 further confirms that CB&I agreed to take full responsibility for the work performed by the subcontractors[1294]:

> "TC 5.4 Contractor's Responsibility for the Work
>
> Subject to the provisions of this Agreement, the Contractor is responsible for the manner in which the Work is performed, and all employees, representatives or Lower Tier Subcontractors are under the control of the Contractor and will not be deemed to be employees of the Owner, and nothing contained in this Agreement or in any Lower Tier Subcontract awarded by the Contractor will be construed as creating any contractual relationship between any such employees, representatives or Lower Tier Subcontractors and the Owner. The engagement by the Contractor of any representative or Lower Tier Subcontractor to undertake any part of the Work shall not relieve or excuse the Contractor from the due and proper performance of those parts of the Work" [Emphasis added].

1198. If CB&I had properly quantified the required work and materials in the Class I Representation Forecast, then any subsequent changes to the subcontracts must have arisen from CB&I's mismanagement of the subcontractors, or their faulty performance, for which CB&I also agreed to take full responsibility; hence, Reficar cannot be held liable for any associated Excess Costs.

1199. In any event, the anecdotal evidence[1295] provided by CB&I regarding alleged interferences by Reficar does not prove causality and does not support a quantification of Excess Costs that the Tribunal could accept as Excluded Costs.

---

[1293] JX-002, p. 205; JX-004, p. 188.

[1294] JX-002, p. 178; JX-004, pp. 163-164.

[1295] Some examples include the hand excavation of contaminated soil by subcontractors, see ESOD, paras. 839-840 – the impacts of contaminated soil are in fact included in the Tribunal's analysis of unforeseeable events; another such decision was the delayed approval for CB&I's proposed mitigation measure of granting extra work to a post-weld heat treatment subcontractor that was performing well, see ESOD, para. 844; Reficar did grant the approval but only after reasonable scrutiny, given how the other subcontractor for the same discipline pre-qualified by CB&I was underperforming.

1200. But, even if such interferences in the determination of the work scope had been significant, it was Reficar's right to instruct and approve scope changes[1296]:

| Step Requiring Approval | CB&I Subcontracts Admin. | CB&I Subcontracts Manager | CB&I Eng / Construction Manager | CB&I Project Controls Manager | CB&I Legal | CB&I Project Director | Owner |
|---|---|---|---|---|---|---|---|
| Change Orders (Additional Scopes) | I | A | I / A | A | - | A | A |

1201. This mechanism is not unusual: Reficar needed to have veto power, to prevent that subcontractors, with CB&I's support, inflate the cost of work. On a cost-reimbursable contract, approval powers for scope changes that lead to additional costs ensure that the main contractor and subcontractors do not collude so as to exploit the owner's funds.

1202. It is thus fully reasonable for Reficar to have refused to grant approval to certain change requests in the subcontractor's scope of work, that would have led to further Excess Costs – in that case, CB&I has to bear the burden of these Excess Costs. In fact, CB&I concedes the point, because at least some Excess Costs incurred by subcontractors were not billed to Reficar[1297].

1203. Third, CB&I argues that Reficar granted the necessary approvals with undue delay[1298].

1204. The Tribunal has already established that by the final years of the Contract, when amendments to the subcontracts became necessary due to the exhaustion of the initially assigned resources, Reficar had already learned of CB&I's nonchalant approach towards Project costs – thus, it was reasonable for it to withhold approval for subcontract changes until it was certain that these changes were warranted.

1205. Fourth, CB&I argues that Reficar directed subcontractors to perform extra work, gave them conflicting orders and rejected CB&I's mitigation plans whenever underperformance of a subcontractor was identified[1299].

1206. The Tribunal is, again, unconvinced.

1207. Nowhere in the Subcontract Plan has the Tribunal found any prohibition of communications between the Owner and the subcontractors.

1208. Reficar was also not obligated to follow CB&I's mitigation plans, especially given how under other circumstances these plans ended up in additional Excess Costs (see findings under Subsections **d.** and **e.** *supra*).

---

[1296] Ex. C-0658, p. 17.
[1297] RPHB, para. 575, citing to H-23, p. 34, which in turn cites to Ex. R- 2219_D and Ex. R-2220_D, adding to a total of COP 68 billion and USD 20 million that CB&I incurred but never invoiced to Reficar. The amounts in COP included those for costs of subcontractors that CB&I chose not to invoice or that CB&I considered non-reimbursable under the Contract; see *e.g.* category for "SPS" (who was a subcontractor).
[1298] ESOD; para. 837.
[1299] ESOD, paras. 812, 846-852.

ICC Case 21747 RD/MK/PDP
Final Award

1209. Fifth, CB&I argues that Reficar delayed payments or refused to reimburse subcontractors, which led to their lowered productivity[1300].

1210. The Tribunal is also not convinced by CB&I's argument.

1211. As regards the payments of subcontractors' costs, this was entirely CB&I's responsibility, as established by the Subcontract Plan[1301]:

> "1.2 Subcontracts Group Organization
>
> CB&I Project Subcontracts Group personnel are responsible for drafting, evaluating, negotiating, awarding, and administering all subcontracts. They are responsible for all formal communication between CB&I and its subcontractors, verification and approval of invoices for payment, and recording the minutes at meetings that track the progress, completion, and acceptance of the subcontracted work.
>
> [...]
>
> 5.3 Invoicing and payment
>
> All subcontractor invoices for work performed will be forwarded to the Subcontracts Group for verification that the pricing and supporting documentation are in accordance with the subcontract, and that daily field reports, timesheets, and other measurements of progress have been approved by CB&I Construction. Once approved by Subcontracts, the invoice will be sent to project accounting group for payment. If rejected, the invoice will be returned to the subcontractor for revision, and the Subcontracts Administrator will include a written communication describing why the invoice (or portion of the invoice) has not been approved."

1212. None of the above provisions mention Reficar – and for good reason. CB&I was in direct contractual relationships with the subcontractors and the obligation to remunerate subcontractors corresponded to CB&I; if CB&I had issues or difficulties in collecting its own invoices from Reficar, this should not have affected the subcontractors' rights to be paid.

1213. CB&I has proffered evidence through which it means to prove the existence of outstanding payments to subcontractors, and the allegation that the unpaid subcontractors threatened to stop work[1302]. Additionally, CB&I has drawn the Tribunal's attention to letters requesting Reficar to pay pending invoices[1303]. None of this evidence is apposite in its claim that subcontractor-related Excess Costs were Excluded Costs, as, even if proven, CB&I's allegations could not modify the contractual arrangements between the Parties.

1214. Finally, the Tribunal notes that CB&I has presented a multitude of arguments with anecdotal evidence about the alleged responsibility of Reficar for the

---

[1300] ESOD, paras. 846-851.
[1301] Ex. C-0658, p. 3.
[1302] Reeves RWS, paras. 105-112.
[1303] Ex. R-0069; Ex. R-0070.

underperformance of subcontractors in the categories of the FCC Unit[1304], pipe insulation and heat tracing[1305], electrical and instrumentation[1306] and testing[1307].

1215. The Tribunal sees no need to address these detailed arguments in sequence, as their general character is already encompassed in the above analysis of Reficar's alleged control over managing subcontractors, Reficar's delayed or declined payments for subcontractors' work and Reficar's decisions made to reduce costs.

1216. In addition to this, the Tribunal notes that the subcontractor on the FCC Unit had finalized almost all of its work by the Cut-Off Date[1308].

1217. In any event, none of CB&I's arguments could overcome the key premise that CB&I, and not Reficar, was fully responsible for the subcontractors' work under the EPC Contract.

**h.   Rework**

1218. Reficar argues that it is entitled to claw back the USD 28.21 million it expended for the rework and corrective work, and the related productivity loss, that resulted from CB&I's errors and omissions in construction[1309].

1219. CB&I denies all responsibility: it followed the required rework procedures[1310], the work on the Project did not give rise to any "major" quality issues[1311], and the rework did not affect the overall worker productivity on the Project[1312]. It also mentions that Reficar's expert's calculations of the monetary impacts of rework are severely flawed[1313].

1220. These arguments are *non-sequitur*: even if CB&I followed the procedures, the scope of rework was limited and there was no impact on overall craft productivity, this does not prove that CB&I would not be responsible for the Excess Costs.

1221. And the point is not whether Reficar inflated the monetary impact of rework: the Tribunal has already established the Excess Costs, applying a Bottom-Up Modified Total Cost Methodology; it is now for CB&I to prove that some of those Excess Costs were caused by factors outside CB&I's control.

1222. On this issue, Mr. Hillier, CB&I's construction expert, opines that the rework was sometimes caused by Reficar, and he points to problems with the storage conditions in the laydown areas, which were Reficar's responsibility (**i.**), or the damage in the refractory equipment, which was also within Reficar's scope of liability (**ii.**). Finally, he also mentions that Vendors could have been to blame for the costs

---

[1304] ESOD, paras. 860-872.
[1305] ESOD, paras. 873-890.
[1306] ESOD, paras. 891-911.
[1307] ESOD, paras. 912-923.
[1308] Based on analysis of Mr. Hillier at Attachment G4.4.1.
[1309] CPHB, paras. 352-353; LI ER, paras. 205-210, 594-612.
[1310] Hillier ER, paras. 4.10.5-8, 18-19.
[1311] Hillier ER, paras. 4.10.9-10.
[1312] Hillier ER, paras. 4.10.14-17.
[1313] Hillier ER, paras. 4.10.20-23.

associated with reworks[1314] (**iii.**). And CB&I adds that it has always complied with good industry practices (**iv.**).

1223. The Tribunal finds these arguments are likewise refuted:

### (i). Storage conditions

1224. CB&I claims that the storage area (the Laydown Areas discussed under Section VII.2.1.3.3.3.D on Materials Management, *infra*), for which Reficar was responsible, was not weather-proof[1315]; it was prone to flooding[1316] and lacked an area with air-conditioning[1317] – which led to some equipment being damaged and needing rework.

1225. The Tribunal finds that, even if CB&I was right, it must have been aware, when it issued the Representation Forecast as of the Cut-Off Date, that the arrangement of lay down areas in Cartagena was not optimal and would cause additional costs, which must have been included in the USD 3,971 million estimate.

### (ii). Refractory materials

1226. Under Section III of the EPC Contract Reficar was responsible for the action titled "Perform dry out of furnace refractory in accordance with the refractory/heater manufacturers requirements" prior to shipping the refractory materials to the work site[1318]. CB&I's materials manager, Mr. Baker, stated at the Hearing that Reficar chose not to perform the dry-out[1319].

1227. In 2012[1320] it became known that refractory materials installed in the furnaces of Units 100, 110 and 111[1321] were damaged, with associated costs amounting to USD 27 million[1322]. CB&I believes that Reficar's failure to perform the dry out caused the damage[1323]. Reficar sees things differently: it argues that the damage was caused by CB&I's failure to properly protect the equipment from moisture or to store it in a proper manner[1324].

1228. The existing evidence supports Reficar's position.

1229. The insurer reviewed the damage suffered by the materials and, in a letter, it rejected Reficar's request for reimbursement, reasoning that the "'shelf life / use by' date suggested by the manufacturer / supplier had expired whilst the materials were stored in the laydown yard"[1325]. In other words: the insurer concluded that the

---

[1314] Hillier ER, paras. 4.10.11-12.
[1315] RPHB, para. 381-382.
[1316] RPHB, para. 381, citing to Tr. 3543:24–3544:19.
[1317] RPHB, para. 382, citing to Baker RWS, paras. 126 and 129.
[1318] JX-006, p. 101, point 5.7.26.
[1319] Tr. 3542:17-20.
[1320] Ex. R-1849_14696, p. 7: "From the documents provided it is clear that this situation was discovered during 2012".
[1321] ESOD, para. 295.
[1322] Total value of COs 360, 361 and 362; Exs. C-0225, C-0226 and C-0227.
[1323] Tr. 3542:17-20.
[1324] ESOD, para. 295.
[1325] Ex. R-1849_14696, p. 7: "From the documents provided it is clear that this situation was discovered during 2012".

materials had deteriorated due to poor management – the materials were simply ordered too early and deteriorated irreversibly with the passage of time.

1230. CB&I argues that Reficar acknowledged the lack of CB&I's fault in the damaging of the equipment because in the insurance claim, Reficar blamed the manufacturer, and not CB&I[1326].

1231. CB&I's argument is refuted by the wording of Reficar's letter to the insurer: "[t]his insurance claim being made by REFICAR is based on the good faith arguments presented by CBI, according to which the damages experienced on this date can be attributed to [the manufacturer]"[1327] – it was thus CB&I that initiated the idea to try to obtain insurance money for the damage, and Reficar agreed to it to try to recover the associated costs – it did not, however, acknowledge that CB&I was not responsible.

### (iii). Vendors' responsibility

1232. Finally, as regards the alleged responsibility of Vendors for some of the rework, Mr. Hillier only states, with no reference to any evidence, that[1328]

> "LI also omits that, in several instances, it was vendors, not CB&I, who were responsible for these "issues" and the subsequent corrective work".

1233. CB&I's construction expert provides detailed explanations in Section I attached to his report, but fails to quantify any rework amounts that CB&I should be credited due to the alleged responsibility of Vendors[1329].

### (iv). Adherence to good construction practices

1234. CB&I argues that its construction work fully complied with good practices, including in the management of construction work packs[1330].

1235. The Tribunal notes that this is a counter-argument whose purpose is to defend CB&I from Reficar's accusations of mismanagement[1331]; however, this argument is inapposite for the determination of Excluded Costs. But, at the same time, CB&I's mismanagement of work packs plays into the narrative of what appears to have happened on the Project.

1236. Work packs "provide discrete work activities to be completed in the field by the construction team"[1332]. The work packs are a system that allows for the efficient and multidisciplinary planning of construction works: each small segment of construction is assigned a work pack, which consists of different categories of information: the necessary engineering documents, budgeted man-hours, lists of materials and equipment and 3D model screenshots necessary to complete the

---

[1326] RPHB, fn. 844 on pdf p. 180.
[1327] Ex. R-1849_13894, p. 1.
[1328] Hillier ER, para. 4.10.12.
[1329] Hillier ER, Section I, sections I3.2-I3.10.
[1330] RPHB, paras. 414-421.
[1331] CPHB, paras. 178, 331-335.
[1332] Hillier ER, para. 4.4.1.

work[1333]. A work pack was first developed, then issued onto CB&I's internal document management system, and finally released to field construction crews[1334].

1237. What happened on the Cartagena Project is that the work packs were in many cases released by CB&I in a "restricted", or incomplete, state. This meant that some materials might be missing, or that the necessary qualified workers were not assigned, but, theoretically, works could still proceed with regard to the "unrestricted" sections of the work pack.

1238. This practice, according to CB&I's expert, is not unusual[1335]. In Reficar's expert's view, however, the premature and simultaneous releasing of construction work packs was one of the main reasons behind CB&I's inefficiencies in construction[1336]:

- it significantly decreased construction productivity due to the constant shifting of workers from one work pack to another;

- scaffolding was left at abandoned work sites while waiting for further work to become unrestricted (as mentioned in Subsection **e.** *supra*, scaffolding was rented and so this implied a constant increase in costs); and

- in other instances, scaffolds were dismantled and then re-erected, also contributing to extra costs.

1239. The Tribunal is convinced by Reficar's expert.

1240. It appears that CB&I was frantically trying to advance construction work by accelerating wherever possible, without regard to the associated Excess Costs. This finding is in line with the Tribunal's previous conclusions regarding scaffolding and cranes – CB&I deviated from agreed practices in order to improve the situation, but these efforts ultimately led to exponential increases in Excess Costs.

\* \* \*

1241. Thus, the Tribunal finds that all rework-related cost overruns cannot be considered Excluded Costs.

## C.  **Modularization**

1242. Construction of the Project was, due to its nature, undertaken mainly in Colombia. The principal exception was modularization, a technique which implied

- the construction of certain pre-fabricated modules off-site at the Island Park facility, situated in the Southern USA and owned and operated by CB&I, and

- the shipping of the finalized modules to the Project site, to be installed in Cartagena with minimal changes.

---

[1333] Hillier ER, para. 4.4.2.
[1334] Hillier ER, para. 4.4.5.
[1335] Hillier ER, para. 4.4.4.
[1336] LI ER, paras. 185, 705-715.

1243. Modularization was not foreseen in the EPC Contract[1337]. But by mid-2010 CB&I recommended[1338] that Reficar move the production of 58 modules – a number which eventually increased to 86[1339] – to CB&I's factory in Island Park. CB&I said this option offered four key advantages: safety, quality, schedule and risk reduction[1340]. CB&I also said that modularization would only increase the budget by USD 217,000[1341].

1244. Reficar accepted CB&I's proposal and the modularization was agreed upon not in an amendment to the EPC Contract, but in a simple WNOC, which was accepted by Reficar, and which was signed on May 19, 2011, with a ROM +/- 50% estimate of the costs involved[1342].

1245. CB&I relies heavily on the fact that it never made a firm representation that modularization would result in lower costs[1343] and that the estimate was at ROM level, with a 50% accuracy margin[1344] – the Tribunal does not share CB&I's point: the fact that CB&I did not represent to Reficar that modularization would result in a cost reduction does not prove that any possible Excess Costs due to the modularization constitute Excluded Costs.

1246. And such Excess Costs, in fact, arose: the Representation Forecast foresaw modularization costs at USD 92.3 million, while ultimately these costs rose to USD 122.8 million[1345], an increase of USD 30.5 million, or one third.

1247. On February 3, 2012, i.e., one month after the Cut-Off Date, but five months before the Representation Letter, CB&I presented to Reficar a document titled "Reasons Causing Delays and Influence on PF at Island Park"[1346], which means that by early February 2012 CB&I was aware of and had identified the causes for delay and low productivity at Island Park.

1248. CB&I now says that the Excess Cost should be considered as Excluded Costs and should be borne by Reficar. But Respondents rely on facts which all happened before the Cut-Off Date and should, thus have been included in the Representation Forecast:

---

[1337] The EPC Contract only references "modularization to reduce site work and reliance on local labour" as one of the Driving Forces on the Project under Section 3.1 of the Project Execution Plan.
[1338] Ex. R-0645, pp. 6-7, Ex. R-0680, pp. 29-32, Ex. C-0776, p. 1: "As Reficar is well aware based on your request, CB&I's recommended change to a Modularization strategy for 86 modules is of considerable advantage to the project in terms of cost and time savings".
[1339] ESOD, para. 589. The number in the file is sometimes 85 – this ambiguity was confirmed at the Hearing, see Tr. 1254:5-15.
[1340] Ex. C-0209, p. 2.
[1341] Ex. R-0196.
[1342] Ex. R-0196.
[1343] RPHB, para. 354, citing to Ex. R-0889; ESOD, paras. 583-587.
[1344] RPHB, para. 354, citing to Ex. R-0196, p. 1; ESOD, para. 613.
[1345] Ex. C-0056, tab "Project Summ Cost Report Only".
[1346] Ex. R-0906, p. 1.

- Suppliers were late in delivering materials[1347], which were of poor quality[1348], and furthermore, record heat conditions caused delays[1349]; but all these issues were recorded in a letter addressed to Reficar in September 2011[1350];

- Piping materials were procured late by Reficar – but the evidence proffered by CB&I proves that CB&I was aware of these delays as early as August 2011[1351];

- The procurement of certain items from abroad was agreed in 2011, prior to the Cut-Off Date[1352];

- The productivity at Island Park, due to the different type of work, is not comparable to the on-site productivity in Cartagena[1353]; whatever the productivity was, it must have been taken into account when preparing the Representation Forecast and on its own cannot prove that Excess Costs were Excluded Costs.

1249. Instead, the Tribunal finds more plausible Reficar's argument for the reasons of the Excess Costs in modularization: CB&I had a self-interest in externalizing the module fabrication to the Island Park facility. It thus seems that the WNOC was beneficial to CB&I, who profited from additional orders at its Houston facility, which, prior to the Parties' agreement, was apparently experiencing a period of economic slowdown[1354] had been struggling around the time of negotiating externalizing the work[1355]; this facility would continue to receive funding as long as the works there continued, so any delays would actually benefit CB&I. But this collateral benefit is not indicative – let alone proper evidence – that CB&I improperly or fraudulently induced Reficar to agree to fabricate pipe rack modules in the United States.

## D. **Materials management**

1250. Part of the Excess Costs in construction were incurred in the area of materials management.

---

[1347] RPHB, paras. 357, 360, citing to Ankura ER, para. 428, Ex. R-1855_043, p. 86 ("Expediting deliveries from SSS to mitigate late delivery for steel to Island Park for 137-02 modules. Behind plan (11Feb11)".).
[1348] RPHB, para. 355, citing to Ex. R-0905, pp. 1-2.
[1349] RPHB, para. 355, citing to Ex. R-0905, p. 2, ESOD, para. 610.
[1350] E.g., Ex. R-0905 dated September 14, 2011.
[1351] RPHB, para. 356, citing to Ex. R-1855_051, p. 22 ("[d]elay in placing piping purchase orders for field rack pipe and Island Park piping materials"); Ex. R-905, p. 1; ESOD, paras. 603-604, 610.
[1352] Ex. R-0906, pp. 5-6 points to a change from the original US to European and Korean suppliers because the US prices were "in some cases, 2.5 times higher". This must have been agreed in 2011 because CB&I's letter points to the relevant POs originating in March 2011 and being modified throughout that year, with the last deliveries made in October 2011, August 2011 and January 2012 (this last one was still a predictable delay, however).
[1353] RPHB, paras. 358-359, citing to Ankura ER, paras. 417-420.
[1354] Ex. C-0210; Ex. C-0211.
[1355] CPHB, para. 154, citing to Ex. C-0210, a press release showing CB&I having to lay off 80 workers in 2009.

1251. Materials management is an important part of construction projects, which entails tremendous logistical endeavours: in order for the works to progress, constant availability of equipment and materials needs to be ensured in real time.

1252. The equipment and materials of the Project were stored in laydown areas, within the Project area or in designated zones in the vicinity, either in Free Trade Zones ["**FTZs**"] or non-FTZ zones.

1253. It was important to secure sufficient FTZ storage space on the Project because materials imported directly to the FTZ zones were granted an exemption for Value Added Tax, significantly lowering their costs[1356]; the FTZ benefits also enabled reductions in the processing time for importing materials and equipment[1357]. Apart from the tax exemptions, on-site laydown areas offered the advantage of allowing for swift delivery of materials to wherever they were needed[1358].

1254. Under the EPC Contract, providing sufficient and proper laydown space was Reficar's responsibility, in accordance with TC 31.1[1359]:

> "31.1 Designated Free Trade Zone laydown and storage areas for the Contractor's use to store equipment and/or materials and for other construction activities will be provided by the Owner at locations designated by the Owner for the Contractor's use. The Contractor shall confine the storage of all equipment and/or material to such storage and laydown areas and shall do so in accordance with all applicable Laws".

1255. CB&I argues that Excess Costs did not arise because of a breach of its Cost Control Commitments – at all times it employed an adequate system for materials organization and tracking and implement appropriate procedures for materials preservation and maintenance[1360] [**a.**]. According to CB&I, any Excess Cost is attributable to Reficar's own failures to provide sufficient lay-down space [**b.**], and FTZ zones [**c.**], triggering the need to transport materials to safeguard their tax-exempt status.

**a.** **Adherence to procedures**

1256. CB&I argues that it followed good construction practices in preserving and maintaining materials[1361] and that it fully incorporated the use of its SmartPlan Materials ["**SPM**"] tracking system[1362].

1257. CB&I's expert, Mr. Hillier, has stated that Reficar and its expert, Long International, have failed to prove any serious deficiencies in the SPM system, which worked according to the contractual and procedural requirements, in his

---

[1356] See e.g. Ex. R-0972, p. 18 (p. 57 for English): "As of August […], we have saved USD 2999,602 in tariffs and VAT. This saving represents 28.4% of the value of all entries to the Free Trade Zone".
[1357] Ex. R-0974, p. 1.
[1358] ESOD, paras. 676-677.
[1359] JX-002 and JX-004, EPC Contract, Section II, at TC 31.1
[1360] RPHB, para. 373, citing to Hillier ER, Para. E, sections E.5.1.4-.5, E8.4-5., E4.4.1-4, E8.3-5.
[1361] RPHB, paras. 373, 389-390.
[1362] RPHB, para. 373; ESOD, paras. 639-641.

opinion[1363]. CB&I's materials manager, Mr. Baker, has confirmed CB&I's compliance with its materials management obligations[1364].

1258. CB&I also cites to the March 2013 Jacobs Report, in which the consultant stated that the "[w]arehouses and lay down yards appeared to be in good order, well laid out and housekeeping issues well taken care of"[1365].

1259. Reficar, on the other hand, avers that CB&I failed to successfully implement the SPM tracking system; instead of the SPM, CB&I was inputting data manually into Microsoft Excel spreadsheets[1366]. This led to multiple errors with reverberations for procurement and construction, as materials were constantly shifting in an erratic manner.

1260. Furthermore, Reficar paid for half a million surplus supplies of pipe insulation materials and of electric cables that CB&I was forced to buy, simply because it failed to properly track the materials on site[1367], as supported by Mr. Suárez[1368]. CB&I's Mr. Baker retorts that surplus materials were ordered simply to ensure that there were sufficient amounts available for construction needs[1369]; and, when offered the right to sell these materials back to the Vendor, Reficar refused[1370].

1261. The Tribunal finds itself before conflicting evidence:

- the photographs presented by CB&I show perfect order in the storage of materials[1371] and those proffered by Reficar display laydown areas in complete disarray[1372];

- likewise, the experts for Claimant[1373] and Respondents[1374] fully support their respective (contradictory) positions.

1262. But, ultimately, the Tribunal takes Reficar's side.

1263. The Tribunal is convinced by the witness statement of Mr. Suárez, who has testified that Reficar was forced to pay for a surplus 25% amount of pipe insulation materials and a 30% surplus of electrical and instrumentation cables due to CB&I's failure to account for materials already being stored in the laydown areas[1375]. This failure could not have been caused by any interferences by Reficar and was in fact caused by CB&I's poor management – Mr. Baker acknowledges that CB&I simply wanted to ensure steady supply of cables, without regard to the extra costs[1376]. Mr. Baker

---

[1363] Hillier ER, paras. 4.6.4-4.6.10.
[1364] Baker RWS, Tr. 3505:18-3617:20.
[1365] Ex. R-3274, p. 26.
[1366] CPHB, para. 311, citing to Suarez CWS, para. 75 and LI ER, paras. 699-702.
[1367] CPHB, para. 309, 311-313.
[1368] Suarez CWS, para. 190.
[1369] Baker RWS, paras. 144-152.
[1370] Baker RWS, para. 153, Hillier ER, para. 4.6.22.
[1371] Ex. R-1996_00589 and Ex. R-1996_03202; slides 373 and 374 of H-002.
[1372] Unnumbered exhibit, titled "Photograph from January 2013" at ESOC, fn. 726.
[1373] LI ER, paras. 695-704.
[1374] Hillier ER, para. 4.6, Section E.
[1375] Suarez CWS, para. 190.
[1376] Baker RWS, paras. 144-152.

also mentioned that Reficar was offered a buyback option[1377], but the Tribunal finds that Reficar made the reasonable decision rejecting to sell the excess cables back to the Vendor, as the conditions under the memorandum were highly disadvantageous to Reficar[1378].

1264. Also, although the Jacobs Report from March 2013 cited by CB&I does state that, at that time, the lay down areas appeared to be in good order[1379]; at the same time, it pointed out that the onsite logistics were very congested, with equipment partially blocked and even damaged from site congestion, and, additionally, Jacobs observed the absence of site supervision during peak times[1380].

1265. The Tribunal finds that the results of a Foster Wheeler audit report from 2011[1381] and letters from Messers. Gilchrist and Riera to Mr. Deidehban from 2011[1382] and 2013[1383], respectively, prove that the SPM system was not properly implemented.

1266. Finally, none of the other arguments presented by CB&I as to its adherence to good construction practices in the area of materials management, even if they were to be accepted, could explain the undeniable fact that there were construction delays and excess materials bought due to mismanagement of the materials.

1267. The Tribunal will now move to CB&I's case that Reficar breached its contractual obligations regarding materials management, leading to Excess Costs.

**b.    Sufficient lay-down space**

1268. Under the EPC Contract, the responsibility for providing lay-down areas corresponded to Reficar, but the Contract did not require any specific amount[1384].

1269. The Parties hold opposite views as to how much lay-down area Reficar was obliged to provide:

-    Reficar refers to a communication dated May 2009[1385] and a letter from February 2010[1386], where the Parties agreed to, approximately, 50 hectares ["**ha**"] – these agreements were reached prior to Contract execution;

-    CB&I, however, invokes two internal documents prepared by Reficar in August and December 2010, *i.e.*, post-Contract execution, that show that 60 ha[1387] and 128.7 ha[1388], respectively, were necessary; CB&I also points to

---

[1377] Baker RWS, para. 153, Hillier ER, para. 4.6.22.
[1378] Ex. R-2627, p. 2, listing conditions for what types of cable could be bought-back, the limit of 15% of maximum quantities of cables eligible for buy-back, Reficar's responsibility for shipping costs, charges and duties for transport to Texas, and a 4% extra consignment fee for all cable returned.
[1379] Ex. R-3274, p. 26.
[1380] Ex. R-3274, p. 25.
[1381] Ex. C-0149, pp. 1-3.
[1382] Ex. C-0147, p. 1.
[1383] Ex. C-0104, p. 13.
[1384] Reply, paras. 626-629.
[1385] Ex. C-0806 (stating that the required space was "[a]n area of approximately 50 hectares") and Ex. C-1858, p. 4 ("The lay down yard requirement is of 50 hectares approximately, but there is some flexibility").
[1386] Ex. C-1860.
[1387] Ex. R-0646, p. 3.
[1388] Ex. R-0976, p. 65.

a report prepared for Ecopetrol by Jacobs consultancy in March 2013, according to which "CB&I originally requested, contractually, 300+ acres [*i.e.*, 121 ha] for onsite lay down storage"[1389].

1270. Of the two positions, the Tribunal tends to favour Reficar's: the 50 ha. figure agreed by the Parties (or at least communicated to one another) at a time which preceded the execution of the EPC Agreement seems to better reflect the intention of the Parties when contracting.

1271. In any event, the relevant issue is whether Reficar breached any obligation acquired contractually. In a letter from early 2012 CB&I acknowledges that Reficar had in fact provided 85.24 ha of laydown space[1390]. This shows that Reficar complied with its obligation.

1272. And there is further evidence that attests to it: Reficar's General Construction Director has testified that CB&I actually never ran out of laydown space[1391], and this statement was confirmed by Reficar's expert, Long International[1392]. Furthermore, Reficar has marshalled a collection of photos, showing over the years empty or close to empty laydown areas[1393]:



---

[1389] Ex. R-3274, pdf p. 25.
[1390] Ex. C-1381, p. 3.
[1391] Suarez CWS, para. 168.
[1392] LI ER, para. 174.
[1393] Ex. C-1848.

1273. Weighing the available evidence, the Tribunal concludes that Reficar has not breached its contractual commitments as regards the provision to CB&I of sufficient lay down areas.

c.    **FTZ laydown space**

1274. CB&I submits a separate argument as regards FTZ laydown space.

1275. CB&I argues that the FTZ laydown space provided by Reficar was insufficient[1394]: Reficar was required to provide at least 128 ha, or 318 acres, of laydown space in the bounds of the Project site[1395], but Reficar only provided a "fraction"[1396] of the necessary areas – in a letter from October 2014, CB&I stated that the area provided only amounted to 73 acres[1397].

1276. CB&I maintains that the use of off-site laydown areas imposed severe incumbrances on CB&I, as it needed to repeatedly move materials between non-FTZ and FTZ areas to retain their tax-exempt status[1398]; the arrangement also limited CB&I's ability to unpack certain crates and required it to re-organize the materials on an ongoing basis[1399].

1277. In 2010, *i.e.*, well before the Cut-Off Date, CB&I presented a plan of extending the FTZ status to an additional laydown area, through the construction of a footbridge valued at USD 1.4 million. Reficar rejected the relevant WNOC due to its "low priority"[1400].

1278. The Tribunal agrees with CB&I that most laydown areas were outside the Refinery site, the arrangement of non-FTZ and FTZ areas was not optimal, requiring materials to be repeatedly moved for tax reasons. But CB&I must have been aware, when it issued the Representation Forecast as of the Cut-Off Date, that the arrangement of lay down areas in Cartagena was sub-optimal, and so the additional costs caused by the situation and characteristics of the available laydown areas, must have been included in the USD 3,971 million estimate.

1279. That said, the Tribunal does have some sympathy with CB&I's defense that the lay down areas did cause additional costs due to shortcomings outside CB&I's scope of control, and there is evidence that, after the Cut-Off Date, extraordinary costs arose, of such magnitude that CB&I actually presented a Change Order:

1280. In October 2014 it submitted Change Order 285, with a value of USD 9.9 million, for equipment to properly manage the storage areas, on the basis of a WNOC submitted in early 2012[1401].

---

[1394] ESOD, para. 675; Ex. R-0974; Ex. R-0975.
[1395] ESOD, para. 676, citing to Ex. R-0975, p. 1.
[1396] ESOD, para. 676, citing to Ex. R-0975 and Ex. R-0646, p. 3.
[1397] Ex. R-0975, p. 1.
[1398] ESOD, paras. 680, 682-686.
[1399] ESOD, paras. 680, 682-683, citing to Ex. R-0975 and Ex. R-2787.
[1400] ESOD, paras. 677-679, citing to Ex. R-1790.
[1401] WNOC 395; Change Order 285, Ex. B-038.

1281. Claimant rejected the requests, without good reason – in fact, Reficar relies on this Change Order as proof of having granted CB&I additional funds[1402].

1282. As anticipated under Section VII.2.1.3.3.2., the Tribunal is prepared to accept the value of this Change Order as Excluded Costs, on the assumption that the underlying costs must relate to additional cost for upgrading the laydown areas, which could not have been predicted at the time of issuance of the Representation Forecast.

1283. In light of the above, the Tribunal finds that USD 9.9 million of the cost overruns related to FTZ laydown space should be considered as Excluded Costs.

## E.    Craft labour productivity

1284. A key component in any estimate, including the Representation Forecast, are the craft productivity factors ("PFs") used in these projections. These factors describe how efficiently craft workers are able to perform their construction tasks; selecting higher or lower PFs has a profound impact on the estimation of the time, and by extension the costs, which the construction works will require. The higher the PFs, the lower the productivity expected in Cartagena, the more conservative the prediction and the higher the resulting cost estimate.

1285. In its February 2010 Estimate CB&I reduced the greenfield PF to 1.66. The Tribunal has already found that CB&I introduced this figure at the request and with full knowledge by Reficar, that this figure was undervalued and that it represented a substantial risk factor [see Section VII.1.1.5.A.c *supra*]. The same greenfield PF of 1.66 was used in the Representation Forecast.

1286. In the end, the actual productivity on the Project was extremely poor: it ended up in the range between 3.02 and 3.25[1403], which means that craft workers on average took twice as long as planned (the PF in the Representation Forecast was 1.66) to complete the works.

1287. CB&I argues that one of the reasons for the existence of Excess Costs is that the Representation Forecast was calculated with a PF which had been instructed by Reficar and which Reficar knew undervalued the actual productivity which could be attained in Cartagena[1404]. The Excess Cost caused by using Reficar-instructed insufficient PFs should be considered Excluded Costs, for which CB&I is not to assume responsibility.

1288. The Tribunal, having already found that the low PFs had been imposed by Reficar, agrees with CB&I. In fact, even Reficar's own expert, Long International, accepts that CB&I should be credited for the imposed PFs.

---

[1402] See ESOC, para. 301: "In all, Reficar provided nearly US$ 10 million for equipment and labour for CB&I to locate and handle the materials and equipment stored in the laydown areas".
[1403] Tr.: 5796:15-21: "[…] As part of his discussion on this topic, [Mr. Hillier] notes that he calculated the actual multiplier on the project and found it was 3.02". Reficar's expert, LI, instead of providing a Project craft productivity multiplier says that "cumulative site productivity ended up at about 0.51, compared to the planned Project productivity of 1.0", see LI ER, para. 767. Extrapolating this number from the February 2010 Estimate's PF of 1.66 gives a PF of 3.25, which is relatively close to 3.02.
[1404] RPHB2, para. 24; RPHB, para. 195.

1289. The real discussion is how much should be credited. Long International has quantified the credit at USD 53.88 million[1405]. CB&I believes it to be too low[1406] and the Tribunal agrees: there is evidence prepared by CB&I at the time of the Cut-Off Date, *i.e.*, *in tempore insuspecto*, showing the cost impact of different PFs as a sensitivity analysis[1407] – a PF of 2.6 would imply USD 215.3 million additional costs.

1290. CB&I in fact confirmed the accurateness of this sensitivity estimation when in October 2012 it recalculated its EPC costs, this time not using the PFs imposed by Reficar, but rather its best estimate of actual PFs: forecasted EPC costs rose by the precise number of USD 215.3 million[1408]. In other words: the Representation Forecast would have been higher by USD 215.3 million, if CB&I had used its best forecast of PFs, instead of the figures imposed by the Owner.

1291. Summing up, the Tribunal finds that USD 215.3 million of Excluded Costs must be deducted from the Excess Costs, on account of craft labour productivity.

## F.    Labour disruptions

1292. Labour disruptions during the Project arose due to conflicts with the Petrol Industry Union, the *Unión Sindical Obrera de la Industria del Petróleo* ["**USO**"], which came to represent more than 4,500 employees on-site[1409].

1293. USO is the Colombian labour union in the oil industry[1410]. Even though it is a union in the oil (and not construction) sector, jobsite workers had the right to join it, because the construction works in the Refinery were activities characteristic of and essential to the oil industry, as recognized by both labour experts[1411].

1294. CB&I maintained a log in which it listed all the incidents with USO[1412]: the first incident was registered on March 10, 2008[1413]. Up until the Cut-Off Date, CB&I listed 44 incidents in the USO Log[1414] and filed the same amount of USO-related WNOCs, for approximately USD 1.3 million[1415].

1295. Following the Cut-Off Date, CB&I listed 128 incidents in the USO Log[1416] and filed 65 USO-related WNOCs for approximately USD 814 million[1417].

1296. Most of the Excess Costs incurred after the Cut-Off Date were due to labour disruptions that arose during mid-2013, when USO presented a formal list of 22 demands to CB&I (*Pliego de Condiciones*) ["**List of Demands**"]. The List of

---

[1405] LI ER, paras. 1129-1132; Table 9.4-4.
[1406] Ankura ER, paras. 536-539; quote from para. 539.
[1407] Ex. R-1914, p. 23; see also Yibirin WS, para. 89.
[1408] Ex. C-0096, p. 17, row 19 "PF Adjustments – All Disciplines".
[1409] According to José Marrugo, 4.500 CB&I employees had affiliated to USO by the end of 2013 (Marrugo CWS, para. 46).
[1410] Herrera ER, para. 47; Molina ER, p. 23.
[1411] Herrera ER, para. 57; Molina ER, p. 21.
[1412] Ex. R-1738.
[1413] Ex. R-1738.
[1414] Ex. R-1738.
[1415] Ex. C-0224.
[1416] Ex. R-1738.
[1417] Ex. C-0224.

Demands is a negotiation mechanism set forth under Colombian Law and its presentation by the union triggers the contractor's obligation to negotiate the demands with the union[1418].

1297. During these negotiations, the relationship with USO deteriorated even further, and culminated with an official labour strike, that effectively shut down the Project for an indefinite period starting on September 20, 2013[1419].

1298. CB&I reacted immediately and resumed negotiations with, presumably, a position more open to conceding in the List of Demands. Soon thereafter, on September 23, 2013, CB&I and USO executed a Collective Bargaining Agreement ["**Bargaining Agreement**"] that met USO's petitions included in the List of Demands[1420]; in exchange, USO agreed to lift the strike, thus assuaging CB&I's biggest concern[1421].

1299. CB&I says that the Excess Costs arising from labour disruptions should be considered Excluded Costs, for which it should bear no responsibility. To support this, Respondents submit a number of arguments, which are denied by Reficar:

1300. First, according to CB&I, Reficar was in control of managing labour relations with USO[1422]:

- Reficar had unilateral control over wages, including productivity bonuses, as it oversaw the "Procedure for the Implementation of the Salary Policy of Reficar S.A. Applicable to Employees of Contractors during the Construction of the Cartagena Refinery and Expansion Project" ["*Política Salarial*"][1423]; and

- Reficar instructed CB&I not to negotiate or reach any agreement with USO[1424].

1301. Reficar denies having interfered and being involved in the management of labour relations[1425]. And it further counters that it was CB&I's obligation under the EPC contract to manage labour relations with USO. Under the EPC Contract, CB&I:

- Assumed full responsibility for the acts of its own employees and those of the Lower Tier Subcontractors[1426];

- Agreed to defend, indemnify, and hold Reficar harmless from any claim related to CBI's breach of its social security payment obligations under Colombian law[1427];

---

[1418] CL-0313, Colombian Labour Code, Art. 433.
[1419] Ex. R-1838.
[1420] Ex. R-1038.
[1421] Ex. R-1038 (Bargaining Agreement, p. 6).
[1422] ESOD, para. 925.
[1423] ESOD, para. 926.
[1424] ESOD, para. 932.
[1425] Reply, para. 820.
[1426] JX-002, TC 44.1, p. 215.
[1427] JX-002, TC 44.3.1, p. 217.

ICC Case 21747 RD/MK/PDP
Final Award

- Committed to use all reasonable efforts to prevent any unlawful, riotous, or disorderly conduct or behaviour by or amongst its employees and those of its subcontractors[1428];

- Committed to notify the Owner of any actual or potential labour dispute which might affect the works[1429]; and

- Agreed to fully comply with the applicable laws addressing employment matters[1430].

1302. Second, CB&I puts the blame for labour disruptions on Reficar and Ecopetrol:

- Certain changes or omissions in the *Política Salarial* caused additional labour disruptions, including Reficar's decision to treat workers' attendance bonuses as non-salary compensation[1431]; and

- A large percentage of the disruption events were instigated by Ecopetrol employees in the brownfield (the old Refinery area); Ecopetrol rarely disciplined or prevented them from disrupting CB&I and its subcontractors[1432].

1303. Reficar retorts that USO complaints were not caused by base salary issues: USO's primary demands during the Bargaining Agreement negotiations were intended to push CB&I to comply with its Colombian labour law obligations[1433].

1304. Subsidiarily, CB&I denies responsibility for labour disruptions which occurred prior to 2011. According to Respondents, their obligations to manage relations with USO only arose after the first USO employee joined the union in 2011[1434]. Moreover, CB&I argues that Colombian law did not allow CB&I to formally negotiate with USO until the union filed the List of Demands[1435].

1305. Reficar retorts that, from the outset of the Project, CB&I had the constitutional, legal and contractual obligation to recognize USO as a valid partner, by receiving its representatives and processing its petitions[1436].

1306. The Tribunal finds most of the above discussion to be inapposite, because the relevant question really is whether, as of the Cut-Off Date, CB&I was fully aware that labour management issues were causing huge disruptions; the Tribunal thinks that it was [**a.**], with one exception: the Bargaining Agreement [**b.**].

---

[1428] JX-002, TC 44.5, p. 218.
[1429] JX-002, TC 44.6, p. 218.
[1430] JX-002, TC 14.6, p. 187; JX-002, TC 44.3.1, p. 217.
[1431] ESOD, para. 954.
[1432] RPHB, para. 439.
[1433] Reply, para. 832.
[1434] RPHB, para. 447. The Tribunal notes that CB&I has referred to two different dates for this event: throughout its written submissions, CB&I has argued that the first CB&I employee joined USO in January 2013 (RPHB, para. 447). However, under para. 434 of RPHB, CB&I indicates the first CB&I employee joined USO in January 2011. Ex. C-1324 confirms this latter date.
[1435] ESOD, para. 933; RPHB, para. 448.
[1436] Reply, paras. 781-782.

ICC Case 21747 RD/MK/PDP
Final Award

a.    **Foreseeability of labour disruptions**

1307. Labour disruptions occurred from the outset of the Project[1437]; as of the Cut-Off Date, the Project had already suffered a schedule impact of more than 50 days due to work stoppages[1438].

1308. And the two events which caused major disturbances – and for which, allegedly, Reficar and Ecopetrol should be responsible – also happened before the Cut-Off Date:

-    Reficar's decision to treat workers' attendance bonuses as non-salary compensation occurred on March 29, 2011[1439]; and

-    Disruptions by Ecopetrol employees in the brownfield were already occurring as early as of February 2011[1440].

1309. Furthermore, concurrently to the Cut-Off Date, CB&I expressly acknowledged the foreseeability of labour disruptions. In a letter sent by CB&I to Reficar on December 2011, CB&I stated that[1441]:

> "USO's work stoppages and threats had prevented CB&I from performing critical pre-turnaround work inside the Refinery (…). Since November 1, 2011 CB&I has only been able to work 3 full days inside the Refinery (…). 22 days are the result of USO work stoppages and safety threats to CB&I and its subcontractors".

1310. CB&I concludes the letter stressing that "these disruptions will continue to impact our efforts in the field"[1442]. Subsequently, CB&I estimated the cost impacts of these disruptions in 12 WNOCs for an approximate amount of USD 843,300[1443].

1311. As to the question of who bears responsibility for the disruptions, the Tribunal notes that, even accepting CB&I's position, its labour obligations would still have commenced on January 25, 2011 (almost a year before the Cut-Off Date), when Respondents received a letter from USO informing CB&I that their first employees voluntarily decided to affiliate to the union[1444].

1312. Consequently, when it issued the Representation Forecast, CB&I was already aware that it was responsible for the costs associated with labour disruptions, that disruptions had already occurred prior to the Cut-Off Date and that it foresaw that this scenario would continue affecting the Project.

1313. In view of this, CB&I's arguments on labour management control can never transform Excess Costs into Excluded Costs, because the Representation Forecast must have included CB&I's Class I estimate of the labour costs which would be

---

[1437] Ex. R-1738.
[1438] Ex. C-0224.
[1439] Ex. R-1296.
[1440] Ex. R-0951.
[1441] Ex. C-1316.
[1442] Ex. C-1316.
[1443] Ex. C-0224.
[1444] Ex. C-1324, p. 4

incurred in the Cartagena Project, taking into consideration the labour disruptions which had become the norm given the involvement of USO.

b.    **The Bargaining Agreement**

1314. Notwithstanding the above, there is one event that could not have been foreseen by CB&I as of the Cut-Off Date: the execution of the Bargaining Agreement. The Tribunal considers that this is an Unpredictable Event for the following reasons:

1315. First, although labour disruptions had occurred prior to the Cut-Off Date, these were never of such a magnitude as to give rise to a List of Demands – let alone an indefinite strike as a means to enforce such demands. This unexpected – and rather desperate – situation triggered the need for CB&I to negotiate and execute a Bargaining Agreement.

1316. Even Reficar acknowledged at the time that the situation was a "labour abnormality" [1445].

1317. Second, the costs associated with the execution of the Bargaining Agreement were significantly higher than those calculated by CB&I in the WNOCs filed before the Representation Forecast:

-    Whilst the 44 USO WNOCs from the period before the Cut-Off Date amounted to USD 1.3 million[1446];

-    As will be seen, the direct costs of the Bargaining Agreement were calculated by CB&I at USD 171 million[1447].

1318. The reason for such a costly Bargaining Agreement is because its scope covers:

-    Monthly payments to workers for food services[1448] and mobilization allowance for national workers coming from outside Cartagena[1449];

-    A one-time payment of COP 60,000 to USO for union allowance[1450] and of COP 500,000 to all CB&I workers as a signing bonus[1451];

-    A general increase of salaries and bonuses[1452]; and

-    Changes to the health and security and compliance bonuses[1453];

---

[1445] Ex. R-0230.
[1446] C-0224. This amount comprises all WNOCs related to labour or USO-related work disruptions, that arose before the Cut-Off Date.
[1447] Ex. B-038, Attachments to WNOC No. 000831, p. 112.
[1448] Ex. R-1038 (Art. 5, Bargaining Agreement).
[1449] Ex. R-1038 (Art. 13, Bargaining Agreement).
[1450] Ex. R-1038 (Art. 9, Bargaining Agreement).
[1451] Ex. R-1038 (Bargaining Agreement, p. 6).
[1452] Ex. R-1038 (Art. 12, Bargaining Agreement).
[1453] Ex. R-1038 (Art. 14, Bargaining Agreement).

1319. There is <u>one additional, but compelling, argument</u> in support of considering the costs of the Bargaining Agreement as Excluded Costs: at the time the agreement was stricken Reficar expressed its willingness to assume all related costs:

1320. The *Política Salarial*, which was under the control of Reficar, sets forth detailed and mandatory guidelines for managing labour compensation on the Project. According to TC 44.8 the EPC Contract, CB&I had to adhere to the guidelines mandated by Reficar in the *Política Salarial*:

> "Without limiting the Contractor's obligations under this TC44, the Contractor shall procure that the salary and/or wage of each of its employees and each of its Lower Tier Subcontractors' employees shall not be less than the minimum legal salary and/or wage under any applicable Laws and <u>the guidelines for employees' salaries relative to their position established by the Owner</u>. The Contractor shall procure that the Contractor and its Lower Tier Subcontractors only deduct such amounts from their employees as are permitted by applicable Laws". [Emphasis added]

1321. The *Política Salarial* expressly indicates that it was prepared and revised by Reficar's internal employees and that any updates should be performed by the financial department of Reficar[1454]. Furthermore, Reficar warned CB&I throughout the Project that it would suffer penalties under the EPC Contract if it failed to comply with the *Política Salarial*[1455].

1322. Given that USO's demands had a direct impact on issues regulated under the *Política Salarial*, Reficar reminded CB&I that it needed to obtain its prior approval before entering into any agreement with USO[1456]. And Reficar added that, subject to such approval, it agreed to reimburse CB&I for any increased costs associated with the Bargaining Agreement[1457]:

> "Provided that CBI can negotiate reasonably acceptable terms with USO, and <u>provided that CBI has obtained our prior approval</u> before executing any final binding agreement with USO, <u>we shall reimburse CBI for increased costs associated with meeting the agreed-upon increases in labour rates</u>. This reimbursement of costs shall be made in accordance with the EPC Contract". [Emphasis added]

1323. Reficar's BofD granted this approval by agreeing to CB&I's costs projections of the Bargaining Agreement during the BofD meetings of September 3, 2013, September 9, 2013, and September 23, 2013[1458].

1324. <u>Therefore</u>, the Tribunal finds that the Excess Costs directly arising out of the Bargaining Agreement should be considered Excluded Costs.

---

[1454] Ex. R-1012, pp. 1 and 14.
[1455] Ex. R-1255; Ex. R-1256; and Ex. R-1289.
[1456] Ex. R-0230.
[1457] Ex. R-0230.
[1458] Ex. R-1339, p. 1.

Quantification

1325. The Tribunal will turn now to the quantification of the costs related to the Bargaining Agreement.

1326. In WNOC 831, CB&I included an estimate for the Bargaining Agreement Excess Costs in the amount of USD 171 million[1459]. The figure seems quite accurate, as Reficar acknowledged in its Statement of Claim that the Bargaining Agreement "cost Reficar over USD 100 million in additional compensation"[1460].

1327. In line with the above finding, the Tribunal has already anticipated under Section 3.3.2 that WNOC 831 should be partially accepted.

1328. Since the Bargaining Agreement is the only factor for which Reficar should assume responsibility, the rest of WNOC 831 and the totality of WNOC 802 is rejected, as they cover work stoppages and disruptions that should have been foreseen by CB&I in the Representation Forecast.

1329. In light of the above, the Tribunal finds that USD 171 million of the cost overruns for labour disruptions should be considered Excluded Costs.

## G. **Procurement**

1330. Procurement was an activity which CB&I was obliged to perform under the EPC Contract – further to engineering and construction. CB&I's role in this activity included the definition of the equipment which had to be procured, and the selection of the appropriate Vendor.

1331. There is a marked difference between engineering and construction, on one side, and procurement on the other. In engineering and construction, CB&I would carry out the required activities under its own responsibility (sometimes involving sub-contractors), while in procurement, CB&I was tasked with "procurement services"[1461], delineated in detail in the Procurement Execution Plan annexed to the EPC Contract[1462]; these services were meant to support Reficar in its management of procurement on the Project.

1332. The EPC Contract reflects this distinction. It defines "Equipment" as "equipment, machinery, apparatus, materials, articles and things of all kinds to be procured by

---

[1459] B-038, Attachments to WNOC No. 831, p. 112; C-0260, USO Schedule Estimate, November 1, 2013 (Under this exhibit, CB&I estimated that the Bargaining Agreement Excess Costs would amount to USD 171 million in a high range scenario. This scenario was then applied by CB&I when filing WNOC No. 831). The Tribunal notes that, according to Long International – Reficar's Expert – CB&I later updated this amount, lifting it to in between USD 190 and 258 million (see Long International ER, para. 1206), but Reficar has taken issue with this increase, as CB&I offers no support or explanation (see Long International ER, para. 1206), and the Tribunal agrees

[1460] ESOC, para. 393.

[1461] TC 26.1 "Responsibilities", JX-002, p. 201; JX-004, p. 185.
26.1.1 In accordance with the Scope of Work, the Contractor is responsible for providing all procurement services (including the administration of any Purchase Offers after they have been entered into by the Owner) necessary for the Work" [Emphasis added].

[1462] See division of responsibilities matrix under the Procurement Execution Plan annexed to the EPC Contract; JX-002, pp. 487-490; JX-004, pp. 462-465.

the Owner from the Vendors and incorporated in the Refinery"[1463]. Unlike subcontractors (which entered into contracts with CB&I), Vendors were bound by contracts entered into directly with Reficar, and not CB&I. This is proven by the definition of Purchase Offer in TC 1:

> "'Purchase Offer' means any contract of any type between the Owner and the Vendor for the supply of Equipment by the Vendor[1464]".

1333. That Reficar was the party in charge of procurement is further confirmed by the fact that, unlike for subcontractors, Reficar was responsible for making payments to the Vendors[1465]:

> "26.1.4 The Contractor will ensure that each Purchase Offer will contain warranty requirements which are acceptable to the Owner (acting reasonably) for any materials, Equipment, machinery, spare parts, or supplies that are purchased from Vendors. The Owner will be responsible for making all payments under the Purchase Offers referred to in TC26.1.3 and will have recourse only to the relevant Vendors of such Equipment for satisfaction of any Vendor warranties. The Contractor shall assist the Owner in the enforcement of any Vendor warranties but shall not be required to institute any arbitration or litigation proceedings (although the Contractor must still provide assistance to the Owner during such proceedings)". [Emphasis added]

1334. For its role CB&I was entitled to receive a remuneration that was not calculated separately – it was simply part of the general Fixed Fee arrangement under the Contract[1466]. This means that CB&I had no opportunity of receiving any kick-back for its procurement services and had no direct incentive to underperform.

1335. The Representation Forecast estimated that procurement costs would amount to USD 1,651.6 million[1467]. Reficar eventually paid USD 1,889.5 million (as proven by the close-out cost report for the Project[1468]), resulting in Excess Costs of USD 237.9 million.

1336. CB&I argues that the Excess Costs incurred as a consequence of the procurement activity should be considered Excluded Costs: it cannot be made responsible for the performance of the supply contracts entered into directly between Reficar and the Vendors. CB&I could never have breached the Cost Control Commitments with regard to supply agreements entered into, and payments made directly, between the Vendors and Reficar[1469].

1337. The Tribunal sides with CB&I. The USD 237.9 million Excess Costs arose, not because CB&I breached any of its Cost Control Commitments, but rather because

---

[1463] JX-002, p. 164; JX-004, p. 150.
[1464] JX-002, p. 169; JX-004, p. 155.
[1465] Communication C-175, p. 5, Table 1; LI ER, paras. 1227-1241.
[1466] TC 58, JX-002, p. 235; JX-004, p. 211-212; JX-003, pp. 3-4; JX-005, p. 3.
[1467] Ex. R-1851_057_00017, tab "Project Summary", Line "Onshore/Offshore Procurement", column "Forecast".
[1468] Ex. C-0056, tab Project Summary, Forecast Column. The Tribunal notes the close proximity of the Actual Costs column – although the Forecast is a more accurate metric given how not all costs had been captured in the Actual Costs column at the end of December 2015.
[1469] Ankura ER, paras. 342-343, 366,

the Vendors eventually charged Reficar more than had been anticipated. This is a unique situation unlike any seen in the previous sections: it does not deal with Excess Costs emanating from CB&I's or Reficar's performance, but of a third-party.

1338. The necessary consequence is that the Excess Costs of <u>USD 237.9 million</u>, incurred for the payment to third party suppliers, must be considered as Excluded Costs.

1339. There is a further argument: in this cost overrun claim, Reficar is asking for the claw back of certain payments made to CB&I, under the argument that these payments were improper. Procurement payments made cannot be clawed-back from CB&I, because these payments did not flow to CB&I, but rather to a third-party Vendor. What has not been paid cannot be clawed-back.

## H.   <u>Prolongation costs</u>

1340. Reficar brings a claim for *daño emergente* caused by the delay suffered in the Project – a claim which CB&I rejects, averring that the delay is to be imputed to Reficar's conduct. This issue will be analysed by the Tribunal under Section VII.2.3 *infra*: the Tribunal will find that of the total 522 days of delay materialized after the Cut-Off Date CB&I is responsible for 334 days, and Reficar for 188.

1341. In this section, the Tribunal has to determine a related issue: if the finding that out of the total 522 days of delay 188 days are to be imputed to Reficar implies that certain additional Excluded Costs must be credited in CB&I's favour[1470].

1342. It is a general principle of all construction activity that an extension of the expected schedule implies that the constructor has to incur certain additional expenses. This general principle is accepted by Long International, the expert designated by Reficar, who acknowledged that due to the prolongation of the schedule, CB&I's costs associated with maintaining the management team, increased by 250%[1471].

1343. When CB&I issued its Representation Forecast, costs were calculated assuming that there would be no delay for causes imputable to the Owner. In reality, Reficar's conduct then resulted in 188 days of delay. The prolongation costs caused to CB&I by such delay should be considered as Excluded Costs and as such should be deducted from Reficar's Claw Back.

1344. What is the correct calculation of the prolongation costs suffered by CB&I?

1345. Reficar's expert, Long International, estimated that CB&I billed (and Reficar paid) the costs for

- the site construction management team at a daily rate of USD 763,970 and

- scaffolding at a daily rate of USD 71,606[1472].

---

[1470] The Tribunal will also find that 203 days of delay had already materialized prior to the Cut-Off Date. This finding is irrelevant for the present section, as any associated costs to this specific delay should had been foreseen by CB&I under the Representation Forecast.
[1471] LI ER, paras. 1261-1262.
[1472] LI Attachment to JER 6 (Table 9.4-32 Rev. 1).

ICC Case 21747 RD/MK/PDP
Final Award

According to Long International, these were the items that resulted in the prolongation costs of the Project[1473], and they sum up to a daily rate of USD 835,576[1474]:

| Site Indirect Costs - Prolonged Schedule and Excessive Indirects | | | | |
|---|---|---|---|---|
| **Description** | **Start** | **Finish** | **Duration** | **Total** |
| **Calendar Days** | | | | |
| Planned | 15-Jun-10 | 28-Feb-13 | 990 | |
| Actual | 15-Jun-10 | 17-Nov-15 | 1.983 | |
| Delayed Completion | | | 992 | |
| CB&I Delay Responsibility | | | 893 | |
| | | **CB&I** | **Vendor** | **Total** |
| **Site CMT & Support (Costs/CD - w/o Scaffolding)** | | | | |
| Planned | | 517.411 | 41.741 | 559.151 |
| Actual | | 763.970 | 37.847 | 801.817 |
| Variance | | 246.560 | (3.894) S | 242.666 |
| **Scaffolding (Costs/CD)** | | | | |
| Planned | | 15.474 | 2.222 | 17.696 |
| Actual | | 71.606 | 10.283 | 81.889 |
| Variance | | 56.132 | 8.061 S | 64.193 |
| | | | | |
| **Prolonged Schedule Impact** | | | | |
| Site CMT | | S 682.225.390 | S 33.797.182 | 716.022.572 |
| Scaffolding | | S 63.944.142 | S 9.183.014 | 73.127.156 |
| **Total** | | S 746.169.532 | S 42.980.196 | S 789.149.728 |
| | | | | |
| **Excessive Indirects** | | | | |
| Excessive CMT | | 268.503.387 | S (4.240.289) | S 264.263.099 |
| Excessive Scaffolding | | S 61.128.009 | S 8.778.590 | S 69.906.599 |
| **Total Excessive Indirects** | | S 329.631.396 | S 4.538.301 | S 334.169.697 |

1346. CB&I has not called the Tribunal's attention to an alternative calculation. The Tribunal sees no reason to put this daily rate in doubt, because it was developed by Reficar's experts to support its own claim[1475].

1347. The multiplication of this rate by the 188 days of delay for which Reficar was responsible after the Cut-Off Date results in a total of USD 157.1 million.

1348. In light of the above, the Tribunal finds that prolongation costs, caused by delay for which Reficar is responsible, and established at USD 157.1 million should be considered Excluded Costs.

**I.    Conclusion**

1349. In sum, the Excluded Costs caused by Claimant's Responsibility Events amount to the following:

- Construction: USD 12.7 million

- Materials management: USD 9.9 million

- Craft labour productivity: USD 215.3 million

---

[1473] LI ER, para. 1260.

[1474] LI Attachment to JER 6 (Table 9.4-32 Rev. 1). The rate derives from summing up the daily rate for (i) CB&I's Site CMT & Support costs; and (ii) CB&I scaffolding costs.

[1475] CPHB, para. 158. Reficar uses Long International's calculation to support its claim for improper prolongation costs.

- Labour disruptions: USD 171 million

- Procurement: USD 237.9 million

- Prolongation costs: USD 157.1 million

1350. In total, the Excluded Costs caused by Claimant's Responsibility Events amount to <u>USD 803.9 million</u>.

### 3.3.4. CONCLUSION AS REGARDS EXCESS COSTS WHICH REFICAR IS ENTITLED TO CLAW BACK

1351. The Tribunal has found that the Reasonable Cost Benchmark amounts to <u>USD 3,971 million</u> and has also determined that the *prima facie* Excess Costs amount to <u>USD 1,937.2 million</u>.

1352. The Excluded Costs amount to USD 1,091.8 million (*i.e.*, Unpredictable Events USD 40.4 million, plus scope changes USD 247.5 million plus Claimant's Responsibility Events USD 803.9 million). This amount should be subtracted from the *prima facie* Excess Costs to determine the total amount that Reficar is entitled to claw back.

1353. Thus, by subtracting USD 1,091.8 million (Excluded Costs) from USD 1,937.2 million (Excess Costs), the Tribunal finds that the final amount of Excess Costs is of USD 845.4 million.

1354. In light of the above, the Tribunal finds that Reficar is entitled to claw-back <u>USD 845.4 million</u> as a consequence of CB&I's breach of the Cost Control Commitments under the EPC Contract.

### 3.3.5. UNSUBSTANTIATED PAYMENTS

1355. Reficar makes an additional claim for improper costs it calls "unsubstantiated advance payments" in a total amount of USD 140 million[1476].

1356. This claim requires some background information.

1357. Towards the end of the Project, the relationship between the Parties was tense. Reficar was upset about the cost overruns. CB&I submitted invoices for cost reimbursement which were rejected by Foster Wheeler as a consequence of the invoice verification process. The impasse was so severe that CB&I threatened abandoning the site[1477]. The Parties then negotiated and accepted two agreements on the payment of invoices:

---

[1476] This amount should be reduced to USD 84 million should the Tribunal grant Reficar its Improper EPC Costs claim under the Top-Down methodology. See Reficar's Request for Relief no. 53, CPHB, para. 532.

[1477] Ex. C-1307; Suarez CWS, para. 350; Ex. R-1849_09749, fn 3 at p. 2: "Reficar's accusations regarding alleged "coercion" presumes [sic] that CB&I had a contractual responsibility to finance the Work. CB&I has no such responsibility"; see also RPHB, para. 571: "By the end of 2013, Reficar's non-payment of a significant backlog of invoices threatened to disrupt the timing and progress of the Project because CB&I could no longer bear the burden of financing the cost of the Work" and RPHB, para. 570: "Preventing

ICC Case 21747 RD/MK/PDP
Final Award

- past invoices were subject to the "Memorandum of Agreement" ["**MOA**"], and

- future ones to the Project Invoicing Procedure ["**PIP**"][1478].

Payment of invoices by Reficar under the MOA and PIP would be made under a reservation of rights to later question whether the invoices had been properly submitted.

1358. Reficar now wishes to claw-back the amounts paid under the MOA and/or the PIP, in those cases where it considers that CB&I failed to properly substantiate its invoices[1479].

1359. The Tribunal considers that Reficar's request for the claw-back of unsubstantiated payments is moot, as any amounts requested will already have been awarded under the Improper EPC costs claim.

1360. The Bottom-Up approach involved looking at the totality[1480] of EPC costs actually paid by Reficar, regardless of the sufficiency (or insufficiency) of the underlying invoices and ancillary documentation. This implies that the Tribunal, in its analysis of Excess Costs for which Reficar should be reimbursed, has already reviewed, as to their reasonableness and propriety, all amounts which Reficar now claims as unsubstantiated advance payments.

1361. The necessary consequence is that the Tribunal must abstain from awarding to Reficar any further compensation for unsubstantiated advance payments. And Reficar itself has accepted this conclusion, when it argues that the unsubstantiated advance payments claim is additional to its claw-back claim:

> "As discussed below, Reficar then adds approximately US $84 million to the Top-Down amount to account for non-duplicative unsubstantiated advance payments, which result in the total of US$ 1,673.16 million". [Emphasis added]

1362. As a result, the Tribunal considers that the sums requested by Reficar under the unsubstantiated advance payments category have already been encompassed in the amounts for claw-back adjudicated under the Improper EPC costs claim and that Reficar is not entitled to any additional relief for these amounts.

CB&I's mirror relief

---

CB&I from "walking off the project" is not a form of mitigating damages. CB&I had a right under Colombian law to stop the Work if it was not getting paid".

[1478] ESOCC, para. 96; EDOCC, paras. 85 and 95.

[1479] Reficar's Request for Relief no. 53, CPHB, para. 532.

[1480] The Tribunal considers that the MOA and PIP amounts are included in the total amount of USD 5,908.2 million paid by Reficar: these amounts are referred to as "paid but not approved" by CB&I and "unsubstantiated advance payments" by Reficar. In addition, the table compiling all the EPC costs paid by Reficar under Ex. C-1181 (tab "ACTUAL A 31 DIC 2016) contains a deduction of USD 5,339,402 for "4.5 COMPENSACIONES MOA COLOMBIANA [...]", meaning that the total number accounts for set-off amounts, and thus, by extension, also the underlying payments under the MOA (and PIP).

1363. The Tribunal notes that CB&I has brought a mirror request for relief: for the Tribunal to issue a declaration that Reficar is not entitled to reclaim any of the amounts paid under the MOA and PIP[1481].

1364. CB&I's request for relief cannot succeed, because the Tribunal, by opting for the Bottom-Up methodology, has found that certain portions of the relief for unsubstantiated advance payments submitted by Reficar will necessarily have been addressed and wrapped up in the Improper EPC Costs claim.

## VII.2.2.    CB&I'S COUNTERCLAIM

1365. CB&I submits a counterclaim; it says that it issued invoices for EPC costs, which Reficar:

- unduly refused to pay in part or as a whole: approximately USD 48.6 million and COP 275 billion;

- settled by improperly off-setting their amounts: approximately USD 3.6 million and COP 125 billion;

- paid, but never approved: approximately USD 75 million and COP 274 billion.

1366. CB&I seeks relief under the Contract:

- a payment order for the first two categories and

- a declaration for the third category, stating that the amounts were correctly paid, to ensure that Reficar does not request a claw-back[1482];

- a declaration that Reficar breached the EPC Contract maliciously or with bad faith[1483].

1367. Finally, CB&I also claims that Reficar should reimburse the amounts it improperly drew on a letter of credit[1484].

<u>Unjust enrichment</u>

1368. CB&I not only requests relief under the Contract, but it submits an additional legal reasoning: it says that by refusing to pay the invoices Reficar became unjustly enriched, because it had the benefit of the goods and services, without paying any consideration[1485]. Both Parties' experts agree that under Colombian law the doctrine of unjust enrichment can only be applied when there is no contractual relationship between the parties[1486]; this subsidiary character of the general principle of unjust enrichment has been confirmed by Colombia's Supreme Court of Justice[1487]. Since

---

[1481] CB&I's Request for Relief "s.", ESOD, para. 1612.
[1482] RPHB, paras. 593, 595.
[1483] CB&I's Requests for Relief relief ee. [31], ESOD, para. 1612; and g(ii.), RPHB, para. 675.
[1484] RPHB, para. 594.
[1485] Respondents' ESOD request for relief k. [no. 11].
[1486] Solarte ER, paras. 1-17; Arrubla Second ER, paras. 237-244.
[1487] RL-407, pp. 24-25.

there is indeed a contractual relationship between CB&I and Reficar, the Tribunal will not pay further attention to CB&I's additional legal reasoning.

Declaratory relief

1369. The Tribunal need not decide on the declaratory relief with regard to the third category of claims (amounts paid but not approved), as this issue has been indirectly resolved by the Tribunal in its previous findings regarding Reficar's claim for improper EPC costs: any amount paid is contained in the total of USD 5,908.2 million disbursed by Reficar and the Tribunal has already determined that out of that amount, USD 5,062.8 million[1488] were proper EPC costs and the remaining USD 845.4 million were improper, because they were incurred in breach of the Cost Control Commitments – thus, the USD 75 million and COP 274 billion over which CB&I seeks declaratory relief have already been analysed jointly with the rest of paid costs, and decided by the Tribunal with prejudice (this also means that Reficar's claim for unsubstantiated advance payments[1489] has already been addressed in the Tribunal's analysis of the Improper EPC Costs claim).

\* \* \*

1370. The Tribunal will address the unpaid invoices first (**1.**), then the allegedly improperly off-set ones (**2.**). Subsequently, the Tribunal will address CB&I's requests for declaratory relief on: the amounts seized under the performance letter of credit (**3.**) and the past and future drawing-upon the advance payment letter of credit ["**Advance Payment LoC**"] by Reficar (**4.**).

### 1.   UNPAID INVOICES

1371. The experts have produced a joint excel spreadsheet analysing a sample of more than 1,000 invoices which have been partly or totally unpaid[1490]. These invoices pertain to 15 cost categories, labelled **A.** through **O.**[1491]:

| | Item | Category of cost | Claimed amount | |
|---|---|---|---|---|
| | | | In USD | In COP |
| | A. | **Tanks and Spheres** | 5.385.565 | 13,616,474,851 |
| | B. | **Nomads** | | 28,256,049 |
| 1.1.1 | C. | **Third Party Invoices: Importations** | 1.276.366 | |
| | D. | **Third Party Invoices: Modularisation** | 13.219.243 | |

---

[1488] USD 3,971 million (Reasonable Cost Benchmark) + USD 1,091.8 million (Excluded Costs) = USD 5,062.8 million

[1489] Reficar's CPHB request for relief number 53.

[1490] Parties' joint communication C-227 & R-213 with Revised Expert Table Requested by Tribunal.

[1491] The Tribunal notes that CB&I's submissions refer to figures which do not match those discussed by the experts. Faced with this discrepancy, the Tribunal has given preference to the amounts claimed by CB&I in its written submissions (see break-down of counterclaimed amounts in tables at RPHB, para. 596; Respondents' Reply on Counterclaim, para. 8 and ESOCC, para. 146).

ICC Case 21747 RD/MK/PDP
Final Award

|  |  |  |  |  |
|---|---|---|---|---|
|  | E. | **Third Party Invoices: Subcontracts** | *302.902* | *66,892,081,378* |
| **1.1.2** | F. | **Third Party Invoices: Inspections** | *175.442* |  |
| **1.1.3** | G | **Fansaro Group** | *860.237* |  |
| **1.1.4** | H. | **Contractor's Fixed Fee and HSE Bonus** | *5.519.947* *1.173.617* | *54,866,665.602* *5,611,813,009* |
| **1.1.5** | I | **Letter of Credit Fees / Bond Premium** | *13.293.246* | *13,339,681.980* |
| **1.1.6** | J. | **Legal Fees and Related Costs** | *1.465.765* | *8,048.362,976* |
| **1.1.7** | K. | **Underpaid August 2015 PIP** | *127.878* |  |
| **1.1.8** | L. | **Labour** | *3.504.472* | *51,875.652,967* |
| **1.1.9** | M. | **Taxes** |  | *37,963,069.637* |
| **1.1.10** | N. | **Expenses** | *1.756.868* | *8.578.407,539* |
| **1.1.11** | O. | **Mixed nature invoices submitted from August 1, 2017 to July 31, 2018** | *1.437.694,22* | *14,463,060,777* |
|  |  | **Total** | *49,499,242* | *275,283,526,765* |
|  |  | (Adjustment)[1492] | *(870.038)* | *(1,091,705)* |
|  |  | **Total claimed** | *48,629,204* | *275,282,435,060* |

1372. CB&I's basic position is that these invoices reflect reasonable and properly incurred EPC costs and that they were submitted with all supportive documentation needed to verify the correctness of each invoice; thus, the invoices should be reimbursed by Reficar. Reficar accepts that a small number of the invoices were correctly submitted, but rejects the reasonableness and propriety of any amounts claimed.

1373. The Tribunal recalls that in the section on Improper EPC Costs, the process for ascertaining Contract-compliant costs involved a scrutiny of the formalities of each invoice (carried out by Foster Wheeler, and which is not contested), followed by the Tribunal's assessment of what amounts were reasonable and proper. The situation is different for the pool of unpaid invoices: these invoices were never paid by Reficar and are now claimed by CB&I. But a similar approach must be taken to ascertain if they should be paid: whether they fulfil the formal requirements and whether the underlying costs were reasonable and proper.

1374. The Arbitral Tribunal will first address the reasonableness and propriety arguments (**1.1**) and then deal with the document verification issue (**1.2**).

## 1.1. REASONABLENESS AND PROPRIETY

---

[1492] For Onshore:
Reficar paid invoices 58901723, 58901723 RM, and 58901899 under the EPC Payment Process and under the MOA/PIP. Reficar paid the gross amount for invoice 58901994, instead of the amount net of withholding taxes. The withholding tax calculated by Reficar on the MOA was too low, resulting in an overpayment, which is now deducted. See Wrights Updated ER, Table 1 at pdf p. 12, fn [F].
For Offshore:
The adjustment is made for the decrease in the amounts claimed by CB&I in the ESOCC (see "Subtotal" for "Unpaid" ONSHORE AMOUNTS, COP 260,820,465,988 in table at para. 146) and the Respondents' Reply on Counterclaim (see "Unpaid Invoices (through 31 July 2017)" of COP 260,819,374,283), for which the Tribunal has not found any explanation in CB&I's submissions.

1375. CB&I is claiming USD 48.6 million and COP 275 billion in EPC costs that were incurred, invoiced and never paid[1493].

1376. Were these costs reasonable and were they properly incurred?

1377. It is possible to give a preliminary answer to these questions.

1378. The Tribunal has already established that USD 3,971 million was a Reasonable Benchmark for the EPC costs and that any costs beyond that amount must be considered unreasonable and improperly incurred Excess Costs, which Reficar should not bear. The principle is applicable both to costs which Reficar has already paid, and to costs that are still pending payment.

1379. The above principle is, however, not absolute – the Tribunal has allowed for some exceptions (the so-called Excluded Costs) and accepted that, if post-Cut-Off-Date EPC costs were either:

-    unforeseeable as of the Cut-Off Date,

-    the consequence of changes in the scope of the works to be performed, or

-    caused by Reficar's fault or lack of diligence,

Reficar was not entitled to claw-back.

1380. The same approach is applicable to CB&I's counterclaim for unpaid invoices: the Tribunal will, thus, analyse whether these additional EPC costs are related to any of the three exceptions. If not, the Tribunal will assume that the costs were known at the time of the Representation Forecast and are included in the USD 3,971 million Reasonable Benchmark.

1381. The difficulty in carrying out this task lies with the scarcity of input from the Parties. CB&I has argued that reasonableness is sufficiently proven if the costs relate to the Project[1494]; but the Tribunal has already determined that such approach is fundamentally flawed: costs will not be reasonable and proper simply because they arose during the performance of the works – reimbursement of costs still requires that CB&I complied with its Cost Control Commitments.

1382. The Tribunal has, nonetheless, analysed each of the 15 categories (**A.** through **O.**) of additional EPC costs, according to the breakdown provided by both experts in the joint spreadsheet referred to in para. 1371 *supra*, to determine the reasonableness and propriety.

---

[1493] Respondents' Reply on Counterclaim, Table "Amounts Claimed Under the Offshore Contract (USD) at bottom of pdf p. 5 and Table "Amounts Claimed Under the Onshore Contract (COP)" at top of pdf p. 6.
[1494] See e.g., Mr. Hackett's analysis on the reasonableness of discrete invoices under JER 10 Quantitative.

### 1.1.1. CATEGORIES A., B., C., D. AND E.

1383. The Tribunal has already analysed the reasonableness and propriety of certain categories of costs [Tanks and Spheres (**A.**)[1495], Nomads (**B.**), Importation (**C.**)[1496], Modularisation (**D.**), and Subcontracts (**E.**)] in the section dedicated to Excluded Costs. The Tribunal's findings were that the categories Tanks and Spheres, Nomads, and Importation costs indeed gave rise to Excluded Costs, while the categories Modularisation and Subcontracts did not[1497].

1384. CB&I is claiming the following amounts under the categories that in the Tribunal's findings constitute Excluded Costs[1498]:

- Tanks and Spheres: USD 5.38 million and COP 13.6 billion;

- Nomads: COP 28.3 million;

- Importation costs: USD 1,299,366.

1385. These amounts *prima facie*, and subject to the verification of the formal invoicing requirements, constitute reasonable and properly incurred costs, for which CB&I is entitled to reimbursement.

### 1.1.2. CATEGORY F.: INSPECTIONS

1386. CB&I engaged certain inspection companies, with which it had worked in the past, to perform inspections services on the Project[1499].

1387. In principle, the Contract foresees that inspection costs should be reimbursed[1500]. The question, thus, is whether by the time CB&I presented the Representation Forecast it did include (or should have included) these costs, as being foreseeable at that time.

1388. The Tribunal notes that the Representation Forecast did in fact include the cost of inspection of certain elements, such as boilers and refurbished equipment from the Big West refinery[1501]. Furthermore, the invoices seem to relate to ordinary inspections – the experts do not point to any extraordinary circumstance.

1389. If CB&I expressly included some inspection costs in the Representation Forecast, there is no reason why it should not have included the costs of all inspections. The

---

[1495] See analysis of WNOC 1024 in para. 1077 *supra*.
[1496] Importation and Nomads refer to procured equipment; since the experts have not referred to any extraordinary circumstances surrounding those costs, the Tribunal will assume that the decision on Procurement applies to them.
[1497] See Section VII.2.1.3.3 *supra*.
[1498] See table in para. *supra*.
[1499] JER-10, Offshore Inspections.
[1500] Section IV, Art. 5.8, "Billable" category; JX-003, pdf p. 10; JX-005, pdf p. 8.
[1501] Ex. R-1851_057_00017, Tab "Summary Cost Slides", Row "Source Inspection Services", Tab "Engineering", Row "Inspection Services", Tab "Construction", Rows "Consulting/Inspection/Surveys", "Safety Inspection & Training", "Inspection and Maintenance of Fire Extinguisher" "Inspection (Site)" et.al.

Tribunal thus finds that these costs are not reasonable and proper and should not be paid by Reficar.

### 1.1.3. CATEGORY G.: FANSARO GROUP

1390. The first step in the invoice payment process was the verification carried out by Foster Wheeler. Foster Wheeler rejected a number of invoices because, allegedly, they lacked proper justification.

1391. CB&I hired the Fansaro Group, a consultancy firm, to address Foster Wheeler's rejections[1502].

1392. The Tribunal is not persuaded that CB&I was contractually entitled to recover this type of costs from Reficar. Under Section IV of the Contract[1503] there are billable and non-billable personnel costs. "Corporate accounting" and "legal for normal corporate company business matters" constitute non-billable costs[1504]. The costs incurred by a consultancy firm hired by CB&I to improve the manner in which the documents supporting invoices were submitted, falls within the category of non-billable costs.

### 1.1.4. CATEGORY H.: FIXED FEES AND HSE BONUS

1393. Pursuant to the remuneration scheme provided for in the Contract, CB&I was entitled, among others, to a:

- Progress fee: an aggregate of USD 44.1 million would be invoiced in monthly instalments, based on project progress achievement[1505] – all CB&I's progress fee invoices were paid, except for the last USD 7,447 and COP 23,580,251,352 invoice[1506], and

- Mechanical Completion fee: USD 5,512,500 and COP 31,286,414,250 upon Mechanical Completion of all Units[1507] – Reficar refused to pay this fee.

1394. CB&I claims payment of USD 5,519,947 and COP 54,866,665,602 for these fees.

1395. The Representation Forecast that set the Reasonable Benchmark at USD 3,971 million already included the Progress and the Mechanical Completion fees. Consequently, CB&I is not entitled to any additional compensation (see para. 1281 *supra*).

Health, Safety and Environment bonus

1396. CB&I also requests payment of the Health, Safety and Environment bonus. This bonus is to be found in Section IV, Art. 3 and TC 58.13 of the Contract[1508]: CB&I was entitled to USD 4 million per year up to the third year of Contract and to an

---

[1502] JER-10, Offshore Fansaro Group.
[1503] Section IV, Art. 5.8; JX-003, pp. 9-10; JX-005, pp. 8-9.
[1504] Section IV, Art. 5.8; JX-003, p. 10; JX-005, p. 9.
[1505] Section IV, Art. 2.4 of the Offshore Contract.
[1506] JER-10, Offshore and Onshore Fixed Fee.
[1507] Section IV, Art. 2.5 of the Offshore Contract
[1508] JER-10, Offshore and Onshore HSE Bonus.

additional USD 1.5 million for each subsequent year, provided that it was able to maintain a low frequency and severity of accidents[1509].

1397. The unpaid invoices claimed relate to the 2011 the Health, Safety and Environment bonus in an amount of USD 1,173,617[1510] and COP 5,611,813,009[1511].

1398. The case is similar to that of the Progress and Mechanical Completion fees. The Representation Forecast also foresaw USD 3,433,200 (Offshore Contract) plus USD 566,800 (Onshore Contract) for the "safety bonus", as the "earned" portions as of January 2012[1512]. The Representation Forecast must have already included the bonus for 2011, and consequently CB&I is not entitled to additional compensation.

### 1.1.5. CATEGORY I.: LETTER OF CREDIT FEES AND ONSHORE BOND PREMIUMS

1399. TC 75 of the Contract requires CB&I to procure two on-demand letters of credit and a bond for the benefit of Reficar:

- A USD 70 million performance letter of credit, securing CB&I's obligations and liabilities under the EPC Contract, in effect until 28 days after the end of the Defects Correction Period;

- A USD 25 million advance payment letter of credit, securing the money Reficar pays CB&I in advance of performing obligations, until the liquidation of the agreement; this amount was amended during the Project, eventually reaching USD 95 million;

- A performance bond with a duration until 28 days after the end of the liquidation of the agreement.

1400. The performance letter of credit was drawn down entirely on March 31, 2016. As regards the advance payment letter of credit, Reficar attempted to draw USD 95 million on March 9, 2016, but was preliminarily enjoined from doing so by Court order[1513]. The Parties then agreed that Reficar would defer the draw down until conclusion of the arbitration, and in return CB&I would maintain the letter of credit alive until that time[1514].

1401. As of June 28, 2019 (the date of the most recent expert reports for CB&I[1515]) CB&I had incurred USD 13,293,246 in fees for the two letters of credit[1516], although only

---

[1509] Section IV, Arts. 3.2.2 and 3.2.3; JX-003, p. 4; JX-005, p. 4:
3.2.2 The "HSE Bonus" means an amount up to thirteen million five hundred thousand Dollars (US$13,500,000) to be paid out of the Incentive Pool.
3.2.3 The "Annual HSE Bonus" means an amount of up to four million Dollars (US$4,000,000) for each of the first three Contract Years and an amount of up to one million five hundred thousand Dollars (US$I,500,000) for any remaining period.
[1510] JER-10, Offshore HSE Bonus.
[1511] JER-10, Onshore HSE Bonus.
[1512] Ex. R-1851_057_00017, tab "Fee", Row "Safety Bonus".
[1513] Ex. R-0358, pdf p. 2.
[1514] Ex. R-0358, paras. 2 and 3 at pdf pp. 3-4.
[1515] Hackett Counterclaim ER II; Wright Updated ER.
[1516] Hackett Counterclaim ER II, Section 9.0; Wright Updated ER, Section VI.C.9 at pdf pp. 38-39.

50% of this amount has been invoiced[1517]: in late 2012/early 2013 the Parties negotiated a memorandum of understanding, in which Reficar accepted to pay 50% of the letter of credit fees in exchange for CB&I reducing another claim[1518]. Although it is undisputed that the Parties never signed the memorandum of understanding, CB&I's invoices have been reduced as if the memorandum of understanding had entered into force.

1402. CB&I also claims reimbursement of the costs arising out of the performance bond, in an amount of COP 13,339,681,980[1519].

1403. Reficar submits that CB&I is responsible for the fees associated with the letters of credit, because these costs are not recoverable under the terms of the Contract. Reficar's expert refers to Letter VP-CBI 14017-5945-16 dated August 23, 2016[1520] where it was stated that these letters of credit provide security to Reficar in the event that CB&I fails to satisfy its obligations under the Contract. As a result, it says that CB&I is responsible for all associated banking fees. The terms and intent of the Contract would be contradicted if Reficar paid these fees[1521]. And, subsidiarily, Reficar submits that only USD 12,384,092 are supported – USD 909,154[1522] are duplicative billings and/or could not be confirmed[1523].

Discussion

1404. The Tribunal has to decide, first, whether the draft memorandum of understanding is a sufficient basis to accept the propriety and reasonableness of these costs. The document was ultimately not entered into and consequently these costs must be decided applying the terms of the Contract.

1405. Section IV, Art. 5.8 includes "Bonds, Insurance and Letters of Credit" as billable expenses. The Contract thus contradicts Reficar's position that these costs were not recoverable.

1406. The remaining question is whether, by the time CB&I presented the Representation Forecast, it did include (or should have included) these costs because they were foreseeable at that time.

1407. The Tribunal is of the opinion that the fees for the letters of credit and for the performance bond should have been foreseen by CB&I in the Representation Forecast, as it knew that these guarantees implied costs which would arise and which Reficar was obliged to cover.

---

[1517] Wright Updated ER, pdf p. 39: "Although CB&I invoiced for 50% of the costs incurred for letter of credit fees, CB&I incurred USD $13,293,246 to maintain the letters of credit".
[1518] Ex. C-1830.
[1519] Hackett Counterclaim ER II, Section 21.
[1520] Letter VP-CBI 14017-5945-16 dated August 23, 2016; Ex. R-1849_14810, p. 2, referenced in Deloitte ER, pdf p. 85.
[1521] Ex. R-1849_14810, p. 2
[1522] The table at the end of Section 7.3 of Deloitte ER provides for the number USD 534,154 as unsupported costs but the Tribunal accepts that the correct number is reflected in the body of the text of the ER, which is USD 909,154 at Deloitte ER, pdf p. 83.
[1523] Deloitte ER, Section 7.3 at pdf p. 86.

1408. The only exception to this rule is the extended duration of the advance payment letter of credit. The Parties' agreement of March 2016 to extend the letter of credit until after the conclusion of this arbitration could not have been foreseen at the time of the Representation Forecast[1524].

1409. This means that advance payment letter of credit fees, accruing after March 2016, could not have been foreseen at the time of the Representation Forecast. Of the various invoices now submitted for payment, 58902977 covers the period of 2nd through 4th quarter of 2016 and 1st quarter of 2017 for an amount of <u>USD 602,180</u>.

1410. The Tribunal notes that under the category "Offshore 17-18 Invs", which compiles unpaid invoices of mixed nature, CB&I is seeking reimbursement of two further invoices[1525]:

| Invoice no. | Amount in USD |
|-------------|---------------|
| 58903013    | 394,701       |
| 58903055    | 207,872       |

1411. Upon examination of the supporting material, the Tribunal finds that the first of these invoices refers to the fees incurred in the 2nd quarter of 2016 and 2nd and 4th quarter of 2017. The amount attributable to the 2nd quarter of 2016, therefore, overlaps with invoice 58902977. The extent of the overlap is easy to determine as the record has an invoice just for 2nd quarter 2016[1526] in an amount of USD 150,211 – which Reficar correctly says should not be counted twice. The net value of invoice 58903013 is, thus, <u>USD 244,489</u>.

1412. As to the second invoice (58903055), the Tribunal has searched in the invoice log and the folder containing all invoices but has been unable to locate it.

1413. <u>In sum</u>, the Tribunal accepts that CB&I's reasonable invoiced costs related to the advance payment letter of credit amount to <u>USD 846,669</u>[1527].

### 1.1.6. CATEGORY J.: LEGAL FEES

1414. As explained by the experts[1528], during the Project CB&I engaged certain external counsel to address employment, union issues and disputes with Vendors, suppliers and subcontractors. For Offshore legal services, CB&I mainly relied on Holland & Knight LLP and Baker McKenzie[1529]; the Onshore legal costs primarily include

---

[1524] Ex. R-0358.
[1525] JER-10, Offshore 17-18 Invs.
[1526] Invoice no. 5802903; Ex. R-0444.
[1527] USD 602,180 + USD 244,489.
[1528] JER-10, Offshore Legal Fees; Deloitte ER, Section 8.7.
[1529] JER-10, Offshore Legal Fees.

fees from Baker McKenzie, *VT Servicios Legales* and *Alberto Jubiz & Abogados Asociados*[1530].

1415. CB&I claims reimbursement of the following amounts related to the abovementioned legal services[1531]:

- USD 1,465,765 for Onshore invoices, and

- COP 8,084,362,976 for Offshore invoices.

1416. According to CB&I, these legal costs are reimbursable under Art. 5.8 of Section IV of the Contract. The Tribunal notes that Section IV is related to employment rates[1532]:

> **5.    EMPLOYEE LABOR GRADE RATES**
>
> **5.1    Not Used**
>
> **5.2    Contractor Expat Rates**

and so does Art. 5.8 itself, as it lists different billable and non-billable items related to "**Personnel** Categories"[1533]:

> 5.8    Billable/Non Billable Personnel Categories
>
> Billable
> - Project Management (Directors and Managers)
> - Project Engineering

1417. The billable expenses under Art. 5.8 only include costs of personnel directly engaged in providing legal services related to the Works, but it does not cover costs arising from CB&I's decision to hire external counsel. Consequently, the expenses for external counsel claimed by CB&I in this category are not billable under the provision it relied upon (and thus, not reimbursable).

1418. In any event, two of the three categories of invoices claimed by CB&I seem to reflect costs incurred in providing routine legal services regarding labour issues after the Cut-Off Date. This type of routine legal costs should have been included in the Reasonable Cost Benchmark, as decided by the Tribunal with regard to Labour costs under Section VII.2.1.3.3.3.F *supra*.

**1.1.7. CATEGORY K.: UNPAID AMOUNT PIP**

1419. CB&I issued invoice PIP08182015 for USD 1,315,596[1534].

---

[1530] Deloitte ER, Section 8.7.
[1531] ESOCC, para. 146.
[1532] Section IV, Art. 5, pdf p. 6; JX-003, pdf p. 6; JX-005, pdf p. 6.
[1533] Section IV, Art. 5.8, pdf p. 6; JX-003, pdf p. 9; JX-005, pdf p. 8. Emphasis added by the Tribunal.
[1534] See discussion at JER 10 – Qualitative, Topic 11.

1420. CB&I claims that Reficar did not pay the invoice in full, leaving USD 127,827 unsettled[1535]. The evidence of this underpayment is, according to Mr. Wright, an email from October 7, 2015 from CB&I attaching an excel document[1536]. Deloitte, however, has reviewed Reficar's SAP records and finds that the total amount of USD 1,315,596 is credited as paid[1537].

1421. The discussion is, thus, not whether the amounts claimed are reasonable, but whether they have actually been paid. The Tribunal tends to side with Reficar: if its accounting software shows that invoice PIP08182015 has been paid in full, it is sufficient evidence to accept that the debt is settled.

### 1.1.8. CATEGORY L.: LABOUR

1422. This category deals with Offshore labour costs, such as management. administration and engineering[1538]; and Onshore costs for the labour of craft employees[1539].

1423. Labour costs is the major costs category in the Representation Forecast, as CB&I's principal task was to perform works through its workers. So, when CB&I represented that the total costs would be USD 3,971 million, it must have included the totality of labour costs.

1424. There is no indication by the experts that the labour costs now claimed were the consequence of an extraordinary cause, which could not have been foreseeable at the time of the Representation Forecast.

1425. The Tribunal, thus, sees no reason to grant CB&I additional compensation for labour costs.

### 1.1.9. CATEGORY M.: ONSHORE TAXES

1426. The invoices claimed cover amounts for Colombian taxes such as *GMF*, *ICA Industrial y Comercio* and *Sobretasa Bomberil*[1540].

1427. The discussion revolves around whether taxes are reimbursable costs.

1428. The Tribunal sides with Reficar in that they are not, according to TC 72.1[1541]:

> "The Contractor represents that it is aware of the tax regulations applicable to this Agreement, including, but not limited to, withholding in respect of income and value added tax ("VAT"), and any tax, or payment, direct or indirect, of national, departmental, or municipal nature, arising out of the execution, performance, or payment under this Agreement, which shall be assumed and paid exclusively by the Contractor".

---

[1535] JER-10, Quantitative, Offshore PIP Tab.
[1536] JER-10, Quantitative, Offshore PIP Tab.
[1537] JER-10, Quantitative, Offshore PIP Tab.
[1538] JER-10, Quantitative, Offshore Labour Tab.
[1539] JER-10, Quantitative, Onshore Labour Tab.
[1540] JER-10, Qualitative, Onshore Taxes, Topic 24.
[1541] JX-002, p. 259; JX-004, pp. 235-236.

1429. Furthermore Section IV, Appendix II, Clause 5.8 refers to "corporate accounting, tax" being non-billable[1542].

1430. The only exception to this rule seems to be VAT (TC 72.3), but here CB&I is seeking reimbursement of taxes different from VAT.

### 1.1.10. CATEGORY N.: EXPENSES

1431. CB&I seeks the reimbursement of employee travel expenses and consulting services in the Offshore Contract[1543] and equipment rental, legal support, travel expenses and other miscellaneous expenses under the Onshore Contract[1544].

1432. The question here, again, is not whether CB&I was entitled to these expenses, but rather whether they were included (or should have been included) in the Representation Forecast.

1433. The Tribunal has reviewed the description of the expenses provided by the experts and finds that these costs mainly arose in the ordinary course of construction activity; these types of expenses had already been incurred before CB&I issued the Representation Forecast[1545]. There is no indication that these expenses were caused by extraordinary circumstances, unforeseeable at the time CB&I made the Representation Forecast. Consequently, no additional compensation to CB&I is warranted.

### 1.1.11. CATEGORY O.: MIXED NATURE

1434. This is a category of 250 invoices of mixed nature submitted between August 1, 2017 and July 31, 2018 (which appears in the experts' spreadsheet under the heading "Offshore 17-18 Invs"/"Onshore 17-18 Invs"). The invoices relate to labour, expenses, letter of credit fees, subcontracts, legal support and importations[1546] and have been dealt with in the respective previous sections.

### 1.2. DOCUMENT VERIFICATION

1435. According to the Tribunal's findings in the previous section, the following invoiced amounts were reasonable costs and should therefore, *prima facie*, be paid by Reficar:

- Tanks and Spheres: USD 5,385,565 and COP 13,616,474,851 (**1.2.1.**);

- Importations: USD 1,299,366 (**1.2.2.**);

- Nomads: COP 28,256,049 (**1.2.3.**); and

- Advance payment letter of credit fee: USD 846,669 (**1.2.4.**).

---

[1542] Section IV, Art. 5.8; JX-003, p. 10; JX-005, p. 9.
[1543] JER-10, Offshore Expenses.
[1544] JER-10, Onshore Expenses.
[1545] Ex. R-1851_057_00017, Summary Cost Slides.
[1546] JER-10, Offshore and Onshore 17-18 Invs.

1436. To make a final determination on whether the amounts are recoverable, as CB&I claims, the Tribunal must verify that the invoices were properly submitted from a formal point of view.

1437. The Contract contains no specific provisions on this issue. But during the life of the Contract, Foster Wheeler (Reficar's consultant) developed a system for the review of invoices from a formal point of view, which was acquiesced by CB&I – as it addressed any of Foster Wheeler's shortcomings and continued to submit invoices for Foster Wheeler's review.

### 1.2.1. TANKS AND SPHERES

1438. Based on his review of the Tanks and Spheres invoice category, CB&I's expert, Mr. Wright states that CB&I's invoices for USD 5,385,565 and COP 13,616,474,851 include appropriate supporting documentation.

1439. Deloitte says that it performed an analysis and found that the invoices submitted by CB&I did not contain adequate documentation to support the costs being claimed. Foster Wheeler had rejected these costs because of a lack of an authorized Change Order.

1440. The amount of USD 5,385,565 derives from invoice 58902081. The Tribunal has considered the documents attached to this invoice and finds that there is no support there for the figure claimed and no further documents have been cited to support that claim[1547]. Hence, Reficar was correct when it rejected the invoice for lack of proper documentation.

1441. The situation regarding the Onshore disputed invoice is similar. CB&I only claims reimbursement of one invoice 3239A, in an amount of COP 13,616,474,851[1548]. This invoice purports to relate to Change Order 491, for which no evidence has been cited to support that it or the NOCs had actually been approved by Reficar. In those circumstances, the Tribunal cannot award any sum to CB&I.

1442. <u>Accordingly</u>, no sums are awarded in respect of the Onshore Tanks and Spheres claim.

### 1.2.2. IMPORTATIONS

1443. The Tribunal has found that Importations cost in an amount of USD 1,299,366 were *prima facie* reasonable and proper.

1444. The Tribunal has reviewed the excel sheet provided by the experts[1549], which analyses the invoices relating to Importations and notes that only three Importation invoices remain actually unpaid: 58902820, 58902829 and 58902839, for USD 68,270, USD 20,496 and USD 78,495, respectively.

1445. The Tribunal has not been given reasons why CB&I is now claiming USD 1,299,366 as unpaid, which is significantly more than what both experts accept.

---

[1547] Ex. R-0444, Offshore, 58902081 – Tanks and Spheres.
[1548] Ex. R-0444, Onshore, 3239.
[1549] ESOCC, Table "Offshore Amounts" at pdf p. 42.

Furthermore, USD 1.3 million (and the precise figure of USD 1,276,266) are unsupported amounts. This figure appears for the first time in para. 190 of Respondents' ESOCC[1550], and just four paragraphs earlier, in para. 186, the relevant figure was USD 1,978,579[1551]. Regardless of these differences, CB&I concludes the Importations section in its ESOCC by stating that it is "entitled to reimbursement of USD 1,276,366"[1552]. This is the figure also used by CB&I to arrive to the final claimed amount for unpaid invoices[1553]. Accordingly, the Tribunal will use this figure in its analysis hereafter.

1446. Be that as it may, the experts say that only three invoices remained unpaid, and since this counterclaim deals with the reimbursement of unpaid invoices, the Tribunal will, thus, limit its analysis to the three unpaid invoices.

## A.    Invoice 58902820

1447. Reficar accepted that the invoice was correctly submitted, but rejected it nonetheless, pursuant to TC 26.1.6 of the Onshore Contract[1554]:

> "All contracts relating to the supply of consumables and tools for the Work within Colombia will be entered into by the Contractor in its own name, provided the value of such contracts is equal to or less than fifty million Colombian Pesos (COP50,000,000). All such contracts with a value in excess of fifty million Colombian Pesos (COP50,000,000) relating to the supply of consumables and tools for Work within Colombia will be entered into by the Owner. It is not permitted to split any such contract with a value greater than fifty million Colombian Pesos (COP50,000,000) so that the resulting contracts fall within this exception). In respect of the contracts referred to in this TC26.1.6, the Contractor will be responsible for the satisfaction of any relevant warranties".

1448. Reficar says that the amount invoiced exceeded USD 50,000 and the claim should, therefore be dismissed[1555].

1449. The Tribunal does not agree: Reficar is availing itself of an excuse provided in the Onshore Contract which is not applicable to the Offshore Contract[1556]:

> 26.1.6  Not Used.

1450. The Tribunal, therefore, considers that the invoiced amount of <u>USD 68,270</u> was correctly submitted.

---

[1550] ESOCC, para. 190; "Thus, CB&I is entitled to reimbursement of USD 1,276,366 [...]".
[1551] ESOCC, para. 186: "Of the total amounts unpaid of the invoice category "Importations" (USD 1,978,579.70) [...]".
[1552] ESOCC, para. 190.
[1553] ESOCC, para. 146.
[1554] JX-002, p. 202.
[1555] JER-10, Qualitative, Topic 16, Offshore Importations.
[1556] JX-004, p. 185.

ICC Case 21747 RD/MK/PDP
Final Award

### B.    Invoice 58902829

1451. The invoice is dated May 23, 2016 and refers to imported materials such as dictionaries, printers, cables and computing equipment.

1452. The reasons for Reficar's rejection are that, despite express requirements, CB&I failed to provide explanations and supporting documents[1557]:

> ..CBI debe Explicar porque la Facturacion es Extemporanea, los gastos corresponden
> a los años 2009 y 2010.
> -Se Evidencian falla de Documentacion soporte tales como: Frann, MRR, BL o AirWay
> Al favor presente esta factura con la debida documentacion Soporte $fic$        $ 5,581,45·

In this handwritten note, FMM, MRR and BL have the following meaning[1558]:

- the *Formulario de Movimiento de Mercancias* ["**FMM**"] a Colombia-specific certificate confirming that the goods had entered the Free Trade Zone;

- the Material Receiving Report ["**MRR**"], a description of the goods and quantities;

- the Bill of Lading ["**BL**"], a document necessary for the processing a freight shipment.

1453. Reficar thus rejected the invoice because it is dated May 23, 2016, but refers to freight invoices in 2010 and because important supporting documents were missing.

1454. CB&I not only failed to provide explanations for the delayed submission and to produce the documents evidencing shipment, but it also acknowledged that some of the invoices which were claimed under invoice 58902829 were missing in CB&I's accounting system[1559]:

> The following invoices are not in CB&I's accounting system. At this time, we are making attempts to locate hardcopies.

1455. In view of the above, the Tribunal finds that Reficar was correct in rejecting invoice 58902829.

---

[1557] Ex. R-0444, Offshore, 58902829 Geodis Wilson USA, Inc, 20160525-Transmittal Inv 58902829. Translation:
- CBI must explain why the invoice is extemporaneous; the expenses relate to years 2009 and 2010.
- it becomes evident that supporting documents are missing, such as: FMM (*goods movement forms*), MRR (*material receiving report*), BL (*bill of lading*) or AirWayBill.
Please produce the invoice with adequate supporting documents
[1558] Deloitte ER, pdf p. 71; EDOCC, para. 173.
[1559] Ex. R-0444, Offshore, 58902829 Geodis Wilson USA, Inc, 20160523-Support Doc Inv 58902829_1.

C.    **Invoice 58902839**

1456. This invoice is dated April 25, 2016 and incorporates four invoices for insulation, which presented inconsistencies and lacked supporting documentation; more specifically[1560]:

- Invoice 37248281-SF: BL and FMM were missing; also the quantities recorded in the invoice were higher than the quantities established in purchase order no. 1029674 (FPO-INS048-INS049) and there was a difference between the unit prices established in purchase order no. 1029674 (FPO-INS048-INS049) and the unit prices registered in the invoice.

- Invoice 87039682-SE: the purchase order did not include freight;

- Invoice 37249506-SF: no FMM;

- Invoice 37249667-SF: no FMM.

1457. Reficar requested further input by CB&I, but none was provided[1561]. In this situation, the Tribunal sides with Reficar in that the rejection was correct.

**1.2.3. NOMADS**

1458. Deloitte analysed the invoices and found that CB&I provided adequate supporting documentation for the sum claimed of COP 28,256,049 in disputed costs and that Foster Wheeler approved these costs. Deloitte therefore accepts that this sum is due[1562].

1459. Since both Parties' experts agree, the Tribunal allows <u>COP 28,256,049</u> for Nomads.

**1.2.4. ADVANCE PAYMENT LOC FEE**

1460. The Tribunal has already found that that CB&I's reasonable invoiced costs related to the Advance Payment LoC amount to USD 846,669[1563]. This sum derives from the following invoices:

| Invoice no. | Period covered | Amount in USD |
|---|---|---|
| 58902977 | $2^{nd} - 4^{th}$ quarter 2016<br>1st quarter 2017 | 602,179.53 |

---

[1560] Ex. R-0444, Offshore, 58902839 Specialty Products and Insulation Company, 20160914-Obj Ltr Inv 58902839.
[1561] The Tribunal's findings are based on the information available in Ex. R-0444, containing all the invoices and underlying support and communications.
[1562] JER 10, Qualitative, Topic 22. Also, JER 10 Quantitative, Onshore Nomads Tab.
[1563] USD 602,180 + USD 244,489.

| 58903013 | 2nd quarter 2016 | (-150,211.81) |
| | 2nd and 4th quarter of 2017 | 394,701.38 |

1461. The Tribunal has looked into the documents supporting each invoice and finds them to be sufficient. There is ample material evidencing the amounts incurred by CB&I as costs for the maintenance of the advance payment letter of credit.

1462. In sum, CB&I is awarded USD 846,669[1564] for the invoiced costs of the advance payment letter of credit.

**1.2.5. CONCLUSION**

1463. In sum, the reasonable and proper, and properly substantiated unpaid invoices are amount to the following:

- Importations: USD 68,270[1565]

- Nomads: COP 28,256,049[1566]

- Advance Payment LoC Fee: USD 846,669[1567]

1464. In total, USD 914,939[1568] and COP 28,256,049[1569] constitute reasonable and proper costs, which have been duly invoiced with all supporting documents, and which Reficar is obliged to pay to CB&I.

1465. The detailed analysis of the invoices which actually remain unpaid, and the small amount which Reficar has been found to owe to CB&I, support the dismissal of CB&I's additional claim that, through withholding the payments for these invoices, Reficar had acted intentionally, maliciously, in an abuse of right or bad faith.

**2.    SET-OFF INVOICES**

1466. Some background information is needed to understand why Reficar performed a set-off of certain invoiced amounts.

1467. *Pro memoria*, towards 2014 the relationship between the Parties became so strained that CB&I threatened to abandon the Works[1570]. To alleviate the tensions, the

---

[1564] USD 602,179.53 + 394,701.38 - 150,211.81= USD 846,669.10.
[1565] See para. 1450 *supra*.
[1566] See para. 1459 *supra*.
[1567] See para. 1462 *supra*.
[1568] USD 68,270 (Importations) + USD 846,669 (advance letter of credit fees).
[1569] For Nomads.
[1570] Ex. C-1307: Suarez CWS, para. 350; Ex. R-1849_09749, fn 3 at p. 2: "Reficar's accusations regarding alleged "coercion" presumes [sic] that CB&I had a contractual responsibility to finance the Work. CB&I has no such responsibility"; see also RPHB, para. 571: "By the end of 2013, Reficar's non-payment of a significant backlog of invoices threatened to disrupt the timing and progress of the Project because CB&I could no longer bear the burden of financing the cost of the Work" and RPHB, para. 570: "Preventing CB&I from "walking off the project" is not a form of mitigating damages. CB&I had a right under Colombian law to stop the Work if it was not getting paid".

304

Parties signed two agreements on the payment of invoices: past invoices were subject to the MOA and future ones to the PIP[1571]. Payment of invoices by Reficar under these agreements would be made under a reservation of rights to later question whether the invoices were properly submitted. Additionally, Reficar reserved the right to set-off amounts for invoices provisionally paid and later contested, with those of later accepted invoices.

1468. This is exactly what happened: Reficar paid, but later challenged, invoices in an amount of USD 3.6 million and COP 125 billion, for alleged failure by CB&I to comply with the formal verification requirements, and so it set-off these amounts against properly submitted invoices.

Preliminary defenses

1469. The first issue to determine is whether this set-off was possible under the agreed terms. CB&I argues that Reficar was not entitled to make any set-offs because[1572]:

- Reficar failed to negotiate in good faith under the MOA and PIP (i.): and

- Reficar's president failed to participate in the meetings required under the PIP (ii.).

1470. (i.) Pursuant to the MOA, Reficar had an absolute right of set-off after a certain period had elapsed[1573]:

"7. Reficar shall have the right to offset any disputed amounts from CB&I's next invoice or against any other amount which may be owed to CB&I, in the following events: [...] (ii) if six (6) months have elapsed since the date of signature of this Agreement and disputes regarding Invoices still remain for whatever reason, unless the parties agree in writing to extend this six (6) months period".

[This six-month period was extended to 11 months under an amendment[1574]]

1471. Similar provisions, allowing Reficar to offset disputed amounts after the expiry of a period of time, may be found under the PIP[1575]:

5. "[...] REFICAR shall have the right to offset any disputed amount that remains unresolved after the expiry of the Seventy Five (75) Days, from CB&I's next invoice or against any other amount which may be owed to CB&I and pay remaining amounts".

1472. Under these agreements, the off-setting of invoices thus did not require a prior period of negotiations between the parties[1576]. And, in any event, the Tribunal has

---

[1571] ESOCC, para. 96; EDOCC, paras. 85 and 95.
[1572] ESOCC, paras. 97-101, 130-132
[1573] JX-009, pdf p. 3; JX-010, pdf p. 3.
[1574] JX-012, para. 3 at p. 1; JX-013, para. 3 at p. 1.
[1575] JX-014, pdf p. 2; JX-015, pdf p. 2.
[1576] These negotiations considered ongoing disputes between the Parties about a craft overhead charge, premiums for Project bonds and insurances and Island Park indirect charges, see para. 8 at JX-014, pdf p. 2; JX-015, pdf p. 2.

not seen evidence proving lack of good faith on Reficar's side when it set-off the invoices.

1473. (ii.) Under the PIP, there is a special regulation. In this agreement, Reficar's right to offset required the Parties to hold a preliminary meeting attended by duly empowered representatives, but, contrary to what CB&I now claims, the participation of Reficar's president was not mandatory[1577].

Reficar's set-off

1474. As a second step, the Tribunal must determine whether the set-off performed by Reficar was correct.

1475. CB&I says that the invoices in question (in an amount of USD 3.6 million and COP 125 billion) were improperly set-off by Reficar: these invoices were reasonable and proper and did comply with the formal verification requirements, and notwithstanding the above Reficar improperly used these invoices to set-off amounts owed under other invoices.

1476. Is there evidence in the file proving CB&I's averment?

1477. CB&I has presented four schedules regarding the set-off invoices, described as follows[1578]:

- invoices that were incorrectly offset under the Onshore Contract are identified in Schedule 7;

- invoices that were offset under the Onshore Contract are identified in Schedule 8;

- MOA invoices from which cross-contract payments were offset are identified in Schedule 9;

- Onshore PIP and Invoicing and Payment Procedure invoices from which the cross-contract offsets were taken are identified in Schedule 10.

1478. The Schedules produced by CB&I simply enumerate the invoices which allegedly were improperly offset – but there is no discussion about the reasonableness, propriety and correct verification of each of the invoices.

1479. Reficar, on the other hand, has produced evidence to the contrary: it has drawn the Tribunal's attention to a list of paid invoices[1579], which CB&I in due course failed to substantiate, entitling Reficar to use these payments to offset subsequent invoices submitted by CB&I[1580].

1480. Summing up, the evidentiary situation is the following: CB&I has produced lists of invoices which allegedly were wrongly used as set-offs; so has Reficar, which relies

[1577] PIP, para. 7, JX-014, pdf. P. 2; JX-015, pdf p. 2.
[1578] Wright Updated ER.
[1579] Rejected Invoice Spreadsheet (June 2019), Exhibit C-1762 (filter Column D by "MOA CB" option).
[1580] EDOCC, para. 105.

306

on its own list of paid invoices which CB&I allegedly failed to substantiate. CB&I, the claimant in this counterclaim, bears the burden of proof. It has failed to prove that the invoices under discussion (in an amount of USD 3.6 million and COP 125 billion) were reasonable and proper, did comply with the formal verification requirements and consequently could not be used to offset subsequent invoices. CB&I's counterclaim regarding set-off invoices is dismissed.

## 3. DRAW-DOWN ON THE PERFORMANCE LoC

1481. According to Section II, TC 75.2.1 of the Contract, CB&I delivered to Reficar a performance letter of credit ["**Performance LoC**"] in an amount of USD 70 million.

1482. In 2015 Reficar attempted to draw on the Performance LoC, but CB&I sought a temporary restraining order before the United States Federal District Court of Oregon, enjoining Reficar from drawing on it. The District Judge dismissed CB&I's petition. On March 9, 2016 Reficar drew down on this LoC, under the assumption that CB&I had failed to perform one or more of its duties under the Contract[1581].

1483. CB&I now claims that Reficar misappropriated USD 70 million under the LoC in bad faith and in violation of the Parties' agreement[1582], since it failed to specify CB&I's failure to perform its work and to provide CB&I with an opportunity to cure[1583]. CB&I relies on the DRA, which requires Reficar to identify a specific dispute, controversy or claim[1584].

1484. Reficar counters that it was not obligated to establish liability to draw on the Performance LoC; not under the Contract, not under New York (and Colombian) law, where letters of credit are governed by an independence principle – and so the bank does not have to police the underlying dispute[1585].

The Parties' claims

1485. The requests are the following:

- CB&I requests a declaration that it has no liability to Reficar under the Performance LoC[1586] (i.);

- Both Parties ask for a finding by the Tribunal on whether Reficar's draw-down was proper and on whether Reficar has an obligation to return the USD 70 million collected[1587]; CB&I submits an ancillary request, claiming the costs and expenses incurred because of Reficar's improper draw-down[1588] (ii.).

---

[1581] CPHB, para. 517.
[1582] ESOCC, para. 114.
[1583] ESOCC, para. 115.
[1584] Respondents' Reply on Counterclaim, para. 154.
[1585] EDOCC, para. 344.
[1586] CB&I's Requests for Relief 5. and 24. under the ESOD.
[1587] Reficar's Request for Relief 16. under the CPHB, CB&I's Requests for Relief 25 under the ESOD and 4 under the RPHB.
[1588] CB&I's Request for Relief 4. under the RPHB.

1486. (i.) The first request for relief is inapposite: Reficar has drawn-down the LoC in full, with the necessary consequence that CB&I has no further liability to Reficar under the Performance LoC.

1487. (ii.) These claims would only be relevant had the Tribunal decided that CB&I was not in breach of its contractual obligations or that the compensation owed to Reficar was less than USD 70 million. In that scenario, it would now be incumbent on the Tribunal to determine whether Reficar's draw on the LoC had or not been proper.

1488. But the Tribunal has found that CB&I indeed breached its Cost Control Commitments, and that Reficar is entitled to a compensation for such breach which exceeds USD 70 million. Consequently, there can be no discussion that Reficar's decision to draw down was proper.

1489. A different question is the relevance of the USD 70 million already cashed by Reficar. When the Tribunal establishes the settlement of accounts between the Parties, these USD 70 million will be taken into account (see Section VIII.2.3 *infra*).

## 4.    <u>DRAW-DOWN ON THE ADVANCE PAYMENT LOC</u>

1490. Apart from the Performance LoC, both Parties bring a number of requests for relief with regard to another letter of credit, serving as a bond for the advance payments made to CB&I by Reficar, the Advance Payment LoC[1589].

1491. The Tribunal will briefly summarise the underlying facts (**4.1.**), the Parties' positions (**4.2.**) and enter into a discussion (**4.3.**).

### 4.1.    FACTUAL BACKGROUND

1492. Under TC 75.3 of the Contract, the Parties agreed that CB&I would procure an unconditional and irrevocable on demand guarantee bond for amounts paid by Reficar "in advance of [CB&I] performing the obligations under [the EPC Contract]"[1590].

1493. The guaranteed amount was initially set at USD 25 million; in accordance with TC 75.3, this amount fluctuated over time, and is currently set at USD 95 million[1591].

1494. Similar to the Performance LoC, in 2016 Reficar attempted to draw upon the Advance Payment LoC[1592], but (upon CB&I's motion) Reficar was preliminarily enjoined from doing so by the United Stated District Court Southern District of New York[1593].

1495. The court then scheduled a hearing to decide on Reficar's right to draw upon the guarantee. The hearing was, however, never held, because the Parties reached an agreement: Reficar would withdraw its request for draw-down and defer further

---

[1589] CB&I's Requests for Relief "t.-w.", ESOD, para. 1612.
[1590] JX-002, p. 264; JX-004, p. 239.
[1591] Ex. R-0108, pdf p. 17.
[1592] Ex. C-1351.
[1593] Ex. R-0357.

attempts until the end of this arbitration[1594]; in exchange, CB&I agreed to extend the duration of the Advance Payment LoC, also until the end of the arbitration[1595].

## 4.2. THE PARTIES' POSITIONS

1496. The Parties now argue about Reficar's past and present entitlement to draw upon the Advance Payment LoC:

1497. CB&I claims that Reficar's prior attempt to draw upon the Advance Payment LoC was fraudulent, because Reficar requested the draw-down despite being fully aware that it was not entitled to collect those amounts[1596]. In addition, Reficar tried to draw down on the Advance Payment LoC in bad faith and in violation of Colombian law and the EPC Contract[1597]. Reficar's action also constituted an abuse of rights[1598].

1498. Reficar argues that the draw-down attempt it made in 2016 was fully compliant with the express terms of the Advance Payment LoC[1599]. In addition, this draw-down was preceded by extensive good faith negotiations with CB&I, which means that the attempt to draw upon the guarantee was not exercised in bad faith[1600]. More than USD 95 million in advance payments remain outstanding and thus Reficar says it is entitled to draw upon the Advance Payments LoC[1601].

1499. CB&I retorts that Reficar is not currently entitled to draw upon the Advance Payment LoC, as there are no longer any amounts covered by this guarantee[1602]. According to CB&I, the Advance Payment LoC only covered future Works, of which there are none currently; thus, Reficar is not in the position to draw upon the Advance Payment LoC[1603].

## 4.3. DISCUSSION

1500. The discussion centres around the scope of protection given to Reficar by the Advance Payment LoC: depending on the answer, the Tribunal will establish whether Reficar was, back in 2016, and currently is entitled to draw upon this guarantee.

## A.   Applicable law

1501. As an initial point, the Tribunal observes that the Advance Payment LoC specifies that it is[1604]

> "subject to and governed by the Laws of the State of New York and the Uniform Customs and Practice for Documentary Credits (2007 Revision)

---

[1594] Ex. R-0358, Section 3 at pp. 3-4.
[1595] Ex. R-0358, Section 2 at p. 3.
[1596] ESOCC, paras. 378-386; Respondents' Reply on Counterclaim, paras. 132, 148-152, 157-160.
[1597] ESOCC, paras. 382-383, 386.
[1598] ESOCC, para. 385.
[1599] EDOCC, paras. 353-356.
[1600] EDOCC, para. 358.
[1601] EDOCC, para. 352; CPHB; paras. 490-492.
[1602] ESOCC, para. 379.
[1603] ESOCC, paras. 361, 379.
[1604] Ex. R-0108, para. 10 at pdf p. 3.

> International Chamber of Commerce Publication No. 600 and in the event of
> any conflict, the Laws of the State of New York shall prevail",

and, as a consequence, any arguments regarding the Advance Payment LoC brought by CB&I under Colombian law are inapposite – with the exception of the obligation to deliver the guarantee under TC 75.3, which, being provided for in the Contract, is subject to Colombian law.

**B.    The definition of "advance payments"**

1502. The Tribunal will first look to two major sources to establish the meaning intended by the Parties behind the term "advance payments", and thus, by extension, the scope of Reficar's protection. The Tribunal will consider the text of the Advance Payment LoC (**a.**) and then the EPC Agreement (**b.**).

**a.    In the Advance Payment LoC**

1503. The Advance Payment LoC specifies that the only requirement for the beneficiary to draw upon the guarantee is the submission of the demand letter in accordance with the form attached to the text of the instrument[1605]:

> "Any Demand sent in accordance with paragraph 2 shall be effective upon receipt by the Bank and any Demand shall be conclusive evidence that the amount claimed is due to the Beneficiary under this Letter of Credit".

1504. This form needed to be followed word-for-word by Reficar, with the filling-in of the gaps; once Reficar submitted the duly completed form signed by an authorized representative, it would become entitled to the draw-down[1606]:

> "We hereby certify that:
>
> (a) we have made an advance payment of US$[ ] to the Applicants in accordance with the terms of the Contracts;
>
> (b) one of the Applicants has failed to perform one or more of its obligations under the Contracts;
>
> (c) accordingly, the amount of US$[ ] is due under the Contracts; and
>
> (d) the amount in (c) remains outstanding.
>
> Accordingly, we hereby demand payment under the Letter of Credit of an amount of US$[ ] […]".
>
> [This form was duly filled out and signed by Reficar's Mr. Reyes Reinoso when Reficar made its draw-down attempt in 2016[1607]].

---

[1605] Ex. R-0108, para. 4 at pdf p. 2; this reflects the text of the form Advance Payment LoC included in the Contract, see JX-002, p. 622; JX-004, p. 596.
[1606] Ex. R-0108, pdf p. 4; this reflects the text of the form Advance Payment LoC included in the Contract, see JX-002, p. 624; JX-004, p. 598.
[1607] Ex. C-1351.

1505. Under the text of the Advance Payment LoC the only requirement for draw-down is a declaration by Reficar that it has made an advance payment in accordance with the terms of the Contracts and that CB&I has breached one or more obligations under the Contract.

**b.**   **In the EPC Contract**

1506. The "advance payments" term is not a defined one under the EPC Agreement and it is only used in connection with the Advance Payment LoC.

1507. TC 75.3.1 enshrines CB&I's obligation to procure the Advance Payment LoC and Reficar's corresponding right to draw upon it[1608]:

> "75.3.1 The Contractor shall procure for the benefit of the Owner an approved, unconditional and irrevocable on demand Advance Payment Letter of Credit (in the form set out in Exhibit 11D) from a bank or financial institution which is rated not less than A (or its equivalent) for long-term unsecured debt by S&P or A2 (or its equivalent) for long-term unsecured debt by Moody's and which is reasonably acceptable to the Owner in an amount equal to twenty five million Dollars (US$25,000,000), which secures the money the Owner has paid to the Contractor in advance of the Contractor performing the obligations under this Agreement to which such money relates (the "Advance Payment Letter of Credit") [...]" [Emphasis added].

1508. Under the terms of the Contract, the Advance Payment LoC thus secures payments by Reficar

> "in advance of [CB&I] performing the obligations under [the EPC Agreement] to which such money relates".

1509. There are two categories of payments that exposed Reficar to credit risk vis-à-vis CB&I:

1510. (i) The first category appears to be undisputed by the Parties and concerns monthly advance payments for labour costs, defined as "**Anticipated/Forecast Labour Invoices**"[1609]:

> "6.1.2 As a minimum, the Contractor will have separate invoices for the following groups of reimbursable items:
>
> -  "Anticipated/Forecast" labour invoice for the current month" [Emphasis added].

1511. Given the sensitivity of labour issues, these Anticipated/Forecast Labour Invoices were issued a month in advance to ensure that CB&I would be able to cover the workers' fees in a timely manner. In the following month these Invoices would be reconciled with actual labour costs incurred by CB&I[1610].

---

[1608] Ex. R-0108, pdf p. 17.
[1609] EPC Agreement, Section IV, para. 6.1.2, JX-003, p. 11; JX-005, p. 9.
[1610] EPC Agreement, Section IV, para. 6.1.2, JX-003, p. 11; JX-005, p. 10.

1512. (ii) The second category is constituted by payments made by Reficar to CB&I, which can still be clawed-back by Reficar if the invoices were submitted by CB&I in breach of its Cost Control Commitments.

## C.    <u>Discussion</u>

1513. CB&I prefers a restrictive interpretation of the term "advance payment" and says that only the monthly labour-related payments, *i.e.,* the Anticipated/Forecast Labour Invoices, were covered by the Advance Payment LoC[1611]; Reficar's view, however, is that the term should be interpreted more broadly[1612].

1514. The Tribunal tends to agree with Reficar for the following two reasons:

1515. <u>First</u>, Reficar's interpretation is confirmed by the form of demand attached to the Contract, which only requires Reficar to declare that it has made an "advance payment".

1516. If the Parties' intention had been that the cover of the Advance Payment LoC be limited to Anticipated/Forecast Labour Invoices, they would have used this term in the instrument – not the wider concept of advance payments in general.

1517. <u>Second</u>, this broader interpretation is also confirmed by the provision of the EPC Agreement which requires that the Advance Payment LoC should be maintained until after the liquidation of the Contract[1613]:

> "75.3.2 The Contractor shall maintain the Advance Payment Letter of Credit in full force and effect until the date which is 28 (twenty-eight) Days after the date of the Liquidation of the Agreement or such earlier date as is agreed between the Parties".

1518. If, as CB&I argues, the Advance Payment LoC was only valid for Anticipated/Forecast Labour Invoices, then it would not have been necessary to continue maintaining this guarantee until the liquidation of the Contract, a step which would take substantively longer than the finalization of the Works themselves.

> [The EPC Agreement provides that it would be liquidated within three months, or a longer period if agreed, following the completion of all the Works or the termination of the Contract[1614]. In fact, the Tribunal will liquidate the Contract as part of the current award, years after the Works ended.]

1519. <u>Summing up</u>, the Tribunal finds that the Advance Payment LoC covered not only the Anticipated/Forecast Labour Invoices paid by Reficar, but also the total USD 5,908.2 million of invoices which Reficar paid, subject to the right of claw-back if CB&I had failed to comply with its Cost Control Commitments with regard to these invoices.

---

[1611] ESOCC, paras. 361-372; RPHB, para. 673.
[1612] EDOCC, paras. 352, 363-372; CPHB, paras. 490-492.
[1613] JX-002, p. 264; JX-004, p. 240.
[1614] TC 78.1, see JX-002, p. 267; JX-004, p. 242.

1520. In view of the above, Reficar was entitled to draw down the Advance Payment LoC when it attempted to do so in 2016 and remains fully entitled to repeat the draw-down after the conclusion of the arbitration. But any amounts Reficar recovers through this draw-down shall be deducted from CB&I's payment obligations as established in this Award.

1521. On a final note, CB&I requests the Tribunal to declare that Reficar acted in bad faith and fraudulently when it intended to draw-down the Advance Payment LoC in 2016: there cannot have been bad faith or any fraud in Reficar's actions as the Tribunal has found that it was and still is fully entitled to do so.

## 5.   CONCLUSIONS

1522. In summary, CB&I has brought five counterclaims:

1523. (i) CB&I requests USD 48,629,204 and COP 275,238,526,765[1615] for invoices which Reficar refused to pay, and a declaration that, through withholding the payments for these invoices, Reficar had acted intentionally, maliciously, in an abuse of right or bad faith.

1524. The Tribunal has decided that USD 914,939[1616] and COP 28,256,049[1617] constitute reasonable and proper costs, which have been duly invoiced with all supporting documents, and which Reficar is obliged to pay to CB&I; the Tribunal has also denied CB&I's request for a declaration that Reficar had acted intentionally, maliciously, in an abuse of right or bad faith.

1525. (ii) CB&I notes that Reficar settled invoices in an amount of USD 3,578,002 and COP 125,339,561,186[1618] by setting-off these amounts against previous invoices Reficar had already paid, but subsequently questioned its obligation to do so. CB&I requested payment of these off-set invoices.

1526. The Tribunal has dismissed this counterclaim.

1527. (iii) CB&I has also requested payment of USD 70 million, which Reficar drew on the Performance LoC and which, CB&I says, constituted an unlawful appropriation.

1528. The Tribunal has found this counterclaim to be moot, because, when establishing the final settlement of accounts between the Parties, the Tribunal will credit to CB&I the amount which Reficar has collected under the Performance LoC.

1529. (iv) Finally, CB&I has pleaded with the Tribunal to issue a declaration that Reficar is not entitled to draw upon the Advance Payment LoC. The Tribunal has sided with Reficar and found that Reficar is entitled to draw upon this guarantee; hence, CB&I's request for relief is dismissed.

---

[1615] See Table in para. 1371 *supra*.
[1616] USD 68,270 (Importations) + USD 846,669 (advance letter of credit fees).
[1617] For Nomads.
[1618] Table 1 at RPHB, para. 596.

## VII.2.3.    IMPROPER DELAY

1530. In addition to the Improper EPC costs claim, Reficar brings a claim for *daño emergente* caused by the delay suffered in the Project. Reficar is claiming a total of USD 896.79 million[1619] in delay-related damages.

1531. Some of these claims – EPC labour escalation and EPC prolongation – have already been addressed in the improper EPC costs claim and cannot be scrutinised again to avoid double-recovery. This leaves

- claims for Owner's delay costs ["**Improper Delay Claim**"][1620], which will be addressed in this section, and

- claims for improper PCS delay costs[1621], which will be addressed separately under Section VIII.3.

[In addition to these claims for *daño emergente*, Reficar brings a number of delay-related claims for *lucro cesante* in a total amount of USD 1,124.13 million[1622]; these will be addressed separately under the *lucro cesante* Section VIII.3.]

1532. The Improper Delay Claim, for USD 165.35 million, which the Tribunal will adjudicate in this Section, is ultimately a modest claim in comparison to the Improper EPC costs claim; however, the amount of evidence on the record for this claim is exponential. The Tribunal will deal with this item in the most expeditious manner possible: after a brief introduction (**1.**), followed by a description of the relevant facts (**2.**) the Tribunal will relate the Parties' positions (**3.**) and enter into a discussion, first analysing the Contract provisions and thereafter apportioning delay on the basis of each Party's responsibility (**4.**).

## 1.    INTRODUCTION

1533. Under the Contract, TC 7.3 provides that[1623]

"In consideration of payment by the Owner, the Contractor shall, subject to the provisions of this Agreement and in accordance with the Scope of Work, carry out and complete all the Work in accordance with this Agreement and shall:

[…] 7.3.2 regularly and diligently proceed with the Work to achieve Mechanical Completion by the Guaranteed Completion Date […]".

---

[1619] CPHB, para. 158: the total of Reficar's delay-related claims actually amounts to USD 1,189.15 million, comprising claims for EPC Labor Escalation (USD 42.68 million), EPC Prolongation (USD 688.76 million), Owner's Delay Costs (USD 165.35 million), PCS Delay Costs (USD 109.88 million), Cost of Capital on Improper Costs (USD 182.48 million)
The Tribunal, however, will consider Cost of Capital and PCS Delay Costs claims separately.
[1620] CPHB, para. 158; communication C-175.
[1621] CPHB, para. 158; communication C-175.
[1622] CPHB, para. 159. The Tribunal notes that the Cost of Capital claim for delay damages in the amount of USD 182.48 million listed under the *daño emergente* category under CPHB, para. 158, is in fact a claim for *lucro cesante* and will thus be addressed separately.
[1623] JX-002, p. 179; JX-004, pp. 164-165.

1534. Under TC 1.1, the "Guaranteed Completion Date" was defined to mean "28 February 2013, or such revised date as may be fixed pursuant to TC 62"[1624] and "Mechanical Completion" was defined as having "the meaning given to it in Section III, Appendix I Schedule 3, excluding the performance of [Unit 002][1625] Post Turnaround Work"[1626].

1535. TC 1.1 also defined "Delay Liquidated Damages" to mean "liquidated damages for delay in achieving Mechanical Completion by the Guaranteed Completion Date, as specified in TC 54.8"[1627].

1536. In sum: CB&I assumed the obligations

-   to achieve Mechanical Completion by the Guaranteed Completion Date of February 28, 2013, and

-   to pay Delay Liquidated Damages for each day of delay in achieving Mechanical Completion by the Guaranteed Completion Date.

## 2.    FACTS

1537. The detailed factual incidents relevant to Reficar's delay claim will be reviewed when performing the window analysis for ascertaining responsibility. As a brief introduction, however, certain key facts must already be established.

1538. The Parties do not contest that the Project experienced a multitude of delays: Mechanical Completion was scheduled in the Contract for February 28, 2013 (the Guaranteed Mechanical Completion Date); but it is undisputed that this milestone was not achieved until 2015 – both Parties accept that there was a delay of at least two years.

1539. There are three main points of discussion:

1540. First, what was the precise date in 2015 when Mechanical Completion was reached:

-   CB&I says it happened on February 23, 2015, when Reficar signed the final subsystem completion certificate for the Project[1628]; while

-   Reficar maintains that this occurred on November 17, 2015, when the last major construction item for the final unit on the Project was cleared[1629].

1541. Second, the Parties have identified several causes of delay[1630]:

---

[1624] JX-002, p. 166; JX-004, p. 152.
[1625] Pursuant to TC 1, "'[Unit 002] Post Turnaround Work' means the activities included in the Scope of Work as being required i) to demolish the FCC unit and associated systems which form part of the Existing Refinery and ii) to leave the relevant area in the condition"; the Tribunal considers this to be inapplicable as CB&I was ultimately not required to demolish Unit 002 but instead to refurbish it. required by the Owner.
[1626] JX-002, p. 168; JX-004, p.153.
[1627] JX-002, p. 164; JX-004, p. 149.
[1628] RPHB, paras. 178-184.
[1629] CPHB, paras. 134, citing to LI ER, para. 37; Reply, para. 854.
[1630] See LI ER, Appendix 7K; Secretariat ER, Section 4.

- Initial design changes to the Project, including the Synergy Changes;

- The purchase of an alkylation Unit from another refinery project ["**Big West**"];

- The discovery and removal of contaminated soils;

- Delays in procurement, especially structural steel fabrication;

- A shutdown of Unit 002; and

- Labour disruptions,

but have divergent opinions regarding the responsibility for these causes.

1542. Third, the Parties discuss whether Reficar had agreed to certain time extensions.

1543. The relevant evidence includes CB&I's monthly reports, which repeatedly postponed the Mechanical Completion Date:

- In the December 2011 monthly report coetaneous to the Representation Letter, CB&I foresaw Mechanical Completion on September 19, 2013, *i.e.,* 203 days after the Guaranteed Mechanical Completion Date[1631];

- Two years later, the September 2013 Report provided a much later estimate for the Mechanical Completion Date: May 12, 2015[1632].

1544. Among other crucial documents invoked by the Parties are two purported Change Orders, which were never signed by both Parties:

- A Change Order discussed in late 2012, envisaging mechanical completion on November 25, 2013;

- A Change Order presented by CB&I in June 2014 seeking an extension of the deadline from February 28, 2013 to May 12, 2015.

## 3.    THE PARTIES' POSITIONS

1545. Reficar claims that CB&I grossly failed to manage the Project Schedule, a failure which caused it to never achieve Mechanical Completion[1633]; or, alternatively, to only achieve Mechanical Completion on November 17, 2015, when the last major construction item for the final unit on the Project was cleared [1634].

---

[1631] Ex. C-0088, p. 4: "The late deliveries of Substations, Isometric Production, Pipe Fabrication, and Tank Farm Modifications have pushed the Mechanical Completion of the Project to 19 September 2013".
[1632] Ex. C-0109, p. 20.
[1633] ESOC, para. 467.
[1634] CPHB, paras. 134-135, citing to LI ER, para. 37.

1546. Out of the 992 days of alleged delay[1635], Reficar concedes that there were 231 days of delay for which there was either Reficar's[1636] or joint responsibility[1637], with the result that CB&I was solely responsible for causing 662 days of delay.

1547. But even for the delay for which CB&I was not solely responsible, CB&I cannot benefit from any purported extension to the Mechanical Completion date stipulated in the EPC Contract (February 28, 2013), because CB&I recklessly disregarded the strict procedure for extending the Guaranteed Completion Date under the EPC Contract[1638].

CB&I's position

1548. CB&I says, as a first argument, that there was no delay at all in the Project Schedule as:

- Reficar tacitly accepted an extended Guaranteed Mechanical Completion Date of May 12, 2015, communicated in the monthly report for September 2013[1639] and in CB&I's September 2013 Schedule update[1640], and

- Mechanical Completion was achieved on February 23, 2015, three months ahead of this extended Guaranteed Mechanical Completion Date[1641].

1549. Subsidiarily, in its view, Mechanical Completion was achieved on February 23, 2015, the day when Reficar signed the subsystem completion certificate for Unit 002, the last unit on the Project[1642]. The delay of the Project would, thus, be set at 725 days[1643]. CB&I further denies responsibility for any of these 725 days of delay.

## 4. DISCUSSION

1550. The Tribunal will first analyse CB&I's obligations to control the Project Schedule (**4.1**) and the Contract provisions regarding the completion of the Project (**4.2**); the Tribunal will later attribute responsibility for delays to the critical path on the basis of a window analysis using both Parties' expert reports (**4.3**) and reach a conclusion on the number of days of delay that CB&I was responsible for and the resulting harm to Reficar (**4.4**).

### 4.1. SCHEDULE CONTROL COMMITMENTS

---

[1635] CPHB, para. 153.
[1636] Reficar says it was solely responsible for 99 days of delay and that both Parties were responsible for 132 days of delay, see CPHB, para. 151.
[1637] CPHB, paras. 135, 151.
[1638] CPHB, paras. 136-141.
[1639] Ex. R-1855_102, p. 21.
[1640] RPHB, para. 211, citing to Ex.C-0513, pdf p. 11 (actual citation to p. 20 appears to be a mistake both source page and pdf page-wise); ESOD, para. 1063, citing to Ex. R-1395 at p. 43 and para. 1215, citing to R-0264.
[1641] RPHB, paras. 172, 176.
[1642] RPHB, paras. 178-184; ESOD, para. 1028.
[1643] Secretariat ER, paras. 4.3.63 at pdf p. 204 and 4.6.2 at pdf p. 265.

1551. The Tribunal has previously established that the EPC Contract contains Cost Control Commitments, which obligated CB&I:

- To act with heightened diligence when incurring costs;

- To only incur costs that were proper and reasonable and in accordance with the Contract; and

- Though the Contract was of cost-reimbursable nature, to treat the costs as if the Contract were signed on a lump sum remuneration basis.

1552. The EPC Contract also contains provisions with regard to CB&I's control of the Project Schedule [previously defined as the "**Schedule Control Commitments**"]; these provisions impose a heightened duty on CB&I:

- First, CB&I undertakes to achieve a specific result: Mechanical Completion of the Project by the Guaranteed Mechanical Completion Date (i);

- Additionally, CB&I also assumes an obligation of diligence: to use its best efforts in controlling the Schedule, as if the Project were CB&I's own (ii).

1553. There is a marked difference between the agreed contractual regime for the control of costs and the control of schedule: while the Cost Control Commitments create a duty of diligence, the Schedule Control Commitments imply an obligation of result: CB&I undertook to achieve Mechanical Completion by an agreed date.

1554. (i) CB&I assumed an obligation of result to achieve Mechanical Completion of all Units[1644] by the Guaranteed Mechanical Completion Date (both terms analysed in the subsequent subsections) – otherwise, it would incur Delay Liquidated Damages for each day of delay in accordance with TC 54.8[1645]:

> "[i]f the Contractor fails to achieve Mechanical Completion of all of the Units by the Guaranteed Completion Date, the Contractor shall be liable to pay Delay Liquidated Damages for each Day from the Day immediately following the Guaranteed Completion Date up to and including the date Mechanical Completion of all of the Units is achieved [...]".

1555. (ii) Additionally, TC 7.3 of the Contract provides that CB&I should proceed with the Works regularly and diligently[1646]

> "[...] the Contractor shall, subject to the provisions of this Agreement and in accordance with the Scope of Work, carry out and complete all the Work in accordance with this Agreement and shall:
>
> 7.3.2 regularly and diligently proceed with the Work to achieve Mechanical Completion by the Guaranteed Completion Date [...]".

---

[1644] With the exception of Unit 002, which could be delivered 104 days afterwards pursuant to TC 54.8.1A, JX-002, p. 226; JX-004, p. 203.
[1645] JX-002, p. 226; JX-004, p. 203.
[1646] JX-002, p. 179; JX-004, pp. 164-165.

1556. TC 51.1 contains a similar provision obligating CB&I to perform Works in accordance with the Project Schedule[1647]:

> "51.1 The Contractor shall undertake all Work in accordance with the Schedule. The Contractor shall be responsible for promptness of execution of the various parts of the Work and shall employ at all times a sufficient number of personnel skilled and experienced in their lines of work and a sufficient organization and equipment so that completion of the Work shall not be delayed and the Work shall be completed in accordance with the Schedule […]".

1557. This general obligation is reflected in the Project Execution Plan, in the same provision which formalizes the Heightened Diligence Obligation, and which specifically applies not only to cost but also to schedule control[1648]:

> "Even though a reimbursable contract CB&I project management will rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own" [Emphasis added].

## 4.2. MECHANICAL COMPLETION

1558. The Parties agreed under the EPC Contract that the Guaranteed Mechanical Completion Date was February 28, 2013[1649]. Mechanical Completion is defined as the state of a part of the Refinery when it is ready for PCS Works.

1559. The Parties have quantified the delay as the difference between the Guaranteed Mechanical Completion Date and the actual Mechanical Completion, and arrived at different results, because:

- First, CB&I is of the view that Reficar agreed to a postponement of the Guaranteed Mechanical Completion Date (**4.2.1.**);

- Second, the Parties have divergent opinions on when Mechanical Completion was achieved (**4.2.2.**)

### 4.2.1. POSTPONEMENT OF THE GUARANTEED MECHANICAL COMPLETION DATE

1560. The Tribunal must first ascertain whether the original Guaranteed Mechanical Completion Date February 28, 2013 is still applicable, or if, as pleaded by CB&I, such date was properly extended by the Parties.

1561. The salient provision for extending the Guaranteed Mechanical Completion Date is TC 54 on hindrances and delays, which specifies the causes of delay which entitle the Contractor to seek an extension (such as interferences by the Owner, orders to suspend the Work or effects of force majeure)[1650]:

---

[1647] JX-002, p. 222; JX-004, p. 199.
[1648] JX-002, p. 654; JX-004, p. 628.
[1649] TC 1 Definitions; JX-002, p. 166; JX-004, p. 152.
[1650] TC 54.4.1, JX-002, pp. 224-225; JX-004, pp. 201-202.

"54.4.1 Subject to the other provisions of this TC54, the Contractor shall only be entitled to request an extension of time to the Guaranteed Completion Date where any of the following events impact the critical path of the Work as shown in the then current Schedule and as a result the achievement of Mechanical Completion of all of the Units is delayed:

(i) any act of prevention, interference, default or breach by any Owner Group member;

(ii) Not used;

(iii) an order to suspend the Work pursuant to TC66, except to the extent that such order is caused due to the Contractor's failure to duly perform its obligations under this Agreement;

(iv) the effect of an Event of Force Majeure;

(v) a cause of delay expressly entitling the Contractor to give a "Written Notice to the Owner in accordance with TC54.2 requesting an extension of time to the Guaranteed Completion Date" under any other TC of this Agreement;

(vi) not used;

(vii) suspension by the Contractor under TC65.13 due to the Owner's failure to pay undisputed invoiced amounts;

(viii) not used; and

(ix) any error, discrepancy or change in any Rely Upon Information".

1562. In order for an extension to be effective, CB&I had to comply with certain formalistic requirements:

1563. (i) CB&I had to adhere to rigid timelines, with an initial notification made within 14 days of becoming aware, or when reasonably expected to have become aware, of a delay event[1651] and a further, more detailed notification, to be filed within the following 14 days[1652].

1564. For delay events of continuing effect, CB&I was entitled to a modified procedure: first submitting within the same deadline of 14 days a notice, and after a further 14 days, instead of a detailed statement, to notify Reficar, with further interim notices given every 28 days – until it could provide a final notice with sufficient detail and fulfilling the substantive requirements[1653].

1565. (ii) The notice had to meet a formal requirement: it needed to specify the TC which CB&I was invoking[1654].

---

[1651] TC 54.2.1, JX-002, p. 224; JX-004, p. 201.
[1652] TC 54.2.2, JX-002, p. 224; JX-004, p. 201.
[1653] TC 54.3, JX-002, p. 224; JX-004, p. 201.
[1654] TC 54.2.2, JX-002, p. 224; JX-004, p. 201.

1566. The Tribunal notes that the Parties have, throughout the Project, frequently acted without adhering to the formal requirements under the EPC Agreement, displaying their intention to only place limited importance on such requirements[1655]. In view of this practice, Reficar cannot rely on the lack of formality of the notification to claim that it was not properly informed of the delayed date of Mechanical Completion; especially given Reficar's participation in schedule reforecast exercises and in monthly meetings with CB&I in which the date of Mechanical Completion was routinely discussed[1656].

1567. (iii) The notice also had to meet certain substantive requirements: information on the material circumstances of the delay event, the nature and extent of the delay, the corrective actions undertaken, the effect on the critical path and the requested extension to the Guaranteed Mechanical Completion Date[1657].

1568. TC 54.7 is clear as to the effects of a failure by CB&I to follow the above steps:

- First, a failure to follow the notice requirements results in the lack of extension to the Guaranteed Mechanical Completion Date, and

- Second, such failure, if not remedied within seven days of the time periods for notification, would automatically constitute prejudice to Reficar.

1569. CB&I claims that it is entitled to time extension, by way of any of the following three mechanisms: the Delay Change Order (**A.**), the Monthly Schedule Updates (**B.**) or the Owner's Change Order (**C.**).

## A.    Delay Change Order

1570. On June 10, 2014, <u>over a year after the Guaranteed Completion Date in the Contract</u>, CB&I requested an extension to the Guaranteed Completion Date from February 28, 2013 to May 12, 2015, *i.e.*, <u>a single deferral of 803 days</u> [the "**Delay Change Order**"][1658]. The Parties make extensive arguments about this Change Order[1659].

1571. The reasons for the extension requested in the Delay Change Order are threefold[1660]:

- Expanded development scope of Unit 002, with a specific reference to the decision made by Reficar in <u>March 2010</u>,

---

[1655] For example, the Tribunal has analysed the WNOCs rejected by Reficar and granted some of the underlying amounts as Excluded Costs regardless of whether said WNOCs fulfilled the formal requirements, see Section VII.2.1.3.3.2.B.b *supra*. The Tribunal will also find that the formal step of issuing a Certificate at Unit level was not necessary for Mechanical Completion, see para. 1614 *infra*.
[1656] See e.g., Ex. R-0068; Ex. R-1813.
[1657] TC 54.2.2, JX-002, p. 224; JX-004, p. 201.
[1658] Change Order 222; Ex. C-0354, pp. 3-4.
[1659] The Tribunal is aware of other Change Orders which determined an impact to the Project Schedule, such as Change Order 425, see JX-425; however, Reficar rejected the time impacts for those Change Orders because CB&I failed to comply with the requirements of TC 54, see JX-426, referencing Ex. R-1849_13203.
The Tribunal also accepts the testimony given under oath by Mr. Warhoe, who said that CB&I never submitted a timely Change Order based on the notice requirements of TC 54, see Tr. 4572:12-4573:22.
[1660] Ex. C-0354, p. 4.

ICC Case 21747 RD/MK/PDP
Final Award

- Deletion of MECOR's scope of work, with a specific reference to CB&I's notification of the change in <u>January 2012</u>, and

- Purchase of recycled alkylation Unit, around <u>2010</u>, as found by the Tribunal in its analysis of scope changes to the Project under Section VII.2.1.3.3.2.A.c.

1572. CB&I relies on the Delay Change Order to maintain that the Guaranteed Completion Date was pushed forward to May 12, 2015.

1573. Reficar denies this; it never accepted the Delay Change Order[1661], nor could it, as the Delay Change Order did not comply with the contractual requirements for a valid time extension:

- The Delay Change Order was not submitted in a timely manner, in fact, it was submitted not two weeks but <u>two years</u> after the last of the referenced delay events; furthermore, there is no information that the Delay Change Order was submitted under the modified procedure for extended delay events;

- The Delay Change Order does not comply with the substantive requirements, as it does not contain sufficient detail; in fact, the argumentation is limited to a single page, and it does not determine the impacts on the critical path of the Project[1662].

1574. The Tribunal sides with Reficar: without Reficar's acceptance, the Delay Change Order cannot be invoked by CB&I as support for the allegation that an extension of the Guaranteed Mechanical Completion Date had been agreed.

**B.    <u>Monthly Schedule Updates and Schedule Reforecasts</u>**

1575. CB&I argues that Reficar continuously agreed to extensions to the Mechanical Completion Date by tacitly accepting CB&I's Monthly Schedule Updates and Schedule Reforecasts throughout the Project[1663].

1576. CB&I's argument does not hold ground when confronted with the text of TC 54.7, which unambiguously states that CB&I could only be entitled to any extension of the Guaranteed Completion Date if it followed the requirements of TC 54[1664]:

"54.7 Failure to Comply

In the event that the Contractor fails to submit any of the notices required under this TC54 within the time periods required and such failure prejudices the Owner, the Contractor shall have no entitlement to any extension of time unless the Owner in its absolute discretion agrees otherwise. In the event that the Contractor fails to submit any of the notices required under this TC54

---

[1661] Ex. C-0354, p. 4.
[1662] The document states at Ex. C-0354, p. 3 that "[t]his change order affects the critical path of the Project" but this broad statement is insufficient to fulfil the requirement of determining the impacts on the critical path.
[1663] RPHB, paras. 172, 176; ESOD, paras. 1260, 1262.
[1664] JX-002, pp. 225-226; JX-004, p. 202.

322

within seven (7) Days of the time periods required, such failure shall automatically constitute prejudice to the Owner".

1577. The only exception to this general rule was if Reficar "in its absolute discretion agree[d] otherwise" – something which the fact record proves Reficar never did.

## C.   Owner's Change Order

1578. CB&I avers that Reficar acknowledged that a six-month extension to the Guaranteed Mechanical Completion Date was appropriate when in early 2013[1665] it issued an Owner's Change Order granting such extension based on Reficar's discretionary power to do so[1666].

1579. The facts prove otherwise.

1580. In the Owner's Change Order referenced by CB&I, Reficar only <u>offered</u> to extend the Guaranteed Mechanical Completion Date within negotiations between the Parties undertaken in 2012 and early 2013. The negotiations ended without any agreement, CB&I rejected the Owner's Change Order[1667] and, thus, the extension to the Guaranteed Mechanical Completion Date offered by Reficar in the course of negotiations never came into effect.

\* \* \*

1581. The Tribunal, thus, finds that the Guaranteed Completion Date is the original Contract date of <u>February 28, 2013</u>.

### 4.2.2. ACTUAL MECHANICAL COMPLETION

1582. Having established the Guaranteed Mechanical Completion Date, the Tribunal needs to consider the separate issue of when Mechanical Completion took place.

1583. Reficar's expert, Long International, says that the ultimate Mechanical Completion date was November 17, 2015; thus, there was a delay of <u>992 days</u> from February 28, 2013.[1668] CB&I's expert, Secretariat, maintains that Mechanical Completion was achieved when the final Subsystem Mechanical Completion Certificate was signed by Reficar on February 23, 2015[1669]. This gives <u>725 days</u> of delay[1670].

1584. The decision on the date of Mechanical Completion is of crucial importance, because the difference in the experts' opinions amounts to 267 days of delay – almost nine months.

1585. In determining the date of Mechanical Completion, the Tribunal will look to two major sources: the EPC Contract (**A.**) and the Certifications and Completions

---

[1665] Ex. R-1849_13173, pp. 2-3.
[1666] ESOD, para.1252, citing to Ex. R-1849_13173 and ESOC, para. 486.
[1667] See Ex. C-0102, p. 1: "While we appreciate Reficar's decision to extend the Guaranteed Completion Date, the time extension and additional costs provided by RCSA/001 does not sufficiently reflect the agreements reached during our recent schedule and cost alignment discussions".
[1668] Table 7.8-1, LI ER.
[1669] Secretariat ER, para 2.5.13, and Ex. R-2576 referring to Unit 002.
[1670] Secretariat ER, para. 2.6.36.

Procedure (**B.**) and on its basis make a decision (**C.**), finalizing with Reficar's counterarguments (**D.**)

## A.    <u>Contract definition</u>

1586. As previously referenced, under TC 1.1, the "Mechanical Completion" is defined as having

> "the meaning given to it in Section III, Appendix I Schedule 3, excluding the performance of the FCC Post Turnaround Work".

1587. The definition in Section III, Appendix I Schedule 3 at Section 3.1.1 says as follows[1671]:

> "MECHANICAL COMPLETION
>
> 3.1.1 Mechanical Completion is defined as meaning [except for minor items of work that would not affect the pre-commissioning/commissioning of the Plant]. (i) all materials and equipment for the Plant have been installed substantially in accordance with the plans, specifications, and checked for alignment and rotation, [hydrostatic or pneumatic pressure integrity]; (ii) all systems required to be installed and tested by Contractor have been installed and tested; (iii) the facility or the remainder of the Plant, as applicable, has been checked to permit commissioning; (iv) the equipment and systems have been installed in a manner that does not void any equipment or system warranties (vendor's, licensor's, and third parties; (v) the facility or the remainder of the Plant, as applicable, is ready to commence pre-commissioning/commissioning, testing, and operations; and (vi) a punch list of the uncompleted items is established and mutually agreed upon by RCSA and Contractor. Mechanical Completion can be accomplished in incremental steps, the sum total of which shall constitute Mechanical Completion of the Plant. For the avoidance of doubt, further definition of Mechanical Completion is provided in the attached Division of Responsibilities Matrices for each discipline" [Insertions in brackets in original].

1588. In sum, Mechanical Completion requires:

- First, that all systems in a certain facility have been installed and tested by CB&I and the facility has been cleared for PCS work to begin; in this context, the term facility used in the Contract includes both Subsystems and Units;

- Second, all materials and equipment have been installed "substantially" in accordance with the plans and specifications;

- Third, Mechanical Completion could be accomplished in steps, facility by facility, and once all facilities had reached that status, Mechanical Completion of the Refinery would have been achieved;

- Fourth, Mechanical Completion only requires that the work in the facility is "substantially" complete; any remaining uncompleted minor works or

---

[1671] JX-006, p. 573.

deviations would be recorded in a punchlist[1672], agreed by the Parties, and CB&I would finalize these items in due course.

The Punchlists

1589. The Contract defines a "**Punchlist**" as:[1673]

> "the list of <u>minor items or incomplete work</u> that is agreed between the Parties <u>to be completed after Mechanical Completion, none of which will impact the ability of the Owner to own, utilize and operate the relevant Work in a safe manner</u> in accordance with all guidelines from Lower Tier Subcontractors, Vendors and the Contractor". [Emphasis added]

1590. A Punchlist is, thus, a list of works still not finished in a facility which is handed over as mechanically complete; these remaining works can only be of a minor nature and cannot affect the safe operation of the facility. A facility can achieve Mechanical Completion even if it is not fully complete, as long as it is safe and ready for PCS works to begin.

Final Completion

1591. There is a term in the Contract that *prima facie* looks similar to Mechanical Completion, but which has a different meaning. "**Final Completion**" designates another milestone in the Project, subsequent to Mechanical Completion; the Contract uses the term for the date when[1674]

- the entire Work has attained Mechanical Completion,

- all work has been completed (including the performance of all items identified in the Punchlists), and

- the requisite documentation has been delivered by CB&I to Reficar.

1592. Final Completion is not the relevant date for calculating delay; it is only relevant for other matters, including payment of the final tranche of the Contractor's Fixed Fee[1675].

1593. The definition is helpful, however, for reinforcing that even after the entire Refinery achieved Mechanical Completion, there would still be pending works; thus, again, "substantial" (but not final) completion and readiness for PCS Works are sufficient for achieving Mechanical Completion.

**B.    Certifications and Completions Procedure**

1594. The language in the Contract specifies that CB&I was to develop and issue for Reficar's approval a "systems turnover procedure one year before the Mechanical

---

[1672] The Tribunal notes that the record contains variations of the term: "Punch List", "Punchlist", "punch list", "punchlist" but that all of these terms have the same meaning.
[1673] TC 1 Definitions, JX-002, p. 169; JX-004, p. 155.
[1674] TC 1 Definitions, JX-002, p. 165, JX-004, p. 150.
[1675] TC 54.8.8, JX-002, p. 227; JX-004, p. 204.

Completion date"[1676], which CB&I first did in July 2011; the document was later revised multiple times [the "**Certifications and Completions Procedure**" or "**CCProcedure**"][1677].

1595. The Tribunal will first address the provisions on completions (**a.**), and later the ones on certifications (**b.**).

**a.    Procedure for establishing Mechanical Completion**

1596. The CCProcedure builds upon the Contract definition of Mechanical Completion, specifying three steps required for each Unit or Subsystem to be considered mechanically complete[1678]:

1597. (i) An **"A" Check Sheet** was used to establish that equipment, piping, and instrumentation had been properly constructed, installed, inspected, tested and documented. The signing by Reficar of the "A" Check Sheet meant that 100% of the major items on a Unit or Subsystem were complete[1679].

1598. (ii) A Punchlist of outstanding items had to be agreed. The CCProcedure provides four different categories of Punchlist items, with the most relevant being **Category "A" Punchlist** items, which affect the safety of a system and necessarily must be completed before PCS Works could start[1680]. Thus, Mechanical Completion of a Unit or Subsystem could not be achieved with any outstanding Category "A" Punchlist item.

1599. (iii) CB&I had to issue a notice ["**Walkdown Notice**"], and thereafter the Parties, together with Foster Wheeler, had to perform a walkdown inspection of the Unit or Subsystem [the "**Walkdown**"].

1600. In sum, for Mechanical Completion of a Unit or Subsystem to be achieved, three conditions, enumerated at para. 13.3 of the CCProcedure, had been complied with[1681]:

-    All "A" Check Sheet items completed;

-    No outstanding Category "A" Punchlist items, and

-    Walkdown had been completed.

Deviation Rules

1601. By late 2013, and in view of the accumulated delay, Reficar decided to accelerate the final stages of the Project, by permitting overlap between the EPC Contract,

---

[1676] Section III, Appendix I Schedule 3 at Section 3.2.3; JX-006, p. 576.
[1677] Ex. C-0350, p. 1.
[1678] Ex. C-0350, para. 10.1 at pdf p. 22; also see Figure 10b – Sub-System Construction Completion Flow at p. 24.
[1679] Ex. C-0350, para. 10.4 at p. 22, para. 12.5.3 at p. 29 and para. 13.3 at p. 33.
[1680] Ex. C-0350, para. 9.6 at p. 19.
[1681] Ex. C-350, para. 13.3 at p. 33.

which was being performed by CB&I, and the subsequent PCS Works – which was to be carried out by other contractors designated by Reficar.

1602. The procedure originally delineated under the CCProcedure was modified by the Parties through a set of guidelines of very high level [the "**Deviation Rules**"][1682], agreed at a meeting between Reficar and CB&I[1683].

1603. The main difference introduced by the Deviation Rules was that, for Mechanical Completion to be achieved, certain deviations from the three major prerequisites were allowed.

1604. Thus, for the Walkdown Notice to be issued[1684]:

-   Certain check sheets were <u>no longer required</u>[1685], others <u>only needed to be 75% complete</u>[1686], and others still only <u>needed be 50% complete</u>[1687], and

-   Category <u>"A" Punchlist items no longer needed to be complete</u>; instead, a deadline for completion by CB&I after Mechanical Completion was sufficient[1688].

1605. As a result of these modifications, Mechanical Completion could be achieved much quicker than originally intended, PCS Works could also start earlier and commercial production by the Refinery would be accelerated.

**b.    Procedure for the certification of Subsystems and Units**

1606. The CCProcedure provides for two main levels of Mechanical Completion[1689]:

-   Subsystem Mechanical Completion, which would be achieved once a Subsystem had reached Mechanical Completion and Reficar had signed the corresponding Certificate[1690];

-   Unit Mechanical Completion, which would be achieved once all Subsystems of a Unit had achieved Mechanical Completion and Reficar had signed the Certificate for that Unit

---

[1682] Ex. C-0127.
[1683] The closest document to an agreement by the Parties on this issue is the minutes of a meeting of September 4, 2014, during which CB&I and Reficar employees discussed the procedure for walk-downs that would precede the release of SMCCs by CB&I and their signing by Reficar's representatives whenever a sub-system was ready for pre-commissioning, the first step of PCS; see Ex. R-2638. This was confirmed at the Hearing by Mr. Benavides, see Tr. 2252:13-2253:23.
[1684] Ex. C-0127, p. 1.
[1685] Ex. C-0127, p. 1: "Painting (X) and Insulation (Q) check sheets are not required".
[1686] Ex. C-0127, p. 1: "Piping (P) and Mechanical (M) discipline check sheets must each be 75% complete or greater for that sub-system".
[1687] Ex. C-0127, p. 1: "Electrical (E), Instrument (I), and Telecom (T) discipline check sheets must each be 50% complete or greater for that sub-system".
[1688] Ex. C-0127, p. 2.
[1689] Ex. C-0350, p. 33.
[1690] The Tribunal notes that there was also the possibility to achieve Mechanical Completion at the discipline level, but this level of Mechanical Completion is not relevant for the discussion.

1607. The following diagram shows the relationship between the two levels of Mechanical Completion[1691]:

**Unit Mechanical Completion Hierarchy**



1608. As soon as all Certificates at the Subsystem level of a certain Unit had been signed, Reficar was obliged to sign the Certificate for that Unit, as confirmed by the CCProcedure[1692]:

> "This Certificate is issued for a unit upon receipt of all SMCCs for each subsystem within the unit".

1609. In other words: once Reficar had signed all the Subsystem Certificates for a given Unit, it could not, on a discretionary basis, refuse to sign the Certificate for the entire Unit.

Transfer of care, custody and control

1610. The CCProcedure says that the signing of the

> "[C]ertificate transfers ownership of the sub-system/unit from the construction team to the commissioning team".

1611. Ownership in this context may be understood as care, custody and control; thus, as soon as Reficar signed the Certificate at Unit or Subsystem level, it took over that part to start PCS Works; this is in line with TC 35.2, which states that [1693]:

> "35.2 Whenever any portion or system of the Work achieves Mechanical Completion the Owner or its designee may, by Written Notice to the Contractor, take custody and care of and operate in a commercial fashion such Work as a "Turnover System" prior to Final Completion […]".

1612. That the signing of a Certificate by Reficar meant the transfer of custody (and, impliedly, also care and control) is also confirmed by the minutes of a meeting of November 2013[1694]:

| Item | Description of Discussion | Action By | Complete By |
|------|--------------------------|-----------|-------------|

---

[1691] Ex. C-0350, p. 34. The DMCC in the diagram stands for Discipline Mechanical Completion Certificate, a level below the SMCC, which is not relevant to the discussion.
[1692] Ex. C-350, p. 33.
[1693] JX-002, p. 210; JX-004, p. 189.
[1694] Ex. R-2639, p. 2

| 2.14 | Care Custody Control – Once the Walk-Down has been done and the DMCC/SMCC has been signed, the client takes custody of it. All subsequent work to be carried out on that sub-system will be carried out under the Reficar Commissioning Permit to Work system. | INFO | |

1613. The transfer of custody, care and control reinforces the Tribunal's finding that the signing of a Certificate (at Unit or Subsystem level) by Reficar constituted the moment of Mechanical Completion of the corresponding Unit or Subsystem.

## C.    **Decision**

1614. It is crucial to accurately establish when Mechanical Completion actually occurred:

-    Reficar says that the Project Mechanical Completion Date was November 17, 2015, when the last "A" Check Sheet was signed; thus, there was a delay of 992 days from February 28, 2013[1695], and

-    CB&I says that Mechanical Completion was achieved when the final Certificate at the Subsystem level was signed by Reficar on February 23, 2015[1696]: this gave 725 days of delay.

1615. Both positions are dictated by differing interpretations of the EPC Contract, the CCProcedure and the Deviation Rules by the Parties, rather than calculations performed by the Parties' delay experts – who only looked at the responsibility for delays in different periods rather than the total length of delay.

    Discussion

1616. The Tribunal sides with CB&I.

1617. Reficar's argument is not grounded on the Parties' agreements – neither the Contract nor the CCProcedure nor the Deviation Rules establish Reficar's signature of the final "A" Check Sheet as the moment of Mechanical Completion – this requirement only was relevant under the Parties' initial agreement, but it was superseded by the Deviation Rules.

1618. Under the CCProcedure, Mechanical Completion could not be achieved if there were any outstanding:

-    "A" Check Sheet items (construction elements crucial for completion), or

-    Category "A" Punchlist items (major identified defects).

1619. The Deviation Rules, however, lowered the requirements:

-    certain check sheet items were no longer required, with completion at only 50% or 75% being accepted for certain disciplines, with no exception for "A" Check Sheets;

---

[1695] CPHB, paras. 134-135, citing to LI ER, para. 37.
[1696] RPHB, paras. 178-184; ESOD, para. 1028.

    -    Category "A" Punchlist items were specifically allowed to remain uncleared for Mechanical Completion; those items would later be completed within a deadline set for CB&I.

1620. Once CB&I had achieved sufficient completion, what was left was the certification process (which remained unchanged by the Deviation Rules): after the issuance of a Walkdown Notice, both Parties would together inspect the works, culminating in Reficar signing the appropriate Certificate, whenever it was satisfied that the Unit or Subsystem inspected fulfilled the completion requirements under the Deviation Rules.

1621. It is a proven fact that, by February 23, 2015, Reficar had signed the Certificates of all Subsystems which constitute the Project[1697]. At that time, Reficar had, however, failed to sign certain Certificates at Unit level (Reficar postponed signing of the last Certificate at Unit level until 2016).

1622. Was Reficar's failure to sign certain Certificates at Unit level, although the totality of Certificates at Subsystem level had been signed, sufficient to impede Mechanical Completion of the Project?

1623. As previously found by the Tribunal, the issuance of a Certificate at Unit level was a mere formality, once the Certificates pertaining to the totality of Subsystems constituting that Unit had been signed. The necessary consequence is that Mechanical Completion of the Project was achieved on February 23, 2015.

* * *

1624. <u>Thus</u>, CB&I achieved Mechanical Completion of the Project in its totality when the final Certificate at Subsystem level was signed by Reficar, on <u>February 23, 2015</u>.

## D.    **Reficar's counterarguments**

1625. Reficar makes five counterarguments that, in its opinion, prove that Mechanical Completion occurred only on November 17, 2015, all of which will be dismissed by the Tribunal.

<u>First counterargument</u>

1626. Reficar argues that in the Deviation Rules the Parties agreed that CB&I would first achieve "partial mechanical completion" and then "final mechanical completion"[1698]. According to Reficar, PCS works by Reficar's contractors could commence as soon as "partial mechanical completion" was achieved; the date of Mechanical Completion relevant for calculating delay would only be the "final mechanical completion"[1699].

1627. Reficar also tries to introduce the concept of Partial Unit Mechanical Completion Certificates[1700] – proof, according to Reficar, that only final mechanical completion

---

[1697] Ex. R-0118; Ex. R-1442, p. 4.
[1698] CPHB, para. 395; ESOC, para. 138, citing to the Deviation Rules.
[1699] LI ER, Appendix 7N, para. 10.
[1700] CPHB, para. 395; ESOC, para. 138.

ICC Case 21747 RD/MK/PDP
Final Award

could constitute Mechanical Completion under the EPC Contract. According to Reficar, the introduction of these Certificates was agreed in the Deviation Rules[1701].

1628. The Tribunal disagrees.

1629. First, Reficar cannot blow hot and cold at the same time: on the one hand, it wanted to accelerate the signing of Certificates, to allow its PCS contractors to immediately begin PCS Works, but on the other hand it now says that the signing of the Certificates only constituted "partial" Mechanical Completion, because some works were still pending.

1630. Second, the Tribunal has studied the Deviation Rules and has not found a single reference to "partial" completion.

1631. The term "partial mechanical completion" is used almost exclusively in Reficar's communications to CB&I[1702]. It is true that certain monthly reports prepared by CB&I also use the terms "Partial Completion" and "Final MC"[1703], but these reports only reflected CB&I's views, and did not constitute a mutually agreed source of obligations between the Parties, that could have modified the EPC Contract and the CCProcedure.

1632. Third, the document referenced by Reficar as a Partial Unit Mechanical Completion Certificate is likewise an ordinary Certificate of completion at the Unit level, with no mention of the word "partial"[1704]:

| CBI | Refineria De Cartagena | 166000 | reficar |
|---|---|---|---|
| **UMCC** | **UNIT MECHANICAL COMPLETION CERTIFICATE** | | |
| Certificate No: | UMCC-1-044 | | |
| Unit No: | 044 | | |
| Unit Description: | HF Alkylation Complex | | |
| Date UMCC Raised: | 9-Feb-2015 | | |

1633. On a final note, the Tribunal agrees with Reficar that Mechanical Completion did not mean the end of CB&I's Works on the Project; this is confirmed by the deadlines set for the completion of outstanding "A" Check Sheet and Category "A" Punchlist items. These obligations have no bearing on Mechanical Completion, however, and will be addressed separately under the Section VII.2.3 *infra* on Reficar's Work Completion claims.

---

[1701] ESOC, para. 471.

[1702] See *e.g.*, Ex. C-0357, p. 1,

[1703] ESOC, para. 139, citing to Ex. C-0128, p. 26.

[1704] Ex. C-0357, pdf p. 3.

Second counterargument

1634. Reficar argues that under the EPC Agreement, the CCProcedure, industry standards and common sense, a Unit could not achieve Mechanical Completion with "A" Punchlist items open because of safety reasons[1705].

1635. Reficar cites to the testimony of Mr. Benavides, who testified at the Hearing that "Reficar's intention was never to take custody and control of subsystems", because the issuance of permits and safety reasons allegedly required custody and control to be taken over on a Unit rather than a Subsystem level[1706].

1636. The Tribunal is unconvinced.

1637. First, as regards Reficar's safety-related arguments, industry standards must give way to Reficar's conscious decision to accept as mechanically complete Subsystems which still had pending items that impacted safety.

1638. Second, Mr. Benavides's testimony that Mechanical Completion could only be achieved on a Unit-by-Unit basis, is contradicted by the CCProcedure, which specifically allows for Mechanical Completion to be achieved at the Subsystem level.

Third counterargument

1639. Reficar also argues that Certificates at the Subsystem level were not sufficient to transfer care, custody and control[1707].

1640. This argument is a *non-sequitur*: under the Contract the transfer of care, custody and control of Subsystems is not a requirement, but rather a consequence of Mechanical Completion.

1641. In any event, Reficar's argument is contradicted by the wording of the CCProcedure, which refers to "Certificate", including both Certificates at the Subsystem and the Unit level:

> "This certificate transfers ownership of the sub-system/unit from the construction team to the commissioning team".

1642. That the signing of a Certificate by Reficar meant the transfer of custody (and, impliedly, also care and control) is also confirmed by the minutes of a meeting of November 2013[1708]:

| 2.14 | Care Custody Control – Once the Walk-Down has been done and the DMCC/SMCC has been signed, the client takes custody of it. All subsequent work to be carried out on that sub-system will be carried out under the Reficar Commissioning Permit to Work system. | INFO | |
|---|---|---|---|

1643. Reficar also cites to contemporaneous communications to prove that even after the signing of the Certificates, CB&I retained control of certain Units, *e.g.* through

---

[1705] Reply, para. 856.
[1706] Tr. 2256:13-2257:17.
[1707] CPHB2, responding to RPHB, paras. 172, 181-182; pdf p. 12.
[1708] Ex. R-2639, p. 2

ICC Case 21747 RD/MK/PDP
Final Award

controlling access to them[1709]. But the issue of controlling <u>access</u> to certain Units is not relevant to the discussion on when Mechanical Completion occurred. Correction of Punchlist items after Mechanical Completion would in any case require that CB&I had access to the Unit in question.

Fourth counterargument

1644. Reficar also avers that the minutes of a meeting between CB&I and Reficar from September 4, 2014, prove that signing of the Certificates by Reficar only meant that the Subsystems were ready for "pre-commissioning" but not for the other parts of PCS – commissioning and start-up[1710].

1645. Reficar's argument is another *non-sequitur*.

1646. Pre-commissioning is the first activity under "PCS"; the fact that the meeting minutes do not explicitly mention commissioning or start-up is irrelevant, since these activities are done sequentially; when Reficar accepted a Subsystem for the first activity, it accepted it for all subsequent PCS Work[1711].

Fifth counterargument

1647. Reficar finally argues that for Mechanical Completion to be achieved, CB&I needed to submit certain documents in a bundle called the "Mechanical Completion Package"; CB&I allegedly failed to do so prior to February 23, 2015[1712].

1648. The Tribunal notes that the submission of the documentation package was only required for the achievement of Final Completion, rather than for Mechanical Completion – two distinct concepts under the EPC Contract[1713].

1649. In any case, when Reficar signed the Certificate for each Subsystem, it specifically confirmed that "the supporting documentation [was] accepted"[1714]:

The above Sub-System has been completed along with all necessary tests and inspections, and a full joint punch has been undertaken. The applicable Punch Lists are attached.
The submitted Sub-System has been subjected to audit by Pre-Commissioning and the supporting documentation and Certification accepted.
The undersigned are approved representatives of the specified companies and departments per the completions authorized signature matrix (166000-000-GE-CP02-0002).

| | CB&I CONSTRUCTION | CB&I QA/QC | REFICAR CONSTRUCTION | REFICAR PRE-COMMISSIONING |
|---|---|---|---|---|
| SIGNATURE | ✓ *illegible* | | | Mech Completion |
| PRINT NAME | ✓ Mathis | | A GARCIA | R Benavides |
| DATE | 23 December | 23/12/14 | 29-12-2014 | 30-Dic-14 |

* * *

---

[1709] R-1851_071_00033.
[1710] CPHB2, responding to RPHB, paras. 172, 181-182; pdf p. 12, citing to Ex. R-2638.
[1711] Ex. R-2638 refers to Punchlist items as "PLs".
[1712] ESOC, paras. 463-464.
[1713] See paras. 1591-1592 *supra*.
[1714] See by way of example Ex. R-1851_146_01654.

333

1650. <u>As a result</u>, the Tribunal upholds its finding that the Mechanical Completion of the Project was achieved on <u>February 23, 2015</u>.

### 4.3. ANALYSIS OF PARTY RESPONSIBILITY FOR DELAY

1651. The Tribunal will now make an analysis of the Project Schedule (**4.3.2.-4.3.5.**) applying a methodology derived from the reports prepared by both Parties' experts (**4.3.1.**).

### 4.3.1. METHODOLOGY

1652. There are two preliminary questions regarding the delay for which CB&I is responsible:

- first, whether CB&I should be held liable for the entirety of the Project delays (**A.**) and

- second, if the answer to the first question is in the negative, how to establish each Party's responsibility (**B.**).

### A. <u>Is CB&I responsible for the totality of delay?</u>

1653. To establish overall delay in the Project Schedule, the Tribunal must calculate the difference in days between

- the Guaranteed Mechanical Completion Date (found to be February 28, 2013 under subsection **4.1.2.** *supra*), and

- the date of Mechanical Completion (found to be February 23, 2015 under subsection **4.1.3.** *supra*),

arriving at a total delay of <u>725 days</u>[1715].

1654. The Tribunal has found in Section **4.2.1.** *supra* that CB&I was bound by an obligation of result to achieve Mechanical Completion by the Guaranteed Mechanical Completion Date.

1655. The Tribunal has previously[1716] also found that in cases of breach of contractual obligations, Art. 1604 of the CCC[1717] creates a presumption of negligence against the defaulting party; thus, the finding of 725 days of delay is sufficient to establish that CB&I *prima facie* breached its obligation of result.

---

[1715] This number will be subject to minor fluctuations on the basis of the analysis of detailed delay events in the subsequent subsections.
[1716] See paras. 807-815 *supra*.
[1717] CL-709; English translation:
"ARTICLE 1604. DEBTOR'S LIABILITY.
[…] The burden of proof of diligence or care lies with the party who should have used it; proving an Act of God is the burden of the party who alleges it.
All of which, however, is without prejudice to the special provisions of the laws, and to the express provisions of the parties.".

1656. The question now arises: should CB&I be held liable for the entirety of the delay?

1657. Strictly applying the first leg of CB&I's Schedule Control Commitments, the Tribunal could forego an analysis of attributing the responsibility for each of the specific delays on the Project and simply award to Reficar damages for all 725 days of delay. Such a solution would be reinforced by the Tribunal's finding in subsection **4.1.2** *supra* that CB&I never complied with the formal requirements under the EPC Contract to obtain an extension to the Guaranteed Mechanical Completion Date.

1658. The Tribunal, having considered this alternative in detail, finds that a strict attribution of all delay to CB&I, regardless of its cause, would be contrary to the Parties' intentions, as formalized in the Contract.

1659. First, TC 54.4 entitles CB&I to request an extension to the Guaranteed Mechanical Completion Date for "any act of prevention, interference, default or breach by any Owner Group member"[1718]. The Contract foresees the possibility of delay caused by the conduct of the Owner, and sanctions such conduct by extending the Guaranteed Mechanical Completion Date to the benefit of the Contractor.

1660. Second, the fact that CB&I was bound not only by an obligation of result, but simultaneously by one of best efforts, proves that the Parties did not intend to penalise CB&I for those delays for which Reficar was solely responsible; otherwise, the strict obligation of result would have sufficed; the additional obligations must be read in accordance with the *effet utile* principle, allowing CB&I some margin for those days of delay when, despite its best efforts, it bore no responsibility.

1661. This is consistent with the approach of both Parties' experts, both of whom assign responsibility to each Party for each of the delays, rather than simply attributing the sum of days solely to one or the other Party.

1662. On a final note, the Tribunal has only established CB&I's *prima facie* negligence in managing the Schedule; thus, CB&I must be granted the opportunity to disprove this preliminary finding.

1663. Summing up, when calculating the delay CB&I is responsible for, the Tribunal will take into account Reficar's responsibility for certain days of delay, and not consider the totality of delay as having arisen due to CB&I's negligence.

**B.    How to establish each Party's responsibility for the delay?**

1664. Having established that CB&I will not be held accountable for delays caused by Reficar, the Tribunal must now establish a method for attributing delay to either Party.

The Experts' approach

1665. Long International ["**LI**"] and Secretariat adopt a different approach.

---

[1718] TC 54.4 (i), JX-002, p. 225, JX-004, pp. 201-202.

ICC Case 21747 RD/MK/PDP
Final Award

1666. LI used a "windows" or time slice approach to assess delays and improvements to the Project schedule in incremental periods of time, assuming that the critical path is dynamic and may change as delays occur during the execution of a project. LI took a discrete slice of time on the project and identified and evaluated delays and improvements that occurred during that period[1719]. It used schedules produced during the Project, but made adjustments under a schedule validation protocol[1720].

1667. LI's conclusions are set out in their March 2019 report as follows:

**Table 7.8-1**
**Summary Table of EPC Project Windows and Delays**

| Window No. | Window Dates | Length of Window on Longest Path (CD) | Relevant Unit on Longest Path | Foremost Project MC Date | Total Delay Days (CD) | Compensable Days Reficar Receiver[1] (CD) | Compensable Days CB&I Receiver[2] (CD) | Concurrent Delay | CB&I's EOT Entitlement[3] (CD) | CB&I's EOT Entitlement[4] (CD) |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

ICC Case 21747 RD/MK/PDP
Final Award

    a. Unit 002 – the Fluid Catalytic Cracking (FCC) Revamp Unit;

    b. Unit 044 – the Hydrofluoric (HF) Alkylation Unit;

    c. Unit 100 – the Integrated Crude and Vacuum Unit;

    d. Unit 110 – the Hydrocracker Unit;

    e. Unit 111 – the Delayed Coking Unit; and,

    f. Unit 146 – the Tank Farm

1670. All of these units were late and these six units were the last to be completed, with Units 002 and 044 being the very last units to be finalized.

1671. A summary of Secretariat's conclusions for the last Unit, Unit 002, is as follows:

| Window | Critical Work in Window | Unit 002 Summary of Delay Table — Causes of Delay | Delay in Window (days) | Cumulative Delay (days) |
|---|---|---|---|---|
| Window 1: 15 June 2010 to 18 April 2012 | Delayed Pre-TAR work, namely construction of the pipe racks | • **Removal of Contaminated Soils:** Unidentified contaminated soils impacted the pre-TAR civil works and contractually required Reficar's removal.<br>• **USO Led Labor Disruptions:** Throughout nearly the entire Project, employee labor disruptions (mainly from Colombia's oil industry union – USO, which consisted of many Ecopetrol employees) impacted CB&I's schedule work in the form of labor disputes, pulled work permits, delays in signing permits, harassment of non-union workforce and vandalism.<br>• **ASER Steelwork Fabrication Delays:** ASER (a Reficar preferred steel fabricator) proved incapable of fabricating the necessary structural steel and meeting the delivery dates required for the pre-TAR pipe rack erection activities.<br>• **Excessive Rainfall and Flooding:** Throughout 2010 and 2011 Cartagena received unexpected and excessive rainfall, leading to refinery-wide flooding and work stoppages that Reficar later considered a force majeure event. | 89 | 89 |
| | A longer than planned TAR period | • **Removal of Contaminated Soils:** Unidentified contaminated soils impacted the TAR civil works and contractually required Reficar's removal.<br>• **USO Led Labor Disruptions:** Continued labor unrest (mainly from Colombia's oil industry union – USO, which consisted of many Ecopetrol employees) impacted CB&I's schedule work in the form of labor disputes, pulled work permits, delays in signing permits, harassment of non-union workforce, and vandalism.<br>• **Changes to the Scope and Timing of the TAR:** Due to several overlapping causes of delay leading to and during the TAR, the scope of the pre-TAR work was reduced, and the start of the TAR was delayed from March 2011 until January 2012. This resulted in disruptions, delays, increased costs, and additional risk in the execution of CB&I's work.<br>• **Ecopetrol Crane Accident:** An Ecopetrol crane accident occurred on 20 February 2012 restricting work for 8 days during the Turnaround period. | 23 | 112 |

| Window | Critical Work in Window | Unit 002 Summary of Delay Table — Causes of Delay | Delay in Window (days) | Cumulative Delay (days) |
|---|---|---|---|---|
| Window 2: 18 April 2012 to 15 May 2013 | Delayed Civil works in the Reactor / Regenerator area | • **Removal of Contaminated Soils:** Unidentified contaminated soils which impacted the start of civil works in the RX/RG area and contractually required Reficar's removal<br>• **Late Issuance / Approval of Information for TC-36000 Crane:** Limited and late information provided to CB&I impacted the mobilization of the Deep South TC-36000 crane, which was the largest crane utilized on the Project and had a limited availability window to perform critical heavy lifts | 62 | 174 |
| | Delayed Civil works in the Flue Gas / Turboexpander area | • **Slow Progress of the Piling Works:** Slow progress of the piling works relative to the planned progress rate formed by Reficar's imposed productivity assumptions and the adverse environment of the Project during this period (i.e. labor unrest, unidentified contaminated soils, increased piling quantities, etc).<br>• **Increased Quantities:** Increased piling quantities stemming from an unfinalized FEED and related scope and design changes. | 68 | 242 |
| Window 3: 15 May 2013 to 1 February 2014 | Delayed Steel work installation in the FG/TEX area | • **USO Labor Strikes & Related Disruptions:** Continued labor unrest (mainly from Colombia's oil industry union – USO, which consisted of many Ecopetrol employees) impacted CB&I's schedule work in the form of labor disputes, pulled work permits, delays in signing permits, harassment of non-union workforce, and vandalism.<br>• **Explosions in the FCC Unit:** Starting in late August 2013, no work was performed until late October 2013 (or approximately 6 weeks) as a result of multiple explosions in the FCC unit.<br>• **Increased Quantities:** Increased structural steelwork quantities stemming from an unfinalized FEED and related scope and design changes. | 171 | 413 |

ICC Case 21747 RD/MK/PDP
Final Award

| Window | Critical Work in Window | Unit 002 Summary of Delay Table Cause of Delay | Delay in Window (days) | Cumulative Delay (days) |
|---|---|---|---|---|
| Window 4: 1 February 2014 To 23 February 2015 | Slow Progress of Piping in the RX/RG FG/TEX area | • **Decline in Productivity:** Decline in piping productivity relative to the planned progress rate due to the adverse environment of the Project during this period (i.e. labor unrest, lack of skilled laborers, contract expirations, etc).<br>• **USO Labor Strikes & Related Disruptions:** Continued labor unrest (mainly from Colombia's oil industry union – USO, which consisted of many Ecopetrol employees) impacted CB&I's schedule work in the form of labor disputes, pulled work permits, delays in signing permits, harassment of non-union workforce, and vandalism.<br>• **Lack of Skilled Labor:** CB&I faced a lack of skilled labor on the Project due to the limited supply in the local market and Colombia. CB&I attempted to supplement the craft labor with laborers from nearby countries (or OCNs), however Reficar often limited or rejected CB&I's hiring efforts as it preferred to exhaust the local labor pools and train them to perform the highly specialized skillsets such as welding and pipefitting.<br>• **Expiration of Labor Contracts (including 4th Term):** Despite CB&I's request for Reficar to renew fixed-term employment contracts, including fourth-term contracts which would require a minimum one year extension; Reficar preferred CB&I proceed with terminations and recruit new laborers. Additionally, CB&I was instructed to prioritize contracts for Colombian workers over foreign nationals (or OCNs), who often lacked the necessary specialized skillset needed to perform works towards the end of the Project.<br>• **Increased Quantities:** Increased piping quantities stemming from an unfinalized FEED and related scope and design changes. | 228 | 641 |
| | Slow Progress of E&I work in the RX/RG and FG/TEX area | • **Decline in Productivity:** Decline in E&I productivity relative to the planned progress rate due to the adverse environment of the Project during this period (i.e. labor unrest, lack of skilled laborers, contract expirations, etc).<br>• **USO Labor Strikes & Related Disruptions:** Continued labor unrest (mainly from Colombia's oil industry union – USO, which consisted of many Ecopetrol employees) impacted CB&I's schedule work in the form of labor disputes, pulled work permits, delays in signing permits, harassment of non-union workforce, and vandalism.<br>• **Lack of Skilled Labor:** CB&I continued to face a lack of skilled labor on the Project due to the limited supply in the local market and Colombia. CB&I attempted to supplement the craft labor with laborers from nearby countries (or OCNs), however Reficar often limited or rejected CB&I's hiring efforts as it preferred to exhaust the local labor pools and train them to perform the highly specialized skillsets such as welding and pipefitting.<br>• **Expiration of Labor Contracts (including 4th Term):** Despite CB&I's request for Reficar to renew fixed-term employment contracts, including fourth-term contracts which would require a minimum one year extension; Reficar preferred CB&I proceed with terminations and recruit new laborers. Additionally, CB&I was instructed to prioritize contracts for Colombian workers over foreign nationals (or OCNs), who often lacked the necessary specialized skillset needed to perform works towards the end of the Project.<br>• **Increased Quantities:** Increased E&I quantities stemming from an unfinalized FEED and related scope and design changes. | 84 | 725 |

Criticism by the Parties

1672. Reficar argues that the analysis of delay by CB&I's expert is untrustworthy, as it is based on the "as-planned versus as-built" methodology, which is not appropriate for long and complex projects such as the Refinery modernisation and expansion[1722]. Reficar adds that the results of the analysis are unreliable because CB&I's expert[1723]:

- failed to establish the critical path for each of the analysed windows, and

- rejected CB&I's monthly schedule updates as the basis for the calculations.

1673. CB&I, on the other hand, argues that the delay analysis performed by Reficar's expert is unreliable, because it attributes all delay for which it cannot establish the cause solely to CB&I[1724]; additionally, the expert's analysis is flawed due to Reficar's biased instructions, such as to attribute all labour-relations-related delays fully to CB&I[1725], and finally because the expert's analysis is limited to[1726]

- As-planned information in CB&I's schedule forecasts rather than an analysis of actual delays, and

---

[1722] CPHB, para. 146.
[1723] CPHB, paras. 146-150.
[1724] RPHB, para. 221.
[1725] RPHB, para. 210.
[1726] RPHB, paras. 189, 196-201.

- The single activity on the longest path in the schedule at the end of a delay window rather than all activities.

<u>Discussion</u>

1674. As a starting point, not all delays are equal: delays affecting the "critical path" are especially relevant. While there is no Contract definition, the term still plays a major role in the Parties' schedule obligations: under TCs 26.1.3[1727] and 54.4[1728], only events impacting the critical path could lead to an extension of the Guaranteed Mechanical Completion Date.

1675. The AACE, recognised by both Parties as an authority in the engineering and construction disciplines, defines the critical path as[1729]

"[…] <u>the longest logical path through the [critical path method] network [which] consists of those activities that determine the shortest time for project completion.</u> Activities within this or [sic] list form a series (or sequence) of logically connected activities that is called the critical path. A delay to the start or completion of any activity in this critical path results in a delay to project completion, assuming that this path consists of a continuous sequence of activities without an overriding date constraint or multiple calendars" [Emphasis added].

1676. As a result, the Tribunal's analysis of delays will be limited to those activities which impacted the critical path, or the longest path that affected completion of the Project and thus caused a postponement of the Mechanical Completion Date.

1677. The Parties' delay experts have used different methodologies to assess the responsibilities for delay to be imputed to Reficar and CB&I – and arrive at markedly different conclusions.

1678. Whilst there are criticisms which can be made of the use of one method of analysis rather than another, the Tribunal will consider the results of the analyses by LI and Secretariat to see whether it is necessary to amend the methodology:

- The analysis by LI looks, in any window, at the predicted delay to Mechanical Completion based on CB&I's schedules at that date; there is an issue as to whether those schedules were accurate or suppressed details at the request of Reficar;

---

[1727] JX-002, p. 202, JX-004, p. 185:
"[…] If there is any delay in the entry, by the Owner, into a Purchase Offer of the kind referred to in this TC26.1.3, and such delay is not attributable to the Owner or does not affect the critical path of the Work there shall be no change to the Guaranteed Completion Date. If there is any delay in the entry, by the Owner, into a Purchase Offer of the kind referred to in this TC26.1.3, and such delay is attributable to the Owner and does affect the critical path of the Work, the Contractor shall be entitled give a Written Notice to the Owner in accordance with TC54.2 requesting an extension of time to the Guaranteed Completion Date."
[1728] JX-002, p. 224, JX-004, p. 201:
"Subject to the other provisions of this TC54, the Contractor shall only be entitled to request an extension of time to the Guaranteed Completion Date where any of the following events impact the critical path of the Work as shown in the then current Schedule and as a result the achievement of Mechanical Completion of all of the Units is delayed: […]"
[1729] LI ER, Pub. Art. Exh. LI-014, pdf p. 3.

339

-    Secretariat's analysis starts with the October 2010 Schedule and calculates actual delay by reference to that programme rather than an updated programme.

1679. Secretariat's analysis focuses on actual contemporaneous delay, while LI's analysis relies on projections, and consequently the Tribunal will in general first follow the more convincing approach by Secretariat, and adjust it using LI's analysis, whenever appropriate[1730].

1680. The Tribunal will focus its analysis on those activities which constituted the critical path. And for these activities it is indeed possible to make a direct comparison of delay using the two methods which the delay experts have used:

-    In LI's analysis, the critical path for Window 4 (May 21, 2011) through Window 15.3 (April 23, 2015) passes through Units 146, 044 or 002[1731];

-    Secretariat's analysis agrees that Units 146, 044, and 002 lie on the critical path[1732].

1681. The Window calculation is not a strict science. The Tribunal has broken down the actual duration of the Works into four periods that best reflect major milestones on the Project:

-    Period 1 from June 15, 2010 to February 24, 2012 – the signing of the Contract until the Cut-Off Date[1733] (**4.3.2**);

-    Period 2 from February 25, 2012 to May 15, 2013 – the Cut-Off Date until May 15, 2013 (**4.3.3**);

-    Period 3 from May 15, 2013 to February 1, 2014 (**4.3.4**); and

-    Period 4 from February 1, 2014 to February 23, 2015 (**4.3.5**).

1682. It is thus possible to make a direct comparison of delay, taking into account the two methodologies proposed by the experts, notwithstanding the fact that the Tribunal's division of Periods does not exactly correspond to the Windows used by either of the experts – some Periods will overlap with a certain Window, some will fall short; these discrepancies are, in any event, minor.

### 4.3.2. PERIOD 1

1683. The critical path delays experienced during this period affected Unit 146 (**A.**) and Unit 044 (**B.**).

---

[1730] The Tribunal notes that LI's approach sometimes leads to counterintuitive conclusions, such as total delays being negative; see *e.g.*, Windows 3.2, 5 and 6.1 under LI ER, Table 7.8-1.
[1731] Except for incidental Windows 5, 9, 11 and 12.
[1732] In the windows when these units do not lie on the critical path, they are still near critical.
[1733] The Tribunal is aware that the precise Cut-Off Date was December 31, 2011; however, to accommodate for the experts' calculations, the Tribunal for the purposes of the current section assumes that February 24, 2012 constitutes an appropriate reflection of the delays as of the Cut-Off Date.

**A.  Unit 146 (June 15, 2010 to February 11, 2011)**

1684. The delay in Unit 146 was caused by the Tanks and Spheres scope of work – an area which has already been analysed by the Tribunal as one of the Excluded Costs. The tanks modification works were completed later than anticipated by CB&I, due to the following facts:

- Reficar took the decision to carry out an inspection of the tanks late – an activity necessary to obtain data for the modification works; by the time the inspection was conducted, the modification works should have already finalised; in fact, the revised outage plan for the tank modification works was scheduled according to the inspection report after the planned completion date[1734].

- The late issuance of the report impacted the schedule of the tender process for the selection of the subcontractor; the subcontractor package was rescheduled by four months[1735].

1685. Both experts accept that the above facts impacted the Works on Unit 146 and Reficar's expert concedes that 188 days should be credited to CB&I as excusable delay[1736].

**B.  Unit 044 (June 15, 2010 to July 1, 2012)**

1686. The following causes for delay have been advanced:

- Unit 044 experienced late design changes, such as the inclusion of several required processes, the alteration of the size of the neutralization basin, the addition of a new water curtain system; all these modifications directly impacted the works schedule[1737];

- Furthermore, as already seen in the analysis of Excluded Costs, Reficar decided to purchase recycled pumps from the Big West refinery, instead of new ones, resulting in the need to acquire additional equipment to make up for the poorer technology[1738];

- There was a change in sequence between the pipe rack steel erection and setting of equipment, likely due, at least in part, to the effects of a congested plot plan and the changing of the pumps; the fact is that the start of steel deliveries was delayed by about two months[1739];

- Finally, a decline in steel productivity relative to the planned progress is also noted[1740].

---

[1734] LI ER, Appendix 7K, paras. 48, 51; Secretariat ER, Appendix G, para. 1.2.6.
[1735] LI ER, Appendix 7K, paras. 52, 53; Secretariat ER, Appendix G, para. 1.2.6.
[1736] LI ER, Appendix 7K, paras. 47, 50; Secretariat ER, Appendix G, para. 1.2.6.
[1737] Secretariat ER, Appendix C, para. 1.3.5.
[1738] Secretariat ER, Appendix C, para. 1.1.18.
[1739] Secretariat ER, Appendix C, para. 1.3.8.
[1740] Secretariat ER, Appendix C, table p. 20.

1687. LI only accepts 74 days as compensable delay, but for a different reason: the late delivery of a substation[1741]; however, ultimately, both experts seem to agree that such late delivery never caused a real delay, as it did not impact on the critical path[1742].

1688. According to Secretariat, the delay adds to 155 days[1743]. The Tribunal is, however, only prepared to grant 20 additional days of excusable delay because:

- The Tribunal has already accepted 188 days of excusable delay for events occurring until February 11, 2011: it is difficult to assess to what extent the 155 days of delay in Unit 044 for events extending over until July 1, 2012 are already encompassed in those 188 days; the Tribunal notes that, if delays were caused homogeneously over time, 32%[1744] would have already arisen during the first tranche;

- Certain delays analysed in the Windows chosen by the Parties would also go beyond Period 1, which ends on February 24, 2012 and, thus, will likely be encompassed in the delay caused in Period 2 to be analysed in the next chapter;

- Although a variety of events causing delay did lie outside CB&I's scope of responsibility, the decline in the steel productivity seems to be another concurrent factor, which is not completely excusable.

* * *

1689. Thus, in the relevant period there were two delays which affected the critical path to the project and for which Reficar was responsible:

- 188 days of delay to Unit 146 and

- 20 days to Unit 044.

The Tribunal therefore concludes that the critical path delay up to the end of this period was likely to be a combination of the delays to these two units, as LI indicates; thus, overall, the Tribunal considers that the delay is in line with that which CB&I assessed in its Representation Forecast[1745], which was <u>203 days</u>.

### 4.3.3. PERIOD 2

1690. The Tribunal has established that for Period 2, the relevant dates are February 25, 2012 to May 15, 2013.

---

[1741] LI ER, Appendix 7K, para. 131.
[1742] LI ER, Appendix 7K, para. 144; Secretariat ER, Appendix C, para. 1.2.8.
[1743] Secretariat ER, Appendix C, para. 1.2.10.
[1744] June 15, 2010 to July 1, 2012 is 747 days. 15 June, 2010 to February 11, 2011 is 241 days. 241 days /747 days is 32%.
[1745] Ex. C-0088, p. 4.

1691. There was an overall delay of 236 days[1746] to Unit 044, the only unit on the critical path in Period 3, which can be broken down in two portions:

## A.  Slow process of steel erection

1692. First, there was a 133 day delay because of the slow progress of steel erection[1747].

1693. This slowness could be attributable to the fact that the amount of pipe rack steel installed almost tripled to 874 tons, and more than tripled (to 690 ton) for the other major structures[1748]. The exact causes for this significant increase are unknown. The Tribunal accepts, however, that very little pipe rack structural steel from the Big West purchase could be used and that replacement steel was required. While there is some discussion whether CB&I could have anticipated the need for replacement steel, the contemporaneous correspondence between the Parties shows that the issue was settled, with Reficar accepting responsibility for the late issuance of the purchase order for additional Unit 044 structural steel.

1694. In general, the Big West purchase, resulting in changes to the plot plan and requiring field adaptations, must have impacted CB&I's sequencing and logistics: the replacement steel was delivered late and, furthermore, the new equipment required refurbishment. The Tribunal, however, notes that the disruptions created by the Big West purchase were already prevalent in prior Windows and, therefore, some of the delay now claimed as excusable has already been captured in the analysis of such Windows.

1695. All in all, the Tribunal finds that it is fair that 52 days out of the 133 days of delay should be considered excusable. CB&I is thus responsible for 81 days[1749] of delay.

## B.  Postponement in start to piping

1696. Second, there was a 103 days delay because of postponement in the start to piping[1750].

1697. CB&I's expert says that the principal cause for this delay was the lack of skilled labour, due to a variety of factors, including[1751]

-    that Reficar preferred to exhaust the local labour pools and train local workers to perform highly specialized skillsets, such as welding and pipefitting,

-    that Reficar preferred that employment contracts be terminated and new laborers recruited, rather than extending employment terms, and generally,

---

[1746] The Tribunal notes that Secretariat has calculated the delays to Unit 044 in Window 2 at 139 and 107 days for the causes analysed by the Tribunal under A and B. Due to the difference in Period 2 and Window 2 analysed by Secretariat, the Tribunal has slightly modified the duration of the delays to harmonise them with the Periods it has established.

[1747] Secretariat calculates this delay at 139 days, see Secretariat ER, Appendix C, paras. 1.4.2-1.4.4.

[1748] Secretariat ER, Appendix C, para. 1.4.12.

[1749] 139-54=85

[1750] Secretariat calculates this delay at 107 days, see Secretariat ER, Appendix C, paras. 1.4.5-1.4.11.

[1751] Secretariat ER, Appendix C, para. 1.4.10.

- that labour disruptions continued.

1698. These reasons seem rather unconvincing: the Tribunal has already determined, when analysing the Excluded Costs, that the hiring of local work force was a contractual obligation and that CB&I's inefficiencies led to the hiring of an unmanageable workforce, and that only a small fraction of disruptions which occurred after the Cut-Off Date were attributable to Reficar (see Section VII.2.1.3.3.3.F *supra*).

1699. In view of these, the Tribunal opines than an appropriate allocation of delay is 32 days as excusable delay, attributable to the Owner, and that <u>71 days</u> correspond to CB&I's responsibility.

<u>Critical path</u>

1700. The experts discuss whether it was Unit 137 (Process & Utilities Interconnecting Piping), rather than Unit 044, which was on the critical path.

1701. LI used the October 2012 schedule update to promote Unit 137 to the critical path[1752]. Secretariat disagrees[1753]: Unit 137 appears on LI's critical path only once, and for a period of less than a month; considering its nature, it is Secretariat's opinion that it was not a practical assessment for Unit 137 to be critical.

1702. The Tribunal, on this issue, sides with Secretariat: pursuant to LI, Unit 044 was the next most critical unit in this Window, and it was critical in the preceding and following Windows, a factor which reinforces that it was this Unit which, in fact, represented the critical path.

\* \* \*

1703. <u>In sum</u>, the Tribunal has found that for Period 2, <u>84 days</u>[1754] are excusable, with CB&I being responsible for the remainder of <u>152 days</u>[1755].

### 4.3.4. PERIOD 3

1704. The Tribunal has established that for Period 3, the relevant dates are May 15, 2013 to February 1, 2014.

1705. There was a total delay of 171 days within this period affecting Unit 002, the only one on the critical path.

1706. The experts confirm that the main causes for the delay were:

- Labour disruptions and a strike[1756], and

---

[1752] See LI ER, Appendix 7K, paras. 410 *et seq*.
[1753] Ex. R-0026, Secretariat ER, para. 3.3.19.
[1754] 52+32=84
[1755] 81+71=152
[1756] LI ER, Appendix 7K, paras. 539 et seq.; Secretariat ER, Appendix B paras. 1.5.8 *et seq*.

- Shutdown following an incident involving an explosion while Ecopetrol employees were doing maintenance, which put the work on halt through the month of September and into early October[1757].

1707. There is one additional, secondary cause, advanced by each expert:

- LI says that, in relation to piping, electrical and instrumentation, progress was delayed due to subcontractor issues, quantity growth, and availability of materials – all areas for which CB&I was responsible[1758];

- Secretariat notes that the steelwork quantities increased due to an unfinalized FEED and related scope and design changes in Unit 002, which fall under Reficar's responsibility[1759].

1708. The Tribunal has already found that the labour disruptions and the strike that were ultimately resolved with the signing of the Bargaining Agreement [see Section on Improper Costs] were predictable for CB&I, and thus, did not give rise to Excluded Costs, except for a very small portion – similarly, they cannot now be the source for Reficar's responsibility.

1709. The shutdown after the explosion, however, seems to be within Reficar's scope of responsibility, as it was caused during the performance of Ecopetrol's employees. As to the other two ancillary causes, the first seems to be attributable to CB&I, the second to Reficar.

\* \* \*

1710. Taking all the above into account, the Tribunal finds that, out of the 171 days of delay:

- <u>85 days</u> are attributable to Reficar's responsibility and

- <u>86 days</u> to CB&I's responsibility.

### 4.3.5. PERIOD 4

1711. For Period 4, the relevant dates are February 2, 2014 to February 23, 2015, which is the Mechanical Completion Date; thus, the delay amounts to 115 days.

1712. Only Unit 002 lay on the critical path in Period 4, as it was the last Unit to obtain the SMCC.

1713. The main factors advanced by Secretariat have already been rejected by the Tribunal as giving rise to excusable delay:

- Slow progress of piping due to labour disruptions and strikes[1760];

---

[1757] LI ER, Appendix 7K, paras. 564 et seq.; Secretariat ER, Appendix B, paras. 1.5.21 *et seq.*
[1758] LI ER, Appendix 7K, paras. 552 *et seq.*
[1759] Secretariat ER, Appendix B, paras. 1.5.31 *et seq.*
[1760] Secretariat ER, Appendix B, paras. 1.6.16 *et seq.*

-     Lack of skilled labours[1761].

1714. There is an ancillary cause, which the Tribunal has accepted, which is the increased piping quantities stemming from an unfinalized FEED and related scope and design changes[1762]. However, part of the delay caused by this factor will already be encompassed in prior excusable delays.

1715. LI, on the other hand, points to an additional cause for the continued erosion in the productivity factor: CB&I's decision in August 2014 to increase the activity "Complete Piping" for a major pipe rack by 200 days. The expert says that they found no documentation explaining why CB&I did so, while simultaneously reducing the overall manhours[1763].

1716. The Tribunal notes that, all in all, the experts agree that there was little progress during this period, which arose from poor productivity.

* * *

1717. Having considered the evidence marshalled, the opinion of the experts, and its own previous findings, the Tribunal resolves that, of the 115 days suffered by Unit 002:

-     19 days are Reficar's responsibility and

-     96 days are CB&I's responsibility.

## 4.4. CONCLUSION ON DELAY CAUSED BY CB&I

1718. Based on the above analysis, the Tribunal finds the following allocation of delay during the period up to Mechanical Completion on February 23, 2015:

| Period | Overall Delay | CB&I Responsibility | Reficar Responsibility |
|---|---|---|---|
| 1: June 15, 2010 to February 25, 2012 | 203 days | 0 days | 203 days |
| 2: February 25, 2012 to May 15, 2013 | 236 days | 152 days | 84 days |
| 3: May 15, 2013 to February 1, 2014 | 171 days | 86 days | 85 days |
| 4: February 1, 2014 to February 23, 2015 | 115 days | 96 days | 19 days |
| Total | 725 days | 334 days | 391 days |

---

[1761] Secretariat ER, Appendix B, paras. 1.6.29 *et seq.*
[1762] Secretariat ER, Appendix B, paras. 1.6.51 *et seq.*
[1763] LI ER, Appendix 7K, paras. 769 *et seq.*

| Total – Post-Cut-Off Date | 522 days | 334 days | 188 days |
|---|---|---|---|

1719. Thus, the *prima facie* finding of CB&I's breach of its Schedule Control Commitments is confirmed: a detailed analysis shows that, post-Cut-Off Date, CB&I is responsible for 334 days of delay – while 188 days of delay were caused by events under Reficar's responsibility.

Legal consequences

1720. What are the legal consequences of these findings?

1721. The Tribunal has already established the consequences of the delay caused by Reficar: CB&I has been granted USD 157.1 million[1764] of prolongation costs for the 188 days of delay caused by Reficar after the Cut-Off Date[1765], which are part of the Excluded Costs.

1722. What remains to be decided are the legal consequences of the 334 days of delay imputable to CB&I. The Tribunal has already explained that under the EPC Contract, the penalty for CB&I's failure to meet its obligation of result to achieve Mechanical Completion by the Guaranteed Mechanical Completion Date is the accrual of Delay Liquidated Damages, to be calculated on each day of tardiness.

1723. The tariff for calculating Delay Liquidated Damages is provided under TC 54.8[1766]:

> "54.8.1 Subject to TC54.8.1A, if the Contractor fails to achieve Mechanical Completion of all of the Units by the Guaranteed Completion Date, the Contractor shall be liable to pay Delay Liquidated Damages for each Day from the Day immediately following the Guaranteed Completion Date up to and including the date Mechanical Completion of all of the Units is achieved, at the following rates per Day:
>
> (i) at the rate of two hundred and sixty two thousand five hundred Dollars (US$262,500) per Day for the first 60 (sixty) Days of such delay; and then
>
> (ii) at the rate of five hundred thousand Dollars (US$500,000) per Day for each Day of such delay thereafter […]".

1724. Pursuant to this rate, the total delay caused by CB&I of 334 days needs to be broken down into two parts:

- The initial 60 days, where the applicable tariff is USD 262,500 per day, amounting to a total of USD 15.75 million, and

- The remainder of 274 days[1767], with a tariff of USD 0.5 million per day, amounting to a total of USD 137 million.

---

[1764] 771,283*193=148.86 million
[1765] See para. 1348 *supra*.
[1766] JX-002, p. 226; JX-004, p. 203.
[1767] 334-60=274.

1725. Thus, the totality of Liquidated Delay Damages amounts to USD 152.75 million.

[The Tribunal flags at this point that TC 54.8.1 (ii) contains a limitation of liability[1768] and that the application of such Liability Cap will be addressed in the Quantum Section of this Award.]

## VII.2.4.    WORK COMPLETION COSTS

1726. There is another claim by Reficar[1769], whose underlying facts are intertwined with those of the Improper Delay Claim, namely the costs of completing the EPC Works that CB&I should have performed under the EPC Contract, but which were finalized by Reficar's PCS contractors ["**Work Completion Claim**"].

1727. Under this section, the Tribunal will analyse Reficar's request for damages related to moneys paid to third party contractors, who either completed or corrected CB&I's Work under the EPC Contract. Although this claim has a rework component, it is different to that one of rework that the Tribunal considered as one of the potential Excluded Costs as argued by CB&I[1770]: that claim related to amounts actually paid to CB&I for performing rework; whilst the Work Completion Claim does not involve a claw back, the moneys now claimed were never paid to CB&I but to the contractors that actually carried out the work completion.

1728. Reficar quantifies its Work Completion Claim as follows[1771]:

- USD 1.61 million[1772] for the PCS contractors completing incomplete EPC work,

- USD 8.69 million[1773] for the PCS contractors correcting defects in CB&I's EPC work, and

- USD 10.32 million for "additional impacts to PCS contractors due to CB&I failing to complete construction and deliver systems and units on committed dates", which includes discrete numbers for either completion or correction works.

## 1.    THE PARTIES' POSITIONS

1729. Reficar argues that CB&I failed to provide the Works in a complete state and free of defects[1774]. According to Reficar, since CB&I failed to meet its Wok Completion

---

[1768] JX-002, p. 226; JX-004, p. 203.

[1769] The Tribunal notes that these claims are referred to as claims for "Improper PCS costs" by Reficar, see e.g., but in fact the claim is for the completion of EPC Works rather than PCS Works; the only connection is that it was Reficar's PCS contractors that completed the EPC Works CB&I refused to finalize.

[1770] See Section VII.2.1.3.3.3.B.h supra.

[1771] CPHB, para. 404.

[1772] The Tribunal notes that Claim Category 19 "PCS Completion of Outstanding and Incomplete Work" amounts to USD 1.61 million according to CPHB, para. 404; this amount was updated during the JER exercise from the initial amount of USD 1.5 million.

[1773] The Tribunal notes that Claim Category 20 "Cost for PCS Contractors to Correct Defects in CB&I's Work" amounts to USD 8.69 million according to CPHB, para. 404; this amount was updated during the JER exercise from the initial amount of USD 5.2 million.

[1774] CPHB, paras. 397, 401-402, Reply, para. 852, ESOC, paras. 467, 474, 640-641.

obligations, Reficar needed to ask its PCS contractors to perform the completion and correction of the Works.

1730. First, Claimant argues that CB&I should first pay to Reficar the additional costs that Reficar paid to its PCS contractors to finalize CB&I's EPC Work (calculated as the difference between the man-hour rate charged by CB&I and those PCS contractors)[1775].

1731. Second, Reficar says that when it started PCS activities, it discovered that some of the Works delivered by CB&I were defective[1776]. When asked to cure these defects, CB&I refused. Thus, Reficar argues that CB&I should compensate Reficar for the entirety of cost incurred by the PCS contractors in performing corrective works that cured the deficiencies in the Works performed by CB&I[1777].

1732. CB&I says it delivered complete Works which were free of defects[1778].

1733. First, CB&I says that it was Reficar's conscious decision to pass on certain final work after Mechanical Completion from CB&I to the PCS contractors; there is no reason for CB&I to bear the costs of that decision[1779].

1734. Second, CB&I says its make-good obligations under the EPC Contract were limited by detailed notice requirements under strict time limits to be complied with by Reficar and which Reficar failed to meet[1780]. CB&I also argues that Reficar accepted care, custody and control of Project subsystems and is thus now barred from bringing claims as to any defects in CB&I's Works[1781]. According to CB&I, the defects identified by Reficar arose from the damage and preservation failures caused by Reficar or its PCS contractors[1782].

## 2.  DISCUSSION

1735. The Tribunal will now address Reficar's allegations that CB&I breached two major obligations under the EPC Contract, namely to deliver the Works:

- First, in a state of completion (**2.1**), and

- Second, free of defects (**2.2**).

### 2.1.  DELIVERY OF COMPLETE WORKS

1736. Reficar argues that CB&I was obligated to finalise the Works under the EPC Contract but never did so[1783]; Reficar goes so far as to argue that CB&I never achieved full Mechanical Completion, because it demobilized from the site leaving

---

[1775] LI ER, paras. 1340-1370.
[1776] Reply, para. 861, ESOC, paras. 474-476.
[1777] LI ER, paras. 1340-1348,1371-1381.
[1778] RPHB, paras. 452-454, 456, 462.
[1779] ESOD, para.1085.
[1780] RPHB, paras. 456-458.
[1781] RPHB, para. 462.
[1782] RPHB, para. 462, ESOD, paras. 1084-1085.
[1783] CPHB, paras. 396, 400.

Reficar's PCS contractors to complete the Works[1784]. As a result, Reficar claims the difference in the amounts between[1785]

- the amounts it would have paid to CB&I for the completion works, and

- the amounts it actually paid to its PCS contractors for doing so instead of CB&I.

1737. CB&I argues that the Works it delivered were complete, as attested by Reficar through the signing of each completion Certificate at the Subsystem level[1786]. When Reficar accepted the Subsystems as mechanically complete, it assumed the risk of any pending completion works; CB&I should not bear the burden of Reficar's decision to grant completion work to PCS contractors[1787].

1738. The Tribunal will side with CB&I.

1739. In arriving at this decision (**B.**), the Tribunal will first interpret the Contract provisions (**A.**).

## A.    Contract provisions

1740. The Tribunal has previously analysed the Contract provisions on Final Completion (as opposed to Mechanical Completion); *pro memoria*, Final Completion meant that Works were not only mechanically complete, but also that all the remaining construction activities were finalised, and the required documentation delivered to Reficar[1788].

1741. The Contract also provides for different sanctions for CB&I's failure to comply with Mechanical Completion (i.) and Final Completion (ii.).

1742. (i.) The delay penalties under the Contract concerned Mechanical, rather than Final Completion; under the Liquidated Delay Damages clause CB&I would pay a daily rate for each day between the Guaranteed Mechanical Completion Date and the date of Mechanical Completion of the Project, as discussed in the preceding Section.

1743. (ii.) By contrast, not achieving Final Completion would not result in damages, but would instead bar CB&I from obtaining a part of the final tranche of the Contractor's Fixed Fee, pursuant to TC 54.8.8[1789]:

> "54.8.8 Upon the attainment of Mechanical Completion of all of the Units, the Parties shall agree the cost of rectifying all of the outstanding items on the Punchlist (the "Punchlist Value"). Following the agreement of the Punchlist Value, the Owner shall, in accordance with TC58, pay the Contractor the final portion of the Contractor's Fixed Fee less the Punchlist Value. Upon Final

---

[1784] ESOC, para. 467.
[1785] CPHB, para. 404, citing to LI ER, paras. 1349-1370.
[1786] RPHB, paras. 452-454, 459-462.
[1787] ESOD, para. 1085.
[1788] See Tribunal's analysis at para. 1591 *supra* on the basis of TC 1 "Final Completion" at JX-002, p. 165; JX-004, p. 150.
[1789] JX-002, p. 227; JX-004, p. 204.

Completion, the Owner shall, in accordance with TC58, pay the Contractor the Punchlist Value" [Emphasis added].

1744. Such an interpretation is buttressed by TC 7.3, which stipulates that CB&I would perform Works in consideration of payment by Reficar[1790]:

> "In consideration of payment by the Owner the Contractor shall, subject to the provisions of this Agreement and in accordance with the Scope of Work, carry out and complete all the Work in accordance with this Agreement and shall regularly and diligently proceed with the Work to achieve Mechanical Completion by the Guaranteed Completion Date" [Emphasis added].

1745. The Contract definition of "Works" suggests that CB&I was obligated to rectify all Punchlist items and defects, after Mechanical Completion[1791]:

> "'Work' means all obligations, goods, services, tools, equipment, and other items to be performed or furnished by the Contractor, as more fully set out in the Scope of Work, including rectification of all items on the Punchlist and all Defects and performance of any FCC Post Turnaround Work" [Emphasis added].

## B.  Decision

1746. Unlike for the correction of defects, there is no Contract provision stating that any outstanding works, after Mechanical Completion, would necessarily have to be performed by CB&I. Thus, while CB&I was, in general, obligated to rectify Punchlist items and other defects after Mechanical Completion, the Contract was flexible and allowed Reficar to adjudicate other pending work within CB&I's scope of performance to a different contractor if it so wished.

1747. The contemporaneous evidence shows that Reficar exercised this choice, and that CB&I respected it:

1748. First, a presentation attached to Reficar's BofD Meeting from August 2015 states that certain completion works would be assumed by Reficar to maintain the Schedule[1792]:

> "A plan of execution was established with CBI identifying which actions will be finalized by CBI and which will be assumed by Reficar to maintain the start-up schedule".

1749. Second, further evidence is provided in a Jacobs report from 2015, in which the consultancy observed that Reficar's PCS contractors were taking over CB&I's completion work at a higher cost to Reficar[1793]:

---

[1790] JX-002, p. 179; JX-004, p. 164.
[1791] JX-002, p. 171; JX-004, p. 157.
[1792] Ex. R-1432, p. 5: "*Se estableció plan de ejecución con CBI identificando que acciones serán finalizadas por CBI y cuáles serán asumidas por Reficar para mantener cronograma de arranque*"; English at p. 24.
[1793] Ex. R-0014, pdf p. 79; for Spanish, pdf pp. 29-30:

"For some of the [sub]systems which were not completed, the commissioning contractor undertook the responsibility of completing them, which transferred the work from the construction budget to the commissioning budget (an additional owner cost)".

1750. Third, there is also direct evidence showing that Reficar instructed CB&I not to perform certain completion works because its PCS contractors would do so:

- an email from Reficar to CB&I from March 2015 in which Reficar requested CB&I not to install sprinklers in the tank farm: Reficar's PCS contractor was taking care of cleaning the piping, and offered to perform the installation of the sprinklers and Reficar agreed to this change in strategy[1794];

- a letter from CB&I dated February 2015 requesting confirmation that certain completion works, including the installation of a perimeter fence and CCTV cameras, were removed from CB&I's scope of work[1795];

- a letter from Reficar dated April 2015 confirming the de-scoping of CB&I's completion work[1796].

1751. The evidence points to Reficar choosing to expedite its PCS activities through accepting as mechanically complete Subsystems with outstanding major construction items and later instructing its PCS contractors to finalize CB&I's work – although the PCS contractors were more expensive than CB&I.

1752. Reficar now claims that CB&I was obligated to finalize the Works under the EPC Contract in order to achieve "Full Mechanical Completion"[1797] and that it is entitled to claim from CB&I compensation for the additional costs incurred when it engaged the PCS contractors to do the completion works.

1753. Reficar is, however, wrong: CB&I is not to be held liable for any damages stemming from the completion works as it was not responsible for works arising after Mechanical Completion. Reficar accepts this, but creates an artificial distinction between "full" and "partial" Mechanical Completion, arguing that these completion works would be carried out after partial Mechanical Completion, but before full Mechanical Completion was accomplished.

1754. The Tribunal has already rejected this purported interpretation: Reficar accepted as mechanically complete Subsystems with outstanding "A" Check Sheet and Category "A" Punchlist items, i.e., Subsystems that still required certain key

---

"*Para algunos de los subsistemas que no estaban completos, el contratista de puesta en marcha asumió la responsabilidad de completar los subsistemas que transfirieron el trabajo del presupuesto de construcción al presupuesto de puesta en marcha (un costo más para el dueño)*".

[1794] Ex. R-2641, p. 10:

"The sprayers of the deluge system of the spheres and pumps should not be installed and should be delivered. We will install them with [PCS Contractor] after the piping has been cleaned".

See p. 4 in original:

"*Los aspersores del Sistema de diluvio de las esferas y las bombas no sean instaladas y sean entregadas. Nosotros las instalaremos con [PCS Contractor] después de la limpieza de la Tubería*".

[1795] Ex. R-1849_09732.

[1796] Ex. R-1849_14538.

[1797] CPHB, paras. 395-396.

construction elements to be completed; the "partial" Mechanical Completion put forward by Reficar was not acknowledged in the completion Certificates themselves or anywhere in the Contract; and, on the basis of the available evidence, the Tribunal has determined that Reficar's signing of the completion Certificate at either the Unit or Subsystem level is sufficient to find that "full" Mechanical Completion of that Unit or Subsystem had occurred.

1755. The Tribunal has also established that, once Mechanical Completion was achieved for each subsystem, care, custody and control of that Subsystem would pass on to Reficar, as confirmed by para. 3.2.1 of Section III, Appendix I, Schedule 3 of the EPC Agreement[1798]:

> "3.2.1 During Construction activities on the project CONTRACTOR is responsible for the care, custody, and control of the project materials and equipment. When the Project has reached Mechanical Completion these responsibilities are transferred to [Reficar] [...]".

1756. As soon as CB&I achieved Mechanical Completion on the Project, *i.e.*, as of February 23, 2015, Reficar took over the last Unit on the Project and CB&I was no longer under the obligation to complete any pending Works, and likewise it would not be entitled to the full Contractor's Fixed Fee as its scope of work was reduced in favour of other contractors performing the completion works.

1757. Reficar was thus in the position to select who would finalize the Works after a Unit or Subsystem was mechanically complete: this could have been CB&I, but if Reficar preferred its PCS contractors, it was free to do so, since after Mechanical Completion was achieved, it had care, custody and control over all subsystems on the Project.

## 2.2.  THAT DELIVERY OF WORKS FREE OF DEFECTS

1758. The second limb of Reficar's Work Completion Costs claim concerns the costs incurred by Reficar in curing defects in CB&I's EPC Works, also performed by Reficar's PCS contractors.

1759. On this issue, the Tribunal will side with Claimant.

1760. The Tribunal will first analyse the relevant Contract provisions (**A.**) and later the underlying facts (**B.**).

## A.  Contract provisions

1761. The EPC Contract contains an array of provisions obligating CB&I to deliver the Refinery free of defects.

1762. In general, under TC 48.5, CB&I was to provide the Works "in accordance with Good Engineering and Construction Practices" (which implies a lack of defects)[1799]:

---

[1798] JX-006, p. 576.
[1799] JX-002, p. 222; JX-004, p. 198.

"The Work will be executed in accordance with Good Engineering and Construction Practices in accordance with this Agreement, including all drawings, and specifications, or subsequent modifications thereof, set forth in the Agreement Documents".

1763. This obligation is reiterated under TC 71.1, which states that all Works[1800]

"[…] shall be performed or constructed in a good workmanlike manner, shall comply with this Agreement and shall be provided in accordance with Good Engineering and Construction Practices".

1764. Accordingly, a defect, pursuant to its contractual definition, is either:

- A failure of the Work to comply with the EPC Contract (including the Project Specifications); or

- A damage in or to the Work which is a result of a failure to use Good Engineering and Construction Practices

1765. TC 49.1 then provides for CB&I's obligation to correct, replace or repair defects[1801]:

"49.1 Subject to TC8.1.1 and TC71, if any Work is determined by the Owner to be Defective or otherwise not in conformance with this Agreement, the Owner shall issue a Written Notice to the Contractor. Rejected workmanship shall be satisfactorily corrected and rejected materials shall be satisfactorily replaced with repaired or proper new materials in accordance with TC71 and the Contractor shall promptly segregate and remove rejected material from the Jobsite […]" [Emphasis added].

1766. This obligation is repeated in the definition of "Make Good Obligations"[1802]

"[…] an obligation on the Contractor to repair, replace or make good a Defect, and includes the cost of any removal or reinstallation, the cost of any equipment or materials procured as part of such repair, replacement or making good, and the cost of services provided by the Contractor, Lower Tier Subcontractors and Third Parties".

1767. Services on the other hand were only qualified as deficient if they[1803]

"[…] failed to meet the standard of performance (including appropriate levels of skill and care) normally exercised by properly qualified and competent EPC contractors performing services of a similar nature".

1768. TC 71.10.5 unifies the Make Good Obligation and the definition of Defect, stating that the obligation only arises with respect of Defects which do not meet the Project specifications and Good Engineering and Construction Practices.

---

[1800] JX-002, p. 255; JX-004, p. 232.
[1801] JX-002, pp. 221-222; JX-004, p. 198.
[1802] TC 1 "Definitions", JX-002, p. 167; JX-004, p. 153.
[1803] TC 71.10.03, JX-002, p. 257; JX-004, p. 234.

1769. CB&I interprets that this provision could only be triggered if the specifications were not met *and* there was a failure to meet Good Engineering and Construction Practices[1804]. The Tribunal, however, finds that TC 71.10.5 should read "and/or": the Defect can arise either because the works fail to comply with the Contract or because Good Engineering and Construction Practices have been breached. It would make little sense for a Defect to escape the duty to repair, simply because it was not caused by a double breach of Project Specification and Good Engineering and Construction Practices.

1770. As regards who corrects the defects, the Contract specifically stipulates that only CB&I can[1805]:

> "71.18 The Owner acknowledges that, in relation to deficient services, its sole remedy is the obligation on the Contractor in this TC71 to reperform the services and make good any Defects".

1771. The Tribunal notes that, although the EPC Contract seems to differentiate between deficient services and defects (of work), the duty to correct under TC 71.18 applies to both.

1772. In any event, the defects discovered by Reficar mainly correspond to damages in equipment, failure to adhere to agreed specifications and to missing items – the Tribunal is persuaded that these shortcomings *prima facie* are a breach of the Project Specifications as well as of the Good Engineering and Construction Practices.

Notice obligations

1773. TC 49.1 puts an obligation on the Owner to issue a Written Notice to the Contractor on the Defect [1806]:

> "49.1 Subject to TC8.1.1 and TC71, if any Work is determined by the Owner to be Defective or otherwise not in conformance with this Agreement, the Owner shall issue a Written Notice to the Contractor. […]".

1774. Pursuant to TC 71.3, this Written Notice had to "stat[e] with reasonable specificity the nature of the Defect together with all available evidence"[1807].

Cost of repair

1775. The burden of repairing defects was counter-balanced by the provisions in the Contract on who would bear the costs of corrective works, which in turn gave CB&I highly beneficial conditions.

1776. For deficient services, under TC 71.10.1 and 71.10.2:

---

[1804] ESOD, para. 1096.
[1805] TC 71.18; JX-002, p. 258; JX-004, p. 235.
[1806] JX-002, pp. 221-222; JX-004, p. 198.
[1807] JX-002, p. 256; JX-004, p. 233.

- Those with a value below USD 50,000 would be covered by Reficar under the cost-reimbursable structure (but without any profit for CB&I), and

- Those with a value over USD 50,000 would be paid by CB&I from its own pockets.

1777. For defects covered by the Make Good Obligation, under TC 71.10.4[1808]:

- Those with a value below USD 50,000 would be covered in full by Reficar, and

- Those with a value over USD 50,000 would be covered both by Reficar and CB&I, at a 50/50 ratio.

1778. Thus, even for defects which arose due to CB&I's negligence (but not gross negligence)[1809], Reficar would cover their entire correction costs if their value was below the threshold of USD 50,000 and cover 50% of the costs if their value exceeded that threshold. This would apply as long as CB&I stuck to its end of the bargain, which meant promptly correcting the defects after receiving a Written Notice from Reficar.

<u>Limitations to the duty to repair</u>

1779. CB&I's obligation to correct defects is not an absolute one:

1780. <u>First</u>, the EPC Contract establishes a period of time, during which defects had to be detected.

1781. For defects discovered prior to Mechanical Completion, CB&I is responsible for their correction, pursuant to TC 71.2[1810]:

> "If, at any time prior to Mechanical Completion, it appears that a problem in the work performed or provided by the Contractor or any other Contractor Group member could delay Mechanical Completion, the Contractor shall, upon instruction from the Owner, immediately remedy or fix the problem regardless of the cause. Further to any remedial action performed to fix the problem, the Contractor will perform an investigation to determine the actual origin of the problem and the Party or Parties who may be liable for the cost of the remedial action".

1782. If defects were discovered afterwards, CB&I was only liable for correction during the so called Defects Correction Period, according to TC 71.4[1811]:

> "Subject to TC71.5 and TC71.6, if requested by the Owner, the Contractor shall promptly repair, replace or otherwise make good any Defect which may

---

[1808] TC 71.10.4 (i) and (ii), JX-002, p. 257; JX-004, p. 234.
[1809] A specific exception for defects caused by gross negligence or willful misconduct is found under TC 71.19; for those, CB&I would have to cover the entirety of the costs.
[1810] JX-002, pp. 255-256; JX-004, p. 233.
[1811] JX-002, p. 256; JX-004, p. 233.

appear or occur during the Defects Correction Period at such times as the Owner reasonably requires".

1783. The Defects Correction Period is defined as ending on the earlier of:

- 18 months after Mechanical Completion of all of the Units and rectification of all items on the Punchlist;

- 12 months after the commissioning[1812] of any portion of Work; and

- 18 months after Reficar's issuance of a Written Notice to take care and custody of a mechanically complete portion or system of Work under TC 35.2.

1784. The final relevant provisions under the EPC Contract concern dispute resolution, which is the same for any scenario in which there was a dispute, including about corrective works. Section 3[1813] of the DRA provides for an initial Informal Dispute Resolution, which, if unsuccessful, allowed the Parties to escalate the dispute to ICC arbitration under Section 4[1814].

1785. The initiation of a dispute would not, however, impede the Parties' near-absolute obligations under the EPC Contract: in theory, both Parties were only able to initiate the dispute after CB&I had complied with its duty to perform corrective works.

1786. The Tribunal is not aware of either Party initiating Informal Dispute Resolution under the DRA regarding CB&I's duties to perform corrective works.

1787. <u>Second</u>, TC 71.6 provided for a list of exceptions for which CB&I cannot be held responsible, if it is able to "<u>establish</u> [that the defects] arise out of":[1815]

- improper operation or maintenance by Reficar,

- operation outside the specifications in the Contract,

- normal wear and tear, or

---

[1812] The Contract uses the term "First Feed", which in accordance with TC 1 "Definitions", means "the date on which process fluids or power is first introduced to the relevant portion or system of Work following its commissioning to enable the normal operation of such Work", see JX-002, p. 165; JX-004, p. 151.
[1813] JX-007, pp. 7-8.
[1814] JX-007, pp. 8-13.
[1815] JX-002, p. 256; JX-004, p. 233.
"71.6 The Contractor shall not be responsible for the repair, replacement or making good of any Defect or of any damage to the Refinery which the Contractor establishes arises out of or results from any of the following causes:
71.6.1 improper operation or maintenance of the Refinery by the Owner, except where such operation or maintenance was in accordance with any operations and maintenance manual supplied by or on behalf of the Contractor;
71.6.2 operation of the Refinery outside the specifications provided in this Agreement, except where such operation was in accordance with any operations and maintenance manual supplied by or on behalf of the Contractor;
71.6.3 normal wear and tear; and
71.6.4 Rely Upon Information [...]".

- Rely Upon Information (information provided by Reficar that CB&I could legitimately "rely upon")[1816].

1788. These four exceptions describe situations for which Reficar is responsible, or which arise from normal wear and tear, for which CB&I cannot be blamed.

1789. The Tribunal finds that the term "establish" in TC 71.6 was used by the Parties to ensure that CB&I provide certain allegation and evidence, proving that the defects fell into one of the four categories of exceptions.

\* \* \*

1790. In sum, if after Mechanical Completion Reficar discovered failures to meet the Project Specifications or Good Engineering and/or Construction Practices, Reficar had to issue a reasonably detailed Written Notice to CB&I requesting corrective works.

1791. CB&I was under the obligation to "promptly repair, replace or otherwise make good any Defect which may appear or occur", as long as the defect appeared or occurred during the Defects Correction Period and the defect did not arise out of any of the four areas outside CB&I's scope of responsibility.

1792. These corrections would, in turn, be covered under financial terms beneficial to CB&I.

**B.    Analysis of underlying facts**

1793. Having established the Parties' obligations with respect to the correction of defective works, the Tribunal will now analyse whether the Parties (**a.** and **b.**) adhered to their respective duties under the Contract. And then it will look at the take-over by the PCS contractors (**c.**).

**a.    Did Reficar comply with the Contract requirements?**

1794. Under TC 71.3 whenever Reficar identified that CB&I needed to perform corrective works, it was required to issue a Written Notice "stating with reasonable specificity the nature of the Defect together with all available evidence"[1817].

1795. When specifying the nature of the Defect, pursuant to TC 71.10.5[1818], Reficar would need to show that the Defects did not meet the Project specifications and/or Good Engineering and Construction Practices.

1796. Reficar has provided ample proof of having notified CB&I of the defects:

---

[1816] The term "Rely Upon Information" is defined under TC 1 of the EPC Contract to mean: "design criteria, process design basis and data, Third Party licensor process design packages, the basic engineering design undertaken under the Basic FEED Contract, site details including subsurface conditions, soils reports, Existing Refinery data and historical meteorological data provided to the Contractor by the Owner, which the Contractor may deem to be correct"; see JX-002, p. 170; JX-004, p. 155.
[1817] JX-002, p. 256; JX-004, p. 233.
[1818] "71.10.5 These Make Good Obligations apply in respect of Defects which do not meet the Project specifications and Good Engineering and Construction Practices", JX-002, p. 257; JX-004, p. 234.

ICC Case 21747 RD/MK/PDP
Final Award

1797. First, on June 10, 2015, Reficar's Mr. Suárez sent a letter to CB&I's Mr. Deidehban containing lists of clearly identified defects for CB&I to remedy which span dozens of pages, listing the Unit number, detailed tag and type of issue, e.g., "damage in the area of the seal" or "metallurgy deviating from plan"[1819]:

| UNI | TAG | DESVIACIÓN (RESUMIDA) |
|------|------------------|-----------------------------------------------------|
| 100 | 100-CDU-D-003 | Daño en el área de sello |
| 100 | 100-CDU-D-005 | Boquilla no relacionada en los planos |
| 100 | 100-CDU-D-005 | Metalurgía diferente al plano |
| 100 | 100-CDU-D-006 | Metalurgía diferente al plano |
| 100 | 100-CDU-D-006 | Daño en fireproofing |
| 100 | 100-CDU-D-007 | Daño en fireproofing |
| 100 | 100-CDU-D-008 | Las silletas del tambor se encontraron descentradas |
| 100 | 100-CDU-D-008 | Metalurgía diferente al plano |
| 100 | 100-CDU-D-008 | Daño en el área de sello |
| 100 | 100-CDU-D-008 | Falta de Apriete |
| 100 | 100-CDU-D-009 | Metalurgía diferente al plano |
| 100 | 100-CDU-D-009 | Material diferente al especificado en los empaques |
| 100 | 100-CDU-D-009 | Pendiente instalación puesta a tierra |
| 100 | 100-CDU-D-012 | Material diferente al especificado en los empaques |
| 100 | 100-CDU-D-014 | Pendiente instalación puesta a tierra |

and a list of pending items arising from an inspection of the Works, dating back to April 2015[1820].

1798. The attachment to the letter also contained a detailed enumeration of construction deviations by Unit, with a reference to the communication notifying CB&I thereof, as well as separate lists for "I&C", "*Rotativo*", and "*Eléctrico*"[1821].

1799. Second, Mr. Suárez sent another letter to Mr. Deidehban on April 30, 2015, this time specifically titled "Written Notice of Defect" informing CB&I of the defects

---

[1819] Ex. C-1150, starting at pdf p. 2.
[1820] Ex. C-1150, p. 113.
[1821] Ex. R-1849_15029_A, tab names.

in the cabling of transmitters, explicitly requesting that CB&I expeditiously undertake corrective works[1822].

1800. Third, on the same date, Mr. Suárez sent yet another letter to Mr. Deidehban, requesting that CB&I expeditiously resolve the construction deviations listed in an attachment; this attachment is not included in the record, but the Tribunal is convinced that the original attached these details as the contents of this attachment are addressed by CB&I in its response[1823].

1801. Fourth, on May 12, 2015, Reficar sent another Written Notice of Defects, this document contains an attachment of 38 pages with pictures detailing all defects identified by Reficar and its PCS contractor[1824]. Reficar requested that CB&I solve a list of deviations "as expeditiously as possible"[1825]. This letter attached not only a list of findings of construction deviations, but also detailed diagrams with explanations[1826]:



as well as pictures identifying the deviations accompanied by recommended solutions[1827]:

---

[1822] Ex. C-0363.
[1823] Ex. C-0360; the response from CB&I in Ex. R-1849_09971 addresses the substance of the alleged Defects and so the attachment to Ex. C-0360 must have been present in the original.
[1824] Ex. R-1849_14557.
[1825] Ex. C-1149, p.1, in original "Notificación Escrita de Defecto - Desvíos de Construcción".
[1826] Ex. C-1149, pdf p. 7; the document contains other similar diagrams for other construction deviations.
[1827] Ex. C-1149, pdf p. 20.

**HALLAZGOS**

Durante el Precondicionamiento del transformador 141-XFR-01, 480 / 208-120 V, se identifica que por el lado de baja tensión (208 - 120 V) NO existe cableado desde el punto neutro del X0 (Neutro) del transformador hasta el tablero de distribución 141 LP-001. El punto neutro no esta conectado fisicamente a tierra.



**RECOMENDACIONES**

- Cablear desde el punto neutro X0 hasta al tablero de distribución
- Aterrizar el neutro fisicamente con cable a la barra o punto de tierra

1802. Reficar additionally sent further Written Notices of defects, *e.g.*, on December 24, 2015[1828].

1803. On the basis of the evidence analysed *supra*, the Tribunal is convinced that Reficar complied with its obligations under TC 71.3 and provided CB&I with Written Notices of defects which stated with reasonable specificity the nature of the defects, together with underlying evidence[1829].

**b.    Did CB&I comply with the Contract requirements?**

1804. The mirror obligation for CB&I, after receiving a reasonably specific Written Notice from Reficar, was to "promptly repair, replace or otherwise make good any Defect which may appear or occur"[1830].

1805. This obligation was not without limits, as the Tribunal has established earlier: Defects had to be discovered within the Defects Correction Period (i.) and there were certain exceptions to CB&I's duty to repair (ii.).

1806. (i.) The Tribunal confirms that in its responsive e-mails in which CB&I refused to perform the corrective works, CB&I never averred that the Defects Correction Period had expired.

---

[1828] Ex. R-1849_15030 and a follow up message of March 18, 2016 under Ex. C-0361.
[1829] The Tribunal is not in the position to fully establish whether Reficar submitted "all available evidence" as required by TC 71.3 but finds that the evidence it did provide was sufficient for the purpose of effectuating a Written Notice under said provision.
[1830] TC 71.4, JX-002, p. 256; JX-004, p. 233.

1807. (ii.) CB&I generally avers that it was under no obligation to correct any defective works as, after a "preliminary review of the alleged deficiencies", CB&I considers that they fall under the list of exceptions. The Tribunal has already found that such a general statement is insufficient: CB&I's cursory responses did not address in detail any of the numerous defects invoked by Reficar and thus failed to "establish" that any of the exceptions under TC 71.6 applied; hence, CB&I was obligated to perform the corrective works.

CB&I's counterarguments

1808. CB&I brings three arguments purporting to prove that it was not obligated to perform any corrective works, all of which will be dismissed.

1809. (i) CB&I argues that, since the defects arose after custody, care and control of the affected Units had already been transferred to Reficar, CB&I should not be held responsible for their correction.

1810. The Tribunal does not concur.

1811. Any such transfer did not relieve CB&I from its obligation to correct defects, as defects were discovered during the Defects Correction Period, pursuant to TC 71.4. And the Tribunal finds that this stipulation is reasonable: latent defects of any machinery will only become apparent once the Refinery is running; it is impossible for initial tests to fully discover all defects that predate the delivery of custody, care and control.

1812. (ii) CB&I further submits that it was not responsible for:

- The construction deviations that arose from the provision of faulty materials or equipment by Vendors (*pro memoria*, third-party suppliers for the Project who were not CB&I's subcontractors);

- Defects caused by accidents and/or vandalism in 2015, "at a time when CB&I had mostly demobilized its personnel"[1831]; CB&I uses the Jacobs Consultancy report from October 2015 as evidence[1832].

1813. The Tribunal has already determined that the Contract established limited exceptions to CB&I's obligation to repair – these limited exceptions are provided for in TC 71.6 and none of the two examples given by CB&I fall into them. So, even if defects were caused by Vendors or by accidents and/or vandalism, CB&I still agreed to deliver the Project free from defects and to make good any existing defects. It would, however, not assume all of the repair costs: Reficar would take up for repairs below USD 50,000 and, above that threshold, costs would be shared equally.

1814. In any event, the Tribunal has reviewed the Jacobs Consultancy report and finds CB&I's statement to be incorrect: the report only mentions that the accidents and acts of vandalism occurred in 2015, but not that CB&I had mostly demobilized by that time. In fact, CB&I still had prominent presence on the Project, even after

---

[1831] ESOD, para. 1108.
[1832] ESOD, para. 1108, citing to Ex. R-0014, p. 25.

ICC Case 21747 RD/MK/PDP
Final Award

Mechanical Completion was achieved in February 2015, as proven by the following diagram based on CB&I's monthly reports[1833]:



1815. (iii) CB&I finally argues that there is ample evidence by Reficar's personnel who have testified to the quality of the design and construction of the Refinery[1834].

1816. This is a *non-sequitur:* just because the final Refinery is lauded as excellent does not mean that there were no defects that Reficar's PCS contractors corrected after Mechanical Completion – in fact, CB&I has never denied that the defects existed.

### c.    Take-over by PCS contractors

1817. On the basis of the evidence marshalled, the Tribunal has found that

-    Reficar complied with its Contract obligations and notified CB&I in Written Notices the need for the latter to correct defective works, and

-    By refusing to repair the defects, CB&I breached its Contract obligation to promptly remedy.

1818. Reficar's response to the four letters from CB&I, refusing to repair the defects, was sent on July 23, 2015[1835]. It contains a clear statement that Reficar would assign the corrective works to other contractors, and that it reserved its right to seek recovery of the costs from CB&I[1836]:

> "As a result of CB&I's blanket refusal to correct any Defects, Reficar has been left with no choice but to take remedial action to fix Defects and fully reserves its right to seek recovery of the costs from CB&I".

1819. Reficar's behaviour was correct.

---

[1833] Unnumbered graph at the end of para. 326 of CPHB; Column AE from Ex. H-013.
[1834] ESOD, para. 1094, citing to testimony by Mr. Arenas, Reficar's Engineering Director, before the Procuradoria, at Ex. R-2642, p. 9 and Mr. Pittaluga, Reficar's Management, Support and Control Director, also before the Procuradoria at Ex. R-2643, p. 29.
[1835] The document itself is not dated; however, the date has been provided in the Parties' Agreed Chronological Index of Exhibits; see pdf p. 1150.
[1836] Ex. C-1153, p. 4.

1820. Under the <u>Contract</u>, Reficar could only request CB&I to perform corrective works[1837]:

> "71.18 The Owner acknowledges that, in relation to deficient services, <u>its sole remedy is the obligation on the Contractor in this TC71 to reperform the services and make good any Defects</u>" [Emphasis added].

1821. Reficar did give CB&I the opportunity to perform the corrective works, but CB&I refused to do so, in breach of its contractual obligations.

1822. In accordance with TC 8.3, in a situation such as this, in which one of the Parties fails to comply with any express remedy under the Contract, the other Party is entitled to enforce its rights under the Contract under applicable Laws[1838]:

> "8.3 Sole Remedy
>
> Where, in relation to any matter, this Agreement provides for an express remedy, such remedy shall, without prejudice to the rights of either Party to suspend or terminate this Agreement in accordance with the Terms and Conditions of this Agreement, be the sole remedy of a Party against the other. In the event that a Party fails to comply with any express remedy under this Agreement, the other Party shall, subject to TC8.1 and TC8.4, be entitled to enforce any rights it has under this Agreement under applicable Laws".

1823. Because CB&I breached the Contract by refusing to correct the defects, under Art. 1613 of the CCC, as the aggrieved party, Reficar is entitled to seek full compensation[1839]

> "*Artículo 1613. <INDEMNIZACIÓN DE PERJUICIOS>. La indemnización de perjuicios comprende el daño emergente y lucro cesante, ya provenga de no haberse cumplido la obligación, o de haberse cumplido imperfectamente, o de haberse retardado el cumplimiento".*

<u>CB&I's counterarguments</u>

1824. CB&I maintains that, under the EPC Contract, the only solution available to Reficar if CB&I failed to perform corrective works was to <u>terminate</u> the Contract in accordance with TC 49.1[1840]:

> "[...] If the Contractor fails promptly to replace rejected material or correct Defective workmanship after receiving a Written Notice from the Owner, the Owner may terminate the Agreement for default in accordance with TC65.1, after the expiry of any applicable cure period as provided in TC65.1".

---

[1837] TC 71.18; JX-002, p. 258; JX-004, p. 235.
[1838] TC 8.3; JX-002, p. 182; JX-004, p. 167.
[1839] CL-0018, English translation:
"Article 1613. <COMPENSATION FOR DAMAGES>. Compensation for damages includes consequential damage and loss of profit, whether derived from failure to comply with the obligation or from imperfect compliance or from delayed compliance".
[1840] JX-002, p. 221; JX-004, p. 198.

1825. CB&I's interpretation is misguided.

1826. TC 49 gave Reficar the <u>right</u> to terminate the Contract if CB&I failed to promptly perform corrective Works. This was an option that went beyond ordinary consequences and was likely inserted in the Contract as a special safeguard for Reficar in case CB&I's works were of insufficient quality, despite corrective works. This provision does not mean, however, that Reficar was only given this singular remedy.

1827. In addition, if Reficar had invoked TC 49.1, then the Contract would have been terminated and the defective works completed by other contractors – for which Reficar would claim damages in the arbitration; thus, the situation would be the same as the current one.

* * *

1828. <u>In sum</u>, CB&I was obligated under the EPC Contract to deliver

- complete Works

- free of defects.

1829. Reficar waived its right to hold CB&I accountable for the completion of works subsequent to Mechanical Completion and thus its claim has been dismissed. But, as regards the correction of defects, Reficar's claim is successful because CB&I failed to meet its contractual obligations to promptly correct defects upon receiving a reasonably specific Written Notice from Reficar.

## 3.   CALCULATION OF DAMAGES

1830. Reficar's expert, LI, calculates the damages for CB&I's failure to correct post-Mechanical Completion defects by multiplying the number of man-hours expended by two main PCS contractors on corrective activities by their corresponding man-hour rates, and adding individual line items of a third contractor[1841]. LI's analysis then continues with a separate type of claims, for

"additional impacts to PCS contractors due to CB&I failing to complete construction and deliver systems and units on committed dates".

1831. The question is whether the three categories of costs now claimed only relate to reparation of defects:

- In the absence of evidence to the contrary, the Tribunal accepts that the hours expended by the two main PCS contractors were spent on corrective works;

- As to the individualised line items of a third contractor, the Tribunal finds that a number of the line items, by their very names, do not correspond to corrective works; and

---

[1841] See LI ER, para. 1371 *et seq.* and JER 6 on Claimed Costs & Quantum, Attachment 1, tabs "Attachment 9-05 Rev. 1" and "Table 9.5-3 Rev. 1".

- The line item names prove that many of the additional impacts also do not reflect corrective works.

1832. For this reason, the Tribunal will

- accept LI's calculations on the basis of the man-hours expended by the two major PCS contractors, and

- only add the line items for the remainder of the contractors[1842] that correspond to corrective activities[1843].

1833. The calculations then are as follows:

- USD 1.36 million for the first major PCS contractor[1844],

- USD 5.79 million for the second one[1845], and

- USD 3.11 million[1846] for the line items for correcting works of the remaining contractors[1847].

---

[1842] The Tribunal notes that certain line items claimed by Reficar arise from costs it paid to its Vendors rather than contractors for corrective works; this distinction is immaterial here; if CB&I refused to correct defects, it was immaterial who ultimately corrected them; Reficar is equally entitled to the damages.

[1843] The Tribunal notes that three categories of costs concern repairs of refractories and furnaces; these will be taken into account as they are separate from the category of repair costs for the refractories and furnaces under the "Rework" category, rejected as an Excluded Cost at para. *supra*. Those costs were paid directly to CB&I and concerned repairs in Units 100, 110 and 111, see ESOC, para. 295; the refractory and furnace repair items considered Completion Costs concerned repairs in Units 115 and 116, see LI ER, para. 1399 and tables 9.5-13 and 9.5-14 of the LI ER.

[1844] Massy Energy, see LI ER, Table 9.5-10 at pdf p. 418, as updated by JER 6 on Claimed Costs & Quantum, Attachment 1, tab "Tables 9.5-10 thru 9.5-12 Rev1".

[1845] KGM Consortium ["**KGM**"], see LI ER, Table 9.5-11 at pdf p. 419; see also JER 6 on Claimed Costs & Quantum, Attachment 1, tab "Tables 9.5-10 thru 9.5-12 Rev1".

[1846] USD (k) 998+207+20+16+416+241+69+51+166+72+305+127+91+80+15+93+21+28+93=3109 k = 3.109 million or USD 3.11 million

[1847] This corresponds to:
USD 998 k for "Management of completion of construction punches in Units 002, 044, 110 & 111" by CDI S.A. [for all CDI S.A. items, see LI ER, Table 9.5-12 at pdf pp. 420-421);
USD 207 k for "Repair of leak in Cooling Water system and repair of leak in internal baffle of drum 044-D-19 in Unit 044" by CDI S.A.;
USD 20 k for "Resources invested in repair of poorly maintained instruments in Units 002, 044, 110 & 111" by CDI S.A.;
USD 16 k for "Resources invested in replacement of fireproof cable due to engineering error in Unit 044" by CDI S.A.;
USD 416 k for "Excavate for repair of underground pipeline in Unit 044" by Conequipos [for all Conequipos items, see LI ER, Table 9.5-13 at pdf p. 423];
USD 241 k for "Direct labor to replace HDPE with carbon steel pipeline in Unit 120 due to defects" by Conequipos;
USD 69 k for "Direct labor to repair underground pipeline in Unit 044" by Conequipos;
USD 51 k for "Direct labor to repair refractories in Furnaces 115/116-F-001" by Conequipos;
USD 166 k for "Direct labor to repair Exchangers 110-HCU-E-007A/B in Unit 110" by Conequipos;
USD 72 k for "Purchase of materials to repair exchangers 110-HCU-E-007A/B of Unit 110" by Conequipos;
USD 305 k for "Provide support of direct and subcontract personnel to repair underground pipeline in Unit 044" by MASA S.A.S.[for MASA S.A.S. items, see LI ER, Table 9.5-14 at pdf p. 425];

1834. The total is thus <u>USD 10.3 million</u>[1848].

Criticisms by CB&I's expert

1835. CB&I's expert on the quantum of Reficar's claims, Ankura, provides three major criticisms of LI's damages calculations for corrective works, all of which will be dismissed by the Tribunal.

1836. <u>First</u>, Ankura says that LI's calculations are flawed because they disregard the provisions of the EPC Contract, namely through:

- The inclusion of defects valued at less that USD 50,000[1849], and

- Not discounting the 50% component of costs for alleged defects that required greater than USD 50,000 to remedy[1850].

1837. The Tribunal would concur with Ankura if CB&I had complied with the Contract and carried out the defect reparation itself. In that, case, defects under USD 50,000 would have been borne by Reficar and those above the threshold, would have been split.

1838. But this is not what happened here. CB&I breached the Contract by refusing to correct the defects. And, in cases of contractual breach, Art. 1613 of the CCC entitles the aggrieved party to seek full compensation[1851].

1839. For this reason, the Tribunal need no longer look at the contractual arrangements of the distribution of costs or any underlying thresholds. Those arrangements were highly beneficial to CB&I and CB&I could have availed itself of them, had it

---

USD 127 k for "Provide labor and hydroextractors to repair exchangers in Units 108 and 109 by MASA S.A.S;
USD 91 k for "Costs related to repair of Furnace 116-F-001" by MASA S.A.S.;
USD 80k for "Scaffolding used to repair refractories in Furnaces 115/116-F-001" by Tubos Vouga [for all Tubos Vouga items, see LI ER, Table 9.5-16 at pdf p. 426];
USD 15 k for "Scaffolding used to repair refractories in Furnace 116-F-001" by Tubos Vouga;
USD 93 k for "Direct man-hours spent to repair construction defects" by Daily Thermetics Instrument Corp., see LI ER, Table 9.5-16 at pdf p. 427; and
USD 21 k for "Study required due to design defects in cathodic protection system and the corrosion of underground pipelines" by INSERCOR, see LI ER, Table 9.5-19 at pdf p. 431;
USD 28 k for "Correction of construction defects" by Tapco Enpro International Inc., see LI ER, Table 9.5-23 at pdf p. 436;
USD 93 k for "Study required to design Defects in Cathodic Protection System" by TECNA I.C.E. S.A., see LI ER, Table 9.5-24 at pdf p. 437 and LI ER, para. 1430 proving that these were "design" defects discovered in July and September 2015, *i.e.*, after Mechanical Completion.
[1848] USD (million) 7.15+3.11= USD 10.26 million or USD 1.3 million when rounding.
[1849] Ankura ER, paras. 766, 780-782, 788-790.
[1850] JER 6 on Claimed Costs & Quantum, Respondent's Expert columns for: Issue 189 at pdf p. 261, Issue 196.B at pdf pp. 271-272; Issue 196.C at pdf pp. 275-276.
[1851] CL-0018, English translation:
"Article 1613. <COMPENSATION FOR DAMAGES>. Compensation for damages includes consequential damage and loss of profit, whether derived from failure to comply with the obligation or from imperfect compliance or from delayed compliance.
Cases where the law expressly limits compensation to consequential damage are excepted".

complied with its obligation to correct defective works. Since it did not, it assumed the risk of the totality of the associated cost.

1840. Second, Ankura says that LI has failed to prove that the amounts claimed actually arose from defects for which CB&I was responsible under the EPC Contract – instead, LI allegedly only performed a subjective analysis of a list of work activities by Reficar's PCS contractors[1852].

1841. The Tribunal disagrees with Ankura's criticism. The only analysis submitted to the Tribunal which quantifies the value of defects for which CB&I is responsible was prepared and submitted by LI[1853]; Ankura has not provided an alternative calculation. Upon scrutiny, the Tribunal considers LI's analysis to be plausible. The calculations performed by LI were amended as a result of the Joint Expert Report exercise, in which LI agreed with CB&I's experts that its initial calculations required some modifications. The Tribunal is not aware of any further criticisms to these updated calculations by CB&I's experts.

1842. Third, Ankura argues that the exchange rate used by LI for the two main PCS contractor man-hour rates (1 USD = COP 2,202.23) is inflated because, at the relevant time, the exchange rate was 1 USD = COP 2,751.26[1854].

1843. Ankura fails to mention that CB&I advocates for the exchange rate used by LI as the correct one when calculating other amounts, including for setting off any amounts awarded by the Tribunal[1855]:

> "In converting amounts from COP to USD, the Tribunal should apply an exchange rate of USD 1 to COP 2,202.23. The Parties used this exchange rate during the Project, including in cost reporting done by Reficar and FW. This rate, therefore, reflects the Parties' expectations and provides a reasonable and appropriate mechanism for converting amounts from COP to USD" [Citations omitted, emphasis added].

1844. It is improper for CB&I to choose a different exchange rate whenever the one used on the Project as a reasonable and appropriate mechanism is not beneficial to its position; hence, Ankura's argument is dismissed.

\* \* \*

1845. For the reasons above, the Tribunal finds that Reficar is entitled to USD 10.3 million for CB&I's breach of its obligations to correct defective Works.

---

[1852] Ankura ER, paras. 769-772, 791-792.
[1853] The Tribunal notes that the Expert Report of Mr. Hillier contains in Section I, para. I8, a list of criticisms towards LI's calculations; however, the analysis does not propose any alternative calculation.
[1854] Ankura ER, para. 765, referencing paras. 758-763 and Table ACG IX-2 at pdf p. 357.
[1855] RPHB, para. 642 and fn. 1241 at pdf p. 241.

ICC Case 21747 RD/MK/PDP
Final Award

## VII.2.5.    PROCUREMENT COSTS

1846. Apart from the reimbursement claim for breach of the Cost Control Commitments with regard to procurement costs, Reficar brings an alternative claim for breach of CB&I's procurement obligations under the EPC Agreement[1856].

1847. To avoid awarding double- recovery, the Tribunal will not analyse Reficar's claims to the extent that they have already been addressed in the Improper EPC Costs Section. Thus, in the current Section the Tribunal will address the remaining claims for EPC Costs, which fall under the category of procurement, namely improper Vendor costs (**1.**) and Back-Charges (defined in Sub-section 2 *infra*) (**2.**).

### 1.    IMPROPER VENDOR COSTS

1848. Reficar argues that CB&I breached its duties under the EPC Contract to properly pre-qualify and manage Vendors, which led to damages of <u>USD 141.92 million</u>[1857]. CB&I avers that its role in procurement was very limited and its management of Vendors appropriate, and that it cannot be held liable for Reficar's actions which caused cost overruns[1858].

1849. Reficar's procurement-related claims are similar to the reimbursement claim discussed in the Section devoted to Improper EPC Costs: in essence, Reficar claims that CB&I is responsible for any procurement-related unreasonable or improper costs incurred in breach of the Contract. Despite the similar arguments by Reficar, the Tribunal cannot apply the same methodology as it did for the reimbursement claim, because the monies for procurement did not flow through CB&I and thus the Cost Control Commitments did not apply to CB&I's procurement activities; as a result, in the Tribunal's previous decision, all procurement-related Excess Costs were excluded from Reficar's reimbursement claim (see Section VII.2.1.3.3.3.G *supra*).

1850. Reficar says that the Tribunal must analyse the alleged Vendor-related cost overruns "based on [...] CB&I's Contractual *Dolo*"[1859].

1851. The Tribunal will thus focus on whether CB&I breached its Vendor-related obligations under the EPC Contract. In doing so, it will first look at the Parties' arguments (**1.1.**) and later enter into a discussion (**1.2.**).

### 1.1.    THE PARTIES' POSITIONS

1852. Reficar argues that under the EPC Agreement, CB&I was responsible for a multitude of procurement tasks on the Project, the most important of which was

-    pre-qualifying bidders in the pre-selection phase; and then

-    managing the Vendors in the post-selection phase;

---

[1856] See Requests for Relief under Section VI *supra*.
[1857] Communication C-175, p. 5, Table 1.
[1858] RPHB, paras. 327-338, 347-349; ESOD, paras. 515-519; 536; 544-545; 547-552.
[1859] CPHB, para. 532; requests for relief 26-29 at pdf p. 242.

CB&I's failure to properly perform these and certain other procurement-related tasks justifies its responsibility for the Vendors' cost overruns[1860].

1853. CB&I, on the other hand, argues that the EPC Contract made Reficar ultimately responsible for all procurement; CB&I only provided services that would assist Reficar[1861]. CB&I also avers that Reficar retained factual control over procurement activities (regardless of the Contract provisions), from issuing the purchase orders, through negotiating Vendor agreements, procuring equipment and material on its own paper, to giving or withdrawing final approval over all procurement decisions[1862].

1854. As regards the pre-qualification, Reficar avers that CB&I designated unqualified bidders as technically acceptable – this meant that incompetent companies were granted supply contracts and later failed to properly deliver the materials and equipment they were supposed to[1863]. CB&I, however, insists that it did its utmost efforts to only pre-qualify bidders compliant with the requirements for each procured material or equipment, but Reficar insisted on choosing local companies despite CB&I's warnings as to their unviability[1864].

1855. According to Reficar, under the EPC Contract, CB&I was responsible for a Vendor's lack of compliance with its obligations towards Reficar[1865]. In particular, CB&I failed its management obligations with regard to Vendors working in four areas:

- structural steel fabrication[1866];

- pipe spool fabrication[1867];

- electrical substations[1868]; and

- automation[1869].

1856. CB&I denies the allegation: in fact, it was Reficar who mismanaged the Vendors, for example through failing to pay in a timely manner[1870]. CB&I also gives detailed arguments for why it did not breach its obligations with regard to Vendor selection

---

[1860] CPHB, paras. 257-259.
[1861] See Section VI with Reficar's request for relief.
[1862] ESOD, para. 464, first row in the table, also paras. 466, 468-477.
[1863] CPHB, para. 266-268.
[1864] ESOD, paras. 515-519; 536; 544-545; 547-552.
[1865] CPHB, para. 269, citing to TC 26.4.1 and TC 26.4.3.
[1866] CPHB, paras. 271-276. The Tribunal notes that there were various steel fabrication Vendors but Reficar's claims focus on ASER (see heading prior to para. 271 in CPHB, stating "Steel Fabrication (ASER)".
[1867] CPHB, paras. 277-285.
[1868] CPHB, para. 286.
[1869] CPHB, para. 287.
[1870] ESOD, paras. 507-512.

and management in structural steel fabrication[1871], pipe spool fabrication[1872], electrical substations[1873] and automation[1874].

1857. Reficar also argues that CB&I committed a number of other procurement-related breaches; all of these allegations will be dismissed by the Tribunal.

## 1.2. DISCUSSION

1858. The Tribunal will first outline the Parties' procurement-related obligations under the EPC Contract (**A.**) and then dismiss Reficar's arguments about CB&I's alleged failures in the Vendor pre-selection phase (**B.**) and the post-selection phase (**C.**).

## A.    Responsibility for procurement under the EPC Contract

1859. Reficar argues that CB&I was responsible under the Contract for "the vast majority of procurement-related tasks" and that CB&I was the party that led the procurement process[1875]; Reficar only retained a degree of approval and involvement typical on a cost-reimbursable contract[1876].

1860. CB&I sees things differently: the EPC Agreement is in fact an "EC" one, with Reficar being in full control of procurement[1877]. CB&I says that Reficar cannot now put the blame on CB&I for any procurement cost overruns, as Reficar made all the procurement-related decisions on the Project[1878].

1861. The Tribunal sides with CB&I.

1862. The EPC Contract is clear in delineating the respective roles of each Party: Reficar was the Party with decision-making powers and CB&I was to provide Reficar with the assistance and support it would require to enact those decisions.

1863. The above division of responsibilities arises from two areas of the Contract: the Procurement Execution Plan, which forms part of the EPC Contracts as Annex 7 (**a.**) and TC 26 "Procurement" (**b.**), with particular focus on CB&I's obligation to "manage" Vendors (**c.**).

## a.    Procurement Execution Plan

1864. The Procurement Execution Plan, appended to the EPC Contract as Annex 7[1879], contains detailed guidance on the responsibility of each Party for procurement-related tasks.

---

[1871] ESOD, paras. 515-528.
[1872] ESOD, paras. 529-535.
[1873] RPHB2, para. 36; fn. 119 at pdf p. 20.
[1874] RPHB2, para. 37; fn. 121 at pdf p. 20.
[1875] CPHB, para. 257; Reply, para. 450.
[1876] Reply, paras. 454-458.
[1877] ESOD, paras. 468-470.
[1878] RPHB, paras. 326-328.
[1879] The Procurement Execution Plan was updated during the Project, most notably in May 2012, with its Revision 9; however, these changes did not impact the main division of responsibilities under the DOR analysed *infra*; see Ex. C-1079.

1865. Section 2 of the Procurement Execution Plan titled "CB&I Entities and Responsibilities" contains a Division of Responsibility Matrix ["**DOR Matrix**"] assigning duties and responsibilities in 47 categories using the following terminology[1880]:

> L = Lead/Responsible; S = Support; I = Information; A = Approval; N/A = None

1866. Reficar argues that, pursuant to the DOR Matrix, it was the Lead/Responsible party for only four out of the 47 items, proving CB&I's responsibility for procurement on the Project overall[1881].

1867. This is only half true, because Reficar fails to mention that its input was required for all items, but three[1882]. So, while *prima facie* CB&I was responsible for the majority of procurement tasks, Reficar retained approval authority for the key stages of the procurement process such as[1883]:

- developing the primary list of bidders,

- changes to recommended suppliers/bidders lists,

- selecting preferred bidders for contract negotiations,

- negotiating final outstanding commercial considerations,

- greenlighting the final commercial and technical bid analyses authorizing contract award, and

- the signing of the Purchase Offer.

1868. CB&I says it was Reficar who bore lead responsibility or final approval authority over the crucial steps[1884], with CB&I only leading the process from an administrative standpoint[1885]. And the Tribunal agrees. In fact, Reficar itself has acknowledged that that it "maintained a degree of approval and involvement"[1886].

1869. The Tribunal's findings under the DOR matrix are confirmed by the provisions of TC 26.

**b.    TC 26 Procurement**

1870. While the DOR matrix contains detailed procurement-related tasks for both Parties, TC 26 of the EPC Contract is key to establishing the Parties' responsibility for any procurement failures.

---

[1880] JX-002, p. 487; JX-004, p. 462.
[1881] JX-002, pp. 487-490; JX-004, pp. 462-465.
[1882] These were: "Coordinate contact with bidders prior to receipt of bids", "Coordinate preparation of RFQ bid addendum(s)" and "Create bid tabulation document (RFQ specific)".
[1883] Items 4, 6, 24, 25, 28 and 32; JX-002, pp. 487-490; JX-004, pp. 462-465.
[1884] ESOD, paras. 476-477.
[1885] ESOD, para. 475.
[1886] Reply, para. 454.

372

1871. First, TC 26 designates CB&I as the responsible party for providing all procurement services on the Project[1887]:

> "26.1 Responsibilities
>
> 26.1.1 In accordance with the Scope of Work, the Contractor is responsible for providing all procurement services (including the administration of any Purchase Offers after they have been entered into by the Owner) necessary for the Work" [Emphasis added].

1872. The wording of TC 26.1 specifically omits a statement that CB&I was responsible for all procurement activities; instead, CB&I was responsible for providing all procurement services. The Parties' intention for CB&I's limited role in Project procurement is elucidated by the example the EPC Contract provides in parentheses: CB&I's procurement services would include administering any of Reficar's contracts with the Vendors[1888].

1873. Another example of CB&I's procurement services is ensuring reasonable warranty conditions for Reficar's contracts with the Vendors, as found in TC 26.1.4:

> "26.1.4 The Contractor will ensure that each Purchase Offer will contain warranty requirements which are acceptable to the Owner (acting reasonably) for any materials, Equipment, machinery, spare parts, or supplies that are purchased from Vendors".

1874. Second, further subsections of TC 26 specify that the contracts with the Vendors must be entered into by Reficar or by CB&I, but acting in Reficar's name and on Reficar's behalf; this provision reinforces Reficar's ownership of and responsibility for Procurement[1889]:

> "26.1.3 Without prejudice to TC26.1.1 and TC26.1.2, all Purchase Offers will be entered into by the Owner or by the Contractor in the Owner's name and on its behalf […]".
>
> [As an exception to the general rule, TC 26.1.6 of the Onshore Contract[1890] stipulates that CB&I is authorized to sign in its own name into contracts for consumables and tools for less than COP 50 million[1891] (USD 27 thousand[1892]). Neither Party is making pleadings about CB&I's responsibility for such contracts.]

1875. Third, the Contract further specifies that it will be Reficar who will deal with all financial aspects relating to procurement:

---

[1887] JX-002, p. 201; JX-004, p. 185.
[1888] See TC 1 Definitions: ""Purchase Offer" means any contract of any type between the Owner and the Vendor for the supply of Equipment by the Vendor"; JX-002, p. 169; JX-004, p. 155.
[1889] JX-002, p. 202; JX-004, p. 185.
[1890] The provision is "Not Used" under the Offshore Contract.
[1891] JX-002, p. 202.
[1892] This calculation is based on the exchange rate of 1 USD = 2202.23 COP that the Parties used during the Project; see RPHB, para. 642 and fn. 1241 at pdf p. 241.

- Reficar will be the party responsible for making all payments under its contracts with the Vendors, with no mention of CB&I in this regard[1893]:

> "[…] The Owner will be responsible for making all payments under the Purchase Offers referred to in TC26.1.3";

- Reficar has the right to collect on any amounts recovered through Vendor warranties; CB&I would only <u>assist</u> Reficar in their enforcement[1894]:

> "[…] The Owner […] will have recourse only to the relevant Vendors of such Equipment for satisfaction of any Vendor warranties. The Contractor shall assist the Owner in the enforcement of any Vendor warranties but shall not be required to institute any arbitration or litigation proceedings (although the Contractor must still provide assistance to the Owner during such proceedings)".

c.    <u>Obligation to "manage"</u>

1876. The focal point in establishing CB&I's responsibility towards Reficar for Vendor underperformance is the interpretation of the term "manage" under TC 26.4.1: if CB&I complied with its management obligation, then it was released from responsibility for Vendors[1895]:

> "26.4.1 […]
>
> Provided that the Contractor has complied with its obligations to Manage, <u>the Contractor shall have no responsibility for compliance by</u> Third Party contractors, <u>Vendors</u> or the Freight Forwarder <u>with the provisions of such Third Party contracts or Purchase Offers</u> entered into by the Owner" [Emphasis added].

1877. The obligation to "manage" is elaborated upon in a further subsection of TC 26.4, in a broad and generic manner[1896]:

> "26.4.3 For the purposes of this TC26.4, "Managing" shall mean planning, directing, coordinating and actively administering the relevant Person by taking those steps in the Contractor's power which are capable of achieving the desired results under the relevant contract, <u>which a prudent, diligent and reasonable engineering, procurement and construction company, which is properly qualified and competent in performing services of a similar nature, would take with the aim of achieving such results</u> (short of entering into a formal dispute resolution procedure with that Person), and "Manage" and "Management" shall be construed accordingly" [Emphasis added].

1878. CB&I's obligations in managing Vendors were limited to taking any actions that any prudent, diligent and reasonable EPC company would take in order to achieve the results desired under the EPC Contract. In addition, in fulfilling these obligations, CB&I was limited to only taking those steps that were in its power;

---

[1893] JX-002, p. 202; JX-004, p. 185.
[1894] JX-002, p. 202; JX-004, p. 185.
[1895] JX-002, p. 204; JX-004, p. 187.
[1896] JX-002, p. 205, JX-004, p. 188.

thus, any decision by the Owner contrary to CB&I's recommendations would override any responsibility on CB&I's part.

1879. This finding is reinforced by the wording of TC 26.4.3, which obligates Reficar to cooperate with CB&I in the latter's performance of its duty to manage the Vendors[1897]:

> "The Owner shall cooperate in a timely manner with the Contractor to enable the Contractor to perform its Management obligations".

1880. The level of responsibility is thus much lower than with regard to Third Party Subcontractors, for whose performance CB&I undertook complete responsibility as a matter of an obligation of result.

\* \* \*

1881. In sum, CB&I's duties to manage Vendors were twofold:

- on the one hand, it assisted Reficar in the pre-selection process of bidders; the winners of the tenders administered by CB&I would become Vendors, who would enter into a contractual relationship directly with Reficar;

- after the selection of the Vendors, CB&I was tasked with managing the contracts, by performing all actions within CB&I's powers which could be expected of a "prudent, diligent and reasonable" contractor.

1882. The DOR matrix and TC 26 prove that CB&I's procurement duties were, unlike for engineering and construction, limited to supporting Reficar.

**B.    Pre-selection duties**

1883. Reficar's accusations first focus on CB&I's duties in the pre-selection phase, and more specifically, the pre-qualification of bidders for the tender.

1884. The purpose of the pre-qualification procedure was to guarantee that Vendors participating in the tender met certain technical criteria (to ensure that they can perform the work) and financial requirements (to ensure their solvency) criteria[1898].

1885. Reficar argues that CB&I failed to properly pre-qualify bidders, which led to the selection of poor Vendors, who later underperformed, leading to Reficar incurring cost overruns. According to Reficar, CB&I included on the pre-qualified bidders' lists Vendors which did not meet the strictly enumerated technical and financial criteria[1899]. Reficar has made specific claims regarding the pre-qualification of two bidders: ASER and Boccard.

---

[1897] JX-002, p. 205, JX-004, p. 188.
[1898] See Section 7 "Recommended Suppliers / Bidders Lists" of the Procurement Execution Plan; JX-002, pp. 498-499; JX-004, pp. 473-474.
[1899] Reply, para. 507.

1886. CB&I accuses Reficar of interfering with CB&I's bidder pre-qualification process and of having forced it to pre-qualify certain Colombian vendors, regardless of whether they fulfilled the requirements and despite CB&I's warnings[1900].

1887. The Tribunal has reviewed the available evidence and sides with CB&I.

### a.  ASER

1888. On June 16, 2010, CB&I notified Reficar about having shortlisted three bidders for the structural steel fabrication: a Chinese one, a UK one and ASER-Colombia[1901].

1889. According to Reficar, CB&I provided a June 2010 Bid Tab[1902], showing that ASER was technically acceptable. Reficar concedes, however, that the document contained a note stating[1903]

> "Acer [sic] only do Revenues of $6m per annum have concern over finances of that company. Verify if "Temporary Union" is legal. How will they manage +/- $20m Recommend not use unless (illegible) support".

1890. Two days later, Reficar's Mr. Beltrán wrote that only ASER-Colombia had the capability to obtain the necessary finance and expressed his disapproval for including the UK company in the shortlist[1904].

1891. The Short List Authorization document, also from June 2010, lacks a "tick" in the box titled "Technical Acceptance" for all fabricators, including ASER[1905].

1892. By the end of June, Reficar's Mr. Beltrán stated that,

> "it is clear that the ASER group have provided sufficient evidence that they can support a large portion of the structural steel fabrication requirements for the [Project]"[1906].

1893. Reficar preferred ASER over the other provider because of its lower costs, and also "to give the national industry 50% of this project"[1907], as explicitly stated in the Contract Committee meeting minutes from June 28, 2010.

1894. On July 2, 2010 Mr. Deidehban warned Reficar about ASER[1908]:

> "[i]n the case of ASER, no information that they have supplied gives us the confidence that they will be able to perform at the expected levels nor can we see that they have done anything close to what they are committing to at anytime in the past".

---

[1900] RPHB, para. 333, citing to Tr. 2844:24–2845:16.
[1901] Ex. R-0828, pp. 2-3.
[1902] The Tribunal has been unable to locate the exhibit.
[1903] Reply, fn. 1044 at pdf p. 257. No exhibit is referenced in the footnote despite it containing a direct citation.
[1904] Ex. R-0828, p. 1.
[1905] Ex. B-352.
[1906] Ex. R-1849_00331, p .1.
[1907] Ex. R-3766, pp. 4-5; translation at pp. 12-13.
[1908] Ex. R-0237.

1895. Mr. Deidehban observed that Reficar could override CB&I's recommendations and choose to award the contract to ASER, but emphatically stated that it would have to do so at its own risk[1909]:

> Everyone's intent in evaluation and recommendation process, in all cases, is to set the project up for success. At any time Reficar has the right to deviate from a recommendation made by CB&I. By definition it is not acceptable for Reficar to instruct CB&I to change our recommendation, however, by all means at any time Reficar can instruct CB&I to award an order in any form our shape to any supplier Reficar so chooses with the full understanding of any associated risks.

1896. On July 6, 2010 CB&I proposed two alternatives to Reficar, in which 60% of the steel fabrication would be awarded to a Chinese Vendor and the other 40% could either be granted to the reputable UK company, or to ASER[1910].

1897. The proposal to include ASER was hedged by a number of caveats, such as doubts as to ASER's capacity to undertake the contract, its lack of experience and financial condition[1911]. CB&I explicitly stated that it had not approved ASER and that it had reservations to awarding a contract to this company[1912].

1898. Despite CB&I's numerous warnings, in a response of July 9, 2010 Reficar's Mr. Bustillo explained why Reficar would ultimately award 40% of the contract to ASER and not to the experienced UK company, emphasising the opportunity for Colombian Vendors[1913]:

> Additionally, the bid evaluation shows that ASER is the technically acceptable low bid, and although the bid tab makes it clear that the potential amount of work they will get is much more than they normally do, you must also consider that the opportunity for
>
> Colombian vendors in the Colombian market has been so far limited but lack of experience alone is not a definite indication that this company would not be capable of complying with our requirements. This project represents the largest project in the country, and we are fully committed to benefit in as much as possible - within the boundaries of what is fear, feasible and reasonable - the Colombian industry and to serve as a boost to our economy generating work opportunities to develop local experience and knowledge. Furthermore, as you are also aware the expectations of the local vendors are immense.

1899. Reficar says that CB&I was negligent in pre-qualifying bidders for procuring structural steel on the Project: if it had properly vetted the bidders, ASER would never have made it to the list of pre-qualified bidders, and would not have been selected for the Project[1914].

1900. The Tribunal does not agree: there is ample evidence showing CB&I's concerns about ASER's capabilities and Reficar's insistence on choosing ASER. A decision, which CB&I warned Reficar, it would take at its own risk. Reficar cannot, now, shift on CB&I the responsibility for ASER's failure.

---

[1909] Ex. R-0237.
[1910] Ex. R-0238.
[1911] Ex. R-0238, p. 2.
[1912] Ex. R-0238, p. 2.
[1913] Ex. C-1055, pp. 1-2.
[1914] RPHB, paras. 273-276; Reply, paras. 514-516.

Reficar's counterarguments

1901. Reficar makes two counter-arguments:

1902. (i.) First, it argues that its hands were tied whenever CB&I included in the pre-qualified bidders' lists companies that did not meet the necessary criteria. In those instances, Reficar was obligated to choose the lowest bidder. Thus, the responsibility for any cost overruns caused by underperforming Vendors lay with CB&I.

1903. But the evidence shows that Reficar's hands were not tied and that it was perfectly capable of going against CB&I's judgment and including other Vendors of its own choosing among the pre-qualified bidders.

1904. (ii.) Reficar makes a second, equally unconvincing counterargument; namely, that it was impossible for it to adhere to CB&I's recommendations whenever CB&I advised it against awarding supply contracts to Colombian companies[1915]. Reficar's witness, Mr. Chinchilla, goes so far as to testify that "CB&I did not like national Vendors, despite the fact that it was a contractual obligation to give them the opportunity to participate"[1916].

1905. Mr. Chinchilla is referring to TC 26.1.10, prioritizing local, then regional and finally national suppliers[1917]:

> "26.1.10 As far as possible, the Contractor shall, when procuring all Lower Tier Subcontracts, Purchase Offers and contracts, give preference first to local suppliers, secondly to regional suppliers, and lastly to national (Colombian) suppliers" [Emphasis added].

1906. Mr. Chinchilla's testimony is, however, unconvincing: CB&I did not have any incentive to disregard TC 26.1.10. And, in any event, TC 26.1.10 did not stipulate that local, regional or national suppliers should be granted supply contracts, even if they did not fulfil the necessary commercial and technical criteria: this is clear from the conditional language of "as far as possible".

1907. Thus, Reficar was fully entitled to follow CB&I's warnings and not to grant supply contracts to local companies, which failed to fulfil the necessary technical and financial requirements, even if those companies were Colombian entities.

1908. Instead, the Project record shows that in some instances Reficar used TC 26.1.10 to pressure CB&I into pre-qualifying and selecting Colombian bidders, despite CB&I's warnings about the risks involved.

**b.    Boccard**

1909. Boccard was one of the key Vendors selected for the fabrication of pipe spools, one of the most prevalent construction elements required for the Project.

---

[1915] ESOC, para. 508.
[1916] Chinchilla CWS, para. 64.
[1917] TC 26.1.10, JX-002, p. 203; JX-004, p. 186.

1910. There is ample evidence in the record which shows CB&I's contemporaneous warnings regarding the Vendor's adequacy and Reficar's insistence and, therefore, Reficar's risk assumption:

1911. On October 26, 2010 Reficar's Mr. Beltrán sent a letter to CB&I's Mr. McShannon, attaching a memorandum[1918] with Reficar's observations on the Bid Tab for the supply of pipe spools; under point 7, Reficar expressly acknowledges that it is aware of the risk connected with selecting Boccard, there being no assurance that its local facility would be operational in the timeline required[1919].

1912. There is also an undated excel sheet (but certainly preceding the contract award date to Boccard) titled "Pipe Fabrication Review- Cartagena Project", last modified by Reficar's Mr. Beltrán, which proves Reficar's prior knowledge of the state of Boccard's Colombian facility[1920]:

> Boccard has two facilities: Houston & new facility near Cartagena, Col. Col. Facility not up and running. Have reassured that it will be by November, 2010

1913. The letter from Boccard with its best and final offer to both CB&I and Reficar[1921] reiterates Boccard's intention to use the Colombian facility[1922]:

> "our proposal enhances local content while providing the benefits of using our Houston fabrication and management capabilities" [Emphasis added].

1914. Bearing in mind Reficar's position regarding other Vendors, it is likely that Boccard was selected, precisely because it offered to handle the fabrication of at least a certain degree of the pipe spools in Colombia.

1915. For this reason, CB&I cannot be held accountable for any negative consequences of selecting Boccard, as it duly notified Reficar of the risk involved with contracting with the company, which had plans to use a local shop that was not yet operational.

## C.    Post-selection duties

1916. The Tribunal has already found that in accordance with the EPC Contract Reficar retained responsibility for procurement and that CB&I's role was only to provide assistance to Reficar. In addition, the Tribunal has established that Reficar ignored CB&I's warnings and directed the pre-qualification of local bidders.

1917. No matter what degree of diligence CB&I could have applied subsequent to the choice of bidders, if deficient Vendors had been selected due to Reficar's interference, CB&I cannot be held liable for the underperformance. This alone would exculpate CB&I from liability for any cost overruns due to the failures in performance of ASER and Boccard.

---

[1918] Ex. R-1849_0508, p. 1.
[1919] Ex. R-1849_0508, p. 3.
[1920] Ex. C-1619, cell E49.
[1921] The first listed addressee is Reficar's Mr. Beltran; the Tribunal notes that the other best final offer letters are addressed only to Mr. Beltran; see Ex. C-1617, pp. 6-10.
[1922] Ex. C-1617, p. 10.

1918. In an abundance of caution, however, the Tribunal will analyse Reficar's particular claims for CB&I's alleged mismanagement and reckless indifference to cost and schedule with regard to four Vendors, for whose underperformance Reficar presents monetary claims:

**a.    Steel fabrication (ASER)**

1919. As regards steel fabrication, even though Reficar's claim concerns multiple steel fabricators, its arguments focus on ASER in particular.

1920. Reficar argues that CB&I should be responsible for the increase in steel quantities caused by improper estimations and late delivery of engineering drawings[1923].

1921. CB&I argues that the increases in steel quantities were a natural implication of the design changes made in the Project, mostly during the initial stages[1924].

1922. The Tribunal is convinced by CB&I's argument.

1923. CB&I has plausibly argued that in the initial stages of the Project, Reficar introduced design changes, which resulted in revisions to engineering drawings and to late delivery of engineering deliverables. The total EPC costs grew by some USD 750 million from signing of the EPC Contract (USD 3,221 million) to issuance of the Representation Forecast (USD 3,971 million), due to Synergy Changes and other scope changes ordered by Reficar; Reficar tacitly accepted this increase when it decided to continue with CB&I as the Contractor after receiving the Representation Letter.

1924. Given the number of changes ordered by Reficar at the initial stages of the Project, it is dubious that even a diligent contractor would have been able to produce all the engineering deliverables on time.

1925. To succeed in its claim, Reficar would also need to prove that CB&I failed to undertake steps, which were in CB&I's power, that a diligent and reasonable contractor would have undertaken. Reficar has not pointed the Tribunal to any such particular steps.

Mitigation actions by CB&I

1926. The finding of the Tribunal that CB&I is not responsible is reinforced by CB&I's actions vis-à-vis ASER, the main underperforming Vendor.

1927. When CB&I discovered the unsatisfactory performance of ASER, it took several mitigating steps:

-    CB&I assigned its own employees to ASER's Colombia shop[1925];

---

[1923] CPHB, para. 272; Reply, paras. 446, 465; ESOC, paras. 286-288.
[1924] RPHB, paras. 190-192, 306; ESOD, paras. 465-466.
[1925] Ex. R-0832, p .1.

- CB&I self-performed certain of the fabrication drawings that ASER was supposed to prepare[1926];

- CB&I eventually assigned five inspectors to ASER's shops and hired an additional country supervisor[1927];

- CB&I supported Reficar, when ASER eventually sued Reficar[1928].

**b.   Pipe spool fabrication (Boccard and Shaw)**

1928. Reficar argues that CB&I was responsible for cost overruns arising from the contracts with Boccard and Shaw, because CB&I was late in the delivery of the engineering[1929].

1929. The Tribunal is not convinced.

1930. The Tribunal has found that CB&I has plausibly argued that in the initial stages of the Project, Reficar instructed it to introduce design changes, which required drawings to be revised and engineering deliverables being late: this finding is true not only for steel fabrication but also for pipe spool fabrication.

1931. In addition, CB&I argues that Reficar made delayed payments to the Vendors.

1932. The minutes from a meeting between Reficar and CB&I dated July 18-22, 2011 prove that CB&I was informing Reficar of the delays in obtaining the necessary inputs from the Vendors, in particular in the area of pipe spool fabrication:

---

[1926] CB&I cites to its letter to Reficar Ex. R-1849_06622 in which it offers to perform a portion of ASER's work on drawings; Reficar has not argued that this has not in fact happened.
[1927] ESOD, para. 527, citing to Ex. R-0837, p. 6. Reficar has not disputed CB&I's statements about hiring the additional employee or delegating additional inspection staff to ASER or its sub-fabricator's facilities.
[1928] Mr. Baker's testimony at Tr. 3607:1-5.
[1929] ESOC, paras. 281-285.

| | **Piping:** |
|---|---|
| 13 | Internal 30% Model reviews not conducted. (Disciplines working up to the last minute to incorporate late vendor and Process data, Majority of the vendor data is Preliminary, P&ID's not officially issued IFD). |
| 14 | All lines associated with this review are considered preliminary awaiting IFD Process data and 1st pass vendor information. |
| 15 | Stress / Hydraulic Reviews of critical lines not completed. (P&IDs not officially IFD, Line list data not available. Process and Mechanical data lacking.) |
| 16 | Preliminary structure modeling not completed. (Lacking good Vendor and Process line sizing data.) |
| 17 | Nozzle orientation studies not completed. (P&ID's not officially IFD, changes to vessel internals. Instrument sketches not issued) |
| 18 | Equipment modeling not completed to 1st pass vendor data. |
| 19 | A/G, U/G Tie-points and demo requirements not field verified / confirmed. (Awaiting IFD process data) |
| 20 | Preliminary in line instrument data not available. |

1933. CB&I avers that Shaw's and Boccard's delays were exacerbated by the late arrival of valves from another of Reficar's Vendors, whom Reficar had failed to pay for almost two years[1930]. The Tribunal tends to give credence to CB&I's argument, which is supported by

-   the minutes of a meeting between Reficar and CB&I of July 13, 2011, during which CB&I informed Reficar about the Vendor's complaints[1931]:

    "Timely payment of invoices from Reficar specifically on Valve orders. Several invoices have been with Reficar for over 60 days. Vendor is threatening to place order on hold, Reference CB&I expediting alert issue July 1st, 2011. NEED to improve process" [Emphasis added; capitals in the original]; and

-   a letter from CB&I to Reficar from March 23, 2012, reiterating delays in payments to the valve Vendor[1932].

1934. Reficar brings a final accusation against CB&I, namely that the final quantities of the piping materials increased exponentially in comparison with the initial

---

[1930] Ex. R-1849_09547; Table 9.3 at WMC ER at pdf p. 516, citing to Ex. R-2954; WMC ER, paras. 1439-1442.
[1931] Ex. R-0787, p. 21.
[1932] Exs. Ex. R-1849_07275, with Attachments 1 through 3.

projections[1933]. In a cost-reimbursable EPC Contract the risk of any cost overruns due to quantity increases lies with Reficar (except if there is a breach of the Cost Control Commitments – which do not apply to CB&I's management of Vendors); thus, CB&I cannot be held liable for any amounts Reficar paid to the Vendors in excess of the initial estimations of their costs without the application of the Cost Control Commitments to procurement.

c.    **Automation (Invensys)**

1935. Invensys was the supplier of Refinery process control systems[1934] responsible for automation of the Central Control Building[1935]. Reficar argues that Invensys submitted numerous Change Orders due to CB&I's late and deficient engineering[1936]. Long International, Reficar's expert, claims that Reficar paid excessive costs arising from "rework resulting from excessive data base revisions"[1937].

1936. The Tribunal is unconvinced.

1937. Reficar has failed to prove that CB&I failed to properly manage Invensys.

1938. According to Reficar, CB&I issued a total of 88 Change Orders related to the work of Invensys. Reficar does not identify the exact Change Orders, but refers to the report of its expert, Long International[1938], who in turn references the witness statement of Reficar's Mr. Arenas[1939]. Long International does not, however, analyse the findings of Mr. Arenas, or the data used by him.

1939. Be that as it may, CB&I provides an explanation for these multiple changes, which, for the reasons already explained, looks plausible: the existence of multiple design changes ordered by Reficar[1940].

d.    **Electrical substations (Powell)**

1940. Powell Electrical Systems ["**Powell**"] was the supplier of prefabricated electrical substations for the Project[1941].

1941. Reficar claims that CB&I should be held liable for a payment made to expedite delivery of certain substations: even though Reficar paid a premium for the substations to be delivered more quickly, due to CB&I's failure to prepare the foundations, the substations could not be installed immediately and thus the premium was wasted[1942].

---

[1933] CPHB, para. 290; ESOC, paras. 168, 170.
[1934] WMC ER, para. 1517.
[1935] LI ER, para. 1229.
[1936] CPHB, para. 287; ESOC, para. 218.
[1937] LI ER, para. 1231.
[1938] LI ER, para. 1230.
[1939] Arenas CWS, paras. 31-47.
[1940] ESOD, paras. 370-382 and references therein.
[1941] LI ER, para. 1227.
[1942] CPHB, para. 286.

1942. Once again, the Tribunal sides with CB&I.

1943. Respondents' expert, WMC, convincingly explains that the number and parameters of the substations were changed due to Reficar-directed changes to basic engineering[1943] – this constitutes a plausible justification for CB&I's delays in preparing the foundations.

1944. In addition, Reficar's witness, Mr. Arenas, appears to agree with CB&I's reasons for the delay: "[t]he main contributing factor to this CB&I failure was late vendor data yet again"[1944]. Any risks of delayed provision of necessary data by Vendors lay with Reficar.

1945. In any event, Reficar accepted the substations-related Change Order[1945], which bars it from now claiming any of these costs as unreasonable or improper[1946].

\* \* \*

1946. In sum, the Tribunal dismisses Reficar's claims for any of the four categories of cost overruns allegedly caused by CB&I's mismanagement of Vendors on the Project.

## D.    Other alleged breaches

1947. Apart from the four monetary claims, Reficar submits that CB&I committed additional breaches of its procurement obligations.

1948. First, Reficar avers that CB&I performed its procurement duties with significant delays[1947].

1949. The question of delays is discussed elsewhere by the Tribunal as part of prolongation costs (Section VII.2.1.3.3.3.H) and delay liquidated damages (Section VII.2.3); Reficar itself has presented a separate calculation for the damages caused by delays to the Project, which encompasses delays caused by any procurement-related activities.

1950. Second, Reficar argues that CB&I breached its procurement obligations because its organizational structure was deficient[1948].

1951. The argument is baseless. The changes to the organizational structure occurred before the EPC Contract[1949]. In any event, the Tribunal sees no cause-and-effect relation between Reficar's claim for Vendor cost overruns and CB&I's organizational structure for procurement.

[1943] WMC ER, paras. 950-955, 963-901.
[1944] Arenas CWS, para. 50.
[1945] Ex. C-0570.
[1946] WMC ER, para. 1521.
[1947] ESOC, paras. 665-666.
[1948] ESOC, para. 664.
[1949] See Moore CWS, para. 24, referencing the Procurement Execution Plan, Rev. 4 from April 2009, Ex. C-1081 as opposed to Rev. 5 from January 2010, Ex. C-1082. The EPC Agreement was entered into in June 2010.

ICC Case 21747 RD/MK/PDP
Final Award

1952. Third, Reficar also argues that CB&I deliberately concealed its procurement failures when it failed to submit or submitted inadequate, incorrect and incomplete reports required by the EPC Contract[1950].

1953. The Tribunal is unconvinced. Reficar has failed to point the Tribunal to any EPC Contract provisions requiring the submission of the specific reports that Reficar argues are "critical tools"[1951]. Even if, *arguendo*, CB&I had issued certain incomplete reports, this would not give rise to Reficar's recovery of the damages it seeks for Vendor underperformance.

## 2. BACK-CHARGES

1954. Reficar brings one more procurement-related claim, for Back-Charges, in the amount of USD 8.74 million[1952].

1955. **Back-Charges** are the labour and material costs incurred by Reficar to modify or correct Vendor materials or equipment that failed to adhere to the purchase specifications, such as incorrectly fabricated structural steel or shipping/freight damages[1953]. In addition, Back-Charges includes costs incurred for materials and equipment that were never delivered by the Vendors[1954].

### 2.1. THE PARTIES' POSITIONS

1956. Reficar says that out of the approximately 830 Back-Charges generated during the Project, CB&I only closed out some 300; the rest was left for Reficar to manage, and, of those, some 350 Back-Charges were rejected by the Vendors[1955].

1957. CB&I retorts by saying that the ultimate responsibility for Back-Charges remained with Reficar and, in any event, Reficar has failed to prove CB&I's responsibility for any of the sums it claims under this category[1956].

---

[1950] ESOC, para. 667.
[1951] ESOC, para. 667, citing to Moore CWS, para. 50 (in ESOC, the citation is wrong as it points to paras. 80-83; the witness statement ends with para. 55).
[1952] Reficar discusses the Back-Charges claim within its argumentation on improper EPC costs in materials management, see CPHB, paras. 314, 317.
At the same time, in the claims table in communication C-175, at p. 11, Reficar includes "Back-charges" as part of the "Breach" damages, but places them in a category separate from "Improper EPC Costs".
CB&I in its latest submission understands that Back-Charges form part of improper EPC costs – see RPHB, para. 541:
"Reficar includes within its purported quantification of "Improper EPC Costs" "Back Charges […]".
In the ESOD, however, CB&I treated Back-Charges as a category separate from improper costs, see ESOD, para. 1517:
"In addition to seeking the return of the allegedly unreasonable or improper costs, Reficar also seeks, among other things, any and all damages and costs to which it claims it is entitled under applicable law, including, but not limited to its […] (6) "vendor back-charges"".
It appears that for Reficar uses for the totality of Improper EPC Costs (communication C-175, p. 11) does not include the Back-Charges and that these costs are a separate category.
[1953] Ex. C-1311, p. 2.
[1954] CPHB, para. 314, citing to Arenas CWS, para. 15.
[1955] ESOC, para. 252.
[1956] RPHB, paras. 544-546.

ICC Case 21747 RD/MK/PDP
Final Award

1958. According to Reficar, the EPC Contract and CB&I's internal **Back-Charge Procedure**[1957] required CB&I

- to act as Reficar's representative in Back-Charge claims, and

- to maintain a Back-Charge log,

both of which CB&I failed to do[1958].

1959. Reficar has proffered the witness testimony of its Project engineer, Mr. Arenas[1959], and two Excel documents cited in his statement as proof of CB&I's failures[1960].

1960. CB&I argues that Reficar has failed to prove that CB&I did not comply with its Back-Charges-related duties[1961]. CB&I attacks the credibility of the Excel compilations presented by Reficar[1962] and draws the Tribunal's attention to the fact that none of Reficar's experts has presented an analysis of the Back-Charge claims[1963].

1961. CB&I presents the testimony of its Project Procurement Manager, Mr. Smith, who has testified that ultimately, the collection of Back-Charges was Reficar's responsibility[1964].

## 2.2. DISCUSSION

1962. The EPC Agreement contains two types of obligations for CB&I that affect Back-Charges: the management of Vendors (**A.**) and record-keeping (**B.**).

## A. <u>Management of Vendors</u>

1963. TC 26.4.1 analysed in the previous Section generally obligates CB&I to "act as [Reficar's] representative in Managing [...] Vendors"[1965].

1964. The obligation to "manage" under TC 26.4.3 constitutes a generic obligation to act with the diligence of a prudent, diligent and reasonable EPC contractor performing similar services[1966].

1965. Reficar argues that CB&I breached its obligation to manage Vendors, because Reficar was required to close-out around 530 Back-Charges, and ultimately failed to recover the costs of some 300 Back-Charges. CB&I says its Back-Charge-related

---

[1957] CPHB, para. 315, citing to Ex. C-1311, clause 4.9.1.
[1958] CPHB, para. 315, citing to TC 26.4.1, JX-002, p. 204; JX-004, p. 187 and TC 59.11, JX-002, pp. 240-241; JX-004, p. 217.
[1959] Mr. Arenas joined the Project as an Instrumentation and Control Engineer and became the Engineering Director in January 2014; see Arenas CWS, para. 4.
[1960] CPHB, paras. 314-316, citing to Arenas CWS, Ex. C-1059 and Ex. C-1491; Reply, para. 912 with fn.1876; ESOC, paras. 250-258; 668.
[1961] RPHB, paras. 541-546.
[1962] RPHB, paras. 542-543.
[1963] RPHB, para. 541.
[1964] RPHB, para. 545, citing to Smith RWS, paras. 73-75, 79, 81.
[1965] JX-002, p. 204; JX-004, p. 187.
[1966] JX-002, p. 205; JX-004, p. 188.

386

duties were limited to support activities and that it cannot be held liable for any unsuccessful Back-Charges.

1966. As an initial matter, it is dubious whether the obligation to act as Reficar's representative in managing Vendors under TC 26.4.1 includes the entirety of the Back-Charge process.

1967. TC 26.4.3 specifies that "managing" is limited to "taking [...] steps in the Contractor's power" – and CB&I argues that the final steps in the process depended on Reficar. Additionally, the obligation to "manage" explicitly excludes "entering into a formal dispute resolution procedure with [the Vendor]"[1967], meaning that CB&I's role in Back-Charges did not extend to initiating disputes.

1968. Since Back-Charges are not regulated in detail in the EPC Agreement and since Reficar had more involvement in procurement, as opposed to engineering and construction, the Tribunal tends to give credence to CB&I's argument.

Mr. Smith's explanation

1969. CB&I's witness, Mr. Smith, presents a cohesive account of the Back-Charges process based on CB&I's internal Back-Charge procedure[1968]:

- first, a defect was discovered (**a.**),

- then this defect was notified using proper forms (**b.**),

- such defect was reviewed and discussed with the Vendor (**c.**),

- and corrective action was performed either by the Vendor, an approved subcontractor or CB&I itself (**d.**),

- then, CB&I developed the formal Back-Charge claim and engaged in negotiations with the Vendor (**e.**), and

- finally, Reficar would collect the Back-Charge in the format it found optimal (**f.**).

1970. Mr. Smith avers that CB&I performed steps (**a.**) through (**d.**) on Reficar's behalf but that steps (**e.**) and (**f.**) were under Reficar's control[1969].

1971. The Tribunal is convinced by Mr. Smith's account.

1972. It was undoubtedly up to Reficar to decide on step (**f.**); only Reficar could take the decision whether certain Back-Charges would be set-off against outstanding amounts with a Vendor, or collected via a Back-Charge invoice – in fact, CB&I has presented a letter from 2012 in which Reficar gave CB&I instructions on how to collect Back-Charges in a few select cases[1970].

---

[1967] JX-002, p. 205, JX-004, p. 188.
[1968] Smith RWS, paras. 77-79, 81, citing to Ex. C-1311, pp. 2-5.
[1969] Smith RWS, paras. 79-81.
[1970] Ex. R-2453.

1973. That Reficar decided on how to collect the Back-Charges also tends to suggest that Reficar was involved in step (**e.**), the negotiations with the Vendors.

1974. There is an additional piece of evidence.

1975. Reficar's involvement in the process of Back-Charges has already been discussed in Section VII.2.1.3.3.3.B.h *supra*, where one of the analysed pieces of evidence was a letter from Reficar to the insurer claiming reimbursement for the damage done to the refractory equipment. This piece of evidence further proves Reficar's leading role in this area.

> [In addition, Reficar's letter concerned one of the items now listed by Reficar in the log used as key evidence for this Back-Charges claim – Reficar appears to be asking for double recovery, which the Tribunal cannot grant[1971].]

1976. Thus, even though CB&I was obligated to represent Reficar in its relations with Vendors, CB&I's obligations were limited to steps that were "in the Contractor's power". CB&I does not bear the burden of Back-Charges not collected from the Vendors.

Reficar's counterargument

1977. Reficar presents the testimony of one of its engineers, Mr. Arenas, to allege that CB&I is responsible for the roughly 350 Back-Charges rejected by Vendors for three reasons[1972]:

- Excessive delay in presenting the Back-Charge (cases of 1-3 years of delay were reported), after the warranties had expired,

- Instances when CB&I performed inspections without informing the Vendor, thus invalidating the warranties, and

- Discrepancies between the requests CB&I issued and Project specifications, which were not the fault of the Vendor.

1978. Mr. Arenas' source for the above allegations is an Excel document titled "Spreadsheet of Outstanding Backcharges"[1973]. This document was updated by Reficar when it submitted the "Updated Back-Charge Log" with its Reply[1974].

1979. For the majority of the Back-Charge rows, the conclusion in the "Background" column is that either "[n]o additional information was provided by CB&I", "[n]o documents, data or information whatsoever were found to support the Back-Charge" or "[n]o further action from CB&I"[1975].

---

[1971] See Ex. C-1491, rows 13, 24, 29, 47, 50, 52, 54, among others, for "KIRCHNER ITALIA S.P.A.".
[1972] Arenas CWS, para. 20.
[1973] Ex. C-1059.
[1974] Ex. C-1491.
[1975] See e.g., rows 3, 6-41.

1980. Neither the original nor the updated Excel document contains a source of the information, its date, or references to any underlying evidence, and thus, both have low probative value.

1981. Reficar has, in general, refrained from making any arguments in its submissions regarding any particular Back-Charges and instead presents the amalgamated number of all the rejected Back-Charges, attributing full responsibility to CB&I.

1982. The only individual reference is to a local arbitration award, in which the tribunal found that Reficar was not entitled to damages from a local supplier, who had provided faulty panels for the Refinery Project, because CB&I failed to timely inspect the panels' quality and later stored them in improper conditions[1976]; Reficar, however, appears to have dropped its discrete claim for losses connected with that arbitration[1977].

1983. Reficar's experts have also not provided any analysis of the Back-Charges claim[1978], further decreasing its credibility.

1984. In view of the above, the Tribunal finds that Reficar has failed to prove that CB&I breached its obligations with regard to Back-Charges and, as a result, the Back-Charges claim is rejected.

**B.    Record-keeping**

1985. TC 59.1 requires that CB&I "maintain such records and accounts as it is required to maintain in accordance with applicable Laws"[1979]. Additionally, CB&I's Back-Charge Procedure document reiterates the obligation for CB&I to maintain "adequate detail to support the case for the back charge"[1980].

1986. Reficar points to TC 59.1 as a source of CB&I's obligation to maintain a Back-Charge log. The provision itself does not explicitly contain such a requirement; instead, it only obligates CB&I to "maintain such records and accounts as it is required to maintain in accordance with applicable Laws"[1981] – and Reficar has not brought to the Tribunal's attention any applicable law that would require such log-keeping by CB&I.

1987. Reficar also presents CB&I's Back-Charge Procedure[1982] as a source for CB&I's obligation of record keeping for Back-Charges. This document, however, is an internal CB&I policy, that cannot on its own be construed as a source for CB&I's obligations.

1988. In any event, CB&I has successfully demonstrated that it in fact "maintained a back-charge log and supporting documentation" – the Excel document from the year

---

[1976] ESOC, paras. 254-258, citing to CL-0286.
[1977] Under ESOC, para. 669, Reficar claimed USD 3.51 million in connection with the local arbitration. This number is no longer listed in Reficar's most recent heads of claims amounts in the CPHB.
[1978] Long International makes references to certain back-charges in its analysis on PCS-related costs, see LI ER, Section 9.5, e.g., Table 9.5-16 – but these are not corroborated by any analysis.
[1979] JX-002, p. 239; JX-004, p. 216.
[1980] Ex. C-1311, Clause 4.9.1 at p. 5.
[1981] JX-002, p. 239; JX-004, p. 216.
[1982] Ex. C-1311, Clause 4.9.1 at p. 5.

ICC Case 21747 RD/MK/PDP
Final Award

2012 it has submitted in the arbitration is sufficient proof of CB&I contemporaneously keeping Back-Charge records[1983].

1989. Mr. Smith also says Reficar was updated regularly through iDocs and in weekly status report meetings[1984], which further corroborates the finding that CB&I did keep sufficient records of the Back-Charges.

## VII.2.6.    INDEMNIFICATION CLAIMS

1990. Finally, Reficar brings an indemnification claim for CB&I's alleged breaches of Colombian and New York law. In particular, Reficar requests the Tribunal to issue a declaration that, in accordance with TC 14.1[1985]:

-    CB&I must fully indemnify Reficar for any judgment or decision by Colombian courts or any other government entity against the Owner Group that was caused by CB&I's violation of any applicable laws; and

-    CB&I is obliged to continue to indemnify and defend Reficar for and from claims pending in Colombian courts presented by workers hired by CB&I during the Project.

1991. Similarly, CB&I makes a request that the Tribunal issue a declaration that:

-    CB&I does not owe Reficar any defense or indemnity under the EPC Contract or applicable law[1986];

-    Reficar owes CB&I such defense and indemnity as is required by the EPC Contract or applicable law[1987];

-    CB&I is entitled to reimbursement for costs and expenses incurred in responding to the Colombian government investigations of Reficar[1988]; and

-    Reficar is obligated to pay all costs, expenses, fines, or penalties that CB&I incurs in responding to the Colombian government investigations of Ecopetrol, Reficar, or their employees and representatives[1989].

1992. The Tribunal will first summarize the Parties' positions (**1.**) and then enter into a discussion (**2.**).

## 1.    THE PARTIES' POSITIONS

---

[1983] Ex. R-2451.
[1984] Smith RWS, paras. 74-75.
[1985] CPHB, para. 532(18 and 19).
[1986] ESOD, para. 1612(p).
[1987] ESOD, para. 1612(q).
[1988] ESOD, para. 1612(ff).
[1989] ESOD, para. 1612(gg).

390

1993. Reficar argues that CB&I should be held liable under TC 14.1 to the extent that its Works do not comply with the "applicable laws" under either Colombian or New York law[1990].

1994. According to Claimant, various Colombian governmental authorities, including the *Fiscalía General de la Nación* and the *Contraloría*, are investigating or have already investigated whether any performance of the Works on the Project violated applicable laws in Colombia[1991].

1995. Reficar argues that, if those authorities impose financial penalties or demands on Reficar, CB&I should indemnify Reficar in accordance with TC 14.1 of the EPC Contract[1992].

1996. CB&I considers this request to be premature[1993]: Reficar appears to rely on the hypothetical possibility of a future finding of its liability under Colombian law[1994]. According to CB&I, the Tribunal should not assess indemnity claims in abstract[1995].

1997. CB&I further avers that Reficar's indemnification claim subjects CB&I to a *probatio diabolica*; Respondents have no means of defending themselves as, thus far, Claimant has failed to[1996]:

-    Present evidence of specific illegal acts;

-    Connect such acts to a law that CB&I has allegedly violated;

-    Demand quantified damages; or

-    Establish a connection between alleged damages and CB&I's indemnity obligations.

1998. As a response, Reficar alleges that it has already incurred significant expenses due to government investigations in Colombia and CB&I is liable for those costs under TC 14.1 of the EPC Contract.

1999. Finally, CB&I also requests that the Tribunal declare that Reficar should defend and indemnify CB&I as required by the EPC Contract or the applicable law[1997].

## 2.    DISCUSSION

2000. The Tribunal will first analyse the indemnification commitments of both Parties under the Contract (**2.1.**) and, on the basis of such analysis, conclude that both Parties' declaratory relief should be partially granted (**2.2.**).

---

[1990] Reply, para. 997.
[1991] ESOC, para. 826; CPHB, para. 514.
[1992] CPHB, para. 514.
[1993] ESOD, para. 1483.
[1994] ESOD, para. 1482.
[1995] ESOD, para. 1484.
[1996] RPHB, para. 664.
[1997] ESOD, para. 1612 (p. and q.).

## 2.1. THE INDEMNIFICATION COMMITMENTS

2001. The EPC Contract contains several provisions whereby a Party commits to indemnify the other in case certain "Claims" arise directly or indirectly from distinct breaches. The Parties have pleaded their indemnification claims under TC 15[1998] (i.) and TC 14[1999] (ii.). The Tribunal will refer to these indemnification obligations as the "**Indemnification Commitments**".

2002. (i.) Pursuant to TC 15, both Parties committed to defend, indemnify and hold the other Party's group members harmless against all Claims arising directly or indirectly in respect of certain Indemnifiable Events listed in TC 15.1.1, 15.1.2 (both in favour of the Owner Group) and TC 15.2 (in favour of the Contractor Group).

2003. Under the EPC Contract, the term "Claims" is defined as:

> "[…] all actions, suits, claims, administrative proceedings, demands, liabilities, security interests, liens, losses, damages, defects, fines, penalties, costs and expenses of any nature (including legal fees and expenses)".

2004. "Contractor Group"[2000] and "Owner Group"[2001], are defined as follows:

> "'Contractor Group' means the Contractor, its Affiliates, each Lower Tier Subcontractor, and the Associated Persons and their respective successors and assigns";

> "'Owner Group' means the Owner, its Affiliates and management consultants and Associated Persons (other than any member of the Contractor Group), and their respective successors and assigns".

2005. (ii.) TC 14.1 provides that the Contractor and each of the Contractor Group members commits to defend, protect, indemnify and hold the Owner Group harmless from and against any Claims[2002] due to non-compliance with applicable Laws[2003]. The Owner also assumes a substantially similar Indemnification Commitment in favour of the Contractor Group members under TC 14.2.

2006. The EPC Contract defines "Laws" as[2004]:

> "[…] the constitution, all existing laws, statutes, decrees, administrative acts, legal codes, ordinances, rules, regulations, lawful orders, permits, licenses, and other legal requirements or authorizations, as amended from time to time, of all federal, national, central, state, commonwealth, provincial, county, parish, canton, departmental, district, municipal, industrial, local and any other governmental agencies and authorities that are applicable to this

---

[1998] *See*, for example, CPHB, para. 514 (footnote 926); ESOD, para. 1016.
[1999] *See*, for example, ESOC, para. 829; ESOD, para. 1481.
[2000] JX-002, p. 162; JX-004, p. 148.
[2001] JX-002, p. 168; JX-004, p. 154.
[2002] TC 14.1 and TC 14.2 extend the Indemnification Commitments to "(…) any Claims, fines, and penalties (…)". "Fines, and penalties" are already covered by the Claims definition in the EPC Contract.
[2003] JX-002, p. 186 ; JX-004, p. 172.
[2004] JX-002, p. 167 ; JX-004, p. 152.

ICC Case 21747 RD/MK/PDP
Final Award

Agreement, the Parties, the Work <u>or any of the Parties' obligations under this Agreement</u> (and "lawful" and "unlawful" shall be construed accordingly) [Emphasis added]".

2007. Thus, the Parties' compliance with the obligations under the EPC Contract are also covered by the Indemnification Commitments of TC 14.

<u>Survival of indemnity rights and obligations</u>

2008. Finally, under TC 76, both Parties agreed that their rights and obligations[2005]

"[…] relating to any waivers and disclaimers of liability, releases from liability, limitations of liability, <u>indemnities</u>, patent indemnities, confidentiality and to insurance" [Emphasis added]

would remain in full force and effect after the completion or termination of the EPC Contract[2006]

"so as to protect each Contractor Group member and each Owner Groups member from any loss or liability that it may incur after this Agreement is assigned, completed or terminated in accordance with its terms."

2009. <u>Summing up</u>, the Indemnification Commitments survive the conclusion of the EPC Contract and include all commitments of one of the Parties under the EPC Contract to defend, indemnify and hold the other Party or its Group members harmless against all Claims arising out of an Indemnifiable Event.

## 2.2. TRIBUNAL'S DECISION

2010. Having portrayed the scope of the Indemnification Commitments, the Tribunal needs to determine if it grants the declaratory reliefs requested.

2011. Reficar requests that the Tribunal declare that CB&I should comply with its obligation to fully indemnify any Owner Group member if any payment of a "Claim", fine or penalty is imposed for CB&I's failure to adhere to the applicable laws[2007].

2012. Although CB&I objects to this request for being "premature"[2008], Respondents also request a similar declaration from the Tribunal: that Reficar should defend and indemnify CB&I as required by the EPC Contract or the applicable law[2009].

2013. Thus, the Parties' positions are closer than they seem, and the Tribunal will, in turn, partially agree with both Parties:

- Reficar's request for this declaratory relief seems reasonable: this Award has determined that CB&I has breached the Cost Control Commitments; pursuant to the definition of Laws contained in the EPC Contract, this contractual

---

[2005] JX-002, p. 266; JX-004, p. 242.
[2006] JX-002, p. 266; JX-004, p. 242.
[2007] ESOC, para. 829.
[2008] ESOD, para. 1483.
[2009] ESOD, para. 1612 (p. and q.).

393

breach is automatically also a breach of the applicable Laws: to the extent that this breach causes harm to the Owner Group through "Claims", then CB&I must comply with the Indemnification Commitments;

- At the same time, the Tribunal has also concluded that in failing to pay CB&I's invoices for reasonable and proper costs, Reficar did not fully comply with the EPC Contract, *i.e.*, the applicable Laws; hence, CB&I's plea for declaratory relief also looks reasonable.

2014. In abstract, these breaches seem to impact the Indemnification Commitments of both Parties under the EPC Contract: if a Claim covered by an Indemnifiable Event arises out of these breaches, then the breaching Party must comply with its Indemnification Commitments.

2015. Under Section VIII.2.5 *infra*, and in accordance with TC 76, the Tribunal will determine that the Indemnification Commitments under the EPC Contract survive the liquidation of the Contract.

2016. Therefore, the Tribunal sees no difficulty in declaring that the breaching Party must comply with its Indemnification Commitments, to the extent that the breaches determined in this Award give rise to an Indemnifiable Event.

CB&I's counterargument

2017. CB&I asks the Tribunal to dismiss Reficar's request for declaratory relief for being premature. CB&I has not denied that the obligation to indemnify the counterparty exists under the EPC Contract (and even requests a similar declaratory relief to the Tribunal), but states that it is too early to determine responsibility under the Indemnity Commitments.

2018. The Tribunal agrees with CB&I that it would be premature to order a precise indemnification payment and it would contravene the Parties' own request, as no Party has attempted to quantify any of their indemnification rights.

2019. However, and considering the breaches determined in this Award, it is not premature to declare that the Parties are bound by the Indemnification Commitments under the EPC Contract.

2020. In light of the above, the Tribunal declares that both Parties should continue to comply with their respective Indemnification Commitments under the EPC Contract, to the extent that the breaches determined in this Award trigger an Indemnifiable Event.

## VII.3.CLAIMS OUTSIDE THE TRIBUNAL'S POWER

2021. Reficar has requested relief related to *lucro cesante*, or lost profits, and cost of capital both under its pre-contractual and contractual liability claims. Additionally, within the Work Completion claim, Reficar also requests relief for damages regarding its PCS-related costs[2010].

2022. The Tribunal has already found that CB&I's conduct in the pre-contractual stage did not amount to deceit, was incapable of resulting in *dolo incidental* and did not constitute a violation of good faith (see Section VII.1 *supra*). Similarly, the Tribunal has also adjudicated the cost-related portion of Reficar's Work Completion Claim (See Section VII.2.4 *supra*).

2023. Thus, the following section will only focus on Reficar's lost profits, cost of capital and PCS-related claims related to its contractual liability claim.

## 1.    BACKGROUND

2024. According to Reficar, CB&I's breaches of the EPC Contract prevented the completion of the works by the Mechanical Completion date and resulted in lost profits to Reficar due to the delay of the operation of the Refinery[2011]. Therefore, Reficar requests USD 809.81 million in lost profits damages[2012].

2025. Additionally, Reficar brings two cost of capital claims, averring that:

-   Had it earned the lost profits, it would have had the ability to invest these profits back into the company[2013] (i.); and

-   It incurred increased financing costs because of CB&I's breach of the Cost Control Commitments[2014] (ii.).

2026. For the above claims, Reficar argues that it is entitled to (i.) USD 182.48 million; and (ii.) 325.01 million in damages[2015].

2027. Similarly, Reficar argues that CB&I's failures to meet the Mechanical Completion date resulted in[2016]:

-   Delay-related PCS costs, for which it requests USD 109.88 million in damages,

-   Decreased productivity of Reficar's PCS contractors, which led to damages in the amount of USD 42.59 million, and

---

[2010] CPHB, para. 404.
[2011] CPHB, para. 157.
[2012] CPHB, para. 159; this includes categories of lost profits, cost on capital on lost profits, lost revenue – electricity sales and an offset for profits from extended life.
[2013] Kenrich ER, para. 5.1.
[2014] ESOC, para. 751.
[2015] CPHB, para. 85.
[2016] CPHB, para. 404.

   -    Additional impacts to its PCS Contractors, for which it requests USD 10.32 million[2017].

2028. CB&I objects to the Tribunal's authority to grant the abovementioned relief in the form of indirect damages, lost profits and cost of capital[2018]: according to CB&I, the DRA bars such relief or damages[2019].

2029. Reficar brings two defenses to CB&I's objection:

   -    <u>First</u>, restrictions under the DRA do not limit the Tribunal's power to award the sought damages; and

   -    <u>Second</u>, in any event, its claims for lost profits and cost of capital have the form of direct damages and are not limited by the alleged restrictions in the DRA.

2030. As determined in Section IV.3 *supra*, the Tribunal will apply New York law to adjudicate this issue. In doing so, the Tribunal will uphold Respondent's objection and conclude that it does not have the authority to grant the relief requested by Claimant under the current section.

2031. The Tribunal's findings mean that Reficar's claims for lost profits, cost of capital and PCS-related costs are outside the Tribunal's power; as a result, the Tribunal will not address them.

## 2.   SCOPE OF THE DRA

2032. CB&I argues that Reficar cannot recover *lucro cesante* or lost profits as Section 4.13 of the DRA expressly precludes the Tribunal from awarding consequential damages to Reficar: CB&I avers that the provision unambiguously restricts the Tribunal's remedial power, precluding any award of "special, indirect, [and] consequential" damages[2020].

2033. Furthermore, Respondents submit that TC 8.2 of the EPC Contract independently bars Reficar from recovering lost profits and consequential damages. The Parties expressly waived all claims for

"any loss of profit [...] loss of opportunity, loss of revenue, loss of production"

and, insofar as not already covered, also

"special, consequential, indirect, incidental [...], costs, losses, or expenses [...] arising out of or in connection with this Agreement"[2021].

---

[2017] The Tribunal notes that a certain number of these claims have been granted by the Tribunal in the Section on the Work Completion Claim as they in fact represented the costs incurred by Reficar on its contractors correcting the defects CB&I refused to make-good.
[2018] TofR, para. 44; RPHB, para. 214 and 225.
[2019] Communication R-165, p. 6; RPHB, para. 225.
[2020] RPHB, paras. 157, 164.
[2021] RPHB, para. 531.

Accordingly, the express exclusion agreed by the Parties precludes the recovery of any such damages[2022].

2034. On the other hand, Claimant avers that the purported limitations under Section 4.13 of the DRA and TC 8.2 of the EPC Contract are not restrictions to the Tribunal's authority; rather, they should be treated similarly to a limitation of liability clause[2023].

2035. It is Reficar's position that CB&I committed *culpa grave*/gross negligence and *dolo*/willful misconduct when it acted with systemic and reckless indifference to cost and schedule throughout the execution of the Project[2024]. In this context, Reficar avers that Section 4.13 of the DRA and TC 8.2 of the EPC Contract are exculpatory provisions under New York law[2025]; these clauses are found unenforceable when they are applied to grant immunity for acts that "smack of intentional wrongdoing"[2026]. Thus, New York law precludes CB&I from relying on them to shield itself from liability for lost profits[2027].

2036. Claimant further submits that it is irrelevant that the clauses themselves do not contain this exception, as New York courts will read in an exception to exculpatory clauses in the context of willful misconduct or gross negligence[2028].

Discussion

2037. The Tribunal sides, partially, with each Party:

2038. (i) Regarding the waiver to claim lost profits and consequential damages contained in TC 8.2.1, Claimant is correct in saying that the waiver is to be treated as a liability limitation. Liability limitations are unenforceable when the liability stems from a breach carried out with *culpa grave* or *dolo* under Colombian law or with gross negligence or willful misconduct under New York law[2029].

2039. Thus, the Tribunal agrees with Reficar that, in principle, if a breach with *culpa grave*/gross negligence or *dolo*/willful misconduct is established, Claimant would be entitled to claim lost profits, cost of capital and any other remedy available under Colombian or New York, and any contractual liability limitations would be lifted.

2040. (ii) The limitation of the Tribunal's authority, however, is a different issue. Here, the Tribunal sides with CB&I.

2041. In the DRA the Parties decided to narrow the Tribunal's authority and to exclude certain issues from its powers[2030]:

---

[2022] RPHB, para. 532.
[2023] Reply, para. 958; Communication C-174, p. 4.
[2024] Communication C-174, p. 4.
[2025] Reply, para. 957.
[2026] Reply, para. 957.
[2027] Communication C-174, p. 5.
[2028] Reply, para. 958.
[2029] See discussion at Section VIII.1.2.2.
[2030] Section 4.13 of the DRA; JX-007, p. 11.

> "The Arbitral Tribunal shall neither have nor exercise any power to act as *amicable compositeur* or *ex aequo et bono*, or to award special, indirect, consequential or punitive damages" [Emphasis added].

2042. Reficar now avers that the exclusion shown in the arbitration agreement should be treated as a liability limitation, subject therefore to lifting in case of *culpa grave* or *dolo* breaches.

2043. The Tribunal does not agree: there is no evidence which suggests that the exclusion of matters from the Tribunal's purview should be tantamount to an exclusion of liability. Questions of liability are a separate issue, unaffected by the arbitration agreement and the choice for a particular forum. And here the Parties validly decided that this Tribunal would lack the power to hear claims for indirect or consequential damages. This restriction of the Tribunal's powers cannot be overturned because CB&I acted with *culpa grave* or *dolo*.

2044. So, the only two questions remaining are whether:

- an exclusion of indirect or consequential damages is permissible (**A.**), and if so,

- whether Reficar's claims for loss of profit, cost of capital and PCS-related costs are "indirect or consequential damages", pursuant to Section 4.13 of the DRA (**B.**).

Since the DRA is subject to New York law, the Tribunal will take its decision pursuant to New York law.

## A. Exclusion of indirect or consequential damages

2045. The exclusion of claims for indirect or consequential damages is not uncommon in New York law. According to *Mayer* and *Tabatabi*, lost profits

> "are ordinarily a form of special damages that a plaintiff must specifically plead and that parties can exclude as damages through a contractual limitation of liability provisions"[2031].

2046. Since New York law accepts that Parties voluntarily exclude those claims from the catalogue of remedies available to them, there should be no discussion that Parties can equally decide to carve out those claims from the Tribunal's authority. The Parties are, thus, free to agree on the width of the scope of the arbitration agreement.

2047. In fact, Reficar itself has acknowledged that Section 4.13 of the DRA has an impact on the Tribunal's authority: throughout its pleadings, Reficar has recognized that Section 4.13 limited "the Tribunal's authority to award punitive damages"[2032]. Because of this, Reficar agreed not to request punitive damages in this arbitration.

---

[2031] RL-777, Mayer, T. and Tabatabi, F. in Haig, R., "New York Practice Series – Commercial Litigation in New York State Courts", Chapter 54, Compensatory Damages, para. 54:17.
[2032] ESOC, para. 824; CPHB, para. 512.

2048. But, in accordance with the express wording of the Parties' agreement, the restrictions on the Tribunal's authority are not limited to the punitive damages; the same limitation applies to indirect or consequential damages.

## B.    Tribunal's remedial powers

2049. Having determined that the Tribunal has no authority to award indirect or consequential damages, the Tribunal will analyse if Reficar's lost profits, cost of capital and PCS-related claims fall within this limitation.

## a.    The Parties' positions

2050. CB&I submits that Reficar is claiming indirect or consequential damages by seeking an award on lost profits, cost of capital and PCS-related costs[2033].

2051. Respondents argue that New York courts have consistently concluded that lost profits are consequential damages, especially when they result from collateral business relationships, such as a separate agreement with a non-party[2034]; CB&I further avers that New York courts treat lost profits as direct damages only in rare cases, where the "non-breaching party bargained for [lost] profits and they are the direct and immediate fruits of the contract"[2035].

2052. Thus, CB&I alleges that Reficar's purported lost profits, cost of capital and PCS-related costs claims fall directly within the scope of this restriction on the Tribunal's remedial power[2036].

2053. Reficar refutes CB&I's position, by arguing that *lucro cesante* and lost profits are forms of direct damages; thus, they are not affected by the restrictions set forth under Section 4.13 of the DRA and TC 8.2 of the EPC Contract[2037].

2054. Reficar avers that, under New York law, lost profits may either be direct or consequential damages[2038]; to consider lost profits as direct damages[2039]:

- The non-breaching party must have bargained for such right: *lucro cesante* claims were clearly in the contemplation of the Parties, as shown by the extensive discussion of the internal rate of return prior to the execution of the EPC Contract[2040]; and

- They should be direct and immediate fruits of the contract: the *lucro cesante* claims are the direct return or gain that was not obtained due to CB&I's improper conduct[2041].

---

[2033] RPHB, para. 214 and 225.
[2034] RPHB, para. 158.
[2035] RPHB, para. 159.
[2036] Communication R-165, p. 6.
[2037] CPHB, para. 159.
[2038] Communication C-184, p. 2.
[2039] Communication C-184, p. 2.
[2040] ESOC, fn. 1774; C-0024.
[2041] Communication C-184, p. 3.

2055. Reficar argues that its cost of capital claim is for costs it incurred in financing the improper payments CB&I was never entitled to receive[2042].

2056. As regards the PCS-related costs claim, Reficar argues that, while PCS activities were not included in CB&I's scope of work, CB&I was still contractually obligated to align its work and achievement of Mechanical Completion with Reficar's PCS activities[2043].

**b.**   **Discussion**

2057. Under New York law, two types of damages may generally be pled in contract cases[2044]:

-   direct damages; and

-   consequential damages.

2058. Direct damages are sought when the non-breaching party tries to recover the value of the very performance promised[2045]; on the other hand, consequential damages do not arise within the scope of the immediate inter-party transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties[2046].

2059. As a starting point, both Parties agree that a lost profit claim under New York law will normally be treated as a claim for consequential damages. The Tribunal concurs: in *Reynolds v. Behrman Brothers* the United States District Court of New York concluded that

> "lost profits and similar damages that do not flow directly from the breach are 'special' or consequential damages"[2047].

2060. According to Reficar, this general finding under New York Law has an exception: lost profit claims will be considered direct damages under New York law if

-   the non-breaching party bargained for the right to claim these damages and

-   if they are direct and immediate fruits of the contract.

Reficar's position is consistent with the findings in *Biotronik A.G. v. Conor Medystems Ireland*, in which the Appellate Division of the First Department of New York Supreme Court understood that[2048]:

---

[2042] CPHB, para. 444, ESOC, para. 751.
[2043] CPHB, para. 403.
[2044] RL-341, p. 6.
[2045] RL-341, pp. 6-7.
[2046] RL-341, pp. 6-7.
[2047] RL-760, p. 5.
[2048] RL-701, p. 4.

ICC Case 21747 RD/MK/PDP
Final Award

"Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract".

## C.    The Tribunal's decision

2061. Thus, the Tribunal will apply these two criteria to Reficar's claims for lost profits and cost of capital thereon (**a.**), and to the PCS-related costs claim (**b.**), to determine whether these claims are within the Tribunal's power under the DRA.

### a.    Lost profits and cost of capital on lost profits

2062. Reficar brings three arguments to support its claim for lost profits and costs of capital on the lost profits:

2063. <u>First</u>, Reficar argues that the expected profits were in the contemplation of the Parties based "on the extensive discussion" of the internal rate of return prior to the execution of the EPC Contract[2049].

2064. The Tribunal is not convinced by Reficar's arguments.

2065. To buttress this assertion, Reficar points to the Execution Masterplan[2050]. The only reference to the internal rate of return is the following:

**1.5 – Critical Issues**

- Timely completion 2010 MC LS project to support Colombia environmental and Ecopetrol agreement requirements
- Timely finish 2011 MC of the rest of the project to meet Ecopetrol agreement support.
- Availability of local skilled craft labor
- Timely permit submission/approval to complete project on time (new jetty, fresh water concession, environmental, etc.)
- Project CAPEX to meet 15% of IRR. A CAPEX of 24 billion dollars was estimated (Class 5) which did not include several critical items.

2066. This reference does not show that the Parties had an extensive discussion on the expected profits of the Project; rather, it shows that, as any diligent owner would do, Reficar and Ecopetrol, prior to the Project, estimated the capital expenditure and the internal rate of return.

2067. Even assuming, *arguendo*, that this reference could serve as evidence of the Parties' discussion on the expected profits, Reficar's argument still fails: after these discussions occurred, Reficar agreed to exclude lost profits out of the sphere of the Parties' remedial rights; the EPC Contract expressly provides that neither Party was to be found liable for "loss of profit"[2051].

2068. Thus, Reficar's arguments show the opposite of what it claims: although Reficar was aware of the expected internal rate of return, it still agreed to exclude lost profit claims from the EPC Contract. In doing so, Reficar agreed to exclude from the Tribunal's powers the right of awarding lost profits.

---

[2049] ESOC, para. 782, fn. 1774.
[2050] Ex. C-0024, pdf p. 12.
[2051] TC. 8.2.1, JX-002, p. 181; JX-004, p. 167.

401

2069. <u>Second</u>, Reficar argues that the lost profits and cost of capital claims are direct fruits of the contracts, and it has relied on the Kenrich Group ["**KG**"] Expert Report to back up this position:

-   For lost profits, it is Reficar's position that CB&I's breach prevented the completion of the Work by the Mechanical Completion Date, resulting in lost profits that Reficar could have obtained if the Refinery had been operative[2052].

-   For cost of capital, the KG Report sets forth that Reficar additionally lost the potential gains it would have obtained by investing the profits back[2053].

2070. The applicable standard, to determine whether a damage derives directly from the contract, may be derived from *First Niagara Bank*[2054]: damages sought must intend to recover "the value of the very performance promised". But Reficar's claims for damages do not encompass the value of the performance that was breached, but rather represent eventual losses arising out of contracts that Reficar could have executed with third parties to maximize its revenue:

-   The lost profits claim is linked to an uncertain amount of profits that Reficar could have obtained from third parties outside of the EPC Contract, had the Refinery been operational;

-   The cost of capital claim on the lost profits even goes a step further: it is a speculative gain Reficar could have obtained by investing the profits previously obtained.

**b.    PCS-related costs claim**

2071. The EPC Contract sets forth that Reficar (not CB&I) was responsible for the PCS Works, *i.e.*, the Works necessary for the pre-commissioning and start-up of the Refinery[2055]. PCS-related activities were outside of CB&I's scope of work, except for the correction of defects[2056]. The necessary consequence is that the Parties cannot have bargained for Reficar's right to claim damages from CB&I for obligations under Reficar's own and exclusive responsibility and that PCS-related cost claims must be considered to be for indirect damages.

2072. In fact, there is a contradiction in Reficar's position: it denies that PCS-related costs are indirect damages, while it accepts that a portion thereof, the PCS delay costs[2057] and other time-related PCS costs, do indeed constitute indirect damages[2058].

---

[2052] CPHB, para. 157.
[2053] Kenrich Group ER, para. 5.1.
[2054] RL-241.
[2055] Section III, Appendix I, Schedule I, para. 1.6 of the EPC Agreement, JX-006, p. 585: "Pre-commissioning, Commissioning, Start-Up, Reliability & Performance Testing is [Reficar's] responsibility with Contractor full assistance to the owner satisfaction".
[2056] CPHB, para. 403.
[2057] CPHB, para. 404, see for "Cost of Delays to PCS Work" category: "This amount is based on a calculation of <u>indirect damages</u> that occurred during the PCS phase as a result of CB&I's failure to turn over the systems and Units per the agreed schedule and sequence" [Emphasis added].
[2058] LI ER, para. 278.

2073. Reficar also claims the PCS contractors' loss of labour productivity and "additional impacts" to these contractors. These claims also give rise to indirect damages:

- Under the standard derived from *Fist Niagara Bank*[2059], damages caused by a decrease in the productivity of Reficar's PCS contractors do not encompass the value of the performance that was breached, but rather constitute indirect damages associated to contracts that Reficar had in place with third parties;

- The same is true for any "additional impacts" category: the additional impacts on the contractors also fail the test under *First Niagara Bank.*

2074. There is, however, one exception: Reficar paid certain amounts to its PCS contractors to correct defects in CB&I's Works and is now claiming reimbursement of these amounts from CB&I. This claim does not constitute indirect damages because in this case CB&I was under the Contract obligated to make-good the defective Work and refused to do so. The Tribunal has already (see Section VII.2.4 *supra*) decided this claim in Reficar's favour.

2075. Summing up, with the exception mentioned in the preceding paragraph, the Tribunal concludes that it has no power to grant damages related to PCS costs, because these damages fall within the indirect damage category.

* * *

2076. In light of the above, the Tribunal finds that Reficar's claims for lost profits, cost of capital on lost profits and indirect PCS-related costs seek relief for indirect or consequential damages, which the Tribunal has no authority to grant. Therefore, in accordance with Section 4.13 of the DRA, the Tribunal decides to dismiss these claims as it "neither ha[s] nor exercise[s] any power […] to award special, indirect, consequential or punitive damages".

---

[2059] RL-241.

# VIII. <u>QUANTUM</u>

2077. The Tribunal will now analyse the quantum of damages to be awarded under the Claim and Counterclaim. Although the analysis of merits is inherently intertwined with the extent of damages (and hence, the Tribunal has reached preliminary conclusions with regard to quantum in the preceding Section), the Tribunal must still address a number of outstanding issues.

2078. The Tribunal has established the total monetary liability of CB&I towards Reficar at the amount of USD 1,008.41 million[2060], which comprises:

-    USD 845.4 million due to the breach of the Cost Control Commitments[2061],

-    USD 152.75 million due to the breach of the Schedule Control Commitments[2062], and

-    USD 10.3 million due to the breach of CB&I's obligation to provide the Works free of defects[2063].

2079. The Tribunal has applied the Bottom-Up Total Modified Cost methodology to the breach of the Cost Control Commitments, and the use of this methodology by its very nature creates causality between the breach and the compensation, calculated as the difference between the Reasonable Cost Benchmark and the final EPC costs incurred by Reficar.

2080. For the damages awarded for CB&I's breach of the Schedule Control Commitments, causality has also been established through apportioning the days of delay for which CB&I is solely responsible.

2081. The Work Completion costs were also caused by CB&I: it breached the Contract when it declined to perform the corrective works and, as a consequence, Reficar may now claim the amounts it paid to its PCS contractors for the corrective works.

2082. According to CB&I, compensation is capped at USD 87.75 million, as a consequence of the liability cap set forth in TC 8.1.1; Reficar contests this allegation. Thus, the Tribunal must determine if the limitation of liability applies to the amounts previously calculated as damages for CB&I's breaches (**VIII.1**). Thereafter the Tribunal will address the set-off of reciprocal credits adjudicated in the present Award, the liquidation of the EPC Contract and the joint and several responsibility of the CB&I Respondents (**VIII.2**). Finally, the Tribunal will determine the applicable interest (**VIII.3**).

---

[2060] 845.4 + 152.75 + 10.3 = 1,008.41 (million, USD).
[2061] See para. 1354 *supra*.
[2062] See para. 1725 *supra*.
[2063] See para. 1845 *supra*.

ICC Case 21747 RD/MK/PDP
Final Award

# VIII.1.     <u>LIABILITY CAP</u>

2083. Both the Onshore and Offshore Contracts specify a Liability Cap, as well as six categories of liability which fall outside of its scope[2064]:

> "8.1.1 The total aggregate liability of the Contractor to the Owner under or in connection with this Agreement […] not exceed seventy million Dollars (US$70,000,000.00) provided that the <u>following liabilities</u> (whether agreed or determined pursuant to TC46) <u>shall not be taken into account</u> in assessing whether the total aggregate liability (or any liability sub cap referred to in TC15.1.2, 54.8.3, 56.3.1 or 71.17) has been reached:
>
> (i) liability under any <u>indemnity under this Agreement</u>;
>
> (ii) liability for any <u>insurance deductibles</u> to be paid by the Contractor hereunder;
>
> (iii) liability arising from any <u>fraud, Gross Negligence or Willful Misconduct</u> committed by the Contractor;
>
> (iv) liability arising for a failure by the Contractor to comply with TC14.1 [failure to comply with local law];
>
> (v) liability for any <u>default interest</u> which accrues due to the late payment by the Contractor of any amount provided for under this Agreement; and
>
> (vi) any amounts paid to the Owner under the <u>Advance Payment Letter of Credit</u> or any repayment made to the Owner of any advance payment made by the Owner to the Contractor" [Emphasis added].
>
> [For the Onshore Contract, Spanish is the language governing its interpretation[2065]. In Spanish, (iii) reads as follows:
>
> "(iii) *responsabilidad derivada de cualquier fraude, Culpa Grave o Dolo incurridos por el Contratista*[2066].]

2084. There is an ancillary point which the Tribunal can dispose of summarily: CB&I argues that Reficar's request to draw down on the Advance Payment LoC exceeds the Liability Cap[2067], but section (vi) above clearly states that the Advance Payment LoC is not subject to the Liability Cap.

2085. The only truly relevant category of amounts that fall outside of the scope of the Liability Cap in the current case concerns section (iii), *i.e.*, liability arising from *fraude*/fraud, *culpa grave*/gross negligence or *dolo*/willful misconduct.

---

[2064] TC 8.1.1, JX-002, pp. 180-181; JX-004, p. 166.
[2065] See TC 1.3; JX-002, p. 173.
[2066] JX-002, p. 51.
[2067] ESOCC, para. 384.

2086. CB&I argues that the Tribunal cannot award more than limitation of liability provisions under the EPC Contract permit[2068]. Reficar submits the contrary: the liability cap is irrelevant, because CB&I acted with *culpa grave*/gross negligence (or subsidiarily with *dolo*/willful misconduct)[2069].

2087. The Tribunal will first address the Parties' positions (**1.**) and then make a determination (**2.**).

## 1.    THE PARTIES' POSITIONS

2088. The Parties make extensive arguments on whether the liability cap finds application to any damages awarded by the Tribunal; the key dispute concerns whether CB&I breached its Cost and Schedule Control Commitments with *culpa grave* or *dolo*.

### 1.1.   REFICAR'S POSITION

2089. Reficar argues that the liability cap does not apply to any damages awarded by the Tribunal.

2090. First, CB&I acted with *culpa grave*[2070].

2091. Reficar says that *culpa grave* requires the showing that a party failed to perform an obligation with the level of diligence or care that even a negligent or careless person would exhibit in his or her own business[2071], which is precisely what CB&I did: it should have treated the Project as if it were a lump sum where the contractor's own finances were at risk and yet it allowed for cost overruns in the range of USD 2 billion on top of a +/-5% accuracy representation as to the Project costs[2072].

2092. Reficar also argues that CB&I was motivated by the desire to make additional profits at the expense of Reficar through rate arbitrage[2073] and through windfalls it gained from its failures in the areas of engineering, modularization, and labour relations[2074].

2093. Second, the liability cap also finds no application to any damages awarded by the Tribunal because CB&I breached its obligations with contractual *dolo*[2075].

2094. As regards the applicable standard, Reficar first makes a reference to Art. 63 of the CCC, defining *dolo* as the positive intent to cause harm – a definition specifically referenced by the EPC Contract[2076].

2095. Reficar argues, however, that Colombian courts do not interpret this provision literally and that instead, the key element of *dolo* is not "intent" but the deliberate

---

[2068] RPHB, para. 491; ESOD, paras. 15, 1333-1335.
[2069] CPHB, paras. 21, 121-122, 426-433,
[2070] CPHB, paras. 195-200.
[2071] H-041, p. 117.
[2072] CPHB, paras. 13, 198, 319, Reply, para. 166.
[2073] CPHB, paras. 14-20.
[2074] CPHB, para. 154.
[2075] ESOC, paras. 786, 810.
[2076] ESOC, para. 791.

or conscious breach of a party's contractual obligations[2077]. Reficar avers that this interpretation has prevailed since a seminal decision by the Colombian Supreme Court in 1949[2078] and has also been applied by arbitral tribunals deciding on the basis of Colombian law[2079].

## 1.2. CB&I's POSITION

2096. According to CB&I, the liability limitations in the Contract limit any damages to be awarded by the Tribunal to the amounts set under TC 8.1, with none of the potential exceptions listed in the Contract finding application.

2097. First, CB&I argues that *culpa grave* requires the meeting of a very high standard, which can only be found in "exceptionally rare circumstances"[2080].

2098. According to CB&I, Reficar is not bringing a case for design errors or construction defects, both of which would be indicative of *culpa grave*[2081]. An example is a case in which a contractor installed piping designed for fire-hose water instead of piping designed for drinking water, resulting in contaminated water in the building it was constructing[2082]. This is not comparable with the current arbitration, in which Reficar obtained a world-class Refinery[2083].

2099. CB&I also avers that a finding of *culpa grave* can only be made with regard to specific breaches, rather than with regard to the general contractual performance of a party[2084] and that Reficar has failed to meet its burden of proof in this regard.

2100. In any event, Reficar's claims about CB&I's alleged mismanagement of cost and schedule controls lack merit because Reficar performed extensive audits of CB&I's costs and was regularly informed of construction progress[2085].

2101. As regards any alleged illicit profit motive, CB&I did not obtain excessive additional profits from the Project; in fact, its Fixed Fee only increased by approximately USD 10.5 million[2086].

2102. Second, CB&I also argues that Reficar has failed to prove that CB&I acted with contractual *dolo*[2087].

---

[2077] Reply, para. 196, citing to CL-0078, pp. 17-18; CL-0090, p. 23; CL-0081, p. 329; CL0065, p. 92; ESOC, paras. 792-796, citing to CL-0065, p. 92; CL-0103, p. 253 (pdf p. 3) and Solarte ER, para. 109 and fn. 60.
[2078] ESOC, para. 791, citing to CL-0063.
[2079] ESOC, paras. 792-795.
[2080] RPHB, paras. 511-512; ESOD, para. 1456.
[2081] RPHB, para. 16.
[2082] ESOD, para. 1456, citing to RL-144, at pp. 58-60.
[2083] RPHB, paras. 1-8, 578.
[2084] RPHB, paras. 491, 509; ESOD, para. 1457.
[2085] RPHB, paras. 18-19,
[2086] ESOD, para. 19.
[2087] ESOD, para. 1336.

2103. CB&I emphasizes the literal meaning of the Art 63 of the CCC, which states that *dolo* refers to the positive intent to cause damage to another or their property[2088] – and says that Reficar has failed to prove such intent on CB&I's part.

2104. According to CB&I, the intent to cause harm must be established to make a finding of *dolo*; otherwise, the concepts of *culpa grave* and *dolo* would become indistinguishable[2089].

## 2.    DISCUSSION

2105. Having summarised the Parties' positions, the Tribunal will now analyse the EPC Contract provisions that limit the Contractor's liability (**2.1**), and the concept of *culpa grave* under Colombian law (**2.2**); on the basis of this analysis, the Tribunal will apply its criteria for *culpa grave* under Colombian law to the facts of the case (**2.3**) and conclude that CB&I breached its cost and schedule control obligations with *culpa grave* (**2.4**). The Tribunal has previously found[2090] that Reficar's claims may be brought under either the Onshore or the Offshore Contract; since Reficar focuses its claims on the Onshore Contract, the Tribunal will analyse the limitations of liability under this Contract, which is subject to Colombian law, first and foremost. In any event, the result will same under the law of New York (**2.5**).

## 2.1.    CONTRACT TERMS

2106. The Tribunal will first analyse the provisions limiting the Contractor's liability[2091] under the Contract (**A.**) and then the exclusions to these limitations (**B.**).

## A.    **Liability Cap provisions**

2107. The EPC Contract provides for limitations of liability in different areas. But the only relevant ones are the following two ["**Liability Caps**"]:

-    USD 70 million under TC 8.1[2092]:

    "8.1.1 The <u>total aggregate liability of the Contractor to the Owner under or in connection with this Agreement</u> (which includes, but is not limited to, (a) liability for Contractor default, (b) liability for Defects, (c) Delay Liquidated Damages payable under TC54.8 (other than those payable under TC54.8.1(i)), (d) Performance Liquidated Damages payable under TC56.2 and subject to the amount set forth in TC56.3.1, and I the Contractor's obligations to reperform any services or make good any deficient Work under TC71), <u>will not exceed seventy million Dollars</u> (US$70,000,000.00) [...]" [Emphasis added];

---

[2088] ESOD, para. 1398, citing to Art. 66 of CCC.
[2089] ESOD, para. 1537, citing to Arrubla Second ER, paras. 48-59.
[2090] See Section IV on the Law applicable to the dispute.
[2091] The Tribunal notes that a separate Liability Cap applies to any liability owed to the Contractor by the Owner; however, Reficar does not invoke these provisions in its defense to the Counterclaim.
[2092] JX-002, pp. 180-181; JX-004, p. 166. The Tribunal notes that a separate cap for just Delay Liquidated Damages was set at USD 45.75 million under TC 54.8.1(ii) but since this number is lower than the overall liability cap and since Reficar does not limit its claims to Delay Liquidated Damages, the Tribunal does not analyse this liability cap in detail.

ICC Case 21747 RD/MK/PDP
Final Award

-    USD 15.75 million for delay of 60 days in the Mechanical Completion of the Project under TC 54.8.1(i)[2093]:

"54.8 Delay Liquidated Damages

54.8.1 Subject to TC54.8.1A, if the Contractor <u>fails to achieve Mechanical Completion of all of the Units by the Guaranteed Completion Date</u>, the Contractor shall be liable to pay <u>Delay Liquidated Damages</u> for each Day from the Day immediately following the Guaranteed Completion Date up to and including the date Mechanical Completion of all of the Units is achieved, at the <u>following rates per Day</u>:

(i) at the rate of two hundred and sixty two thousand five hundred Dollars (US$262,500) per Day for the first 60 (sixty) Days of such delay [...]

54.8.2 <u>Any amount payable pursuant to TC54.8.1(i) shall not count towards the Contractor's aggregate limit on liability set out in TC8.1.1.</u>" [Emphasis added]

**B.    <u>Liability Cap exclusions</u>**

2108. Both the Onshore and Offshore Contract specify six categories of liability under TC 8.1 which fall outside of the scope of the Liability Caps[2094]:

"8.1.1 The total aggregate liability of the Contractor to the Owner under or in connection with this Agreement [...] will not exceed seventy million Dollars (US$70,000,000.00) provided that the <u>following liabilities</u> (whether agreed or determined pursuant to TC46) <u>shall not be taken into account</u> in assessing whether the total aggregate liability (or any liability sub cap referred to in TC15.1.2, 54.8.3, 56.3.1 or 71.17) has been reached:

(i) liability under any <u>indemnity under this Agreement</u>;

(ii) liability for any <u>insurance deductibles</u> to be paid by the Contractor hereunder;

(iii) liability arising from any <u>fraud, Gross Negligence or Willful Misconduct</u> committed by the Contractor;

(iv) liability arising for a failure by the Contractor to comply with TC14.1 [failure to comply with local law];

(v) liability for any <u>default interest</u> which accrues due to the late payment by the Contractor of any amount provided for under this Agreement; and

(vi) any amounts paid to the Owner under the <u>Advance Payment Letter of Credit</u> or any repayment made to the Owner of any advance payment made by the Owner to the Contractor" [Emphasis added].

---

[2093] JX-002, p. 226; JX-004, p. 203.
[2094] JX-002, pp. 180-181; JX-004, p. 166.

[For the Onshore Contract, Spanish is the language governing its interpretation[2095]. In Spanish, (iii) reads as follows:

"(iii) *responsabilidad derivada de cualquier fraude, Culpa Grave o Dolo incurrido por el Contratista*"[2096]]

2109. Out of the scenarios above, the only relevant one in the current case concerns roman number (iii), *i.e.*, liability arising from *fraude*/fraud, *culpa grave*/gross negligence or *dolo*/willful misconduct.

[The Tribunal will not analyse the concept of fraud/*fraude,* because neither Party brings any claim or counterclaim on such basis; in any event, the term appears to be similar in nature to *dolo*[2097].]

2110. The Tribunal must, then, establish whether CB&I breached its obligations with *culpa grave*/gross negligence or *dolo*/willful misconduct.

2111. In order to fully ascertain the meaning of the concepts enumerated as exceptions to the Liability Caps – *culpa grave*, gross negligence, *dolo* and willful misconduct – the Tribunal will revert to the definitions section of both the Onshore and Offshore Contract.

2112. The Onshore Contract provides that the terms "*Culpa Grave*"[2098] and "*Dolo*"[2099] have the meaning given to them under the CCC. The equivalent terms "Gross Negligence"[2100] and "Willful Misconduct"[2101], in the English version, refer to the same provisions of Colombian law.

2113. "Willful Misconduct" is described in the English version of the Offshore Contract as "an intentional act or omission that the relevant Person knew or should have known was wrongful"[2102]. The equivalent term in Spanish is defined as "*Mala Conducta Intencional*" – a literal translation of "willful misconduct". The term is followed by "(*Dolo*)" in parentheses, which means that the Offshore Agreement equates willful misconduct and *dolo*[2103]. The terms "*Culpa grave*" and "Gross Negligence" are not defined in the Offshore Contract.

2114. In accordance with the provisions of the Onshore and Offshore Agreements, Colombian law will take precedence in the Tribunal's analysis of *culpa grave*/gross negligence and *dolo*/willful misconduct: the Onshore Contract specifically references the CCC and, since the Offshore Contract does not define *culpa*

---

[2095] See TC 1.3; JX-002, p. 173; JX-004, p. 159.
[2096] JX-002, p. 51.
[2097] Reficar only cursorily states that CB&I's acts that amount to *dolo* would be equivalent to *fraude* but makes no separate arguments, see ESOC, paras. 789, 803-804, 809. The Tribunal notes that the concept of fraud/*fraude* was also not discussed in the Joint Expert Report on Colombian Law.
[2098] JX-002, p. 31.
[2099] JX-002, p. 32.
[2100] JX-002, p. 166.
[2101] JX-002, p. 171.
[2102] JX-004, p. 157.
[2103] JX-004, p. 34.

*grave*/gross negligence and equates willful misconduct with *dolo*, the Tribunal will interpret both legal concepts under Colombian law.

2115. In addition, CB&I has acknowledged that a finding under either Colombian or New York law is sufficient to disarm the Liability Caps with regard to each claim[2104]:

> "Reficar cannot recover damages in excess of USD 85.75 million, <u>unless it can establish</u> that each component of its claimed damages arises from fraud, gross negligence, or willful misconduct <u>under New York law or the equivalent Colombian law principles</u> of fraude, culpa grave, and dolo" [Emphasis added].

2116. In any event, the Tribunal's conclusions will be affirmed under New York law.

## 2.2. ENFORCEABILITY OF THE LIABILITY CAPS

2117. The Parties argue whether the Liability Caps provisions under the EPC Contract are binding and enforceable.

## A.    The Parties' positions

2118. Reficar avers that the Liability Caps find no application under Colombian law and is void because it is derisory[2105], abusive[2106], or unenforceable as it concerns an essential obligation under the Contract[2107].

2119. The result under New York is no different: the Liability Caps are also unenforceable because it is unconscionable[2108], and attempts to limit liability for intentional wrongdoing and duress[2109].

2120. CB&I argues that Reficar exercised its freedom of contract, recognized both under Colombian and New York law, when it agreed to the Liability Caps[2110]. Both legal systems limit the freedom to contract if it contravenes statutory law or public policy – neither of which is the case with the EPC Contract[2111].

2121. According to CB&I, the Liability Caps were duly negotiated by two sophisticated parties and should be enforced by the Tribunal despite the fact that Reficar now finds this provision to be disadvantageous to its position[2112].

## B.    Tribunal's decision

2122. Reficar argues that the Liability Caps cannot be applied under Colombian and New York law due to its derisory or abusive nature and CB&I avers that it is a perfectly enforceable provision negotiated by two sophisticated parties.

---

[2104] RPHB, para. 491.
[2105] ESOC, paras. 755-759.
[2106] ESOC, paras. 760-762.
[2107] ESOC, paras. 763-765.
[2108] ESOC, paras. 770-772.
[2109] ESOC, paras. 773-774.
[2110] ESOD, paras. 1487-1489.
[2111] ESOD, paras. 1491-1498.
[2112] ESOD, para. 1490.

2123. The Tribunal sides with CB&I.

2124. Both Parties agree that the CCC recognises the right of the contracting parties to modify the general rules on liability through consensual agreement by limiting or excluding certain types of liability[2113]. New York courts have also unequivocally established that the limitations of liability agreed by two sophisticated Parties are in general enforceable[2114].

2125. A liability cap, like any provision, would not be enforceable if it attempted to impose restrictions that are forbidden by statutory law or public policy. The clearest example of such an unenforceable liability limitation provision would be one for liability arising from *culpa grave*/gross negligence or *dolo*/willful misconduct[2115]. But these circumstances have been expressly included as exceptions to the Liability Caps under TC 8.1[2116]. Reficar's argument as to the alleged exclusion of liability arising from intentional wrongdoing is, thus, moot.

2126. The Tribunal is likewise unconvinced by Reficar's arguments that the character of TC 8.1. is derisory, abusive, unconscionable or coercive.

2127. The concepts invoked by Reficar are predominantly applicable in consumer contracts, where one party has a clear advantage or a higher bargaining power than the other. In the present case, Reficar is an expert in the business of running oil refineries, and as such cannot avail itself of protection invoking consumer laws; furthermore, it was advised by a professional law firm and a multitude of external advisors, equalising any imbalances in the position of knowledge.

2128. Finally, the existence of contractual limitations to the parties' liabilities is a typical mechanism in construction contracts. In fact, Reficar fails to mention that the limitation was negotiated not only for CB&I's liability towards Reficar, but also for Reficar's liability to CB&I, with the same list of exceptions to its application[2117].

2129. There is, thus, no evidence on the supposed derisory, abusive, unconscionable or coercive character of the Liability Caps provisions.

---

[2113] RPHB, para. 493; ESOC, para. 786.

[2114] See *e.g.*, RL-748, para. 352 at pdf p. 6: "It is well settled that courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities"; RL-751, paras. 266 at pdf p. 2: "A clause which exculpates a contractee from liability to a contractee for damages resulting from delays in the performance of the latter's work is valid and enforceable and is not contrary to public policy if the clause and the contract of which it is a part satisfy the requirements for the validity of contracts generally".

[2115] For Colombian law, see Solarte ER, para. 109: "*dolo* and *culpa grave* limit the validity of clauses that restrict liability in the sense that an agreement by the parties regarding the scope of the obligation to pay damages cannot go so far as to release the debtor for intentional breaches or breaches arising from *culpa grave*"; for New York law, see *e.g.*, *Abacus Fed. Savings Bank v. ADT Sec. Srvs., Inc.*, 967 N.E.2d. 666, 669 (N.Y. 2012): "However, it is New York's public policy that a party cannot "insulate itself from damages caused by grossly negligent conduct" and *Red Sea Tankers Ltd. v. Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep. 548 (11): "the fact that New York law would not recognize the validity of any exclusion of gross negligence supported that conclusion".

[2116] In the case of TC 54.8.3, the provision specifically states that the limitation of the Contractor's liability for Delay Liquidated Damages is "[s]ubject to TC8.1.1]", which includes the exceptions for *culpa grave*/gross negligence and *dolo*/willful misconduct.

[2117] TC 8.4, JX-002, p. 182; JX-004, p. 168.

ICC Case 21747 RD/MK/PDP
Final Award

**2.3.** *CULPA GRAVE* UNDER COLOMBIAN LAW

2130. The Tribunal will now analyse the concept of *culpa grave*, beginning with the legal definition (**A.**); the Tribunal will then determine who bears the burden of proof when allegations of *culpa grave* are made (**B.**), look at different possible criteria for establishing *culpa grave* (**C.**) and finally scrutinise relevant Colombian case law (**D.**).

## A.  Legal definition

2131. *Culpa*, in English negligence or fault, is regulated under Art. 63 of the CCC[2118]:

> "*Artículo 63. <CULPA Y DOLO>. La ley distingue tres especies de culpa o descuido.*
>
> *Culpa grave, negligencia grave, culpa lata, es la que consiste en no manejar los negocios ajenos con aquel cuidado que aun las personas negligentes o de poca prudencia suelen emplear en sus negocios propios. Esta culpa en materias civiles equivale al dolo.*
>
> *Culpa leve, descuido leve, descuido ligero, es la falta de aquella diligencia y cuidado que los hombres emplean ordinariamente en sus negocios propios. Culpa o descuido, sin otra calificación, significa culpa o descuido leve. Esta especie de culpa se opone a la diligencia o cuidado ordinario o mediano.*
>
> *El que debe administrar un negocio como un buen padre de familia, es responsable de esta especie de culpa.*
>
> *Culpa o descuido levísimo es la falta de aquella esmerada diligencia que un hombre juicioso emplea en la administración de sus negocios importantes. Esta especie de culpa se opone a la suma diligencia o cuidado*" [Emphasis added].

2132. Colombian law thus differentiates between three levels of negligence – *culpa grave*, *culpa leve* and *culpa levísima*. *Culpa grave* is defined as

---

[2118] CL-13; English translation:
"Article 63. <FAULT [*CULPA*] AND *DOLO*>. The law distinguishes three kinds of fault [*culpa*] and lack of care.
Gross fault [*culpa grave*], gross negligence, *lata culpa*, is fault that consists of not managing others' affairs with the care that even negligent or careless persons usually use in their own affairs. This fault in civil matters is equivalent to *dolo*.
Minor fault [*culpa leve*], minor lack of care, slight lack of care, is the absence of the diligence and care that men usually use in their own affairs. Fault or lack of care, without any other description, means ordinary fault or lack of care. This kind of fault is opposed to ordinary or average diligence or care.
A person who should administer a business as a good father of a family is responsible for this kind of fault.
Very minor fault [*culpa levísima*] or lack of care is the absence of the careful diligence that a judicious man uses in the administration of his important affairs. This kind of fault is opposed to the highest degree of diligence or care.
*Dolo* consists of a positive intention to inflict injury on the person or property of another" [Tribunal's clarifications in parentheses].

> *"no manejar los negocios ajenos con aquel cuidado que aun las personas negligentes o de poca prudencia suelen emplear en sus negocios propios"*,

> or "not managing others' affairs with the care that even negligent or careless persons usually use in their own affairs".

2133. The Parties' experts agree that an obligor acts with *culpa grave*[2119]

- If his/her conduct shows a significant lack of consideration of the creditor's interest in the performance of the contract, or

- If the obligor fails to manage the creditor's business with the level of care that even negligent or imprudent people usually employ in the management of their own business.

2134. Reficar's expert, Prof. Solarte, uses similar terms: *culpa grave* takes the form of serious breaches, with a failure to use the minimum care expected or with extreme negligence, that would not be committed by even the most careless person[2120] – a description with which Prof. Arrubla does not disagree. The only point made by CB&I's expert is that the standard for *culpa grave* is very high and that findings of *culpa grave* by adjudicators are rare[2121].

2135. The above standard is also confirmed by Colombian scholars:

- Prof. Cubides Camacho states that

> *"culpa grave [...] consiste en una negligencia extrema que no cometen ni aun las personas más descuidadas"*[2122];

> [*culpa grave* [...] is extreme negligence that not even the most careless people commit[2123]"],

- Prof. Velásquez Gómez has classified *culpa grave* as *"muy torpe"*[2124] or "very clumsy" conduct[2125].

2136. In sum, *culpa grave* under Colombian law may be seen as reckless disregard of the interests of the counterparty, made visible through breaches that even a negligent or imprudent person would not have undertaken in the management of their own business.

## B.    Burden of proof

2137. Art. 1604 of the CCC provides[2126]:

---

[2119] JER 8 on Colombian Law, Issue 81, pdf pp. 60-62.
[2120] Solarte Rebuttal ER, para. 85.
[2121] JER 8 on Colombian Law, Issue 83, Prof. Arrubla's Comments, pdf p. 63.
[2122] CL-0469, p. 272 (pdf p. 3).
[2123] English translation taken from Solarte Rebuttal ER, fn. 84 at pdf p. 30.
[2124] CL-0201, p. 687 (pdf p. 2).
[2125] CL-0201, p. 687 (pdf p. 4).
[2126] RL-320, English translation: "[...] The burden of proof is assigned to the party who wishes to employ it; proof of a fortuitous case to the party who alleges it".

"*ARTICULO 1604. <RESPONSABILIDAD DEL DEUDOR>.*

*[...] La prueba de la diligencia o cuidado incumbe al que ha debido emplearlo; la prueba del caso fortuito al que lo alega*".

2138. As the Tribunal has already established in para. 1027 *supra,* under Colombian law in contractual relations there is a presumption of *culpa*: it rests on the defendant to prove that he/she applied the requisite standard of care. When a person enters into a contract, he/she is bound to act diligently and the burden of proving that this threshold has been met, falls upon his/her shoulders; negligence is presumed, unless the person who should have used diligence or care proves otherwise. As explained by a Prof. Castro de Cifuentes[2127],

"*Es decir, en principio se presume su culpa, admitiéndose evidentemente la prueba en contrario para desvirtuar tal presunción*".

2139. The same is stated by Prof. Cubides Camacho[2128]:

"*En materia civil, tratándose de responsabilidad contractual, el artículo 1604 del Código, al prever que "la prueba de la diligencia o cuidado incumbe al que ha debido emplearlo" establece una especie de presunción de culpa y dispone para desvirtuarla la probanza de la diligencia debida*".

2140. Prof. Cubides Camacho continues, however, in explaining that the presumption does not apply whenever an accusation is made of *culpa grave*[2129]:

"*Desde luego, por virtud de la equiparación de la culpa grave y el dolo, aquella debe probarse como este, inclusive en los eventos de responsabilidad contractual, en los cuales, a pesar de presumirse la culpa del incumplido y tener él la carga de la prueba de su diligencia y cuidado, si el contratante perjudicado con el incumplimiento endilga al incumplido una culpa grave, porque, por ejemplo, aspira a que se den los efectos propios del dolo, es obligado a probarla*" [Emphasis added].

2141. For this reason, while CB&I was under the presumption of having been negligent in the performance of the EPC Contract, the burden of proving that CB&I breached its obligations under the EPC Contract with *culpa grave* lies with Reficar.

---

[2127] CL-0711, p. 8 (source p. 179); English translation:
"In other words, their fault is presumed in principle, obviously admitting evidence to the contrary to disprove the presumption".
[2128] CL-0469, p. 273 (pdf p. 4). English translation (pdf p. 7):
"In civil matters, when it comes to contractual liability, Article 1604 of the Code, by providing that "the proof of diligence and duty of care lies with the one who has had to use it" it establishes a kind of presumption of negligence and stipulates in order to distort it, the evidence of due diligence".
[2129] CL-0469, p. 274 (pdf p. 5). English translation (pdf p. 8):
"Of course, by virtue of equivalence of the gross negligence and *dolo*, it has to be proven as such, even in the event of contractual liability, in which, despite presuming the negligence of the individual in breach and having the burden of proof of his diligence and care, if the contracting party damaged by the breach foists a gross negligence on the individual in breach, because, for example, it pursues the effects inherent to *dolo*, it is obliged to prove it".

C.    **Criteria for finding _culpa grave_**

2142. There is no one-size-fits-all test under Colombian law that could in abstract solve all cases with allegations of _culpa grave_. To the contrary, as stated by Prof. Velásquez Gómez, a determination of _culpa grave_ must be made on the basis of each factual scenario:

> "_No toda persona se comporta de manera idéntica ante un mismo hecho, sin que, por lo tanto, se pueda dejar el lado la valoración de las circunstancias que lo rodean. En otros términos, el hecho no se puede aislar de su contorno, de la realidad_"[2130].

> ["Not everybody behaves in the same way concerning one same fact, without, omitting an appraisal of surrounding circumstances. In other words, facts cannot be separated from their context – from reality"[2131].]

2143. Prof. Velásquez Gómez also gives an illustrative example comparing the level of care that is required of an obligor depending on the item that is being cared for:

> "_Nadie puede dudar que la conducta que desempeña el hombre no es la misma cuando se le exige cuidar un lápiz de poco valor, a cuando se le exige cuidar una joya de enorme valor. La experiencia muestra que el común de las gentes cuidará con mayor énfasis la joya que el lápiz_"[2132].

> ["No one can doubt that a man's conduct is not the same when he is required to take care of a pencil of little value, as when he is required to take care of a jewel of enormous value. Experience shows that the average person will take more care of the jewel than the pencil"[2133].]

2144. Keeping in mind the above need to look closely at the facts when establishing the requisite standard of care, the Tribunal has full freedom to exercise its own judgment in weighing the evidence marshalled by the Parties and establishing whether the conduct of any of the parties complies or fails to comply with this standard. CB&I's legal expert, Prof. Arrubla, accurately invokes the principle of logical and reasonable rules of evaluation under Colombian law, according to which the adjudicator is "completely free to form his or her own opinion on the probative merit that the means of proof offer"[2134].

2145. What criteria should the Tribunal then adopt to weigh the available evidence and to conclude whether CB&I breached its obligations with _culpa grave_?

2146. The Parties have offered a catalogue of available criteria (**a.**), which the Tribunal will contrast against the relevant case law (**b.**), to establish the applicable test (**c.**).

---

[2130] CL-0201, p. 703 (pdf p. 3).
[2131] CL-0201, p. 703 (pdf p. 5).
[2132] CL-0201, p. 703 (pdf p. 3).
[2133] CL-0201, p. 703 (pdf p. 5).
[2134] JER 8 on Colombian Law, Issue 84, comments by Prof. Arrubla, pdf p. 64.

a.   **The Parties' positions**

2147. Reficar, supported by its legal expert, points to a number of factors that the Tribunal should take into account when assessing whether CB&I acted with *culpa grave*:

- the results of the performance: analysing cumulatively[2135] the difference between what the Parties had agreed to and the final result of the Contract[2136],

- the existence of multiple breaches[2137];

- referring to essential obligations[2138];

- the magnitude of the harm caused by such breaches[2139];

- the high value of the Project[2140] and of the interests involved[2141];

- the foreseeability of harm, *i.e.*, CB&I's awareness of the risks involved in the Project and of the grave repercussions of a breach of its contractual obligations[2142];

- the failure to adopt measures to prevent clearly foreseeable harm[2143];

- impermissible behaviour by a professional obligor, taking into account his experience and sophistication[2144].

2148. CB&I's expert, Prof. Arrubla, accepts that the *culpa grave* assessment may be based on several criteria, but he takes issue with the suitability of the following three[2145]:

- the existence of multiple breaches (i.),

- the magnitude of the harm (ii.),

- the type of obligation breached (whether it is an essential or non-essential one) (iii.).

2149. (i.) The Tribunal will not apply the criterion of multiple breaches, as it considers such criterion inapposite in the circumstances of the present case, and thus does not need to refute Prof. Arrubla's counterargument.

---

[2135] Reply, paras. 171-176, citing to CL-0368, paras. 764, 771, CL-0469, p. 272, CL-0369, p. 42.
[2136] Reply, paras. 185-189, citing to an analysis under French law under CL-0365, pp. 434-435 and the previously quoted arbitrations under Colombian law, CL-0799, p. 46 and CL-0075, p. 114 and Solarte Rebuttal ER, para. 88.
[2137] Solarte Rebuttal ER, para. 118.
[2138] Solarte Rebuttal ER, para. 118.
[2139] Solarte Rebuttal ER, para. 118.
[2140] Reply, para. 190, citing to Solarte Rebuttal ER, para. 87.
[2141] Solarte Rebuttal ER, para. 118.
[2142] Reply, para. 191, citing to CL-0075, p. 104 and CL-0800.
[2143] Solarte Rebuttal ER, para. 118.
[2144] Solarte Rebuttal ER, para. 118.
[2145] JER 8 on Colombian Law, Issue 84, Comments by Prof. Arrubla, pdf pp. 64-65.

2150. (ii.) As regards the magnitude of the harm, Prof. Arrubla, says that the existence and seriousness of the damage cannot be an element proving *culpa grave*, because the existence of the breach is independent of its magnitude and must be proven separately; otherwise, the Tribunal would follow the fallacy of "begging the question"[2146].

2151. The Tribunal disagrees.

2152. Proving the existence (and magnitude) of the damages is indeed a different requirement of civil liability, autonomous from *culpa grave*. The Tribunal does, however, believe that the extent of the damages can be helpful in assessing the obligor's conduct and the seriousness of the breach.

2153. (iii.) Finally, as regards the nature of the breached obligation, Prof. Arrubla makes a valid point that both essential and non-essential obligations may be breached with different levels of *culpa*[2147]; however, this does not mean that in establishing whether the obligor acted with *culpa grave*, the Tribunal should not take the nature of the breached obligation into consideration when assessing the seriousness of the obligor's *culpa*.

* * *

2154. As both Parties agree, the Tribunal will use a multi-pronged test to establish whether Respondents acted with *culpa grave*. In order to determine the criteria relevant for the finding of *culpa grave* the Tribunal needs to contrast the Parties' opinions with Colombian case law.

**b.    Case law**

2155. Before analyzing these criteria for the existence of *culpa grave,* the Tribunal will briefly review Colombian case law on the matter, by first addressing seminal decisions by the Colombian Supreme Court of Justice ["**Colombian Supreme Court**"] (**i.**) and then arbitral rulings decided under Colombian law in construction disputes (**ii.**).

**(i). Supreme Court of Justice**

2156. The Parties and their legal experts have referenced only a limited number of disputes decided by Colombian courts.

2157. The seminal case concerns a 1958 Colombian Supreme Court ruling, in which the decision of the Superior Tribunal of Barranquilla was overturned, due to its erroneous interpretation of the concept of *culpa*, in a case where a Mr. Birbragher recklessly accused a Mr. Lara Nieto of theft[2148].

2158. The Colombian Supreme Court decision elaborates on the proper interpretation of *culpa* under Colombian law. It employs the terms "*culpa consciente*" or "conscious

---

[2146] JER 8 on Colombian Law, Issue 84, Comments by Prof. Arrubla, pdf p. 65.
[2147] JER 8 on Colombian Law, Issue 84, Comments by Prof. Arrubla, pdf p. 65.
[2148] CL-0800, p. 140 (pdf p. 6).

negligence" and "*culpa inconsciente*" or "unconscious negligence" and its findings are applicable to any scenario where *culpa*, including *culpa grave*, is contemplated.

2159. (i) *Culpa consciente*, qualified as "more serious" or "*más grave*", concerns situations "*[c]uando el autor conoce los daños que, pueden ocasionarse con un acto suyo pero confió imprudentemente en evitarlos*"[2149].

> ["When the agent knows the damages that can occur as a result of his acts but imprudently believes he can avoid them"[2150].]

2160. (ii) *Culpa inconsciente* occurs "*[c]uando el autor no prevé el daño que pueda causarse con un acto suyo, pero hubiera podido preverlo, dado su desarrollo mental y conocimiento de los hechos*"[2151].

> ["When an actor cannot foresee the type of damages that have been caused by his acts but could have nonetheless prevented [the harm which caused] them given [...] his knowledge of the facts"[2152].]

2161. The Colombian Supreme Court used these two scenarios of *culpa* to establish that the applicable standard is <u>objective</u> rather than subjective:

> "*la capacidad de prever no se relaciona con los conocimientos individuales de cada persona, sino con los conocimientos que son exigidos en el estado actual de la civilización para desempeñar determinados oficios o profesiones*"[2153].
>
> [The capacity to foresee [the harm] is not related to the knowledge of each person but rather the knowledge which is required at the current stage of society to perform specific occupations or professions[2154].]

2162. The conclusion for the present case is that Reficar is not required to prove that CB&I acted with actual knowledge (or foresight) that its actions would breach the Contract; instead, Reficar must only prove that a <u>sophisticated contractor such as CB&I</u> would have foreseen that Respondents' actions would breach the Contract.

<u>Colombian Supreme Court ruling of 2014</u>

2163. Another, more recent case decided by the highest court in Colombia discussed by the Parties, is a judgment delivered on July 31, 2014, in which the Colombian Supreme Court applied the following standard for gross negligence[2155]:

---

[2149] CL-0800, p. 136 (pdf p. 4).
[2150] CL-0800, pdf p. 7.
[2151] CL-0800, p. 136 (pdf p. 4).
[2152] CL-0800, pdf p. 7.
[2153] CL-0800, p. 136 (pdf p. 4).
[2154] Translation by the Tribunal.
[2155] CL-0065, pp. 93-94, English translation by the Tribunal:
"In other words, from this perspective, *culpa grave* is evaluated according to a specific standard: 'the average conduct of the common man [...] <u>[T]he negligence or imprudence that gives rise to gross negligence must be [...] of a magnitude characterized by disproportion and notorious infrequency. It is not enough, then, that the acts in question be clearly careless; they must also be clearly exceptional in the environment in which the respective activity is carried out</u> [...]. It is with this orientation that authorized scholars have

> *"Esto es, que desde esa óptica la culpa grave se evalúa en función de una*
> *pauta concreta: 'la conducta media del hombre común [...]. [L]a negligencia*
> *o la imprudencia que da lugar a la culpa grave deba revestir [...] una*
> *magnitud caracterizada por la desmesura y la notoria infrecuencia. No basta,*
> *pues, que se trate de actos de claro descuido, sino que, además, se requiere*
> *que tengan un carácter palmariamente excepcional en el medio en el que se*
> *desenvuelve la respectiva actividad [...]. Con esa orientación es que*
> *autorizados doctrinantes han precisado que la culpa grave comporta 'una*
> *negligencia, imprudencia o impericia extremas, no prever o comprender lo*
> *que todos prevén o comprenden, omitir los cuidados más elementales,*
> *descuidar la diligencia más pueril, ignorar los conocimientos más comunes'"*
> [Emphasis added].

2164. The Tribunal observes that the above test refers to elements proposed by Prof.
Solarte, such as the magnitude of the breach; the test also speaks of extreme
imprudence, disregarding the most basic diligence, which is precisely the level of
negligence identified by the Tribunal in the preceding analysis of Art 63 of the
CCC.

> [The test also speaks of "notorious infrequence" and "exceptional character"
> of the actions tainted by *culpa grave*; however, this criterion should be viewed
> as a qualifier of the degree of recklessness rather than the frequency with
> which decision-makers should make findings of *culpa grave*.]

### (ii). Arbitral decisions

2165. The Tribunal understands that the Parties agree that for <u>construction</u> disputes in
particular, arbitral decisions rendered by tribunals applying Colombian law offer
sufficient persuasive value to assist the Tribunal in its analysis.

2166. The Parties have drawn the Tribunal's attention to a number of such awards, in
which arbitral tribunals applying Colombian law found *culpa grave*[2156]. The
Tribunal will focus on the main case used by each Party: *Consorcio Ferrovial
SAINC v. Carbones del Cerrejón Limited* ["***Consorcio Ferrovial***"][2157] cited to by
Claimant and *Edificio Centro de Comercio Internacional v. INHISA S.A.* ["***Edificio
Centro de Comercio Internacional***"][2158] – by Respondent.

---

specified that *culpa grave* entails 'extreme negligence, imprudence or inexperience, not foreseeing or
understanding what everyone foresees or understands, omitting the most elementary care, neglecting the
most puerile diligence, ignoring the most common knowledge'" [Emphasis added].
[2156] See e.g.:
CL-0079, p. 60 – with regard to the use of pipes that did not conform with the norms for transmitting potable
water;
CL-0080, p. 22 – with regard to a transport company failing to adopt security measures that would have
prevented the theft of the goods that were stolen *en route*;
CL-0368, paras. 774-782 – with regard to a construction consortium that presented a work plan that it knew
beforehand it was incapable of meeting.
[2157] CL-0368.
[2158] RL-0144.

ICC Case 21747 RD/MK/PDP
Final Award

*Consorcio Ferrovial*

2167. In this ICC case decided in July 2017, the underlying facts concerned a mining company contracting with a construction consortium to build an expansion to its infrastructure. At one point, the mining company terminated the contract, which led the consortium to initiate an arbitration. The consortium requested the payment of the costs of certain items it had constructed, stand-by costs, general expenses and demobilisation costs, among others. The owner brought a counterclaim, alleging serious breaches of schedule, failure to meet project milestones and abandonment of works, among others, all of which, in the owner's view, were committed with *culpa grave*.

2168. Due to the expansion project being a highly complex endeavour, involving significant costs, the tribunal set the requisite amount of care for the consortium as the highest standard of diligence:

> "*el estándar de diligencia [...] más alto: el que corresponde a un profesional altamente especializado en el trabajo que se le encomienda*"[2159].

> ["the one that corresponds to a highly specialized professional in the work that was commissioned to it"[2160]].

2169. The majority of the tribunal sided with the mining company, and found that the consortium had indeed acted with *culpa grave*, because the results of its actions were simply unjustifiable:

> "*En síntesis, todo parecería indicar que, por razones que resultan difíciles de entender, el Contrato desbordó la capacidad de planeación, concepción, programación y ejecución del Consorcio. Es explicable que se hubiera presentado incumplimiento o demoras por circunstancias específicas respecto de ciertos ítems o aspectos del proyecto. Pero no resulta fácil entender o justificar un incumplimiento casi sistemático de todo el Contrato*"[2161].

> ["In summary, everything would seem to indicate that, for reasons that are difficult to understand, the Contract went beyond the Consortium's ability to plan, foresee, schedule, and perform. It is understandable that there would be breaches or delays due to specific circumstances regarding certain items or aspects of the project. However, it is not easy to understand or justify an almost systematic breach of the entire Contract[2162]"] [Emphasis added].

2170. Particular emphasis was placed by the tribunal on the fact that the consortium presented to the owner a work plan with, full knowledge that it was unachievable:

> "*En particular, cabe destacar que de la prueba en estas actuaciones ha quedado comprobado [...], que como ha sido alegado por Cerrejón, el Consorcio presentó fechas en su plan de trabajo relativas al suministro del Jack-Up que sabía de antemano no podía cumplir. Este proceder es al menos*

---

[2159] CL-0368, para. 763, p. A204 (pdf pp. 209-210).
[2160] CL-0368, para. 763, p. A204 (pdf p. 258).
[2161] CL-0368, para. 776, p. A212 (pdf p. 217).
[2162] CL-0368, para. 776, p. A212 (pdf p. 266).

*gravemente culposo y posiblemente doloso, no solo por su entidad, sino además por su impacto negativo en el Camino Crítico atento a la utilización programada de los Jack-Ups en la realización de los trabajos por mar y su empleo efectivo para ejecutar los de tierra desde el mar*"[2163].

["In particular, it should be stressed that the evidence in these proceedings has proved [...] that, as claimed by Cerrejón, the Consortium submitted dates in its work plan regarding Jack-Up supply that it knew beforehand it could not meet. This way of acting is at the least grossly negligent and possibly fraudulent, not only because of its consequence, but also because of its adverse impact on the Critical Path, given the scheduled use of the Jack-Ups in carrying out marine work and their effective use in performing the land work from the sea"[2164]] [Emphasis added].

2171. Other particular factors considered by the tribunal to be indicative of *culpa grave* included the fact that the consortium[2165]:

- abandoned the works,

- presented a faulty risk matrix,

- failed to follow the repeated calls of the counterparty to comply with its contractual obligations,

- suspended the works as a result of a strike, and

- failed to deliver to the owner relevant information on the delivery date of certain materials or equipment.

2172. The Tribunal finds the award in *Consorcio Ferrovial* particularly persuasive as it has been upheld by the Colombian Supreme Court after being brought to annulment proceedings by the consortium[2166].

*Edificio Centro de Comercio Internacional*

2173. Respondent in turn relies primarily on *Edificio Centro de Comercio Internacional*.

2174. The tribunal in *Edificio Centro de Comercio Internacional* established that the applicable standard for *culpa grave* is

"*la conducta que consiste en no manejar los negocios ajenos con aquel cuidado que, aun las personas negligentes o de poca prudencia, suelen emplear en sus negocios propios*"[2167],

---

[2163] CL-0368, para. 781, p. A213 (pdf p. 218).
[2164] CL-0368, para. 781, p. A213 (pdf p. 267).
[2165] CL-0368, para. 774, pp. A211-A212 (pdf pp. 216-217 and 266-267 for the translation).
[2166] CL-0369, p. 59: "*Resuelve Primero. Declarar infundado el recurso de anulación del laudo internacional formulado por las sociedades SAINC INGENIEROS CONSTRUCTORES S.A. y FERROVIAL AGROMAN S.A.[...] frente al laudo arbitral de fecha 19 de julio de 2017 [...]*".
[2167] RL-0144, p. 59.

["conduct which consists in not managing the interests of others with the care that even negligent and imprudent persons apply in their own business"[2168]],

thus reiterating the text of Art. 63 of the CCC.

2175. Applying this standard to the facts of the case, the tribunal found that a contractor acted with *culpa grave* when it installed fire-hose water piping instead of piping designed for drinking water[2169]:

> "*Inhisa S.A.[...] NO empleo la debida diligencia y cuidado profesional que implica su condición profesional y el alcance que conllevan la obra de instalación de la nueva tubería para la conducción de agua potable [...]*".

> ["Inhisa S.A. [...] DID NOT apply the required diligence and professional care implied by its professional status and the scope of work involved in the installation of the new drinking water pipeline [...]"[2170]] [Capitals in the original].

2176. In finding *culpa grave*, the tribunal rather than explaining in detail why the applicable standard was met, stated that it was simply unexplainable for the contractor to have exhibited such an egregious level of carelessness:

> "*No de otra manera se explica que – a pesar de esos factores que jugaban a su favor – en la ejecución de ese contrato, esa empresa hubiera incurrido en errores tan graves como instalar para la conducción de agua potable una tubería que, según los estándares reconocidos en la actividad de la ingeniería Hidráulica, no es apta para la conducción de ese liquido sino para conducir agua destinada a apagar incendios [...]*"[2171].

> [It cannot be explained otherwise that – despite these factors that played in its favour – in the execution of this contract, this company had committed such serious errors as installing a pipe for the conduction of drinking water that, according to the recognized standards in the activity of hydraulic engineering, is not apt for the conduction of this liquid but to carry water destined to extinguish fires [...]"[2172].

2177. The Tribunal will apply the same reasoning when evaluating CB&I's conduct.

c.    **The applicable test**

2178. Having analysed the opinions of both Parties' legal experts and the Colombian jurisprudence presented by the Parties, the Tribunal finds that in establishing *culpa grave*, the Tribunal must pay special attention to:

-    The significance of the obligation that was breached;

---

[2168] Translation by the Tribunal.
[2169] RL-0144, p. 59.
[2170] Translation by the Tribunal.
[2171] RL-0144, p. 59.
[2172] Translation by the Tribunal.

- The magnitude of the damage caused by the breach;

- The attitude shown by the party in breach towards the foreseeable damage.

2179. If the obligation breached was essential, the magnitude of the damage caused was significant, and the attitude of the party in breach was reckless, the Tribunal will find that the requirements of the legal definition in the CCC of *culpa grave* have been met: "not [manage] others' affairs with care that even negligent or imprudent people usually employ in the management of their own business".

## 2.4. DETERMINATION OF *CULPA GRAVE*

2180. In the current Section, the Tribunal will apply the three-pronged test under Colombian law to the facts of the case and find that CB&I breached its cost and schedule control obligations with *culpa grave*.

## A.  Significance of the obligation breached

2181. The first criterion concerns the nature of the breached obligations: if these obligations were essential, *i.e.*, if significant interests were enshrined in them, then there is a higher likelihood that their breach amounted to *culpa grave*. If, however, the breach concerned an obligation of ancillary nature, *i.e.*, of minor interest, this could be indicative that the *culpa* did not qualify as *grave*.

2182. CB&I breached its Cost and Schedule Control Commitments. The question is, thus, whether the Cost and Schedule Control Commitments were essential obligations in the EPC Contract. The answer is in the affirmative: cost-related obligations are always essential to any construction contract, because the basic obligations assumed by the contractor is to construct at an agreed price (or reasonably within cost predictions) and within a fixed timeframe.

2183. But, even more so, in this case, where the Parties placed special importance on the Cost and Schedule Control Commitments:

2184. First, the material nature of the Cost and Schedule Control Commitments, for both Parties, is enhanced by the following facts:

- The Cost Control Commitments provided Reficar with the protection that assuaged its fears as to entering into a cost-reimbursable EPC Contract (which was CB&I's preferred cost-modality, as it would shift the risk of cost overruns on Reficar), as opposed to a lump sum, where it would be CB&I running that risk;

- The Schedule Control Commitments were also essential for both Parties, with the clear obligation to reach Mechanical Completion of the Project by February 2013: finalizing the works within the agreed timeframe was a fundamental requirement for success and would earn CB&I a bonus, while the alternative scenario of delays would result in the accrual of liquidated damages and prolongation costs.

2185. Second, the Tribunal has previously established that the relationship between Reficar and CB&I was not that of a typical, arms-length construction contract.

2186. The Parties agreed that CB&I would be bound by a Heightened Diligence Obligation under para. 3 of the Project Execution Plan[2173]:

> "Even though a reimbursable contract CB&I project management will rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own" [Emphasis added].

2187. CB&I agreed that its contractual role would not be that of a mere contractor; instead, CB&I accepted to become a contractor *cum* mandatary[2174], with the obligation to construct the Project and the right to be reimbursed by the Owner, but subject to a fiduciary obligation that all costs (and schedule) decisions taken must safeguard Reficar's resources as if its own.

2188. The existence of this additional bond between the Parties speaks to a heightened level of legitimate trust that Reficar could and did place on CB&I's representations as to the estimated Project costs and Mechanical Completion date – a trust that CB&I breached:

- When CB&I submitted the Representation Letter, it guaranteed, with a +/- 5% accuracy, that costs would amount to USD 4 billion, yet they ended up reaching USD 5.9 billion, with a large amount of the Excess Costs being foreseeable by the Cut-Off Date; in fact, the cost forecast from September to October 2012 alone rose by a staggering USD 1.25 billion, without any explanation by CB&I;

- Similarly, when Reficar expressed worries regarding a possible delay, CB&I assuaged its fears assuring that the Mechanical Completion date would not be altered; during the July 19, 2011 Reficar BofD meeting Mr. Deidehban was asked for certain explanations about the status of the Project[2175] and he explained that a critical unit was affected by a 2.4% delay, but "the guaranteed mechanical completion date should not be adjusted on the basis of the issue"[2176]; yet, only six months later, CB&I's projected date of Mechanical Completion was moved by more than half a year[2177] and, eventually, Mechanical Completion occurred with a delay of 725 days[2178].

2189. The Tribunal notes that in *Consorcio Ferrovial*, analysed *supra*, another ICC tribunal deciding under Colombian law found that a contractor acted with *culpa grave* when it presented a work plan it was aware was unachievable. The abrupt changes in the schedule presented by CB&I suggest that CB&I, being aware of unavoidable delays, was prepared to knowingly submit unachievably optimistic predictions.

---

[2173] JX-002, p. 654; JX-004, p. 628.
[2174] See Section VII.2.1.3.1.1 *supra*.
[2175] Ex. C-0429, p. 5.
[2176] Ex. C-0429, p. 5.
[2177] Ex. C-0088, p. 4: "The late deliveries of Substations, Isometric Production, Pipe Fabrication, and Tank Farm Modifications have pushed the Mechanical Completion of the Project to 19 September 2013". The Tribunal notes that the 203 days are imputable to Reficar. Still, CB&I had a duty to keep Reficar updated on any projected delays to the Project Schedule.
[2178] Out of the total of 725 days of delay, 334 are imputable to CB&I and 391 to Reficar, pursuant to the analysis in Section VII.2.3 *supra*.

2190. In sum, CB&I breached the Cost and Schedule Control Commitments, all of which were essential obligations under the Contract thereby evidencing that it acted with *culpa grave*. Furthermore, there is no plausible explanation for CB&I's failure to provide precise and trustworthy cost and time estimations, other than that it acted with *culpa grave*.

**B.    Magnitude of the breach and damage caused**

2191. The second criterion concerns the magnitude of the breach (**a.**) and the foreseeable damage caused by the breach (**b.**): if the breach was material and/or led to a significant harm, this is indicative of *culpa grave*.

**a.    Magnitude of the breach**

2192. The purpose of the Cost and Schedule Control Commitments was to guarantee that the Project would be built for a cost and within a time frame equal to, or as close as possible, to the estimates provided by CB&I.

2193. The failure to control costs on the EPC Project is visible from the findings on liability made in this Award:

- the total amount awarded by the Tribunal as Improper Costs (USD *circa* 800 million) is almost ten-times higher than the total aggregate Liability Cap (USD 87.75 million),

- the Improper Costs were not motivated either by events outside of the Parties' control or by events for which Reficar is responsible – all potential Excluded Costs have already been discounted by the Tribunal,

- the Improper Costs are almost six-times the amount that CB&I itself expected to earn on the Project as gross profit: USD 135 million[2179],

- on their own, the Improper Costs would amount to the costs of another large-to-mega-project[2180].

2194. As with costs, the magnitude of CB&I's breach of the Schedule Control Commitments is daunting: the Parties agreed in June 2010 for CB&I to deliver the Project by February 2013; the Project ended up being delivered two years after the Guaranteed Mechanical Completion Date agreed by the Parties in the Contract, in February 2015. Thus, the Project ended up lasting almost twice as long as had been agreed.

2195. The Tribunal has found that CB&I was solely responsible for a total of 334 days of delay – nearly a year. In the Tribunal's view, a delay of almost a year on a Project originally scheduled to only take a total of two and a half years serves as a further indication of the sheer magnitude of CB&I's failings.

---

[2179] USD (million) 800/135= 5.925925(...) or 5.93.
[2180] See B&OB ER, para. 32 for a definition of megaprojects as opposed to large projects. See also Ex. B-004, pdf p. 9.

CB&I's counterargument

2196. CB&I argues that it could not have breached its Schedule Control Commitments with *culpa grave*, because only less than a half of the number of days of delay to the Project schedule can be attributed to CB&I's sole responsibility[2181].

2197. The Tribunal disagrees.

2198. What matters to determine the magnitude of the breach is that CB&I issued a Representation Letter making a representation as to the +/- 5% accuracy of the schedule predictions. And after that representation, the delay attributable to CB&I still amounted to around a year.

2199. In sum, if the Project were CB&I's own, it is highly unlikely that CB&I would have allowed the costs to explode by almost USD 800 million and the schedule by almost a year. Because CB&I did so, the Tribunal finds the magnitude of CB&I's breaches and damage caused as indicative of it acting with *culpa grave*.

**b.    Damage caused**

2200. As regards damages, from early on in the Project CB&I was fully aware that it was in continuous breach of both the Cost and Schedule Control Commitments and that such breach would cause harm in the form of Excess Costs (including prolongation costs).

2201. The most obvious manifestation of the damage is, thus, in the form of Excess Costs[2182].

2202. But there is an added negative effect: these Excess Costs could provoke personal liability of Reficar's management. Reficar is a company owned by the Colombian State, through Ecopetrol. As public companies, their expenses are public expenditures, and subject to review by the *Contraloría* – a powerful entity entrusted with the supervision of public expenditures[2183] and empowered by law to charge Ecopetrol's and Reficar's officers with public offences and personal responsibility, if (in the *Contraloría*'s judgment) they had failed to properly control public expenditure.

2203. There is ample evidence that Reficar informed CB&I, and that CB&I was perfectly aware, of the interests at stake, if the Cost and Schedule Control Commitments were not observed[2184] – and that, notwithstanding this awareness, CB&I failed to take any remedial action.

2204. Summing up, the Tribunal finds that the damage caused by the breach of the Cost and Schedule Control Commitments was significant, and that such harm was foreseeable – this being another indicator of CB&I's *culpa grave*.

---

[2181] RPHB, para. 221.
[2182] See Section VII.2.1 *supra.*
[2183] JER 11 on Colombian Fiscal Liability Law, Issue 6, pdf pp. 5-9.
[2184] See e.g., Ex. C-0094; Ex. C-0095; Ex. C-0097; Ex. C-0115; Ex. C-0121; Ex. C-0136.

ICC Case 21747 RD/MK/PDP
Final Award

Self-dealing by CB&I

2205. Respondents' breach did not only cause damages to Reficar, but at the same time, it also led to CB&I's own enrichment.

2206. In accordance with the provisions on remuneration in the EPC Contract, CB&I was initially entitled to earn USD 175.75 million[2185] – an amount which CB&I subsequently readjusted to USD 135 million in its internal projections[2186].

2207. However, the graph below, which is a slide from CB&I's Project Manager Review presentation at the end of the Project[2187], shows that CB&I finally managed to obtain USD 225 million in gross profits, which represents an additional unexplained profit of USD 90 million:



2208. Are there convincing explanations for this additional profit?

2209. A possible explanation could be Change Orders, which significantly increased the size of the Project; the accepted change orders, however, only amount to USD 10.5 million[2188]. Another possible explanation is the Health and Security Bonus, which

---

[2185] See discussion under Pre-Contractual Liability Section VII.1.1.7.B.
[2186] See Mr. Deidehban's testimony at Tr. 1497:23-1498:7.
[2187] Ex. C-1329, p. 36. The version used by the Tribunal is the one presented by Claimant in CPHB, para. 18.
[2188] ESOD, fn. 14, p. 16; CB&I simultaneously argues that Reficar rejected most of such extra work WNOCs, see RPHB, para. 479.

CB&I only achieved in 2010[2189]. This still leaves unexplained gross profits in the amount of almost USD 80 million, or over 50% more than agreed with Reficar.

2210. At the Hearing, the Tribunal asked Mr. Deidehban about potential sources of additional revenue, apart from the Fixed Fee arrangement, fee mark-up for Change Orders and the various performance bonuses CB&I was entitled to. When pressed on the issue, Mr. Deidehban mentioned rate arbitrage – the difference between the rate at which Reficar reimbursed to CB&I the cost of indirect hire labour and the salaries CB&I actually satisfied to these indirect hire employees[2190]:

> "The slight difference may be just an issue with the reporting, but there is no, it's – we took up the contingency that we left for ourselves in the to get us to 175.5, plus the additional incrementals we had from change order approvals and that, and if there would have been anything in the rate arbitrage, but there wouldn't have been any – it wouldn't have been that significant".

2211. The existence of profit resulting from rate arbitrage is relevant: the longer the Project went on, and the more indirect hire employees were employed, the higher CB&I's profit. Despite Reficar's best efforts to limit any devious incentives for CB&I through the fixed fee remuneration structure, ultimately CB&I stood to benefit from the Project languishing from February 2013 to February 2015.

2212. This finding was confirmed in the witness statement of CB&I's former employee, Mr. Ernest Breaux[2191]:

> "[…] [CB&I construction block managers'] attitude was that since the Project was under a cost reimbursable contract structure, efficiency was not a priority for them. Indeed, the view of CB&I was that the longer the job went on, the more money CB&I would make" [Emphasis added].

2213. Reficar's Mr. Suárez also confirmed at the Hearing Reficar's preoccupation about CB&I's interest in prolonging the Project due to its rate arbitrage-related profits[2192]:

> "The contract said that, for indirect hire, rates had been agreed upon, labour rates, and within these labour rates and the contract, of course, also establishes what scope that rate covers. I mean, for the lodging, catering, whatever, as determined in the contract. So for each indirect hire, there was a given rate that had to cover all those costs, plus salaries, and indemnity payments, health scheme payments, all that is required by law. But this is my belief because what happened that – the rate had to cover all what I have just mentioned, and certainly and additionally, there should be a plus to that. Why? Because the one that negotiated how the salary to be paid to each person was CB&I. So in

---

[2189] CB&I does not bring to the Tribunal's attention the actual amount earned, or any underlying documents. See Wright Counterclaim ER, p. 60; Counterclaim ESOC, paras. 168-169, citing to Deidehban RWS, para. 68 (with no reference) and documents Ex. R-1525 and R-1526, both of which contain a number of Excel Sheets with a compilation of Onshore and Offshore accounting records without any possibility for the Tribunal to identify the relevant invoices.
[2190] Tr. 1498:18-1499:1.
[2191] Breaux CWS, para. 55.
[2192] Tr. 1888:19-1889:12.

these rates, there was ultimately a possibility for an economic profit"
[Emphasis added].

2214. There were additional, ancillary benefits for CB&I, deriving from the extended duration of the Works:

-     CB&I had a secure source of revenue for its employees: the engineers, procurement team, construction supervisors, over the years of delay,

-     It could report to its investors that it was working on a project of great value,

-     It could advertise itself as being entrusted with this highly important Project, and

-     It could cover the costs of its Island Park facility, which apparently had been underperforming prior to being entrusted with certain works for the Project[2193].

2215. Thus, the Tribunal finds that the evidence proves that CB&I obtained additional profits from the extended duration of the Works (mainly, through rate arbitrage). This self-dealing is indicative of CB&I having breached the Cost and Schedule Control Commitments with *culpa grave*.

## C.   Reckless attitude

2216. According to the CCC, *culpa grave* is the failure to manage others' affairs with even less care than that expectable from a negligent or imprudent person managing their own business.

2217. The Tribunal notes that the very definition of the Cost Control Commitments encompasses some *culpa grave* notions:

> "Even though a reimbursable contract CB&I project management will rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own" [Emphasis added].

2218. The relevant point is, thus, whether in failing to safeguard Reficar's resources, CB&I deployed a degree of care that was below the standard expected from a negligent or imprudent person.

2219. *Res ipsa loquitur*: cost overruns amounting to more than USD 800 million and achieving Mechanical Completion two years after the guaranteed date to do so, with a year's time of solely-caused delays, can only be interpreted as the result of a reckless disregard for controlling costs and schedule. There is ample evidence to prove this averment:

2220. First, Mr. Deidehban, CB&I's highest officer on the Project, conceded that the standard for submitting costs to Reficar was[2194]:

---

[2193] See para. 1249 and supporting evidence *supra*.
[2194] Tr 1127:17-1127:18.

"If I incurred costs associated with the work, they are reimbursable".

2221. Mr. Suárez, Reficar's Deputy Project Manager (and later Project Director), confirmed this[2195]:

> "I was shocked to see CB&I's Project Team adopt an attitude that the Project would 'cost whatever it cost' and frequently state that 'it is what it is.' These are phrases I heard several times from CB&I's management team on the Project, including from Mr. Deidehban himself" [Emphasis added].

2222. And so did Mr. Houtz, Reficar's engineer[2196]:

> "Reficar made constant requests for explanations as to why CB&I was incurring delays and ever increasing hours. During many of these meetings Mr. Deidehban would simply say that 'it is, what it is' and 'this is a cost reimbursable contract.' Indeed, the phrase 'it is, what it is' became CB&I's motto and was repeated to us on many occasions. [...] Second, CB&I would then argue that Reficar was interfering with its means and methods (which was not true) and, ultimately, end the discussion by telling again us that "it is, what it is" [Emphasis added]".

2223. The above statements show no degree of care on CB&I's side when incurring costs.

2224. Second, the reckless disregard to controlling cost and schedule are reflected in CB&I's contemporaneous communications from 2013, which prove that it believed to be entitled to all costs submitted for reimbursement, according solely to its judgment, and regardless of its duty of care:

> "Whether the schedule is extended to August 31, 2013, August 22, 2014 or any other date, CB&I is entitled to be compensated for extended performance costs associated with that time extension"[2197], and

> "While CB&I acknowledges that it does not have a "blank check" to enlist unlimited resources, Reficar is nonetheless required to approve those resources that CB&I reasonably deems necessary to enable its means and methods in performing the Work[2198]" [Emphasis added].

2225. Third, the Tribunal is convinced that the above-mentioned attitude contributed to CB&I's inaction vis-à-vis the increase in costs – CB&I did not believe it was breaching the Contract, did not contemplate increasing costs as damages and, hence, it did not take actions to mitigate the over-run. CB&I did not take any responsibility for the situation it had created.

2226. The Tribunal is convinced that, had CB&I treated the Project as a lump sum contract in which cost overruns risks lay with CB&I – as it should, according to the Cost Control Commitments – costs would not have increased the way they did.

---

[2195] Suarez CWS, para. 80.
[2196] Houtz CWS, para. 193.
[2197] Ex. C-0102, p. 2.
[2198] Ex. C-0378, p. 4.

2227. It is worth noting that by September 2012, the Monthly Forecast had reached USD 4.221 billion[2199] (which is higher, but still reasonably close to the Representation Forecast), but by October 2012, just one month later, the estimation had skyrocketed to <u>USD 5.467 billion</u>[2200], an increase of some USD 1.25 billion (or 23%). Had CB&I treated overrun costs as if they came out of its own pocket, the reaction would have been to implement immediate cost reduction measures. No reasonable contractor would simply accept that its profits will decrease by USD 1.25 billion, without trying to avoid such outcome by all possible means.

2228. But CB&I took no cost reduction action. It simply presented the new augmented cost estimations as a *fait accompli*, assuming no responsibility for the Excess Costs it was causing.

2229. The same is true for the Project schedule: after making a representation as to the +/- 5% accuracy of the schedule, the delay attributable to CB&I amounted to around a year; indicating a reckless disregard to Reficar's interests.

2230. <u>In sum</u>, CB&I's failed to honour its Cost and Schedule Control Commitments in a reckless way, taking no responsibility for the spiralling costs and schedule, and failing to implement mitigation actions, as if the business were its own – thereby acting with *culpa grave*.

## 2.5. CONCLUSION

2231. CB&I's breaches of the Cost and Schedule Control Commitments meet all of the criteria under the three-prong test applied above:

- The Cost and Schedule Commitments were all essential obligations;

- The breaches by CB&I were material and led to foreseeably significant damages;

- CB&I showed recklessness, taking no responsibility for the increases in costs and time and failing to adopt mitigating actions.

2232. <u>As a result</u>, the Tribunal finds that CB&I breached its Cost and Schedule Control Commitments with *culpa grave*. Thus, the Liability Caps do not find application to the damages awarded as a result of those breaches.

### CB&I's counterarguments

2233. CB&I brings two counterarguments which would prove that it could not have acted with *culpa grave*: first, because only major construction errors could amount to *culpa grave* and there are no such allegations by Reficar (i.), and second, because findings of *culpa grave* are fundamentally rare (ii.).

2234. (i.) CB&I suggests that on an EPC contract, such as the one between the Parties, only major construction errors could be indicative of the contractor acting with

---

[2199] Ex. C-0093, pp. 4, 39.
[2200] Ex. C-0096, p. 13; the Tribunal notes that the same document offers different ranges for the reforecast at p. 17.

*culpa grave*[2201]. CB&I bases its argument on the decision in *Edificio Centro de Comercio Internacional*.

2235. But the decision in *Edificio Centro de Comercio Internacional* does not, at any point, posit that *culpa grave* in the performance of construction contracts may <u>only</u> be found with regard to the performance of construction activities. It only so happens that in the factual circumstances of that case, the contractor's *culpa grave* took the form of severe construction errors, that resulted in installing piping that could not serve its purpose. But that does not in any way preclude the current Tribunal's finding that CB&I acted with *culpa grave* in breaching its Cost and Schedule Control Commitments.

2236. (ii.) CB&I also argues that, because the standard for finding *culpa grave* is so high, it is fundamentally rare for courts or tribunal to issue decisions finding this standard to be met.

2237. CB&I's argument is misguided.

2238. Although CB&I does not provide any underlying data for its proposition, the Tribunal notes that the 2014 Colombian Supreme Court ruling analysed *supra* under the Subsection 2.3.C.b on case law mentions the "notorious infrequence" and "exceptional character" of the actions tainted by *culpa grave*, But the Tribunal has already clarified that such qualifications only have a bearing on the required degree of negligence; it is not a guideline for decision-makers to limit its power to find for *culpa grave*.

2239. Even if, *arguendo*, CB&I were correct about the actual infrequency of decisions finding *culpa grave*, this would not impact this Tribunal's decision. The facts of the current case – the only controlling factor for the Tribunal's decision – have been analysed in this Section and are compelling: CB&I acted with *culpa grave* and no statistics on frequency can change this.

2240. In any event, the Parties have pointed the Tribunal to a number of decisions under Colombian law with a positive finding of *culpa grave*, which further defeats CB&I's argument.

*Dolo*

2241. Reficar makes a subsidiary argument that CB&I's actions also amounted to contractual *dolo*.

2242. The Tribunal need not address this argument as the finding of *culpa grave* is sufficient to decide that the amounts awarded for CB&I's breaches of Cost and Schedule Control Commitments fall outside the scope of the Liability Cap.

## 2.6. ANALYSIS UNDER NEW YORK LAW

---

[2201] ESOD, para. 1456.

2243. The Tribunal is convinced that its finding of CB&I having acted with *culpa grave* with regard to the Cost and Schedule Control Commitments is sufficient to disapply the Liability Caps. In an abundance of caution, however, the Tribunal will make a finding that the result of the analysis would be the same, applying the concept of gross negligence under New York law.

## A.   The Parties' positions

2244. Reficar's standards for gross negligence under New York law include conduct that:

- "evinces a reckless indifference to the rights of others"[2202],

- constitutes "a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others"[2203], or

- "smacks of intentional wrongdoing"[2204].

2245. Reficar cites to *F. D. Borkholder Co., Inc. v. Sandock*, in which a construction company was found to have acted in gross negligence when, building an additional room to a pre-existing structure, it knowingly[2205]:

- Failed to fill a wall suffering from a moisture problem with concrete and shortened the roofline, contrary to design plans,

- Later assured the owner that the moisture problem was caused by simple condensation, which was not the case, and

- Finally promised to fix the moisture problem but never did.

2246. Reficar additionally references *Internationale Nederlanden*. In this case, the note holders of a company that subsequently entered into bankruptcy accused a trust company tasked with managing the company's voting by failing to correctly transmit the note holders' votes on distribution options, leading to the invalidity of their ballot and severe resulting monetary damages[2206]. The New York Court of Appeals specifically found that "several acts of negligence with foreseeably severe cumulative effect", in this case the discrete acts of failure to properly manage the votes submitted by note holders, can in aggregate constitute gross negligence, citing to *Food Pageant*[2207].

2247. Reficar also cites to *Hyatt v. United States*[2208], a case in which the New York court found gross negligence on the basis of a totality of circumstances[2209]. Another case cited to by Reficar, *Bothmer v. Schooler, Weinstein, Minsky & Lester, P.C.*,

---

[2202] ESOC, para. 806, citing to *Johnson v. Smith*, 2006 N.Y. Misc. LEXIS 2618, at *27 (N.Y. City Ct. Sept. 8, 2006), CL-0122, * 42 at pdf p. 14.
[2203] ESOC, para. 805, citing to New York Pattern Jury Instructions - Civil § 2:10A, CLA-0124.
[2204] ESOC, para. 806, citing to *Sommer*, 79 N.Y.2d at 554 (citation and alteration omitted), CL-0123.
[2205] ESOC, para. 807, citing to *F.D. Borkholder Co., Inc. v. Sandock*, 413 N.E.2d 567, 568 (Ind. 1980), CL-0126.
[2206] CL-0684.
[2207] CL-0684, para. 5 on pdf p. 5.
[2208] CL-0680.
[2209] Reply, para. 179, citing to *Hyatt v. U.S.*, 968 F.Supp. 96, 111 (E.D.N.Y. 1997).

according to Reficar contains phrasing that suggests that the degree of negligence could rise if the negligent action persisted over the course of years[2210].

CB&I's position

2248. CB&I argues that under New York law, there is no precise definition of "gross negligence" but that there is unanimous agreement that there is a need to meet a "high bar" to make such a finding[2211]; gross negligence "is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care"[2212].

2249. According to CB&I, the test for finding gross negligence was elaborated under *Radiology and Imaging Specialists*:

> "a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts"[2213],

and *Matter of Part 60 Put-Back Litig*

> "when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must smack of intentional wrongdoing or evince a reckless indifference to the rights of others"[2214].

2250. Other definitions cited by CB&I include conduct which "smacks of intentional wrongdoing"[2215], "conduct that evinces a reckless disregard for the rights of others"[2216] and "the failure to exercise even slight care"[2217] – but not merely "misguided" or "over-hasty pursuit" of one's contractual duties[2218].

2251. In addition, CB&I argues that the presence of "material causative factors for which [the defendant] is not liable" also precludes a finding of gross negligence[2219].

---

[2210] Reply, para. 179, citing to *Bothmer v. Schooler, Weinstein, Minsky & Lester, P.C.*, 266 A.D.2d 154 (N.Y. App. Div. 1999).

[2211] RPHB, para. 512.

[2212] ESOD, para. 1472, citing to *Red Sea Tankers Ltd. v. Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep. 547, 586.

[2213] RPHB, para. 512, citing to *Radiology and Imaging Specialists*, 2021 WL 149027, at *2 (internal quotations omitted).

[2214] RPHB, para. 512, citing to *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 352 (internal quotations omitted).

[2215] ESOD, para. 1467, citing to *Red Sea Tankers Ltd. v. Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep. 547, 581(Comm) (emphasis added) and *Matter of New York City Asbestos Litig.*, 89 N.Y.2D 955, 956–57 (1997).

[2216] ESOD, para. 1467, citing to *Gold Connection Discount Jewelers v. Am. Dist. Tel. Co.*, 212 A.D.2d 577, 578 (2d Dep't 1995).

[2217] ESOD, para. 1467, citing to *Food Pageant v. Consol. Edison Co.*, 54 N.Y.2d 167, 172 (1981).

[2218] ESOD, para. 1468, citing to *Red Sea Tankers Ltd. v. Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep. 547, 622 (Comm).

[2219] ESOD, para. 1478, citing to James Pickavance & James Bowling, "Exclusions from Immunity: Gross Negligence and Wilful Misconduct", Address at the Society of Construction Law (Sept. 5, 2017).

## B. **Tribunal's analysis**

2252. The Tribunal, having reviewed both Parties' submissions, finds that the standard for gross negligence under New York law is in substance very similar to that of *culpa grave* under Colombian law. To make a finding of gross negligence, it is necessary to establish the existence of the same degree of culpability, namely "reckless disregard" for the rights of the counterparty.

2253. The Tribunal is confident that its previous test for *culpa grave* under Colombian law may also serve to establish that CB&I acted with gross negligence under New York law.

2254. The tests used by New York courts and invoked by CB&I are undoubtedly met by CB&I's breaches of the Cost and Schedule Control Commitments; for the purposes of comprehensiveness, the Tribunal will address three such decisions using its previous findings:

2255. (i) *Red Sea Tankers Ltd:*

> "[gross negligence] is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care"[2220].

2256. CB&I did not simply fail to exercise proper skill and/or care; it allowed cost overruns of some USD 800 million and delays in Mechanical Completion of two years, with one year's worth of solely-caused delay – this proves a spectacular, rather than ordinary, failure by CB&I to control cost and schedule.

2257. (ii) *Radiology and Imaging Specialists:*

> "a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts"[2221],

2258. The magnitude of the results of CB&I's breaches serve as a compelling demonstration evincing extreme culpability. CB&I would not have allowed for such ballooning of cost and time overruns unless it showed callous indifference to Reficar's rights.

2259. (iii) *Matter of Part 60 Put-Back Litig:*

> "when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must smack of intentional wrongdoing or evince a reckless indifference to the rights of others"[2222].

2260. The Tribunal's previous findings hold CB&I responsible for behaviour which shows its reckless disregard to the rights of Reficar, which means that CB&I's gross

---

[2220] ESOD, para. 1472, citing to *Red Sea Tankers Ltd. v. Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep. 547, 586.
[2221] RPHB, para. 512, citing to *Radiology and Imaging Specialists*, 2021 WL 149027, at *2 (internal quotations omitted).
[2222] RPHB, para. 512, citing to *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 352 (internal quotations omitted).

ICC Case 21747 RD/MK/PDP
Final Award

negligence may rightfully be invoked to pierce the agreed-upon Liability Cap in the EPC Contract.

CB&I's counterargument

2261. One particular example that CB&I invokes as alleged proof of a very high standard for finding gross negligence under New York law, is *Tougher Industries*[2223]; however, CB&I gives an incomplete picture of this decision.

2262. The New York Supreme Court in that case did not decline to make a finding of gross negligence despite finding "a multitude of design errors and other issues", as claimed by CB&I[2224]. Instead, the Court did not find gross negligence because of the existence of additional provisions in the contract that made the counterparty responsible for

- examining the project site and accepting it, and

- finalizing and updating the project schedule, which was prepared so poorly that it constituted the reason for the claim of gross negligence of the defendant[2225].

2263. Thus, this was a case of dismissing a claim of gross negligence due to the existence of material contributory negligence, rather than a failure to find gross negligence because "only the most egregious, knowing actions" can amount to a finding of gross negligence, as claimed by CB&I[2226].

2264. The Tribunal has not found contributory negligence on Reficar's part in the current case and thus CB&I's counterargument is inapposite.

2265. CB&I also uses *Tougher Industries* to argue that "misguided" or "over-hasty pursuit" of contractual duties does not amount to gross negligence.

2266. The Tribunal does not disagree with the clarification under *Tougher Industries*.

2267. The argument is, however, unhelpful to CB&I, as its breaches of the Cost and Schedule Control Commitments did not arise because CB&I was "misguided" – in fact, it was fully aware of the clearly foreseeable damages of its failures.

2268. In addition, CB&I engaged in the opposite of an "over-hasty pursuit" of its contractual obligations: it allowed for the delays to accumulate while at the same time benefitting from each day Mechanical Completion was pushed back in time, as proven by the evidence on record.

\* \* \*

2269. Summing up, even by applying New York law, the Tribunal reiterates its finding that the Liability Caps do not find application to the damages awarded for CB&I's

---

[2223] *Tougher Indus., Inc. v. Dormitory Authority,* 130 A.D.3d 1393, 1396 (3d Dep't 2015).
[2224] ESOD, para. 1468.
[2225] RL-263, pdf p. 2.
[2226] ESOD, para. 1468.

breaches of the Cost and Schedule Control Commitments, because those damages arose from CB&I's gross negligence.

Willful misconduct

2270. Taking into account the Tribunal's finding that CB&I breached the Cost and Schedule Control Commitments with gross negligence and that, as a result, the Liability Caps are not applicable, a further analysis of willful misconduct under New York law would be moot.

## VIII.2.    SET-OFF AND LIQUIDATION

2271. The Tribunal has established that CB&I owes Reficar USD 1,008.41 million, which comprises:

- USD 845.4 million due to the breach of the Cost Control Commitments,

- USD 152.75 million due to the breach of the Schedule Control Commitments, and

- USD 10.3 million due to the breach of CB&I's obligation to provide the Works free of defects.

2272. Reficar, in turn, owes[2227]:

- To CB&I UK:  USD 914,939 under the Offshore Contract, and

- To CBI Colombiana:  COP 28,256,049 under the Onshore Contract,

for unpaid invoices.

2273. Both Parties have asked the Tribunal to perform a set-off of the amounts awarded[2228].

### 1.    AUTHORITY TO SET-OFF

2274. As an initial matter, under Colombian law, set-off of mutually due, liquid obligations expressed in monetary terms[2229] operates as a matter of law (*ipso iure*)[2230]:

> "*ARTICULO 1714. <COMPENSACIÓN> Cuando dos personas son deudoras una de otra, se opera entre ellas una compensación que extingue ambas deudas, del modo y en los casos que van a explicarse*".

2275. The amounts awarded by the Tribunal are, without a doubt,

- mutually due (either from CB&I to Reficar or from Reficar to CB&I),

- liquid (as of the Liquidation Date, as analysed *infra*), and

---

[2227] See para. 1524 *supra*.
[2228] CPHB, para. 498; RPHB, para. 675, request for relief g.
[2229] Art. 1715 of the CCC, RL-691:
"*ARTICULO 1715. <OPERANCIA DE LA COMPENSACION> La compensación se opera por el solo ministerio de la ley y aún sin conocimiento de los deudores; y ambas deudas se extinguen recíprocamente hasta la concurrencia de sus valores, desde el momento que una y otra reúnen las calidades siguientes:*
*1.) Que sean ambas de dinero o de cosas fungibles o indeterminadas de igual género y calidad.*
*2.) Que ambas deudas sean líquidas; y*
*3.) Que ambas sean actualmente exigibles.*
*Las esperas concedidas al deudor impiden la compensación; pero esta disposición no se aplica al plazo de gracia concedido por un acreedor a su deudor*".
[2230] Art. 1714 of the CCC, also RL-0794, pdf pp. 3-12

- expressed in monetary terms (the set-off will only be performed for amounts expressed in USD).

2276. The Parties have, under the Coordination Agreement, specifically agreed that Reficar would have set-off rights for any amounts it is owed under one contract against amounts it owes to CB&I under another contract[2231]:

> "3.5 Set-Off
>
> The Contractors agree and accept that there may be circumstances in which it may be to the advantage of the Owner to set-off the amount owed to the Owner under one of the Contracts against amounts owed by the Owner under the other Contract. Neither of the Contractors shall contend, whether in legal proceedings or otherwise, that the Owner is not entitled to exercise such rights of set-off, provided that the Owner may only set-off amounts in accordance with the terms and conditions of the relevant Contract".

2277. Both Parties accept that Reficar's above prerogative extends to the Tribunal, which is empowered to perform a set-off of the amounts owed by each party to the counterparty[2232].

<u>Limitation</u>

2278. There is, however, a limitation to the Tribunal's power to order a set-off between the awards amounted under the claims with those awarded under the counterclaims.

2279. As correctly pointed out by CB&I, Art. 17, para. 2 of Colombian Law 1116 of 2006 prohibits movements of assets (including set-offs) of companies which are subject to judicial liquidation proceedings without a prior authorisation by the judge[2233]:

> "*A partir de la admisión al proceso de insolvencia, de realizarse cualquiera de los actos a que hace referencia el presente artículo sin la respectiva autorización, será ineficaz de pleno derecho* […]".
>
> ["From the moment of the admission of the insolvency process, if any of the operations referred to in this article are performed without the respective authorization, they will not have legal effect *ipso jure* […]"].

2280. As of the most recent update to the Tribunal, CBI Colombiana is an entity in the process of judicial liquidation[2234].

2281. For this reason, the set-off ordered by the Tribunal cannot impact the COP 28,256,049 credit which CBI Colombiana holds vis-à-vis Reficar – the only credit which can be off-set is CB&I UK's credit for USD 914,939. (The prohibition of set-off does not affect CBI Colombiana's joint and several liability under Section VIII.2.4 *infra*)

---

[2231] JX-007, p. 33.
[2232] CPHB, para. 498; RPHB, paras. 635-642.
[2233] RPHB, para. 639, fn. 1412.
[2234] Letter from the Liquidator dated November 11, 2020.

2.  **DATE FOR THE SET-OFF**

2282. Both Parties agree that the Tribunal should set off all amounts as of a single date rather than attempting to perform different set-offs at various stages of the Project[2235].

2283. As to the specific date of set-off, Reficar simply refers to the EPC Agreement's provisions on contract liquidation[2236] and acknowledges that the Tribunal has full discretion. Whereas CB&I argues that the Tribunal should perform the set-off as of the date of the Award, because this is the time when, under Colombian law, "the amount of the debts will become liquid, undisputed, due, and owing"[2237].

2284. The Tribunal sides with Claimant.

2285. The proper date for set-off is the agreed date for the liquidation of the EPC Contract [the "**Liquidation Date**"], because TC 78.3 provides that, as of that date, the Parties' reciprocal accounts are to be settled:

> "78.3 Once the Agreement has been liquidated, the Owner will pay the Contractor, if applicable, any amounts outstanding in respect of the Work that result from the Liquidation, subject to any applicable withholdings and deductions".

2286. Which is the appropriate Liquidation Date in the present situation?

2287. TC 78.1 provides the guiding principle. The EPC Agreement should be liquidated within three months of either[2238]:

- the completion of all Works plus the Owner certifying that the Works have successfully undergone the performance tests, or

- the termination of the Agreement.

2288. Given that the Agreement has not been terminated, the first alternative is applicable: the Liquidation Date should fall three months after the completion of all Works and after the certification by Reficar that the performance tests have been successful.

2289. In the present case, the Works were never formally finalized (and there is no evidence that Reficar ever issued documentation confirming the successful testing

---

[2235] CPHB, para. 499; RPHB, para. 636.
[2236] CPHB, paras. 499-500.
[2237] RPHB, para. 640.
[2238] TC 78.1, JX-002, p. 267; JX-004, p. 242:
"78.1 Within the three (3) months (or such longer period as the Parties may agree) following the earlier of the date of:
(i) completion of all the Work (other than Defect warranty obligations) and the issue by the Owner of the Performance Certificate; or
(ii) termination of this Agreement for cause or for convenience in accordance with TC64 and TC65, respectively,
the Contractor and the Owner shall proceed to the Liquidation of the Agreement […]".

of the Refinery). But there is evidence in the record showing when CB&I stopped working on the Project and performed its demobilisation:

- Mechanical Completion was achieved in February 2015, but thereafter CB&I continued performing certain activities, such as completing Category "A" Check Sheets and "A" Punchlist items (see Section on Improper Delay *supra*);

- CB&I demobilised from the construction site in Cartagena in the fall of 2015; Reficar acknowledges that CB&I left the Project in October 2015[2239];

- The Refinery began preliminary operations in November 2015[2240].

2290. Taking all the evidence into consideration, CB&I ceased performing Works on the Project around October 2015. Adding three months, as per TC 78.1, brings the Liquidation Date to the end of 2015.

2291. For these reasons, the Tribunal decides that the proper Liquidation Date of the EPC Agreement should be <u>December 31, 2015</u>, and that this date should also be used for the set-off of reciprocally owed credits.

## 3.    APPLICATION

2292. The consequence of set-off is that the reciprocal credits held by two persons, who are creditors of each other, are deemed paid and settled in the concurring amount, as of a certain date.

2293. Applying this principle, Reficar's claim against CB&I UK deriving from this Award, in an amount of USD 1,008,410,000, should be deemed partially paid and settled through set-off, against CB&I UK's counterclaim against Reficar in an amount of USD 914,939, as also adjudicated in this Award, resulting in a net credit held by Reficar against CB&I UK in an amount of USD 1,007,495,061.

2294. Reficar must, however, pay the amounts awarded under the Offshore Contract to CBI Colombiana for unpaid invoices, in an amount of <u>COP 28,256,049</u>.

2295. There is an additional amount that the Tribunal must take into account for purposes of set-off: the USD 70 million that Reficar has already obtained under the Performance LoC, as analysed under Section VII.2.2.3 *supra*. The amounts awarded to Reficar must be reduced by these USD 70 million already collected by Reficar, to avoid that Claimant obtains double recovery. Thus, the amount in USD to which Reficar is entitled in accordance with this Award is <u>USD 937,495,061</u>[2241].

## 4.    JOINT AND SEVERAL LIABILITY OF THE CB&I RESPONDENTS

2296. So far, the Tribunal has treated the CB&I entities collectively; however, the three Respondents

---

[2239] CPHB, para. 1; ESOC, para. 598.
[2240] ESOC, para. 101.
[2241] 1,007,495,061-70,000,000= 937,495,061.

- CBI Colombiana S.A.,

- CB&I UK LTD., and

- Chicago Bridge & Iron Company N.V. (CB&I N.V.)

are corporations with separate legal personality.

2297. *Pro memoria*, Reficar entered into:

- the Offshore Contract with CB&I UK, mostly for the performance of engineering and procurement services, and

- the Onshore Contract with CBI Colombiana, mostly for the performance of construction works, while

- CB&I N.V. issued two Contractor Performance Guarantees in favour of Reficar; one in respect of the obligations of CB&I U.K.[2242], and another in respect of the obligations of CBI Colombiana[2243].

The Parties' positions

2298. One of the questions asked by the Tribunal after the conclusion of the Hearing concerned the status of the three CB&I entities in the arbitration: which among CB&I UK, CBI Colombiana and CB&I N.V. should be held liable for any damages potentially awarded by the Tribunal[2244].

2299. According to Reficar, CBI Colombiana and CB&I UK are jointly and severally liable for all claims in the arbitration; this is the result of applying the Coordination Agreement[2245]. Furthermore, Colombian law establishes the principle that, when there are several debtors, they are presumed to be jointly and severally liable[2246].

2300. CB&I acknowledges that CB&I UK and CBI Colombiana are indeed jointly and severally liable, under the Coordination Agreement[2247], but argues that first, Reficar has to prove that it is bringing separate claims against each of the companies under their respective contracts[2248]:

- CBI Colombiana under the Onshore Contract, and

- CB&I UK under the Offshore Contract.

2301. CB&I says that Reficar has failed to specify which claims it is bringing under which Contract, and has failed to argue its case under New York law, with the result that

---

[2242] JX-008, pp. 17-32.
[2243] JX-008. 1-16.
[2244] Communication A 164.
[2245] JX-007, p. 40.
[2246] CPHB, para. 30 invoking Art. 825 of the Colombian Commercial Code: "In commercial contracts, when there are several debtors (contractors) there is a presumption that they are joint and severally liable" – no citation to exhibit.
[2247] RPHB, paras. 16, 21, 639.
[2248] RPHB, para. 21.

no claims are brought under the Offshore Contract; hence, Reficar cannot hold CB&I UK liable.

<u>Discussion</u>

2302. The Tribunal has already rejected Respondents' arguments under Section IV *supra*.

2303. The wording of the Coordination Agreement does not leave room for doubt:

> "**18. Joint and Several Liability**
>
> The liability and obligations of the Contractors under this Agreement and the Contracts shall be joint and several."

2304. In accordance with the Coordination Agreement, Reficar can bring its claims under the Onshore Contract or the Offshore Contract, and if either CBI Colombiana or CB&I UK is held liable for the breach of either of the Contracts, both companies will be jointly and severally responsible for any consequences which may arise out of that breach, including but not limited to paying damages.

<u>Joint and several liability of CB&I N.V.</u>

2305. CB&I N.V. is a guarantor. It issued a first performance guarantee in respect of CB&I U.K's obligations[2249], and another in respect of CBI Colombiana's obligations[2250].

2306. Reficar argues that CB&I N.V. is jointly and severally liable as guaranteeing "both payment and performance, and not merely collectability"[2251] and that it does so as "a primary obligor and not a surety"[2252]. Claimant adds that this is supported by the Parties' conduct – the three CB&I entities in the arbitration appear jointly as "CB&I"[2253].

2307. According to Respondents, Reficar has not advanced an indemnity claim against CB&I N.V[2254]. This CB&I entity will, thus, only become implicated if and when a separate claim is made against it, after the conclusion of the arbitration, assuming CB&I UK and CBI Colombiana cannot fully cover the amounts awarded by the Tribunal.

2308. Reficar replies that it invoked the Parent Guarantees as early as in April 2015[2255]:

> As a result, Reficar writes to invoke its rights under the Guarantees and requests that Chicago Bridge & Iron Company N.V. take immediate steps to cause CB&I to fully and promptly perform its duties, obligations, covenants, undertakings, including but limited to the following:

---

[2249] JX-008, pp. 17-32.
[2250] JX-008. 1-16.
[2251] JX-008 (Parent Guarantees) under para. 2 on p. 6 and para. 2 on p. 22.
[2252] JX-008 (Parent Guarantees) under para. 2.1(a) on p. 5 and para. 2.1 on p. 21.
[2253] CPHB, para. 32.
[2254] RPHB, para. 23.
[2255] CPHB2, p. 7, second row, responding to para. 23 of RPHB.

2309. Claimant adds that CB&I N.V. was included as primary obligor in the Statement of Claim[2256]; thus, Reficar is fully entitled to seek relief jointly and severally from all CB&I entities, including CB&I N.V.[2257].

2310. The Tribunal sides with Reficar.

2311. Reficar has clearly invoked the Parent Guarantees, and it did so prior to the commencement of the arbitration[2258]. In addition, CB&I N.V. has been one of the named Respondents in the case, ever since the filing of the RfA in 2016[2259].

2312. Furthermore, according to the Contractor Performance Guarantee Agreements, the Guarantor not only guaranteed the collectability of any potential debts unpaid by CBI Colombiana or CB&I U.K., but also both payment and performance of their respective obligations[2260]:

> **2.2    Payment and Performance**
>
> This Guarantee is a guarantee of both payment and performance, and not merely of collectability, and, until all Obligations have been irrevocably paid, discharged, met or performed in full, the Beneficiary may refrain from applying or enforcing any other moneys, security or rights held or received by the Beneficiary (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantor shall not be entitled to the benefit of the same.

2313. Since the payment and performance of CB&I UK and CBI Colombiana deriving from the EPC Contract has been adjudicated in the current Award, any liability found is automatically and immediately extended jointly and severally to CB&I N.V. as guarantor.

* * *

2314. <u>For the reasons above</u>, the Tribunal finds that Reficar may seek the relief awarded in the current arbitration from all three Respondents: CB&I UK, CBI Colombiana and CB&I N.V., all of which are jointly and severally liable.

## 5.    LIQUIDATION OF THE CONTRACT

2315. Reficar requests that, through the resolution of the current dispute, the Tribunal[2261]:

- declare that the EPC Agreement is liquidated (**5.1.**);

- determine the EPC Agreement's appropriate value (**5.2.**), and

---

[2256] ESOC, para. 841.
[2257] ESOC, para. 842.
[2258] Ex. C-0379, p. 2.
[2259] RfA, p. 1. "Chicago Bridge & Iron Company N.V., CB&I (UK) Limited and CBI Colombiana S.A. Respondents".
[2260] JX-008, Section 2.2; pp. 6, 22.
[2261] Reply, para. 1022; ESOC, para. 845.

445

- determine the Parties' remaining rights and obligations to one another, if any (**5.3.**).

2316. In turn, CB&I asks that the Tribunal declare that the EPC Agreement is still in full force and effect until it is liquidated[2262]:

> "[a] declaration that the EPC Contract is a valid and binding agreement on the parties, is still in full force and effect, and Reficar must reimburse CB&I for all reasonable and proper costs it incurs until the EPC Contract is liquidated".

## 5.1. DECLARATION OF LIQUIDATION

2317. TC 1 defines "Liquidation" as the settlement and discharge of any pending liabilities or obligations between the Parties, in order to permanently conclude the relationship between them under the EPC Agreement[2263]:

> "'Liquidation' means the procedure whereby both Parties, as provided in TC78, will detail the status of their liabilities and obligations under the Agreement and, to the extent agreed upon by them, will settle and discharge any pending liabilities or obligations, in order to permanently conclude the contractual relationship between them under this Agreement, irrespective of the Defects Correction Period and the obligations related to the correction of Defects".

2318. The main provision on liquidation in the EPC Agreement is TC 78, which provides the time frame and conditions, as well as its effects on both Parties' obligations.

2319. Reficar is now asking this Tribunal to liquidate the EPC Contract.

2320. CB&I demobilized from the Works site eight years ago and since that date has performed no additional construction activity; during this period the Refinery has been functioning under Reficar's management. CB&I has failed to provide any evidence that the EPC Contract is still being performed or is otherwise in full force and effect. What the evidentiary record shows is the contrary: that for more than eight years, neither CB&I has performed, not Reficar has demanded any performance under the EPC Contract. Given this lack of performance, for such a long time, the appropriate solution is to formally liquidate the Contract – and this is what the Tribunal will do, complying with Reficar's request.

2321. The question of the Liquidation Date has already been decided, when the Tribunal analysed and adjudicated the proper date for performing the set-off between the reciprocal credits held by Reficar and CB&I U.K. In the Tribunal's opinion, the appropriate Liquidation Date, which should also function as the proper date for set-off, is December 31, 2015.

## 5.2. VALUE OF THE EPC AGREEMENT

2322. Having established the Date of Liquidation, the EPC requires that the Tribunal quantify the value of the EPC Agreement. TC 58.1 provides that the actual value of

---

[2262] CB&I's Request for Relief z, ESOD, para. 1612.
[2263] JX-002, p. 167; JX-004, p. 153.

the EPC Agreement is to be determined by adding all amounts paid to CB&I to which it is entitled, plus all amounts to which CB&I is entitled but payment is still outstanding:

> "the actual value of this Agreement, as at the date of Liquidation, shall be determined by adding together the value of all amounts which Contractor has been paid, or is entitled to be paid, in each case in accordance with Section IV Article II".

2323. The Tribunal will thus perform the following calculation:

- The starting point is the actual amounts paid by Reficar to CB&I (USD 5,908.2 million);

- This amount must be reduced by the costs Reficar is entitled to claw-back (USD 845.4 million), arriving at USD 5,062.8 million,

- The result must be increased by the amounts Reficar paid to its PCS contractors for the correction of CB&I's defective Works (USD 10.3 million[2264]), arriving at USD 5,073.1 million,

- And also by the amounts awarded to CB&I under the counterclaim, for invoices that Reficar should have but has not paid (USD 0.9 million and COP 28.3 million), arriving at USD 5,074 million[2265], plus COP 28.3 million[2266].

2324. The total value of the EPC Agreement thus amounts to <u>USD 5,074 million</u> plus COP <u>28.3 million</u>.

## 5.3.  SURVIVING RIGHTS AND OBLIGATIONS

2325. As regards the Parties' surviving rights and obligations, as previously advanced in Section VII.2.6 *supra*, TC 76 provides guidance as to these obligations:

> "76.1 The rights and obligations of the Parties under TC1.1, 1.2, 1.3, 8, 15, 16, 17, 18, 19, 24, 44.3, 46, 56.1.21, 58.14, 59, 71, 75.2.2, 75.3.2, 75.5.4, 78, 79.1, 79.2 and 79.4 and this TC76.1 and relating to any waivers and disclaimers of liability, releases from liability, limitations of liability, indemnities, patent indemnities, confidentiality and to insurance shall continue in full force and effect regardless of whether the Work is completed or terminated and shall continue to be in full force and effect so as to protect each Contractor Group member and each Owner Group member from any loss or liability that it may incur after this Agreement is assigned, completed or terminated in accordance with its terms. Termination of this Agreement shall also be without prejudice to any accrued rights and obligations under this Agreement as at the date of termination".

---

[2264] The Tribunal is unable to quantify the amounts Reficar would have paid to CB&I for performing the same corrective works but considers the amounts paid by Reficar to its PCS contractors to be a reasonable approximation of these amounts.
[2265] 5,073,100,000 + 914,939 = 5,074,019,939 or 5,074 million.
[2266] 28,256,049 is rounded to 28.3 million.

2326. Therefore, the Parties have expressly foreseen which of their rights and obligations under the EPC Contract survive its liquidation. As such, these surviving rights and obligations will comprise:

- The survival clause under TC 76, which includes Indemnification Commitments, and

- The rights and obligations ordered by the Tribunal in the current Award.

# VIII.3.    <u>INTEREST</u>

2327. Both Parties are in agreement that any amounts awarded by the Tribunal should be increased by interest, pre- and post-award[2267].

2328. Section 4.21 of the DRA stipulates that any amounts awarded in the arbitration should be paid with interest[2268]:

> 4.21 [...] any Arbitration Award for the payment of money shall be paid in the currency or respective currencies for payment specified in the applicable Project Agreement or Project Agreements underlying the Dispute or Disputes <u>and with interest</u> [...]" [Emphasis added].

2329. There are two major points the Tribunal must establish regarding the interest: the relevant dates for the start and end of accrual (**1.**) and the applicable rate (**2.**).

## 1.    <u>START AND END DATE OF ACCRUAL</u>

2330. Reficar offers two alternatives for the *dies a quo,* the date when the accrual of interest should start:

- a monthly basis relative to when Reficar actually expended additional funds on the basis of the expert analysis performed by Breakwater Forensics[2269],

- the mid-point between the start of the EPC Contract on June 15, 2010 and CB&I's demobilisation on October 12, 2015, *i.e.*, February 11, 2013[2270],

2331. When it comes to the *dies ad quem*, Reficar asks for post-award interest until the effective date of payment of the Award[2271].

2332. CB&I, on the other hand, simply references the text of the EPC Agreement and speaks of accrual "from the date of injury until payment" or, for late payments, "from the date such amount should have been paid"[2272]. CB&I and its expert, Compass Lexecon, do, however, heavily criticise the calculations of the monthly payments as presented by Reficar's expert[2273].

2333. The Tribunal is not convinced by the proposals of either Party.

2334. CB&I is correct in criticising the accuracy of the monthly payments schedules presented by Reficar's expert, because these schedules do not differentiate between payments of costs which were reasonable, proper and incurred in accordance with the Contract and payments of costs which failed to meet these requirements. Thus the analysis is of no help to the Tribunal. Reficar's subsidiary proposal of using

---

[2267] ESOC, para. 824; Reficar's request for relief no. 35 under ESOC, para. 844; CB&I's request for relief no. ii, ESOD, para. 1612.
[2268] JX-007, p. 13.
[2269] CPHB, para. 507.
[2270] CPHB, para. 508, citing to LI ER, para. 349.
[2271] Reficar's request for relief no. 59; CPHB, para. 532.
[2272] RPHB, para. 643.
[2273] Compass Lexecon ER, Section IV.4 at pdf p. 105.

February 11, 2013 as the *dies a quo* would be unfair to CB&I, as at that point in time, the Works were still advancing and payments continued for at least two more years.

2335. CB&I's suggestion to calculate interest "from the date of injury" is also not helpful: as a consequence of the Bottom-Up approach, it is impossible to determine the exact date on which each Excess Cost arose.

2336. Taking into account its prior findings, the Tribunal decides that the Liquidation Date, as of which the final settlement of accounts is performed, constitutes the appropriate moment for starting the accrual of interest.

2337. As to the *dies ad quem*, both Parties are in agreement that it should be set as of the date of effective payment of any amounts awarded.

2338. Thus, the *dies a quo* used by the Tribunal for calculating interest shall be the Date of Liquidation, *i.e.*, December 31, 2015 and interest shall accrue until the date of effective payment of any amounts awarded by the Tribunal.

## 2.   APPLICABLE RATES AND METHOD OF CALCULATION

2339. Claimant primarily requests that the Tribunal set pre-award interest at the level of Reficar's cost of capital[2274]. Claimant argues that Section 4.21 of the DRA allows the Tribunal to establish interest rates as it finds appropriate, and thus it permits to equate the rate of interest with Reficar's cost of capital (as calculated by Reficar's expert)[2275]. Subsidiarily, Reficar argues that the Tribunal should apply the contractual rate for late payments[2276].

2340. Respondents aver that the contractual interest rate should apply as the rate mutually agreed by the Parties[2277]. CB&I's expert cites to literature stating that whenever tribunals look for the appropriate interest rate, they should first look to the contract that has given rise to the dispute[2278].

2341. The Tribunal sides with CB&I.

2342. As a starting point, the Tribunal notes that Section 4.21 of the DRA grants it considerable leeway in its decision on interest. This Section provides a general rule[2279]:

> "any Award for the payment of money shall be paid [...] with interest accruing from the date of injury until payment at the rate or respective rates of interest accruing on late payments under the applicable Project Agreement or Project Agreements underlying the Dispute or Disputes";

---

[2274] CPHB2, pdf p. 28, response to para. 646.
[2275] CPHB2, pdf pp. 27-28, response to para. 643.
[2276] CPHB, para. 504.
[2277] RPHB, paras. 643-646.
[2278] RPHB, para. 646, and fn 1431 at pdf p. 274, citing to Compass Lexecon, para. 125, in turn citing to CLEX-026, Beeley, Mark and Richard E. Walck. 2014. "Approaches to the Award of Interest by Arbitration Tribunals". *The Journal of Damages in International Arbitration*, (April): 51-76, at 53 and 54.
[2279] JX-007, p. 13.

But then the provision adds a default option: the general rule (*i.e.*, the rate of interest on late payments) is to be applied

"[u]nless otherwise decided in the Arbitration Award"[2280].

2343. Although the DRA grants this default option, the Tribunal sees no reason to deviate from the general rule agreed upon by the Parties: there is financial logic in extending the rate of interest agreed upon for late payments to amounts awarded under the present Award. That the late payments rate should apply is reinforced by the fact that Reficar uses this rate as an alternative to its primary request.

2344. The interest rate for late payments under the EPC Contract may be found under TC 58.12, which under the Onshore Agreement provides for an annual rate of LIBOR +2% rate for amounts in USD and DTF +2% rate for amounts in COP[2281]:

"58.12 Late Payment

[...] if either Party fails to pay any amount which is due and payable under this Agreement by the fourteenth (14th) Day following the date (if any) by which it is required to make such payment, such amount shall bear interest (as well as before any judgement) at:

58.12.1 in case of amounts in US Dollars, <u>a rate per annum which is equal to LIBOR plus 2%</u>; and

58.12.2 in case of amounts in Colombian Pesos, a rate which is equal to DTF plus 2% [...]" [Emphasis added].

[The Offshore Agreement reiterates the above provision[2282].]

2345. The above terms "LIBOR" for the USD and "DTF" for the COP rates are both defined under the EPC Contract

"'LIBOR' means the six-month US dollar London interbank offer rate as published by the British Bankers Association at approximately 11:00 a.m., London time, on the relevant Day"[2283];

"'DTF' means the rate certified by the Central Bank of Colombia ("*Banco de la República*") for the week in which late interest is accrued as per the provisions of this Agreement, to be the offered rate for 90 days Colombian Peso certificates of deposit"[2284].

2346. TC 58.12 also specifies that the interest should be compounded daily[2285]:

"58.12 Late Payment

---

[2280] JX-007, p. 13.
[2281] JX-002, p. 236; JX-004, p. 213.
[2282] JX-002, p. 236; JX-004, p. 213.
[2283] JX-002, p. 167; JX-004, p. 153.
[2284] JX-002, p. 164.
[2285] JX-002, p. 236; JX-004, p. 213.

[…]

The applicable interest rate shall be payable on demand and shall accrue from Day to Day and shall be compounded daily from the date such amount should have been paid until the date of actual payment in full of such amount and such interest" [Emphasis added].

2347. Based on the above, the Tribunal decides that CB&I must pay Reficar interest on the amounts awarded and denominated in USD, at the rate of LIBOR for six-month deposits, plus a margin of 2%, compounded daily, with accrual starting as of December 31, 2015 and continuing until the date of actual payment of all outstanding amounts. For the reasons expressed in Section VIII.2.4 *supra* CB&I UK, CBI Colombiana and CB&I N.V. are jointly and severally liable as regards the payment of interest.

2348. Reficar, in turn, must pay CBI Colombiana interest on the amounts awarded in COB, at the rate of DTF, plus a margin of 2% compounded daily, with accrual starting as of December 31, 2015 and continuing until the date of actual payment of all outstanding amounts.

LIBOR alternative

2349. The Tribunal notes that LIBOR is in the process of phasing out and for this reason the Tribunal must make contingencies and establish an alternative to LIBOR, should it cease to exist while interest is still accruing.

2350. The Tribunal posed this question to the Parties, and they provided the following answers[2286]:

2351. Reficar proposes that the Tribunal should use the DTF; alternatively, Reficar would not be opposed if the Tribunal selected an alternative benchmark, which is widely accepted as a replacement for LIBOR[2287].

2352. CB&I argues that the Tribunal should use the Secured Overnight Financing Rate ["**SOFR**"] as an alternative, as recommended by the Federal Reserve Board and the Federal Reserve Bank of New York[2288].

2353. The Tribunal sides with CB&I.

2354. The rate of interest that accrues on any amounts is inherently connected with the underlying currency; for this reason, it would be unreasonable for the Tribunal to follow Reficar's suggestion to apply the DTF rate, agreed by the Parties as the rate applicable to amounts awarded in COP, to amounts awarded in USD.

---

[2286] Communication A 164.
[2287] CPHB, para. 506.
[2288] RPHB, para. 644, citing to:
https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/ARRC_Press_Release_Term_SOFR.pdf .

2355. CB&I, on the other hand, offers a reasonable proposal: the SOFR has been recommended by two major authorities in the State of New York, in which the seat of the arbitration is located.

2356. That SOFR should be accepted as the alternative to LIBOR is confirmed by Reficar, who has pleaded that it would not oppose a decision of the Tribunal adopting a widely accepted alternative benchmark instead of LIBOR; the Tribunal has already found that SOFR is a widely respected benchmark in the State of New York.

2357. For these reasons, should LIBOR cease to exist while interest is still accruing, SOFR should replace the LIBOR rate. Since the applicable LIBOR rate is the six-month rate, the SOFR replacement, if applicable, should also reflect the six-month rate of that benchmark.

## 3.  CONCLUSION

2358. In sum, the Tribunal has decided that:

- (i.) CB&I must pay Reficar interest on the awarded amount of USD 937,495,061, at the rate of six-month LIBOR +2%, compounded daily, accruing from December 31, 2015 until the date of payment.

- Alternatively, should LIBOR cease to exist by the time of payment of the above amounts, then CB&I must pay Reficar interest on the awarded amount of USD 937,495,061, at the rate of six-month LIBOR +2%, compounded daily, accruing from December 31, 2015 until the date when LIBOR ceases to exist, and at the rate of six-month SOFR +2%, compounded daily, accruing from that date, until the date of payment.

- (ii.) Reficar must pay CBI Colombiana interest on the awarded amount of COP 28,256,049, at the rate of DTF +2% compounded daily, accruing from December 31, 2015 until the date of payment.

# IX. COSTS

2359. In accordance with Art. 37(4) of the ICC Rules, the Arbitral Tribunal shall fix the costs of the arbitration and decide which of the Parties shall bear them or in what proportion they shall be borne by the Parties.

2360. At the invitation of the Tribunal[2289], each Party presented its respective Statement of Costs[2290].

2361. The following subsections account for the Parties requests (**1.** and **2.**) and the Arbitral Tribunal's decision (**3.**).

2362. As the Tribunal will grant partial award on costs to both Parties, it will thereafter address the set-off of reciprocal credits adjudicated in the present Section (**4.**) and determine the applicable interest (**5.**).

## 1.   CLAIMANT'S REQUEST

2363. Reficar requests the Tribunal an award of the costs of the arbitration incurred by Claimant, including attorneys' fees[2291].

2364. The Statement of Costs submitted by Claimant is as follows[2292]:

| Submissions on Claim (all amounts are in $USD) | |
|---|---|
| Counsel fees | 54,296,371 |
| Expert/witnesses | 28,489,929 |
| Disbursements/expenses | 16,469,424 |
| *Total* | **99,255,724** |
| **Submissions on Counterclaim** | |
| Counsel fees | 11,953,694 |
| Expert/witnesses | 3,726,955 |
| Disbursements/expenses | 1,216,359 |
| *Total* | **16,897,008** |
| **Tribunal Decisions with Reservation on Allocation of Cost** | |
| **Decision – Procedural Order No. 2** | |
| Counsel fees | 313,442 |
| Disbursements | 15,000 |
| *Total* | **328,442** |
| **Decision – Procedural Order No. 3** | |
| Counsel fees | 271,182 |
| Disbursements | - |
| *Total* | **271,182** |
| **ICC Administrative Costs** | |
| Advance on cost of May 2016 | 147,000 |

---

[2289] Communication A 168.
[2290] Communications C-232 and R-219. Claimant initially submitted its Statement of Costs on December 20, 2021 (communication C-232); in January 2022, the ICC Court increased the advance on costs for both Parties; as a result, Claimant resubmitted its Statement of Costs, together with a correction of a minor error, on February 21, 2022 (Communication C-233).
[2291] Reficar's request for relief no. 58 under CPHB, para. 532.
[2292] Communication C-233.

ICC Case 21747 RD/MK/PDP
Final Award

| | |
|---|---|
| Advance on cost of September 2016 | 175,000 |
| Advance on cost of August 2018 | 702,500 |
| Advance on cost of November 2018 | 702,500 |
| Advance on cost of May 2021 | 897,500 |
| Advance on cost of January 2022 | 775,000 |
| **Total** | **3,399,500** |
| **Document Production Phase** | |
| Incurred in preparation of DPS and in defense of its DPS | 1,233,397 |
| Incurred in preparation of objections to counterparty's DPS | 646,853 |
| **Total** | **1,880,250** |
| **Grand Total** | **122,032,106** |

2365. Therefore, Reficar requests an award on costs of USD 122,032,106.

2. RESPONDENTS' REQUEST

2366. CB&I has asked for a declaration that it is entitled to be awarded its legal fees, expert fees, and costs of this arbitration[2293].

2367. CB&I's Statement of Costs looks as follows:

| | |
|---|---|
| **Submission on Claim** | |
| Legal Fees | 67,847,277.19 |
| Expert Fees | 28,566,129.61 |
| Disbursements/Expenses | 6,235,709.10 |
| *Total* | *102,649,115.90* |
| **Submission on Counterclaim** | |
| Legal Fees | 21,969,859.90 |
| Expert Fees | 9,250,096.56 |
| Disbursements/Expenses | 2,019,206.39 |
| *Total* | *33,239,162.85* |
| **ICC Administrative Costs** | |
| Payment of Initial Advance on Costs | 325,000.00 |
| Payment of Readjusted Advance on Costs | 897,500.00 |
| Payment of Further Readjusted Advance on Costs2 | 775,000.00 |
| *Total* | *1,997,500.00* |
| **Submissions on Tribunal Decisions with Reservations on Allocation of Costs** | |
| **Procedural Order No. 2** | |
| Legal Fees | 283,365.12 |
| *Subtotal* | *283,365.12* |
| **Procedural Order No. 3** | |

---

[2293] CB&I's request for relief no. hh. Under ESOD, para. 1612.

ICC Case 21747 RD/MK/PDP
Final Award

| | |
|---|---|
| Legal Fees | 569,390.43 |
| Expert Fees | 17,700.00 |
| *Subtotal* | *587,090.43* |
| **Total** | **870,455.55** |
| **Document Production Phase** | |
| Costs incurred in relation to Respondents' DPS | 246,902.15 |
| Costs incurred in relation to Claimant's DPS | 3,896,899.20 |
| ***Total*** | ***4,143,801.35*** |
| **GRAND TOTAL** | ***142,900,035.65*** |

2368. Therefore, CB&I requests a declaration that it is entitled to a total of USD 142,900,035.65 on legal fees, expert fees, and costs of this arbitration.

3. **DISCUSSION**

2369. In reaching its decision on the attribution of costs, the Tribunal will be guided by two provisions: the DRA (i.) and Art. 37 of the ICC Rules (ii.).

2370. (i.) Section 4.22 of DRA stipulates that[2294]:

> "The Arbitral Tribunal shall be empowered to award all or a portion of the costs of the arbitration, and arbitration fees, to either Party. Any Party unsuccessfully resisting enforcement of any Arbitration Award must pay the enforcing Party's cost of those proceedings".

2371. (ii.) Art. 37.5 of the ICC Rules confirms the Tribunal's discretion to make any decision it deems appropriate, at the same time suggesting that the Tribunal take into consideration the Parties' conduct during the proceedings:

> "5 In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner".

2372. Additionally, Art. 37(1) of the ICC Rules establishes that there are two main categories of Costs:

- The reasonable legal costs incurred by each Party in the furtherance of the arbitration ["**Legal Costs**"] (**3.1.**); under the Statement on Costs, these are reflected by the attorney and expert fees, and the expenses; and

- The fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court ["**Administrative Costs**"] (**3.2.**).

2373. The Tribunal will take separate decisions regarding these two categories and it will summarize its findings (**3.3.**).

---

[2294] JX-007, p. 13.

**3.1.  LEGAL COSTS**

2374. The Tribunal will split its analysis into three categories: Claim (**A.**), Counterclaim (**B.**) and procedural decisions (**C.**).

**A.    Claim**

2375. Reficar has been successful in its Claim and must, therefore, be reimbursed for the reasonable Legal Costs incurred in presenting its case.

2376. According to the Statement of Costs, Reficar spent USD 99,255,724 in Legal Costs relating to the Claim. The Tribunal finds that this amount is reasonable; this reasonableness is confirmed by the fact that CB&I spent a similar (slightly higher) amount in its defense against the Claim.

2377. The Tribunal must now decide what proportion of these reasonable costs should be borne by CB&I – the unsuccessful party. In reaching this decision, the Tribunal has considered that Reficar's case, in essence, dealt with the following issues:

-    Pre-contractual liability claim, which, although not completely unmeritorious, the Tribunal finally decided against;

-    Contractual liability claim, for breach of Cost and Schedule Control Commitments, which the Tribunal accepted, finding that CB&I had breached those contractual obligations with *culpa grave*;

-    Quantum of the damages caused by said breach, which the Tribunal established at USD 1,008.41 million, which is approximately 25% of the amount claimed by Reficar.

2378. Allocating equal weight to each of the above issues and taking into account Claimant's relative success rate of 50% and 25% for the first and the last of them, and the full success of the second item, the Tribunal decides that, all in all, Reficar has been successful in, approximately, 58% (50% * 33.33% + 100% * 33.33% + 25% * 33.33%) of its claim.

2379. In light of the above, Reficar is entitled to the reimbursement of 58% of its reasonable Legal Costs arising out of the Claim, *i.e.*, USD 57,568,320.

**B.    Counterclaim**

2380. CB&I filed a Counterclaim, in which it was partly successful, and must similarly be reimbursed for reasonable costs incurred.

2381. According to the Statement of Costs, CB&I spent USD 33,239,162.85 in Legal Costs. The Tribunal thinks that this amount should be adjusted downwards to reflect what, in its view, should be a reasonable amount. The Tribunal notes that Reficar has spent a significantly lower amount in its defense against the Counterclaim, USD 16,897,008. Taking this discrepancy into account, as well as the characteristics of the Counterclaim, the Tribunal finds that CB&I's Legal Costs should be brought down by, approximately, 33%. In the Tribunal's view, USD 22 million is an

457

acceptable quantification for CB&I's reasonable Legal Costs in bringing its Counterclaim.

2382. In determining what proportion of those reasonable costs should be disbursed by Reficar, the Tribunal has considered that the Counterclaim dealt with one major issue, which is the unpaid invoices (**a.**), and several other issues (**b.**).

**a.    <u>Unpaid invoices</u>**

2383. CBI brought a Counterclaim of USD 48.6 million and COP 275 billion for unpaid invoices, but was ultimately only granted USD 914,939 and COP 28,256,049, which amount to, approximately, a 1% success rate.

2384. Taking into account the complexity and importance of this issue, the Tribunal decides to attribute 60% weight to it. The Tribunal will award 0.6% (60% * 1%) of CB&I's reasonable Legal Costs on account of the success of the unpaid invoices issue.

**b.    <u>Other issues</u>**

2385. The Tribunal has also decided the following other issues:

- Improperly off-set amounts: this Counterclaim was dismissed by the Tribunal;

- Paid, but never approved invoices: this request had already been dealt with in the Tribunal's decision regarding the Claim;

- Drawing upon the Performance LoC: the Tribunal found that Reficar's drawing upon the Performance LoC had been correct, but acknowledged that said amount must be deducted from the amounts ordered to be paid to Reficar since Reficar had already collected; and

- Drawing upon the Advance Payment LoC: the Tribunal dismissed the declaratory relief requested by CB&I.

2386. The Tribunal decides to attribute a 50% success rate to CB&I for the decision on the unapproved invoices (these invoices were subject to the deduction of Excluded Costs) and the drawing of the Performance LoC (the amounts drawn down were deducted from the amounts ordered to be paid by CB&I) and 0% success rate to the other two issues.

2387. Taking into account the complexity and importance of each of these categories of Counterclaims, the Tribunal decides to assign a 10% weight to each of them.

2388. This brings CB&I's success rate on these four other issues to 10% ([0% * 10%] + [50% * 10%] + [50% * 10%] + [0% * 10%]).

* * *

2389. Summing up, considering the maximum reasonable defense costs incurred in arguing the Counterclaim of USD 22 million, the Tribunal finds that CB&I is entitled to a reimbursement of 10.6%[2295] thereof, *i.e.*, USD 2,332,000.

## C.    Procedural Decisions

2390. Three procedural decisions warrant a decision in a distinct section[2296]:

- Document production (**a.**); and

- PO No. 2 and PO No. 3 (**b.**).

### a.    Document production

2391. The Tribunal notes that Claimant spent USD 1,880,250 in the document production exercise and Respondents USD 4,143,801. In view of the characteristics of the case, given the number of the document production requests, the Tribunal, exercising the discretion it has when deciding on costs, is of the opinion that USD 1 million is the maximum reasonable amount for Legal Costs incurred in the document production exercise.

2392. As anticipated in PO No. 1, the Tribunal will allocate that amount to the Party that showed more efficiency during the document production exercise, taking into consideration the reasonableness of the requests and objections, the willingness to produce documents and the relative success of the requests made[2297].

2393. The Tribunal finds that Reficar has come closest to reaching efficiency, as it:

- Spent less than half the amount Respondents incurred and yet achieved a higher percentage of granted requests;

- Convinced the Tribunal that the counterparty's requests had to be rejected or narrowed down in a higher percentage than Respondents did; and

- Voluntarily produced a significantly higher number of requests than Respondents.

2394. For these reasons, the Tribunal decides that Claimant be awarded USD 1 million in Legal Costs incurred during the document production phase. The remainder of costs incurred by each Party shall not be reimbursed.

### b.    PO No. 2 and PO No. 3

2395. As explained in Section II.7 *supra*, PO No. 2 and PO No. 3 related to the admission of the Total Contested Documents from the *Contraloría* Proceedings. During this procedural incident, Reficar sent a letter to the *Contraloría* notifying it that Respondents had used documents obtained from the *Contraloría* Proceedings in this arbitration[2298]. At that stage of the proceedings, the Tribunal found that Reficar

---

[2295] 0.6%+10%=10.6%
[2296] PO No. 1, para. 65; Communication A 168.
[2297] PO No. 1, para. 66.
[2298] See para. 68 *supra*.

had breached the confidentiality regime of the arbitration by sending such notification[2299] and reserved its decision on costs for this incident until the Final Award[2300].

2396. The Tribunal considers that the reimbursement of reasonable Legal Costs incurred in defending this procedural incident is the appropriate remedy that should be granted to CB&I. According to the Statement on Costs, Respondents spent USD 283,365 in Legal Costs to address this incident; the Tribunal finds that this amount is reasonable, as Reficar spent a similar, if slightly higher, amount.

2397. Regarding PO No. 3, both Parties requested that the Tribunal order sanctions against the counterparty due to alleged improper procedural behaviour. As these specific allegations have not had any further development throughout the proceedings, the Tribunal does not consider that the Legal Costs arising out of PO No. 3 should be reimbursed to either Party.

2398. Thus, CB&I is entitled to <u>USD 283,365</u> of its reasonable Legal Costs related to PO No. 2 and each Party should bear their own Legal Costs related to PO No. 3.

## 3.2. ADMINISTRATIVE COSTS

2399. As decided in the ICC Court's session of May 5, 2023, the Administrative Costs amount to USD 5,368,500[2301]. Claimant paid USD 3,382,655[2302] and Respondents USD 1,985,845[2303].

2400. The Tribunal finds that Reficar should be awarded a large portion of the Administrative Costs it paid: CB&I breached its Cost and Schedule Control Commitments with *culpa grave*, showing recklessness in the way it allowed costs and delay to grow. And, although the Tribunal ultimately decided that CB&I had not incurred pre-contractual liability, the Tribunal did acknowledge that CB&I's pre-contractual conduct was far from being commendable.

2401. Hence, the Tribunal finds that Reficar, undisputedly, had a lawful right to commence this arbitration and seek compensation for these breaches. The Tribunal also notes that Reficar's behaviour is not completely without reproach: it failed to pay approximately USD 1 million in invoices due and not all its claims for improper EPC costs have been successful.

2402. In view of this, the Tribunal decides that Reficar be compensated by CB&I for 80% of the Administrative Costs borne by Reficar, *i.e.*, <u>USD 2,706,124</u>. This means that the Administrative Costs are split in a proportion of, approximately, 12.6% for Reficar and 87.4% for CB&I.

## 3.3. CONCLUSION

---

[2299] PO No. 2, paras. 152-154.
[2300] PO No. 2, para. 154.
[2301] Case Financial Table compiled by the ICC, dated May 5, 2023.
[2302] USD 3,402,500 minus the reimbursed amount of USD 19,845.
[2303] USD 1,997,500 minus the reimbursed amount of USD 11,655.

2403. In conclusion, Reficar is entitled to reimbursement of the following costs:

- Reasonable Legal Costs in a total of USD 58,568,320, comprising USD 57,568,320 incurred in relation to the Claim, as well as USD 1 million incurred with regard to the document production phase; and

- Administrative Costs in the amount of USD 2,706,124.

2404. Accordingly, Reficar is awarded costs in the amount of USD 61,274,444.

2405. On the other hand, CB&I is also entitled to an award on costs of USD 2,615,365 (*i.e.,* reasonable Legal Costs of USD 2,332,000 incurred in relation to the Counterclaim, and USD 283,365 in relation to PO 2).

**4.    SET-OFF**

2406. The Tribunal has found that both Parties owe each other an award on costs. Thus, it will set-off the amounts due by applying the same principles as those decided in Section VIII.2 *supra* on set-off.

2407. Applying these principles, Reficar's award on costs, in an amount of USD 61,274,444, should be deemed partially paid and settled through set-off, against CB&I's award on costs in an amount of USD 2,615,365, as also adjudicated in this section.

2408. In light of the above, CB&I UK, CB&I N.V. and CBI Colombiana[2304] must jointly and severally pay Reficar an award on costs in the amount of USD 58,659,079.

**5.    INTEREST**

2409. As with set-off, interest on awarded costs will also fall under the same principles as those decided in Section VIII.3 *supra,* on interest. The only difference is that interest on awarded costs is to accrue from the date of the notification of this Award until the date on which payment of any amounts awarded has been carried out.

2410. Therefore, Respondents must pay Reficar interest on the costs awarded at the rate of six-month LIBOR (or the alternative rate, if LIBOR is discontinued[2305]) plus a margin of 2%, compounded daily, accruing from the date of the notification of this Award until the date of payment.

\* \* \*

2411. In conclusion, the Tribunal decides that CB&I UK, CB&I N.V. and CBI Colombiana are ordered to pay jointly and severally to Reficar an award on costs of USD 58,659,079, plus interest at the rate of six-month LIBOR (or the alternative rate, if LIBOR is discontinued) plus a margin of 2%, compounded daily, accruing from the date of the notification of this Award until the date of payment.

---

[2304] Respondents are jointly and severally ordered to pay the award on costs considering the Tribunal's decision in Section VIII.2.4 *supra*.
[2305] See para. 2357 supra.

ICC Case 21747 RD/MK/PDP
Final Award

# X. <u>SUMMARY</u>

2412. The Parties have presented long and exhaustive requests for relief in their submission, which are to be found in Section VI *supra*. In the next sub-sections, the Tribunal will provide a summary of the decisions adopted in this Award, by reference to the Blended Requests for Relief outlined in para. 299 *supra*. The Tribunal will devote individual sub-sections to

- Procedural decisions (**1.**),

- Precontractual liability (**2.**),

- Liability and quantum (**3.**),

- Joint and several liability, set-off and liquidation (**4.**),

- Interest and costs (**5.**), and

- Other claims (**6.**).

## 1. <u>PROCEDURAL DECISIONS</u>

2413. Reficar has asked the Tribunal to take three procedural decisions regarding the evidence of a witness who failed to appear at the Hearing, negative inferences from deficient document production and shifting of burden of proof[2306]. The Tribunal has taken the appropriate decisions in section III.2 *supra*.

## 2. <u>PRECONTRACTUAL LIABILITY</u>

2414. The Blended Request for Relief related to precontractual liability is the following[2307]:

> "*1. A declaration that CB&I committed pre-contract misconduct, breaching a pre-contractual duty to act in good faith and/or act with pre-contractual dolo and that CB&I is liable for damages*".

2415. The Tribunal's findings with respect to precontractual liability are the following:

2416. Reficar's case is that CB&I purposefully provided incorrect PFs (i.), July 2009 (ii.) and February 2010 (iii.) Estimates and April 2010 Schedule (iv.). The Tribunal, however, has found that[2308]:

- (i.) it was Reficar who had full knowledge of and requested the use of unrealistic PFs;

---

[2306] CPHB requests for relief no. 1 and 2.
[2307] CPHB requests for relief no. 3, 4, 5, 6, 7, 10, 23 and 24: RPHB, paras. 675.1 (Respondents' ESOD requests for relief no. 3 and 29) and 675.3(e).
[2308] See para. 653 *supra*.

462

- (ii.) the July 2009 Estimate did not adhere to the AACE Class 2 +/-10% accuracy level, but was not decisive for Reficar's decision to execute an RC contract;

- (iii.) the February 2010 Estimate did not meet the AACE Class 2 +/- 10% accuracy level, but Reficar was aware of this fact when it decided to execute an RC contract;

- (iv.) the April 2010 Schedule was not a Level 3 Schedule, but was acceptable to Reficar and, in any event, it was not decisive for Reficar's decision to execute an RC EPC Contract.

2417. As a matter of law, Reficar's case is that, by using deception and misrepresentation, CB&I induced Reficar to switch the EPC Contract from an LSTK to an RC methodology with liability caps. Reficar says that CB&I's misconduct resulted in *dolo* and in a breach of a pre-contractual duty to act in good faith.

2418. As regards the *dolo* claim, the Tribunal decided that[2309]:

- it was Reficar who, concerned about the volatile market conditions, took the initiative to change the EPC Contract from LSTK to RC;

- Reficar was aware that the February 2010 Estimate provided by CB&I was not an AACE Class 2 +/-10% estimate; similarly, it knew that the April 2010 Schedule was not a proper Level 3 resource-loaded schedule;

- Reficar did not rely on the Final Full Estimate when it consented to the RC EPC Contract, but on its own budget; similarly, it did not rely on the April 2010 Schedule, but accepted to agree to a Mechanical Completion Date and to receive the Level 3 resource-loaded schedule after the execution of the contract.

2419. The Tribunal also determined that Reficar took an informed decision to change to an RC EPC Contract, based on advice obtained from various expert sources; and that CB&I's input was not accepted lightly, but carefully reviewed by expert advisors engaged by Reficar.

2420. The Tribunal has further resolved that, even if it had found that CB&I's conduct amounted to *dolo* (*quod non*), Reficar still would have failed to provide a counter-factual scenario to establish damages[2310].

2421. As regards the claim for breach of good faith duties, the Tribunal acknowledged that, although CB&I's behaviour was not commendable, it was not the expression of bad faith or indicative of a breach of the good faith duties under Art. 863 of the Colombian Commercial Code[2311].

---

[2309] See para. 739 *supra*.
[2310] See para. 747 *supra*.
[2311] See para. 811 *supra*.

2422. In view of the above, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "1. Declares that CB&I did not commit pre-contract misconduct, did not breach its pre-contractual duty to act in good faith and did not act with pre-contractual dolo and is not liable for any damages under this heading".

## 3. LIABILITY AND QUANTUM

2423. Both Parties have presented several claims based on the counterparty's breach of certain obligations. The Tribunal will first recall its previous decisions regarding CB&I's breaches (**3.1.**), then Reficar's breaches (**3.2.**). The Tribunal will then move to the question whether CB&I's breaches amounted to *dolo* or *culpa grave* and therefore, to the lifting of liability caps (**3.3.**). Finally, the Tribunal will address liabilities stemming from other proceedings (**3.4.**).

### 3.1. BREACH OF OBLIGATIONS BY CB&I

2424. The Tribunal has dismissed some claims based on the fact that they fall outside the Tribunal's power (**A.**). Claims adjudicated by the Tribunal power relate to the following contractual breaches: improper EPC Costs (**B.**), improper delay (**C.**), and work completion (**D.**).

### A. Claims outside the Tribunal's power: indirect or consequential damages

2425. The Blended Request for Relief in this regard reads as follows[2312]:

> "2. A declaration that the limitations in Section 4.13 of the DRA are enforceable".

2426. The Tribunal has found that Section 4.13 of the DRA limits the Tribunal's authority to award indirect or consequential damages[2313]; thus, Reficar's claims for

- lost profits (request for relief no. 22),

- cost of capital on lost profits (request for relief no. 51) and

- indirect PCS-related costs (requests for relief no. 44, 47 and 48),

which all seek indirect damages, are outside the Tribunal's power and consequently are dismissed[2314].

2427. Request for relief no. 47 (make-good obligation of defective Work) includes a combined claim for indirect damages and for direct damages, and the Tribunal has found that the claim for indirect damages is outside the Tribunal's power[2315].

---

[2312] CPHB requests for relief no. 22, 44, 47, 48, 50 and 51: RPHB, para. 675.1 (Respondents' ESOD requests for relief no. 3 and 13).
[2313] See para. 2041 *supra*.
[2314] See para. 2076 *supra*.
[2315] See para. 2075 *supra*.

2428. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "2. Declares that the limitations as regards the Tribunal's powers, contained in Section 4.13 of the DRA are enforceable; as a result, the Tribunal lacks the power to adjudicate Reficar's requests for relief no. 22, 44, 48 and 51 and these requests are dismissed; request for relief no. 47 is partially dismissed for the same reason".

## B.  **Improper EPC Costs**

2429. The Blended Request for Relief related to improper EPC Costs is the following[2316]:

> "3. A declaration that CB&I must reimburse Reficar USD 1,945.96 million for costs paid by Reficar to CB&I, in performing work that were not reasonably and properly incurred in accordance with the EPC Contract".

2430. The Tribunal has found that the EPC Contract is not a standard cost-reimbursable construction contract, because it includes specific, two-pronged Cost Control Commitments[2317]:

- CB&I's Heightened Diligence Obligation, which required CB&I to rigorously control cost and schedule, in a similar way to a lump sum contract, and to safeguard Reficar's resources as if its own;

- CB&I's Reasonable Cost Obligation, under which CB&I agreed only to claim reimbursement for costs that had been incurred reasonably, properly and in accordance with the Contract.

2431. The Tribunal found that, pursuant to TC 4 and TC 58.9, Reficar is entitled to claw back any amounts paid to CB&I, whenever CB&I has breached its Cost Control Commitments[2318] and that in the present case CB&I has indeed committed such breach[2319].

2432. In order to determine the magnitude of the breach, *i.e.*, to quantify the costs incurred in the construction of the Project that were unreasonable or improperly incurred, the Tribunal opted for a Bottom-Up methodology, which compares the actual EPC costs with an appropriate baseline (defined as the Reasonable Cost Benchmark)[2320]. The methodology implies the following steps:

2433. (i.) The starting point of the calculation is the actual amount paid by Reficar to CB&I, which is USD 5,908.2 million.

---

[2316] CPHB requests for relief no. 8, 14, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 53 and 56: RPHB, paras. 675.1 (Respondents' ESOD requests for relief no. 1, 3, 6, 7, 9, 14, 15 and 27) and 675.3(b).
[2317] See para. 866 *supra*.
[2318] See para. 918 *supra*.
[2319] See para. 942 *supra*.
[2320] See paras. 952 and 963 *supra*.

2434. (ii.) The second step of the calculation is the determination of the Reasonable Cost Benchmark, which the Tribunal set at USD 3,971 million.

2435. (iii.) Amounts paid in excess of the Reasonable Cost Benchmark constitute Excess Costs, which Reficar is in principle entitled to claw back; the Excess Costs are thus the difference between the total amount paid by Reficar (USD 5,908.2 million) minus the Reasonable Cost Benchmark (USD 3,971 million), *i.e.*, USD 1,937.2 million.

2436. (iv.) But the Tribunal also accepted that some of these Excess Costs were caused by factors outside CB&I's scope of control and needed to be excluded; these costs have been defined as Excluded Costs[2321].

2437. Excluded Costs amount to USD 1,091.20 million, broken down as follows:

- Costs caused by Unpredictable Events: USD 40.4 million[2322];

- Costs due to scope changes: USD 247.5 million[2323];

- Costs due to Claimant's Responsibility Events: USD 803.9 million[2324].

2438. (v.) The Excluded Costs must be deducted from the Excess Costs, resulting in an amount of <u>USD 845.4 million</u>; this is the amount that Reficar is entitled to claw back from CB&I as improper EPC Costs[2325].

2439. Reficar's additional claim for unsubstantiated advance payments, in an amount of USD 140 million, is already included in the previous analysis[2326].

2440. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "*3. Declares that CB&I breached its Cost Control Commitments under the EPC Contract and must reimburse Reficar USD 845.4 million for costs paid by Reficar to CB&I, which had not been reasonably and properly incurred in accordance with the EPC Contract*".

## C.    <u>Improper delay</u>

2441. The Blended Request for Relief related to improper delay is the following[2327]:

> "*4. A declaration that Reficar is owed USD 366.25 million for liquidated damages for delay*".

2442. The Tribunal's findings with respect to improper delay are the following:

---

[2321] See para. 1015 *supra*.
[2322] See para. 1047 *supra*.
[2323] See para. 1080 *supra*.
[2324] See para. 1350 *supra*.
[2325] See para. 1354 *supra*.
[2326] See para. 1362 *supra*.
[2327] CPHB requests for relief no. 43, 44, 50, 51, 52 and 55; RPHB, para. 675.1 (Respondents' ESOD requests for relief no. 1, 3 and 18).

2443. The Tribunal found that the Guaranteed Mechanical Completion Date agreed by the Parties was February 28, 2013[2328] and that such date had not been amended[2329]. The Tribunal further determined that CB&I achieved Mechanical Completion of the Project when the final Certificate at Subsystem level was signed by Reficar, *i.e.*, on February 23, 2015[2330]. The delay of the Project was set at 725 days[2331]:

-   Of these 725 days of delay, 203 occurred before the Cut-Off Date and are attributable to Reficar[2332].

-   Of the 522 days of delay which occurred after the Cut-Off Date, 334 days are CB&I's responsibility and 188 days are Reficar's[2333].

2444. The prolongation costs in an amount of USD 157.1 million caused by these 188 days of delay attributable to Reficar have already been computed in the Excluded Costs and thus have been credited to CB&I[2334].

2445. The 334 days of delay caused by CB&I give rise to the application of Delay Liquidated Damages, as provided under TC 54.8, in a total amount of <u>USD 152.75 million</u>[2335].

2446. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "4. Declares that CB&I breached its Schedule Control Commitments under the EPC Contract and owes Reficar USD 152.75 million for delay liquidated damages".

## D.   <u>Work completion</u>

2447. The Blended Request for Relief related to work completion costs is the following[2336]:

> "5. A declaration that Reficar is owed USD 20,626,550 for specific impacts on PCS contractors, including the completion of outstanding and incomplete work and the correction of defective work".

2448. The Tribunal's findings with respect to work completion costs are the following:

2449. The Tribunal has decided that, once CB&I had achieved Mechanical Completion, Reficar took the Project over and CB&I was no longer under the obligation to complete any pending Works[2337].

---

[2328] See para. 1558 *supra*.
[2329] See para. 1581 *supra*.
[2330] See para. 1624 *supra*.
[2331] See para. 1718 *supra*.
[2332] See para. 1718 *supra*.
[2333] See para. 1718 *supra*.
[2334] See para. 1348 *supra*.
[2335] See para. 1725 *supra*.
[2336] CPHB requests no. 45, 46 and 47; RPHB, para. 675.1 (Respondents' ESOD requests for relief no. 1 and 3).
[2337] See para. 1756 *supra*.

2450. The decision on correction of defective work, however, was different: CB&I was contractually obliged to correct defects and failed to properly comply with this commitment; thus, CB&I is obliged to pay to Reficar USD 10.3 million[2338] as compensation for the cost of the PCS contractors which carried out the reparations *in lieu* of CB&I[2339].

2451. In view of the above, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "5. Declares that CB&I breached its defects correction obligations under the EPC Contract and owes Reficar USD 10.3 million for specific impacts on PCS contractors".

## 3.2. BREACH OF OBLIGATIONS BY REFICAR

2452. CB&I's counterclaim refers to Reficar's failure to pay invoices for cost incurred by CB&I (**A.**) and to Reficar's draw upon letters of credit (**B.**).

## A. Unpaid invoices

2453. The Blended Request for Relief related to unpaid invoices is the following[2340]:

> "6. A declaration that Reficar abused its rights and intentionally and/or maliciously breached its duties under the EPC Contract, and must reimburse CB&I for all reasonable and proper costs incurred until the EPC Contract is liquidated, in an amount of USD 146,964,022 and COP 568,695,037".

2454. The Tribunal's findings with respect to unpaid (and off-set) invoices is the following:

2455. The Tribunal has decided that CB&I was entitled to payment from Reficar for invoices that complied with the requirements of the EPC Contract: costs had to be reasonable and proper, and invoices had to be correctly submitted and verified[2341].

2456. The Tribunal applied this approach to all invoices claimed by CB&I and decided that Reficar owed CB&I USD 914,939 and COP 28,256,049 for reasonable, proper and duly verified, but unpaid invoices[2342]; the Tribunal also concluded that there was no proof that Reficar had breached the Contract intentionally, maliciously, in an abuse of right or bad faith[2343].

2457. CB&I also claimed that the set-off performed by Reficar with regard to certain invoices had been improper and that the amounts set-off were still due, while Reficar denied the claim. The Tribunal dismissed CB&I's claim for lack of evidence[2344].

---

[2338] See para. 1834 *supra*.
[2339] See para. 1831 *supra*.
[2340] RPHB, paras. 675.1 (Respondents' ESOD requests for relief no. 1, 4, 8, 11, 26 and 31) and 675.1(a)
[2341] See para. 1373 *supra*.
[2342] See para. 1524 *supra*.
[2343] See para. 1465 *supra*.
[2344] See para. 1480 *supra*.

2458. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "*6. Declares that Reficar breached its payment obligations under the EPC Contract and owes CB&I USD 914,939 and COP 28,256,049 for reasonable and proper costs*".

* * *

2459. Reficar presented two requests for defensive reliefs against CB&I's counterclaim[2345]; given that the Tribunal has partially accepted the counterclaim, these defensive reliefs are already addressed in the relief regarding the counterclaim.

## B.    <u>Draw-down of letters of credit</u>

2460. The Blended Request for Relief related to the draw-down of letters of credit is the following[2346]:

> "*7. A declaration that Reficar properly drew on the Performance LoC and that amounts already collected must be credited to CB&I in the settlement of accounts; a declaration that Reficar is entitled to fully draw on the Advance Payment LoC, and that amounts drawn reduce the total amount that CB&I is ordered to pay by this Award*".

2461. The Tribunal's findings with respect to the draw-down on letters of credit is:

2462. Reficar's draw-down on the Performance LoC was proper: CB&I was in breach of its contractual obligations and the damage caused exceeded the amount of USD 70 million drawn down[2347]. Since the Performance LoC was drawn-down in full, CB&I no longer has any liability to Reficar under the Performance LoC[2348].

2463. As regards the Advance Payment LoC, the Tribunal has decided that it covered the total USD 5,908.2 million of invoiced costs paid by Reficar[2349]. Reficar was fully entitled to draw upon the Advance Payment LoC when it first attempted to do so – there is, thus, no evidence of a fraudulent conduct[2350] – and CB&I is still liable under the Advance Payment LoC[2351].

2464. If Reficar draws upon the Advance Payment LoC once this arbitration has finished, the amounts collected shall be deducted from CB&I's payment obligations as established in this Award[2352].

---

[2345] CPHB requests for relief no. 13 and 15.
[2346] CPHB requests for relief no. 16 and 17; RPHB, paras. 675.1 (Respondents' ESOD requests for relief no. 3, 4, 5, 20, 21, 22, 23, 24 and 25) and 675.3(d).
[2347] See para. 1488 *supra*.
[2348] See para. 1489 *supra*.
[2349] See para. 1519 *supra*.
[2350] See para. 1521 *supra*.
[2351] See para. 1519 *supra*.
[2352] See para. 1520 *supra*.

2465. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Requests for Relief is that it:

> "7. Declares that Reficar properly drew on the Performance LoC and that amounts already collected must be credited to CB&I in the settlement of accounts; Reficar is entitled to fully draw on the Advance Payment LoC, and amounts drawn will reduce the total amount that CB&I is ordered to pay in this Award".

## 3.3. LIMITATIONS OF LIABILITY

2466. The Blended Request for Relief related to limitations of liability is the following[2353]:

> "8. A declaration that CB&I breached the EPC Contract during the execution phase through culpa grave or gross negligence and CB&I cannot avail itself of the limitation-of-liability provisions in the EPC Contract".

2467. The Tribunal's findings with respect to the limitations of liability are the following:

2468. The Tribunal analysed CB&I breaches of the Cost and Schedule Control Commitments[2354]:

- The Cost and Schedule Control Commitments were all essential obligations;

- The breaches by CB&I were material and led to foreseeably significant damages;

- CB&I showed recklessness during the breach of its Cost and Schedule Commitments, taking no responsibility for the increases in costs and time and failing to take mitigating actions.

2469. As a result, the Tribunal found that CB&I acted with *culpa grave* when it breached the Cost and Schedule Control Commitments; thus, the liability caps under TCs 8 and 54 do not find application[2355].

2470. <u>In view of the above</u>, the Tribunal's decision on the Blended Request for Relief is that it:

> "8. Declares that CB&I breached the EPC Contract Cost and Schedule Control Commitments through culpa grave or gross negligence and that CB&I cannot avail itself of the limitation-of-liability provisions in the EPC Contract with regard to the amounts awarded to Reficar in decisions 3. and 4. supra".

## 3.4. INDEMNIFICATION COMMITMENTS

---

[2353] CPHB requests for relief no. 9, 10 and 12; RPHB, para. 675.1 (Respondents' ESOD requests for relief no. 3, 12, 18 and 28).
[2354] See Section VIII.1.2.4 *supra*.
[2355] See para. 2232 *supra*.

ICC Case 21747 RD/MK/PDP
Final Award

2471. The Blended Request for Relief related to the Indemnification Commitments is the following[2356]:

> "*9. A declaration that each Party owes the other or its Group members defense and indemnity for any judgment or decision by Colombian courts or any other governmental authority*".

2472. The Tribunal's findings with respect to the Indemnification Commitments are as follows:

2473. The Tribunal found that the breaching Party must comply with its Indemnification Commitments, to the extent that the breaches determined in this Award give rise to an Indemnifiable Event.

2474. <u>In view of the above</u>, the Tribunal's decision with regard to the Blended Request for Relief is that it:

> "*9. Orders both Parties to comply with their respective Indemnification Commitments under the EPC Contract, to the extent that the breaches determined in this Award trigger an Indemnifiable Event* ".

## 4.   JOINT AND SEVERAL LIABILITY, SET-OFF AND LIQUIDATION

2475. The Tribunal will address each category of decisions separately.

2476. The Blended Requests for Relief related to the set-off, payment and liquidation of the EPC Contract are the following:

> "*10. A declaration that CB&I UK and CBI Colombiana are jointly and severally liable under any Project Agreement. A declaration that CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded pursuant to the Parent Guarantee*"[2357];

> "*11. A payment order for the amounts awarded*"[2358];

> "*12. A declaration that the Tribunal has Liquidated the EPC Agreement and established the appropriate EPC Agreement value*"[2359].

### 4.1.   JOINT AND SEVERAL LIABILITY

2477. The Tribunal has found that CB&I UK, CBI Colombiana and CB&I N.V. are all jointly and severally liable under the EPC Contract with regard to the totality of amounts awarded in the present procedure[2360].

---

[2356] CPHB, requests for relief no. 18 and 19; RPHB, paras. 675(1) (Respondents' ESOD requests for relief no. 3, 16, 17, 32 and 33) and 675.3(c).
[2357] CPHB requests for relief no. 20 and 21; RPHB, paras. 675(1) (Respondents' ESOD request for relief no. 3) and 675.3(f).
[2358] CPHB request for relief no. 60; RPHB, paras. 675(1) (Respondents' ESOD request for relief no. 2).
[2359] CPHB, requests for relief no. 15, 43, 46, 47, 56 and 60; RPHB, paras. 675.1 (Respondents' ESOD requests for relief no. 2 and 26) and 675.3(g).
[2360] See para. 2314 *supra*.

## 4.2. SET-OFF

2478. The Tribunal has established that CB&I owes Reficar USD 1,008.41 million, which comprises[2361]:

- USD 845.4 million due to the breach of the Cost Control Commitments,

- USD 152.75 million due to the breach of the Schedule Control Commitments, and

- USD 10.3 million due to the breach of CB&I's obligation to provide the Works free of defects.

2479. Reficar, in turn, owes[2362]:

- To CB&I UK:  USD 914,939 under the Offshore Contract, and

- To CBI Colombiana:  COP 28,256,049 under the Onshore Contract,

for unpaid invoices.

2480. Both Parties have asked the Tribunal to perform a set-off of the amounts awarded and the Tribunal decided to do so as of the Liquidation Date, *i.e.*, December 31, 2015.

2481. Applying the set-off, Reficar's claim against CB&I UK in an amount of USD 1,008,410,000, are set-off against CB&I UK's counterclaim against Reficar in an amount of USD 914,939 resulting in a net credit held by Reficar against CB&I UK in an amount of USD 1,007,495,061. This amount must be reduced by USD 70 million already collected by Reficar under the Performance LoC[2363]. Thus, the amount in USD to which Reficar is entitled in accordance with this Award is <u>USD 937,495,061</u>[2364].

2482. Reficar must, however, pay the amounts awarded under the Offshore Contract to CBI Colombiana for unpaid invoices, in an amount of <u>COP 28,256,049</u>.

## 4.3. LIQUIDATION

2483. The Tribunal has decided to liquidate the Contract as of the Liquidation Date and has established the value of the EPC Agreement at USD 5,074 million plus COP 28.3 million[2365].

2484. <u>In view of the above</u>, the Tribunal's decision on the Blended Requests for Relief is that it:

> *"10. Declares that CB&I UK and CBI Colombiana are jointly and severally liable under any of the Project Agreements and that, pursuant to the Parent*

---

[2361] See para. 2078 *supra*.
[2362] See para. 1524 *supra*.
[2363] See para. 1528 *supra*.
[2364] 1,007,495,061-70,000,000= 937,495,061.
[2365] See para. 2324 *supra*.

ICC Case 21747 RD/MK/PDP
Final Award

*Guarantee, CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded; as a result, Reficar may seek the relief awarded in this arbitration from all three Respondents: CB&I UK, CBI Colombiana and CB&I N.V., all of which are jointly and severally liable under the EPC Contract";*

*"11. Orders (i) CB&I UK, CBI Colombiana and CB&I N.V. to pay jointly and severally to Reficar USD 937,495,061 and (ii) Reficar to pay COP 28,256,049 to CBI Colombiana ";*

*"12. Declares that the EPC Agreement, with a value of USD 5,074 million plus COP 28.3 million, is liquidated as of December 31, 2015".*

## 5. INTEREST AND COSTS

### 5.1. INTEREST

2485. The Blended Request for Relief related to interest is the following[2366]:

*"13. An order for interest on the balance after liquidation and post-award interest until the date of payment of the award".*

2486. The Tribunal's findings with respect to interest are the following:

2487. CB&I UK, CBI Colombiana and CB&I N.V., which are jointly and severally liable, must pay Reficar interest on the amounts awarded and denominated in USD, at the rate of LIBOR for six-month deposits, plus a margin of 2%, compounded daily, with accrual starting as of December 31, 2015 and continuing until the date of actual payment of all outstanding amounts.

2488. Reficar, in turn, must pay CBI Colombiana interest on the amounts awarded in COB, at the rate of DTF, plus a margin of 2%, compounded daily, with accrual starting as of December 31, 2015 and continuing until the date of actual payment of all outstanding amounts.

2489. Should LIBOR cease to exist while interest is still accruing, SOFR should replace the LIBOR rate. Since the applicable LIBOR rate is the six-month rate, the SOFR replacement, if applicable, should also reflect the six-month rate of that benchmark.

2490. In view of the above, the Tribunal's decision on the Blended Request for Relief is that it:

*"13. Orders (i) CB&I UK, CBI Colombiana and CB&I N.V. to pay jointly and severally to Reficar interest on the awarded amount of USD 937,495,061 at the rate of six-month LIBOR plus a margin of 2%, compounded daily, accruing from December 31, 2015 until the date of payment and (ii) Reficar to pay to CBI Colombiana interest on the awarded amount of COP*

---

[2366] CPHB requests for relief no. 49 and 59; RPHB, para. 675.1 (Respondents' ESOD requests for relief no. 3 and 35).

> *28,256,049, at the rate of DTF plus a margin of 2%, compounded daily,
> accruing from December 31, 2015 until the date of payment*".

## 5.2. COSTS

2491. The Blended Request for Relief related to costs is[2367]:

> "*14. An award on costs*".

2492. The Tribunal's findings with respect to costs are that both Parties were entitled to an award on costs:

- Reficar in the amount of <u>USD 61,274,444</u>; and

- CB&I in the amount of <u>USD 2,615,365</u>.

2493. Applying the same set-off principles as in Section VIII.2 *supra*, the Tribunal found that Reficar's award on costs should be deemed partially paid and settled through set-off, against CB&I's award on costs.

2494. Accordingly, Reficar is entitled to a reimbursement of its costs in the amount of USD 58,659,079.

2495. Finally, the Tribunal found that the award on costs should accrue interest in the same manner as any other awarder amounts, with the difference that interest on awarded costs is to accrue from the date of the notification of this Award until the date on which payment has been effectuated.

2496. <u>In view of the above</u>, the Tribunal's decision on the Blended Request for Relief is that it:

> "*14. Orders CB&I UK, CB&I N.V. and CBI Colombiana to pay jointly and
> severally to Reficar an award on costs of USD 58,659,079, plus interest at the
> rate of six-month LIBOR plus a margin of 2%, compounded daily, accruing
> from the date of the notification of this Award until the date of payment*".

## 6. OTHER CLAIMS

2497. Both Parties have presented a number of additional requests for relief which the Tribunal needs not address, because of their subsidiary nature:

- Reficar's claim for breach of fiduciary duties[2368] and disgorgement of CB&I's profits and fees[2369] is only pleaded in the alternative, should the Tribunal dismiss the contractual breaches claim[2370], which it has not;

- Similarly, CB&I's counterclaim for unjust enrichment[2371] would only become relevant if the contractually available remedy did not provide adequate

---

[2367] CPHB request for relief no. 58; RPHB, para. 675.1 (Respondents' ESOD request for relief no. 34).
[2368] CPHB request for relief no. 11.
[2369] CPHB request for relief no. 54.
[2370] See para. 228 *supra*.
[2371] Respondents' ESOD request for relief no. 11.

compensation; but in this case, CB&I has successfully claimed payment of invoices due – there is, thus, no room for an additional claim for unjust enrichment[2372].

2498. The Tribunal also notes that CB&I presented two further requests for relief for additional compensation for fluctuations[2373] or unfair impact on CB&I's economic balance[2374], which are now moot given that the settlement of accounts does not render a result in CB&I's favour.

2499. Therefore, the Tribunal will now take a final decision which adjudicates all requests for relief which have not been dealt with in the preceding decisions[2375]; namely, it:

"*15. Dismisses any other claim, counterclaim or relief sought*".

---

[2372] See para. 1368 *supra*.
[2373] Respondents' ESOD requests for relief no. 36.
[2374] Respondents' ESOD requests for relief no. 37.
[2375] Among other, CPHB requests for relief no. 57 and 61 are covered by this decision. Similarly, Respondents' ESOD request for relief no. 30 is partially addressed in the Tribunal's adjudication of Reficar's Improper EPC Costs claim.

# XI. **DECISION**

2500. For the reasons provided above, the Arbitral Tribunal decides as follows:

1.  Declares that CB&I did not commit pre-contract misconduct, did not breach its pre-contractual duty to act in good faith and did not act with pre-contractual *dolo* and is not liable for any damages under this heading;

2.  Declares that the limitations as regards the Tribunal's powers, contained in Section 4.13 of the DRA are enforceable; as a result, the Tribunal lacks the power to adjudicate Reficar's requests for relief no. 22, 44, 48 and 51 and these requests are dismissed; request for relief no. 47 is partially dismissed for the same reason;

3.  Declares that CB&I breached its Cost Control Commitments under the EPC Contract and must reimburse Reficar USD 845.4 million for costs paid by Reficar to CB&I, which had not been reasonably and properly incurred in accordance with the EPC Contract;

4.  Declares that CB&I breached its Schedule Control Commitments under the EPC Contract and owes Reficar USD 152.75 million for delay liquidated damages;

5.  Declares that CB&I breached its defects correction obligations under the EPC Contract and owes Reficar USD 10.3 million for specific impacts on PCS contractors;

6.  Declares that Reficar breached its payment obligations under the EPC Contract and owes CB&I USD 914,939 and COP 28,256,049 for reasonable and proper costs;

7.  Declares that Reficar properly drew on the Performance LoC and that amounts already collected must be credited to CB&I in the settlement of accounts; Reficar is entitled to fully draw on the Advance Payment LoC, and amounts drawn will reduce the total amount that CB&I is ordered to pay in this Award;

8.  Declares that CB&I breached the EPC Contract Cost and Schedule Control Commitments through *culpa grave* or gross negligence and that CB&I cannot avail itself of the limitation-of-liability provisions in the EPC Contract with regard to the amounts awarded to Reficar in decisions 3. and 4. *supra*;

9.  Orders both Parties to comply with their respective Indemnification Commitments under the EPC Contract, to the extent that the breaches determined in this Award trigger an Indemnifiable Event;

10. Declares that CB&I UK and CBI Colombiana are jointly and severally liable under any of the Project Agreements and that, pursuant to the Parent Guarantee, CB&I N.V. is jointly and severally liable as a primary obligor for all obligations declared and amounts awarded; as a result, Reficar may seek the relief awarded in this arbitration from all three Respondents: CB&I UK,

CBI Colombiana and CB&I N.V., all of which are jointly and severally liable under the EPC Contract;

11. Orders (i) CB&I UK, CBI Colombiana and CB&I N.V. to pay jointly and severally to Reficar USD 937,495,061 and (ii) Reficar to pay COP 28,256,049 to CBI Colombiana;

12. Declares that the EPC Agreement, with a value of USD 5,074 million plus COP 28.3 million, is liquidated as of December 31, 2015;

13. Orders (i) CB&I UK, CBI Colombiana and CB&I N.V. to pay jointly and severally to Reficar interest on the awarded amount of USD 937,495,061 at the rate of six-month LIBOR plus a margin of 2%, compounded daily, accruing from December 31, 2015 until the date of payment and (ii) Reficar to pay to CBI Colombiana interest on the awarded amount of COP 28,256,049, at the rate of DTF plus a margin of 2%, compounded daily, accruing from December 31, 2015 until the date of payment;

14. Orders CB&I UK, CB&I N.V. and CBI Colombiana to pay jointly and severally to Reficar an award on costs of USD 58,659,079, plus interest at the rate of six-month LIBOR plus a margin of 2%, compounded daily, accruing from the date of the notification of this Award until the date of payment; and

15. Dismisses any other claim, counterclaim or relief sought by any Party.

Place of arbitration: New York City, New York, U.S.A.

Date: June 2, 2023

ICC Case 21747 RD/MK/PDP
Final Award

## THE ARBITRAL TRIBUNAL

_____

Juan Fernández-Armesto
President of the Arbitral Tribunal

478

ICC Case 21747 RD/MK/PDP
Final Award

Andrés Jana Linetzky
Co-arbitrator

ICC Case 21747 RD/MK/PDP
Final Award

Sir Vivian A. Ramsey
Co-arbitrator