UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V. and CB&I UK LIMITED,<br><br>               Petitioners,<br><br>v.<br><br>REFINERÍA DE CARTAGENA S.A.S.,<br><br>               Respondent,<br><br>v.<br><br>CBI COLOMBIANA S.A.<br><br>               Cross-Respondent. | Civil Action No. 1:23-cv-04825-GHW |

**REFINERÍA DE CARTAGENA S.A.S.'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITION TO VACATE AND IN SUPPORT
<u>OF CROSS-PETITION TO CONFIRM</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

      A.     History of Dispute ................................................................................. 4

      B.     History of the Arbitration ..................................................................... 7

      C.     The Award ........................................................................................... 10

STANDARD OF REVIEW ................................................................................................. 11

ARGUMENT ...................................................................................................................... 12

I.      The Tribunal Was Not Guilty of Misconduct ...................................................... 13

      A.     The Tribunal's Limited Admission of Written Statements from Two Witnesses Does Not Warrant Vacatur ................................................. 13

      B.     The Tribunal's Management of Pre-Hearing Submissions Does Not Warrant Vacatur ................................................................................... 18

      C.     The Tribunal's Decision to Hold More Than Six Weeks of Merits Hearings Does Not Warrant Vacatur ................................................... 22

II.     The Tribunal Did Not Exceed Its Powers ........................................................... 23

      A.     The Tribunal's Application of the Law Does Not Warrant Vacatur .... 24

      B.     Holding a Virtual Hearing During a Pandemic Does Not Warrant Vacatur ... 26

III.    The Tribunal Did Not Manifestly Disregard the Law ........................................ 29

IV.    The Tribunal's Award Should Be Confirmed ..................................................... 32

CONCLUSION ................................................................................................................... 33

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alexander Julian, Inc. v. Mimco, Inc.*,
   29 F. App'x 700 (2d Cir. 2002) ................................................................ 14

*Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*,
   579 F.2d 691 (2d Cir. 1978) ........................................................... 12, 32

*Attia v. Audionamix Inc.*,
   No. 14 Civ. 706, 2015 WL 5580501 (S.D.N.Y. Sept. 21, 2015)............................ 17

*Barbier v. Shearson Lehman Hutton, Inc.*,
   948 F.2d 117 (2d Cir.1991) ................................................................ 33

*Beijing Shougang Mining Inv. Co. v. Mongolia*,
   11 F.4th 144 (2d Cir. 2021) ......................................................... *passim*

*Bell Aerospace Co. Div. of Textron, Inc. v. Loc. 516*,
   500 F.2d 921 (2d Cir. 1974) ................................................................ 14

*Bergheim v. Sirona Dental Sys., Inc.*,
   711 F. App'x 43 (2d Cir. 2017) ............................................................. 23

*Bisnoff v. King*,
   154 F. Supp. 2d 630 (S.D.N.Y. 2001) ...................................................... 17

*Broumand v. Joseph*,
   522 F. Supp. 3d 8 (S.D.N.Y. 2021) ......................................................... 28

*Chem-Met Co. v. Metaland Int'l, Inc.*,
   No. Civ.A. 96-02548, 1998 WL 35272368 (D.D.C. Mar. 25, 1998)........................ 17

*Com. Risk Reinsurance Co. v. Sec. Ins. Co. of Hartford*,
   526 F. Supp. 2d 424 (S.D.N.Y. 2007) ........................................... 18, 19, 20, 21

*D.H. Blair & Co. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ................................................................ 33

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   40 F.4th 56 (2d Cir. 2022) ................................................................ 12

*Fairchild Corp. v. Alcoa, Inc.*,
   510 F. Supp. 2d 280 (S.D.N.Y. 2007) ...................................................... 14

*Florasynth, Inc. v. Pickholz*,
   750 F.2d 171 (2d Cir. 1984) ............................................................... 32

*Folkways Music Publishers, Inc. v. Weiss*,
    989 F.2d 108 (2d Cir. 1993) ....................................................................... 11, 12

*In re McDermott Int'l Inc.*
    No. 20-30336 (Bankr. S.D. Texas, Mar. 12, 2020), Dkt. No. 665 .............................. 9

*Iran Aircraft Indus. v. Avco Corp.*,
    980 F.2d 141 (2d Cir. 1992) ............................................................................ 17

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005) ............................................................................ 20

*Kondot S.A. v. Duron LLC*,
    586 F. Supp. 3d 246 (S.D.N.Y. 2022) .............................................................. 2, 11

*Landy Michaels Realty Corp. v. Loc. 32 B-32J*,
    954 F.2d 794 (2d Cir. 1992) .......................................................................... 32, 33

*Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016) ................................................................ 3, 12, 14, 22

*NYKCool A.B. v. Pac. Fruit, Inc.*,
    507 F. App'x 83 (2d Cir. 2013) ....................................................................... 19

*Odeon Cap. Grp., LLC v. Ackerman*,
    182 F. Supp. 3d 119 (S.D.N.Y. 2016) ................................................................ 22

*Odeon Cap. Grp., LLC v. Ackerman*,
    864 F.3d 191 (2d Cir. 2017) ............................................................................ 22

*Oracle Corp. v. Wilson*,
    276 F. Supp. 3d 22 (S.D.N.Y. 2017) ......................................................... *passim*

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013) ...................................................................... 23, 24, 25, 29

*Pipkin v. Nabors Indus., Ltd.*,
    No. 21-MC-156S, 2021 WL 9681373 (D. Wyo. Sept. 30, 2021) .......................... 28

*Polimaster Ltd. v. Rae Systems, Inc.*,
    623 F.3d 832 (9th Cir. 2010) ......................................................................... 28

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
    497 F.3d 133 (2d Cir. 2007) ......................................................................... 2, 11

*ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*,
    564 F.3d 81 (2d Cir. 2009) ............................................................................ 11

*Sanduski v. Charles Schwab & Co.*,
   No. 2:19-cv-01340, 2020 WL 4905537 (D. Nev. Aug. 20, 2020)........................................... 28

*Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co.*,
   668 F.3d 60 (2d Cir. 2012) .................................................................................................... 11

*Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*,
   57 F.4th 372 (2d Cir. 2023) ................................................................................................... 11

*Stifel, Nicolaus & Co. v. Forster*,
   No. 14 Civ. 6523, 2015 WL 509684 (S.D.N.Y. Feb. 6, 2015) ............................................... 18

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010)................................................................................................... 23, 29, 32

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
   592 F.3d 329, 339 (2d Cir. 2010) ............................................................................... 11, 29, 32

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*,
   No. 22-cv-1761, 2023 WL 257915 (S.D.N.Y. Jan. 18, 2023) ................................................ 12

*Tempo Shain Corp. v. Bertek, Inc.*,
   120 F.3d 16 (2d Cir. 1997) ........................................................................................ 14, 15, 17

*United Steelworkers v. Enter. Wheel & Car Corp.*,
   363 U.S. 593 (1960)............................................................................................................ 19, 29

*VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*,
   717 F.3d 322 (2d Cir. 2013) ................................................................................................... 12

*Westerbeke Corp. v. Daihatsu Motor Co.*,
   304 F.3d 200 (2d Cir. 2002) ......................................................................................... *passim*

*Zurich Am. Ins. Co. v. Team Tankers A.S.*,
   811 F.3d 584 (2d Cir. 2016) ................................................................................................... 12

**Statutes & Rules**

9 U.S.C. § 9.................................................................................................................................... 32

9 U.S.C. § 10................................................................................................................ 11, 12, 13, 23

Fed. R. Civ. P. 45(c) ..................................................................................................................... 28

**Other Authorities**

*Announcements Archive: February 14, 2022 – Resumption of In-Person Court
   Proceedings and Other Court Operations at the United States Court of Appeals for the
   Second Circuit*, https://www.ca2.uscourts.gov/announcements_archive.html......................... 28

Refinería de Cartagena S.A.S. f/k/a Refinería de Cartagena S.A. ("Reficar") submits this memorandum in opposition to the petition to vacate filed by McDermott International Holdings B.V., f/k/a Comet II B.V. f/k/a Chicago Bridge & Iron Company N.V. ("CB&I N.V."), and CB&I UK Limited ("CB&I UK," and collectively with CB&I N.V., the "CB&I Petitioners"), and in support of its cross-petition to confirm the final arbitration award, dated June 2, 2023 (the "Award"), issued by the International Court of Arbitration of the International Chamber of Commerce ("ICC"), against the CB&I Petitioners and CBI Colombiana S.A. ("CBI Colombiana," and collectively with the CB&I Petitioners, "CB&I").  For reasons set forth below, the CB&I Petitioners' petition should be denied and Reficar's cross-petition should be granted.

## INTRODUCTION

This proceeding follows the seven-year international arbitration of a construction dispute, overseen by one of the most distinguished tribunals ever assembled:

- **Professor Juan Fernández-Armesto** of Spain (Chairman), the former President of the Spanish SEC who has been an arbitrator in more than 180 proceedings;

- **Professor Andrés Jana** of Chile, the current Vice President of the International Court of Arbitration at the ICC; and

- **Sir Vivian Ramsey** of the United Kingdom, the former presiding judge of the Technology and Construction Court and CB&I's party-appointed arbitrator.

