**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CHICAGO BRIDGE & IRON COMPANY
N.V. AND CB&I UK LIMITED,

                Petitioners,

      v.

REFINERÍA DE CARTAGENA S.A.S.,

                Respondent.

CASE NO. 1:23-cv-04825-GHW

**ORAL ARGUMENT REQUESTED**

---

**PETITIONERS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITION TO VACATE AND IN OPPOSITION TO REFICAR'S CROSS-PETITION TO CONFIRM**

# **TABLE OF CONTENTS**

Introduction.............................................................................................................1

Counterstatement of Facts......................................................................................2

Argument ...............................................................................................................5

    I.     Vacatur is warranted under Subsection (a)(4) because the Tribunal exceeded its powers. ..................................................................................7

           A.     The Tribunal ignored the Parties' choice of law.............................7

                  1.     The Parties chose New York law to govern four of their six contracts, but the Tribunal applied Colombian law instead............7

                  2.     The Tribunal used Colombian law to impose a fiduciary duty when New York law prohibited it.....................................................9

                  3.     The Tribunal used Colombian law to lift the damages cap when New York law prohibited it...................................................10

           B.     Despite Reficar's contentions, the Tribunal did more than construe the contracts. ....................................................................................14

           C.     Courts confronting similar situations have not hesitated to vacate awards. ................................................................................................16

           D.     In the alternative to vacatur, the Court should at a minimum modify the Award under 9 U.S.C. § 11(b). .........................................17

    II.     Vacatur is also warranted because the Tribunal manifestly disregarded the law.....................................................................................................18

           A.     The Tribunal manifestly disregarded the Parties' choice of New York law and its effect on the damages cap. ............................18

           B.     The Tribunal manifestly disregarded New York's and Colombia's prohibition on double recovery when it awarded liquidated damages and actual damages for the same breach.....................................20

           C.     The Tribunal manifestly disregarded New York's prohibition on re-writing contracts when it turned a cost-reimbursable agreement into a fixed-price one. ...............................................................................24

III.    Vacatur is warranted under Section 10(a)(3) because the Tribunal's procedural decisions deprived CB&I of a fair hearing. ...........................................28

        A.    The Tribunal deprived CB&I of a fair hearing by considering and relying on evidence from two witnesses CB&I could not cross-examine. ................................................................................................29

        B.    Reficar's arguments to the contrary ring hollow. .....................................33

        C.    Vacatur is the appropriate remedy. ...........................................34

Conclusion ...............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander Julian, Inc. v. Mimco, Inc.*,
   29 F. App'x 700 (2d Cir. 2002) ..............................................................34

*American Tel. & Tel. Co. v. City of N.Y*,
   83 F.3d 549 (2d Cir. 1996).............................................13, 14, 19, 20

*Asian Vegetable Rsch. and Development Ctr. v. Inst. of Intern. Educ.*,
   944 F. Supp. 1169 (S.D.N.Y. 1996)..................................9, 13, 19, 20

*Assocs. v. Alemayehu*,
   934 F.3d 245 (2d Cir. 2019)...................................................................7

*Attia v. Audionamix Inc.*,
   No. 14 CIV. 706 RMB, 2015 WL 5580501 (S.D.N.Y. Sept. 21, 2015) ...............................28

*Banco de Seguros del Estado v. Mutual Marine Off., Inc.*,
   344 F.3d 255 (2d Cir. 2003).................................................................6

*Beijing Shougang Mining Inv. Co. v. Mongolia*,
   11 F.4th 144 (2d Cir. 2021) ................................................................15

*Bruno's, Inc. v. United Food and Com. Wkrs. Int'l.*,
   858 F.2d 1529 (11th Cir. 1988) .........................................................33

*Capstone Bldg. Corp. v. Mid- Atl. Mech. Inc.*,
   No. 08-cv-1157-JHH, 2008 WL 11379868 (N.D. Ala. Nov. 12, 2008) ...............................16

*Carvel Corp. v. Eisenberg*,
   692 F. Supp. 182 (S.D.N.Y. 1988) .....................................................19

*Chem-Met Co. v. Metaland Int'l, Inc.*,
   1998 WL 35272368 (D.D.C. March 25, 1998).........................28, 29, 33

*Cofinco, Inc. v. Bakrie & Bros., N. V.*,
   395 F. Supp. 613 (S.D.N.Y. 1975) .....................................................28

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
   393 U.S. 145 (1968).............................................................................5

*Derewecki v. Pa. R.R. Co.*,
   353 F.2d 436 (3d Cir. 1965)........................................................29, 34

iv

*Detone v. Bullit Courier Serv., Inc.*,
    140 A.D.2d 278 (N.Y. App. Div. 1988) ............................................................13, 19

*DFP Mfg. Corp. v. Northrop Grumman Corp.*,
    No. 97 Civ. 4494, 1999 WL 33458384 (E.D.N.Y. Mar. 23, 1999) .........................10

*Edstrom Indus., Inc. v Companion Life Ins. Co.*,
    516 F.3d 546 (7th Cir. 2008) ....................................................................................16

*Eljer Mfg., Inc. v. Kowin Dev. Corp.*,
    14 F.3d 1250 (7th Cir. 1994) ...............................................................................20, 23

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ...............................................................................................5

*Firstman v. Credit Suisse Sec.*,
    No. 19-CV-04025-CAP, 2020 WL 10456852 (N.D. Ga. June 20, 2020) ...............16

*GFI Brokers, LLC v. Santana*,
    No. 06-CV-3988 (GEL), 2008 WL 3166972 (S.D.N.Y. Aug. 6, 2008) ..................22

*Goldberg v. Nugent*,
    No. 601076/10, 2010 WL 9039501 (Sup. Ct., N.Y Cnty. Dec. 03, 2010) .............23

*Goldman v. Architectural Iron Co.*,
    306 F.3d 1214 (2d Cir. 2002) ....................................................................................23

*Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*,
    979 F. Supp. 2d 385 (S.D.N.Y. 2013) ........................................................................8

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (N.Y. 2002) .....................................................................................24

*Hayes v. Delbert Servs. Corp.*,
    811 F.3d 666 (4th Cir. 2016) ......................................................................................7

*Henneberry v. Sumitomo Corp. of Am.*,
    532 F. Supp. 2d 523 (S.D.N.Y. 2007) ......................................................................10

*Hormel Foods Sales, LLC v. Ship Side Food Serv., Inc.*,
    No. 16-CV-1595 (LDH), 2017 WL 9732058 (E.D.N.Y. Sept. 29, 2017) .................7

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Loc. 901*,
    763 F.2d 34 (1st Cir. 1985) .........................................................................................6

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) ...............................................................................................5

*Lee v. Consol. Edison Co.*,
    95 Misc. 2d 120 (N.Y. Civ. Ct. 1978) ............................................................................13, 20

*Levitt Corp. v. Levitt*,
    No. 78 C 1531, 1978 WL 21377 (E.D.N.Y. Aug. 29, 1978), *aff'd*, 593 F.2d
    463 (2d Cir. 1979) ..........................................................................................................23

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011) ............................................................................................24

*N.Y. Cardiothoracic Surgeons, P.C. v. Brevetti*,
    208 A.D.3d 1241 (2d Dept. 2022) .................................................................................23

*On Time Staffing, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    784 F. Supp. 2d 450 (S.D.N.Y. 2011) .............................................................................6

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
    497 F.3d 133 (2d Cir. 2007) ..............................................................................6, 18, 20

*Sawtelle v. Waddell & Reed*,
    304 A.D.2d 103 (1st Dept. 2003) ..................................................................................23

*Schwartz v. Merrill Lynch & Co.*,
    665 F.3d 444 (2d Cir. 2011) ....................................................................................23, 25

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) ...................................................................................................5, 28

*Tempo Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16 (2d Cir. 1997) ...............................................................................................6

*U.S. Fid. & Guar. v. Braspetro Oil Servs.*,
    369 F.3d 34 (2d Cir. 2004) .............................................................................................20

*United States v. Fitzpatrick*,
    437 F.2d 19 (2d Cir. 1970) ......................................................................................29, 34

*Waehner v. Frost*,
    1 Misc. 3d 893 (N.Y. Sup. Ct. 2003) .............................................................................20

*Wallace v. Buttar*,
    378 F.3d 182 (2d Cir. 2004) .............................................................................................6

*Westerbeke Corp. v. Daihatsu Motor Co.*,
    304 F.3d 200 (2d Cir. 2002) ...........................................................................................15

*Woodling v. Garrett Corp.*,
    813 F.2d 543 (2d Cir. 1987) .......................................................................................7, 19

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us,*
    126 F.3d 15 (2d Cir. 1997)..................................................................................17

**Statutes**

9 U.S.C. § 3 ............................................................................................................5

9 U.S.C. § 4 ............................................................................................................5

9 U.S.C. § 10 ....................................................................................................5, 17

9 U.S.C. § 10(a)(3) ........................................................................................ *passim*

9 U.S.C. § 10(a)(4) ................................................................................6, 7, 15, 16

9 U.S.C. § 11 ....................................................................................................5, 17

9 U.S.C. § 11(b) ...................................................................................................17

Colombian Civil Code, Art. 1592 .........................................................................20

Colombian Civil Code, Art. 1600 .........................................................................21

**Other Authorities**

Restatement (Second) of Conflict of Laws §§ 187, 207 (Am. L. Inst. 1971)................................8

## INTRODUCTION

In the seven years just before the $937 million breach-of-contract Award at issue in here, outside the arbitration proceedings, chaos reigned. The Colombian government's equivalent to the Office of the Attorney General raided CB&I Colombiana's offices, took computers and documents, and indicted and arraigned CB&I's Project Director and its CEO. Ex. 96; Ex. 97 at 124. A Colombian judge asked Interpol to issue a "blue notice" for CB&I's Project Director—an alert circulated to law enforcement to find a person of interest in a criminal investigation. Ex. 98. And the Colombian foil to a Comptroller General charged four CB&I entities for financial responsibility, then, at Reficar's request, recommended a disciplinary and criminal investigation of CB&I's attorneys. Ex. 97 at 123; Ex. 24.

