UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V. AND CB&I UK LIMITED,<br><br>Petitioners,<br><br>v.<br><br>REFINERÍA DE CARTAGENA S.A.S.,<br><br>Respondent. | CASE NO. 1:23-cv-04825-GHW |

**DECLARATION OF MICHAEL TRAVIS BRANTLEY IN SUPPORT OF PETITIONERS' RESPONSE TO ORDER TO SHOW CAUSE**

I, Michael Travis Brantley, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

**I.      The Businesses**

1.      I have been Chief Financial Officer (the "<u>CFO</u>") for McDermott International, Ltd ("<u>MIL</u>") and its subsidiaries (the "<u>Group</u>") since March 2022.  My responsibilities include overseeing the management of the Group's finances, including financial planning, management of financial risks, record-keeping, and financial reporting.

2.      Prior to my appointment as CFO, I have held various corporate and operational finance roles, most recently serving as the Group's Global Vice President and Chief Accounting Officer, since joining MIL in July 2015.

3.      Prior to joining MIL, I spent 9 years in Deloitte's external audit practice, primarily serving clients in the oil and gas industry.  I am a Certified Public Accountant in the State of Texas in the United States.  In addition to my career in finance, I have spent a combined 21 years (active and reserve) in the United States Army.

4.	CB&I UK Limited ("CB&I UK") is a private limited company incorporated under the laws of England and Wales.

5.	Chicago Bridge & Iron Company, N.V. ("CB&I N.V.") was a company organized under the laws of The Netherlands, with its principal place of business in the Hague. Effective May 10, 2018, CB&I N.V. merged into Comet II B.V., now known as McDermott International Holdings B.V. ("MIH"). MIH is organized under the laws of The Netherlands, with its principal place of business in The Hague.

6.	The Group, together with its affiliates, provides engineering, procurement, and construction ("EPC") services under contracts with global customers, including national and integrated international energy companies as well as large-scale producers of petrochemical, electric, and liquefied natural gas ("LNG") facilities. The Group routinely enters into EPC contracts to engineer, build, and deliver large-scale, complex projects over multiple years.

7.	As CFO of the Group, I am duly authorized by the Group to make this declaration on behalf of Petitioners, and I am acquainted with the affairs of the Petitioners. I therefore make this declaration in opposition to Reficar's Motion by Order to Show Cause for (1) Prejudgment Attachment Order and (2) Disclosure of Petitioners' Assets (the "Motion") from the facts and matters within my own knowledge and on the basis of the documents and information provided to me by others. Where the facts and matters are within my own knowledge, I confirm that they are true. Where the facts and matters are derived from information provided to me by others, I confirm that they are true to the best of my knowledge and belief.

II.	**Corporate Restructuring**

8.	In May 2018, McDermott International, Inc. ("MII", MIL's predecessor entity) combined with MIH's predecessor, Chicago Bridge & Iron Co. NV. MII inherited a number of

loss-making, fixed-price projects which strained MII's liquidity and capital resources. Despite MII's efforts at the time to mitigate the financial strain brought on by adverse market conditions through, among other things, non-core asset divestitures and operational "rightsizing," MII's liquidity position remained strained and was projected to be insufficient over the long-term to fund the capital-intensive nature of its business and to service its highly leveraged capital structure.

9.  Further, notwithstanding significant efforts, MII had been unable to refinance its debt or attract sufficient new capital. As a result, in the second half of 2019, the Group engaged financial and legal advisers to explore strategic alternatives to enhance MII's liquidity, evaluate strategic merger and acquisition opportunities, and address its capital structure.

10. As a result of these discussions, on October 21, 2019, certain of various debtors entered into a super priority senior secured credit facility, which provided for an aggregate principal amount of $1.7 billion, consisting of a $1.3 billion term loan facility and a $400 million letter of credit facility.

