UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V. AND CB&I UK LIMITED,<br><br>Petitioners,<br><br>v.<br><br>REFINERÍA DE CARTAGENA S.A.S.,<br><br>Respondent. | CASE NO. 1:23-cv-04825-GHW |

**DECLARATION OF HANNAH RACHAEL CRAWFORD IN SUPPORT OF PETITIONERS' RESPONSE TO ORDER TO SHOW CAUSE**

I, HANNAH RACHAEL CRAWFORD, hereby declare under penalty of perjury:

1. I submit this declaration (this "Declaration") in support of Petitioner's Response to Order to Show Cause (the "Motion")[1] on behalf of CB&I UK Limited, a company incorporated under the laws of England and Wales (the "English Petitioner" or "CB&I UK"). I am a solicitor duly admitted to practice in England and Wales, and a partner with the law firm Kirkland & Ellis International LLP, English counsel to the Petitioner.

2. As of the date hereof, the English Petitioner is the subject of a proceeding (the "English Proceeding") currently pending before the High Court of Justice of England and Wales (the "English Court") concerning a restructuring plan (the "Restructuring Plan") pursuant to Part 26A of the Companies Act 2006 (as modified, amended or re-enacted from time to time, the "Companies Act"). In parallel, two of the English Petitioner's affiliates incorporated in the Netherlands (McDermott International Holdings B.V. ("MIH" or the "Dutch Petitioner")) and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Lealand Finance Company B.V. ("LFC")) are proposing Dutch restructuring plans (*Wet homologatie onderhands akkoord*) (the "WHOA Proceedings"), which are inter-conditional with the Restructuring Plan. A separate declaration in support of the Motion in respect of the WHOA Proceedings will be given by Teun Struycken.

3. I am a member in good standing of the Solicitors Regulation Authority and have been with either the Solicitors Regulation Authority or its predecessor, the Law Society, since I qualified as a solicitor on September 15, 2015. I have been a Partner at Kirkland & Ellis International LLP since 2021 and have considerable experience in matters related to English restructuring and insolvency law. My practice has been involved in all aspects of corporate restructuring and insolvency, both contentious and non-contentious. In particular, I have advised investment funds, financial sponsors, financial institutions and corporate borrowers in connection with transactions across the credit spectrum, in particular, cross-border and domestic financial restructurings, special situations investments, credit-led opportunities, event-driven financings and specialized lending transactions. I qualified as a solicitor in September 2015, after a bachelors degree in law from the University of Cambridge and law school at BPP University College, London.

4. This declaration comprises both statements of legal opinion and statements of fact. Where the matters stated in this declaration are statements of legal opinion, such statements represent my view of English law as a practicing lawyer admitted and licensed to practice in England and Wales. These statements are made without waiver of the attorney-client privilege or work product doctrine.

5. Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this declaration are statements

of fact that are not within my personal knowledge, they are derived from documents and/or information supplied to me and are true to the best of my knowledge, information and belief.

**I.      The Restructuring Plan under English law**

**A.      English Restructuring Plan**

6.      Part 26A of the Companies Act allows English companies (and certain foreign companies) to utilize a "restructuring plan" to impose a compromise or arrangement (including restructuring of liabilities) agreed to by a statutory majority of the relevant company's creditors or members (or any class of creditors or members) upon each and every creditor or member of the relevant class subject to the restructuring plan in order for all claims to be assembled against the limited assets of a debtor in a single proceeding, provided that certain conditions are met.  The restructuring plan is largely based on the well-known pre-existing "scheme of arrangement" procedure under Part 26 of the Companies Act. The most notable difference is that, for a scheme of arrangement, each and every class of creditors or members that is subject to the scheme of arrangement needs to vote in favor of the scheme, whereas "cross-class cram-down" is possible under a restructuring plan, provided that certain conditions are met.

7.      Unlike a scheme of arrangement, there are two additional "threshold" conditions that must be satisfied in order for a company to be subject to a restructuring plan.  The additional conditions are that:

        a)    the company has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern; and

        b)    the purpose of the proposed compromise or arrangement is to eliminate, reduce or prevent, or mitigate the effect of, any of those financial difficulties.

