UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- X
                                                               :
CHICAGO BRIDGE & IRON COMPANY N.V.                             :
and CB&I UK LIMITED,                                           :
                                                               :
                                          Petitioners,         :
                                                               :
                      -v-                                      :
                                                               :
REFINERÍA DE CARTAGENA S.A.S.,                                 :
                                                               :
                                          Respondent.          :
                                                               :
------------------------------------------------------------- X
```

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: 1/10/2025 | |

1:23-cv-4825-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

From 2016 to 2023, Petitioners Chicago Bridge & Iron Company N.V. and CB&I UK
Limited (together with nonparty CBI Colombiana, "CB&I") and Respondent Refinería de Cartagena
S.A.S. ("Reficar") arbitrated one of the largest and most complex construction disputes in the world.
Reficar sought billions of dollars for CB&I's cost overruns in modernizing the Cartagena Refinery,
an oil facility owned and controlled by the Republic of Colombia. CB&I, in turn, sought millions of
dollars in unpaid invoices for its work. Over the course of seven years, the parties submitted,
among other things, thousands of pages of briefing, fifteen thousand pages of written testimony,
and hundreds of thousands of pages of exhibits. Parallel legal proceedings—both civil and
criminal—produced additional reams of evidence to be considered and disputed.

The Tribunal's award, commensurate with the magnitude of the dispute, was nearly 500
pages long. Both parties won on various claims, but in the end, the Tribunal awarded Reficar nearly
$1 billion. CB&I now seeks an order vacating the award under a number of grounds provided in
Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, arguing that the Tribunal was

guilty of procedural misconduct, that it exceeded its powers, and that it manifestly disregarded the law.  Reficar, in turn, seeks an order confirming the award under Section 9 of the FAA, 9 U.S.C. § 9.

The Court finds that each of the Tribunal's challenged decisions at least arguably construed or applied the parties' contracts.  In such cases, "[t]he arbitrator's construction holds, however good, bad, or ugly." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013).  Accordingly, CB&I's petition to vacate the arbitration is DENIED and Reficar's cross-petition to confirm the award is GRANTED.

## I.    BACKGROUND[1]

### A.    The Parties

Petitioner Chicago Bridge & Iron Company N.V. ("CB&I N.V.") is a Dutch engineering, construction, and procurement ("EPC") company with its principal place of business in The Hague, Netherlands.  Dkt. No. 1 ¶ 1 ("Petition").  Petitioner CB&I UK Limited ("CB&I UK," and together with CB&I N.V., "Petitioners") is a British limited liability company with its principal place of business in Middlesex, United Kingdom.  *Id.* ¶ 2.

Respondent Refinería de Cartagena S.A.S. ("Respondent" or "Reficar") is a Colombian corporation wholly owned by Ecopetrol S.A. ("Ecopetrol"), the national oil company of the Republic of Colombia.  *Id.* ¶¶ 239–40, 245; Petition ¶ 3.  Respondent is in the business of "the refinery of crude oil and the production of petrochemical products."  Award ¶ 239.  Respondent owns the Cartagena Refinery (the "Refinery"), an oil refinery located in Cartagena, Colombia.  *Id.*

---

[1] The facts are taken from the arbitral award, Dkt. Nos. 15-1 & 15-2 (the "Award"), and are accepted as true for the purposes of this petition, *Westerbeke Corp. v. Daihatsu Motor Co.,* 304 F.3d 200, 213 (2d Cir. 2002) ("An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbitrator found them." (quoting *Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.*, 274 F.3d 34, 36–37 (1st Cir. 2001))).

### B.    The Project and Initial Negotiations

In the early 2000s, Ecopetrol conceived of the "Cartagena Refinery Modernization and Expansion Project" (the "Project"), which would be "one of the largest construction endeavours in the energy sector in the recent history of Colombia." *Id.* ¶¶ 244–45.  As part of the Project, Ecopetrol formed Respondent and assigned it ownership of the Refinery, *see id.* ¶¶ 239–40, 245, and, along with Respondent, began searching for an EPC contractor to undertake the massive planned improvements to the Refinery, *id.* ¶¶ 246–47.  "One of the key aspects in deciding to whom to award the contracts was the willingness and ability of the contractor to undertake works under a lump sum turnkey [], rather than a cost-reimbursable [] basis."  *Id.* ¶ 247.

Under a lump-sum turnkey construction contract, the contractor is paid a single price to complete the project.  Accordingly, "the risk of cost overruns and delays lies with the contractor and not the owner."  *Id.*  By contrast, under a cost-reimbursable contract, the contractor is generally paid for the costs it incurs to complete the project, plus an additional fee.  The risk of cost overruns and delays, therefore, "rests with the owner and not the contractor."  *Id.*

In 2007, Respondent awarded CB&I N.V., CB&I UK, and CBI Colombiana S.A. ("CBI Colombiana")[2] an initial contract for the Project.  *Id.* ¶¶ 248–49.  Under that contract, "[t]he Project would start under a cost-reimbursable basis," but "this phase was later to be followed by a definitive EPC Agreement on a [lump sum turnkey] basis."  *Id.* ¶ 249.  "This initial assumption changed, however, with the evolution of market conditions."  *Id.* ¶ 250.  After an "informal[]" suggestion by a CB&I officer, Respondent performed an independent market study, and "[o]n the basis of the study, . . . formally approach[ed] CB&I about the possibility to switch the modality of the future EPC Agreement from [lump sum turnkey] to [cost-reimbursable]."  *Id.* ¶¶ 252–53.

---

[2] In 2020, an agency of the Colombian government assumed control of CBI Colombiana and liquidated the company. Award ¶ 8; Dkt. No. 6 at 09 ("Petitioners' Mem.").  The entity is not a party in this case.

A period of "intense negotiations" followed.  *Id.* ¶ 424.  Both sides hired "a cadre of experts,

engineers, consultants, and lawyers."  *See id.* ¶ 516; Petitioners' Mem. at 5.  On November 10, 2009,

after approximately eighteen months of deliberation and negotiations, the parties entered into a

letter of intent presaging a final EPC contract providing for payment on a cost-reimbursable basis.

Award ¶ 262.

### C.    The Operative Agreements

On June 15, 2010, the parties entered into six agreements (together, the "EPC Contracts").

*Id.* ¶ 263.  They were:

- The **Onshore Contract**, Dkt. Nos. 15-3 & 15-4, Ex. 4, "between Reficar and CBI Colombiana for work (mainly construction) performed by CBI Colombiana," Award ¶ 263. The Onshore Contract "generally . . . covered work performed in Colombia," Petitioners' Mem. at 5, and provided that the Onshore Contract "and any matter relating thereto shall be governed by the laws of the Republic of Colombia," Onshore Contract, Terms and Conditions § 82.1.

- The **Offshore Contract**, Dkt. Nos. 15-6 & 15-7, Ex. 6, "between Reficar and CB&I UK for design, engineering, procurement, and other work performed by CB&I UK primarily outside of Colombia," Award ¶ 263.  It provided that the Offshore Contract "and any matter relating thereto shall be governed by the laws of the State of New York," Offshore Contract, Terms and Conditions § 82.1.

- The **Coordination Agreement**, Dkt. No. 15-3, Ex. 3, "executed by Reficar, CB&I UK, and CBI Colombiana," Award ¶ 263.  The Coordination Agreement was to be governed by New York law.[3]  Petition ¶ 12.  It "addressed how the parties' obligations" under the Onshore and Offshore Contracts "interrelated," Petitioners' Mem. at 5, and provided, among other things, that "[t]he liability of [CB&I UK and CBI Colombiana] under this Agreement and the [Onshore and Offshore Contracts] shall be joint and several," Award ¶ 2303 (quoting Coordination Agreement § 18).

- The **Dispute Resolution Agreement** ("DRA"), Dkt. No. 15-3, Ex. 3, "between Reficar and CB&I," Award ¶ 263.  The DRA was to be governed by New York law.  DRA § 14.  It provided for, and governed, arbitration of "[a]ny dispute not amicably resolved by the parties."  *Id.* § 1.1.

- An **Offshore Parent Guarantee** between Reficar and CB&I N.V.  Award ¶ 263.

---

[3] Both parties' briefs assume that New York law governed where the contracts provided for New York law, and, likewise, that Colombia law governed where the contracts provided for Colombian law.  *E.g.*, Dkt. No. 52 at 7 ("Petitioners' Reply"); Dkt. No. 55 at 8 ("Respondent's Reply").  That "suffic[es] to establish the applicable choice of law."  *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

- An **Onshore Parent Guarantee** between Reficar and CB&I N.V. *Id.*

The six contracts were expressly "inter-related." DRA at 4. Much of the substance in the Onshore and Offshore Contracts was set forth in lengthy "Terms and Conditions" sections, referred to as "TC," Onshore Contract, TC § 1.1; Offshore Contract, TC § 1.1, which were identical in many respects, *see* Onshore Contract, Section II; Offshore Contract, Section II; Award ¶ 424 ("[O]n May 10, 2010 the Parties agreed on the principal terms of the EPC Contract in a Baseline Agreement and Negotiated Terms and Conditions."). Accordingly, the parties and the Tribunal often refer to them together. *See, e.g.,* Petition ¶ 57; (citing to "Onshore and Offshore . . . TC" together); Petitioners' Mem. at 6–7 (same); Award ¶ 433 (same).

1.      **Cost-Reimbursable Structure and Countervailing Cost Control Commitments**

Together, the EPC Contracts provide for Petitioners to perform EPC work on the refinery on a cost-reimbursable basis. Award ¶ 433. Accordingly, the EPC Contracts do not set a fixed contract price. Instead, the EPC Contracts' "value" would be determined by CB&I's construction costs, plus a $175,750,000 fixed fee, Dkt. Nos. 15-5 & 9:

> As a result of the cost-reimbursable nature of this Agreement, this Agreement is of indeterminate value . . . The actual value of this Agreement . . . shall be determined by adding together the value of all amounts which the Contractor has been paid, or is entitled to be paid, in each case in accordance with Section IV Appendix II.

TC § 58.1.1.

To mitigate the risks Respondent assumed as the party responsible for the indeterminate costs of the Project, *see* Award ¶ 247, several provisions required Petitioners to work to constrain them. In the Project Execution Plan, which is "incorporated into the . . . Onshore and Offshore Agreements," *id.* ¶ 428, the parties agreed that CB&I would assume what the Tribunal defined as a "Heightened Diligence Obligation," *id.* ¶¶ 265, 866:

"[E]ven though a reimbursable contract, CB&I project management will rigorously control cost and schedule similar to a lump sum contract, safeguarding Reficar resources as if their own.

*Id.* ¶ 427. Moreover, in Section IV of the Onshore and Offshore Contracts, the parties agreed that

CB&I would assume what the Tribunal defined as a "Reasonable Cost Obligation," *id.* ¶ 266:

In consideration of the performance by the Contractor of the Work under this Agreement, the Owner will pay the Contractor on a cost reimbursable basis . . . and the amount payable shall be the Contract Price. Only costs which are reasonably and properly incurred by the Contractor in accordance with the Agreement in carrying out the Work shall be paid by the Owner.

*Id.* ¶ 882. The Tribunal dubbed these two obligations the "Cost Control Commitments." *Id.* ¶ 265.

It found that "CB&I accepted these additional obligations[] because it wanted to encourage Reficar

to change its mind, abandoning its original idea of awarding the construction of the Refinery on a

lump sum basis and accepting, instead, a cost-reimbursable structure." *Id.* ¶¶ 864–65.

## 2. Liquidated Damages and Liability Limitation Provisions

The EPC Contracts also provide for "Delay Liquidated Damages" payable by CB&I. They

are defined as "liquidated damages for delay in achieving Mechanical Completion by the Guaranteed

Completion Date." TC § 1.1. Delay Liquidated Damages correspond to what the Tribunal termed

CB&I's "Schedule Control Commitments," which were defined by a "Guaranteed Completion

Date" and a "Mechanical Completion Date." Award ¶ 1552. The Guaranteed Completion Date of

the Project started out as "28 February 2013," but was revisable pursuant to other terms and

conditions. *Id.* Mechanical Completion was defined by reference to various performance metrics

across the contracts. *Id.*; *see* Award ¶¶ 1558–1650. Delay Liquidated Damages accrued each day of

CB&I's delay in achieving Mechanical Completion by the Guaranteed Completion date, but were

capped at $45.75 million. *Id.* ¶ 2107 n.2092; TC § 54.8.3.

The EPC Contracts also provided for a $70 million cap on CB&I's "total aggregate liability"

under the agreements. TC § 8.1.1. If that liability cap applied, then CB&I's liability for Delay

Liquidated Damages could not exceed $15.75 million.  *Id.* §§ 8.1.1, 54.8.1(i); Award ¶ 476.  However, the caps on aggregate liability and Delay Liquidated Damages were expressly inapplicable to, among other things, "liability arising from any fraud, Gross Negligence, or Willful Misconduct committed by [CB&I]."  TC § 8.1.1(iii).

### 3.    Choice of Law Provisions

As discussed, the Onshore and Offshore Contracts provide for, respectively, Colombian and New York law to apply to "any matter relating thereto."  TC § 82.1.  Where, as here, a dispute implicates both Contracts, the DRA contains several relevant provisions.  On one hand, the DRA provides, in language that Petitioners argued in arbitration "mean[t] that New York law applies to those . . . claims that relate to the Offshore Agreement," Award ¶ 209; *see also, e.g., id.* ¶¶ 2105, 2301:

> The Arbitral Tribunal shall be governed by and shall apply the substantive law governing the Agreement under which the Dispute(s) arise.  If the Dispute(s) refers to two (2) or more agreements with different applicable law, the Arbitral Tribunal shall apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement.