This tribunal *unanimously* issued the Award, which contains 480-pages of factual findings and careful legal analysis. Ex. 1 (Award).[1]  The seven years of proceedings involved thousands of pages of pleadings over seven rounds of briefing, more than 100 fact witness statements, nearly 30 expert reports, 11 joint expert reports, and six weeks of evidentiary hearings on the merits.

---

[1] Reficar's supporting documents are annexed to the Declaration of Mike Stenglein, dated August 4, 2023 ("Stenglein Decl.") and are referenced herein as "Ex. __."  All emphases herein are added unless otherwise noted.

At the close of hearings, CB&I's lead counsel confirmed that the Tribunal had not violated his clients' due process rights and that there were no due process issues for the Tribunal to address:

> Chairman Fernández-Armesto: So is there any breach of due process rights which the Tribunal has committed and which any of the parties would like us to draw our attention to and so that we can take the appropriate corrective action? ... [C]an I get the confirmation from you that you don't have any issue of due process which you would like to raise to our attention[?]

> Mr. Shapiro: There [are] no due process issues or any other matters that I wish to raise.

Ex. 2 (July 16, 2021 Tr.) at 6924:12–6925:19.   Yet now that the Award has been issued with determinations favorable to Reficar, the CB&I Petitioners takes the opposite position — arguing that the Tribunal's determinations were "rooted in due process violations."   CB&I Petitioners' Memorandum of Law in Support of Petition ("MOL"), at 12.

The CB&I Petitioners' new objections do not come close to meeting the high standard for vacatur. As the Second Circuit has repeatedly held, "'an extremely deferential standard of review' is appropriate in the context of arbitral awards in order '[t]o encourage and support the use of arbitration by consenting parties.'"   *Kondot S.A. v. Duron LLC*, 586 F. Supp. 3d 246, 254 (S.D.N.Y. 2022) (alteration in original) (quoting *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007)).   Given the deferential standard, "[o]nly a barely colorable justification for the outcome reached by the arbitrator[s] is necessary to confirm [an] award."   *Id.* (internal quotation marks and brackets omitted).   Here, the 480-page Award on its face provides justification for the arbitrators' carefully reasoned and unanimous decision.

The CB&I Petitioners nonetheless urge this Court to overturn the Tribunal's careful work, raising seven narrow objections.   None have any merit, and none come close to identifying the type of fundamental error that could justify vacating the Tribunal's decision.   Instead, the CB&I Petitioners are impermissibly asking this Court to second-guess the Tribunal's factual findings,

contractual interpretations, and procedural rulings.  By way of example, the CB&I Petitioners'
leading argument — presumably their strongest (albeit unfounded) ground for challenging the
Award — contends that the Tribunal erred by admitting the written statements of two fact
witnesses (out of more than 100 statements submitted in total) because the witnesses were not
available for cross-examination.  But that is not a permissible ground to vacate an award.  It is
"well settled that procedural questions that arise during arbitration, such as which witnesses to hear
and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and
should not be second-guessed by the courts."  *Nat'l Football League Mgmt. Council v. Nat'l
Football League Players Ass'n*, 820 F.3d 527, 545–46 (2d Cir. 2016).

Moreover, as with almost all of its objections, the CB&I Petitioners fails to provide critical
context: After considering arguments on this exact issue, the Tribunal found that the witnesses had
a "legitimate reason" for not appearing at the hearing, agreed to apply "*additional scrutiny* to *all*
evidence in the case file based on the [two] witness statements," and, in any event, never cited the
two statements to justify any part of the 480-page Award.  *See* Ex. 1 (Award) ¶¶ 154–68.  When
context is provided for the rest of the CB&I Petitioners' arguments for vacatur, they are similarly
meritless and do not satisfy the high standard that must be met to justify interfering with the
Tribunal's carefully considered judgment.

The CB&I Petitioners' petition to vacate should be denied and the Award should be
confirmed.

## FACTUAL BACKGROUND

The following background summarizes the Tribunals' factual findings and the procedural
history of the arbitral proceedings, which are described in more detail in the Award.

A.       **History of Dispute**

Reficar is a company organized under Colombian law and the owner of a refinery in Cartagena, Colombia.  Ex. 1 (Award) ¶ 239.  In 2007, Reficar awarded CB&I an initial agreement for process design and basic engineering for the potential expansion and modernization of its refinery.  *Id.* ¶¶ 244–49.  Reficar selected CB&I for this initial contract based on CB&I's promise to perform the subsequent engineering, procurement, and construction ("EPC") on a lump-sum turnkey basis, agreeing that CB&I would bear the risk of any cost overruns.  *Id.*

In Spring 2008, CB&I expressed its desire to move the expected EPC contract to a cost-reimbursable basis.  *Id.* ¶¶ 249–51.  While evaluating that proposed change, Reficar requested, and CB&I agreed to provide, a cost estimate with a +/- 10% accuracy margin for the subsequent EPC work.  *Id.* ¶¶ 256–57.  CB&I ultimately provided two estimates that it characterized as AACE Class II +/- 10% estimates: (1) a July 2009 estimate for $3.495 billion, and (2) a February 2010 estimate for $3.149 billion.  *See id.* ¶¶ 255–60.

Reficar and CB&I then entered (in June 2010) into six interrelated agreements that were collectively known as the "EPC Agreement":

- The "Onshore Contract," governed by Colombian law, between Reficar and CBI Colombiana for work (mainly construction) performed by CB&I inside Colombia.

- The "Offshore Contract," governed by New York law, between Reficar and CB&I UK for design, engineering, procurement, and other work performed by CB&I primarily outside of Colombia.

- The "Coordination Agreement" executed by Reficar, CB&I UK, and CBI Colombiana.

- The "Dispute Resolution Agreement" ("DRA") between Reficar and CB&I UK, CBI Colombiana, and CB&I, N.V.

- The "Onshore Parent Guarantee" between Reficar and CB&I N.V.

- The "Offshore Parent Guarantee," between Reficar and CB&I N.V.

*Id.* ¶ 263.  The "Onshore" and "Offshore" components of the EPC Agreement were substantively identical and separated into different contracts for tax reasons.  The Coordination Agreement provided that the "liability and obligations of [CBI Colombiana and CB&I UK] under this Agreement and the [Onshore and Offshore] Contracts shall be joint and several."  *Id.* ¶ 2303. Moreover, because the contracts were designed to work together as an integrated whole, CB&I agreed not to contend that any claim raised under one of the interrelated contracts should have been brought under the other contract.  *Id.* ¶¶ 193–94.

The EPC Agreement reflected a cost-reimbursable structure instead of the lump-sum turnkey structure that Reficar sought and CB&I had initially promised.  In return, the EPC Agreement included several critical provisions designed to protect Reficar from cost overruns. Those provisions, as identified by the Tribunal, are:

- **Heightened Diligence Obligation**[2] — CB&I agreed to "rigorously control cost and schedule similar to a lump sum contract, safeguarding Reficar resources as if their own." *Id.* ¶¶ 265, 427–28.

- **Reasonable Cost Obligation** — CB&I agreed it would be entitled to reimbursements of only those costs that were "reasonably and properly incurred … in accordance with the Agreement[.]" *Id.* ¶¶ 266, 465–66.

- **Schedule Control Commitments** — CB&I agreed to proceed with the project regularly and diligently and to achieve the guaranteed completion date in the EPC Contract — February 28, 2013. *Id.* ¶¶ 267, 1533–34.

As found by the Tribunal, "CB&I accepted these additional obligations, because it wanted to encourage Reficar to change its mind, abandoning its original idea of awarding the construction of the Refinery on a lump sum basis and accepting, instead, a cost-reimbursable structure."  *Id.* ¶¶ 864–65.

---

[2]  The Tribunal often also refers to this obligation as CB&I's Cost Control Commitment, and both terms are used in this memorandum.

Once the parties signed the EPC Agreement, CB&I repeatedly violated its core obligations. In August 2011, CB&I revealed that its forecast for EPC costs had increased from approximately $3.2 billion to $3.641 billion. *Id.* ¶¶ 271–72. In December 2011, the forecast increased to $3.809 billion, and the next month CB&I revised it to $3.971 billion. *Id.*

Reficar grew frustrated with CB&I's failure to adhere to its cost-control obligations and threatened to "take action outside the contract" by hiring a replacement contractor. *Id.* ¶ 274. In response, CB&I certified in a May 2012 letter that its $3.971 billion forecast met the highest accuracy requirements of the industry, as it purportedly complied with the requirements of a Class I +/-5% estimate. *Id.* ¶¶ 275–76. At the time of this critical representation designed to provide cost certainty, CB&I had been performing the EPC work for approximately two years, and there was only nine months left before the guaranteed completion date of February 2013.

Despite its May 2012 representation, CB&I continued to violate its contractual obligations and costs continued to explode. CB&I was ultimately ***over two years late*** in meeting its construction deadlines, and Reficar paid ***$5.908.2 billion*** in EPC costs — approximately $2.750 billion more than CB&I represented in its February 2010 estimate. *Id.* ¶ 280.