Despite these distractions, the Parties made it through a hearing on the merits, and the admittedly well-qualified Arbitration Tribunal produced a multi-hundred-page Award. But that decision was deeply flawed. The Tribunal relied on Colombian law when four of the Parties' six contracts chose New York law to govern, and over $120 million of damages depended on those contracts. Yet sometimes, the Tribunal never consulted New York law. Other times, it grafted Colombian legal principles onto a New York analysis without checking if they held true. And still other times, it said Colombian law and New York law were the same when they were not.

This deviation from the Parties' agreement is not what CB&I consented to, and no matter how hard the Tribunal worked—or how thorough it purported to be—its venture past its powers cannot stand. Unable to deny this journey beyond the boundaries, Reficar instead insists there is nothing this Court can do because the Tribunal simply construed the Parties' contracts. Reficar is wrong. Application of New York law was a condition to abide by, not a dispute to resolve. By using Colombian law when New York law controlled, the Tribunal exceeded its authority.

That is not the only error. The Tribunal also manifestly disregarded the law. It wrote into

the Parties' contract a fiduciary duty the creation of which New York law prohibited. It shifted the burden of proof to CB&I when New York law required it to stay with Reficar. It exceeded the damages cap after using res ipsa loquitur and the degree of harm Reficar suffered to find gross negligence—when New York law forbade relying on either to make such a finding. It awarded double delay damages, one liquidated, the other actual, when both New York and Colombian law said no. And it ignored the plain language of the Parties' contract—in contravention of bedrock principles of New York contract interpretation—to recast the Parties' accord as a fixed-price agreement when the Parties chose a cost-reimbursable structure. Reficar, for its part, responds that CB&I simply disagrees with the outcome. CB&I *does* disagree with the outcome. But so does New York law (and in one instance, Colombian law), and that is what matters.

And that is not all. The Tribunal deprived CB&I of a fair hearing as well. It accepted, considered, and relied on witness statements from two key witnesses who agreed to testify in person but backed out—one of them four days before the hearing, the other four days into it. This change of heart robbed CB&I of the chance to cross-examine them. But Reficar suggests it was no big deal because, it says, CB&I can show no harm. The Tribunal never cited those two statements, Reficar points out, but it did cite the statements of other witnesses whom CB&I could cross-examine. If all witnesses were just as interchangeable, Reficar might have a point. But they were not; the witnesses in question were among the most important in the case. So for two stars of Reficar's show, the greatest legal engine for the discovery of truth sat idle.

For all these reasons, vacatur is required.

## COUNTERSTATEMENT OF FACTS

Before exploring the nuances of the Federal Arbitration Act and why they mandate vacatur, CB&I must set the record straight on four points.

First, Reficar argues that CB&I's counsel "confirm[ed] there were 'no due process issues'

for the Tribunal's consideration at the close of the evidentiary hearing." Opp. 21. That is misleading. CB&I objected on due process grounds repeatedly throughout the proceedings.[1] And the colloquy Reficar excerpts followed a long argument on precisely the due process issue CB&I now raises: the Tribunal's refusal to exclude the testimony of Christian Mantilla and Andrés Riera when CB&I was deprived of the opportunity to cross-examine them. Just four pages earlier in the same transcript Reficar cites, CB&I's counsel asked the Tribunal about the appropriate use of Mantilla's testimony, in part because it was a due process issue:

> We would like to know to what extent we can call into question as to the appropriate use or weight of Mr. Mantilla's testimony, not just with respect to his testimony but its ramifications for the experts because I think this is intrinsically a due process issue.

Ex. 29 at 6920:24–6921:5 (emphasis added); *see also id.* 6902:6–6906:3 (argument on the Tribunal's consideration of Mantilla's and Riera's witness statements).

This context reveals the Tribunal was permitting the Parties to raise *additional* due process issues. Indeed, the Tribunal asked a similar question after closing arguments on the final day of the merits hearing: "Do either of the parties have any procedural issue, any issue of due process that they would like to raise *at this stage*? This is the last moment that if there is any question of due process, you should raise it now with the Tribunal so that we can take corrective actions." Ex. 105 at Tr. 7238:18–24 (emphasis added). CB&I's counsel responded: "Nothing from [CB&I] other than the points we have made throughout the proceeding," to which the Chairman acknowledged,

---

[1] *See, e.g.*, Ex. 39 at 4724:20–4725:1 ("…CB&I has an objection. Mr. Mantilla did not appear to testify and I have to object to using an expert to substitute for that testimony."); Ex. 56 at 2 ("The right to cross-examine a witness is fundamental to basic principles of due process and equality of arms. These witnesses' refusals to testify, especially considering the timing, has not only effectively eliminated CB&I's opportunity to meaningfully challenge these witnesses' testimony, but also the testimony of other Reficar witnesses that CB&I did not call to be cross-examined due to the time constraints of the Hearing"); Ex. 99 at 537:2–17 (objection to Reficar's request to shift burden of proof); Ex. 100 at 2 (objection to due process infringements created by virtual hearing); Ex. 71 at 1 (objection to deprivation of due-process rights created by shortened hearing schedule); Ex. 70 at 1 (same); Ex. 72 at 2 (same); Ex. 101 (objections to due process issues raised by Colombian government interferences); Ex. 102 at 10 (same); Ex. 103 at 1 (same); Ex. 104 at 3 (same).

"[v]ery good." *Id.* at 7239:11–15.

Second, Reficar claims that "CB&I initially agreed to a three-week hearing (15 days) with an additional week held in reserve." *See* Opp. 7, 22. CB&I agreed to that framework as a placeholder, at the very beginning of the proceeding—before Reficar disclosed its damages method and causation theories.[2] But when Reficar's multi-billion-dollar claims came in, CB&I requested six full weeks.[3]

Third, Reficar suggests that "the Tribunal provided CB&I more than six weeks [] of hearing," Opp. 22, which Reficar says gave "CB&I 34 days of available hearing time...," *id.* The Tribunal measured by hours, not by weeks or days, and it required the Parties to split the time evenly. Rather than having 34 days, then, CB&I had 85 hours of testimony time, or the equivalent of roughly 12 standard seven-hour hearing days. That covered both direct and cross-examination for all fact and expert witnesses. And the hearings lasted six calendar weeks because the panel opted to reduce each hearing day to just five hours of testimony. Pet'rs' Br. 30.

Finally, when identifying the reasons Mantilla and Riera gave for refusing to attend the arbitration, Reficar says that both "were not Reficar employees" but "were charged in the Contraloría proceeding." Opp. 15. Riera, however, *was* a Reficar employee during the Project, and his successor employer is Reficar's wholly owned parent, Ecopetrol.[4] And Mantilla was neither investigated nor charged by the Contraloría.[5] His employer, Foster Wheeler/PCIB, was.

---

[2] *See* Ex. 106 dated October 20, 2016 ("…as the Respondents have explained previously, the timetable is driven in significant part by the fact that the Claimant has not set out the scope and extent of its case with the particularity necessary for the Respondents to begin preparing their defense, despite the fact that [Claimant] has been preparing its case for years."); *see also* Pet'rs' Br. 27-28.

[3] *See* Ex. 71, Ex. 70, Ex. 72, Ex. 73, and Ex. 74 (CB&I requests for adequate hearing time).

[4] Ex. 52 at ¶¶ 6-7 (Riera was a Reficar employee through September 2016); *see also* Ex. 15 (Contraloría investigations initiated in January 2016).

[5] Ex. 18 at 6 (naming Riera as a subject of investigation).

## ARGUMENT

Reficar boasts of an easy path to confirmation and derides CB&I for allegedly falling short of what Reficar calls a "very high" burden for securing vacatur. Opp. 11. Some of CB&I's arguments, it says, do not "withstand even minimal scrutiny." *Id*. at 13. Others it calls "meritless" or "baseless." *Id*. at 3, 18, 26, 29 (meritless); *id*. at 19, 20, 24 (baseless). In attaching these easy-to-reach but unhelpful labels, however, Reficar ignores key concepts from Arbitration 101.

The Federal Arbitration Act's "first" and "foundational" principle is that "arbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1415 (2019). The FAA requires courts to "rigorously...enforce arbitration agreements according to their terms, including...the rules under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (emphasis omitted). This focus on the terms of the parties' agreement is evident throughout the FAA's provisions. Section 3 requires courts to stay litigation of arbitrable claims "in accordance with the terms of the [arbitration] agreement." 9 U.S.C. § 3. Section 4 emphasizes the court's duty to compel arbitration "in accordance with the terms of the [arbitration] agreement." 9 U.S.C. § 4. And Sections 10 and 11, respectively, empower courts to vacate and modify awards when arbitral proceedings deviate from the terms of the parties' agreement. 9 U.S.C. §§ 10.

These provisions embody an overarching federal policy "to give effect to the intent of the parties" as reflected in their arbitration agreement. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 684 (2010). Congress recognized that parties would not consent to submit their disputes to arbitration, where arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review," without a baseline guarantee of fairness. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968) (plurality op.).