11. After extensive, arm's-length negotiations, on January 21, 2020, various Group entities entered into a restructuring support agreement with certain of their lenders, letter of credit issuers and holders of certain senior notes due 2024 and filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas to pursue a joint prepackaged Chapter 11 Plan of Reorganization ("Chapter 11 Process").

12. The transactions embodied in the court approved Chapter 11 plan included, among other things, (i) all previously existing equity interests attributable to the Group's previous parent company being cancelled and (ii) the holders of those equity interests, including the holders of outstanding shares of common stock, being entitled to no recovery relating to those equity

interests. Holders of approximately $4 billion of the Group's primary funded indebtedness received the primary equity interests in the restricted Group and such indebtedness was discharged. The Group also had credit facilities restated.

13. The relevant Group entities ultimately met all conditions precedent in accordance with its plan of reorganization and successfully emerged from bankruptcy as a reorganized enterprise comprised of MIL, established under the laws of Bermuda, and the majority of the Group's pre-emergence subsidiaries and affiliates. However, several events have taken place since the Chapter 11 Process which have had an unprecedented and material impact on the Group's immediate liquidity position including:

    a. The continuing impact of the COVID pandemic has accelerated what was already a challenging trading environment for CB&I UK. The imposed shutdowns across all the countries in which it operates since March 2020 caused unprecedented disruption and delay to projects for substantial and prolonged periods.

    b. Prices for oil and natural gas have historically been, and CB&I UK anticipate they will continue to be, extremely volatile and react to changes in the supply of and demand for oil and natural gas, domestic and worldwide economic conditions and political instability in oil producing countries. Material fluctuations in the prices of raw materials and commodities, such as oil and natural gas prices, have affected, and will likely continue to affect, the demand for and pricing of the Group's service.

    c. The Russia-Ukraine crisis, which is expected to have further global economic consequences, including continued disruptions to the global

supply chain and energy markets. These disruptions and the resulting impacts have already led to, among other things, an increase in the number and amounts of unapproved change orders that the Group is currently pursuing with its customers, which are at an all-time high. As of December 31, 2022, there were unapproved change orders included in transaction prices for the Group's projects aggregating approximately $343 million. This figure increased to approximately $855 million by June 2023.

d. Inflationary pressures, including rising costs, a tightening market for steel and other raw materials, and skilled labor shortages, resulting in increases to the Group's non-fixed operating costs, in addition to raising costs for customers.

14. Further, the Group has continued to recognize material unfavorable changes in estimates on certain challenging projects which has significantly affected the Group's liquidity. Certain contracts have been identified by management and the Board that are expected to make, collectively, a greater than $600 million gross loss during 2023. Each contract has experienced its own difficulties and challenges, although the common thread across these fixed-price contracts relates to the increased cost of resources, access to availability of resources and disputes with the customer relating, among other things, to project delays and cost overruns.

15. To try to manage liquidity, the Group has stretched its vendor base to unsustainable levels. Delays in settling obligations with vendors has caused significant operational issues, in many cases bringing projects to a halt or severely impacting project schedules, which in turn results in increased carrying costs and delayed revenue realization. Further, in many instances, the Group's vendors have a direct line of communication to the Group's customers, such that the

vendors' displeasure with the Group's payment practices has fed back to customers, straining relations with the customer base.

16. CB&I UK and the Group's ability to access Letters of Credit support is imperative to the business's ability to continue to service all of its clients. Without such ability to draw on Letters of Credit support, CB&I UK, and the Group more widely, simply cannot continue. An example of this was seen during the most second financial quarter of 2023 when certain significant contracts that had been awarded to the Group, including by Saudi Aramco involving the expansion of $1.8 billon oilfield projects, were cancelled because of the Group's inability to post requisite Letters of Credit. This has been the subject of press coverage.