8.      As with a scheme of arrangement, the restructuring plan can be commenced by a company, any creditor or member of a company, a liquidator of a company being wound up, or an

administrator of a company in administration. In this case, the restructuring plan was commenced by the English Petitioner. The applicant begins with the preliminary step of circulating a letter (known as a "practice statement letter") to the creditors or members who will be subject to the compromise or arrangement contemplated by the proposed restructuring plan. Among other things, the practice statement letter will typically set out the applicant's proposed classes and the applicant's case for why the English court has jurisdiction for the restructuring plan. The practice statement letter will notify the recipient creditors and members that they have the right to attend the court hearings for the restructuring plan and to object.

9.  The restructuring plan procedure begins when an application is made to the English Court in accordance with Part 26A of the Companies Act requesting a hearing (known as a "convening hearing") for permission to convene meetings of each class of the company's creditors or members proposed to be subject to the restructuring plan to enable them to consider and vote on the proposed compromise or arrangement. Under English law, creditors or members of a company will form a class for the purpose of voting on the restructuring plan if those creditors' or members' rights against the company, both before and after the compromise or arrangement in the proposed restructuring plan is implemented, are not so dissimilar as to make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest (taking into account, among other things, the relevant alternative, discussed below). The applicant for the restructuring plan will propose the classes of creditors and members to the English Court as part of its convening hearing application, but the decision as to whether or not the class constitution is correct is ultimately one for the English Court. Creditors and members are given notice of, and entitled to attend, the convening hearing to voice any concerns regarding the proposed restructuring plan, including the composition of the proposed class(es).

10. The restructuring plan application is supported by a witness statement and a draft explanatory statement, which is the disclosure document for creditors or members (described below in more detail). At the convening hearing, the English Court will decide whether to grant the applicant permission to convene meetings of the relevant class(es) to consider and vote upon the proposed compromise or arrangement. In making its decision, the English Court will consider jurisdictional "roadblocks" as well as review the composition of the proposed voting class(es). If the English Court grants the application to convene the meetings, it will issue an order authorizing the applicant to convene the restructuring plan meeting(s).

11. The restructuring plan will become legally binding on the English Petitioner and on all the creditors or members in the relevant class(es) if sanctioned by the English Court at a second court hearing (referred to as the "sanction hearing"). The English court may only sanction the restructuring plan if:

    a) a number representing at least 75% in value of each class of creditors or members, of those present and voting (in person or by proxy), vote in favor of the restructuring plan at the meeting for that class (note that, unlike the scheme of arrangement, there is no requirement for over 50% by number of the class to approve the restructuring plan); or

    b) in the event that one or more classes of creditors or members does not approve the restructuring plan in accordance with the voting threshold referred to above, the English Court is satisfied that: (i) no member of a dissenting class would be any worse off if the restructuring plan were sanctioned than they would be in the event of the "relevant alternative" (as to which see below); and (ii) the compromise or arrangement has been agreed in accordance with the voting threshold referred to above by at least one class of creditors or members who would receive a payment, or have a "genuine economic interest" in the company, in the event of the "relevant alternative". This is referred to as the "cross-class cram-down mechanism" and is the principal distinguishing feature of the restructuring plan, compared with the pre-existing scheme of arrangement.

12. The "relevant alternative" is whatever the English Court considers would be most likely to occur in relation to the company if the compromise or arrangement were not sanctioned

by the English Court.  CB&I UK has provided evidence to the English Court as to what the relevant alternative is likely to be; CB&I UK has determined that if the Restructuring Plan is not sanctioned by the English Court, CB&I UK and the Group more broadly is likely to enter into a series of liquidation proceedings globally.

13. Under section 901A(4) of the Companies Act, the English Court has jurisdiction to sanction a restructuring plan in relation to any company liable to be wound up under the Insolvency Act 1986.  This captures companies registered under the Companies Act in England and Wales, such as the English Petitioner. The English Court must be reasonably assured that there is at least a reasonable prospect that the scheme or restructuring plan will be recognized and given effect in each relevant foreign jurisdiction where it is important that the scheme or plan is given effect, such as jurisdictions in which the company (and any obligors that will be released from their obligations pursuant to the scheme) are incorporated or have material assets.[2]

14. I understand that the sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code.  All creditors and members who are affected by the restructuring plan have an opportunity to raise questions and objections to the restructuring plan and present evidence at the sanction hearing.