DRA § 4.12.  On the other hand, the DRA also provides, in language that the Tribunal interpreted as "favour[ing] that only one law be applied" even where a dispute implicates the Onshore and Offshore Contracts, Award ¶ 212:

> The inter-related nature of the Project Agreements means that Disputes may arise under one Project Agreement which are related to Disputes which arise under one or more other Project Agreements, and it is in the interest of the Parties that such related Disputes be resolved in a consistent manner.

DRA at 4.

The Coordination Agreement also contains several relevant choice-of-law provisions.  Sections 4.1 and 4.22 provide, in language that the Tribunal concluded "provide[s] that neither party can excuse its liability [by] alleging that the claim against it was brought under the wrong contract," Award ¶ 193:

> Each Contractor undertakes not to contend, in connection with any Dispute . . . that it is not liable in respect of any Dispute . . . on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made.
>
> . . .
>
> The Owner undertakes not to contend, in connection with any Dispute . . . that it is not liable in respect of any Dispute . . . on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made.

Coordination Agreement §§ 4.1, 4.2.2.  Similarly, Section 1.1 and 1.2 provide, with respect to CBI Colombiana (the "Onshore Contractor") and CB&I UK (the "Offshore Contractor"):

> The Onshore Contractor undertakes not to allege that it is not liable in respect of a claim under the Onshore Contract on the grounds that the claim should properly have been made under the Offshore Contract.
>
> . . .
>
> The Offshore Contractor undertakes not to allege that it is not liable in respect of a claim under the Offshore Contract on the grounds that the claim should properly have been made under the Onshore Contract.

Coordination Agreement §§ 1.1, 1.2.

### 4.    Arbitration Provisions

In the DRA, the parties agreed to submit to arbitration "any dispute, controversy, or claim which arises out of or is related to any one or more of the Project Agreements." DRA § 1.1.  The arbitration was to be administered and conducted under the ICC rules and the DRA:

> Any Dispute not amicably resolved by the Parties . . . must be referred to and finally resolved by arbitration administered by the ICC and conducted under the ICC Rules as modified by this Agreement.

*Id.* § 4.1.  The DRA further provided that "[t]he place and seat of arbitration shall be New York," and that the Tribunal "may hold hearings, meetings or sessions only where convenient" where "agreed to by all Parties to the arbitration."  *Id.* § 4.9.

### D.    The Arbitration

On March 8, 2016, Respondent initiated arbitration in accordance with the DRA.  Award ¶ 27.  Among many other things, Respondent sought compensatory damages for Petitioners' breaches of the EPC Contracts.  CB&I had missed its construction deadlines by more than two years, and had billed Respondent $5.908.2 billion in construction costs, approximately $2.5 billion more than the estimates it submitted to Respondent in 2010.  *Id.* ¶ 280.  Respondent argued that CB&I's performance was the result of gross negligence, such that the EPC Contracts' limitations on its liability did not apply.  *See id.* ¶¶ 2108–10.

The parties assembled a three-member arbitral panel.  Respondent appointed Professor Andrés Jana, the Vice President of the International Court of Arbitration at the ICC; CB&I appointed Sir Vivian Ramsey, the former presiding judge of the Technology and Construction Court in the United Kingdom; and the two appointees appointed as chairman of the panel Professor Juan Fernández-Armesto, the former president of the Spanish equivalent of the U.S. Securities and Exchange Commission.  *Id.* ¶¶ 37–38; Respondent's Mem. at 1.  No party objected to these panelists, and the ICC confirmed them on July 18, 2016.  Award ¶ 37.

The arbitration became "the largest and one of the most complex construction disputes in the world."  Dkt. No. 15-3, Ex. 2 ¶ 3.  The proceedings lasted seven years, and involved thousands of pages of pleadings over seven rounds of briefing, more than 7,500 exhibits, over 100 witness statements, 41 expert reports, and six weeks of merits hearings.  *See* Award ¶¶ 122–31.  Even the fraction of the dispute that is relevant to this petition is substantial.  It is outlined here.

#### 1.    Arbitral Procedures

In October 2016, the Tribunal submitted to the parties a draft of Procedural Order No. 1, which would govern the timing and procedures of the arbitration, and invited comments.  *Id.* ¶ 43.  The following month, the parties jointly submitted an updated version of Procedural Order No. 1,

on which they had reached "complete agreement" except for two discovery matters not relevant here. *See* Respondent's Mem. at 6–7; Petitioners' Reply at 4. Procedural Order No. 1 provided for four rounds of substantive argument before the tribunal: first, a simultaneous submission of "non-exhaustive initial pleadings"; second, after a period of discovery, a simultaneous submission of "exhaustive pleadings," as well as expert and fact witness statements; third, a simultaneous submission of "reply pleadings," which could respond to the exhaustive pleadings but could not otherwise introduce new evidence or argument; and finally, a merits hearing (the "Hearing") before the Tribunal, for which three weeks were initially scheduled, plus an additional week in reserve. Petitioners' Mem. at 25–26; Respondent's Mem. at 7. The Tribunal issued Procedural Order No. 1 later that month. Respondent's Mem. at 8.

The arbitration largely followed the structure in Procedural Order No. 1, with two notable exceptions. First, both parties argued that the other party's "reply pleadings" contained new arguments. Award ¶ 57. Accordingly, the Tribunal allowed both sides to submit an additional round of specified submissions.[4] *Id.* In response to CB&I's reply brief, Respondent was permitted to submit an additional 25-page written submission, two supplemental witness statements, and a supplemental expert report. Dkt. No. 39-10 ¶¶ 6–7. In response to Respondent's reply brief, CB&I was permitted to submit, among other things, two new expert reports, three new fact witness statements, and two evidentiary guides totaling 25 pages, to match the length of Respondent's additional written submission. *Id.* ¶¶ 12–20.

---

[4] CB&I also argued that Respondent's non-exhaustive initial pleading improperly "failed to disclose Reficar's alleged damages or explain any causative nexus between those damages and the substantive claims being asserted." Petitioners' Mem. at 26; Dkt. No. 15-21, Ex. 65. Respondent provided more details substantiating its damages and causation theories in its exhaustive pleading. Petitioners' Mem. at 27; Dkt. No. 15-19, Ex. 42. The Tribunal did not change the procedure for written submissions in response to Petitioners' argument. Under Procedural Order No. 1, it was not until the parties' exhaustive submissions that they were required to state "the relief sought exhaustively." Procedural Order No. 1 ¶ 46.

Second, the schedule for the Hearing changed.  In 2019, CB&I "repeatedly requested that the Hearing schedule be enlarged to a minimum of six weeks," Petitioners' Mem. at 30 (emphases and alterations omitted), in light of the ballooning complexity of the dispute, *see id.*, and in particular Respondent's broader theories of causation and damages in its exhaustive and reply pleadings, *see id.* at 29–30.  In response, the Tribunal expanded the Hearing schedule, but not to six weeks.  Instead, it "settled on a 23-day Hearing schedule with 7-hour hearing days," *id.*; Dkt. No. 18, Ex. 30 ¶ 14, reasoning that this was "sufficient time for the Parties to properly examine fact and expert witnesses, and to properly present their case to the Tribunal," Dkt. No. 18, Ex. 30 ¶ 15.

### 2.  Virtual Hearing

The Hearing procedures changed again as a result of the COVID-19 pandemic.  In the fall of 2020, the parties submitted arguments regarding whether the upcoming Hearing should be held virtually for health and safety reasons.  *See* Dkt. No. 15-22, Ex. 88 ¶ 20.  Respondent argued in favor of a virtual hearing, but Petitioners objected, citing due process concerns and the ICC Rules, as well as Section 4.9 of the DRA, which provided that the "place and seat of arbitration shall be New York," and permitted the Tribunal to "hold hearings, meetings, or sessions anywhere convenient and as agreed to by all Parties to the arbitration."  *Id.* ¶¶ 31–38; DRA § 4.9.

On September 7, 2020, Tribunal ordered that the Hearing be conducted virtually.  Dkt. No. 15-22, Ex. 88 ¶ 72.  The Tribunal first observed that, at that time, "[t]he COVID-19 pandemic ha[d] . . . not abated," that "[a] physical hearing would require that many people travel from a number of locations to the chosen venue and that during the hearing perhaps up to 100 people gather in a single room," and that holding such a hearing "would imply a health risk for all participants and their relatives."  *Id.* ¶ 40.  The Tribunal determined that it was "not prepared to assume such responsibility."  *Id.*  The Tribunal then conducted a 29-paragraph analysis of the DRA and the ICC Rules, and determined that both permitted the Tribunal to order a virtual hearing "absent consent of

11

one of the parties." *Id.* ¶ 42.  As to Section 4.9 of the DRA, the Tribunal concluded that it required

the Tribunal to obtain consent from the parties before determining the location of physical

meetings, but did not limit the Tribunal's power to order virtual meetings.  *Id.* ¶¶ 55–59.  The

Tribunal reasoned that, among other things, "the DRA uses the expression 'anywhere,' an adverb of

place which clarifies that the rule can only refer to physical meetings."  *Id.* ¶ 58.  The Tribunal also

observed that the parties' Joint Proposal on Hearing Logistics, submitted in 2019, contemplated

virtual testimony upon a showing of "undue hardship" or "due cause."  *Id.* ¶ 63; Dkt. No. 15-22, Ex.

93 at 4.  It found that Respondent had satisfied the "due cause" requirement by pointing to the

"present pandemic."  *See* Award ¶ 64.

The Tribunal ordered a virtual Hearing schedule that preserved essentially the same hearing

time, but spread out over 34 days with shorter hearing days.  Petitioners' Mem. at 30–31; Petitioners'

Reply at 4.  The Hearing eventually took place in two parts, first from May 17 to June 4, 2021, and

then from June 28 to July 16, 2021.  Award at 5, 7.

### 3.    Cross-Examination Procedures

On November 16, 2019, the parties submitted a Joint Proposal on Hearing Logistics

governing, among other things, the "timing and identification of fact witnesses for cross-

examination."  Dkt. No. 15-22, Ex. 93 at 4.  Under the Joint Proposal, each party would designate

which witnesses they intended to cross-examine at the Hearing.  *Id.*  The parties agreed to make

available, by February 3, 2020, those "Fact Witnesses identified for cross-examination."  *Id.*  The

parties further agreed that "[i]f any Fact Witness will *not* be made available for in-person

examination, the opposing party must provide [by February 3, 2020] the justification for the Fact

Witness not being able to appear in person."  *Id.*  CB&I initially designated 32 Reficar fact witnesses

for cross-examination, but noted that "CB&I may be able to narrow this list based on the

submission of . . . Witness Statements and Evidence Guides" that it was preparing.  Dkt. No. 15-18, Ex. 31.

On October 20, 2020, as the start date for the Hearing approached, the Tribunal directed the parties to, among other things, "narrow, to the extent possible, Fact Witnesses previously designated for cross examination."  Dkt. No. 15-18, Ex. 32 at 8.  CB&I subsequently narrowed its list of witnesses designated for cross-examination to 13 fact witnesses.  Dkt. No. 15-18, Ex. 35.

On March 22, 2021, the Tribunal adopted the parties' agreed-upon procedures for introducing and cross-examining fact witnesses (the "Hearing Protocol").  Dkt. No. 15-18, Ex. 33; Petitioners' Mem. at 16.  Among other things, the Hearing Protocol provided that the Tribunal could not consider the written statement of a fact witness who failed to appear for cross-examination unless the Tribunal found that a "legitimate reason" was provided for the witness's absence:

> In its discretion, the Tribunal may also consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question provides a legitimate reason for the Fact Witness's failure to appear.  The Tribunal will evaluate the weight of that Witness Statement considering the entire record and all other relevant facts and circumstances.  The Tribunal *shall not* consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question fails to provide a legitimate reason for the Fact Witness's failure to appear.

Dkt. No. 15-18, Ex. 33 ¶ 79 ("Hearing Protocol") (emphasis in original).

### 4.    Colombian Government Proceedings

In March 2018, following CB&I's exhaustive pleadings, "the Tribunal became aware of the existence of an Ordinary Fiscal Liability Proceeding of the Colombian Contraloría General de la República [the "Contraloría"] against [CB&I]."  Award ¶ 59 (emphasis omitted).[5]  The proceeding

---

[5] Petitioners argue that the *Contraloría* proceeding was "politically motivated."  Petitioners' Mem. at 2, 9, 20.  The Award did not make such a finding.  Petitioners do not support their argument with findings from the Tribunal, but rather with various news articles.  *Id.* at 9; Dkt No. 15-16, Ex. 15; Dkt No. 15-17, Exs. 16, 17, 18.  Petitioners do not point to, and the Court does not find, anything within those articles that would permit the Court to judicially notice that the proceeding was politically motivated.  The Court therefore does not find, for the purposes of this petition, that the *Contraloría* proceeding was politically motivated.  *See Westerbeke*, 304 F.3d at 213.

arose from the cost overruns and delays associated with the Project, *see, e.g.*, *id.* at 3–4, ¶ 2202, and named as defendants, among others, CB&I, Foster Wheeler USA Corporation and Process Consultants, Inc. ("Foster Wheeler"), a consultant for Respondent on the Project, and certain of their employees, *see id.* at 5, ¶¶ 59, 76, 158; Petitioners' Mem. at 9.