This enormous cost over-run and delay was no accident. According to the unrebutted testimony of CB&I's HSE Operations Manager:

> In my numerous discussions with CB&I construction block managers and supervisors, their attitude was that since the Project was under a cost reimbursable contract structure, efficiency was not a priority for them. Indeed, the view of CB&I was that the longer the job went on, the more money CB&I would make. The workers understood — as I understood — there was as a markup on the hourly rate charged to Reficar for our time and that CB&I made money on each employee on the Project, including my time.

*Id.* ¶ 936. In short, CB&I unlawfully prioritized its profit motive over its express contractual obligations to rigorously control costs. *Id.* ¶¶ 931–36.

### B.      History of the Arbitration

In March 2016, Reficar initiated arbitration pursuant to the requirements of the EPC Agreement, which are set forth in Section 4 of the Dispute Resolution Agreement:

> 4.1 Any Dispute not amicably resolved by the Parties pursuant to the terms of Clause 3 of this Agreement must be referred to and finally resolved by arbitration administered by the ICC and conducted under the ICC Rules as modified by this Agreement.

Ex. 1 (Award) ¶ 27.   Reficar appointed Professor Andrés Jana; CB&I appointed Sir Vivian Ramsey; and the two party-appointed arbitrators nominated Professor Juan Fernández-Armesto as chairman.   *Id.* ¶¶ 37–38.   Given their preeminence in the field, no party objected to the Tribunal members, and the ICC confirmed the appointments.   *Id.*

In October 2016, the Tribunal sent the parties a draft of Procedural Order No. 1 ("PO No. 1") — governing the timing and procedures of the arbitration — and invited comments. Ex. 1 (Award) ¶ 43.   In the following month, CB&I informed the Tribunal that the parties had "reached complete agreement on the timetable for the arbitration," as well as the procedures in PO No. 1 (except for two discovery issues not relevant here).   *See* Ex. 3 (R-16) at 1.   CB&I attached proposed drafts showing the following procedural agreements:

- The parties would simultaneously submit non-exhaustive initial pleadings on April 28, 2017 ("First Written Submissions").

- There would thereafter be a document exchange period between May 22, 2017, and September 30, 2017.

- The parties would simultaneously submit exhaustive pleadings, along with expert opinions and fact witness statements, on January 30, 2018 ("Second Written Submissions").

- The parties would submit final reply pleadings on July 31, 2018 ("Third Written Submissions").

- The merits hearing would take place between October 15 to November 15, 2018, with the clarifying note that the hearing would be "three weeks, plus one week held in reserve."

Ex. 3 (Proposed PO No. 1 and Procedural Annex attached to R-16).  In response to this submission, the Tribunal issued PO No. 1 in late November 2016, approving the dates agreed to by the parties. Ex. 4 (November 29 Tribunal transmittal and attachments).

The parties followed the procedures set forth in PO No. 1, although the specific dates changed because of requested postponements and CB&I's bankruptcy in 2020. As set forth in the Award, the basic timeline of proceedings was as follows:

- April 2017:  The parties submitted their non-exhaustive First Written Statements.  Ex. 1 (Award) ¶ 49.

- March 2018:  The parties submitted their exhaustive Second Written Submissions.  *Id.* ¶ 53.

- March 2018:  Reficar sent a letter to the Tribunal asking to exclude privileged documents that CB&I had used in its Second Written Submissions that were provided to CB&I in a proceeding before Colombia's *Contraloría General de la República*, a proceeding to which Reficar was not a party.  *Id.* ¶¶ 59–72.

- November/December 2018:  Following months of submissions about the *Contraloría* documents, the Tribunal extended the deadline for the Third Written Submissions.  *Id.* ¶ 75. In a ruling favorable to CB&I, the Tribunal determined that the "documents obtained from the case file of the *Contraloría* Proceeding were admissible in this arbitration."  *Id.* ¶ 76.

- May 2019:  The parties agreed to postpone the hearing dates to April and May 2020, providing four weeks of hearing.  The Tribunal provisionally reserved an additional two weeks, as CB&I requested.  *Id.* ¶ 106; Ex. 5 (A-65)

- June 2019:  The parties submitted their Third Written Submissions.  Ex. 1 (Award) ¶ 54.

- January 2020:  After complaints by both parties that the Third Written Submissions contained new arguments, the Tribunal granted the parties an opportunity to provide additional submissions.  *Id.* ¶ 57.  With respect to CB&I, the Tribunal authorized the submission of two new expert reports with accompanying exhibits, three new fact witness statements with additional exhibits, and two evidentiary guides from counsel.  Ex. 6 (Communication A-85).

- Later that same month:  CB&I notified the Tribunal that CB&I N.V. and CB&I UK had filed Chapter 11 petitions and asserted that the automatic stay precluded the hearing from moving forward as scheduled.  *See* Ex. 7, R-103.  In response, the Tribunal vacated the

scheduled hearing dates, as well as all other pending deadlines.  Ex. 8 (Communication A-88).  CB&I N.V. and CB&I UK emerged from Chapter 11 on June 30, 2020.[3]

- June 29, 2020:  CB&I informed the Tribunal that CBI Colombiana, which had not sought the protection of Chapter 11, had received a liquidation order from the Colombian *Superintendencia de Sociedades* [the "*SDS*"] on the grounds of insolvency.  Ex. 1 (Award) ¶ 8.  Thereafter, the *SDS* appointed a liquidator for CBI Colombiana, and the liquidator informed the Tribunal that CBI Colombiana would "keep on participating in the referred procedures and maintains all the previous arguments, defenses and claims presented before the tribunal and henceforth adheres to all arguments, defenses, writs, requests and filings presented by [CB&I]."  *See id.* ¶¶ 9–13.

- September 2020:  The Tribunal confirmed that the "hearing will take place in the six weeks reserved in mid-2021 (weeks of May 17, May 24, May 31, June 28, July 5, and July 12, 2021), either physically in person or (if that proves impossible) virtually by videoconference."  Ex. 9 (A-108).

- October 2020:  The parties submitted their supplemental submissions the Tribunal had authorized before CB&I's bankruptcy.  Ex. 10 (R-137)

- February 2021:  After considering the parties' arguments, the Tribunal determined that the hearing would be held virtually because of the pandemic, citing "the global delays in the process of mass inoculation, the discovery of new strains of the SARS-CoV-2 virus and the lack of possibility to predict future government measures restricting public gathering and international travel."  Ex. 11 (A-133).

- May 17, 2021:  The two-block evidentiary hearing commenced.  The first block started on May 17, 2021, and ended on June 4, 2021, one day earlier than planned.  The second block started on June 28, 2021, and ended on July 16, 2021.  Ex. 1 (Award) ¶ 113.

- October/November 2021:  The parties submitted their first and second post-hearing briefs.  *Id.* ¶¶ 115–16.

---

[3] The confirmation order entered in connection with the CB&I Petitioners' bankruptcy specifically preserved any causes of action or awards that Reficar had or may have against CB&I and its affiliates.  *See* Order at 88, *In re McDermott Int'l Inc.* No. 20-30336 (Bankr. S.D. Texas, Mar. 12, 2020), Dkt. No. 665 ("Notwithstanding anything in the Plan, the Disclosure Statement, this Confirmation Order or any documents related hereto or thereto to the contrary, Refinería de Cartagena S.A. ("Reficar") is deemed to have timely and affirmatively opted out of the Third-Party Releases set forth in Article VIII.D of the Plan with respect to all of its Claims regardless of whether or not Reficar has submitted an Opt-Out Form, and shall not be considered a "Released Party" or a "Releasing Party."  For the avoidance of doubt, as a Holder of Class 10 General Unsecured Claims against Comet II B.V. (successor in interest to Chicago Bridge & Iron Company N.V.) and CB&I UK Limited, no Claim or Cause of Action of Reficar, or any affiliate of Reficar, shall be released, impaired or otherwise modified by the Plan, the Disclosure Statement, this Confirmation Order or any documents related hereto or thereto, and all Claims, including all Causes of Action of Reficar, or any affiliate of Reficar, will be Reinstated, including against Reorganized Comet II B.V. (successor in interest to Chicago Bridge & Iron Company N.V.) and Reorganized CB&I UK Limited for the Cartagena Arbitration, and shall be excluded from the provision of VIII.F of the Plan relating to the Injunction." (footnote omitted)).

- November 18–19, 2021:  The Tribunal held two days of closing arguments.  *Id.* ¶ 118.

Over the course of seven years, the parties submitted "over 6,000 numbered factual exhibits," "over 1500 legal exhibits," "the testimony of dozens of fact witnesses," "nearly 30 expert reports," "11 Joint Expert Reports," and 25 "main substantive submissions" (*i.e.*, pleadings). Ex. 1 (Award) ¶¶ 122–131.  The Tribunal "issued 156 communications containing decisions regarding procedural incidents and four Procedural Orders."  *Id.* ¶ 24.  The hearing transcript is 7,241 pages long.  *Id.* ¶ 129.

C.     **The Award**

The Award, which was unanimously signed by all three arbitrators, is dated June 2, 2023, and the ICC provided electronic copies to the parties on June 7, 2023.  The Award contains 2,500 paragraphs and 2,375 footnotes.  Ex. 1 (Award).  It is replete with citations to and analysis of Colombian law, New York law, and the governing contracts.