So Congress empowered courts to vacate arbitration awards "where the arbitrators

exceeded their powers...." 9 U.S.C. § 10(a)(4). This can occur when the arbitrator touches an issue the parties' contract puts out of reach. *See On Time Staffing, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 784 F. Supp. 2d 450, 454 (S.D.N.Y. 2011). It can also happen when "the arbitral award is merely the arbitrators' own brand of justice." *Banco de Seguros del Estado v. Mutual Marine Off., Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (cleaned up).

And when arbitrators are guilty of misconduct or "of any other misbehavior by which the rights of any party have been prejudiced," vacatur of an award is also appropriate. 9 U.S.C. § 10(a)(3). Within this ground for vacatur resides the concept of fundamental fairness. It requires each party must have an "adequate opportunity to present its evidence and arguments." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20–21 (2d Cir. 1997); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Loc. 901*, 763 F.2d 34, 39–40 (1st Cir. 1985). Without it, an arbitration award must fall. *Tempo*, 120 F.3d at 21.

Then there is manifest disregard for the law. It sits as another reason for vacatur beyond the FAA's four statutory grounds. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133 (2d Cir. 2007). And it occurs when (1) arbitrators know of a governing legal principle yet refuse to apply it or ignore it altogether and (2) the ignored legal principle is well defined, explicit, and clearly applicable to the case. *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004).

Here, each of these grounds for vacatur applies. The Tribunal exceeded its authority by applying Colombian law when the Parties' contracts called for New York law. The Tribunal manifestly disregarded the law by using shortcuts the law prohibits. And the Tribunal deprived CB&I of a fair hearing by considering and relying on the testimony of key witnesses CB&I could not cross-examine.

I.    **Vacatur is warranted under Subsection (a)(4) because the Tribunal exceeded its powers.**

A.    **The Tribunal ignored the Parties' choice of law.**

Arbitrators must apply the law the parties choose. That's because arbitration is "a matter of consent." *Dr.'s Assocs. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (internal quotation marks omitted). Parties are "free within bounds to use a choice of law clause in an arbitration agreement to select which local law will govern the arbitration," and such provisions "bring a welcome measure of predictability and thus efficiency to the dispute resolution process." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016). So parties set the rules, and arbitrators follow them. When arbitrators break those rules, however, they go beyond the parties' consent. Or, to use Congress's chosen words, they "exceed their powers." 9 U.S.C. § 10(a)(4). That's what happened here.

1.    **The Parties chose New York law to govern four of their six contracts, but the Tribunal applied Colombian law instead.**

The Parties drafted, negotiated, and executed six contracts: the Onshore Agreement; the Offshore Agreement; the Onshore Parent Guarantee; the Offshore Parent Guarantee; the Coordination Agreement; and the Dispute Resolution Agreement. Award ¶¶ 189–192. In all but the Onshore Agreements, the Parties picked New York law to govern. *Id.* That choice, in turn, meant the Tribunal had to apply New York law when interpreting those contracts.

The Tribunal's obligation extended beyond merely interpreting the contracts, too. For the aspects of Reficar's claims that involved the four New York specific agreements, the Tribunal had to apply New York law throughout its entire analysis. *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987). The elements of the claim, the burden of proof, the standard of proof, affirmative defenses, damages—New York law governed all of it, so from New York law the Tribunal could not stray. *See, e.g.*, *Hormel Foods Sales, LLC v. Ship Side Food Serv., Inc.*, No. 16-

CV-1595 (LDH), 2017 WL 9732058, at *3 (E.D.N.Y. Sept. 29, 2017) (stating the elements of a breach-of-contract claim under the law of the jurisdiction selected by a choice-of-laws clause); *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 392-93 (S.D.N.Y. 2013) ("[W]here parties have validly chosen a state's law 'to govern their contractual rights and duties,' that...substantive law will govern '[t]he measure of recovery for a breach of contract.'") (quoting Restatement (Second) of Conflict of Laws §§ 187, 207 (Am. L. Inst. 1971)).

And New York law mattered, not only in the proceedings generally but also for the outcome the Tribunal reached. Reficar brought and succeeded on breach-of-contract claims related to cost overruns. Award ¶ 2500.3. In its arbitration demand, it never identified which contracts it was claiming CB&I breached by incurring which categories of costs. But in its post-hearing brief, it admitted that at least $122 million of the damages it sought stemmed from CB&I's obligations under the Offshore Agreement:

### Offshore Contract (U.S. Dollars)

| Category of Unreasonable Cost | USD Amount |
| --- | --- |
| 2. Engineering Productivity | $102.39M |
| 14. Module Fabrication Productivity | $20.06M |

Ex. 107 at 191. Reficar also brought and succeeded on breach-of-contract claims related to schedule delay, encompassing the added time it took for CB&I to complete work that fell under the Offshore Agreement.

New York law was therefore integral to the dispute, but the Tribunal wandered to Colombian law primarily and repeatedly. Its deviation from the Parties' chosen path appears at Paragraph 193 of the Award. There, the Tribunal cited Sections 4.1 and 4.2.2 of the Coordination Agreement, in which the Parties agreed that neither side could escape liability by arguing that the other side brought a claim under the wrong contract. These provisions, as even Reficar concedes, Opp. 25–26, stems from the imposition of joint and several liability on CB&I entities. Yet the

Tribunal used them to conclude that what law it applied didn't matter. "Since it was the Parties' intention that liability be enforced, even if claimed under the wrong Contract," the Tribunal reasoned, "it naturally follows that the same should result if the claim is brought under the wrong applicable law." Award ¶ 194. The Tribunal later relied on this logic to apply Colombian legal principles broadly—even when New York law governed.

> **2.    The Tribunal used Colombian law to impose a fiduciary duty when New York law prohibited it.**

Recall that the Tribunal held CB&I liable for breaching what it termed two "Cost Control Commitments." Award ¶ 265. One it described as a "Reasonable Cost Obligation." *Id*. ¶ 882. The other, it said, was a "Heightened Diligence Obligation." *Id*. ¶ 868.

The latter obligation, the Tribunal held, was a fiduciary one. It reached that conclusion by looking to a single sentence from a Project Execution Plan, which was attached as part of an annex to two of the contracts that made up the overarching deal. The sentence read: "Even though a reimbursable contract[,] CB&I project management will rigorously control cost and schedule similar to a lump sum contract[,] safeguarding Reficar resources as if their own." *Id*. That language, the Tribunal said, "put[] CB&I in a position like that of a mandatary (mandatario) in a mandate contract (contrato de mandato)." *Id*. ¶ 869. And as a mandatary, the Tribunal continued, "CB&I agreed that its contractual role would not be that of a mere contractor, without any fiduciary duty vis-a-vis Reficar...." *Id*. ¶ 871. Thus, the Tribunal felt, "CB&I accepted...a fiduciary obligation that all costs decisions taken must safeguard Reficar's resources as if its own." *Id*.

But there was a problem: The Project Execution Plan was attached to the Offshore Agreement. New York law governed that accord, Award ¶ 191, and, "absent extraordinary circumstances," it prohibits the creation of a fiduciary relationship when "parties deal at arm's length in a commercial transaction." *Asian Vegetable Rsch. and Development Ctr. v. Inst. of Intern.*

9

*Educ.*, 944 F. Supp. 1169, 1179 (S.D.N.Y. 1996).[6] But the Tribunal never considered New York law, much less whether the Parties dealt at arm's length (they did)[7] or whether extraordinary circumstances existed (they did not).[8] Instead, in the three pages the Tribunal spent outlining the so-called Heightened Diligence Obligation and why it created a fiduciary duty, the Tribunal stuck solely to Colombian law. *See* Award ¶¶ 868–881.

The upshot of the Tribunal's decision was devastating. It judged CB&I on a body of law to which CB&I had not consented—and on a fiduciary obligation that New York law forbade creating.

### 3. The Tribunal used Colombian law to lift the damages cap when New York law prohibited it.

The Tribunal's use of Colombian law pervaded the rest of its ruling. One affected aspect was the damages cap. For CB&I's potential aggregate liability, the Parties set a ceiling: $70 million, with an additional $15.75 million for delay liquidated damages if the non-delay damages used up the initial amount. Award ¶ 2107. But Reficar could go beyond the cap if it proved "liability arising from any fraud, Gross Negligence, or Willful Misconduct...." *Id.* ¶ 2108. The Award totaled $937 million—far beyond the limit for ordinary breaches. Award ¶ 2500.13.

To grant Reficar nearly $1 billion in damages, the Tribunal again looked to Colombian law. This time, it focused on the Colombian equivalents of fraud, gross negligence, and willful misconduct: *fraude*, *culpa grave*, and *dolo*. It did so because it thought the Spanish versions of

---

[6] *See also Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 550 (S.D.N.Y. 2007) ("parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation, absent extraordinary circumstances") (citation omitted); *DFP Mfg. Corp. v. Northrop Grumman Corp.*, No. 97-CV-4494, 1999 WL 33458384, at *9 (E.D.N.Y. Mar. 23, 1999) ("Generally, commercial transactions do not create fiduciary obligations, absent express language in the contract, or a prolonged prior course of dealings between the parties establishing a fiduciary relationship.").

[7] Award ¶ 699 (Reficar was a "highly sophisticated party advised by multiple qualified experts"); *id.* ¶ 746 (Reficar "was advised by a professional law firm, Linklaters"); *id.* ¶ 680 (Reficar was "a highly experienced operator of refineries").