17. It is imperative that CB&I UK manages its vendor base, which is stretched to unsustainable levels as result of the liquidity issues I have described and address the critical need to amend and extend the Secured Credit Agreements. This outstanding amendment and extension of the Secured Credit Agreements, as well as dealing with the Reficar Claim and the Contraloría Claim (as described below), are the principal issues being addressed by the proposed CB&I UK's Restructuring Plan.

18. These matters have also been further impacted, in addition, by ongoing proceedings between the Group and Bayport Polymers LLC ("Baystar"). This follows Baystar's attempts to draw on Letters of Credit totaling approximately $200 million in connection with the Group's engineering and construction of two chemical plants, Baystar's Ethane Cracker facility in Port Arthur, Texas (the "Cracker Project") and its High-Density Polyethylene plant in Bayport, Texas (the "BB3 Project"). The Group is having to litigate these matters to seek to prevent Baystar from drawing on these Letters of Credit which would have a catastrophic impact. The two claims against the Group amount to $497 million, consisting of $75.4 million in liquidated damages for delays at

the BB3 Project and alleged damages of more than $422 million for purported breaches by the Group on the Cracker Project. These claims add exposure to the balance sheet, and the working capital outflow makes a prudent reserve in respect of these claims.

19. In addition, in April 2023, the Group experienced a material cybersecurity incident, resulting in a full global shutdown of all systems, and significant disruption to the Group's ability to track accurately contract progress (WIP), make new contract bids, make supplier payments and ensure collection of customer receipts in a timely manner. The Group was without key operating systems for 5-6 weeks and it was necessary to engage third-party cybersecurity experts to assist in the containment of the threat and restoration of the Group's systems. It took until mid-August 2023 to conclude on the overall impact to financial results, which the Group estimates was approximately $26 million of losses relating to this incident (during the second quarter of 2023), including expenses to respond to, remediate, and investigate this matter.

### III. Principal Liabilities of the Petitioners

20. The Petitioners' principal indebtedness and liabilities are owed to a mix of secured and unsecured creditors. I have summarized these liabilities below.

21. In broad terms, following the previous Chapter 11 Process, the Group entered new financial arrangements to refinance and provide additional facilities, which predominately comprise the financial arrangements set out below.

    A.    *Exit Credit Agreement*

22. As part of the Chapter 11 Process, on June 30, 2020, Lealand Finance Company B.V. ("LFC") (as borrower) and the CB&I UK (as guarantor) (among others) entered into a New York law governed credit facility agreement with among others the Lenders (as defined therein),

the Term Loan Administrative Agent, and the LC Administrative Agent (the "Exit Credit Agreement").

23. Pursuant to the Exit Credit Agreement, as of the date of this filing, McDermott has aggregate lending commitments of approximately $2.83 billion, of which $2.44 billion is currently drawn. The Exit Credit Facilities are as follows:

    a. The "Super Senior LC Facility" (with lending commitments of $743 million, of which $548.6 million is currently outstanding);

    b. The "Make-Whole Term Loan Facility" (with principal amount of $44.28 million, which is entirely drawn);

    c. The "Senior LC Facility" (with lending commitments of $1.176 billion, of which $1.146 billion is currently outstanding); and

    d. The "Takeback Term Loan Facility" (with the initial principal amount of $500 million and the outstanding principal amount of $546 million).

24. Absent extension or amendment, many of these commitments are due in cash in March 2024.

    B.  *Escrow LC Facility Agreement*

25. On December 31, 2020, LFC (as borrower) and CB&I UK (as guarantor) (among others) entered into a senior secured escrow letter of credit facility which provided for the issuance of up to $371,000,000 face amount of letters of credit (which was reduced to $303,614,864.29 in connection with the implementation of the Tanks Credit Facilities described below) based on $389,550,000 of cash escrow (which was reduced to $318,795,607.50 in connection with the implementation of the Tanks Credit Facilities (described below) and release of certain escrowed funds described below) with, amongst others, various Investors (as defined therein) or their

affiliates (the "Escrow LC Facility") in order to replace an existing cash secured letter of credit facility on similar terms and permit a release of the cash collateral securing the existing cash secured letter of credit facility.