15. The English Court may sanction the restructuring plan unconditionally, may sanction the restructuring plan conditional upon certain modifications or amendments to the restructuring plan, or may refuse to sanction the restructuring plan.  The use of the word "may" in

---

[2] See, for example, *Re DTEK Energy BV* [2022] 1 BCLC 260 at [27](iv); *Re Virgin Atlantic Airways Ltd* [2020] EWHC 2191 (Ch) at [57-59] (applying the conventional approach adopted for schemes of arrangement of restructuring plans); *Re Smile Telecoms Holdings Ltd* [2022] EWHC 740 (Ch) at [91]; *Re AGPS Bondco plc* [2023] EWHC 916 (Ch) at [331-332].

section 901F makes clear that the English Court has discretion regarding whether or not to sanction the restructuring plan. Part 26A does not specify the factors that the English Court will take into account when deciding whether or not it should exercise that discretion. However, paragraph 190 of the Explanatory Notes to the Corporate Insolvency and Governance Act 2020 (prepared by the UK Government to assist readers of the primary legislation)[3] suggests that the English Court will draw on the "well-established principles" that apply in relation to schemes of arrangement. This would include considering whether:

    a)     the compromise or arrangement proposed by the restructuring plan is such that an intelligent and honest person, being a member of the relevant class of creditors or members concerned and acting in respect of their interests, might reasonably approve;

    b)     the restructuring plan is fair, taking into account the interests of the creditors or members, the nature of the restructuring plan's impact upon dissenting creditors or members (or dissenting classes of creditors or members), and whether each class was fairly represented by those attending the meeting(s), including that the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and

    c)     the applicable statutory and procedural requirements have been fulfilled, including whether the requisite majorities of voting creditors and members approved the restructuring plan and, where one or more classes of creditors or members dissents, whether the conditions referred to above have been satisfied. Indeed, it is likely that there will be more scrutiny from the English Court where there are dissenting classes.

16.     If the English Court sanctions a restructuring plan, the restructuring plan will take effect once a certified copy of the English Court's order sanctioning the restructuring plan (the "<u>Sanction Order</u>") has been delivered to the Registrar of Companies of England and Wales (or, in the case of an overseas company, published in the Gazette (the official journal of public record)). Upon such delivery (or publication, as applicable), the restructuring plan is binding and effective

---

[3]     Available at https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpga_20200012_en.pdf

according to its terms on all creditors and members intended to be subject to the restructuring plan, and their respective liabilities which are subject to and compromised pursuant to the restructuring plan, irrespective of notice and their participation or vote at any meeting. As the restructuring process continues, the foreign courts overseeing the proceedings will ensure that Reficar receives the information to which it is entitled so it can assess its position under the respective restructuring proposals.

### B.   Status of English Proceeding

17.   On September 8, 2023, the English Petitioner issued a practice statement letter (the "Practice Statement Letter") to all creditors and members that will be affected by the Restructuring Plan (the "Plan Creditors"). The Restructuring Plan provides for the following seven separate classes of Plan Creditors, listed below in order of priority in the waterfall, for purposes of voting on the plan:

   a) The Super Senior LC Facility Plan Creditors;
   b) The Make-Whole Facility Plan Creditors;
   c) The Senior LC Facility Plan Creditors;
   d) The Escrow LC Facility Plan Creditors;
   e) The Takeback Facility Plan Creditors (together with (a) to (d), the "Secured Plan Creditors" in respect of the "Secured Debt Facilities");
   f) The Dispute Proceeding Plan Creditors (which includes Reficar and Contraloria); and
   g) The Contribution Claim Plan Creditors (together with (f), the "Unsecured Plan Creditors").

18.   Among other things, the Practice Statement Letter notified the Plan Creditors, including Reficar, of the English Petitioner's intention to propose the Restructuring Plan, the English Petitioner's intention to apply to the English Court for permission to convene meetings of the Plan Creditors for the purpose of voting on the Restructuring Plan, and the composition of the

proposed classes. Having considered the rights of the Plan Creditors, both before and following the Restructuring Plan, the English Petitioner has concluded that it is appropriate that separate meetings be held for each Plan Creditor class for the purposes of voting on the Restructuring Plan. In response to this notice, Reficar appeared to assert its rights.

19. The application to the English Court was accompanied by a draft explanatory statement (the "Explanatory Statement").

20. On September 28, 2023, the English Court held the convening hearing (the "Convening Hearing"). At the Convening Hearing, Reficar was represented by its own counsel and its concerns and intentions to challenge the Restructuring Plan were heard. Reficar is conducting and has received discovery.