Among other reasons, the Contraloría proceeding was relevant because a "voluminous" casefile of evidence pertinent to the arbitration was submitted in that proceeding. Award ¶ 131 n.145. The Parties disputed whether that evidence could be admitted before the Tribunal. *Id.* ¶ 76. On December 19, 2018, the Tribunal, over Respondent's objections, admitted the evidence. *Id.* The Tribunal later admitted more evidence from the proceeding in January and February 2021. *Id.* ¶¶ 80–81.

On June 29, 2020, a separate agency of the Colombian government, the Superintendencia de Sociedades (the "SDS"), assumed control over CBI Colombiana and ordered its liquidation. *Id.* ¶ 8. On November 11, 2020, after an inquiry from the Tribunal, the SDS notified the Tribunal that CBI Colombiana would "keep on participating in the referred procedures and maintains all the previous arguments, defenses, and claims presented before the tribunal and henceforth adheres to all arguments, defenses, writs, requests and filings presented by [CB&I]," and that it "shall not appoint counsel for the proceedings." *Id.* ¶¶ 10–11. The arbitration proceeded without any further disruptions from the SDS or CBI Colombiana. *See id.* ¶¶ 12–14.

In the spring of 2021, shortly before the Hearing was finally scheduled to take place, the Contraloría issued an order "attributing fiscal liability" arising from the Project's delays and cost overruns to CB&I, Foster Wheeler, and some of their employees (the "Contraloría Order"). *Id.* ¶ 158; Petitioners' Mem. at 10.

### 5.    Contested Witness Statements

Among the 13 Reficar fact witnesses that CB&I identified for cross-examination were Christian Mantilla and Andrés Riera.  Dkt. No. 15-18, Ex. 35.  Mantilla was a "civil engineer employed by Reficar's consultant, Foster Wheeler," who had roles as, among other things, "vice-president of the Project," "vice-president of the pre-commissioning and start-up," and "advisor to Ecopetrol, Reficar's parent company."  Award ¶ 155.  Riera "likewise served as the vice-president of the Project and vice-president of pre-commissioning and start-up," and "later served as technical manager and refining advisor to Ecopetrol."  *Id.*

Between them, Mantilla and Riera submitted three of the "over a hundred witness statements" relied on by the parties in the arbitration proceedings (the "Witness Statements").  Award ¶¶ 126, 155 n.154, 155 n.155.  The Witness Statements stated, among other things, that Petitioners' "poor planning was to blame for construction progress underperformance," Petitioners' Mem. at 18 (describing Mr. Mantilla's written testimony), and that Petitioners' "poor engineering performance was entirely attributable to [their] lack of competency and [their] desire to increase . . . profits by prolonging the work," *id.* at 19 (describing Riera's written testimony).

Despite their designation for cross-examination, Mantilla and Riera "failed to appear at the Hearing."  *Id.* ¶ 154.  Respondent did not announce their unavailability when they were designated for cross-examination.  Petitioners' Mem. at 15.  Instead, Respondent announced Mantilla's unavailability on May 13, 2021, "four days prior to the Hearing," and announced Riera's unavailability on May 20, 2021, "four days into the Hearing."  Award ¶ 156.  "CB&I submitted its objections to both announcements on May 13 and May 21, 2021, respectively."  *Id.*

Respondent proffered, as a "legitimate reason" for Mantilla's "last-minute" unavailability, Dkt. No. 15-18, Ex. 33 ¶ 79; Award ¶ 158, that he "had been instructed by his employer, Foster Wheeler, to refrain from attending the Hearing in light of the then-recent order issued by the

Contraloría attributing fiscal liability to Foster Wheeler and some of its employees," Award ¶ 158. As for Riera, he "could not attend the Hearing for the same underlying reason of having to manage the aftermath of the Contraloría order." *Id.* Respondent argued that "both witnesses [were] directly affected" by the order. *Id.*

CB&I objected that neither witness failed to appear for a legitimate reason. It argued that the Contraloría Order had been issued two weeks before the Hearing, and thus did not explain the suddenness of their unavailability. *See id.* ¶ 164. CB&I also argued, among other things, that both witnesses had submitted Witness Statements to the Tribunal while the Contraloría proceeding was still ongoing (though before the Contraloría order was issued), and that other witnesses at greater "risk in the Contraloría proceeding" had "all appeared during the ICC hearing." Petitioners' Mem. at 20–21. Finally, CB&I argued that "it would be highly prejudiced if the Tribunal accepts information from witnesses CB&I was unable to cross-examine." Award ¶ 164.

The Tribunal ultimately found that "both Parties [were] partially correct." *Id.* ¶ 165. It found that the Contraloría Order "had a specific impact on the personal situation of the two witnesses," and thus that both "witnesses indeed had a 'legitimate reason' not to appear at the Hearing." *Id.* ¶ 166. On the other hand, it found that CB&I's "position could be prejudiced by the fact that it has been unable to cross-examine two of Reficar's witnesses, whom it had specifically selected for these purposes." *Id.* ¶ 167. Accordingly, the Tribunal declined to strike Mantilla's and Riera's witness statements or any portions of Respondent's expert reports based thereon, but it "appl[ied] additional scrutiny to all the evidence in the case file based on the [Witness Statements]," and "t[ook] account in assessing the weight given the fact that there was no opportunity for CB&I to cross-examine these witnesses." *Id.* ¶ 168. Consistent with that determination, the Tribunal did not cite to any Witness Statement anywhere in the Award, other than in its discussion of whether to admit them.

### E.    The Award

On June 2, 2023, the Tribunal issued the Award.  The Award is nearly 500 pages long.  It provides, among other things, a 50-paragraph analysis of the various contracts' choice-of-law provisions, *id.* ¶¶ 187–236; a 537-paragraph analysis of Respondent's breach-of-contract claim, *id.* ¶¶ 828–1364; a 196-paragraph analysis of Respondent's claim for Delay Liquidated Damages, *id.* ¶¶ 1530–1725; and a 188-paragraph analysis of the applicability of the agreements' liability caps, *id.* ¶¶ 2083–2270.  The Award also rejected Respondent's arguments that CB&I had fraudulently induced it to enter into the cost-reimbursable EPC Contracts, *id.* ¶ 695, and rejected Respondent's claims for various consequential and indirect damages, including lost profits, *id.* ¶ 2426.

On the other hand, the Award found that CB&I had breached its Cost Control Commitments and its Schedule Control Commitments under the EPC Contracts.  It found that CB&I was liable for $845.4 million for its breach of the Cost Control Commitments, and that CB&I was liable for $152.75 million in Delay Liquidated Damages for its breach of the Schedule Control Commitments.  *Id.* ¶ 2078.  The Award found that CB&I's breaches of both commitments rose to the level of gross negligence, such that the agreements' liability caps did not apply.  *Id.* ¶ 2270.  The Award also found that CB&I was liable for $10.3 million in "defects" to its work on the Project.[6]  *Id.* ¶ 2271.  Finally, the Award found that CB&I N.V., CB&I UK, and CBI Colombiana were jointly and severally liable for the full damages award, *id.* ¶ 2314, which amounted to $937,495,061.

### F.    Procedural History

Petitioners filed their petition to vacate the Award on June 8, 2023.  Dkt. No. 1 (Petition); Dkt. No. 6 (Petitioners' Mem.); Dkt. No. 15 ("Shapiro Decl.").  Respondent filed its cross-petition to confirm the Award on August 4, 2023.  Dkt. No. 38; Dkt. No. 37 (Respondent's Mem.); Dkt. No. 39 ("Steinglein Decl.").  Petitioners filed their reply in support of the petition to vacate and

---

[6] Petitioners do not challenge this part of the Award.  *See* Petitioners' Mem. at 12.

opposition to Respondent's cross-petition to confirm in one brief, on August 31, 2023.  Dkt. No. 51 ("Supp. Shapiro Decl."); Dkt. No. 52 (Petitioners' Reply);[7] Dkt. No. 54.  Respondent filed its reply in support of its cross-petition to confirm on September 22, 2023.  Dkt. No. 55 (Respondent's Reply); Dkt. No. 56 ("Supp. Steinglein Decl.").

On October 10, 2023, the United States Bankruptcy Court of the State of Texas issued a stay order pursuant to a bankruptcy petition filed by CB&I UK and McDermott International Holdings B.V., into which CB&I N.V. had merged.  Dkt. No. 72-1; *see also* Dkt. No. 19.  The Court stayed this case later that day.  Dkt. No. 73.

On May 21, 2024, Respondent notified the Court that the bankruptcy stay had been lifted. Dkt. No. 74.  The Court lifted the stay in this case that same day.  Dkt. No. 75.

## II.    JURISDICTION

The Court has subject-matter jurisdiction over this dispute pursuant to 9 U.S.C. § 302, which provides for jurisdiction over an action falling under the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"), 9 U.S.C. § 302 (incorporating 9 U.S.C. § 203); *accord Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 390 (2d Cir. 2011), provided that the action is not "entirely between citizens of the United States" and that it arises out of a "commercial" legal relationship, 9 U.S.C. § 302 (incorporating 9 U.S.C. § 202); *accord Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 44 (2d Cir. 1994) (observing that, where an arbitration award does not arise from a "dispute[] between citizens of the United States," "[t]he only express prerequisite to the court's jurisdiction [under Section 302] is that the dispute between the parties concerns a commercial transaction or agreement").  The parties to this action are foreign corporations, Petition ¶¶ 1–3, and there is no question that this is a commercial dispute, *see, e.g.*, *id.* ¶ 25 (describing $1 billion arbitration award).

---

[7] Petitioners filed identical versions of their reply brief and supplemental declaration at Dkt. Nos. 53 and 50, respectively.

Under the Panama Convention, "the country in which an arbitral award is rendered 'is said to have primary jurisdiction over the arbitration award,'" *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 & n.2 (2d Cir. 2022) (quoting *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71 (2d Cir. 2017)),[8] and may therefore enforce, set aside, or modify the award "in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief," *id.* at 62 (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)).  Accordingly, because the arbitral award in this case was rendered in New York, Petition ¶ 8, this Court has jurisdiction to confirm or vacate the Award in accordance with the Federal Arbitration Act ("FAA").  *See, e.g.*, *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 160 (2d Cir. 2021).

## III.    LEGAL STANDARD

The Panama Convention applies to this dispute, Petitioners' Mem. at 12; Respondent's Mem. at 12 n.4, because the parties agreed in the DRA that the Award may be enforced "in accordance with the [Panama Convention] and, where not in conflict, the [New York Convention]." DRA at § 7.3.  The Panama Convention and the New York Convention are "substantively identical." *Esso*, 40 F.4th at 62 n.2; *accord Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 185 n.3 (2d Cir. 2017) (observing that "there is 'no substantive difference' between the Panama and New York Conventions" (quoting *Pemex*, 832 F.3d at 105)). Accordingly, "authority interpreting one may be applied to the other." *Esso*, 40 F.4th at 62 n.2; *accord Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 185 n.3

---

[8] The *Esso* court was concerned with the terms of a separate treaty, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"), but explained that "[i]t has long been established . . . that the Panama Convention is substantively identical to the New York Convention and that authority interpreting one may be applied to the other." 40 F.4th at 62 n.2.  As such, the *Esso* court relied, in part, on prior opinions addressing the terms of the Panama Convention. *See id.* at 61 (citing *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 106 (2d Cir. 2016)).

(2d Cir. 2017) (observing that "there is 'no substantive difference' between the Panama and New York Conventions" (quoting *Pemex*, 832 F.3d at 105)).

Because the Award was "entered in the United States, however, the domestic provisions of the FAA also apply," *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012), "as is permitted by Articles V(1)(e) and V(2)" of the Panama Convention, *see id.* (interpreting New York Convention); *Corporacion Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploracion y Produccion*, 962 F. Supp. 2d 642, 655 n.18 (S.D.N.Y. 2013), *aff'd*, 832 F.3d 92 (2d Cir. 2016) ("The relevant portion of Article 5(1)(e) of the Panama Convention is substantially identical to the analogous portion of Article V(1)(e) of the New York Convention.") (collecting authorities).  The FAA applies to judgments entered under the Panama Convention "to the extent [it] is not in conflict with" Chapter 3, which codifies the Panama Convention, or the Panama Convention itself.  9 U.S.C. § 307.

"Neither party disputes that section 10 of the FAA governs the issues" before the Court in this case. *Scandinavian*, 668 F.3d at 71; Petitioners' Mem. at 13; Respondent's Mem. at 12.  Under Section 10, a court "may make an order vacating the award upon the application of any party to the arbitration" in "any of the following cases":

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In addition to these grounds, the Second Circuit has recognized an additional "judicially-created ground, namely that 'an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law.'"  *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011) (quoting *Westerbeke*, 304 F.3d at 208).

20

To obtain relief on these grounds, petitioners "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010); *accord Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (describing the "heavy burden" petitioners face in seeking vacatur of an arbitral award). The Second Circuit has "repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process." *Scandinavian*, 668 F.3d at 72 (quoting *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007)). The grounds for vacatur set forth in the FAA "all . . . involve corruption, fraud, or some other impropriety on the part of the arbitrators." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). Accordingly, "[i]t is not enough for petitioners to show that the panel committed an error—or even a serious error." *Stolt-Nielsen*, 559 U.S. at 671.

District courts "treat a petitioner's application to confirm or vacate an arbitral award as akin to a motion for summary judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011) (internal quotation marks omitted). The "party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006). "Generally, the arbitrator's rationale for an award need not be explained," *Leeward Constr. Co., Ltd. v. Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 638 (2d Cir. 2016) (internal quotation marks omitted)), and "only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award," *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 378–79 (2d Cir. 2023) (quotation marks and alterations omitted). This "severely limited" review avoids frustrating the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian*, 668 F.3d at 71–72 (quotation marks and citations omitted).