While too voluminous to summarize in detail here, the Award makes extensive factual findings and addresses all claims submitted by the parties, ruling in favor of CB&I on some issues and Reficar on others.  It includes a 118-paragraph summary of the procedural history, *id.* ¶¶ 23–140; a 50-paragraph choice-of-law analysis, *id.* ¶¶ 187–236; a 50-paragraph summary of the facts, *id.* ¶¶ 237–86; a 522-paragraph analysis of Reficar's pre-contract claims that finds in favor of CB&I, *id.* ¶¶ 304–825; a 537-paragraph analysis of Reficar's contractual claims that finds in favor of both parties in part, *id.* ¶¶ 828–1364; a 165-paragraph analysis of CB&I's counterclaims that also finds in favor of both parties in part, *id.* ¶¶ 1365–1529; a 196-paragraph delay analysis that finds in favor of both parties in part, *id.* ¶¶ 1530–1725; a 56-paragraph analysis of lost profits that finds in favor of CB&I, *id.* ¶¶ 2021–76; and a 188-paragraph analysis of the applicability of the contractual liability cap that finds in favor of Reficar, *id.* ¶¶ 2083–2270.

The Award ultimately orders "CB&I UK, CBI Colombiana and CB&I N.V. to pay jointly and severally to Reficar USD 937,495,061 and … Reficar to pay COP 28,256,049 to CBI Colombiana." *Id.* ¶ 2500(11).  It also orders payment of certain fees and pre- and post-award interest to both parties. *Id.* ¶ 2500(13–14).

## STANDARD OF REVIEW

The burden for vacating an arbitration award is very high. *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 382 (2d Cir. 2023) (noting the "strong presumption in favor of enforcing an arbitration award").  Because the New York Convention provides no basis for vacating an arbitral award, courts apply the Federal Arbitration Act ("FAA") and any relevant state arbitral law.  *See Kondot*, 586 F. Supp. 3d at 255.

Because the FAA is designed to "encourage and support the use of arbitration by consenting parties," it requires an "extremely deferential standard of review." *Smarter Tools Inc.*, 57 F.4th at 378 (quoting *Porzig*, 497 F.3d at 139); *see also* 9 U.S.C. § 10.  A court may vacate an award only when (1) the award was procured by fraud, (2) the arbitrators were corrupt, (3) the arbitrators were guilty of misconduct, or (4) the arbitrators exceeded their powers.  9 U.S.C. § 10(a).  In addition to these enumerated grounds, courts may vacate an award when it is rendered "in manifest disregard of the law." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339, 346 & n.10 (2d Cir. 2010).  That standard is satisfied in only "severely limited" circumstances. *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co.,* 668 F.3d 60, 71 (2d Cir. 2012) (quoting *ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)).  A court "may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).

Reflecting the same strong policy in favor of international arbitration, the threshold for confirming an arbitral award is very low.  Arbitral awards are "subject to very limited review" to promote the twin goals of arbitration — "settling disputes efficiently and avoiding long and expensive litigation." *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016) (quoting *Folkways Music*, 989 F.2d at 111).  To confirm an arbitral award, "all the law requires" is a "'barely colorable'" justification for the outcome. *Nat'l Football League*, 820 F.3d at 539, 545–46 (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 704 (2d Cir. 1978)); *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, No. 22-cv-1761, 2023 WL 257915, at *4 (S.D.N.Y. Jan. 18, 2023).  Under the Panama and New York Conventions,[4] a court must "confirm the award unless it finds one of the seven grounds for refusal." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013).  "Given the strong public policy in favor of international arbitration, the party seeking to avoid summary confirmance of an arbitral award has the heavy burden of proving that one of the seven defenses applies." *Id.* (internal quotation marks omitted).

## ARGUMENT

Nothing in the CB&I Petitioners' petition approaches the high standard for vacating an arbitral award — particularly one issued by a preeminent tribunal following seven years of proceedings.  The CB&I Petitioners make no assertion that the Tribunal was corrupt or that the Award was procured by fraud.  9 U.S.C. § 10(a)(1), (2).  They instead contend that the Tribunal engaged in misconduct under 9 U.S.C. § 10(a)(3); exceeded its powers under 9 U.S.C. § 10(a)(4);

---

[4] Under the parties' agreement, the Panama Convention applies.  *See* Ex. 3 (Dispute Resolution Agreement) § 7.3. But "[i]t has long been established … that the Panama Convention is substantively identical to the New York Convention and that authority interpreting one may be applied to the other." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 n.2 (2d Cir. 2022).

and manifestly disregarded the law.  Because none of these objections has merit, the petition to vacate should be denied, and the Award confirmed.

## I.      The Tribunal Was Not Guilty of Misconduct.

Section 10(a)(3) allows vacatur of an award only "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party may have been prejudiced."  9 U.S.C. § 10(a)(3).  "To demonstrate arbitral misconduct, the challenging party must show that his *right to be heard has been grossly and totally blocked*."  *Oracle Corp. v. Wilson*, 276 F. Supp. 3d 22, 29 (S.D.N.Y. 2017) (emphasis in original) (internal quotation marks omitted).

The CB&I Petitioners argue that the Tribunal erred by (1) refusing to exclude the witness statements of two witnesses who did not appear at the hearing and whose statements were not cited or relied on by the Tribunal, (2) failing to enforce the Tribunal's procedural order regarding written pleadings, and (3) refusing CB&I's request for an even longer hearing.  MOL 13–29.  None of these arguments withstand even minimal scrutiny, let alone meet the high bar for vacating an arbitral award.  The record is clear that CB&I had a fair opportunity to present its case.  The CB&I Petitioners' complaints on appeal are merely garden-variety disagreements with the Tribunal's discretionary procedural rulings and factual findings.

### A.      The Tribunal's Limited Admission of Written Statements from Two Witnesses Does Not Warrant Vacatur.

The CB&I Petitioners argue that the Tribunal committed misconduct by refusing to exclude the witness statements of Christian Mantilla and Andres Riera — two witnesses who submitted statements in support of Reficar but declined to participate in the hearing for reasons the Tribunal found to be legitimate.  *See* MOL 14–22; Ex. 1 (Award) ¶¶ 154–68.  The Tribunal's decision fell

well with its broad discretion.  CB&I has not —and cannot — show that the Tribunal relied on these two witnesses in rendering any substantive portion of its Award or that failing to exclude the witness statements grossly and totally blocked CB&I from being heard.

Arbitrators have substantial discretion to admit or exclude evidence when conducting hearings.  *See Nat'l Football League*, 820 F.3d at 545–46.  "In making evidentiary determinations, an arbitrator 'need not follow all the niceties observed by the federal courts.'"  *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (quoting *Bell Aerospace Co. Div. of Textron, Inc. v. Loc. 516*, 500 F.2d 921, 923 (2d Cir. 1974)).  Arbitrators "are afforded broad discretion to determine whether to hear or not hear evidence."  *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 286 (S.D.N.Y. 2007).  Indeed, a party asking for vacatur under § 10(a)(3) must show actual prejudice, explaining why the excluded evidence "would have caused the Arbitrator to resolve the dispute in its favor."  *Oracle Corp.*, 276 F. Supp. 3d at 32.

The CB&I Petitioners have not shown that CB&I was prevented from presenting its case and denied a fundamentally fair hearing.  *See Nat'l Football League*, 820 F.3d at 545–46.  Demonstrating how difficult it is to meet this high standard, the Second Circuit held that it was not fundamentally unfair for a tribunal to decide a case *without hearing evidence from the defendant* after the defendant's lawyer could not attend an evidentiary hearing because of a scheduling conflict but failed to find substitute representation.  *Alexander Julian, Inc. v. Mimco, Inc.*, 29 F. App'x 700, 703 (2d Cir. 2002).  It necessarily follows that allowing the submission statements from two witnesses who were unavailable and whose testimony was never relied on by the Tribunal cannot possibly render the hearing fundamentally unfair.  In fact, when understood in proper context, the CB&I Petitioners have not even carried their burden to show that the Tribunal erred, let alone that any error fundamentally denied CB&I the opportunity to present its case.

*First*, the decision not to exclude the Mantilla and Riera witness statements was well within the Tribunal's broad discretion and explained in detail in the Award.  Ex. 1 (Award) ¶¶ 154–68. The parties' agreed-on Hearing Protocol anticipated and addressed the situation: "The Tribunal shall not consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question fails to provide a legitimate reason for the Fact Witness's failure to appear." *Id.* ¶ 161; Ex. 12 (Hearing Protocol ¶ 79(b), dated March 22, 2021).  Consistent with the protocol, once the two witnesses informed Reficar that they would not attend the hearing and CB&I objected to their witness statements, the Tribunal invited both parties to brief whether legitimate reasons justified the witnesses' failure to appear.  Ex. 1 (Award) ¶ 157.