[8] *See generally* Ex. 107 and Ex. 108 (neither mentioning extraordinary circumstances being present).

both the Onshore and the Offshore Agreements used those terms:

> Colombian law will take precedence in the Tribunal's analysis of *culpa grave*/gross negligence and *dolo*/willful misconduct: the Onshore Contract specifically references the CCC and, since the Offshore Contract does not define *culpa grave/gross* negligence and equates willful misconduct with *dolo,* the Tribunal will interpret both legal concepts under Colombian law.

Award ¶ 2114. (The Offshore Agreement, however, does not mention *culpa grave* or *dolo*.)

Then, with those Colombian legal concepts in mind, the Tribunal turned to the damages cap. Four aspects of its analysis warrant discussion here: the burdens of proof it assigned to each party; the test it fashioned for assessing *culpa grave*; its use of res ipsa loquitur, and the reappearance of the fiduciary duty that it found lurking in an annex to the Parties' contracts.

*Burden*. "[U]nder Colombian law, the Tribunal noted, "in contractual relations there is a presumption of *culpa:* it rests on the defendant to prove that [it] applied the requisite standard of care." Award ¶ 2138. That meant "CB&I was under the presumption of having been negligent in the performance of the EPC Contract," which in turn meant that all Reficar had "the burden of proving" was "that CB&I breached its obligations...with *culpa grave*...." *Id*. ¶ 2141.

*Test*. After detailing what various Colombian authorities had to say about *culpa grave*, *id*. ¶ 2155-2177, the Tribunal fashioned its own test. It looked to (1) the significance of the breached obligation; (2) the scope of the damage caused by the breach; and (3) the attitude shown by the party in breach toward the foreseeable damage. *Id*. ¶ 2178.

The Tribunal found that the first factor suggested that CB&I acted with *culpa grave*. It pointed to the Cost and Schedule Control Commitments, which it viewed as essential obligations. The Tribunal also referred to CB&I's fiduciary duty to Reficar, which it thought spoke "to a heightened level of legitimate trust that Reficar could and did place on CB&I's representations as to the estimated Project costs and Mechanical Completion date...." Award ¶¶ 2182, 2185, 2188.

On the second factor, the Tribunal found that it, too, suggested *culpa grave* given how long beyond the initial projection CB&I took to complete the Project and the added profit CB&I earned when the Project exceeded that projection, both of which led to a high total amount of damages awarded (even though a damages-cap analysis is a predicate to arriving at a final damages amount). *Id*. ¶¶ 2192-2215. On the third factor, the Tribunal turned to res ipsa loquitur.

Res Ipsa Loquitur. When assessing CB&I's attitude (the third factor of the test for *culpa grave*), the Tribunal started by framing the issue in terms that resembled what one might expect to see: "whether in failing to safeguard Reficar's resources, CB&I deployed a degree of care that was below the standard expected from a negligent or imprudent person." *Id*. ¶ 2218. But then the Tribunal took a shortcut. Citing the doctrine of res ipsa loquitur, the Tribunal said that the size of the cost overruns and delays spoke for themselves:

> Res ipsa loquitur: cost overruns amounting to more than USD 800 million and achieving Mechanical Completion two years after the guaranteed date to do so, with a year's time of solely-caused delays, can only be interpreted as the result of a reckless disregard for controlling costs and schedule.…

*Id*. ¶ 2219.

*Fiduciary Duty*. After emphasizing the size of the cost overruns and delay, the Tribunal offered three more reasons for a finding of *culpa grave*—all of which depended on the fiduciary duty the Tribunal previously imposed. The Tribunal cited testimony of and about CB&I's highest officer on the Project, which the Tribunal thought established that CB&I exercised "no degree of care...when incurring costs." Award ¶ 2223. It also mentioned CB&I's communications during the Project, which the Tribunal said "prove[d] that [CB&I] believed to be entitled to all costs submitted for reimbursement, according solely to its judgment, and regardless of its duty of care." *Id*. ¶ 2224. And the Tribunal pointed to the lack of any cost mitigation measures, which it felt showed that "CB&I did not believe it was breaching the Contract" and "did not contemplate increasing costs

as damages." *Id.* ¶ 2225. "[H]ad CB&I treated the Project as a lump sum contract in which cost overruns risks lay with CB&I—as it should, according to the Cost Control Commitments," the Tribunal noted, "costs would not have increased the way they did." *Id.* ¶ 2226.

These four aspects of the Tribunal's reasoning lacked a basis under New York law. Start with burden. In New York, "[n]egligence...is not presumed. It must be proved by the plaintiff, and it must be proved by a preponderance of the evidence." *Detone v. Bullit Courier Serv., Inc.*, 140 A.D.2d 278, 280 (N.Y. App. Div. 1988). Next, consider the test for gross negligence. It looks nothing like the three factors the Tribunal fashioned for assessing *culpa grave*. Decisionmakers assessing gross negligence may not consider the extent of the harm suffered. *See, e.g.*, *American Tel. & Tel. Co. v. City of N.Y*, 83 F.3d 549, 556 (2d Cir. 1996) ("The district court's holding misapplies the applicable gross negligence standard by focusing not on whether NYT's errors, mistakes, or omissions constituted a gross failure to exercise due care but on the fact that NYT caused a harm to the City that was gross in magnitude."). Then move to res ipsa loquitur. "The authorities are uniform in holding that gross negligence cannot be proven by application of the res ipsa loquitur doctrine." *Lee v. Consol. Edison Co.*, 95 Misc. 2d 120, 127 (N.Y. Civ. Ct.) *rev'd on other grounds*, 413 N.Y.S.2d 826 (1st Dept. 1978). And end with fiduciary duty. As discussed above, "absent extraordinary circumstances" not present here, New York law prohibits the creation of a fiduciary relationship when "parties deal at arm's length in a commercial transaction," *Asian Vegetable Rsch.*, 944 F. Supp. at 1179, meaning that under the Offshore Agreement, there was no fiduciary duty for CB&I to disregard.

Taken together, these deviations from New York law meant the Tribunal lifted the damages cap when it should have stayed in place. What mattered was whether CB&I's actions constituted a gross failure to exercise due care, *American Tel. & Tel. Co.*, 83 F.3d at 556, and on that question,

the Tribunal pointed only to CB&I's failure to recognize that it had a fiduciary duty—a duty that could not exist under the contracts New York law governed.

To be sure, after conducting its analysis under Colombian law, the Tribunal also supplied a short survey of New York law. *See* Award ¶¶ 2243–2269. But even then, the Tribunal pivoted right back to Colombian law, noting that it was "confident that its previous test for *culpa grave* under Colombian law may also serve to establish that CB&I acted with gross negligence under New York law." *Id.* ¶ 2253. And when the Tribunal went beyond simply invoking its prior deductions, all it mentioned was the scope of the harm Reficar suffered:

> CB&I did not simply fail to exercise proper skill and/or care; *it allowed cost overruns of some USD 800 million and delays in Mechanical Completion of two years,* with one year's worth of solely-caused delay - this proves a spectacular, rather than ordinary, failure by CB&I to control cost and schedule.

and:

> *The magnitude of the results of CB&I's breaches serve as a compelling demonstration evincing extreme culpability.* CB&I would not have allowed for such ballooning of cost and time overruns unless it showed callous indifference to Reficar's rights.

Award ¶¶ 2256, 2258 (emphasis added). Again, New York law bars using the degree of harm to establish gross negligence. *American Tel. & Tel. Co.*, 83 F.3d at 556.

For the aspects of Reficar's claims that New York law governed, the Colombian legal principles the Tribunal applied should have stayed sidelined. By applying those principles anyway to lift the cap for *all* Reficar's claims (and thus necessarily for its New York claims), the Tribunal went beyond the adjudicatory powers the Parties gave it.

### B. Despite Reficar's contentions, the Tribunal did more than construe the contracts.

Reficar unsurprisingly has a different view of what happened. Rather than apply Colombian law when the Parties chose New York law, Reficar says, all the Tribunal did was

construe the contracts. Opp. 25. And if that's the extent of the analysis, Reficar continues, the Tribunal's actions are unreviewable. *Id*. "Section 10(a)(4) does not permit vacatur for legal errors," Reficar emphasizes, and CB&I's arguments really just boil down to dissatisfaction with how the Tribunal interpreted the contracts. *Id*. at 24.

For support, Reficar points mostly to two cases: *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144 (2d Cir. 2021) and *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002). Neither carries clout.

Start with *Beijing Shougang Mining*. There, parties to an arbitration "clearly and unmistakably" submitted to the arbitration tribunal "the issue of the scope of the arbitrators' jurisdiction under Article 8(3) of [a 1991 bilateral investment treaty]." 11 F.4th at 161. Because they had done so, the Second Circuit ruled that what mattered was whether the arbitrators interpreted the parties' contract, not whether they got its meaning right. *Id*. And the tribunal's determination that it lacked jurisdiction under a reasonable reading of Article 8(3) fell well within its interpretive authority, the court ruled, so vacatur was improper. *Id*.

Here, however, there was nothing to submit to the Tribunal. That New York law governed four of the Parties' contracts was a condition for the Tribunal to abide by when adjudicating Reficar's claims under those contracts, not a dispute for it to resolve. The Tribunal, then, had the authority to find and apply principles of New York law to the issues the Parties did dispute. But by using Colombian law instead, the Tribunal exceeded its authority.

Next, consider *Westerbeke*. There, the Second Circuit reversed the vacatur of an arbitration award under Section 10(a)(4) when the parties contested whether the arbitrator properly awarded expectancy damages—but not whether their contract allowed the arbitrator to award them. *Westerbeke*, 304 F.3d at 220.