26. The Escrow LC Facility Agreement has a maturity of June 30, 2024 and is governed by New York law. As of September 25, 2023, an amount of approximately $292,100,000 was issued and outstanding under the Escrow LC Facility Agreement.

C.  *Tanks Credit Facilities*

27. On September 8, 2023, certain members of the Group entered into documentation with certain creditors facilities (including the five referenced above) in respect of certain facilities to provide the Group with additional liquidity to bridge to completion of the Group Restructuring and provide it with additional working capital going forward ("Transaction Support Agreement").

28. Under the terms of the Transaction Support Agreement, among other things:

   a. the relevant members of the Group agreed to implement the Restructuring in accordance with several timing milestones, including the implementation of the Tanks Credit Facilities ahead of launching the Restructuring Plan; and

   b. each of the consenting stakeholders has undertaken to take all actions reasonably necessary in order to support the Restructuring.

29. On or around June 2023, the Group's liquidity forecasts indicated that CB&I UK and the Group would not have sufficient liquidity to be able to maintain progress on key projects, achieve business plan projections, and meet financial covenants under the Group's debt documents absent new money.

30.     The Group's accounts payable to vendors more than doubled from $672,000,000 in Q4 2022 to $1,429,000,000 as of June 30, 2023. It was considered that immediate relief to the vendor base was critical to maintain key project progress and avoid potential contagion effects from the customer base. This amount was unsustainable over the short term.

31.     Additionally, the Group determined that it was necessary to borrow $250 million of new money under a new term loan (the "Tanks Term Loan Facility"), secured against certain assets within the Group's storage tanks business (the "Tanks Business"). The new money needed to be borrowed urgently to avoid a collapse of the Group, and there was no time to wait for the Plan to become effective.

32.     Thus, reorganization of CB&I UK and MIH was necessary even before the Reficar Arbitration award was issued (discussed below), as a liquidity shortfall had already occurred.

**IV.     Proposed Restructuring Plan**

33.     In the United Kingdom, CB&I UK has applied under section 901C(1) of the Companies Act 2006 (the "Companies Act") for an order that CB&I UK has permission to convene meetings (the "Plan Meetings") of certain creditors for the purposes of considering and, if thought fit, approving (with or without modifications) a restructuring plan proposed by CB&I UK pursuant to Part 26A of the Companies Act (the "Restructuring Plan").

34.     In parallel with the Restructuring Plan, on September 8, 2023, Lealand Finance Company B.V. ("LFC") and MIH, both companies in the Group, filed opening declarations pursuant to the *Wet Homologatie Onderhands Akkoord* ("WHOA") with the Amsterdam District Court to initiate WHOA proceedings. On or around October 20, 2023, LFC and MIH each intend to offer proposals for certain of their respective creditors (the "WHOA Proposals"). The primary purpose of the WHOA Proposals is to implement the financial restructuring of MIH and LFC (and

certain other Group companies) on the terms set out in the WHOA Proposals, in a manner which is broadly consistent with the terms of the Restructuring Plan.

35. The Restructuring Plan will be used to implement the amendments to the secured credit agreements described above and will set out the order in which the steps required to implement the Restructuring Transaction will take place.

36. The purpose of the Restructuring Plan is to rescue CB&I UK and the Group from a worldwide liquidation.

37. If the Restructuring Plan fails, the relevant alternative would be an insolvent liquidation of the Debtors and the wider Company except for the Tanks business line, which would be sold as a going concern via an accelerated share sale through a liquidation of the holding entity (the "Relevant Alternative"). The Company anticipates that if the Transaction Support Agreement terminates, it will not have sufficient liquidity to pay its debt obligations, and there would be significant uncertainty regarding the Company's ability to obtain the requisite level of creditor consent to implement any alternative transaction in a timely manner. Further, the Company has concluded, with the benefit of an expert valuation, that returns to creditors in the Relevant Alternative would be materially worse than the returns available to creditors through the Restructuring Plan.