21. The English Court subsequently issued a convening order (the "Convening Order"). The English Court ordered, among other things, that: (i) the English Petitioner convene seven separate meetings of the Plan Creditors to be held from 2 p.m. (London time) onwards on November 7, 2023; and (ii) the sanction hearing in respect of the Restructuring Plan (the "Sanction Hearing") will be held in the week commencing November 27, 2023. Reficar has argued that the proceedings are not urgent.

22. Reficar will have the opportunity to be heard on its objections to the Restructuring Plan at the Sanction Hearing, just as any other Creditor can, and has an avenue through which to raise and address its grievances.

23. If the English Court approves the Sanction Order, the Restructuring Plan will become effective, and thereby binding as a matter of English law on all Plan Creditors, wherever located, upon delivery of the Sanction Order to the Registrar of Companies of England and Wales.

All Plan Creditors' rights against the English Petitioner's assets, wherever such assets may be situated (including U.S. assets), will be bound by the effect of the Restructuring Plan.

## II.   The English Petitioner

24.   The English Petitioner is a company incorporated under the laws of England and Wales and along with its English Petitioner and non-English Petitioner affiliates (collectively, the "Group"), provides engineering, procurement and construction services to customers predominately operating in the oil, gas and energy sector. The English Petitioner designs projects for a worldwide client base. The ultimate parent company of the English Petitioner is McDermott International, Ltd. ("MIL").

## III.   Principal Liabilities of the Group

25.   The Group's principal indebtedness and liabilities are owed to a mix of secured creditors and unsecured creditors.

26.   The Group's principal secured liabilities include but are not limited to the following:

   a)   the Exit Credit Agreement Facilities, under which approximately $2,463,288,255.73 in principal commitments have been made available to the Group;

   b)   the Escrow LC Facility, which provides for the issuance of up to $303,614,864.29 face amount of letters of credit;

   c)   the Hedging Agreements, under which the English Petitioner's estimated liability is approximately $6,000,000; and

   d)   the Tanks Credit Facilities, under which the whole of a $250,000,000 senior secured term loan facility has been drawn and approximately $254,000,000 senior secured letter of credit facility has been made available.

## IV.    The English Petitioner's Restructuring Plan

### A.    Background to the English Petitioner's Proposed Restructuring Plan

27.    The background to the Group's financial difficulties motivated the implementation of a wider restructuring of the Group's capital structure (the "Restructuring").

28.    The wider Restructuring includes not only the Restructuring Plan but also other parallel processes.

29.    The Restructuring aims, amongst other things, to restore the English Petitioner and the Group to financial stability and continue the business of the Group.

### B.    Key Terms of the English Petitioner's Proposed Restructuring Plan

30.    The Restructuring Plan is therefore being proposed to compromise the claims of the Secured Plan Creditors and the Unsecured Plan Creditors to enable the English Petitioner (amongst other members of the Group) to avoid a series of liquidation procedures which the English Petitioner considers would result in a worse return for Plan Creditors, including Reficar, than they will receive as a result of the Restructuring Plan.

31.    Pursuant to the Plan Document, the English Petitioner intends and anticipates that the following matters will occur as part of the Restructuring Plan:

   a)    implementation of the A&E Transaction to extend the Group's access to critical committed letter of credit facilities and remove the risk of a cash collateralization of outstanding Letters of Credit in the near term;

   b)    a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility, such that the commitments of the Consenting Super Senior LC Facility Lenders will be reduced dollar-for-dollar by the amount of their respective commitments under the Tanks Senior LC Facility Tranche 1;

   c)    the Non-Consenting Super Senior LC Facility Lenders will have the option to take up their pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments through the Restructuring Plan. Such pro rata entitlement will be equal to their pro rata share of the full Tanks Senior LC Facility of approximately $253,610,000. If Non-Consenting Super Senior LC Facility Lenders do not elect to take up

        their pro rata share, such unallocated share will be offered to each Consenting Super Senior LC Facility Lender;

d)    a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that those Super Senior LC Facility Lenders who have been allocated commitments in the Tanks Senior LC Facility Tranche 2 shall have their commitments in the Super Senior LC Facility reduced dollar-for-dollar by the amount of its commitment under the Tanks Senior LC Facility Tranche 2;