## IV.    DISCUSSION

Petitioners have not met their burden of demonstrating the "very unusual circumstances" required for vacatur of the Award. *Oxford Health,* 569 U.S. at 569 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).  Petitioners seek vacatur under three of the possible grounds for vacating an arbitral award under the FAA:  Section 10(a)(3), which permits vacatur when an arbitrator is guilty of procedural misconduct, 9 U.S.C. § 10(a)(3); Section 10(a)(4), which permits vacatur "where the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4); and the Second Circuit's "judicial gloss on the specific grounds for vacatur" in Section 10, which permits vacatur based on an arbitrator's "manifest disregard of the law," *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010).  None of these grounds apply to the Award in this case.  Accordingly, Petitioners' petition to vacate or modify the Award is denied.

### A.    The Tribunal Was Not Guilty of Procedural Misconduct That Warrants Vacatur

Petitioners' procedural arguments under Section 10(a)(3) do not justify vacatur of the Award because they do not demonstrate that the arbitral proceedings were fundamentally unfair.  "It is well settled that procedural questions that arise during arbitration, such as which witnesses to hear and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts."  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016).  "Arbitrators do not 'need to comply with strict evidentiary rules,' and they possess 'substantial discretion to admit or exclude evidence.'"  *Id.* (quoting *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 194–95 (2d Cir. 2013)); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (explaining that arbitrators "need not follow all the niceties observed by the federal courts").

Section 10(a)(3) provides a "narrow exception" to a court's deference to the arbitrator on procedural matters.  *Nat'l Football League*, 820 F.3d at 545.  Under Section 10(a)(3), a court may

vacate an arbitral award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). The Second Circuit has held that "misconduct occurs under this provision only where there is a denial of 'fundamental fairness.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Tempo Shain*, 120 F.3d at 20). Fundamental fairness does not require the arbitrator to "hear all the evidence proffered by a party," but it does require the arbitrator to "give each of the parties to a dispute an adequate opportunity to present its evidence and argument." *Tempo Shain*, 120 F.3d at 20 (quotation omitted). "To demonstrate arbitral misconduct, the challenging party must show that his right to be heard has been grossly and totally blocked, and that this exclusion of evidence prejudiced him." *Fid. Brokerage Servs. LLC v. Deutsch*, No. 17 Civ. 5778, 2018 WL 2947972, at *6 (S.D.N.Y. May 31, 2018), *aff'd*, 763 F. App'x 104 (2d Cir. 2019).

Petitioners dispute three procedural decisions made by the Tribunal, none of which support vacatur of the Award. They argue that the Tribunal improperly credited the testimony of two witness that did not appear for cross-examination, that it improperly managed the arguments raised in Respondent's written submissions, and that it placed improper time limits on the arbitration's oral hearing. These decisions did not render the proceedings "fundamentally unfair." *Tempo Shain*, 120 F.3d at 20. Accordingly, they do not support vacatur of the Award.

### 1. The Tribunal's Admission of Witness Statements from Two Witnesses Who Did Not Appear for Cross-Examination

The admission of Christian Mantilla's and Andrés Riera's witness statements was not fundamentally unfair, and therefore does not support vacatur of the Award. Petitioners' principal procedural objection to the Award is that it "credited" Mantilla's and Riera's witness statements even though they were designated for cross-examination and not produced. Petitioners' Mem. at 11.

Petitioners argue that the recent Contraloría Order was not a "legitimate reason" for Mantilla's and Riera's failures to appear for cross-examination, and, accordingly, that their witness statements should have been stricken from consideration. Petitioners' Mem. at 21 (citing Hearing Protocol ("The Tribunal shall not consider the Witness Statement of a Fact Witness who fails to appear if the Party proffering the Fact Witness in question fails to provide a legitimate reason for the Fact Witness's failure to appear.") (emphasis omitted)). Petitioners also argue that the failure to strike the Witness Statements prejudiced them because "the Tribunal . . . founded material aspects of its Award on these witness's testimony." *Id.* at 14. Neither argument supports vacatur here, for multiple reasons.

First, the Tribunal's decision to consider the Witness Statements followed directly from the parties' agreements. When an arbitrator decides a procedural matter by "arguably construing or applying the contract," "no fundamental fairness" can follow. *Nat'l Football League*, 820 F.3d at 547 (quotation omitted). The parties themselves negotiated and agreed to the Hearing Protocol for excluding witness statements during the Hearing. *See* Petitioner's Mem. at 16. The Hearing Protocol permitted the inclusion of a witness's statement in spite of his failure to appear for cross-examination so long as he provided a "legitimate reason," *id.* (quoting Hearing Protocol ¶ 79), and, importantly, left the determination of whether a party had provided a "legitimate reason" to the "discretion" of the Tribunal, Hearing Protocol ¶ 79 (not reserving for the parties the question of whether a "legitimate reason" existed for a fact witness's failure to appear for cross-examination); *see also* Award ¶ 161; Petitioners' Mem. at 20–21 (disputing Tribunal's determination that a "legitimate reason" was provided, but not disputing that the question was properly submitted to the Tribunal). The Tribunal, consistent with the Hearing Protocol, invited briefing and oral argument from the parties regarding whether Respondent had provided a legitimate reason for Mantilla's and Riera's absence, Award ¶¶ 115, 157 & n.160, and, despite Petitioners' arguments, issued a ruling that

favored both parties, *see id.* ¶ 165 (finding that "both Parties are partially correct").  The Tribunal

found that the Contraloría Order "had a specific impact on the personal situation of the two

witnesses," and thus that they had a "legitimate reason" for their absences on short notice.  *Id.* ¶ 166.

However, the Tribunal also found that Petitioners would be prejudiced if the Witness Statements

were admitted without cross-examination.  *Id.* ¶ 167.  Accordingly, while the Tribunal admitted the

Witness Statements, it "appl[ied] additional scrutiny to all the evidence in the case file based

[thereon]."  *Id.* ¶ 168.

  The Tribunal's decision fell easily within the discretion afforded to it under the parties'

agreement, *see id.* ¶ 161, and within its otherwise "substantial discretion to admit or exclude

evidence," *Kolel*, 729 F.3d at 107 (quoting *LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc.*, 725 F.3d

184, 195 (2d Cir. 2013)).  Far from engaging in procedural "misconduct," 9 U.S.C. § 10(a)(3), the

Tribunal did everything the Petitioners tasked it with doing in the Hearing Protocol, *see* Hearing

Protocol ¶ 79b; *see also* Petitioners' Mem. at 16, and more.  The Tribunal afforded both sides the

opportunity to dispute the legitimacy of the witnesses' absences, articulated a reasonable basis to

conclude that the absences were legitimate, *see* Award ¶ 166, and nonetheless consciously mitigated

the prejudicial impact to Petitioners of declining to strike the Witness Statements, *see* ¶ 168 (applying

"additional scrutiny" to all evidence based on Witness Statements).  That determination does not

warrant vacatur, as the Tribunal was merely "construing or applying the contract and acting within

the scope of [its] authority."  *Nat'l Football League*, 820 F.3d at 547 (quoting *United Paperworks Int'l

Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

  Moreover, in any event, Petitioners have not shown that the Tribunal's closely scrutinized

consideration of the Witness Statements deprived them of "an adequate opportunity to present

[their] evidence and argument."  *Tempo Shain*, 120 F.3d at 20 (quotation omitted).  An arbitrator's

decision is not "fundamentally unfair," as required for vacatur, merely because it excludes some

"evidence proffered by a party." *Tempo Shain*, 120 F.3d at 20.  Instead, the decision must have

"grossly and totally blocked" the party from presenting its argument.  *E.g.*, *Fid. Brokerage Servs.*, 2018

WL 2947972, at *6; *Oracle Corp. v. Wilson*, 276 F. Supp. 3d 22, 29 (S.D.N.Y. 2017); *Stifel, Nicolaus &*

*Co. v. Forster*, No. 14 Civ. 6523 (RWS), 2015 WL 509684, at *5 (S.D.N.Y. Feb. 6, 2015).  Petitioners

did not get the opportunity to cross-examine Mantilla and Riera, but they did get the opportunity to

cross-examine twenty-three other Reficar witnesses, Award ¶ 129, including other high-level Reficar

employees, *see, e.g.*, *id.* ¶¶ 126, 129 (relying on hearing transcript for Ernie Houtz, "Vice President &

Project Director" and "Technical Consultant" for Reficar).  Petitioners were also permitted to

submit, among other things, at least seven rounds of substantive briefing, *id.* ¶ 122, thousands of

factual and legal exhibits, *id.* ¶ 123, expert reports from seven different expert witnesses, *id.* ¶ 127,

and "85 hours of testimony time" at the Hearing, Petitioners' Reply at 4.  Petitioners offer no

explanation, beyond mere speculation as to what new information cross-examination might have

yielded, *see* Petitioners' Mem. at 18–20; Petitioners' Reply at 30–32,[9] why their concededly ample

submissions to the Tribunal did not suffice to present their argument, Petitioners' Mem. at 3

(noting, among other things, that "the parties presented thousands of pages of arguments through a

series of written submissions").  *See, e.g.*, *Kolel*, 729 F.3d at 107 (upholding arbitral award, holding

that "[t]he Panel's decision to hear only one witness does not make the arbitration fundamentally

unfair," as it "held seven or eight sessions, for more than thirty hours total, to consider legal

arguments from both sides before it issued the Award, and was not required to hear more—or

any—testimony to reach its determination"); *MSV Synergy, LLC v. Shapiro*, No. 21 CIV. 7578 (ER),

---

[9] Petitioners offer almost no evidentiary support for their arguments that Mantilla and Riera would have "upended" the Award if cross-examined.  Petitioners' Reply at 30.  At most, Petitioners point to "contradict[ions]" between testimony Mantilla and Riera provided to the Tribunal and testimony they provided in the Contraloría proceedings.  Petitioners' Mem. at 19.  But as Petitioners concede, the Tribunal admitted that "contradict[ory]" testimony "as evidence in the Arbitration."  *Id.*  Petitioners cannot be said to have been "grossly and totally blocked" from being heard, therefore, merely because Petitioners did not have the opportunity to "examin[e] these conflicts through cross examination at the merits Hearing."  *Id.*; *see Fid. Brokerage Servs.*, 2018 WL 2947972, at *6.

2024 WL 4931868, at *9 (S.D.N.Y. Dec. 2, 2024) (upholding arbitral award where tribunal purportedly "failed to consider or apply certain evidence," noting that the tribunal heard testimony from five witnesses, received dozens of exhibits, and reviewed multiple memoranda from the parties).  Having failed to demonstrate that their opportunity to present their argument was grossly and totally blocked, Petitioners have failed to demonstrate that the Tribunal's decision not to exclude the Witness Statements supports vacatur of the Award.  *E.g.*, *Fid. Brokerage Servs.*, 2018 WL 2947972, at *6.

Finally, even putting those reasons aside, Petitioners have failed to demonstrate any prejudice resulting from the inclusion of the Witness Statements.  Prejudice is a required element for vacatur under Section 10(a)(3), *see* 9 U.S.C. § 10(a)(3) (". . . by which the rights of any party have been prejudiced"), and Petitioners bear the burden of demonstrating it, *e.g.*, *D.H. Blair*, 462 F.3d at 110.  Despite this, and despite acknowledging that "the Tribunal attempted to minimize the prejudice" that could follow from admitting the Witness Statements, Petitioners' Reply at 33, Petitioners do not point to a single instance where the Tribunal made a "dispositive" decision based on the Witness Statements.  *MSV Synergy*, 2024 WL 4931868, at *9 (declining to vacate award where petitioners did not make a "showing that any excluded evidence was 'so dispositive to their claims that access to them—as opposed to all the other evidence and testimony before the Arbitrator— would have changed the outcome of the proceedings'" (quoting *Rollins v. Goldman Sachs & Co. LLC*, No. 18 Civ. 7162 (ER), 2022 WL 1124823, at *6 (S.D.N.Y. Apr. 14, 2022) (alterations omitted))).  Instead, Petitioners point to three occasions within the 500-page Award where the Tribunal cited, not to the Witness Statements themselves, but to letters that Riera sent to CB&I while the project was still ongoing.  *See* Petitioners' Reply at 31–32 (citing Award ¶¶ 929 n.988, 2203 n.2184).  But even if those letters were inseparable from Riera's witness statement, and even if the Tribunal's citations to them were dispositive to the Award, all three citations to those letters cited to additional

evidence besides Riera's letters to support the Award's findings. *See* Award ¶¶ 929 n.988, 1265, 2203 n.2184. Similarly, while Petitioners speculate that cross-examination of Mantilla and Riera would have "upended" the Award's calculation of a "reasonable benchmark" against which to measure damages, Petitioners' Reply at 30–31, that too is an argument based not on the substance of the Witness Statements themselves, but on separate—and in this case hypothetical—issues for which there was sufficient independent evidence to support the findings in the Award, *see, e.g.*, Award ¶¶ 1006–1010 (summarizing bases for establishing "reasonable benchmark," including, among other things, that the benchmark was "an estimate prepared by [Petitioners]"). Petitioners' failure to identify instances where it was prejudiced by the inclusion of the Witness Statements independently "defeats [their] claim for vacatur." *Oracle*, 276 F. Supp. 3d at 32 (rejecting procedural objections to arbitral award because petitioner failed to identify prejudice with "particularity").