As Reficar explained, Mr. Riera and Mr. Mantilla, who were not Reficar employees, were charged in the *Contraloría* proceeding as fiscally responsible for CB&I's multi-billion-dollar cost overruns on the project.  Ex. 13 (C-214), Ex. 14 (C-220).  Because that decision issued just weeks before the arbitration hearing, both witnesses informed Reficar that they could not attend because they needed to focus on the *Contraloría* proceeding.  *Id.*  After considering the parties' arguments, the Tribunal found that the two witnesses had legitimate reasons for not appearing: "[U]pon the issuance of a new order by the *Contraloría*, that had a specific impact on the personal situation of the two witnesses, these witnesses indeed had a 'legitimate reason' not to appear at the Hearing." Ex. 1 (Award) ¶ 166.  The Tribunal's decision was objectively correct and, in any event, certainly fell within the broad discretion of arbitrators over evidentiary issues.  *See Tempo Shain*, 120 F.3d at 20.  The CB&I Petitioners make no meaningful showing that the Tribunal abused its discretion in finding that the witnesses had valid reasons for not attending.  *See Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214 (2d Cir. 2002) (noting that an arbitrator's "factual findings … are not subject to judicial challenge").

*Second*, the CB&I Petitioners fail to mention that the Tribunal, siding with CB&I and over Reficar, took specific steps to reduce any potential prejudice that might have resulted from the witnesses' failure to appear.  Rather than admitting the witness statements without qualification, the Tribunal acknowledged the concern that CB&I "could be prejudiced by the fact that it has been unable to cross-examine two of Reficar's witnesses." Ex. 1 (Award) ¶ 167.  The Tribunal therefore agreed to "apply *additional scrutiny to all the evidence in the case file* based on the witness statements of Messrs. Mantilla and Riera and take account in assessing the weight given the fact that there was no opportunity for CB&I to cross-examine these witnesses." *Id.* ¶ 168.

*Third*, the CB&I Petitioners have not shown any prejudice resulting from the Tribunal's decision. *Oracle Corp.*, 276 F. Supp. 3d at 32.  Their assertion that the Tribunal "founded material aspects of its Award on these witness's testimony" is demonstrably false.  The only time either witness statement is cited is in the Award's discussion of whether to admit them.  The witness statements are not relied on by the Tribunal for any finding or ruling.  By contrast, the Tribunal cited the statements of other Reficar witnesses who CB&I *did* cross-examine at the hearing — 10 fact witnesses and 13 expert witnesses, *see* Ex. 1 (Award) ¶ 129 — hundreds of times in the Award.  The CB&I Petitioners do not identify a single section, finding, or paragraph of the Award that was even allegedly affected by the admission of the Mantilla and Riera statements.  In short, the CB&I Petitioners cannot show that CB&I was fundamentally deprived of an opportunity to present its case merely because it was not able to cross-examine two witnesses whose testimony the Award did not rely on.

*Fourth*, the CB&I Petitioners rely on inapposite case law to support their position.  *See* MOL 13–14, 21.  None of the cases they cite addresses analogous circumstances or casts any doubt on the reasonableness of the Tribunal's evidentiary ruling.  Instead, in all of the cases the excluded

evidence was proven to be material and its exclusion was obviously prejudicial.  For example, CB&I relies on *Tempo Shain*, 120 F.3d at 20.  But as this Court has explained, "the essential proposition for which *Tempo Shain* stands is that, absent a reasonable basis for its decision, a refusal to grant an adjournment of a hearing, due to a medical emergency, constitutes misconduct under the [FAA] if it excludes the presentation of evidence material and pertinent to the controversy thus prejudicing the parties in the dispute and making the hearing fundamentally unfair." *Bisnoff v. King*, 154 F. Supp. 2d 630, 638 (S.D.N.Y. 2001).

The CB&I Petitioners' other cases are similarly unhelpful.  *Iran Aircraft Industries v. Avco Corporation* involved a tribunal misleading a party into believing that it did not need to present actual invoices to substantiate its claim, but then rejecting that party's claim because it did not submit actual invoices.  980 F.2d 141, 146 (2d Cir. 1992).  And in *Chem-Met Co. v. Metaland International, Inc.*, the tribunal employed a summary judgment procedure that "effectively constituted a failure to hear material evidence," violating the applicable arbitration rules.  No. Civ.A. 96-02548, 1998 WL 35272368, at *4 (D.D.C. Mar. 25, 1998).  Similarly, in *Attia v. Audionamix Inc.*, the tribunal struck the affidavit of a party who was accused of evidence spoliation.  This Court found that was prejudicial error because "[t]here was no other witness equally 'competent to address the substantive core of [his] claims [refuting spoliation].'"  No. 14 Civ. 706, 2015 WL 5580501, at *8 (S.D.N.Y. Sept. 21, 2015) (alteration in original).

Here, the CB&I Petitioners have not shown that the Tribunal misled them, improperly used a summary judgment procedure, or excluded the testimony of a witness for which there was no one else "equally competent" to testify on key issues.  To the contrary, even though CB&I was able to present or cross-examine 42 witnesses at the hearing, Ex. 1 (Award) ¶ 129, the CB&I Petitioners are complaining that they were unable to cross examine two witnesses whose testimony

was not relied on by the Tribunal when issuing its Award.  The Tribunal did not "grossly and totally block[]" CB&I's "right to be heard" by admitting those witness statements on such a limited basis and not relying on them for any portion of the Award.  *See Oracle Corp.*, 276 F. Supp. 3d at 29 (emphasis omitted) (quoting *Stifel, Nicolaus & Co. v. Forster*, No. 14 Civ. 6523, 2015 WL 509684, at *5 (S.D.N.Y. Feb. 6, 2015)).  For the CB&I Petitioners to contend otherwise as their leading reason to vacate only demonstrates that their petition as a whole lacks merit.

**B.      The Tribunal's Management of Pre-Hearing Submissions Does Not Warrant Vacatur.**

The CB&I Petitioners next argue that the Tribunal committed misconduct by (1) failing to "enforce the Terms of Reference, Procedural Order No. 1 ("PO No. 1"), and the ICC Rules" in permitting Reficar to disclose its damages model at a later date than CB&I preferred, and (2) permitting Reficar to submit new evidence in its Third Written Submission.  MOL 23–29. These arguments, which reflect mere disagreements with the Tribunal's procedural decisions on pleadings, are as meritless as the CB&I Petitioners' lead argument.

Arbitral panels "possess broad latitude to determine the procedures governing their proceedings."  *Com. Risk Reinsurance Co. v. Sec. Ins. Co. of Hartford*, 526 F. Supp. 2d 424, 428 (S.D.N.Y. 2007).  In *Commercial Risk*, this Court evaluated whether the arbitral panel improperly excluded witness testimony about damages after it determined the witness was not on the witness list.  *Id.* at 428–29.  It found "no justification for going behind the arbitrators' interpretation and application of their procedural mandate so as to reexamine whether or not the panel's conclusion … [was] warranted."  *Id.*  The Court explained that "[s]uch a course would constitute an open invitation for courts either to second guess arbitrators' reading and application of the scope of their procedural rules, or to compel them, against the explicit mandate of applicable arbitration

doctrine, to articulate detailed explanations for any disputed procedural ruling." *Id.* (citing *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960)).

That is what the CB&I Petitioners are improperly requesting here.  They argue that Reficar's First Written Submission on April 28, 2017, lacked sufficient details on damages and causation, and the Tribunal erred by not granting CB&I some type of procedural relief in 2017. MOL 26–27.  A few record facts underscore the weakness of this argument:

- Under PO No. 1, the parties' First Written Submissions were expressly intended to be "non-exhaustive" because expert reports — the basis for damages in construction disputes — were to be provided with the *Second* Written Submissions. Ex. 15 (A-16) ¶ 19; Ex. 4 (PO No. 1 and Procedural Timetable Annex).

- Reficar's non-exhaustive First Written Submission was *324-pages in length* — more than four times the length of CB&I's non-exhaustive submission.  Ex. 16 (Reficar NSOC).

- Reficar's subsequent Second Written Submission, which included the expert reports on damages and causation as scheduled, was submitted on March 16, 2018 — more than *three years* before the hearing. Ex. 1 (Award) ¶ 53.

- CB&I subsequently had the opportunity to submit *responsive* experts reports with its Third Written Submission, which CB&I did in a substantial submission on June 28, 2019. Ex. 1 (Award) ¶ 54.

In light of this context, it is clear that CB&I did not suffer any prejudice and the Tribunal correctly rejected CB&I's baseless procedural complaint.  *See NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App'x 83, 88–89 (2d Cir. 2013) (refusing to vacate the arbitration award where petitioner did not identify why an evidentiary hearing on the issue of joint and several liability would have helped the arbitrators resolve the issue in petitioner's favor).  As the Tribunal explained in 2017:

> 19. PO 1 was issued after extensive exchanges between the Tribunal and the Parties.  The solution adopted by the Tribunal was carefully thought through:
>
> - The procedure would start with a Non-Exhaustive Statement of Claim and a Non-Exhaustive Statement of Counterclaim,
>
> - Followed by an extensive document production phase,

- Followed by Exhaustive Statements of Claim and Counterclaim, together with witness statements and expert reports to quantify the respective claims,

- And finally, an Exhaustive Reply to the counterparty's claims.

20. The Parties agreed to this scheme, which provides ample opportunity for each Party to present its case, and the Tribunal sees no reason to deviate from its original decision.

Ex. 15 (A-16) ¶¶ 19–20.  In short, it is simply not possible for the CB&I Petitioners to show that they were grossly and totally blocked from presenting their case when the Tribunal enforced the procedures agreed to by the parties and CB&I was allowed to respond to Reficar's damages model and causation evidence, which was disclosed more than three years before the hearing.