Reficar's invocation of *Westerbeke* fails for the same reason as its reliance on *Beijing Shougang Mining* does. Unlike those cases, no dispute exists over the choice of law here. Colombian law applies to the two Onshore Agreements. New York law applies to the remaining four contracts. And when the Tribunal opted to use Colombian law where the contracts required New York law, it defied Section 10(a)(4).

### C. Courts confronting similar situations have not hesitated to vacate awards.

The Tribunal's adventure beyond the bounds of its authority is, unfortunately, not all that uncommon. Take *Edstrom Indus., Inc. v Companion Life Ins. Co.*, which CB&I explored in its opening brief. 516 F.3d 546 (7th Cir. 2008); Pet'rs' Br. 35–36. There, Judge Posner recognized that "precisely because arbitration is a creature of contract, the arbitrator cannot disregard the lawful directions the parties have given them. If they tell him to apply Wisconsin law, he cannot apply New York law." *Edstrom Industries, Inc.*, 516 F.3d at 552.

Consider, too, *Firstman v. Credit Suisse Sec.*, No. 19-CV-04025-CAP, 2020 WL 10456852 (N.D. Ga. Nov. 20, 2020). There, the Northern District of Georgia vacated an award under Section 10(a)(4) when the contract called for New York law and the arbitrators "directly contradicted the plain language of the arbitration agreement" by applying Georgia law. *Id*. at *7.

Or try *Capstone Bldg. Corp. v. Mid- Atl. Mech. Inc.*, where the Northern District of Alabama vacated in part an arbitral award because the arbitrator used Alabama's rate for postjudgment interest instead of New Jersey's. No. 08-cv-1157-JHH, 2008 WL 11379868 (N.D. Ala. Nov. 12, 2008). "[T]he parties agreed that the arbitrator should apply New Jersey law," the court noted, and it was "evident that he did not do that, but instead, went outside the scope of the agreement and applied Alabama law—conduct to which the parties did not consent when they included an arbitration clause in their contract." *Id*. at *4 (internal quotation marks omitted).

Here, by choosing New York law to govern the Offshore Agreement and three others, the

Case 1:23-cv-04825-GHW    Document 52    Filed 08/31/23    Page 24 of 42

Parties limited what the Tribunal could do. For Reficar's claims that arose out of those four agreements, the Tribunal could not invoke Colombian law to: (a) shift the burden of proof on negligence to CB&I; (b) consider the extent of harm when assessing gross negligence; (c) use res ipsa loquitur to find gross negligence; (d) impose a fiduciary duty in an arm's length commercial transaction; or (e) conclude that because CB&I didn't know of that fiduciary duty, it acted recklessly. But when the Tribunal did those things anyway, it exceeded its authority.

### D. In the alternative to vacatur, the Court should at a minimum modify the Award under 9 U.S.C. § 11(b).

When arbitrators go beyond their powers, most often courts vacate the entire award. But sometimes courts correct the error by trimming the award down to size. *Compare* 9 U.S.C. § 10 (grounds for vacating award) *with id.* § 11 (grounds for modifying award); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us*, 126 F.3d 15, 23 (2d Cir. 1997) ("awards may be vacated…or modified" (citing 9 U.S.C. § 10, § 11)). Here, if nothing else, the Court should modify the Award.

To be sure, vacatur is still the better option. Even though the Tribunal applied Colombian law across the board when some contracts called for it while others did not, the Tribunal's method of calculating damages is challenging to parse. Had the Tribunal assigned values to the harm Reficar suffered from the alleged breach of each of the contracts, it would be easy to pinpoint only the damages specific to the agreements New York law governed. Instead, the Tribunal separated its damages calculations by the type of breach, which could have stemmed from the Onshore Agreement, the Offshore Agreement, or both:

> The Tribunal established the total monetary liability of CB&I towards Reficar was $1,008.41 million which comprises:
>
> - USD 845.4 million due to the breach of the Cost Control Commitments;
>
> - USD 152.75 million due to the breach of the Schedule Control Commitments; and,

> - USD 10.3 million due to the breach of CB&I's obligation
>   to provide the Work free of defects.

Award ¶ 2078. Then the Tribunal set off that amount by about $900,000.00 for CB&I's success on a counterclaim and by another $70 million for money Reficar had collected by drawing down on a letter of credit. *Id*. ¶ 2481. That left a final Award of just over $937 million. *Id*. But exactly how much of that total stemmed from the Tribunal's trip beyond its powers is unclear.

Still, the Court has an alternative. Reficar admitted that the Offshore Contract, and thus New York law, governed at least $102.39 million in Engineering Productivity damages and another $20.06M in Module Fabrication Productivity damages. Ex. 107 at 191. At a minimum, then, the Court should reduce the Award by those amounts, which total $122.45 million.

## II. Vacatur is also warranted because the Tribunal manifestly disregarded the law.

Arbitrators have leeway in applying the law, but they cannot spurn it altogether. If arbitrators know of a legal principle and pass it by, and if that principle is "well [] defined, explicit, and clearly applicable to the case," then they leave courts no choice but to vacate their awards. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).

Here, vacatur of the Award is a must. When the Tribunal applied Colombian law instead of New York law, it necessarily disregarded the Parties' choice of law and its ramifications for the creation of contractual fiduciary duties, the burden of proof, and the path to gross negligence. The Tribunal also shrugged off New York's (and Colombia's) bar on double recovery by awarding liquidated damages and actual damages for the same breach. And it took matters into its own hands when morphing the Parties' contract from a cost-reimbursable structure into a fixed-price one.

### A. The Tribunal manifestly disregarded the Parties' choice of New York law and its effect on the damages cap.

When claiming to apply the Parties' choice of law, the Tribunal said the right words but did the wrong things. For four of the Parties' contracts, they settled on New York law to govern,

which requires a decisionmaker to give "great deference" to the Parties' decision of which law to apply. *Carvel Corp. v. Eisenberg*, 692 F. Supp. 182, 184 (S.D.N.Y. 1988). The Tribunal acknowledged this principle, which it called a "mandate...to apply the law chosen by the Parties…." Award at ¶ 208. And it recognized that New York law was, in fact, the Parties' choice for these contracts. *Id*. ¶¶ 189–192. But as explained above, *supra* § I.A., it then roamed into Colombian law. New York law precludes such a free-wheeling, mix-and-match approach to contractual choices of law. *See, e.g.*, *Woodling*, 813 F.2d at 551.

The Tribunal's refusal to heed the Parties' choice of law led to four more instances of manifest disregard as well. Those bouts of tunnel vision for Colombian law are the reasons CB&I listed above for why the Tribunal's venture beyond its powers was so destructive. *See supra* § I.A. But they are also standalone grounds for vacatur under the manifest-disregard standard:

| Tribunal's Decision | New York Law |
|---|---|
| ▪ "CB&I agreed that its contractual role would not be that of a mere contractor, without any fiduciary duty. ..; instead, CB&I accepted...a fiduciary obligation that all costs decisions taken must safeguard Reficar's resources as if its own." Award ¶ 871. | ▪ "Under New York law, where parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *Asian Vegetable Rsch.*, 944 F. Supp. at 1179 (cleaned up). |
| ▪ "CB&I was under the presumption of having been negligent in the performance of the EPC Contract. .." Award ¶ 2141. | ▪ "Negligence...is not presumed. It must be proved by the plaintiff, and it must be proved by a preponderance of the evidence." *Detone*, 140 A.D.2d at 280. |
| ▪ "The magnitude of the results of CB&I's breaches serve as a compelling demonstration evincing extreme culpability." Award ¶ 2258. | ▪ A decisionmaker "misapplies the applicable gross negligence standard by focusing…on the fact that [the defendant] caused a harm to the [the plaintiff] that was gross in magnitude." *American Tel. & Tel. Co.*, 83 F.3d at 556. |
| ▪ "Res ipsa loquitur: cost overruns amounting to more than USD 800 million | ▪ "The authorities are uniform in holding that gross negligence cannot be proven |

19

and achieving Mechanical Completion two years after the guaranteed date to do so, with a year's time of solely-caused delays, can only be interpreted as the result of a reckless disregard for controlling costs and schedule. .." Award ¶ 2219.

by application of the res ipsa loquitur doctrine." *Lee*, 95 Misc. 2d at 127.

These were no mere errors or disagreements with CB&I's view of the world; they were abrupt departures from longstanding New York precedent, the most recent of which—*American Tel. & Tel. Co.* and *Asian Vegetable Rsch.*—issued nearly 30 years ago. The Tribunal's knowing disregard of established New York law on critical matters of liability and damages brings this matter within the subset of arbitral awards the Court must vacate. *See Porzig*, 497 F.3d at 139-40.

### B.    The Tribunal manifestly disregarded New York's and Colombia's prohibition on double recovery when it awarded liquidated damages and actual damages for the same breach.

The Tribunal also looked past one legal principle on which New York and Colombian law align: A plaintiff may not recover twice for harm it suffered once. This, too, requires vacatur—or at a minimum, a reduction of the Award. *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994) ("Double recovery constitutes a materially unjust miscalculation which may be modified under section 11 of the [FAA]").

Start with New York law. "[D]ouble recoveries are prohibited and discouraged both in common law and by statute." *Waehner v. Frost*, 1 Misc. 3d 893, 895 (N.Y. Sup. Ct. 2003) (citations omitted). And "liquidated and actual damages are mutually exclusive remedies...." *U.S. Fid. & Guar. v. Braspetro Oil Servs.*, 369 F.3d 34, 71 (2d Cir. 2004).