## V.   Reficar Liability

38. On or about June 7, 2023, CB&I UK and CB&I N.V. (together the "Reficar Claim Respondents") received notice of an arbitration award being issued against it in connection with arbitration proceedings entitled *Refineria de Cartagena SA. v. Chicago Bridge & Iron Company N.V., et al.* (the "Reficar Arbitration").

39. The Reficar Arbitration relates to certain disputes concerning a large engineering, procurement and construction agreement for the expansion of a refinery in Cartagena, as completed by the Group in 2015.

40. The arbitration panel granted the Refineria de Cartagena (the "Reficar Claim Plan Creditor") the following award:

    a. net damages of approximately $938,000,000;

    b. legal costs reimbursement (net of costs awarded to Reficar Claim Respondents) of approximately $59,000,000;

    c. interest on the damages award from December 31, 2015; and

    d. interest on the legal costs award from the date of notice of the award (7 June 2023) at the London Interbank Offer Rate ("LIBOR") plus 2% (until such time as LIBOR ceases to exist, and then at the Secured Overnight Financing Rate plus 2%) through date of payment of the award (the "Reficar Claim").

41. The Reficar Claim Plan Creditor has been issued a letter of credit in the amount of $95,000,000 by the Senior LC Facility Lenders on a pro rata basis pursuant to the terms of the credit facility agreement dated June 30, 2020, between, among others, LFC as borrower, the Lenders, the Term Loan Administrative Agent, and the LC Administrative Agent (each as defined therein) to which CB&I UK is a guarantor (the "Exit Credit Agreement") (pursuant to the Senior LC Facility) in support of CB&I UK's obligations in connection with, and as security for, the Reficar Claim (the "Reficar Letter of Credit"). In the event that the defense of the Reficar Claim is not successful (i.e., the petition to set aside the award (and any subsequent appeals) fail), and the Reficar Letter of Credit is drawn and not reimbursed by the relevant Group entity, such reimbursement obligation of the Group shall be deemed to be a borrowing of term loans by the

Group and shall be pari passu in terms of payment and priority with the reimbursement obligations in respect of the amounts drawn under the Super Senior Letters of Credit. In such case, Senior LC Facility commitments will be automatically reduced by the corresponding amount.

### VI. Contraloría Claim

42. On April 26, 2021, following an investigation, the Contraloría General de la República (an administrative agency of the Republic of Colombia) issued its opinion that multiple parties, including CB&I UK (the "Contraloría Claim Respondents"), were jointly and severally responsible for cost overruns totaling approximately 2.95 trillion Colombian pesos (or approximately $718.4 million as the date of this declaration) on the project which was the subject of the Reficar Claim (the "Contraloría Claim").

43. CB&I UK sought to void the Contraloría Claim within the Colombian court system, however that claim was rejected on appeal in February 2022. The Group have now filed a bilateral investment treaty arbitration and separate Colombian court proceedings, both of which are ongoing.

44. In the event that the defense of the Contraloría Claim is not successful, it is possible that CB&I UK may be jointly and severally liable in respect of the Contraloría Claim (including in respect of a potential contribution claim from other of the Contraloría Claim Respondents). The Contraloría Contribution Claim is currently contingent. The Plan Company considers it very unlikely that such contingent claims will crystalize in the near future.

### VII. Conclusion

45. If the SDNY Court were to make an attachment order of the sort that the Reficar Claim Plan Creditor is seeking, it would cause significant disruption and instability to the Group. It is precisely this sort of destabilizing action, taken in this case by an "out of the money" creditor,

that could precipitate the insolvent liquidation of CB&I UK and subsequent liquidation of the Group.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 4, 2023
              Houston, Texas

Michael Travis Brantley