e)    each of the Dispute Proceeding Plan Creditors' claims will be released in exchange for a right to receive the Dispute Proceeding Plan Creditor Consideration, as further described below;

f)    each of the Contribution Claim Plan Creditors' claims will be released in exchange for a right to receive the Contribution Claim Plan Creditor Consideration;

g)    upon the completion of the Restructuring, among others, the English Petitioner, its affiliates and their respective officers, directors and advisors will be given full and final releases in respect of the negotiation and implementation of the Restructuring; and

h)    certain releases will be granted by the Plan Creditors and the English Petitioner (amongst others) pursuant to which they will irrevocably and unconditionally release the released parties from every, any and all claims and liabilities which:

        i.    relate to the Restructuring; and

        ii.    in the case of Unsecured Plan Creditors, relate to the Reficar Claim, the Reficar Contribution Claim, the Contraloría Claim and the Contraloría Contribution Claims (as applicable), which such Plan Creditors have ever had, now have or hereafter can, shall or may have, against the relevant released party.

32.    Specifically, the Dispute Proceeding Plan Creditors are given the opportunity to benefit from the potential upside, assuming the successful implementation of the Restructuring), because the Restructuring Plan includes an obligation on the English Petitioner to pay the Dispute Proceeding Plan Creditors the greater of:

a)    the amount that the Dispute Proceeding Plan Creditor would be entitled to in a liquidation, i.e., no less than their entitlement to the prescribed part of assets that would be available for unsecured creditors in the event of an

       insolvent liquidation of the English Petitioner pursuant to section 176A of the Insolvency Act 1986 (the "Prescribed Part"); and

    b)     the relevant Dispute Proceeding Plan Creditor's pro rata share of the relevant per annum amount in respect of the Target EBITDA test (subject to the maximum aggregate available amount to all Dispute Proceedings Plan Creditors of $2,000,000 per annum in respect of the Target EBITDA test only), (the "Dispute Proceeding Plan Creditor Consideration").

**C.     Other Reficar Rights Not Prejudiced by Restructuring Plan**

33.     In all events, Reficar possesses other rights to recover sums in respect of the Reficar Claim, which rights are not affected or prejudiced in any way by the Restructuring Plan. These include:

    a)     a letter of credit issued in the amount of $95,000,000 by the Senior LC Facility Lenders pursuant to the terms of the Exit Credit Agreement (under the Senior LC Facility) in support of the English Petitioner's obligations in connection with, and as security for, the Reficar Claim (the "Reficar Letter of Credit"), which may be drawn by Reficar at any time; and

    b)     rights against the English Petitioner's insurers under certain insurance policies which presently benefit the English Petitioner and related Group policyholders (the "Insurance Policies"). The English Petitioner is insured by the Insurance Policies against covered liabilities owing to the Dispute Proceeding Plan Creditors, subject to the remaining cover limit (being $213,000,000) for the sum of all claims and any other defenses or limitations that apply under the Insurance Policies. Upon the sanction of the Restructuring Plan, or indeed in the Relevant Alternative, Reficar would automatically become a "relevant person" as defined in section 6(1) of the Third Parties (Rights against Insurers) Act 2010 (the "2010 Act"), entitled to pursue the English Petitioner's Insurance Policies by operation of law. Any rights that Reficar may have against the English Petitioner's insurers under the 2010 Act will not be affected or prejudiced by the Restructuring Plan.

Another example is that Reficar will be entitled to receive a payment through the Foreign Restructuring Processes in the event the Petitioners and the group exceed their forecasted EBITDA targets for 2023 and 2024.

**D.      Relevant Alternative to the Restructuring Plan**

34.     Considering the conditions affecting the Group, the English Petitioner considers that if the Restructuring is not implemented, it will be unable to meet its outstanding and upcoming payment obligations to its creditors and the Group would not have sufficient liquidity to support the English Petitioner in order for it to continue as a going concern. In other words, the relevant alternative to the Restructuring Plan is likely to be an insolvent liquidation of the English Petitioner and attendant liquidation of the wider Group (the "Relevant Alternative"). The English Petitioner has been advised that in the Relevant Alternative, the Unsecured Plan Creditors would receive de minimis recoveries, i.e., no less than their respective entitlement to the Prescribed Part in respect of their claims.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 4 October, 2023

*Hannah Crawford*
Name: Hannah Rachael Crawford
Title: Partner