### 2. The Tribunal's Management of the Parties' Written Submissions Was Not Fundamentally Unfair

The Tribunal was not "guilty of misconduct" in its management of the arguments presented in the parties' written submissions. 9 U.S.C. § 10(a)(3). Petitioners argue that the Award should be vacated because the Tribunal did not require Respondent's initial non-exhaustive briefs to "disclose" its alleged damages, or to allege a "causative nexus" between those damages and Petitioners' alleged conduct. Petitioner's Mem. at 26–27. But that decision merely complied with the parties' agreed-upon protocol for written submissions, Shapiro Decl. Ex. 60 at Annex I ¶ 9 ("Procedural Order No. 1"), and "[t]here is simply no fundamental unfairness in affording the parties precisely what they agreed on," *Nat'l Football League*, 820 F.3d at 547. Under Procedural Order No. 1, Respondent's non-exhaustive brief was intended to be just that. Respondent's Mem. at 19. It was not until the "exhaustive" round of briefing that the parties were required to state "the relief sought exhaustively." Procedural Order No. 1 ¶ 46. And as Petitioners concede, Respondent quantified its damages, and provided a supporting "causation theory," in its exhaustive brief. Petitioners' Mem. at

27.  The Tribunal's acceptance of Respondent's damages statements at this stage, therefore, merely complied with the parties' agreed-upon protocol for written submissions.  Such decisions do not support vacatur under Section 10(a)(3).  *Nat'l Football League*, 820 F.3d at 547 (denying vacatur where arbitrator's decision was, "at the very least, arguably construing or applying the contract" (quotation omitted)); *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 CIV. 7428 (PAE), 2016 WL 3913599, at *20–*21 (S.D.N.Y. July 15, 2016) (denying vacatur under Section 10(a)(3) where the arbitrator's decision "derived from the structure of the License Agreement").

The Tribunal's purported decision to "admit[]" "new evidence and new argument" in its reply brief, Petitioners' Mem. at 28, also does not justify vacatur under Section 10(a)(3).  To start, Petitioners do not identify what new evidence and arguments were raised in that brief.  *See id.* at 28–29.  "[S]uch a lack of particularity defeats a claim for vacatur" under Section 10(a)(3), *Oracle*, 276 F. Supp. 3d at 29 (collecting cases), as it is Petitioners who "bear the burden of proof" of demonstrating that vacatur is warranted, *D.H. Blair*, 462 F.3d at 110.  *See Kolel*, 729 F.3d at 107 (denying vacatur under Section 10(a)(3) where there was no arbitration transcript and the parties did "not agree on multiple disputed facts," explaining that "[w]ithout a more detailed record of the proceeding, the party seeking vacatur cannot meet the high threshold in order to warrant vacating the award").  Moreover, as Respondent points out, both sides—not just Petitioners—argued before the Tribunal that the other side's reply briefs raised new arguments.  *See* Award ¶ 55–56.  The Tribunal responded by allowing both parties—including Petitioners—to submit additional materials responsive to the reply briefs.  *Id.* ¶ 57; Dkt No. 39-10 ¶¶ 12–20 (detailing additional materials Petitioners could submit to the Tribunal in response to Respondent's reply brief).  Petitioners do not address, let alone dispute, the mitigative effect that these additional submissions had on any prejudice suffered from Respondent's reply brief.  Petitioners' Reply at 28–34.  Accordingly, they

have failed to demonstrate the prejudice required for vacatur under Section 10(a)(3).  *See, e.g.*, *Oracle*, 276 F. Supp. 3d at 29.

3.    **The Length of the Hearing Was Not Fundamentally Unfair**

Petitioners' objections to the Hearing procedures fail under the same principles.  Petitioners argue that a six-week Hearing did not suffice "to ensure a comprehensive and complete presentation of the evidence," Petitioners' Mem. at 33, and thus that the Tribunal's decision not to "lengthen the Hearing by a few weeks" was "arbitrary" and "severely prejudicial," *id.* at 34.  Here again, Petitioners take issue with the Tribunal's enforcement of the parties' agreed-upon procedural protocols, Award ¶¶ 104–05 (explaining that "[o]riginally, the Hearing had been scheduled for one month" under Procedural Order No. 1), this time in a manner that not only did not "grossly and totally block[]" Petitioners from presenting their case, *Fid. Brokerage Servs.*, 2018 WL 2947972, but in fact expanded the length of the Hearing in response to Petitioners' requests, Award ¶ 106.  Petitioners initially agreed to a three-week hearing, with an additional week held in reserve.  Petitioners' Reply at 4.  Petitioners later requested that the Hearing be expanded to six weeks given the growing complexity of the case, *id.*; *see also* Award ¶ 106, and the Tribunal granted that request in part, scheduling the "rough[]" "equivalent" of a five-week Hearing spread out over six weeks with shortened days, *see* Petitioners' Reply at 4.  The Tribunal explained that "while the current dispute is one of the largest of its kind, in the Tribunal's experience [the modified Hearing schedule] should be sufficient to carry out all necessary witness examinations."  Petitioners' Mem. at 32.

The Tribunal's decision to expand the Hearing to five weeks rather than six is not a basis for vacatur under Section 10(a)(3).  The decision "was consistent with [the Tribunal's] broad authority to regulate procedural matters" in the arbitration "and comported with" the parties' agreements, *Nat'l Football League*, 820 F.3d at 545–46, and it did not "grossly and totally block" Petitioners' "right to be heard," *Fid. Brokerage Servs.*, 2018 WL 2947972.  As discussed, and as Petitioners concede, the

Tribunal accepted "thousands of pages of arguments" from the parties in written submissions, and multitudes more in witness statements and expert reports. Petitioners' Mem. at 3; *see generally* Award ¶¶ 122–131 (summarizing record evidence). Plaintiffs argue that the limited Hearing schedule prevented them from cross-examining additional witnesses, and from cross-examining important witnesses for longer, *see* Petitioners' Mem. at 32–33, but that is an argument on the margins, not an argument that "this case . . . is an exceptional one that warrants vacatur," *Nat'l Football League*, 820 F.3d at 532. Having accepted such substantial written submissions, the Tribunal did not violate fundamental fairness by holding five weeks of hearings rather than six. *See Kolel*, 729 F.3d at 107 (holding arbitrator's "decision to hear only one witness [did] not make the arbitration fundamentally unfair"); *see also id.* ("[A]rbitration proceedings require merely an expeditious and summary hearing, with only restricted inquiry into factual issues." (quoting *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 285 (S.D.N.Y. 2007))).[10]

## B.     The Tribunal did not Exceed Its Powers

Nor is vacatur appropriate on the theory that the Tribunal "exceeded [its] powers." 9 U.S.C. § 10(a)(4). Section 10(a)(4) permits courts to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). An arbitrator's powers are largely "a matter of contract," as "a party cannot be required to submit to arbitration any dispute which he

---

[10] Petitioners also briefly argue that the Tribunal's "identical allocation of examination time to both parties" at the Hearing was prejudicial because Respondent submitted more fact-witness statements and expert reports than Petitioners, leaving Petitioners with less cross-examination time per witness than Respondent. Petitioners' Mem. at 31–32 (noting that Petitioners submitted 26 fact-witness statements and 5,400 pages of expert reports, while Respondent submitted 42 fact-witness statements and 7,700 pages of expert reports). But as Petitioners recognize, the "allocations were not limited to cross-examination." *Id.* at 31. "[T]he parties had to draw from their . . . allocations to introduce and redirect their own witnesses" in addition to cross-examination the opposing witnesses. *Id.* While Petitioners may have had less cross-examination time per witness, Respondent had less time to introduce and redirect its own witnesses. Moreover, in any event, Petitioners had ample opportunity in its substantial written submissions—and in the Hearing—to present their case. The Tribunal "was not required to hear more—or any—testimony" beyond those submissions to satisfy the Court that the hearing was not fundamentally unfair. *Kolel*, 729 F.3d at 107; *see also Oracle*, 276 F. Supp. 3d at 29 ("To demonstrate arbitral misconduct, the challenging party must show that his *right to be heard has been grossly and totally blocked*." (quotation omitted) (emphasis in original).

has not agreed to so submit." *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996)). "The scope of an arbitrator's authority thus 'generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.'" *Id.* (quoting *Synergy Gas Co. v. Sasso*, 853 F.2d 59, 63–64 (2d Cir. 1988)). Accordingly, "in considering a section 10(a)(4) challenge, '[t]he principal question for the reviewing court is whether the arbitrator's award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free merely to dispense with its own brand of justice.'" *Id.* (quoting *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005)).

Still, "a petition brought under the FAA is 'not an occasion for de novo review of an arbitral award.'" *Scandinavian*, 668 F.3d at 71 (quoting *Wallace*, 378 F.3d at 189). The Second Circuit has "consistently accorded the narrowest of readings" to Section 10(a)(4), *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 263 (2d Cir. 2003), "in order to facilitate the purpose underlying arbitration: to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation," *ReliaStar*, 564 F.3d at 85; *see also Synergy Gas*, 853 F.2d at 63 ("[O]ur function in confirming or vacating an arbitration award is severely limited. If it were otherwise, the ostensible purpose for resort to arbitration, i.e., avoidance of litigation, would be frustrated." (quotation omitted)). "This is 'especially' true when section 10(a)(4) is invoked to challenge an award deciding 'a question which all concede to have been properly submitted in the first instance.'" *Jock*, 646 F.3d at 122 (quoting *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997)).

Accordingly, "[t]he focus of [the] inquiry . . . under section 10(a)(4) is 'whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue.*'" *Id.* (quoting *DiRussa*, 121 F.3d at 824) (emphasis in original). A challenged award will be upheld so long as "a barely colorable justification for the outcome reached by the arbitrators" is discernible. *Smarter Tools*, 57 F.4th at 378–79. "In

other words, 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'" *ReliaStar*, 564 F.3d at 86 (quoting *Misco*, 484 U.S. at 38). Under these standards, an arbitrator "may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 646 F.3d at 122.

Petitioners have failed to raise an instance of the Tribunal exceeding its powers. Petitioners take issue with the Tribunal's application of Colombian law to certain aspects of the dispute, in purported violation of the arbitration agreements' choice-of-law provisions. Petitioners also dispute the Tribunal's choice to hold a virtual hearing during the COVID-19 pandemic. Because both of those decisions drew their "essence" from the arbitration agreements, they do not support vacatur here. *ReliaStar*, 564 F.3d at 85.

### 1. The Tribunal Did Not Refuse to Apply the Agreements' Choice-of-Law Provisions

The Tribunal's application of the agreements' choice-of-law provisions did not exceed its powers. According to Petitioners, the Tribunal exceeded its powers when it "ignored the parties' express choice-of-law directives" providing for the application of Colombian law to matters relating to the Onshore Contract and New York law to matters relating to the Offshore Contract. Petitioners' Mem. at 34. In particular, Petitioners dispute the Tribunal's application of Colombian law in two decisions: first, in finding that the agreements imposed "Cost Control Commitments" on Petitioners, which Petitioners then breached, Petitioners' Mem. at 37–38; Petitioners' Reply at 9–10; and second, in finding that Petitioners' conduct rose to the level of gross negligence, such that the agreements' liability caps did not apply, Petitioners' Reply at 10–14; *see* Award ¶¶ 2108–09 (explaining that the provisions limiting liability in "[b]oth the Onshore and Offshore Contract[s]"

specify that they do not apply to "liability arising from any fraud, gross negligence, or willful misconduct committed by [Petitioners]"). Neither determination warrants vacatur.

The four relevant agreements are outlined in Section I.C.3, *supra*: the Onshore Contract, the Offshore Contract, the DRA, and the Coordination Agreement. The Onshore Contract generally applies to work performed by CB&I in Colombia, and the Offshore Contract generally applies to work performed by CB&I outside of Colombia. *See* Award ¶ 191. The Onshore Contract provides that it "and any matter relating thereto shall be governed by the laws of the Republic of Colombia," Onshore Contract TC § 82.1, and the Offshore Contract provides that it "and any matter relating thereto shall be governed by the laws of the State of New York," Offshore Contract TC § 82.1.

There is no question that, in this case, the dispute "affects both the Onshore and Offshore Agreements." Award ¶ 213; *see also, e.g.*, Petitioners' Mem. at 37. The DRA and Coordination Agreement are both relevant in such cases. The DRA provides, in language touted by Petitioners, that where a dispute "refers to two (2) or more agreements with different applicable law, the Arbitral Tribunal shall apply the applicable law of the Agreement to the part of the Dispute(s) that refers or relates to each Agreement." DRA § 4.12. However, the DRA also provides, in language that the Tribunal interpreted as "favour[ing] that only one law be applied," Award ¶ 212, that disputes implicating the Onshore and Offshore Contracts may arise because the two are "inter-related," and that "it is in the interest of the Parties that such related Disputes be resolved in a consistent manner." *Id.* at 4. Moreover, the Coordination Agreement provides that each Petitioner "undertakes not to contend, in connection with any Dispute . . . that it is not liable in respect of any Dispute . . . on the grounds that such Dispute should properly have been made under a Contract other than the one under which it is made," Coordination Agreement § 4.1.