The CB&I Petitioners also argue that the Tribunal improperly allowed Reficar to submit unspecified "new evidence and new argument" in its Third Written Submission.  MOL 28–29.  But that vague reference is plainly insufficient to meet the CB&I Petitioners' heavy burden necessary given the deference owed to the Tribunal.  *Com. Risk Reinsurance Co.*, 526 F. Supp. 2d at 428 (arbitrators possess "broad latitude" to determine procedure and courts should not second guess that procedure).  Without specifying what the evidence might be, the CB&I Petitioners cannot possibly demonstrate the materiality and prejudice necessary to support its baseless suggestion that the hearing was fundamentally unfair.  *See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

In any event, here again, the CB&I Petitioners fail to acknowledge essential context for the procedural dispute that the Tribunal carefully resolved:  After the Third Written Submissions were submitted, *both* parties complained that the other side's submission contained new evidence or argument.  *See* Ex. 17 (C-84).  With regard to Reficar's Third Written Submission, the Tribunal

reviewed CB&I's complaint and determined that Reficar's submissions "*prima facie* **comply** with

PO No. 1, as they appear to rebut arguments and evidence submitted in [CB&I's] Second Written

Submissions." Ex. 18 (A-74) ¶ 23.  Nevertheless, the Tribunal concluded its analysis as follows:

> [T]he Tribunal is sensitive to the fact that both Parties have complained about
> allegedly new arguments and evidence presented by the counterparty in their
> Third Written Submissions. ... The Tribunal is also aware that it has a duty to
> ensure that both Parties are granted the widest opportunity to submit argument
> and to marshal evidence, in order to contradict those presented by the
> counterparty. … For the above reasons, the Tribunal decides to offer both
> Parties an exceptional and strictly limited opportunity: if either Party feels that,
> in order to properly present its case, it requires the chance to submit certain
> additional arguments or to marshal specific new evidence, to respond to
> allegedly new arguments or evidence submitted by the counterparty in the Third
> Written Submissions, it is invited to make a short submission to the Tribunal
> by November 8, 2019[.]

Ex. 18 (A-74) ¶¶ 37–40.  The Tribunal then granted CB&I the special right to file two new expert

reports with accompanying exhibits, three new fact witness statements with additional exhibits,

and two evidentiary guides from counsel, over Reficar's objection.  Ex. 6 (Communication A-85)

¶¶ 12–20.  These additional filings cured any possible prejudice that even potentially could have

resulted, even assuming Reficar's arguments were not proper rebuttal evidence.  And, in any event

and most importantly, CB&I's right to be heard was not "grossly and *totally* blocked."  That

standard can never be satisfied where a party is permitted, like CB&I, to submit several new filings

to respond to "new" evidence.  And if the CB&I Petitioners thought otherwise, they should have

raised the objection with the Tribunal rather than confirming there were "no due process issues"

for the Tribunal's consideration at the close of the evidentiary hearing.

In sum, the CB&I Petitioners' effort to frame two of the Tribunal's procedural rulings as

arbitral misconduct fails.  The Tribunal's decisions fell within the broad discretion provided to

arbitrators to run their own proceedings.  *See Com. Risk Reinsurance Co.*, 526 F. Supp. 2d at 430–

31.

### C.     The Tribunal's Decision to Hold More Than Six Weeks of Merits Hearings Does Not Warrant Vacatur.

The CB&I Petitioners argue that the Tribunal committed misconduct by "refusing to lengthen the [h]earing by a few weeks," MOL 33, even though the Tribunal provided CB&I more than six weeks (34 days) of hearing.  Precisely because "procedural questions that arise during arbitration … are left to the sound discretion of the arbitrator[s]," *Nat'l Football League*, 820 F.3d at 545, a refusal to extend a hearing "does not rise to the level of misconduct required to vacate an arbitration award."  *Odeon Cap. Grp., LLC v. Ackerman*, 182 F. Supp. 3d 119, 125–26 (S.D.N.Y. 2016) (finding that arbitrators' decision not to postpone a hearing was not a denial of fundamental fairness), *aff'd in part, vacated in part, remanded on other grounds*, 864 F.3d 191 (2d Cir. 2017).

The CB&I Petitioners have not cited any case where a court vacated an arbitration award because the arbitral panel did not grant an extension.  MOL 29–34.  Nor have they provided any reason this Court should second-guess the Tribunal's exercise of discretion.  CB&I initially agreed to a three-week hearing (15 days) with an additional week held in reserve.  Ex. 3 (R-16); Ex. 3 (Proposed PO No. 1 and Procedural Annex attached to R-16).  Largely at the request of CB&I, the original hearing schedule eventually *more than doubled*, with the Tribunal providing CB&I 34 days of available hearing time:  16 days during the first hearing block (only 15 of which the parties used); 16 days during the second block; and two days for closing arguments. Ex. 1 (Award) ¶¶ 113, 118, 129.

While it is true that CB&I requested even more time than the six-plus weeks the Tribunal ultimately provided, the Tribunal duly considered those requests and determined the hearing time was sufficient.  In fact, before CB&I's bankruptcy and the COVID-19 pandemic, the Tribunal had determined that four weeks was sufficient:

> The Tribunal has given significant thought to [CB&I's] request for an additional two weeks to be added to the Hearing, and has discussed the request at length

> during the conference call held on November 18, 2019.  After considering the
> Parties' proposed Hearing plans under a four and six-week scenario, the
> Tribunal has decided that six weeks is excessively long and unnecessary, and
> that four weeks is sufficient time for the Parties to properly present their case....
> The Tribunal has endeavored to provide additional time to the Parties which
> can be put towards the cross examination of fact witnesses. Should the Parties
> wish, the Tribunal is willing to sit on Saturdays, namely: April 25; May 2 and
> 23. This would provide the Parties with an extra three days, providing a total of
> 23 Hearing days.... The Tribunal considers this to be sufficient time for the
> Parties to properly examine fact and expert witnesses, and to properly present
> their case to the Tribunal.

Ex. 19 (A-78) ¶¶ 9–15.  Ultimately, the Tribunal provided even more time — 34 days of potential

hearing time — only 33 of which CB&I elected to use.  The CB&I Petitioners have provided no

authority that even remotely suggests that a hearing of that length is grounds for vacatur.  CB&I's

"right to be heard" was not "grossly and totally blocked," and the CB&I Petitioners have therefore

not carried the heavy burden necessary to show that the Tribunal engaged in misconduct.  *Oracle*

*Corp.*, 276 F. Supp. 3d at 29 (cleaned up).

## II.    The Tribunal Did Not Exceed Its Powers.

Section 10(a)(4) allows vacatur "where the arbitrators exceeded their powers."  9 U.S.C.

§ 10(a)(4).  But as the Supreme Court has explained, "[s]o long as the arbitrator was 'arguably

construing' the contract … a court may not correct his mistakes under § 10(a)(4)."  *Oxford Health*

*Plans LLC v. Sutter*, 569 U.S. 564, 572–73 (2013).  To secure vacatur on this ground, the CB&I

Petitioners "must do more than show that the arbitrator 'committed an error — or even a serious

error.'"  *Bergheim v. Sirona Dental Sys., Inc.*, 711 F. App'x 43, 45 (2d Cir. 2017) (quoting *Stolt-*

*Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).

The Second Circuit has "consistently accorded the narrowest of readings" to the FAA's

"authorization to vacate awards pursuant to § 10(a)(4)."  *Westerbeke*, 304 F.3d at 220 (cleaned

up).  Under the applicable standard, the first question is whether the particular issue was submitted

to the arbitrator.  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 161 (2d Cir. 2021),

*cert. denied*, 142 S. Ct. 2889 (2022).  If it was, then the only question for the Court is "whether the arbitrator[s] (even arguably) interpreted the parties' contract, not whether [they] got its meaning right or wrong."  *Id.* (quoting *Oxford Health Plans*, 569 U.S. at 569).  "Section 10(a)(4) does not permit vacatur for legal errors."  *Westerbeke*, 304 F.3d at 220.

The CB&I Petitioners contend that the Tribunal exceeded its powers by (1) refusing to compel Reficar to distinguish its claims between the Onshore and Offshore Contacts, and (2) ordering a virtual hearing over CB&I's objection.  Both arguments are founded on interpretations of the EPC Agreement and/or the ICC Rules made by the Tribunal, which precludes vacating the Award under § 10(a)(4).  *Westerbeke*, 304 F.3d at 220.

## A.    The Tribunal's Application of the Law Does Not Warrant Vacatur.

The CB&I Petitioners argue that the Tribunal did not distinguish which claims arose under Colombian law or New York law, but instead "created *its own law* with no power to do so." MOL 34–39 (emphasis in original). This argument is baseless for myriad reasons.

***First***, the specific assertion that the Tribunal "created its own law" by applying the "Heightened Diligence Obligation" and the "Reasonable Cost Obligation," MOL 34–39 (internal quotation marks and emphasis omitted), borders on the absurd.  As the Award made clear, those were terms used by the Tribunal as shorthand for two *written contractual provisions* found in the governing EPC Agreement:

> 882.  The precise wording of the ***Reasonable Cost Obligation*** is to be found in Section IV (on Pricing) of the Onshore and Offshore Agreements, which has an Appendix I (on Contractor's Fixed Fee, Rates and Management Fee):
>
> > "In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis [ ... ] and the amount payable shall be the Contract Price.  <u>Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner</u>" [Emphasis added].