Colombian law comes out the same way. It recognizes an equivalent to a liquidated-damages provision called a "*Cláusula Penal*," which sets a "penalty" for a party's non-compliance or delay. Ex. 109, Colombian Civil Code, Art. 1592. And unless parties to a contract agree otherwise, "the penalty and the compensation for damages may not be requested at the same

time...." Ex. 109, Colombian Civil Code, Art. 1600.

Thus, a plaintiff litigating under either legal regime can win liquidated damages, or it can recover actual damages, but it cannot get both. CB&I briefed this point, so the Tribunal knew it well. *See, e.g.*, Ex. 110 at ¶ 1337–40; Ex. 111 at ¶ 223 & nn.471–474. But Reficar still got both. With one hand, it secured liquidated damages for the delay in the Project's completion. And with the other, it recouped actual damages for that same delay.

*Liquidated Damages*. The Parties agreed that if CB&I failed to complete the Project by a guaranteed date, it would pay Reficar "Delay Liquidated Damages":

> [I]f the Contractor fails to achieve Mechanical Completion of all of the Units by the Guaranteed Completion Date, the Contractor shall be liable to pay Delay Liquidated Damages for each Day from the Day immediately following the Guaranteed Completion Date up to and including the date of Mechanical Completion of all of the Units is achieved, at the following daily rates….

Ex. 4 and Ex. 6 at TC 54.8.1; *see also* Award ¶ 1554. Those damages, the Parties also agreed, were "fair and reasonable pre-estimates of the damages likely to be sustained" if such a delay occurred. Ex. 4 and Ex. 6 at TC 54.8.5.

The Guaranteed Completion Date was February 28, 2013, Award ¶ 940, but the Project didn't pass that milestone before February 2015. *Id*. So the Tribunal held CB&I liable, but only for 334 days of the delay because CB&I didn't cause the rest. *Id*. Still, for that 11 months, the Tribunal awarded $152.75 million in "Liquidated Delay Damages." *Id*. ¶¶ 1725, 2445, 2500.4.

*Actual Damages*. To understand how Reficar recovered actual delay damages, it helps to take a step back to examine the Tribunal's broader method of calculation. The Tribunal used what it called a "Modified Total Cost Approach," which began with a "Reasonable Cost Benchmark." Award ¶ 952. That "Benchmark" was what the Tribunal thought the Project should have cost in the absence of any contract breaches—what Reficar would have had to pay for a cost-controlled

21

Project delivered on time. After setting that benchmark, the Tribunal ruled that any costs Reficar paid above it were "Excess Costs" for which CB&I was prima facie liable. *Id*. ¶¶ 1013–15.

The primary reason the Project cost more than the benchmark was because it took longer than expected to complete. That delay was vital to Reficar's case. It sought damages for "Improper EPC Costs," including two categories of delay damages. *See* Ex. 112 at ¶¶ 1244–49. The first category was "Labor Escalation." *Id*. Reficar explained that it was "additional labor costs that would not have been incurred had the Project been completed on time." *Id*. As compensation, Reficar sought $42.68 million. Ex. 107 at ¶ 158. The second category was "EPC Prolongation." *See* Ex. 112 at ¶ 1254–63. Reficar said this type of harm was added costs related to the construction management team that were "attributable to the prolonged schedule." *Id*. To make it whole in this respect, Reficar requested $688.76 million. Ex. 107 at ¶ 158. In total, Reficar sought $731.44 million in delay-related actual damages.

Reficar recovered much of that amount, too. The Tribunal awarded Reficar $845.4 million in actual damages for "Improper EPC Costs." Award ¶ 2500.3. But when calculating that number, it never subtracted anything for the delay-related Labor Escalation costs Reficar sought. To be sure, the Tribunal bumped down EPC Prolongation Costs some, but it did so only for the delay it attributed to Reficar. Award ¶ 1348. That meant the amount the Tribunal awarded still included EPC Prolongation Costs connected to CB&I's share of the delay.

*The Remedy*. When parties contract for liquidated damages, it becomes their "exclusive remedy," meaning it "precludes any recovery of actual damages." *GFI Brokers, LLC v. Santana*, No. 06-CV-3988 (GEL), 2008 WL 3166972, at *11 (S.D.N.Y. Aug. 6, 2008). That's because liquidated damages, "[b]y their nature...are in lieu of, not in addition to, other compensatory damages." *Levitt Corp. v. Levitt*, No. 78 C 1531, 1978 WL 21377, at *8 (E.D.N.Y. Aug. 29, 1978),

*aff'd*, 593 F.2d 463 (2d Cir. 1979). By not limiting the award of delay damages to Liquidated Delay Damages, the Tribunal manifestly disregarded both New York and Colombian law. Its Award must therefore be vacated. *See Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002) (recognizing that manifest disregard of the law leads to vacatur.).

In the alternative, the Court should modify the Award to rid it of delay-related actual damages. Outside the context of arbitration, when a plaintiff is compensated twice for a single breach of contract, "[t]he duplicate award must be vacated." *N.Y. Cardiothoracic Surgeons, P.C. v. Brevetti*, 208 A.D.3d 1241, 1244 (2d Dept. 2022). And at times, courts have upheld altering an arbitral award, rather than vacating it, to prevent a double recovery. *See, e.g., Eljer Mfg.*, 14 F.3d at 1254 (upholding modification of arbitral award to prevent double recovery); *Sawtelle v. Waddell & Reed*, 304 A.D.2d 103, 107 (1st Dept. 2003) (modifying judgment in part and affirming reduction of arbitral award to account for double award of attorney's fees).

Modification of the Award is also warranted because a double recovery defies New York public policy. Courts need not enforce arbitral awards that violate well-defined, dominant public policy. *See Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011); *see also* Panama Convention, Art. V(2)(b) (stating that recognition may be refused where "the recognition or execution of the decision would be contrary to public policy"). "It is longstanding public policy in New York that litigants are to be fairly compensated, but that duplicative recoveries and windfalls should be avoided." *Goldberg v. Nugent*, No. 601076/10, 2010 WL 9039501 *6 (Sup. Ct., N.Y Cnty. Dec. 03, 2010). And courts have not hesitated to decline confirmation of arbitral awards that allow a plaintiff to double dip. *See, e.g., id*.

Should the Court prefer modification, it should reduce the Award by $321.76 million. As noted above, liquidated damages are an exclusive remedy. To correct the Award, then, the Court

should deduct all delay-related actual damages. Finding that number requires further examination of the Tribunal's reasoning and math. The Tribunal concluded that the Project exceeded the Guaranteed Completion Date by 725 days. *See, e.g.*, Award ¶ 1653. But 203 of those days were before February 25, 2012, which the Tribunal said meant that they were already built into the forecast it used as the "Reasonable Cost Estimate." *See, e.g.*, *id.* ¶¶ 1681, 1689. Accepting that finding, there were 522 days of delay that increased costs above the Reasonable Cost Estimate. And as discussed above, the Tribunal ruled that CB&I was responsible for 334 days of that delay, *id.* ¶ 2445, and it separately deducted from its Award of actual damages an amount of EPC Prolongation Costs equivalent to the delay for which it found Reficar responsible, *id.* ¶ 1348. To calculate that amount, the Tribunal used a chart from a Reficar expert that quantified the average amount of EPC Prolongation Costs per day: $835,576. *Id.* ¶¶ 1344–45. So to determine the EPC Prolongation Costs attributable to CB&I's delay, all one needs to do is multiply the daily average ($835,576) by the number of CB&I delay days (334). The result is $279.08 million. And to that, the Court must add the $42.68 million for Labor Escalation that the Tribunal never subtracted from its actual-damages award. In total, then, a reduction of $321.76 million is appropriate.

### C. The Tribunal manifestly disregarded New York's prohibition on re-writing contracts when it turned a cost-reimbursable agreement into a fixed-price one.

New York law presumes that parties mean what they say in their contracts. *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002). When contract terms are unmistakable, courts applying New York law enforce them as written. *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

Arbitrators applying New York law hold that obligation, too. If they fall short by issuing an award "in manifest disregard of the parties' relevant agreement," vacatur is required. *Schwartz*

*v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011). To be sure, a court may not simply supplant an arbitrator's reading of a contract with a reading of its own. *Toys "R" Us*, 126. F.3d at 25. But when an arbitrator "makes the right noises—noises of contractual interpretation—while ignoring the clear meaning of contract terms," the resulting award must fall. *Id*.

The Tribunal did exactly what New York law proscribes. The Parties chose a cost-reimbursable contract, and they did so after first discussing—and then moving away from—a fixed-price contract. The Tribunal recognized both what the final contract said and the route the Parties took to get there, but it then awarded damages based on a fixed price anyway.

*Contract Language*. The Parties' contract contained no set price. Instead, Reficar agreed to pay CB&I "for the performance of the Work on a cost reimbursable basis." Exs. 5, 7, at "Preamble." The "cost-reimbursable nature" of the deal, they stated, meant that the "Agreement [wa]s of indeterminate value." Award ¶ 433 (quoting TC. 58.1.1). So to determine the "actual value" of the Project, or the "Contract Price," the Parties settled on "adding together the value of all amounts which [CB&I] has been paid, or is entitled to be paid." *Id.*; *see also* Ex. 2 at pp. 235; Ex. 4 at pp. 211-12.