As an initial matter, "all concede" that interpretation of the agreements' choice-of-law provisions was "properly submitted [to the Tribunal] in the first instance." *Jock*, 646 F.3d at 122

(quotation omitted); *see* Award ¶ 195 (referencing Petitioners' briefing on this issue before the Tribunal); Petitioners' Mem. at 38–39 (arguing not that the Tribunal was not empowered to reach the choice-of-law question, but rather that the Tribunal "disregarded" and "ignored" the choice-of-law provisions); Respondent's Mem. at 25 (explaining that "the parties submitted this issue [to] the Tribunal"). The parties' concession is appropriate, as "interpretation of the contract terms is within the province of the arbitrator." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 110 (2d Cir. 2019) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011)); *see Hutchinson v. Farm Fam. Cas. Ins. Co.*, 500 F. Supp. 2d 87, 91-92 (D. Conn. 2007) (denying petition for vacatur under Section 10(a)(4) based on arbitrator's disputed choice-of-law determination after finding that "the parties expected the arbitration panel to rule on the choice of law issue because it was presented to the panel"). Their concession is also significant, because when parties submit an issue to the Tribunal in the first instance, "the sole question for [the Court] is whether the arbitrators (even arguably) interpreted the parties' contract, not whether they got its meaning right or wrong." *Beijing Shougang*, 11 F.4th at 161 (quoting *Oxford Health*, 569 U.S. at 569) (quotation marks and alterations omitted). Accordingly, and "[n]otably, [the Court] *do[es] not consider whether the arbitrators correctly decided the issue*" of which law to apply under the agreements' choice-of-law provisions, *Jock*, 646 F.3d at 122 (quoting *ReliaStar*, 564 F.3d at 86) (emphasis in original), unless "the law []or the agreement categorically bar [the Tribunal] from deciding that issue," *id.* at 124. Instead, the Court "will uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached," even if that justification appears to be a "serious error." *ReliaStar*, 564 F.3d at 86 (quotation omitted); *see also Westerbeke*, 304 F.3d at 220 ("Section 10(a)(4) does not permit vacatur for legal errors.").

At least two "barely colorable justification[s] . . . can be inferred from the facts of the case," each of which precludes vacatur under Section 10(a)(4). *Smarter Tools*, 57 F.4th at 379. The Court has already previewed the first. The Tribunal acknowledged that New York law applied to certain of

the EPC Contracts, including the Offshore Contract, Award ¶ 191, and indeed applied New York

law on at least one occasion where an issue fell cleanly under such a contract, *see id.* ¶¶ 234, 2030

(applying New York law in analyzing whether, under the DRA, the Tribunal had the authority to

award indirect or consequential damages).  But as to Petitioners' breaches of the EPC Contracts, the

Tribunal found, as a factual matter, that Petitioners' breaches were comprehensive, "affect[ing] both

the Onshore and Offshore Agreements," such that they "cannot be split" and "partially attribut[ed]

to each Contract."  Award ¶¶ 213–14; *see also id.* ¶ 214 (noting that Respondent's claims were not

"divisible").[11]  That factual finding controls for purposes of the Court's review of the Award, *see, e.g.,*

*Westerbeke*, 304 F.3d at 213 (explaining that an arbitrator's factual findings are "not open to judicial

challenge" and thus courts must "accept the facts as the arbitrator found them"), and in any event is

consistent with Petitioners' briefs before the Court, which, despite Petitioners' burden of proof, do

not specify any aspect of this dispute that "relat[es] to" the Offshore Contract but does not "relat[e]

to" the Onshore Contract, Onshore Contract TC § 82.1 (providing for application of New York law

to "any matter relating to" the Offshore Contract), Offshore Contract TC § 82.1 (providing for

application of Colombia law to "any matter relating to" Onshore Contract).

　　　Having found that the dispute could not be parsed between the Onshore and Offshore

Contracts, the Tribunal analyzed, "first and foremost," Petitioners' liability under the law governing

the Onshore Contract, on which Respondent had "focuse[d] its claims."  Award ¶ 2105.  That law

was Colombian law.  Onshore Contract § 82.1.  The Tribunal found further support for the uniform

application of Colombian law in the DRA, where the parties recognized that disputes implicating the

---

[11] The Tribunal made this finding with respect to Respondent's "pre-contractual" claims, under which, among other
things, Respondent claimed that it was "induced" into executing the EPC Contracts.  *See* Award ¶ 209.  Those claims are
not at issue here because the Tribunal ruled in favor of Petitioners on those claims.  *Id.* ¶ 215.  However, the Tribunal
explained that its choice-of-law analysis in this section applied to other determinations, including the determinations that
Petitioners dispute here.  *See id.* ¶ 2105 (analyzing liability caps in the EPC Contracts, and citing to this choice-of-law
analysis to explain that "the Tribunal has previously found that [Respondent's] claims may be brought under either the
Onshore or the Offshore Contract" and that "[Petitioner] focuses its claims on the Onshore Contract").

Onshore and Offshore Contracts could arise and agreed that "it is in the interest of the Parties that such related Disputes be resolved in a consistent manner." Award ¶ 212 (quoting DRA at 4) (emphasis omitted). Moreover, the Tribunal reasoned that under the Coordination Agreement, the parties had "waived [their] right to argue that the dispute should properly have been brought under another Contract" with "another legal system." *Id.* ¶ 194 (citing Coordination Agreement § 4.1). Accordingly, the Tribunal applied Colombian law in examining Petitioners' breaches of the Cost Control Commitments, *id.* ¶ 868, and in examining whether those breaches rose to the level of "gross negligence" such that the liability caps did not apply, *id.* ¶ 2190.

In doing so, the Tribunal did not exceed its powers. The Court expresses no "opinion on the correctness of the [Tribunal's] decision," *Beijing Shougang*, 11 F.4th at 161 n.16, but is satisfied that the Tribunal's analysis provides "a barely colorable justification for the outcome reached." *ReliaStar*, 564 F.3d at 86. The Tribunal's reading of the agreements was, at a minimum, not unreasonable or "incoheren[t]," *Weiss*, 939 F.3d at 111, and, accordingly, fell "within [the Tribunal's] interpretive authority," *Beijing Shougang*, 11 F.4th at 161; *see also Yusuf Ahmed Alghanim & Sons v. Toys 'R' Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) ("This court has generally refused to second guess an arbitrator's resolution of a contract dispute."). The Tribunal's "reasoning also drew its essence from the agreement[s] to arbitrate, as indeed the arbitrators looked closely at the text of the [agreements] in arriving at their decision," *Beijing Shougang*, 11 F.4th at 161 (internal quotation marks and citation omitted); *see, e.g.*, Award ¶¶ 189–206 (explaining why, in the Tribunal's view, the language in the contracts supported application of Colombian law), "while distinguishing competing interpretations in their analysis," *Beijing Shougang*, 11 F.4th at 161; *see, e.g.*, Award ¶¶ 193–95 (rejecting Petitioners' argument based on language in the Coordination Agreement), 214 (rejecting Petitioners' argument based on language in the DRA). This alone precludes vacatur based on the Tribunal's application of Colombian law. *See Stolt-Nielsen*, 559 U.S. at 671 ("It is only when an arbitrator strays from

interpretation and application of the agreement and effectively dispenses of his own brand of industrial justice that his decision may be unenforceable." (quotation and alterations omitted)).

Still, there is another reason to find that the Tribunal did not exceed its powers. The Tribunal did not, as Petitioners contend, "ignore[] the parties' choice of [New York] law . . . entirely." Petitioners' Mem. at 39. To the contrary, the Tribunal expressly applied New York law to reach both determinations disputed by Petitioners here.[12] In concluding that Petitioners' conduct constituted gross negligence, such that the agreements' limitations on liability did not apply, Award ¶¶ 2108–09, the Tribunal conducted separate analyses under Colombian *and* New York law, *id.* ¶¶ 2083–2242 (applying Colombian law), 2243–70 (applying New York law). The Tribunal started with Colombian law because it had earlier determined that Colombian law should apply, *see supra*, but nonetheless turned to New York law "[i]n an abundance of caution," in evident recognition of the competing choice-of-law provisions in the Onshore and Offshore Contracts. *Id.* ¶ 2243; *see also id.* ¶¶ 2244–51 (analyzing both parties' briefing on New York law). The Tribunal's examination of New York law spanned 28 paragraphs, *id.* ¶¶ 2243–70, and analyzed numerous apposite cases, including a case from the New York Court of Appeals, *see id.* ¶ 2246 (applying gross-negligence standard in *Food*

---

[12] For this reason, among others, the cases on which Petitioners rely—all of which come from outside of this circuit—do not apply here. In those cases, the arbitrator provided no reference to, or analysis of, the applicable law under the arbitration agreements' choice-of-law provision. *Edstrom Indus., Inc. v. Companion Life Ins. Co.*, 516 F.3d 546, 552–53 (7th Cir. 2008) (vacating award where arbitrator did not mention or apply governing law provided in choice-of-law provision and briefed in arbitration); *Capstone Bldg. Corp. v. Mid-Atl. Mech., Inc.*, No. 2:08-CV-1157-JHH, 2008 WL 11379868, at *4 (N.D. Ala. Nov. 12, 2008) (similar, adding also that it was "evident" that the arbitrator applied the wrong governing law); *Snipes v. TitleMax of Virginia, Inc.*, 2022-NCCOA-558, ¶ 30, 285 N.C. App. 176, 187 (similar, where arbitrator explicitly applied the wrong governing law); *see also Firstman v. Credit Suisse Sec. (USA), LLC*, No. 1:19-CV-04025-CAP, 2020 WL 10456852, at *7 (N.D. Ga. Nov. 20, 2020) (finding that arbitration agreement indisputably provided for New York law, but declining to vacate award because it "d[id] not explain the reasoning behind the panel's decision," and thus "there was no possible way for the court to conclude that the panel did not apply New York law"). The Court also notes that in *Edstrom*, which Petitioners analyze at length, Petitioners' Mem. at 34–36; Petitioners' Reply at 16, there was no question that Wisconsin law applied to the entire dispute. *See* 516 F.3d at 548, 552. In this case, the parties' choice of law was not so straightforward. The applicable law required, among other things, factual determinations regarding which aspects of a dispute "related" to which contract, *see* Dkt. No. 15-2, Ex. 2 § 22.1; 15-3, Ex. 4 § 82.1, as well as the interpretation of various and arguably competing provisions in several contracts, *see generally* Award ¶¶ 189–95 (analyzing language in Onshore Contract, Offshore Contract, DRA, and Coordination Agreement).

*Pageant, Inc. v. Consol. Edison Co.*, 54 N.Y.2d 167, 172 (1981) to facts in this case.[13]  The examination

easily "satisfies the 'barely colorable justification' standard" required to defeat vacatur, *Smarter Tools*,

57 F.4th at 383, as it addresses, at length, any concern that the Tribunal should have applied New

York law to various aspects of the dispute, *see* Petitioners' Mem. at 36–39 (arguing that the Tribunal

declined to apply New York law to various, though unspecified, aspects of the dispute that related to

the Offshore Agreement).

    The Tribunal's determination that Petitioners breached the agreements' Cost Control

Commitments also referenced, and plausibly applied, New York law.  At the outset of its analysis,

the Tribunal determined that New York and Colombian law did not meaningfully differ with respect

to its interpretation of the Cost Control Commitment provisions, because Petitioners' liability

thereunder was essentially a matter of reading the contract language.  The Tribunal stated:

> As regards contractual liability, the legal framework is essentially confined to
> contractual provisions.  The only area in which the discussion on Colombian or New
> York law becomes relevant concerns the interpretation of the liability cap provisions.

*Id.* ¶ 217.  That observation, though brief, is enough to refute Petitioners' arguments that it ignored

New York law.  *See D.H. Blair*, 462 F.3d at 110 (observing that an "arbitrator's rationale for an award

need not be explained"); *Edstrom*, 516 F.3d at 552 (noting that the arbitrator "was not required" to

provide a "written . . . opinion").  Moreover, it meets the "barely colorable justification standard,"

*Smarter Tools*, 57 F.4th at 383, as indeed the Tribunal's analysis hewed closely to the language in the

agreements, *see* Award ¶¶ 216–226, 868–881; *Stolt-Nielsen*, 559 U.S. at 671 (explaining that vacatur

---

[13] Petitioners argue that the Tribunal's New York analysis "pivoted right back to Colombian law," pointing to a single paragraph within the Tribunal's New York law analysis where the Tribunal stated its view that the standards for gross negligence under Colombia and New York law were similar.  Petitioners' Reply at 14 (quoting Award ¶ 2253 ("The Tribunal is confident that its previous test for *culpa grave* under Colombian law may also serve to establish that [Petitioners] acted with gross negligence under New York law.")).  That paragraph does not refute the Tribunal's application of New York law.  The Tribunal repeatedly referenced the governing "tests used by New York courts" to determine gross negligence, Award ¶ 2254; *see, e.g., id.* ¶¶ 2257 (examining gross-negligence standard stated in *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., U.S.A., Inc.*, No. 20 CIV. 4117 (AKH), 2021 WL 149027, at *2 (S.D.N.Y. Jan. 15, 2021)), 2259 (examining gross-negligence standard *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352 (2020)), and applied the facts in this case to those tests, *see, e.g., id.* ¶¶ 2258, 2260.

under Section 10(a)(4) is only appropriate where the arbitrator "stray[ed] from interpretation and application of the agreement"); *In re MPM Silicones*, 874 F.3d 787, 795 (2d Cir. 2017) ("Under New York law, . . . a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties.").  That is true regardless of whether the Court agrees with Petitioners' objections that the Tribunal misapplied New York law.[14]  *See Westerbeke*, 304 F.3d at 220 ("Section 10(a)(4) does not permit vacatur for legal errors."); *see also Beijing Shougang*, 11 F.4th at 161 (denying vacatur, noting that "any difference in opinion is not enough to conclude that the arbitrators strayed from interpretation and application of the agreement and effectively dispensed their own brand of justice" (quotation omitted)).