****

2186.   The Parties agreed that CB&I would be bound by a ***Heightened Diligence Obligation*** under para. 3 of the Project Execution Plan:

"Even though a reimbursable contract CB&I project management will <u>rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if their own</u>" [Emphasis added].

Ex. 1 (Award) ¶¶ 882, 2186 (footnotes omitted); *see also* ¶ 873.  The CB&I Petitioners are thus effectively arguing that using defined terms as shorthand is "creating law."

***Second***, as to the question of whether Colombian or New York law (or both) applies to Reficar's claims, the parties submitted this issue, and the Tribunal resolved it by interpreting the applicable agreements.  The Award contains a 50-paragraph analysis under the heading "Law Applicable to the Dispute," *see* Ex. 1 (Award) ¶¶ 187–236 (citing the parties' briefing and the contract provisions on this issue), as well as related choice-of-law analysis throughout the Award, *see e.g.*, *id.* ¶¶ 2298–2304.  The Tribunal determined that the EPC Agreement allowed Reficar to bring its claims under Colombia law based on the Coordination Agreement and Dispute Resolution Agreement, *id.* ¶¶ 193–95, 212–14, 2300, 2304, and alternatively found no meaningful difference between applicable Colombian law and New York law, which were both applied to the facts at issue, *e.g.*, *id.* ¶¶ 216–26, 2244–70.  Because the Tribunal considered and interpreted the parties' contract, Section 10(a)(4) does not permit vacatur — *even if* the Tribunal "got its meaning … wrong."  *Beijing Shougang*, 11 F.4th at 161 (quoting *Oxford Health Plans*, 569 U.S. at 569); *Westerbeke*, 304 F.3d at 220.

***Third***, and in all events, the Tribunal got it exactly right.  Reficar brought its claims primarily under Colombian law, which it was contractually permitted to do:

- The Onshore and Offshore Agreements were substantively identical and only divided for tax purposes.

- The Coordination Agreement stipulated that the "liability and obligations of the Contractors under this Agreement and the Contracts shall be ***joint and several***," Ex. 20 (Coordination Agreement, JX-007) § 18.

- In light of this joint and several liability, CB&I UK and CBI Colombiana each expressly "under[took] not to allege that it [was] not liable in respect of a claim under the [Offshore or Onshore Contact] on the grounds that the claim should have been made under the [other Contract]," *id.* § 1.1, § 1.2.

- The Coordination Agreement further stipulated that the "use of a separate Offshore and Onshore Contract shall not … diminish the liabilities of any party in relation to the Project," *id.* § 3.7.1.

- The Dispute Resolution Agreement stipulated that "[t]he inter-related nature of the Project Agreements means that Disputes may arise under one Project Agreement which are related to Disputes which arise under one or more other Project Agreements, and ***it is in the interests of the Parties that such related Disputes be resolved in a consistent manner***," Ex. 20 (Dispute Resolution Agreement) at 1 ¶ B.

Moreover, Reficar also extensively briefed its claims under New York law and demonstrated how the result was the same under either law. *E.g.*, Ex. 21 (Reficar's Third Written Submission - Reply) ¶¶ 177–82, 197–202, 239–50, 892–94, 945–53, 957–61, 974–83. CB&I has never articulated how the application of one law over the other could impact the outcome of any disputed issue, and the Tribunal expressly found that the application of either law led to the same result. *E.g.*, Ex. 1 (Award) ¶¶ 216–26, 2244–70.

In short, the Tribunal's choice-of-law analysis was objectively correct. But even if that were not the case, the Tribunal interpreted the parties' agreements before deciding the issue. The CB&I Petitioners' dissatisfaction with the Tribunal's interpretation is simply not a ground for vacatur under this Circuit's law. *Beijing Shougang*, 11 F.4th at 161; *Westerbeke*, 304 F.3d at 220.

## B.   Holding a Virtual Hearing During a Pandemic Does Not Warrant Vacatur.

The CB&I Petitioners next contend that the Tribunal violated § 10(a)(4) by deciding to hold the hearing virtually because of the pandemic. MOL 39. This argument is also meritless.

*First*, the permissibility of a virtual hearing is a question of interpretation that was submitted to the Tribunal and extensively briefed by the parties. Ex. 22 (C-118); Ex. 23 (R-117). The relevant question is thus whether the Tribunal arguably interpreted the parties' agreement — not whether its interpretation was right or wrong. *Beijing Shougang*, 11 F.4th at 161. The Tribunal provided a *57-paragraph analysis* for its decision to hold the hearing remotely as a result of the pandemic, an analysis that included the Tribunal's detailed interpretations of the parties' Dispute Resolution Agreement, the ICC Rules, and the parties' joint hearing protocol. Ex. 24 (A-105) ¶¶ 20–76; *see also* Ex. 11 (A-133). The Tribunal's analysis goes well beyond the requirement to "arguably … interpret the parties' contract," which precludes the CB&I Petitioners' challenge here. *See Beijing Shougang*, 11 F.4th at 161 (finding vacatur under § 10(a)(4) unavailable where "arbitrators looked closely at the text of the Treaty in arriving at their decision, in line with customary approaches to treaty interpretation, while distinguishing competing interpretations in their analysis").

*Second*, the Tribunal decision was again objectively correct. Based on the ICC Rules and ICC Guidance Note on COVID-19, the Tribunal was empowered to order a virtual hearing because there was "no agreement by the Parties that would prohibit it from ordering … the hearing to be held by videoconference." Ex. 24 (A-105) ¶ 55. While Section 4.9 of the Dispute Resolution Agreement provides that "[t]he place and seat of arbitration shall be New York," it "*does not address* … whether the Tribunal can order that the First Block of the hearing be held virtually by videoconference." *Id.* ¶¶ 55–59. In contrast, the parties' Joint Proposal on Hearing Logistics permitted videoconference testimony of witnesses for "undue hardship or good cause." Ex. 25 (C-85 & R-89 attachment) at 4. The Tribunal correctly found that the COVID-19 pandemic satisfied this standard. Ex. 24 (A-105) ¶¶ 63–64; Ex. 11 (A-133) (acknowledging "the global delays in the

process of mass inoculation, the discovery of new strains of the SARS-CoV-2 virus and the lack of possibility to predict future government measures restricting public gathering and international travel").

*Third*, multiple courts have found that virtual arbitration hearings were permissible during the pandemic. *See Pipkin v. Nabors Indus., Ltd.*, No. 21-MC-156S, 2021 WL 9681373, at *6–7 (D. Wyo. Sept. 30, 2021); *Sanduski v. Charles Schwab & Co.*, No. 2:19-cv-01340, 2020 WL 4905537, at *5 (D. Nev. Aug. 20, 2020) ("Permitting Geddes to participate via telephone is likely a procedural alteration, which would not be grounds for vacatur. Accordingly, I find that the panel's denial of Sanduski's postponement request was not misconduct under § 10(a)(3)." (footnote omitted)). And this Court has rejected the proposition that "testimony via teleconference somehow moves a trial to the physical location of the testifying person." *Broumand v. Joseph*, 522 F. Supp. 3d 8, 23 (S.D.N.Y. 2021) (cleaned up) (analyzing Fed. R. Civ. P. 45(c)).

While the CB&I Petitioners rely on the Ninth Circuit's decision in *Polimaster Ltd. v. Rae Systems, Inc.*, 623 F.3d 832 (9th Cir. 2010), to argue the hearing could only occur in person, that case predates the COVID-19 pandemic by 10 years, did not involve a virtual hearing in lieu of a physical hearing, and did not involve a petition to vacate under § 10(a)(4). In fact, the CB&I Petitioners do not cite a single case from any jurisdiction holding videoconference proceedings to be improper in response to the COVID-19 pandemic.[5] And, in any event, "courts have no business overruling" an arbitral tribunal merely because the courts' "interpretation of the contract is

---

[5] The virtual hearing in this arbitration commenced in May 2021. By way of comparison, the Second Circuit did not allow the public even to access its courthouse until July 2021, and did not begin conducting in-person oral arguments until August 2021. Those in-person arguments lasted only a few months, and, in December 2021, the Second Circuit announced that it would return to remote hearings. The Court did not resume in-person hearings until February 2022. *See Announcements Archive: February 14, 2022 – Resumption of In-Person Court Proceedings and Other Court Operations at the United States Court of Appeals for the Second Circuit*, https://www.ca2.uscourts.gov/announcements_archive.html.

different." *Oxford Health Plans*, 569 U.S. at 572–73 (quoting *Enter. Wheel*, 363 U.S. at 599).  An arbitral tribunal's construction "holds, however good, bad, or ugly." *Id.*

III.    **The Tribunal Did Not Manifestly Disregard the Law.**

The CB&I Petitioners contend that the Tribunal manifestly disregarded the law because it "improperly converted the parties' cost–reimbursable contract into a guaranteed fixed-price contract" and "improperly applied a tort damages standard for damages for breach of contract" claim, "ignoring the parties' agreed upon liability cap."  MOL 45–49.  These arguments also fail.