*Negotiation History*. Although a cost-reimbursable structure is where the Parties finished, it is not where they started. At first, they discussed a fixed-price proposal. Then market conditions changed, and both sides independently began exploring a cost-reimbursable model. Award ¶ 335. On Reficar's side, its then-President discussed with its Board of Directors the possibility of replacing a "turnkey" model with "cost plus" contracting. Ex. 111 at ¶ 79; *see also* Award ¶¶ 344–347. In response, the Board told Reficar to investigate "modifying the type of turnkey or LSTK [lump-sum turn key] contract to a 'cost plus' contract type." *Id*. Less than a week later, CB&I made a similar decision to explore a shift to "a cost-reimbursable structure." *Id*. Those separate

assessments eventually led the Parties to the current contract: a cost-reimbursable one. Award ¶¶ 365–68.

*Cost-Reimbursable Recognition.* The Tribunal, for its part, recognized the difference between a cost-reimbursable contract and a fixed-price agreement. *See* Award ¶ 247 ("In a cost-reimbursable contract,...the price and time risks rest with the owner and not the contractor," but "in an [fixed-price] contract...the risk of cost overruns and delays lies with the contractor and not the owner."); *see also id.* ¶ 330. It found that Reficar knew the difference, too. *See id.* ¶ 748 ("Reficar was advised on the risks associated with a [cost-reimbursable] EPC Contract vs. a[] [fixed-price] EPC Contract."). And it even wrote that, unlike a fixed-price contract in which the contractor "tenders a price for the completion of the scope of works," the Parties' contract "d[id] not set a Contract Price." *Id.* ¶ 433.

That was not all. The Tribunal also noted the simultaneous paths the Parties took from a fixed-price model to a cost-reimbursable structure. "While CB&I was changing its strategy to favour lower-risk RC [cost-reimbursable] contracts over LSTK ones," the Tribunal said, "the volatile market conditions prompted Reficar to independently reassess whether to proceed with the EPC phase of the Project on an LSTK or RC basis." Award ¶ 335. Indeed, the Tribunal acknowledged, "it was Reficar who took the initiative to commence negotiations to change the contract modality. ..." *Id.* ¶ 695. Reficar did so, the Tribunal continued, for at least four reasons. First, "the other major contractor on the Project, Technip,...made it clear it was reluctant to proceed with an [lump sum turn key] EPC Contract." *Id.* ¶ 696. Second, Reficar's "external consultant Pathfinder...provided a study proving the superiority of the cost-plus option at the time." *Id.* Third, "Citigroup, Reficar's lender,...commented on how [a cost-reimbursable] approach was more usual for similar megaprojects." *Id.* And fourth, Nexidea, an external consultant, said after conducting a

study "that Reficar could expect 9% in Project cost savings if it switched to [a cost-reimbursable] contract." *Id*.

  *Fixed-Priced Damages*. Even though the Parties disowned a fixed-price model, the Tribunal created and used one anyway. Recall the damages calculations discussed above, which started at a "Reasonable Cost Benchmark." *Supra*, § II.B. The Tribunal took that benchmark and subtracted it from the actual cost of the Project. Award ¶¶ 1013-15. But this Court need not take CB&I's word for it. Here is what the Tribunal said:

> [T]he Tribunal prefers the Bottom-Up approach. Under this methodology, the Excess Costs caused by CB&I's breach of its Cost Control Commitments, for which CB&I bears responsibility, are calculated as the difference between
>
> - a Reasonable Cost Benchmark, properly established and then properly adjusted taking into consideration CB&I's defenses, and
>
> - the actual EPC costs paid to CB&I.

Award ¶ 964. In other words, the Tribunal set a *fixed price*, beyond which it shifted costs to CB&I.

  *The Result*. The Tribunal gave the Parties the very contract structure both sides independently rethought before jointly agreeing to abandon. Or, to use the Second Circuit's phrasing, the Tribunal made "the right noises—noises of contractual interpretation—while ignoring the clear meaning of contract terms." *Toys "R" Us*, 126. F.3d at 25. Where Reficar agreed to pay "for the performance of the Work on a cost reimbursable basis," Exs. 5, 7, at "Preamble," the Tribunal thought it better to set a benchmark. Award ¶ 964. When the Parties said the "Agreement [wa]s of indeterminate value," *id*. ¶ 433 (quoting TC. 58.1.1), the Tribunal said it was $3.971 billion, Award ¶ 1351. And when the Parties decided on "adding together the value of all amounts which [CB&I] has been paid, or is entitled to be paid," to set the "Contract Price," the Tribunal opted instead to use an estimate CB&I provided in a letter to Reficar in May 2012, long before the Project's completion. *Id*. ¶¶ 992–1010.

27

These choices flouted both New York law and the plain meaning of the Parties' chosen contract terms. "Cost reimbursable basis" means what it says. So does "indeterminate value." A fixed price, "cost benchmark," or a predetermined value mean exactly the opposite. Rather than fully benefiting from their bargain, then, the Parties walked away with the Tribunal's "own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). That renders the decision unenforceable. *Id.* Vacatur is required.

## III.    Vacatur is warranted under Section 10(a)(3) because the Tribunal's procedural decisions deprived CB&I of a fair hearing.

Section 10(a)(3) of the FAA requires vacatur of an arbitral award for arbitrator misconduct or misbehavior. Those are harsh terms, but arbitrators need not act intentionally; neglectful disregard will suffice. *See Cofinco, Inc. v. Bakrie & Bros., N. V.*, 395 F. Supp. 613, 615 (S.D.N.Y. 1975) ("The result of the short circuit effected on appeal was a basic species of arbitral 'misconduct'...It makes no difference that the appellate panel may have acted only in neglectful disregard...."). This standard encompasses many things, one of which is fundamental fairness. An arbitrator's refusal to hear evidence pertinent and material to a party's case deprives the party of a fair hearing and amounts to arbitral misconduct. *See Attia v. Audionamix Inc.*, No. 14-CV-706, 2015 WL 5580501 (S.D.N.Y. Sept. 21, 2015). And misconduct also includes an arbitrator's refusal to permit the party to cross-examine key witnesses whose evidence is fundamental to the ultimate questions in the dispute. *See Chem-Met Co. v. Metaland Int'l, Inc.*, No. 96-CV-02548, 1998 WL 35272368 (D.D.C. Mar. 25, 1998).

The Tribunal reached its decision using a process that was unfair. It accepted and considered evidence from two important witnesses while depriving CB&I of an opportunity to cross-examine them. The Tribunal's conduct therefore renders the Award eligible for vacatur under these principles.

A.    **The Tribunal deprived CB&I of a fair hearing by considering and relying on evidence from two witnesses CB&I could not cross-examine.**

"Full and fair cross-examination is the cornerstone of the adversary system." *United States v. Fitzpatrick*, 437 F.2d 19, 23 (2d Cir. 1970). The right to it "is established beyond any necessity for citation of authorities...." *Derewecki v. Pa. R.R. Co.*, 353 F.2d 436, 442 (3d Cir. 1965). So important is this right "that if cross-examination of an available witness is not had[,] the litigant, deprived of cross-examination, has been denied due process of law." *Id*. An arbitrator who deprives a party of cross-examination therefore denies that party due process. *See Chem-Met Co. v. Metaland Int'l, Inc.*, 1998 WL 35272368 (D.D.C. March 25, 1998). Without due process, an arbitration is not fair. And if an arbitration is not fair, the arbitrator has violated § 10(a)(3), meaning a court may vacate the award.

That logic applies with force here. In the months just before the arbitration hearing, CB&I planned diligently for the opportunity to cross-examine two key Reficar witnesses. One was Christian Mantilla, the Project Controls Director and, later, the Project Director of the entire Project, for Reficar's Project Management Consultant Foster Wheeler. The other was Andrés Riera, a Vice President of the Project for over five years. Four days before the hearing, however, Mantilla dropped out. And three days into it, Riera also refused to show. They did so, they claimed, because the Colombian government issued a fiscal liability order weeks earlier against Mantilla's employer and Riera personally. *See* Exs. 26, 27. But both men had authored extensive and important witness statements, which Reficar still sought to enter as evidence. CB&I objected, but the Tribunal admitted the statements and relied on them—and on other documents that only they could speak on.

The inability to cross-examine two witnesses who submitted written statements in a protracted arbitration may seem innocuous, but closer inspection lays bare the prejudice.

*Mantilla*. Cross-examination of Mantilla would have upended the Tribunal's damages analysis. Remember that the Tribunal used a "Reasonable Cost Benchmark": an estimate of what the Project should have cost absent delays and cost overruns. Award ¶ 952. To do so, the Tribunal created from scratch a four-factor test it used to sift through the evidence to find a suitable price proxy. The fourth factor looked to the Parties: They both "should have accepted [the benchmark candidate] as a reliable cost projection." Award ¶ 983.

Ultimately, the Tribunal selected a forecast that CB&I prepared in December 2011 and January 2012, which landed on a figure of $3.971 billion. Award ¶¶ 984–985, 1013–1014. CB&I later included that projection in a letter, which the Tribunal called the "Representation Letter." *Id*. And the Tribunal used that letter to calculate damages. *Id*.

The Representation Letter and the projection it contained were therefore crucial, but unbeknownst to the Tribunal, they failed the benchmark test. That was because neither party thought they held a reliable cost estimate. For CB&I, Project Director Masoud Deidehban testified to that effect. Rather than acting as an all-encompassing calculation, he submitted, the purpose of the forecast—which was part of a years-long series of forecast discussions between the Parties— was to let Reficar attempt to renegotiate the EPC Contract and convert it to a lump-sum agreement. *See* Ex. 113 at ¶¶ 388–399.