For these reasons, Petitioners' petition for vacatur under Section 10(a)(4) based on the Tribunal's application of the agreements' choice-of-law provisions must be denied.

### 2.    The Tribunal's Employment of a Virtual Hearing Did Not Exceed Its Powers

The Tribunal also did not exceed its authority by ordering a virtual hearing.  As before, Petitioners disagree with the Tribunal's conclusion that the DRA and ICC Rules permitted a virtual hearing, *see generally* Petitioners' Mem. at 39–44, but because that determination was "properly

---

[14] The parties dispute various issues of New York gross-negligence law, including whether, in concluding that Petitioners had a Heightened Diligence Obligation under the Project Execution Plan, the Tribunal improperly inferred a fiduciary duty from a contract in violation of New York law, Petitioners' Reply at 9–10 (arguing that New York law permits the creation of a fiduciary relationship from a contract negotiated at arms' length only in "extraordinary circumstances" (quoting *Asian Vegetable Rsch. and Development Ctr. v. Inst. of Intern. Educ.*, 944 F. Supp. 1169, 1179 (S.D.N.Y. 1996))); Respondent's Reply at 12–13 (arguing that contract counterparties can create fiduciary relationships by "specify[ing] for them in the contract" (quoting *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 164 (1993))), and whether the Tribunal improperly considered "the extent of the harm suffered" in assessing gross negligence, Petitioners' Reply at 13 (citing *American Tel. & Tel. Co. v. City of N.Y*, 83 F.3d 549, 556 (2d Cir. 1996) ("The district court's holding misapplies the applicable gross negligence standard by focusing . . . on the fact that NYT caused a harm to the City that was gross in magnitude.")); Respondent's Reply at 14 (citing *Internationale Nederlanden (U.S.) Cap. Corp. v. Bankers Tr. Co.*, 261 A.D.2d 117, 122 (N.Y. App. Div. 1999) ("Failure to keep accurate records has been considered evidence of gross negligence where the plaintiff relied on the defendant to protect its property interests and the defendant was aware that significant losses could result from inaccurate records.")).  As before, the Court takes no position on the "correctness" of the Tribunal's application of New York law in interpreting the Cost Control Commitment provisions.  *Beijing Shougang*, 11 F.4th at 161 n.16; *accord Jock*, 646 F.3d at 124 ("[I]t is not for the district court to decide whether the arbitrator 'got it right' when the question has been properly submitted to the arbitrator and neither the law nor the agreement categorically bar her from deciding that issue.").

submitted" to the Tribunal "in the first instance," *Jock*, 646 F.3d at 122 (quotation omitted); *see* Dkt.

Nos. 39-27 (Respondent's brief before Tribunal in support of virtual Hearing), 39-28 (Petitioners'

brief before Tribunal in opposition to virtual Hearing), 39-29 (Tribunal's ruling on virtual Hearing

after briefing), the "sole question" for the Court is whether the Tribunal "even arguably[] interpreted

the parties' contract, not whether [it] got its meaning right or wrong," *Beijing Shougang*, 11 F.4th at

161 (quotation and alterations omitted).  The Tribunal's order providing for a virtual hearing meets

this standard because the Tribunal's "reasoning . . . drew 'its essence from the agreement to

arbitrate'"—in this case, the DRA.  *Beijing Shougang*, 11 F.4th at 161 (quoting *ReliaStar*, 564 F.3d at

85); *see* Petitioners' Mem. at 39–44.  The Tribunal's virtual-hearing order included 57 paragraphs of

analysis that "looked closely at the text" of the DRA, *id.*; Steinglein Decl., Ex. 24 ¶¶ 42, 56–71

(analyzing text of DRA and "institutional rules incorporated in the DRA" to "assess whether it is

empowered to order that, absent consent of one of the Parties, . . . the hearing be held virtually by

video conference"), and the governing ICC rules, Steinglein Decl., Ex. 24 ¶¶ 43–51, "while

distinguishing competing interpretations in [its] analysis," *Beijing Shougang*, 11 F.4th at 161; *see, e.g.*,

Steinglein Decl., Ex. 24 ¶¶ 31–38, 60–65 (summarizing and rejecting Petitioners' arguments).  The

Tribunal's decision to order a virtual hearing therefore does not support vacatur, as "even if [the

Court] would not necessarily reach the same interpretation, any difference of opinion is not enough

to conclude that the arbitrators 'strayed from interpretation and application of the agreement and

effectively dispensed of their own brand of justice.'"  *Beijing Shougang*, 11 F.4th at 161 (quoting *Stolt-*

*Nielsen*, 559 U.S. at 671) (alterations omitted).

### C.    The Tribunal did not Manifestly Disregard the Law

Finally, none of the Tribunal's decisions manifestly disregarded the law.  "[A] litigant seeking

to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden,

as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances

where some egregious impropriety on the part of the arbitrator is apparent." *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625–26 (2d Cir. 2021) (quoting *T.Co Metals*, 592 F.3d at 339). As with arguments that a Tribunal exceeded its powers, an award will be upheld against a challenge that it manifestly disregarded the law "so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'" *Id.* (quoting *Schwartz*, 665 F.3d at 452). "Vacatur is only warranted, by contrast, when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Weiss*, 939 F.3d at 109.

"The two-prong test for ascertaining whether an arbitrator has manifestly disregarded the law has both an objective and a subjective component." *Westerbeke*, 304 F.3d at 209. The subjective component requires petitioners to show that "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether." *Wallace*, 378 F.3d at 189 (quoting *Banco de Seguros*, 344 F.3d at 263). The objective component requires a showing that the disregarded legal principle "was well defined, explicit, and clearly applicable to the case." *Banco de Seguros*, 344 F.3d at 263. In assessing these components, "[a] federal court may not conduct a reassessment of the evidentiary record," except "for the purpose of discerning whether a colorable basis exists for the panel's award." *Wallace*, 378 F.3d at 193. "Only this approach to the evidentiary record is consistent with the 'great deference' which must be paid to arbitral panels by federal courts." *Id.* (quoting *DiRussa*, 121 F.3d at 821).

The court's review, so limited, does not find that the Tribunal manifestly disregarded the law. Petitioners argue that the Tribunal manifestly disregarded the law on four occasions, many of which overlap with Petitioner's arguments that the Tribunal exceeded its powers.[15] On none of

---

[15] In their reply brief, Petitioners add an argument that the Tribunal's application of the agreements' choice-of-law provisions not only exceeded its powers, but also manifestly disregarded the law. Petitioners' Reply at 18–20. The Court has already found, in analyzing the prior argument, that there is a "barely colorable justification" for the Tribunal's

those occasions did the Tribunal "stray[] from interpretation and application of the agreement."
*Weiss*, 939 F.3d at 109. Accordingly, they do not support vacatur of the Award.

        **1.**      **The Tribunal did not Disregard the Cost-Reimbursable Nature of the Agreements**

      Petitioners' first argument fails because it would require the Court to second-guess the Tribunal's findings of fact, "which federal courts may not review even for manifest disregard." *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 98 (2d Cir. 2008), *rev'd on other grounds*, *Stolt-Nielsen*, 559 U.S. 662. Petitioners argue that the Tribunal "unilaterally re-wrote the contract" by employing a methodology to calculate their liability for breach of the EPC Contracts that is generally "used for lump sum contracts" rather than cost-reimbursable contracts like those at issue here. Petitioners' Mem. at 47. Petitioners contend that the Tribunal, having found that Petitioners breached a cost-reimbursable contract, should have used an "invoice-by-invoice" method instead. *Id.* at 46. Petitioners made the same argument before the Tribunal, Award ¶ 957, but the Tribunal found that an analysis of each of Petitioners' invoices "was not . . . feasible," as "the total number of invoices issued nears 20,000," the review of which would be "a herculean task, from which, most tellingly, CB&I and its numerous experts have shied away," *id.* ¶ 959.

      Accordingly, the Tribunal adopted what it admitted was an "inherently less accurate" approach. *Id.* ¶ 958. The Tribunal first determined, after a lengthy analysis, a benchmark for what the Project would reasonably have cost. *Id.* ¶¶ 965–83. It ultimately settled on a $3.971 billion estimate that Petitioners had previously submitted to Respondent. *Id.* ¶ 984. The Tribunal then identified, after another lengthy analysis, $1.092 billion in "excluded costs" for which Petitioners

---

application of the choice-of-law provisions. *See supra* Part IV.B.1. As discussed, that finding also defeats Petitioners' argument that the Tribunal's application manifestly disregarded the law. *See Seneca Nation*, 988 F.3d at 625–26 (applying standard to manifest-disregard arguments); *Jock*, 646 F.3d at 122 (applying standard to exceeding-powers arguments); *see also T.Co Metals*, 592 F.3d at 340 (explaining that "manifest disregard [is] a judicial gloss on the specific grounds for vacatur of arbitration awards under 9 U.S.C. § 10" (quotation omitted)).

should not be liable. *Id.* ¶¶ 1013–1354. Finally, it subtracted those figures from the $5.908 billion Respondent paid for the Project, *id.* ¶¶ 1351–53, and arrived at an award of $845.4 million for Petitioner's breaches of the Cost Control Commitments, *id.* ¶ 2078. Petitioners argue that the Tribunal's use of a "fixed price, 'cost benchmark'" to calculate Respondent's damages "flouted . . . the plain meaning of the parties' chosen contract terms," which calculated the contract price on a cost-reimbursable basis. Petitioners' Reply at 28; *see also id.* at 25 (citing Award ¶ 433 (recognizing that "[t]he EPC Agreement, as it is cost-reimbursable, does not set a Contract Price," and quoting provision stating that "this Agreement is of an indeterminate value")).

Petitioners' argument is not a basis for vacatur. Their dispute, ultimately, is with the Tribunal's calculation of Respondent's damages for breach of the agreements. However, "[t]he manner of computing damages is for the arbitrator and not for the courts." *Forall USA, Inc. v. Sarah LLC*, No. 21 CIV. 2721 (VM), 2021 WL 3604758, at *2 (S.D.N.Y. Aug. 12, 2021) (quoting *Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama, S. A.*, 312 F.2d 299, 300 (2d Cir. 1963)) (alterations omitted). An arbitral award cannot be vacated based on such decisions because the Tribunal's methodology for calculating Respondent's damages is "fact-based and does not permit the Court to vacate the arbitrator's award." *Squarepoint Ops LLC v. Sesum*, No. 19 CIV. 7317 (LAP), 2020 WL 996760, at *5 (S.D.N.Y. Mar. 2, 2020) (denying vacatur based on objections to arbitrator's damages calculations).

Moreover, in any event, the Tribunal's choice of damages methodology is supported by "a barely colorable justification." *Seneca Nation*, 988 F.3d at 628. The Tribunal's determination that an invoice-by-invoice analysis was infeasible was a reasonable one, *see Beijing Shougang*, 11 F.4th at 161 (denying vacatur where arbitrator's reading of contract was "reasonable"), especially given the "voluminous" number of invoices and the "exceptionally complicated" nature of the calculations, Award ¶ 959. The Tribunal's alternative methodology, too, was at least colorably well-founded, *see*

*Seneca Nation*, 988 F.3d at 628, as it was supported by a lengthy and fact-intensive analysis of Respondent's outlays and Petitioners' performance under the agreements. *Id.* ¶¶ 965–1354. And finally, despite Petitioners' arguments, the Tribunal's use of a "benchmark" to calculate damages did not manifestly ignore the "indeterminate," cost-reimbursable "value" of the agreements. Petitioners' Reply at 28 (quoting TC § 58.1.1). Having found that an analysis of each invoice was not feasible, the Tribunal employed what it determined to be the best option to calculate the indeterminate value of the contract and Respondent's accordant damages, *see* Award ¶¶ 957–59, 984, 1351–54, in full recognition that it was calculating damages under a cost-reimbursable contract, *see, e.g., id.* ¶¶ 1011 (calculating credits to Petitioners in damages award, noting that "[t]he general principle in a cost-reimbursable construction contract is that the risk that the project results in higher costs than anticipated is assumed by the owner"), 1201 (determining fault with reference to practices under cost-reimbursable contract). Indeed, the Tribunal specifically applied principles of cost-reimbursable contracts to reduce Petitioners' liability. *Id.* ¶ 1028 (determining that "[s]ince the present EPC Contract is a cost-reimbursable agreement, the Excess Costs caused by such Unpredictable Events should constitute Excluded Costs, which [Respondent] is not authorised to claw back"). The Tribunal's calculations, therefore, did not "stray[] from interpretation and application of the agreement." *Stolt-Nielsen*, 559 U.S. at 671. Accordingly, even if the Tribunal calculations were subject to judicial review, they would not warrant vacatur here.

### 2. The Tribunal did not Manifestly Disregard the Agreements' Limitations on Petitioners' Liability

Nor did the Tribunal manifestly disregard the law when it determined that the agreements' limitations on liability were inapplicable in this case. As discussed, the EPC Contracts capped Petitioners' aggregate liability at $70 million plus an additional $15.75 million for Delay Liquidated Damages, Petitioners' Mem. at 4, except where Petitioners' "liability ar[ose] from fraud, Gross Negligence, or Willful Misconduct," Award ¶ 2108. The Tribunal determined that Petitioners'

breaches of the Cost and Schedule Control Commitments rose to the level of gross negligence, or *culpa grave*, *id.* ¶¶ 2242, 2269, and, accordingly, that the agreements' "liability caps do not find application to the damages awarded for [Petitioners'] breaches of [those] Commitments," *id.* ¶ 2269; *see id.* ¶ 265 (noting compensatory damages applied to breaches of Cost Control Commitments), 1152 (noting that the agreements provided for Delay Liquidated Damages for breaches of the Schedule Control Commitments).