"A litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those *exceedingly rare* instances where some *egregious impropriety* on the part of the arbitrator is apparent." *T.Co Metals*, 592 F.3d at 339 (citation omitted) (cleaned up).  The Second Circuit has recognized three elements that must be satisfied to prove that arbitrators acted with manifest disregard: (1) the law must be clear, as "misapplication of an ambiguous law does not constitute manifest disregard," (2) the law must have been "improperly applied, leading to an erroneous outcome," as courts must confirm the award "if a justifiable ground for the decision can be inferred from the facts of the case," and (3) the arbitrators must have had subjective intent to violate the law and not apply it "to the problem before [them]." *Id.* (quoting *Stolt-Nielsen*, 548 F.3d at 93).

The CB&I Petitioners' arguments that the distinguished Tribunal in this case intentionally and manifestly disregarded the law are utterly meritless.  The CB&I Petitioners make no meaningful showing that the law was clear or that the Tribunal subjectively intended to violate the law.  Even their suggestion that the Tribunal improperly applied the law has no merit.

***First***, contrary to their assertions, the Tribunal did *not* "convert[] the parties' cost-reimbursable contract into a guaranteed fixed-price contract."  MOL 45–46.  As the Award explained:

> *There is no dispute that the nature of the EPC Contract is that of a cost reimbursable agreement*, and that the essence of the Contract is that the Owner must reimburse the Contractor for the expenses incurred in the furtherance of the Project. And it is also undeniable that the EPC Contract includes the Cost Control Commitments, which form part of Section IV of the Onshore and Offshore Agreements and of the Project Execution Plan.

Ex. 1 (Award) ¶¶ 874–76. The CB&I Petitioners' real complaint is the Tribunal's factual findings establishing that CB&I grossly breached its Cost Control Commitments, which the CB&I Petitioners bizarrely describe as "fictional." MOL 45. As the Award explains in detail, the Cost Control Commitments were express *contractual* terms. Ex. 1 (Award) ¶¶ 863–86. For example, the Heightened Diligence Obligation was a binding contractual term in the Project Execution Plan by which CB&I agreed to "rigorously control cost and schedule similar to a lump sum contract safeguarding Reficar resources as if [CB&I's] own." *Id.* ¶¶ 868, 873 (emphasis omitted). In total, the Tribunal provided a *148-paragraph* analysis of the contractual Cost Control Commitments and how CB&I violated them. *Id.* ¶¶ 862–1010. The CB&I Petitioners may disagree with the outcome, but the Tribunal did not intentionally disregard the law.

**Second**, while the CB&I Petitioners complain about how the Tribunal calculated damages, they do not even attempt to identify what law has been "manifest[ly] disregard[ed]." MOL 46–47. The Award contains a *343-paragraph* analysis calculating the damages from CB&I's breaches of the Cost Control Commitments based on the terms of the EPC Agreement. Ex. 1 (Award) ¶¶ 1011–1354. Notably, if the CB&I Petitioners were correct that this damages methodology "unilaterally re-wrote the contract and overrode its essence by converting it into an effective lump sum agreement," MOL 47, the Tribunal should have awarded Reficar approximately $2.7 billion — the difference between CB&I's estimate incorporated into the EPC Agreement ($3.149 billion) and what Reficar actually paid ($5.908 billion). Instead, because the Tribunal provided numerous credits to CB&I in its detailed analysis, the Award found that Reficar was entitled to

only $845.4 million in damages from CB&I's breach of the Cost Control Commitments.  Ex. 1 (Award) ¶¶ 1013–15, 1351–54.

*Third*, contrary to the CB&I Petitioners' assertions, the Tribunal did not conclude that "CB&I acted with gross negligence / *culpa grave* without conducting any meaningful analysis." MOL 47–48.  The CB&I Petitioners feign outrage over the Tribunal's use of the Latin phase "*res ipsa loquitur*," but fail to quote the entirety of the paragraph where that phrase appears:

> *Res ipsa loquitur*: cost overruns amounting to more than USD 800 million and achieving Mechanical Completion two years after the guaranteed date to do so, with a year's time of solely-caused delays, can only be interpreted as the result of a reckless disregard for controlling costs and schedule.  ***There is ample evidence to prove this averment***:

Ex. 1 (Award) ¶ 2219.  The emphasized sentence is an important omission by the CB&I Petitioners.

In fact, the Award contains a *187-paragraph* analysis of the contractual liability cap, ultimately finding that the cap did not apply because CB&I's conduct amounted to ***both culpa grave*** under Colombian law and gross negligence under New York law.  Ex. 1 (Award) ¶¶ 2083–2270.  Some of the ample evidence cited by the Tribunal for its findings included:

- Witness statements confirming that CB&I acted as if all costs were reimbursable regardless of the level CB&I's performance, as admitted by CB&I's project director at the hearing.  *Id.* ¶¶ 2220–23.

- Contemporaneous project documents that demonstrated the same.  *Id.* ¶ 2224.

- A lack of evidence that CB&I took any efforts to control costs despite repeated requests from Reficar.  *Id.* ¶¶ 2225–29.

- Evidence that CB&I secretly profited from the extended duration and excess cost of the Project, including testimony from a former CB&I employee and an internal report prepared by CB&I.  *Id.* ¶¶ 2205–15.

- Evidence that CB&I was fully aware of the damage its conduct was causing, including personal liability to Reficar's officers.  *Id.* ¶¶ 2200–04.

- The fact that CB&I issued a purported Class 1 +/- 5% estimate in the middle of the project that proved false and misleading. *Id.* ¶¶ 2198–99.

- The fact that CB&I agreed to heightened standards of care toward Reficar, which were material obligations, and then knowingly breached them, by among other things, "knowingly submit[ting] unachievably optimistic predictions." *Id.* ¶¶ 2181–90.

As found by the Tribunal, "CB&I engaged in the <u>opposite</u> of an 'over-hasty pursuit' of its contractual obligations: it allowed for the delays to accumulate while at the same time benefitting from each day Mechanical Completion was pushed back in time, as proven by the evidence on record." *Id.* ¶ 2268 (emphasis added). These factual findings "are not subject to judicial challenge." *Westerbeke*, 304 F.3d at 214.

In sum, however much the CB&I Petitioners disagree with the outcome, the Tribunal did not manifestly disregard the law. The Award is plainly not one of "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[s] is apparent." *T.Co Metals*, 592 F.3d at 339 (quoting *Stolt-Nielsen*, 548 U.S. at 91).

## IV.    The Tribunal's Award Should Be Confirmed.

Because the CB&I Petitioners have failed to establish any basis for vacating the Award under the FAA, the award should be confirmed. Confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984), and the court "must grant" confirmation "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. Only "a barely colorable justification for the outcome reached'" by the arbitrators is necessary to confirm the award. *Landy Michaels Realty Corp. v. Loc. 32 B-32J*, 954 F.2d 794, 797 (2d Cir. 1992) (quoting *Andros Compania*, 579 F.2d at 704). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed 'if a ground for the arbitrator's decision can be

inferred from the facts of the case.'" *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 121 (2d Cir.1991)).

Here, the parties' disputes were submitted to ICC arbitration per the terms of the EPC Agreement.  Ex. 20 (DRA); Ex. 26 (Reficar RFA).  A distinguished Tribunal was appointed and approved without objection.  Ex. 27 (Compilation of Appointments of Arbitrators).  After seven years of work, the distinguished Tribunal then issued the Award in June 2023, within the timeline authorized by the ICC.  Ex. 28 (compilation of ICC extensions).  Because the Award contains 480-pages of detailed factual and legal analysis, it provides more than a "barely colorable justification" for the outcome.  *See Landy Michaels Realty Corp.*, 954 F.2d at 797 (internal quotation marks omitted).

## CONCLUSION

The Court should deny the petition to vacate and confirm the Award.  In addition, because the CB&I Petitioners have sought to prevent enforcement of the Award, the Court should award Reficar its attorney's fees for these proceedings.  Ex. 20 (Dispute Resolution Agreement, JX-007) § 4.22.

Dated: August 4, 2023

Respectfully submitted,

/s/ *Mike Stenglein*
Mike Stenglein (*admitted pro hac vice*)
Matthew Vandenberg (*admitted pro hac vice*)
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, Texas 78701
(512) 457-2000 (telephone)
mstenglein@kslaw.com
mvandenberg@kslaw.com

Adam L. Gray (*admitted pro hac vice*)
KING & SPALDING LLP
Al Fattan Currency House
Tower 2, Level 24
Dubai International Financial Centre
Dubai, UAE
971 4 377 9931 (telephone)
agray@kslaw.com

Ashley C. Parrish (*pro hac vice forthcoming)*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
(202) 626-2627 (telephone)
aparrish@kslaw.com

Randy M. Mastro
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
(212) 827-4019 (telephone)
rmastro@kslaw.com

**ATTORNEYS FOR RESPONDENT**
**REFINERÍA DE CARTAGENA S.A.S.**

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 4, 2023, I electronically served the foregoing document on all opposing counsel for Petitioners, and served CBI Colombiana S.A. through its agent for service of process.

/s/ Mike Stenglein
Mike Stenglein (*admitted pro hac vice*)