Mantilla, if pressed on cross, would have admitted the same thing. As the Project Controls Director for Foster Wheeler, Reficar's Project Management Consultant, he led forecast-review meetings during the fall of 2011 that led to the creation of the forecast.[9] So Mantilla knew that the $3.971 billion figure was a partial forecast. Foster Wheeler even explained the true purpose to Reficar: It was an exercise "directed towards achieving CB&I's commitment to a challenging

---

[9] Ex. 114 at 1.

target cost that would serve as the basis of a negotiation between Reficar and CB&I."[10] And Foster Wheeler also recognized that one of the driving forces behind the projection was Reficar's wish "to establish a basis on which to incorporate a cost target along with the schedule targets that were in the negotiations at that time for re-alignment of CB&I's contract incentivization." *Id*.

The forecast was a beginning, not an end. Without cross-examination of Mantilla, CB&I had no way to show that Reficar didn't view the $3.971 billion estimate as a reliable projection. CB&I therefore lost its best evidence to negate the fourth factor of the Tribunal's benchmark test.

*Riera*. The inability to cross-examine Riera harmed CB&I because he was the most senior Reficar project representative who offered a witness statement and authored key documents on which both Reficar and the Tribunal relied. To begin, Riera wrote a letter to Masoud Deidehban in November 2013, detailing Reficar's complaints about CB&I's "deficient engineering services and associated cost impact," Ex. 40, Ex. 52 at ¶¶ 8–27. This letter became one of the most important pieces of evidence. Riera alleged that CB&I's "seriously deficient engineering" caused "unreasonable costs" and "wreaked havoc on all aspects of the project, such as cost and schedule forecasts, material procurement and laydown area management." *See* Ex. 40 at 2, 12–13, 19. He also claimed that "CBI's serious engineering deficiencies (combined with its numerous other serious failures in procurement, planning. fabrication and construction) [drove] costs to heights beyond any conceivably reasonable explanation or expectation." *Id*. at 19. Reficar invoked these accusations to make identical arguments and to contend that CB&I acted with gross negligence. Indeed, together with its fact witnesses and experts, Reficar cited the letter nearly 50 times.[11]

---

[10] Ex. 114 at 1.

[11] *See, e.g.*, Ex. 115 at n. 287, n. 295; Ex. 116 at n. 16; Ex. 52 at n. 33, n. 37, n. 38, n. 41; Ex. 117 at n. 7, n. 8; Ex. 118 at n. 5; Ex. 119 at n. 209, n. 583, n. 673; Ex. 120 at n. 584, n. 587, n. 588; Ex. 121 at n. 567; Ex. 122 at n. 283, n. 386, n. 410, n. 459, n. 466, n. 487, n. 531, n. 576, n. 577, n. 578, n. 1539, n. 1555, n. 1557; Ex. 123 at n. 45, n. 536, n. 943, n. 945, n. 1280, n. 2081, n. 2099; Ex. 41 at n. 100, n. 104; Ex. 107 at n. 175, n. 365, n. 404, n. 407, n. 557; Ex. 108 at 12; Ex. 124 at 49; Ex. 125 at 33; Ex. 126 at 127.

And the Tribunal relied on the letter, too. When it concluded that CB&I breached its cost-control obligations, the Tribunal pointed to the letter's criticism of CB&I for allegedly incurring costs in breach of that obligation and the lack of evidence of a response from CB&I. Award ¶¶ 929-930. The Tribunal also relied on Riera's statements in this letter as evidence that CB&I failed to adhere to good construction practices and breached its materials management obligations, concluding that CB&I was responsible for the resulting excess costs. *Id.* ¶¶ 1262–1266.

That was not the only letter Riera wrote. He signed hundreds of letters on the Project, but relevant here, he penned correspondence to Mr. Deidehban in March 2013, August 2014, and October 2014, which Reficar turned to repeatedly.[12] They were evidence that CB&I's increasing cost and schedule forecasts in October 2012 were inaccurate, which in turn supported Reficar's claims that CB&I failed to report costs accurately. Ex. 127. Reficar also said they showed that it never accelerated the Project schedule in 2013 and that CB&I could not claim that this acceleration affected Project costs. Ex. 128. And Reficar cited them to support its position that it bore no responsibility for declining productivity and that CB&I was contractually responsible for related delays. Ex. 129. The Tribunal also thought positively of Riera's three letters; it used them to find that CB&I failed to "adopt[] meaningful measures" to strictly control costs and prevent delays and to award Reficar USD 845.4 million for breach of cost-control obligations. Award ¶ 929–930, n. 988; *see also id.* ¶ 2203, n. 2184.

Without cross-examination, however, CB&I never got the chance to test Riera's claims in any of his four letters. CB&I could not demonstrate that Reficar was intimately involved in, and in fact directed constraints to, CB&I's cost forecasts. It could not question Riera about Reficar's schedule acceleration directives. It could not illustrate Reficar's effects on productivity. And it

---

[12] *See* Ex. 127; Ex. 128; Ex.129.

could not question Riera about the invoice review procedure Reficar created, which required Foster Wheeler to carefully review CB&I's invoice costs for reasonableness—testimony that would have undermined the Tribunal's determination that CB&I breached its cost-control obligations. *Compare* Ex. 52 at ¶¶ 28–29 (Riera's allegations that CB&I improperly incurred excess costs) *with* Ex. 130 (Foster Wheeler invoice review procedure requiring Foster Wheeler's careful, detailed review of reimbursable costs); *see also* Award ¶¶ 953, 964 (finding CB&I breached its cost-control obligations). That meant the Tribunal got the good (for Reficar) without the bad; it heard only one side of the story.

### B.    Reficar's arguments to the contrary ring hollow.

Reficar dismisses the Tribunal's refusal to exclude Mantilla and Riera's testimony as an unreviewable exercise of the Tribunal's discretion. *See* Opp. 14. Reficar also says that the decision didn't harm CB&I. *See id*. at 13 ("The record is clear CB&I had a fair opportunity to present its case."). Reficar is wrong on both counts.

"[A]n arbitrator does not have unfettered discretion." *Bruno's, Inc. v. United Food and Com. Wkrs. Int'l.*, 858 F.2d 1529, 1531 (11th Cir. 1988). If a party loses its right to test an opponent's case, and if that loss leads to prejudice, vacatur is still required. *See Chem-Met.*, 1998 WL 35272368, at *4. And as explained above, CB&I lost its chance to test evidence that wound up being crucial to the Award, including an opportunity to knock the props out from under the cost projection the Tribunal used as a benchmark. Without the Representation Letter's estimate to serve as a benchmark, there is no telling what the Tribunal would have done.

To be sure, the Tribunal attempted to minimize the prejudice. It did so by promising to view Mantilla's and Riera's witness statements with additional scrutiny. Award ¶ 168. That might have been a nice gesture, but it was not an effective one. As discussed above, CB&I lost an opportunity to cross-examine the witnesses on more than just their statements. The documents

33

those witnesses could speak on mattered. And without cross-examination, the Tribunal was left unaware of precisely which aspects of Riera's and Mantilla's testimony to grade harder. The gap between what due process demanded and what the Tribunal provided was too great.

Finally, Reficar suggests that the standard for showing fundamental unfairness is so high that arbitrators can hold hearings without counsel present for one side. Opp. 14. It therefore "necessarily follows," Reficar continues, "that allowing the submission statements from two witnesses who were unavailable and whose testimony was never relied on by the Tribunal cannot possibly render the hearing fundamentally unfair." *Id*. Reficar cites just one case for its premise, *Alexander Julian, Inc. v. Mimco, Inc.*, 29 F. App'x 700 (2d Cir. 2002), and it's unhelpful to Reficar's cause. In *Alexander*, the attorney who was not present had been repeatedly made aware of the scheduling conflict and *opted not to attend*. *Id*. at 703. Here, however, CB&I's counsel showed up; it was two of Reficar's key witnesses who skipped the hearing. Reficar cannot rely on counsel's dereliction in another case to override prejudice that counsel here had nothing to do with.

### C.    Vacatur is the appropriate remedy.

Without cross-examination of Mantilla and Riera—or the exclusion of the evidence only they could verify—Reficar won an unfair fight. CB&I lost "the cornerstone of the adversary system," *Fitzpatrick*, 437 F.2d at 23, and without it, CB&I could never test the strength of the inferences the Tribunal drew from Riera's letters or the accuracy of the Tribunal's self-selected cost projection that Mantilla would have shown failed the Tribunal's benchmark test. Having been "deprived of cross-examination," CB&I was "denied due process of law." *Derewecki*, 353 F.2d at 442. Whether intentional or merely the product of neglect, the Tribunal's conduct cannot stand under Section 10(a)(3). The Court must vacate the Award.

## CONCLUSION

For these reasons, the Court should vacate the Award or, in the alternative, modify it.

Dated:  August 31, 2023

Respectfully submitted,

CHICAGO BRIDGE & IRON COMPANY
N.V. and CB&I UK LIMITED,

By their attorneys,

*/s/ Michael F. Williams*

Stephen B. Shapiro
Cheryl A. Feeley
HOLLAND & KNIGHT LLP
800 17TH Street, N.W., Suite 1100
Washington, DC 20006
Telephone: 202.955.3000
stephen.shaprio@hklaw.com
cheryl.feeley@hklaw.com

Stosh M. Silivos
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3533
stosh.silivos@hklaw.com

Benjamin R. Wilson
HOLLAND & KNIGHT LLP
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Telephone: 215.252.9571
benjamin.wilson@hklaw.com

Michael F. Williams (*pro hac vice*)
Peter A. Farrell (*pro hac vice*)
Candice A. Andalia
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave, N.W.
Washington, DC 20004
Telephone: 202.389.5000
michael.williams@kirkland.com

Kevin M. Neylan
Patrick J. Gallagher
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  212.446-4800

*Attorneys for Petitioners*