Petitioners argue that the Tribunals' decision manifestly disregarded the law. In particular, Petitioners take issue with the Tribunal's invocation of the doctrine of *res ipsa loquitur* in finding that Petitioners' breaches were grossly negligent. *See, e.g.*, Petitioners' Mem. at 47–49. *Res ipsa loquitur* means "the thing speaks for itself." The doctrine enables a plaintiff to establish negligence "merely from the happening of the event that caused the harm" where, among other things, "the event is of a type that ordinarily would not occur in the absence of negligence." *Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177, 180 (2d Cir. 2017). The Tribunal mentioned the doctrine in a single paragraph, Award ¶ 2219, within its 160-paragraph analysis of whether Petitioner's breaches constituted gross negligence under Colombian law, *id.* ¶¶ 2083–2242, before turning to whether the breaches constituted gross negligence under New York law, *id.* ¶¶ 2243–2270. Nonetheless, Petitioners argue that the Tribunal's mention of *res ipsa loquitur* disregarded the agreements' choice-of-law provisions requiring the application of New York law to matters relating to the Offshore Contract, Petitioners' Reply at 18–20, because under New York law, "gross negligence cannot be proven by application of the res ipsa loquitur doctrine," *id.* at 13, 19–20 (quoting *Lee v. Consol. Edison Co.*, 95 Misc. 2d 120, 127 (N.Y. Civ. Ct.) *rev'd on other grounds*, 413 N.Y.S.2d 826 (1st Dep't 1978)). Petitioners also argue that the Tribunal manifestly disregarded Colombian law, because the Tribunal's application of a thing-speaks-for-itself doctrine was a "shortcut," Petitioners' Reply at 6, 12, which led to its "failure to

point to any specific breaches to substantiate its finding of *culpa grave / gross negligence*,"
Petitioners' Mem. at 49. Neither argument supports vacatur.

To start, the Tribunal's invocation of *res ipsa loquitur* did not manifestly disregard the
agreements' choice of New York law, Petitioners' Reply at 18–20, because the Tribunal did not
purport to apply New York law when it invoked the doctrine. As discussed *supra* Part IV.B.1, the
Tribunal made independent findings that Petitioners' breaches constituted violations of Colombian
law, Award ¶¶ 2083–2242, and New York law, *id.* ¶¶ 2243–2270. The Tribunal's lone invocation of
*res ipsa loquitur* took place in its analysis of Colombian law. *Id.* ¶ 2219. So even if Petitioners are
right that the doctrine cannot support a finding of gross negligence under New York law,
Petitioners' Reply at 12, 19–20, the Tribunal did not disregard that principle because it did not hold
otherwise. Vacatur, therefore, is not warranted on this ground. *See Seneca Nation*, 988 F.3d at 626
(denying vacatur where the arbitrator did not "flout[] or disregard[]" the relevant law).

Nor did the Tribunal manifestly disregard Colombian gross-negligence law. Petitioners
argue otherwise, not because Colombian law prohibits the application of *res ipsa loquitur* to find gross
negligence, *see* Petitioners' Petitioners' Mem. at 47–49; Petitioners' Reply at 18–20, but because the
Tribunal's application of the doctrine caused it to "ignore[] the [agreements'] liability cap,"
Petitioners' Mem. at 49. Having invoked *res ipsa loquitur*, Petitioners argue, the Tribunal contented
itself to "s[ay] that the size of the cost overruns and delays spoke for themselves," Petitioners' Reply
at 12, rather than "point[ing] to any specific breaches on the part of [Petitioners] to substantiate its
finding of *culpa grave / gross negligence*," Petitioners' Mem. at 47. This argument mischaracterizes
the Award, as is made plain from the single paragraph where *res ipsa loquitur* is mentioned:

> *Res ipsa loquitur*: cost overruns amounting to more than USD 800 million and achieving
> Mechanical Completion two years after the guaranteed date to do so, with a year's time
> of solely-caused delays, can only be interpreted as the result of a reckless disregard for
> controlling costs and schedule. *There is ample evidence to prove this averment*:

Award ¶ 2219 (emphasis added).  The Tribunal, indeed, went on to provide what it considered to be "ample evidence" of Petitioners' recklessness.[16]  *Id.* ¶¶ 2220–30.  Among other things, the Tribunal quoted statements from three witnesses, including Petitioners' "highest officer on the Project," as well as Petitioners' "contemporaneous communications from 2013."  *Id.* ¶ 2220–24.

The Tribunal's application of Colombian law does not warrant vacatur.  "Under the manifest disregard standard, . . . the governing law must clearly apply to the facts of the case, *as those facts have been determined by the arbitrator*."  *Westerbeke*, 304 F.3d at 213 (emphasis in original) (reversing vacatur predicated on district court's finding, after an "independent examination of the contract language," that contract was a preliminary agreement).  The Tribunal stated, in a single paragraph, that Petitioners' gross negligence "speaks for itself."  *See* Award ¶ 2219.  But it also provided substantial factual findings in support of that conclusion, *id.* ¶¶ 2180–2232, even though it was not required to do so, *D.H. Blair*, 462 F.3d at 110.  The Court finds no basis, therefore, to find that the Tribunal "ignored the liability cap agreed to between the parties" and instead "dispensed its own brand of industrial justice."  Petitioners' Mem. at 49; *see, e.g.*, *Seneca Nation*, 988 F.3d at 626–27 ("[A]n arbitrator cannot be faulted for 'manifest disregard' unless it has 'willfully flouted the governing law.'").

### 3.    The Tribunal did not Disregard the Principle Against Double-Recovery

Contrary to Petitioners' arguments, the Tribunal did not disregard—let alone manifestly disregard—the principle under New York and Colombian law that "[a] plaintiff may not recover

---

[16] After analyzing various Colombian authorities, the Tribunal identified three essential elements of gross negligence under Colombian law:  "[t]he significance of the obligation that was breached," "[t]he magnitude of the damage caused by the breach," and "[t]he attitude shown by the party in breach towards the foreseeable damage."  Award ¶ 2178.  Petitioners do not dispute this conclusion.  *See* Petitioners' Mem. at 47–48 (listing, without disputing, these elements).  The Tribunal mentioned *res ipsa loquitur* in analyzing the third element.  Award ¶¶ 2216, 2219.  Petitioners also briefly argue that the Tribunal's findings as to the first two elements were "conclusory," *id.* at 48, but as with the third element, the Tribunal supported its conclusions with evidence and analysis.  *See* Award ¶¶ 2181–90 ("significance" element); 2191–2215 ("magnitude element").

twice for harm it suffered once."  Petitioners' Reply at 20–21 (collecting New York and Colombian authorities).  In their opposition to Respondents' cross-petition to confirm the Award,[17] Petitioners argue that the Award must be vacated because it awarded Respondent "liquidated damages for the delay in the Project's completion" and "recouped actual damages for that same delay," *id.* at 21, even though Petitioners "briefed this point, so the Tribunal knew it well," *id.* (citing Dkt. Nos. 51-16 (Petitioners' Exhaustive Statement of Claim), 51-17 (Petitioners' Post-Hearing Submission)). Specifically, Petitioners argue that the Tribunal awarded compensatory damages for two types of delay-related EPC costs—"Labor Escalation costs" and "EPC Prolongation costs"—and awarded liquidated damages for those same costs under the agreements' "Delay Liquidated Damages" provisions.  *Id.* at 21–23.

Petitioners' arguments are unavailing.  The Court agrees that, at least under New York law, parties should not be awarded actual and liquidated damages for the same harm.  *See, e.g.*, *GFI Brokers, LLC v. Santana*, No. 06 CIV. 3988 (GEL), 2008 WL 3166972, at *11 (S.D.N.Y. Aug. 6, 2008) (Lynch, J.) ("A liquidated damages provision provides an agreement's 'exclusive remedy' in the sense that such a provision 'precludes any recovery of actual damages.'" (quoting *Federal Realty Ltd. Partnership v. Choices Women's Medical Center, Inc.*, 735 N.Y.S.2d 159, 161 (2d Dep't 2001)).  But Petitioners have not demonstrated that the Award made such an error.  Petitioners' brief provides plenty of evidence that the Tribunal awarded actual damages for Respondent's Labor Escalation and EPC Prolongation costs, Petitioners' Reply at 21–22, but it provides no evidence that the Tribunal also awarded liquidated damages for those costs, *see id.* at 21.  That is consistent with the Award,

---

[17] Petitioners raise this and other arguments for the first time in their second brief to the Court, which is both a "reply memorandum in support of [their] petition to vacate" and an "opposition to [Respondent's] cross-petition to confirm." Dkt. No. 52.  Respondent argues that these new arguments are waived because "Petitioners raise this request for the first time in their reply brief."  Respondent's Reply at 15.  However, the cases Respondent relies on address new arguments raised in standalone reply briefs.  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006); *LTF Constr. Co. v. Cento Sols. Inc.*, No. 20-CV-4097 (LAP), 2020 WL 7211236, at *6 (S.D.N.Y. Dec. 7, 2020).  Because Petitioners' reply brief is also an opposition brief, where new arguments are permitted, the Court does not hold that Petitioners' new arguments are waived.

which recognized, and accounted for, the exact double-recovery problem Petitioners raise here.[18]  In calculating Delay Liquidated Damages under the agreements, the Award explained:

> [Respondent's] delay-related claims . . . amount[] to USD 1,189.15 million, comprising claims for EPC Labor Escalation (USD 42.68 million), EPC Prolongation (USD 688.76 million), Owner's Delay Costs (USD 165.35 million), PCS Delay Costs (USD 109.88 million), [and] Cost of Capital on Improper Costs (USD 182.48 million) . . . *Some of these claims—EPC labour escalation and EPC prolongation—have already been addressed in the improper EPC costs claim and cannot be scrutinised again to avoid double-recovery.*  This leaves claims for Owner's delay costs . . . and claims for improper PCS delay costs.

Award ¶¶ 1530 n. 1619, 1531 (emphasis added).  The Tribunal ultimately awarded $152.75 million in liquidated damages for Respondent's "Owner's delay costs," *id.* ¶ 1725, and dismissed Respondent's claim for "improper PCS delay costs" under the DRA's prohibition on "indirect or consequential damages," *see id.* ¶¶ 229, 2425–26; *see also* DRA § 4.13.  The Tribunal awarded no liquidated damages for Respondent's "Labor Escalation" or "EPC Prolongation" costs, having already awarded actual damages for those harms, *see* Award ¶¶ 229, 2429 & n.2316, 2430–2440;[19] *see also id.* ¶ 1531 (excluding "EPC labour escalation and EPC prolongation" costs from liquidated damages analysis "to avoid double-recovery").  Yet those are precisely the categories of damages which Petitioners argue yield actual *and* liquidated damages.  Petitioners' Reply at 22.

In short, Petitioners have not provided, and the Court has not found, any evidence that the Tribunal awarded Respondent a "double recovery" for its Labor Escalation and EPC Prolongation costs.  *Id.* at 20.  The Award suggests the opposite, as it expressly excludes those costs from its calculation of liquidated damages to avoid double recovery.  Award ¶ 1531.  Having found no basis

---

[18] Petitioners request, as an alternative to vacatur, that the Court modify the Award to reduce it by $321.76 million, which Petitioners calculate as the amount of duplicative damages for the Labor Escalation and EPC Prolongation costs. Regardless of the accuracy of Petitioners' calculations, their request for modification is denied for the same reasons that Petitioners' request for vacatur is denied.  Petitioners have not established that the damages award was duplicative, let alone that it was duplicative in manifest disregard of the law.

[19] The Tribunal specified that Labor Escalation and EPC Prolongation costs were part of its award of $845.4 million in actual damages for Respondent's EPC costs, *see* Award ¶¶ 229.2, 2429 & n.2316, but the Tribunal did not specify what portion of the $845.4 million was attributable to those costs, as opposed to the twenty-two other costs that comprised Respondent's EPC-Cost damages, *see id.*

to conclude that the Tribunal disregarded or even misapplied that legal principle, the Court will not vacate the Award on these grounds. *See, e.g.*, *Seneca Nation*, 988 F.3d at 626 (denying vacatur because the arbitral panel, "far from flouting or disregarding [an applicable statute], the arbitral panel openly discussed and applied it").

### D.    Reficar's Application for Confirmation of the Award is Granted

Reficar's cross-petition for confirmation of the Award is granted. Where, as here, a party requests confirmation of an arbitral award within three years of its entry, the FAA requires that the court "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [Panama] Convention." 9 U.S.C. § 302 (incorporating 9 U.S.C. § 207); *accord, e.g.*, *Corporación Mexicana*, 962 F. Supp. 2d at 661. The question in this case was whether the Panama Convention's provisions permitting vacatur under domestic law applied. *See* Petition at 2–4 (raising objections exclusively under the FAA); *Scandinavian*, 668 F.3d at 71; *Corporación Mexicana*, 962 F. Supp. 2d at 655 n.18. Because they do not, Respondent's cross-petition for confirmation of the Award is confirmed. *See Pemex*, 832 F.3d at 105–06; *see also L'Objet, LLC v. Limited*, No. 11-CV-3856-LBS, 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011) ("Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter.").

## V.    CONCLUSION

For the foregoing reasons, Petitioners' motion to vacate the Award is DENIED and Respondent's cross-petition to confirm the Award is GRANTED. The Clerk of Court is directed to enter judgment in favor of Respondent Refinera de Cartagena S.A.S. and to close this case.

SO ORDERED.

Dated: January 10, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge